**No. 25-158**
**Consolidated with Nos. 25-572 and 25-573**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

ALASKA COMMUNITY ACTION ON TOXICS, et al.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
and LEE ZELDIN, in his official capacity as
Administrator of the United States Environmental Protection Agency,

*Respondents*.

---

On Petitions for Review of a Final Agency Action of the
United States Environmental Protection Agency
89 Fed. Reg. 102,773 (December 18, 2024)

---

# PETITIONERS' ADDENDUM OF DECLARATIONS

---

October 17, 2025

Tosh Sagar
Earthjustice
1001 G St NW
Suite 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org

Michael Youhana
Earthjustice
48 Wall St., 15th Floor
New York, NY 10005
(212) 284-8033
myouhana@earthjustice.org

*Counsel for Alaska Community Action on Toxics*

Samantha Liskow
Environmental Defense Fund
257 Park Ave S
New York, NY 10010
(212) 616-1247
sliskow@edf.org

*Counsel for Environmental Defense Fund*

# TABLE OF CONTENTS

**Page**

DECLARATION OF JANICE ANGLIN
Environmental Defense Fund ....................DEC001

DECLARATION OF ROBERT DEFERRANTE
Environmental Defense Fund ....................DEC005

DECLARATION OF DR. MARIA DOA
Environmental Defense Fund ....................DEC009

DECLARATION OF JASMINE JEMEWOUK
Alaska Community Action on Toxics ....................DEC040

DECLARATION OF PAMELA MILLER
Alaska Community Action on Toxics ....................DEC043

DECLARATION OF RICHARD VULTAGGIO
Environmental Defense Fund ....................DEC061

DECLARATION OF VIOLA WAGHIYI
Alaska Community Action on Toxics ....................DEC064

# DECLARATION OF JANICE ANGLIN
# IN SUPPORT OF PETITIONERS' OPENING BRIEF

I, Janice Anglin, declare as follows:

1. My name is Janice Anglin, and I live in Endicott, New York. My husband I lived here in the same house for over 40 years, where we raised our three children. Since recently losing my husband, I live here with my King Charles spaniel.

2. I have retired from my career as a reading specialist, and hope to volunteer in the schools soon. I spend free time with my children and five grandchildren, who come to visit as often as possible. One of my children still lives in Endicott. I am active, and play tennis outside when I can.

3. I am interested in environmental issues, particularly as they pertain to toxic substances, and that interest has also led me to a deep interest in nutrition. I have been a member of Environmental Defense Fund (EDF) for over five years.

4. Here in Endicott, people have dealt with various environmental issues. For example, IBM – which was here for years – was known to have caused pollution. More recently, a company from New Jersey began emitting visible pollution at nighttime. Community members, including a committee at my church, spoke up and passed around information about this, and Endicott's mayor learned about these challenges and the visible emissions eventually stopped.

5. I have been concerned for many years about drinking water quality and toxicity. I installed a filtration system for my whole house, and have given my children water filters to use instead of drinking tap water. I have done research to try to determine what contaminants – including carcinogens – are in Endicott's town water, along with doing research for my friends' areas, but have not been sure that I've gotten full information about what is in these water systems.

6. Concern about my children's health was heightened when my son began exhibiting symptoms of leukemia many years ago. After he was finally diagnosed, he had to undergo many difficult treatments, including a bone marrow transplant. He still has side effects from his treatments.

7. I have recently been made aware of the problems of persistent, bioaccumulative, toxic ("PBT") chemicals and about the fact that EPA has issued a regulation that does not protect people from new PBTs that companies make. I have also learned of a facility near me in Endicott, on Wayne Street, which appears to go by the name of Chrysta-Lyn Chemical Company, and the fact that this company has asked EPA to be able to make new types of PBT chemicals without going through a standard review process. I have also learned that, based on the limited information available to the public, these chemicals can cause health effects for people exposed to them and at least one of them can be toxic to aquatic life.

8. This company is a mile from my house. I am worried that the chemicals enter my drinking water. Even though I have a filtration system, I do not know if it is able to filter these particular chemicals out. I am worried about serious health harms and illness from the PBT chemicals to me, my family, and future family members, including to my son who is already dealing with leukemia.

9. I am concerned about the possible impact of these toxic chemicals on the value of my home here in Endicott.

10. I also understand that I may be exposed to other PBTs from other facilities in town or from products in my home, which could make the effects from PBTs from the facility on Wayne Street worse for me and my family.

11. I understand that the regulation EPA issued last year, unless it is fixed, will lead to companies making unsafe chemicals because EPA will not fully ensure their safety. Instead, the regulation should be changed, and EPA should not allow new PBTs to be approved unless it fully reviews the chemicals and makes sure they will not harm my community.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 13 October, in 2025 in Endicott, New York.

Janice Anglin

Janice Anglin

# DECLARATION OF ROBERT DEFERRANTE IN SUPPORT OF PETITIONERS' OPENING BRIEF

I, Robert Deferrante, declare as follows:

1. My name is Robert Deferrante, and I live in Endicott, New York. I am retired from my career, and I enjoy spending some of my free time now driving a school bus. I also stay educated about environmental issues, and support environmental work.

2. For example, I support Environmental Defense Fund (EDF), because I feel it is an effective organization that does a variety of activities while keeping their overhead low. I have been a contributing member of EDF for 28 years, and have gotten involved with various EDF campaigns and calls to action.

3. I have been concerned about harms to the environment for decades, since I was a child. My father was a staunch environmentalist who also supported work in defense of the environment. He raised his kids to care about the environment as well.

4. For many years, I have been focused on pollution and its harm to people. For example, when I lived in Los Angeles, I learned of abandoned, improperly capped oil wells in areas of lower socioeconomic status. I was concerned about both the environmental and justice and safety issues of that issue, and got involved in calls to action like petitioning to clean up these areas.

5. Though my involvement with EDF, I have learned about issues of toxic chemicals in this country.

6. I have also been made aware of the problems of persistent, bioaccumulative, toxic ("PBT") chemicals and about the fact that EPA has issued a regulation that does not protect people from new PBTs that companies make.

7. I have also been made aware of a facility near me in Endicott, which appears to go by the name of Chrysta-Lyn Chemical Company, and the fact that this company has made PBTs before, and that they did not undergo a full review by EPA before they were made. I have also been made aware that, based on the limited information available to the public, these chemicals can cause health effects for people exposed to them and at least one of them can be toxic to aquatic life.

8. This company is located in walking distance from my house. I was disturbed to learn these facts, and I am concerned that these - and other PBT chemicals that this company may make in the future without a full review - will harm my health and the surrounding environment, including the river that I live two blocks from, are not fully understood. Since moving to Endicott, I go to the river about five days a week, and often take my dog on walks there. I also bike on the Two Rivers Greenway path.

9. I also understand that I may in addition to environmental exposure to the PBTs being produced at the local facility, I may be exposed to other PBTs, like through flame retardant chemicals in products in my home, and that harms from PBTS from the facility could be compounded by the harms through my daily exposures from these other sources.

10. I have two daughters. One daughter lives less than four miles away from me here in Endicott, and another goes to college in Philadelphia and comes back to visit often. I am concerned about their exposures and harm, as well as to any family – including children – they will have one day. In short, I am worried about serious health harms and illness from the PBT chemicals to me, my family, and future family members.

11. I understand that the regulation EPA issued last year, unless it is fixed, will lead to the making and using of unsafe chemicals because EPA will not fully ensure their safety. Instead, the regulation should be changed, and EPA should not allow new PBTs to be approved unless it fully reviews the chemicals and makes sure they will not harm communities like Endicott.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 16 **October**, in 2025 in UNION, New York.

Robert Deferrante

# DECLARATION OF MARIA DOA

I, Maria J. Doa, declare and state as follows:

1. I am the Senior Director, Chemicals Policy, at the Environmental Defense Fund. I hold a Bachelor of Science in chemistry and a Ph.D. in organic chemistry. Before joining Environmental Defense Fund, I worked at the U.S. Environmental Protection Agency ("EPA"), where for twenty-two years I held various leadership positions focused on the regulation of toxic chemicals and the management of the application of scientific research and data to regulatory decisions. A copy of my CV is attached as **Exhibit 1**.

2. The Environmental Defense Fund is a non-profit organization that works to protect the public from toxic chemicals, including chemicals that are reviewed and regulated under the Toxic Substances Control Act (TSCA).

## Personal Experience at EPA and in the TSCA New Chemicals Program

3. Before joining the Environmental Defense Fund in November 2021, I held leadership positions at EPA, most recently as the director of the Science Policy Division in EPA's Office of Research and Development. The Science Policy Division coordinates scientific advice on regulatory activities and coordinates science and technology issues, such as public access to data, across the Agency.

4. Before I joined the Office of Research and Development in 2018, I served for seven years as Director of the Chemical Control Division in the Office of Chemical Safety and Pollution Prevention. The Chemical Control Division was responsible for the development and implementation of regulations and programs for the testing, data development and collection, and risk management functions for most industrial, commercial, and consumer chemicals subject to TSCA.

5. As part of my role as the Director of the Chemical Control Division, I led the TSCA risk management programs for new chemicals, which is intended to ensure that these chemicals are appropriately regulated before they enter the marketplace and cause harm to humans and the environment. This included managing the review of premanufacture notices (PMNs); exemption applications including low volume exemptions (LVE) and low releases and low exposures exemptions (LoREX); significant new use notices; and the development of any regulation of the new chemicals including through TSCA section 5(e) orders.[1] I

[1] 15 U.S.C. § 2604(e). One outcome of EPA's review of a premanufacture notice for a new chemical substance or a significant new use is a TSCA section 5(e) order. Most TSCA section 5(e) orders issued by EPA are Consent Orders that are negotiated with the submitter of the notification. EPA must issue an order when the Agency determines the substance may pose an unreasonable risk to health or the environment, there is insufficient information to allow the Agency to make a reasoned evaluation of the health and environmental effects of the new chemical substance or significant new use or the chemical substance is or will be produced in substantial quantities and will either enter the environment in substantial quantities or there may be significant or substantial human exposure to the

also led the development of significant new use rules[2] and regulations that apply to the review of new chemicals. In my time in this role, the program reviewed thousands of new chemicals. I directly made decisions for a substantial sub-set of those, including the PMNs regulated by TSCA section 5(e) orders and certain LVE submissions.

6. I worked closely with the Risk Assessment Division, which developed the risk assessments that were the basis for determining whether the risks presented by a new chemical were unreasonable. These risk assessments consisted of an evaluation of the toxicity and “environmental fate” (persistence, bioaccumulation, environmental transport) of the chemical and the ways people and the environment could be exposed to them. These risk assessments were also the basis for determining the most effective risk management requirement(s) to mitigate the unreasonable risks presented by the chemical.

substance. A section 5(e) order prohibits or limits the chemical's manufacture, processing, distribution, or use to protect against that risk. The orders can include requirements for testing, protective equipment, hazard communication, restrictions on releases to air, water and/or land, and recordkeeping.

[2] TSCA section 5(a)(2) significant new use rules can be used to require notice to EPA before a chemical substance is used in a way that changes the type or form of exposure to humans or the environment to a chemical substance, increases the magnitude and duration of exposure of humans or the environment to a chemical substance, increases the quantity of the chemical substance or changes the manner and methods of manufacturing, processing, distribution in commerce and disposal of a chemical.

**The Problem of PBT Chemicals**

7. Persistent, bioaccumulative, and toxic chemicals ("PBT") are an especially pernicious category of chemicals. PBTs are defined by their: (1) persistence, meaning the length of time the chemical can exist in the environment before being destroyed (i.e., transformed) by natural processes; (2) potential for bioaccumulation, meaning the process by which organisms may accumulate certain chemicals in their bodies. The term refers to both uptake of chemicals from water and from ingested food and sediment residues; and (3) toxicity, meaning the deleterious or adverse biological effects elicited by a chemical, physical, or biological agent. Persistent chemicals can take months to years to break down in the environment, and so even small, repeat releases of such chemicals will build up in the environment, increasing their potential exposure to humans and wildlife.

10. Even small releases of these toxic chemicals that can remain in the environment for a significant amount of time and can bioaccumulate have the potential to present greater risks to human health and the environment than toxic chemicals that do not. In other words, for any given level of release to the environment, a toxic chemical that is a PBT is far riskier than a chemical of equivalent toxicity due to PBTs' persistence and potential for bioaccumulation. Thus, even relatively small amounts of PBTs present outsized risks. PBT chemicals may be released to the environment at any point throughout their

lifecycle, i.e. when they are manufactured, distributed in commerce, processed into other products, or used. And once a product containing a PBT chemical reaches the end of its useful life, it must be disposed of—for example, in a landfill or incinerator—at which point there is a high likelihood the PBT chemical will be released. This is the case even for products where the PBT is "enclosed," like a capacitor containing a PBT chemical. During use or treatment and disposal at the end of its life, the PBT will likely come out of the product. In other words, once manufactured, the release of a PBT chemical at some point in its lifecycle is a near certainty. Once a PBT chemical is released into the environment, people and other organisms are likely to be exposed. Toxic chemicals that are both persistent and bioaccumulative also have the potential to pose significant exposures to humans and ecosystems over a longer period of time, years to decades. Repeated small releases of these chemicals can build up over time, serving as a reservoir for the chemical and a source of ongoing exposure to plants, animals and humans. This can impact whole ecosystems and the communities that live and depend on these areas.

11. A well-known example that illustrates this is polychlorinated biphenyls or "PCBs" in the Great Lakes. They were used in coolants, hydraulic fluids, heat transfer fluids, paints and rubber due to their stability, non-flammability and electrical insulating properties. They were also used in

"enclosed" applications such as capacitors and electrical transformers. The manufacture of these industrial chemicals was banned under TSCA in 1977,[3] but their legacy uses, including the many in so-called "enclosed systems," continued providing a source of releases. PCBs have been found throughout the Great Lakes in sediments, water, and aquatic organisms. PCBs persist in lake sediments, and almost 50 years after manufacturing stopped they are a continuing source of exposure. Human exposure to PCBs in the Great Lakes region comes from the food pathway, primarily via sport and subsistence fish (such as lake trout and walleye), which bioaccumulated these chemicals and from drinking water.

12. Toxic chemicals that persist and bioaccumulate can pose significant exposures to communities and ecosystems both near and far. They can pose risks to those that immediately surround industrial sources because the PBTs will reach those communities first. In addition, many PBTs are known to undergo regional and long-range transport and will impact communities farther away from their origin of release. Results from an EPA study of chemicals in lake fish found that PCBs as well as dioxins and furans, also PBTs, were widely distributed in lakes

[3] 15 U.S.C. § 2605(e).

and reservoirs in the lower 48 states.[4] They have also been found in the Arctic and there has been little evidence that levels there have been decreasing.[5]

13. PBT chemicals present a distinct risk to indigenous communities living in Arctic regions like Alaska. Once released into the environment, PBTs that are mobile undergo long range transport, including via a process called global distillation, also known as the "grasshopper effect," that causes them to migrate from the warmer regions where they are released, leapfrogging into polar regions, where they then accumulate over time.[6] As an example, global ocean current patterns represent a significant pathway for this long-range transport of PBTs. And once in the Arctic, the colder environment further slows the breakdown of PBT chemicals, which then accumulate over time in the Arctic environment and in

---

[4] EPA. The National Study of Chemical Residues in Lake Fish Tissue. chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.epa.gov/sites/default/files/2018-11/documents/national-study-chemical-residues-lake-fish-tissue.pdf

[5] MacDonald, RW, LA Barrie, TF Bidleman, ML Diamond, DJ Gregor, RG Semkin, et al. 2000. Contamination in the Canadian Arctic: 5 years of progress in understanding sources, occurrence and pathways. *The Science of the Total Environment* 254(2-3):93-234. PMID: 10885446.

[6] Rigét, F. A Bignert, B Braune, J Stow, S Wilson. 2010. Temporal trends of legacy POPs in Arctic biota, an update. *The Science of the Total Environment* 408:2874-2884. (available at www.amap.no/documents/download/1116).

biological organisms, including plants and animals.[7,8] These plants and animals are then consumed by indigenous populations, resulting in greater exposures to the chemical than those experienced by the general population.[9]

14. Thus, PBT chemicals can pose a heightened risk to many subpopulations, including to indigenous communities in the Arctic, communities that live near plants that make or use PBTs ("fenceline communities"), and subsistence fishers.

**Statutory and Regulatory Background**

15. Section 5 of TSCA establishes a comprehensive system of review by EPA before a new chemical can be manufactured in the United States (defined to include import into the country).[10] This system of premanufacture review is designed to ensure chemicals that may present or present an unreasonable risk are

[7] de Wit, CA. D Herzke, K Vorkamp. 2010. Brominated FRCs in the Arctic environment—trends and new candidates. *The Science of the Total Environment* 408(15):2885-2918. PMID: 19815253. (available at http://www.ncbi.nlm.nih.gov/pubmed/19815253);

[8] AMAP 2015. Summary for Policy-makers: Arctic Pollution Issues 2015. *Arctic Monitoring and Assessment Programme (AMAP)*, Oslo, Norway. 12 pp. (available at www.amap.no/documents/doc/sum-mary-for-policy-makers-arctic-pollution-issues-2015/1195).

[9] AMAP 2014. Trends in Stockholm Convention Persistent Organic Pollutants (POPs) in Arctic Air, Human media and Biota.

[10] 15 U.S.C. § 2604.

appropriately regulated before they can be commercialized and cause harm to humans and the environment. These protections are particularly important for safeguarding against the threat posed by PBT chemicals.

16. Under the standard process for premanufacture review, a chemical manufacturer must submit a premanufacture notice ("PMN") to EPA, and EPA must review the PMN to determine the risk posed by the chemical, and then based on the results of that review make a determination of whether to regulate the new chemical's manufacture.[11] EPA may "upon application and rule" exempt a new chemical or category of new chemicals from PMN review if EPA determines the terms of the exempting rule ensure new chemicals "will not present an unreasonable risk of injury," including that it will not present such risk to potentially exposed and susceptible subpopulations.[12] EPA has created four rules-based exemptions to the standard PMN process. As relevant here, EPA has maintained two rules-based exemptions to PMN review for several decades, the Low Volume Exemption (LVE) and the Low Release and Exposure Exemptions (LoREX) (collectively, "the Exemptions").[13]

---

[11] *See generally* 15 U.S.C. § 2604.

[12] 15 U.S.C. §§ 2604(h)(4), 2625(c).

[13] 40 C.F.R. § 723.50(c)(1), (c)(2).

**The Standard PMN Process**

17. As part of the PMN, the manufacturer must include information pertaining to the chemical's properties, including information on health and safety, production volume and how the chemical will be produced and used. Based on the information the company submits along with other information available to the Agency, EPA can make one of five possible determinations as to the potential risk of the new chemical:

> (i) The chemical substance presents an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(A) of the Act.
>
> (ii) Information available to EPA is insufficient to permit a reasoned evaluation of the health and the environmental effects of the relevant chemical substance, as set forth in section 5(a)(3)(B)(i) of the Act.
>
> (iii) In the absence of sufficient information to permit EPA to make such an evaluation, the chemical substance may present an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(B)(ii)(I) of the Act.
>
> (iv) The chemical substance is or will be produced in substantial quantities, and such substance either enters or may reasonably be anticipated to enter the environment in substantial quantities or there is or may be significant or substantial human exposure to the substance, as set forth in section 5(a)(3)(B)(ii)(II) of the Act.
>
> (v) The chemical substance is not likely to present an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(C) of the Act.

EPA must regulate the new chemical unless EPA determines that the new chemical "is not likely to present an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator under the conditions of use."[14] If EPA makes one of any of the four other determinations, it must regulate the chemical before it can be manufactured. These regulations may include options like further testing or limitations on the chemical's manufacture. Under TSCA, the manufacturer cannot manufacture the chemical until EPA has rendered a determination on the PMN. TSCA sets out a general timeframe of 90-180 days to complete PMN review, but EPA may take longer given the complexities of many cases. The only consequence of a longer review is that the applicant's fees are returned.[15]

18. Thus, EPA's adequate evaluation of the risks posed by new chemicals is necessary and fundamental to carrying out this system of premanufacture review and ensuring that new chemicals do not harm people or the environment. EPA cannot fulfill its mission if it does not adequately assess the risk of a new chemical. If EPA underestimates risk, it likely cannot effectively manage the risks presented by the chemical. EPA may erroneously conclude that the new chemical is not

[14] 15 U.S.C. § 2604(a)(3)(C).

[15] 15 U.S.C. § 2605(a)(4), (c).

likely to present unreasonable risk and, thus, does not need to be regulated. Or, having underestimated the true magnitude of risk, EPA is likely to issue under-protective regulations to safeguard against the new chemical's risks. This is of particular concern for PBTs because even small amounts used and released can have long-term impacts on human health and the environment.

19. Simplistically, "risk" is a function of estimated or assessed hazard and exposure. *See* 15 U.S.C. § 2605(b)(4)(F). Hazard is an assessment of the potential harms caused by the chemical and the levels at which the harms occur. And exposure is an assessment of how much of a chemical an individual (or ecological receptor like an animal or a tree) encounters. Integrated together, hazard and exposure inform how likely a harmful outcome is anticipated to occur. Persistence and bioaccumulation influence risk, because persistence may lead to higher and longer sources of exposures and bioaccumulation may lead to an increase in body burden.

20. EPA is required to use the "best available science" in assessing the risk posed by new chemicals. 15 U.S.C. § 2625(h). Consistent with the best available science mandate, an evaluation that accurately represents the risks presented by the chemical requires consideration of the type of harm(s) caused by the chemical, the toxicity level of the chemical (how much exposure to the chemical is expected to cause that harm), and a picture of the ways an individual is

exposed to the chemical and the magnitude of that exposure. This picture should include all the ways the general population, more highly exposed or susceptible subpopulations, and the environment are exposed during the manufacture, processing, distribution in commerce, use and disposal of the chemical—that is, from the sum of what is referred to in TSCA as the chemical's "conditions of use."[16] This picture must also reflect that a person may be exposed via multiple conditions of use of the chemical and through multiple pathways of exposure, including by inhalation, drinking water, and dermal contact. Finally, this picture must reflect that exposure can come from multiple environmental sources, including the air, water, and land. It is the consideration of the sum of the exposures during the lifecycle of the chemical that is the basis of an accurate determination of the types and magnitude of the risks the chemical presents.

21. Again, this is a more complicated analysis in the context of new chemicals and relevant information needed to determine the risk posed by a new chemical is likely to be lacking precisely because they are new, requiring EPA to order the development of more information about the chemical to gain an adequate picture of it.

22. EPA is also required to consider risks to potentially exposed and susceptible subpopulations, whom Congress, in 2016, specifically required EPA to

[16] 15 U.S.C. § 2602(4).

consider when assessing the risk posed by new chemicals.[17] Subpopulations such as fenceline communities or people who rely on subsistence diets are often more highly exposed than the general population. These subpopulations are often at greater risk than the general population even at the same level of exposure because they may be exposed to a chemical from multiple conditions of use of the chemical. For example, the community may be exposed to releases from one or more industrial facilities, some of which manufacture the chemical, others which process it, and still others where the chemical is disposed. Members of the community may also be additionally exposed because they work at one of the facilities and/or are exposed to the chemical in products they use at home. The number and type of potentially exposed and susceptible subpopulations will often be greater for PBTs than for non-PBTs. Subsistence and sport fishers are one example of more highly exposed subpopulations. They will be exposed to higher levels of PBT chemicals in fish and other aquatic life, given the demonstrated ability of PBTs to bioaccumulate in these species.

23. Further, fenceline communities are often more susceptible to a given new chemical because they are already exposed to multiple chemicals that are produced and released together. Some of these may cause the same harm, such as cancer, and even attack the same part of the body. For example, members of the

[17] 15 U.S.C. § 2604(a)(3).

community exposed to one of these chemicals may be more susceptible to liver cancer based on their co-exposure to similar chemicals also associated with liver cancer already released into their environment. In assessing a chemical, the failure to consider the cumulative exposures for each of the chemicals for that community would likely significantly underestimate to its members the actual risk of liver cancer.

24. Assessing the risks from PBT chemicals is more complicated given the effect of persistence and bioaccumulation on estimating exposure. This complication is compounded because the exposure models EPA uses in the TSCA New Chemicals Program are not designed for chemicals that are persistent and bioaccumulative. Rather, they are designed for a simpler screening analysis targeted to chemicals that readily degrade and have a low potential for bioaccumulation. For example, for routine releases of a chemical that readily biodegrades and is thus not persistent, the potential for exposure dissipates rapidly. Thus, the daily exposure for that chemical is directly based on the daily release. In contrast, calculating exposure from daily releases of a chemical that is persistent requires a consideration of the amount released each day plus the amount that remains from the previous day and the amount that remains from the day before that, etc. For example, consider a daily 100-pound release of a chemical with a

half-life of 3 months.[18] For each daily release of 100 pounds, after 3 months, one half—or 50 pounds—of the chemical will remain. After another 3 months, half of that—or 25 pounds—will remain. In this situation a daily release of 100 pounds of the chemical will quickly build up in the environment and the analysis of the daily exposure becomes more complicated. Compare this with a non-PBT chemical that has a half-life of 3 hours. Twenty-four hours after the release of the chemical, less than 1% of the chemical remains. Thus, conducting a rapid exposure assessment on a PBT chemical using models developed for non-PBT chemicals is inconsistent with using the best available science. This chemical-degradation differential also illustrates that for PBTs that are highly persistent and highly bioaccumulative, there is no release threshold below which exposure is safe.

25. Similarly, evaluating exposure across a PBT chemical's lifecycle can be more complicated for PBTs given that releases from uses, disposal of products, and treatment of industrial and commercial wastes containing PBTs may add to environmental levels and the levels already accumulated in humans, animals and plants, thus becoming a source for long-term exposure. Careful attention must be given to releases associated with production processes, effectiveness of

[18] A half-life of 3 months means that half of the quantity of the chemical will be destroyed (transformed) in 3 months, with half of the original quantity of the chemical remaining.

engineering controls, wastewater treatment removal efficiencies, disposal release, and more to assess these additional contributors to PBT exposures.

26. In sum, having a robust system of premanufacture review for new PBT chemicals is incredibly important and cannot effectively be done during an abbreviated exemption review.

27. Recognizing the outsized risks posed by PBT chemicals and the difficulty of assessing them, EPA officially designated new PBT chemicals as a distinct category of new chemicals for purposes of premanufacture review in 1999.[19] The 1999 PBT Policy consisted of two primary components: regulation under a TSCA section 5(e) consent order and testing requirements.[20]

28. For chemicals that EPA found were PBT chemicals, the policy provided that EPA would issue a section 5(e) order regulating the chemical and requiring testing (typically once specified production levels were reached). And for those new PBT chemicals that were "very persistent" (half-life in soil, sediment or water greater than 6 months) and "very bioaccumulative" (fish bioconcentration factor or bioaccumulation factor greater than 5000), the 1999 PBT Policy provided

---

[19] EPA. Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances; Policy Statement, 64 Fed. Reg. 60196, Nov. 4, 1999. (1999 PBT Policy)

[20] 15 U.S.C. § 2604(e).

that EPA would ban the manufacture of the chemical pending further health and safety testing.[21] In essence, EPA recognized in the 1999 PBT Policy that there is too much uncertainty regarding new PBTs to effectively safeguard the public through premanufacture review, and so established a policy that would result in: (1) the regulation of new PBTs that go through premanufacture review; and (2) the ongoing development of new test data after the premanufacture review ended so that the regulations could be strengthened if needed or for very persistent and very bioaccumulative toxic chemicals test data could be developed before commercialization to determine the extent to which it could cause harm and build up in the environment and plants, animals and people.

29. As applied to the Exemptions, when I was the director of the Chemical Control Division, from 2014 to 2017 any LVE exemption application identified as meeting the criteria of the 1999 PBT Policy was required to be raised to me for review. This procedure for review of PBT LVEs by the Chemical Control Division director was reflected in a 2017 New Chemical Program standard operating procedure. Essentially all LVE exemption applications for new PBTs were denied because they were PBTs, which meant the manufacturer would have to apply under the full PMN review, triggering the testing and regulation requirements mandated by the 1999 PBT Policy.

[21] 1999 PBT Policy at 60202.

**2024 Exemptions as Fast-Tracking PBT Approval**

30. In the 2024 rule establishing framework rules for new chemicals, EPA—for the first time—expressly authorized new PBT chemicals to be approved under expedited approval processes established by the Exemptions. The rule fast-tracks the approval of new PBTs, expressly making any new PBT eligible for the Exemptions unless EPA finds a specific new PBT has "anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms."[22] The term "potentially unreasonable exposures" is not defined and has no relationship to the 1999 PBT Policy.

31. The LVE exemption requires an applicant manufacturer to establish that its new chemical will be "manufactured in quantities of 10,000 kilograms or less per year."[23] The LoREX exemption requires an applicant manufacturer to establish that the new chemical will meet eligibility criteria establishing "low environmental release and low human exposure," including criteria pertaining to: specific groups—consumers, the general population, and workers; surface water concentrations; incinerators releases; and land and groundwater releases.[24]

[22] 40 C.F.R. § 723.50(d)(2).

[23] 40 C.F.R. § 723.50(c)(1).

[24] 40 C.F.R. § 723.50(c)(1).

32. To establish eligibility of a new chemical for approval under one of the Exemptions, a manufacturer must file a notice with EPA containing specified information.[25] And the review period for an application under the Exemptions is significantly truncated, only 30 days, as compared to the 90-180 day review period for a PMN.

33. Exemptions differ from full new chemical reviews in numerous ways, including that there are no testing provisions for exemptions. TSCA's section 5(e) — "Regulation Pending Development of Information" —provides for the development of testing in the absence of sufficient information,[26] but there is no corollary regulatory provision authorizing testing for approved LVEs. Also, unlike PMN reviews, multiple LVEs may be granted for the same chemical because multiple different companies can apply under the LVE to manufacture the same chemical. Multiple exemptions associated with a single new PBT can result in quantities of that PBT that exceed the 10,000 kilogram exemption limit for an applicant to manufacture an individual PBT under that exemption.

34. This new fast-track regulation is dangerous, because it short-cuts the standard PMN process for new PBT chemicals and is contrary to EPA's recognition in the 1999 Policy that PBTs should be subject to regulation and

[25] 40 C.F.R. § 723.50(e).

[26] 15 U.S.C. § 2604(e).

additional testing. The terms of the Exemptions do not protect against the unique risks posed by new PBT chemicals and thus do not ensure that a new PBT chemical will not present unreasonable risk.

35. It is unlikely that EPA can conduct a comprehensive release and exposure assessment for new PBTs in the expedited 30-day review period for the LVEs and LoREX exemptions. For example, multiple different companies at different times may have applied for LVEs to manufacture the same new PBT chemical. An adequate assessment of whether the new PBT chemical may present unreasonable risk, particularly to potentially exposed and susceptible subpopulations, would examine releases and exposures resulting from all of the LVE applications, if granted. But that is typically not done in the LVE analysis; indeed, the individuals within EPA responsible for reviewing a new exemption application may not be aware that other Exemption applications have previously been granted for the same PBT chemical given the speed of the process. Even when they are aware of other LVEs for the same PBT chemical, it is likely not possible to conduct such an assessment adequately within the 30-day review period. This is because of the complications of the analysis and the need to consider the potential for the impacts from the individual LVEs for the new PBT to build on each other.

36. New PBTs approved under the Exemptions will threaten health—particularly the health of subpopulations like indigenous people living in the Arctic and fenceline communities—and the environment, because the terms of the Exemptions do not sufficiently protect against their risks.

**PBT LVEs Recently Issued by EPA**

37. Based on a screening-level review of a large sample of LVE applications submitted to EPA between 2016 and 2025, it is apparent that companies regularly apply to manufacture new PBTs under the Exemptions.

38. To identify potential LVE PBTs, I worked with colleagues to develop an approach to identify PBT LVEs. We reviewed 1,458 LVEs from 2016 to 2025. Of these, 344 LVEs had non-confidential chemical identities.[27] Knowing the specific chemical identity is critical to assessing its properties. Using the identity of the chemical, we then searched EPA's CompTox Chemicals Dashboard Resource

[27] Under TSCA, a company that submits an application to manufacture a new chemical may claim that the specific chemical identify constitutes confidential business information (CBI), pursuant to 15 U.S.C. § 2613. In practice, once a submitter has claimed that the specific identity is CBI, EPA will not release the specific identity to the public, but instead will release a generic identifier. Without the specific identity, it is difficult for members of the public to gain relevant information about the new chemicals. The vast majority of manufacturers claim specific chemical identity to be CBI. For the sample we reviewed, EPA revealed the specific identity of less than 25% of the chemicals.

Hub[28] for information, including physical-chemical properties, chemical degradation (to estimate persistence), bioconcentration factors (to estimate bioaccumulation) and toxicity of the chemicals. For toxicity, we also looked at the Safety Data Sheets (SDS)[29] for the chemical or existing information developed by another government agency, e.g., the European Union Chemicals Agency. Additionally, we used EPA's EPI Suite to estimate persistence, bioaccumulation and aquatic toxicity.[30] EPI Suite is a suite of programs for screening-level estimates of physical-chemical properties and environmental fate (including chemical degradation and bioconcentration/bioaccumulation). EPI Suite also includes the ECOSAR program, which estimates ecotoxicity. EPA developed EPI Suite with Syracuse Research Corp. and routinely uses EPI Suite in its evaluation

---

[28] EPA. CompTox Chemicals Dashboard Resource Hub. https://www.epa.gov/comptox-tools/comptox-chemicals-dashboard-resource-hub. "EPA developed the CompTox Chemicals Dashboard ("Dashboard") to provide public access to chemistry, toxicity, and exposure data. This information includes chemical structures, experimental and predicted physicochemical and toxicity data, hazard and bioassay data, and additional links to relevant websites and applications."

[29] A Safety Data Sheet or SDS is a document that provides essential information about the hazards, properties, and safe handling practices for chemicals used in the workplace.

[30] EPA. EPI Suite™-Estimation Program Interface. https://www.epa.gov/tsca-screening-tools/epi-suitetm-estimation-program-interface.

of TSCA new chemicals. We then compared the estimates for persistence and bioaccumulation with the criteria for these properties in the 1999 PBT Policy.

39. We identified 30 chemicals that meet the 1999 PBT Policy persistence and bioaccumulation criteria. The 1999 PBT Policy's lowest criterion for persistence is a transformation half-life of greater than 2 months and lowest criterion for bioaccumulation is a bioconcentration factor or bioaccumulation factor greater than 1,000. For aquatic toxicity, we considered chronic toxicity values of less than 10 milligrams/liter, which is consistent with the aquatic toxicity criteria in EPA's Points to Consider When Preparing TSCA New Chemical Notifications.[31] For the human health toxicity criterion, we considered indications of "hazard endpoints," including genotoxicity, indications of systemic toxicity in any organism, identification of toxicity in SDS and/or by other government agencies, also consistent with EPA's stated criteria.[32]

40. The 30 LVEs included LVEs EPA granted to Crysta-Lyn of Endicott, NY for two chemicals. These chemicals have been characterized as causing skin

[31] EPA. Points to Consider When Preparing TSCA New Chemical Notifications. p. 19. https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/points-consider-when-preparing-tsca.

[32] Id. p. 12, "The human health score is typically based on qualitative considerations such as hazard endpoints."

sensitization and are toxic to aquatic life.[33] Further, these chemicals are similar to each other and have similar properties[34] and the cumulative exposures from both to the community and environment near the production and use of these PBT chemicals would even further increase potential risks.

41. Given the regularity with which manufacturers have applied under the Exemptions for approval to manufacture new PBTs in the recent past, it is almost certain they will continue to do so now that EPA has expressly fast-tracked their approval under these Exemptions. It is likely these reviews will be further expedited given EPA's recently announced initiative to accelerate the review of LVEs.[35]

42. These harms would be remedied if new PBTs were made ineligible for approval under the Exemptions. These new PBT chemicals would instead have

---

[33] EPA. ChemView, https://chemview.epa.gov/chemview/ Submission information for L-23-0187 (CASRN 162093-35-8) and L-23-0199 (CASRN 864666-05-7).

[34] The similarity of the chemical structures which inform their similar properties can be seen in EPA. CompTox Chemicals Dashboard Resource Hub. See https://comptox.epa.gov/dashboard/chemical/details/DTXSID401386102 for information on L-23-0199 and https://comptox.epa.gov/dashboard/chemical/details/DTXSID001387039 for information on L-23-0187.

[35] EPA. *EPA Accelerates Review of New Chemicals used in Low Volumes and Slashes Backlog of these Submissions* (Aug. 11, 2025), https://www.epa.gov/chemicals-under-tsca/epa-accelerates-review-new-chemicals-used-low-volumes-and-slashes-backlog.

to go through full review under the standard PMN process, and EPA would be required to adequately evaluate their risks and impose restrictions individually tailored to each chemical to ensure they do not present an unreasonable risk. That would safeguard EDF members and the broader public—including fenceline communities, and indigenous people living in the Arctic— from risks posed by new PBT chemicals.

**Informational Injuries**

43. Additionally, if EPA codified its 1999 PBT Policy for new PBTs in the regulations, that would benefit EDF directly, by disclosing information on new PBT chemicals that would be helpful to EDF. If the policy were codified and new PBTs made ineligible for the Exemptions, when EPA receives an application to manufacture a new PBT under an Exemption, the applicant would be required to instead submit a PMN application for the chemical. TSCA mandates that the PMN application file be made publicly available and those application files are useful to EDF. In turn, the 1999 PBT Policy envisions that EPA would either ban the production pending testing or issue a TSCA section 5(e) order requiring testing. TSCA mandates the disclosure of such test data, and EDF would utilize that test data in its research and advocacy.

44. This information would be useful to EDF in accomplishing the mission of protecting people from dangerous chemicals. Our efforts rely on EPA

disclosing information about new chemicals, as it is obligated to do under TSCA. For example, EDF submits comments on rulemakings implementing TSCA, including rules related to the new chemicals program, which requires EDF to review new chemical submissions. Additionally, information from new chemical submissions and EPA decisions on these submissions is useful in educating our members and the general public about the chemicals EPA is allowing onto the market and the restrictions EPA imposes on them. EPA sends out action alerts, publishes blog posts, and communicates through other channels to inform members and the public of whether EPA is adequately protecting them. Finally, EDF engages in advocacy work at the national, state, and local level to protect their members from potentially dangerous classes of chemicals. EPA needs information about whether EPA is adequately and lawfully implementing the system of premanufacture review to educate policy makers and effectively engage in this advocacy.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October 15, 2025.

Maria J Doa

__________________________

Maria J. Doa, Ph.D.

# EXHIBIT 1

# Maria J. Doa, Ph.D.

4223 38th Street, N.W., Washington, DC 20016
202.286.3020; mariajdoa@gmail.com


---

***Summary***

- Extensive experience in the integration of science and public policy
- Effective communicator of complex interdisciplinary scientific issues at the national and international levels
- Focus on developing risk assessment and risk management practices that consider the impacts of chemicals wholistically
- Expertise in modern risk-management practices
- Experience working with international organizations

***Employment History***

**Environmental Defense Fund, Washington, DC**

**Senior Director, Chemical Policy** November 2021 – Present

*I lead efforts to reduce exposures to toxic chemicals, primarily through health-protective implementation of the nation's primary chemical safety law – the Toxic Substances Control Act. My efforts focus on encouraging more robust, inclusive, and transparent decisions that consider the impacts chemicals can have throughout their lifecycle on communities, particularly those most at risk.*

**U.S. Environmental Protection Agency, Office of Research and Development, Washington, DC**

**Director, Science Policy Division** October 2019 – October 2021

*I led the synthesis of the Office of Research and Development's scientific support for EPA regulatory activities and coordinated cross-EPA science and technology policy issues.*

***Accomplishments***

- Led the coordination and synthesis of the Office of Research and Development's scientific contributions to the development of more than 40 significant EPA regulations and regulatory-related scientific assessments.
- Developed metrics and an information system to evaluate the impact of the Office of Research and Development's contributions to the development of EPA regulations.
- Improved the cross-EPA coordination of science and technology policy issues, such as peer review, risk assessment guidelines, and reproducibility of information.

**Senior Science Advisor** April 2018 – October 2019

*In this position, I led evaluations on the impact of EPA's Office of Research and Development's science on decision making at the national, regional, state, and local level.*

**U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, Office of Chemical Safety and Pollution Prevention, Washington, DC**

**Director, Chemical Control Division** May 2011 – April 2018

*In this position I developed and implemented incentive-based and regulatory risk management approaches to significantly reduce risks from industrial, commercial and consumer chemicals. Many actions involved complex scientific, technical and policy issues and were done under tight legislative deadlines.*

***Accomplishments***

- Improved EPA's approach on established chemicals through leadership on the prioritization of more than 1,000 candidate chemicals for risk evaluation. The prioritization methodology I developed was subsequently included by Congress as a key component in the 2016 amendments to the Toxic Substances Control Act.
- Annually, completed pre-market regulatory evaluations for 1,000 chemicals.
- Successfully led the development of the first proposed regulations in 25 years to protect the public and workers from exposures to highly toxic chemicals.
- Improved the quality, timeliness and consistency of regulations on industrial, commercial and consumer chemicals by collaboratively leading cultural change, identifying critical solutions and empowering managers and staff resulting in the elimination of a backlog of 400 chemical cases within 2 years and timely completion of 100 chemical cases annually.

- Provided leadership at the international level representing the United States environmental policies to the Organization for Economic Cooperation and Development (OECD) Working Party on Manufactured Nanomaterials, chairing international expert meetings on nanomaterials, and leading bilateral negotiations on nanomaterials with Canada and the European Union.
- Increased access to, usability of, and transparency of scientific and regulatory information on more than 15,000 chemicals and nanomaterials through the development of ChemView, a modern Web-based information system available to industry, the public, and government.

**Director, National Program Chemicals Division** July 2003 – May 2011

*I led EPA's lead paint program, resulting in major progress toward eliminating lead poisoning in children; risk-reduction programs on polychlorinated biphenyls (PCB) and mercury; and the asbestos in schools program. This work required strong scientific and policy backgrounds and involved working with a wide range of international and domestic public, industry, and government stakeholders.*

***Accomplishments***

- Created a strong community of collaboration to coordinate scientific and regulatory activities with partners across EPA, the Federal Government (including the Centers for Disease Control and Prevention, the Consumer Products Safety Commission, the National Institute of Standards and Technology (NIST), the Department of Housing and Urban Development), with states, the Environmental Council of States (ECOS), the Quicksilver Caucus, industry, and environmental, public health and community public interest groups.
- Chaired the United Nations Environment Program – World Health Organization Global Alliance to Eliminate Lead in Paints and the United Nations Environment Program Global Mercury Partnership Mercury-Containing Products Partnership Area.
- Reduced children's exposure to lead paint from residential renovations by leading the development and implementation of regulatory renovation standards, through innovative collaborative outreach strategies, including with the Ad Council, and by the creation of a new grant program supporting local efforts to reduce lead poisoning. These lead poisoning prevention efforts have resulted in more than $1.5 billion in benefits.

**U.S. Environmental Protection Agency, Office of Environmental Information**

**Director, Toxics Release Inventory Program Division** October 1999 - July 2003

*I led the multi-media Toxics Release Inventory (TRI) Program - a key community right- to-know program about toxic chemicals.*

***Accomplishments***

- Created a modern data management approach to TRI data including development of intelligent reporting tools, annual receipt and processing of 100,000 plus submissions, quality control, and working with community and environmental groups on the use of the data
- Expanded TRI by completing hazard determinations for and adding to TRI more than 300 chemicals and 5 industry sectors, significantly increasing publicly available information on toxic chemical releases and industry's environmental performance.
- Chaired the OECD Task Force on Pollutant Release and Transfer Registers and represented the Agency in other international fora, including the North American Commission for Environmental Cooperation, and the Inter-Organization Programme for the Sound Management of Chemicals.
- Represented EPA in the United Nations Economic Commission for Europe negotiations on the development of a Pollutant Release and Transfer Register protocol under the Convention on Access to Information, Public Participation in Decision-making and Access to Justice in Environmental Matters.

***Education***

University of Pittsburgh, Pittsburgh, Pennsylvania; Ph.D., Organic Chemistry

University of Michigan, Ann Arbor, Michigan; B.S., Chemistry

**DECLARATION OF JASMINE JEMEWOUK IN SUPPORT OF PETITIONERS' OPENING BRIEF**

I, Jasmine Jemewouk, declare as follows:

1. I am a descendant of the Native Village of Elim, one of over 200 federally recognized native communities in Alaska, as well as an enrolled member of the Eastern Band of Cherokee Indians. I grew up in Elim, Alaska, a village of roughly 300 people on the Seward Peninsula. I currently live in Anchorage, Alaska, with my husband and my daughter, who is about one-and-a-half years old.

2. I am a member and supporter of Alaska Community Action on Toxics ("ACAT") and currently work as ACAT's Water Quality and Community Health Protection Coordinator. I served on the board of directors of ACAT from 2016 until 2023. I first became in involved in ACAT when I was in high school. I participated in the National Institute of Health's STEP UP Program, through which I secured an internship with ACAT, doing research on public health issues facing Alaskans, including Alaska Native people.

3. Through my work at ACAT and my service as a board member, I have learned a great deal about the problems that persistent, bioaccumulative, toxic ("PBT") chemicals cause for Alaskans, particularly Alaska Native people. Because the Arctic is a hemispheric sink, I am aware that PBT chemicals travel to Alaska from other parts of the country and then concentrate in our environment and our

traditional foods. I am gravely concerned about the contamination of our traditional foods and its impact on me and my family.

4. Traditional foods, such as birds, fish, seal, caribou, berries, and greens, are of great importance to our community, as they are integral part of our way of life and identity. When I return home to Elim, I join my family to go out hunting for beluga whales, gather the eggs of wild birds, fish, and pick berries. Traditional foods represent one of the only regular and reliable sources of food for many Alaska Native people. It takes two plane rides to get to my village, so it is difficult and costly to transport food from outside. Eating these traditional foods is one of the only ways to get vital calories and nutrients. My grandmother has four freezers stocked full of these traditional foods and makes sure to feed me whenever I am home. Accordingly, I, my young daughter, and the rest of my family, regularly consume these traditional foods and will continue to eat them foods going forward.

5. I am aware that the Environmental Protection Agency issued a rule that allows it to fast-track the approval of applications to manufacture new PBT chemicals. I am concerned about my exposure and my daughter's exposure to toxic new PBT chemicals approved under this new rule. I want EPA to prohibit new PBTs from being approved under these rushed procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __9__ October, in 2025.

JASMINE JEMEWOUK

# DECLARATION OF PAMELA MILLER

I, Pamela K. Miller, hereby declare as follows:

1. I am the Executive Director of Alaska Community Action on Toxics ("ACAT"). I helped found ACAT in 1997 and have served as Executive Director since its founding. In this capacity, I am familiar with all aspects of ACAT's mission, purpose, membership, and activities. I submit this declaration in support of ACAT's petition challenging provisions of the 2024 New Chemicals Rule related to persistent, bioaccumulative, and toxic chemical substances ("PBTs") issued by the United States Environmental Protection Agency ("EPA") to implement provisions of the Toxic Substances Control Act ("TSCA"). *See* EPA, *Updates to New Chemicals Regulations Under the Toxic Substances Control Act (TSCA)*, 89 Fed. Reg. 102773 (December 18, 2024) ("New Chemicals Rule").

2. My background is as a biologist. I have a bachelor's degree in biology from Wittenberg University (1978) and a master's degree from Miami University in environmental science with a specialty in aquatic biology (1981). I have over thirty years of experience in research, policy, advocacy, and training programs focused on environmental health, justice, and marine ecology. Since 2005, I have served as a principal investigator for community-based research projects supported by the National Institute of Environmental Health Sciences ("NIEHS") with Indigenous communities and have served as author or co-author of a dozen papers

concerning our community-based participatory research, published in the peer-reviewed scientific literature. In 2016, I was elected to serve as the co-chair of the International POPs Elimination Network ("IPEN"), a global network of more than 500 environmental health and justice organizations working for a toxics-free future. A true and correct copy of a recent Biographical Sketch (which identifies select publications and recent research projects) is attached.

3. ACAT is a 501(c)(3) non-profit public interest environmental health research and advocacy organization. ACAT is incorporated and has its headquarters in Alaska. ACAT works on behalf of Alaska communities that are concerned about environmental health issues arising from pollution, with a particular emphasis on Alaska Native communities. ACAT's mission is to advocate for environmental and community health for our members by protecting their rights to clean air, clean water, toxics-free food, and a toxic-free environment, as well as the rights of their communities to know about the toxic chemicals in their environment, products and food. ACAT empowers communities to eliminate exposure to toxics through collaborative research, shared science, education, organizing, and advocacy. Upon request, we assist individuals, tribes, and communities to implement effective strategies to prevent or reduce their exposures to toxic substances, protect the ecosystems that sustain them, and hold accountable those responsible for the contamination. Because existing remedies are so often

inadequate to address Alaskans' concerns, we also work to achieve systemic policy change at the marketplace, local, state, national, and international levels.

4. Much of our work is done in collaboration with Alaska Natives, who make up 20% of the state's population and are disproportionately exposed to toxic chemicals because of contamination of their traditional food sources. As a result, these communities face unique and serious environmental challenges. We support community-based environmental health research and train village leaders to conduct their own environmental sampling though our Community-Based Environmental Health Research Institute. We also work with coalitions to advocate for state policies that will protect Alaska's people, wildlife, and the environment. Our role is to listen to the voice and priorities of communities and be available to support initiatives to improve community health and provide helpful resources.

5. We currently have eight board members. Six of our eight board members are Alaska Native women representing the diverse communities that we serve (including Yupik, Inupiaq, Gwich'in Athabascan, Kaagwaantaan Tlingit, and Sugpiaq). One other board member is an Alaska resident, and the eighth and final member lived in Alaska for many years and now resides in Colorado. ACAT's board of directors is responsible for the governance of the organization, including approval of the organizational budget, organizational priorities, financial policies, and personnel policies; supervising the executive director; and fundraising. The

officers are two co-chairs, the treasurer, and secretary. All board members make personal financial contributions and work with our development director on fundraising from individuals.

6. ACAT is supported financially by its 800 non-voting members, who contribute financially to ACAT, and has 12,000 supporters, who respond to action alerts, attend events, or engage in workshops or meetings. The overwhelming majority of our members and supporters live in Alaska.

7. ACAT actively worked for the 2016 reform of TSCA. Our hope was that under a reformed TSCA, EPA would prioritize, evaluate, and then regulate chemicals that are found in high levels in Alaska communities.

8. Since TSCA was amended in 2016, ACAT has continued to push EPA to implement TSCA in a way that centers public health and protects overburdened communities, like Alaska Natives. To that end, ACAT advocates for EPA to conduct robust risk evaluations of new and existing chemicals that consider all sources of exposure and the higher risks faced by overburdened communities, as well as to adopt strong, health-protective risk management rules. ACAT's advocacy includes submitting comments to EPA on proposed rules, as well as bringing legal challenges when EPA fails to comply with an environmental law.

**Chemical Contamination in Alaska**

9. Most people think of Alaska as pristine and unpolluted, but this is not correct. Though largely undeveloped, Alaska has more than its share of contaminants. Toxic chemicals from many sources, both local and global, are showing up in Alaska's land, water, fish, wildlife, and people.

10. Far from pristine, Alaska has more than 2,000 known toxic waste sites from military and industrial operations.

11. In addition to these local sources of pollution, Alaska is contaminated by persistent organic pollutants ("POPs")—which are within the category of PBTs—that originate thousands of miles away travel to, and concentrate in, the Arctic in a process known as "global distillation." In the process of global distillation, POP chemicals that are emitted to the air or enter into the water from polluting sources in Europe, Asia, and North America are picked up by oceanic and atmospheric currents and deposited in the Arctic. Once there, their deterioration is slowed by low temperatures and sunlight and they remain available for uptake into biological systems (including plants and animals) for far longer than they would in other environments.

12. In the Arctic ecosystem, these POPs can bio-magnify in the food chain and reach extremely high concentrations in marine mammals, such as ringed seals and polar bears, which contain some of the highest levels of these chemicals

on the planet. These animals are integral components of the diets and lifestyles of indigenous peoples of Alaska and the Arctic. Their consumption has long provided basic nutrition as well as social, cultural, spiritual, and economic well-being.

13. The presence of POP chemical contaminants in traditional foods means that Indigenous Peoples, including Alaska Natives, regularly ingest chemicals that are harmful to human health. In response, many have shifted away from their ancient diets and lifestyles. This shift has resulted in rising rates of obesity, diabetes, and cardiovascular disease.

14. The study of Arctic contamination has been the focus of initiatives such as the Northern Contaminants Program that was initiated in 1991 by the Canadian government and the multi-country circumpolar Arctic Monitoring and Assessment Programme. These programs have provided solid evidence that the concentrations of many legacy existing and new chemicals, particularly POPs, are increasing in Arctic ecosystems and peoples due to long-range transport, and that current levels represent a hazard to human health. POPs, such as brominated and chlorinated flame retardants, perfluorinated chemicals, and dioxins, are among the chemicals of greatest concern.[1]

[1] *See e. g.* AMAP 2015. Summary for Policy-makers: Arctic Pollution Issues 2015. *Arctic Monitoring and Assessment Programme (AMAP)*, Oslo, Norway. 12 pp. (available at www.amap.no/documents/doc/sum-mary-for-policy-makers-arctic-pollution-issues-2015/1195); MacDonald, RW, LA Barrie, TF Bidleman, ML Diamond, DJ Gregor, RG Semkin, et al. 2000. Contamination in the Canadian Arctic: 5 years of progress in understanding sources, occurrence and

15. The end result is that the indigenous peoples of Alaska and the Arctic are among the world's most chemically contaminated populations. Children, pregnant women, and Alaska Natives are particularly vulnerable and experience disproportionate exposures. The developing brains and bodies of babies and infants are exquisitely sensitive to very low levels of toxic chemicals passing through the placenta or breast milk. Alaska Natives are particularly vulnerable because of their reliance on traditional foods such as fish and marine mammals (which are near the top of the food web and concentrate PBTs in their fatty tissue). Arctic Indigenous populations have levels of contamination in blood and breast milk higher than those found anywhere else on Earth [2,3]. Women of child-bearing age in the Alaska's Yukon-Kuskokwim Delta have the highest levels of toxic polybrominated diphenyl ethers ("PBDEs") of any population in the circumpolar Arctic. This is

pathways. *The Science of the Total Environment* 254(2-3):93-234. PMID: 10885446. (available at http://www.ncbi.nlm.nih.gov/pubmed/10885446); Rigét, F. A Bignert, B Braune, J Stow, S Wilson. 2010. Temporal trends of legacy POPs in Arctic biota, an update. *The Science of the Total Environment* 408:2874-2884. (available at www.amap.no/documents/download/1116); de Wit, CA. D Herzke, K Vorkamp. 2010. Brominated FRCs in the Arctic environment—trends and new candidates. *The Science of the Total Environment* 408(15):2885-2918. PMID: 19815253. (available at http://www.ncbi.nlm.nih.gov/pubmed/19815253); AMAP 2014. Trends in Stockholm Convention Persistent Organic Pollutants (POPs) in Arctic Air, Human media and Biota. AMAP Technical Report to the Stockholm Convention. AMAP Technical Report. No. 7 (2014), Arctic Monitoring and Assessment Programme (AMAP), Oslo, Norway (available at http://www.amap.no/documents/search/ ISBN – 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-084-4).

[2] AMAP 1998. Assessment Report: Arctic Pollution Issues 1998. ISBN 82-7655-061-4. www.amap.no/documents/doc/amap-assessment-report-arctic-pollution-issues/68

[3] AMAP 2015. Summary for Policy-makers: Arctic Pollution Issues 2015. Arctic Monitoring and Assessment Programme (AMAP), Oslo, Norway. 12 pp. www.amap.no/documents/doc/summary-for-policy-makers-arctic-pollution-issues-2015/1195.

concerning because prenatal exposure to PBDEs is associated with lower IQ and higher hyperactivity scores in children. Whale and walrus meat, the mainstay of the people of St. Lawrence Island in the Northern Bering Sea, is so contaminated with PCBs that EPA recommends eating not more than one serving per month.

**ACAT's Work on Chemical Contamination in Alaska**

16. ACAT works to eliminate environmental contaminants that affect the water, traditional foods, health, and cultures of the Indigenous peoples and other residents of Alaska in several ways:

a. Advocating at the local, state, national, and international levels for protective policies that reduce and eliminate exposures to toxic chemicals.

b. Working directly with Alaska communities to prevent industry and the military from conducting polluting activities;

c. Working with school boards to pass policies that will protect children and workers from toxic exposures at school and with health care facilities to reduce the use of harmful chemicals in the healthcare setting; and

d. Raising awareness of existing pollution, such as educating mine workers and people living downstream from Red Dog Mine in northwest Alaska, the single largest polluter in the nation, about the chemicals that are released into the air, water, and land as a result of mining activities.

17. ACAT also provides workshops, public lectures and other educational programs to inform physicians, nurses, teachers, environmentalists, and other professionals as well as the general public about the link between pollutants and adverse effects on human health. For example, ACAT:

a. Established the Collaborative on Health and the Environment ("CHE")-Alaska, which advances knowledge and effective action to address concerns about the links between human health and environmental factors. CHE-Alaska sponsors monthly seminars and other public events featuring scientists, health care professionals, and policy experts who are working to improve environmental health.

b. Organized the first-ever Alaska Children's Environmental Health Summit to bring together scientists, Alaska Native community and Tribal leaders, health care professionals, policy makers, parents, teachers, and children's advocates to discuss the latest science and develop recommendations to protect the health of children in the Arctic.

18. ACAT conducts health surveys, environmental sampling, biomonitoring studies, and other community-based participatory research to enhance our understanding of the threats faced by our members, so we know where to focus our efforts. ACAT also trains tribal village leaders to conduct their

own environmental sampling through our Community-Based Research Field Institute. For example, we are working with the Yupik people of St. Lawrence Island on a traditional foods study to determine levels of PCBs and other contaminants in subsistence foods such as fish and marine mammals. ACAT and our research partners have published 20 papers in the peer-reviewed scientific literature based on our community-based-research in the Arctic concerning persistent contaminants, endocrine disruption and other biomarkers associated with health outcomes. These research activities consume a significant share of our budget.

**The Role of TSCA in Protecting Human Health and the Environment in Alaska and the Arctic**

19. Given the unique vulnerability of our members' communities to harm from toxic chemicals, ACAT and its members have a particular interest in ensuring that the revised TSCA is implemented in the most health-protective manner that the law permits.

20. When Congress revised TSCA in 2016, ACAT was hopeful that it would provide an effective means to protect our members and Alaska's communities because it contains a number of provisions that require EPA to identify potentially exposed or susceptible subpopulations, such as our members, and protect them from the risks posed by toxic chemicals. Of particular importance

is TSCA's requirement that EPA review all new chemicals before they are manufactured in or imported to the United States, and regulate those chemicals as necessary to protect potentially exposed or susceptible subpopulations. The requirement that EPA assess the risk to at-risk subpopulations is critically important to protecting Alaska Natives, who are at-risk from POPs. If properly implemented, TSCA's premanufacture review system can protect our members from the hazards of chemical exposure.

21. ACAT has long been concerned that EPA has exempted potentially dangerous chemicals from the standard premanufacture review process in a way that threatens Alaskans and Alaska Natives. TSCA establishes a standard review procedure in which chemical manufacturers must submit a premanufacture notice ("PMN") that EPA must review before a new chemical can be manufactured. During PMN review, EPA must restrict a chemical from being manufactured unless it finds that the chemical will not present an unreasonable risk. EPA has established a number of problematic exemptions to the PMN review process, particularly under the Low Volume Exemption (LVE) and the Low Release and Exposure Exemption (LoREX). These exemptions allow expedited review and approval of toxic new chemicals that meet certain production or release criteria, even though these criteria are not stringent enough to protect people, particularly at-risk subpopulations like Alaskans and Alaska Natives, from the risks posed by

POPs. Given these concerns, ACAT has advocated that EPA to restrict these exemptions. For example, in 2021 ACAT signed a petition to EPA requesting that EPA make Per- and Polyfluoroalkyl Substances ("PFAS"), a highly dangerous subcategory of POPs, ineligible for these exemptions.

22. In 2024, EPA issued a final rule to update the regulations governing premanufacture review. Updates to New Chemicals Regulations Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 102773 (December 18, 2024) ("New Chemicals Rule").

23. The final New Chemicals Rule stated that new PBTs (and thus, new POPs) are eligible for LVE and LoREX exemptions, unless EPA determines the manufacture of a new PBT results in "anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms." *See* 89 Fed. Reg. at 102,1798. Thus, the New Chemical Rule allows EPA to approve the manufacture of new PBTs, including new POPs, that may pose an unreasonable risk—including an unreasonable risk to subpopulations like Native Alaskans—under the LVE and LoREX exemptions, thereby bypassing a full and rigorous PMN review. In addition, the New Chemicals Rule adopted a vague definition of "PBT chemical substance" that failed explain EPA's process for identifying these substances. *See id*. This creates the risk that EPA will fail to identify POPs that should be ineligible, even under EPA's deficient criteria.

24. ACAT's members and the people we serve will be harmed by the above provisions of the New Chemicals Rule because those provisions weaken TSCA's protections against new POP chemicals to which they are exposed.

25. Finally, EPA's failure to codify its 1999 Policy harms ACAT, denying ACAT information about dangerous new PBTs that would be helpful to ACAT. If EPA codified the 1999 Policy, applications to manufacture new PBTs would have to go through the standard PMN review process and would presumptively result in section 5(e) orders requiring additional testing. That test data would have to be publicly disclosed under TSCA. Such test data would be helpful to ACAT's advocacy, which often involves presenting scientific data about chemicals to regulatory bodies at the state and federal level, and to meetings of the Stockholm Convention.

26. A court order could remedy this injury, for example by vacating the unlawful provisions that fast-track the approval of new PBTs or by remanding the rule to the agency, thus giving it an opportunity to cure the deficient rule.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on 12 October, in 2025.

Pamela K. Miller

Pamela K. Miller

## BIOGRAPHICAL SKETCH

Provide the following information for the Senior/key personnel and other significant contributors.
Follow this format for each person. **DO NOT EXCEED FIVE PAGES.**

NAME: **Pamela K. Miller**

eRA COMMONS USER NAME (credential, e.g., agency login): pamelamillerpi

POSITION TITLE: **Executive Director, Alaska Community Action on Toxics**

EDUCATION/TRAINING *(Begin with baccalaureate or other initial professional education, such as nursing, include postdoctoral training and residency training if applicable. Add/delete rows as necessary.)*

| INSTITUTION AND LOCATION | DEGREE *(if applicable)* | Completion Date MM/YYYY | FIELD OF STUDY |
|---|---|---|---|
| Wittenberg University (Springfield, Ohio) | B.S. | 06/1978 | Biology |
| Miami University (Oxford, Ohio) | M.En. | 06/1981 | Environmental Science |

### A. Personal Statement

I have twenty-four years of experience in conducting and supervising research among communities, multiple researchers, and health care institutions, as well as experience in coordinating field research programs in remote locations of Arctic Alaska. In collaboration with the Yupik people of Sivuqaq (a/k/a St. Lawrence Island), I oversee community-based participatory research (CBPR) as a Principal Investigator, implement community educational programs and interventions, health fairs, workshops for health care providers, meetings with community youth and leadership, research translation, and evaluation. As a public environmental health scientist, I understand that any efforts I make to bring about positive policy changes and public health interventions must be backed by scientific information. My work is directed toward advancing scientific knowledge and policy with an emphasis on understanding the effects of environmental contaminants and improving the health and wellbeing of the indigenous peoples of Alaska and the circumpolar Arctic.

**On-Going Research Support from the past three years that I would like to highlight:**

NIEHS 2R01ES019620-06A1 (Miller, PI) [with 2 no-cost extensions] 09/20/17 – 06/20/24
<u>Role</u>: Principal Investigator
Protecting the Health of Future Generations: Assessing and Preventing Exposures to Endocrine- Disrupting Flame-Retardant Chemicals & PCBs in Two Alaska Native Arctic Communities on St. Lawrence Island. (PFG II)
Purpose: We used minimally invasive methods to assess the body burden of PCBs and select flame retardant chemicals and their relationships to health outcomes in SLI children aged 2-12. We have collected resident stickleback fish to assess mechanisms of developmental disruption due to exposure to PCBs and select flame retardant chemicals, using transcriptomic, epigenetic, endocrine, and histological approaches. We are developing measures to prevent and mitigate exposure of SLI children to PCBs and select flame retardant chemicals.

NIEHS 1R01ES032392-01 (Miller, PI) 05/20/21 – 02/28/26
Role: Principal Investigator
Restoring Northeast Cape for the Health and Well-Being of the Yupik Communities of St. Lawrence Island, Alaska (NEC)
Purpose: We collected blood and hair samples from 200 adult residents of Sivuqaq (traditional name for St. Lawrence Island), Alaska, including a sub-sample of people who use the Northeast Cape (NEC), formerly used defense site, as a subsistence food gathering site and/or use it as a seasonal or temporary camp. In addition, all 200 participants wore passive silicone wristband monitors for 72 hours. We will analyze the samples to estimate exposure to contaminants such as PCBs (polychlorinated biphenyls), pesticides, and mercury. We assessed markers of health, such as thyroid and diabetes risk.

Related publications I would like to highlight:

1) Babayev, M., Capozzi, S.L., **Miller, P.K.**, McLaughlin, K.R., Seguinot-Medina, S., Byrne, S.C., Zheng, G., Salamova, A. PFAS in drinking water and serum of the people of a southeast Alaska community: A pilot study, *Environmental Pollution*, Volume 305, 2022, 119246, ISSN 0269-7491, https://doi.org/10.1016/j.envpol.2022.119246
2) Jordan-Ward R., von Hippel, F.A., Zheng, G., Salamova, A., Dillon, D., Gologergen, J., Immingan, T, Dominguez, E., **Miller**, P.K., Carpenter, D.O., Postlethwait, J.H., Byrne, S., and Buck, C.L. 2022. Elevated mercury and PCB concentrations in Dolly Varden (*Salvelinus malma*) collected near a formerly used defense site on Sivuqaq, Alaska. *Science of the Total Environment* 826:154067. https://doi.org/10.1016/j.scitotenv.2022.154067
3) **Miller, P.K**. 2023. Protecting the health of future generations in the Arctic through community-based participatory research and action. *Explore* 19(2):271-272. https://doi.org/10.1016/j.explore.2022.12.008
4) Jordan-Ward, R., von Hippel, F.A., Wilson, C.A., Maldonado, Z.R., Dillon, D., Contreras, E., Gardell, G., Minicozzi, M.R., Titus, T., Ungwiluk, B., **Miller**, P.K., Carpenter, D.O., Postlethwait, J.H., Byrne, S., Buck, C.L. 2024. Differential gene expression and developmental pathologies associated with persistent organic pollutants in sentinel fish in Troutman Lake, Sivuqaq, Alaska. *Environmental Pollution* 340:122765. https://doi.org/10.1016/j.envpol.2023.122765

## B. Positions, Scientific Appointments, and Honors

### Positions

1997- present Executive Director, Alaska Community Action on Toxics (ACAT)
Founded ACAT and served as Executive Director since then for this statewide, nonprofit environmental health organization. Won multiple federal research grants for ACAT (since 2000), serving as research team leader for the first four years, and as principal investigator since 2005.

1990-1997 Research Biologist, Greenpeace Alaska, Anchorage
Conducted advocacy-based campaigns concerning environmental issues such as energy, climate change, and contaminants affecting human health. Worked with Alaska communities to solve environmental problems. Lobbied Congress and state legislators for marine environmental protection. Co-founded Cook Inlet Keeper program to protect the Cook Inlet watershed and served on the Keeper board from 1994 - 2002.

1986-1990 Technical Coordinator, Ocean Issues, State of Washington Department of Ecology
Served as Governor's representative on Regional Technical Working Group for the continental shelf program of the U.S. Department of Interior. Worked within the State's federally funded Coastal Zone Management Program to establish the Olympic Coast National Marine Sanctuary. Coordinated the efforts of federal and state agencies on marine issues. Organized major conference on ocean environmental issues. Organized and managed bird rescue program after large offshore oil spill. Edited monthly newsletter published by the Department of Ecology for policy makers and the public: *Coastal Currents.*

1987-1990 Director, Nisqually Reach Nature Center
Directed volunteer-based marine education center in the south Puget Sound region of Washington State. Led marine education programs youth, teachers, and the public.

1985-1986 Instructor, Florida Keys Community College
Taught biology and botany courses as an adjunct instructor.

1984-1985 Research Biologist, National Marine Fisheries Service
Collected biological data for NMFS aboard fishing vessels in Bering Sea.

1982-1984 Research Biologist, Harbor Branch Institution
Designed and conducted marine ecological and botanical studies in the Florida Keys.

1981-1982 Instructor, Newfoundland Harbor Marine Institution
Taught marine science workshops for teachers, students, and adults in the Florida Keys.

### Honors

2023 *Alaska Conservation Foundation's Lifetime Achievement Award* for protecting and enhancing Alaska's natural greatness

2016 - present Elected to Steering Committee and Co-Chair of the International Pollutants Elimination Network

2015 - present Invited to participate with prominent scientists and public health advocates on the newly formed Project TENDR (Targeting and Neuro-Developmental Risks).

| | |
|---|---|
| | Coordinated working groups focused on PBDE flame retardants (polybrominated diphenyl ethers) and plastics. Co-Authored TENDR Consensus Statement (July 2016) http://ehp.niehs.nih.gov/ehp358/ |
| 2013 | Selected as Board Member, Groundswell Fund |
| 2013-2016 | Served as mentor to teams of fellows in the Reach the Decision Makers program from the University of California San Francisco, Reproductive Health and Environment Program. (First invited to be a fellow for the 2011 cohort and later asked to mentor fellows) |
| 2012 | *Meritorious Service Award* by the Board of Regents of University of Alaska for service to the community |
| 2009-2010 | Advisory Group for Centers for Disease Control and Prevention |
| 2010 | White House Advisory Forum |
| 2001 | *Olaus Murie Award for Outstanding Professional Contribution* to protecting Alaska's natural environment |
| 1990 | *Washington State Governor's Environmental Excellence Award* for establishing the Olympic Coast National Marine Sanctuary |

**C. Contributions to Science**

Alaska has more than 2,000 known toxic waste sites from military and industrial operations, and the health of Alaska residents is also affected by the long-range transport of persistent pollutants to the north as well as toxic chemicals in consumer products.

**1. <u>Amchitka Island</u>.** As a research biologist, I led a research expedition in 1996 to Amchitka in the Aleutian Islands of Alaska. We collected biological samples to determine radiation levels associated with underground nuclear tests conducted in the 1960s-70s. Our research revealed plutonium-239/240 and americium-241 in freshwater plants at the edge of the Bering Sea. We concluded that the underground nuclear explosions on Amchitka were the source of the observed radiation. I wrote two public reports in collaboration with physicist Norm Buske describing our findings: *Nuclear Flashback: Return to Amchitka* (1996) and *Nuclear Flashback Part II: The Threat of the U.S. Nuclear Complex* (February 1998). These offer our methods and results to allow future scientists to replicate our findings. http://www.akaction.org/media-center/publications/

As a result of our research, the Clinton Administration agreed to begin the first health assessment of the Amchitka workers' occupational exposures. The Amchitka Project was established in 2000 as a non-profit organization located at the offices of Laborer's Local 341; I served on the advisory committee for the Project until 2005. As of December 2015, $97 million dollars had been distributed to provide medical evaluation and compensation to workers and their families.

**2. <u>Stockholm Convention on Persistent Organic Pollutants</u>.** When I founded ACAT in 1997, one of my first tasks was to support an international effort by the United Nations to negotiate a binding treaty to eliminate persistent organic pollutants (POPs) worldwide. The Arctic is a hemispheric sink for POPs that travel north on air and ocean currents, where they are "trapped" in the cold environment through a process known as global distillation. The POPs enter the food chain and eventually make their way into marine mammals. Indigenous peoples of the Arctic are particularly vulnerable because of their reliance on traditional foods which include marine mammals.

Because of my scientific and technical expertise about the effects of POPs in the Alaska Arctic, ACAT was instrumental in the negotiation, signing, and implementation of the Stockholm Convention on Persistent Organic Pollutants (POPs Treaty). Since the POPs Treaty was ratified and activated in 2004, ACAT has participated in biennial meetings in Geneva with delegates to the Conference of Parties (COP); and in annual meetings in Europe of the POPs Review Committee (POPRC). The POPRC is comprised of scientists who advise COP delegates to ensure the treaty's implementation. POPRC scientists and COP delegates work to continue adding specific POPs to the list for global elimination.

I am an official observer through IPEN at meetings of the POPRC and the COP. Each of the six observers from IPEN takes one to three of the nominated chemicals to shepherd through the POPRC's process for consideration. I participate in subcommittees and provide them with the most recent science to help them decide whether to pass the POP to the next stage for consideration. We also prepare reviews of scientific literature intersessionally and prepare an analysis for "our" POPs and send them to the secretariat for the POPRC for distribution to other stakeholders to rebut. These intersessional scientific "debates" are held every three months. To date, thirty-four chemicals have been listed for global elimination. The first "Dirty

Dozen" were listed in 2004: aldrin, endrin, dieldrin, chlordane, heptachlor, hexachlorobenzene, mirex, toxaphene, polychlorinated biphenyl, DDT, dioxins, and furans.

My contribution to science for the POPRC is to review scientific literature and prepare technical comments. The POPRC scientists sent to the POPRC by various nations can arrive at consensus precisely because they have solid, up-to-date research to support their decisions provided by my IPEN colleagues andmyself.

**3. Sivuqaq (a/k/a St. Lawrence Island)**. In 1998 I connected with faculty researchers who were interested in using science to shed light on the links between military toxics and health conditions observed by a Yupik elder and health aide (Annie Alowa) in her remote village on Sivuqaq. We began a series of collaborative research projects on Sivuqaq with ACAT's first NIEHS (National Institute of Environmental Health Sciences) grant in 2000 and continue this research to present. Each of our research projects on Sivuqaq is more than a collaboration among scientists and health organizations; everything we do is in full partnership with the Yupik Tribes and people who live on Sivuqaq. My tasks are to oversee all the planning, research, and advocacy we conduct on the Island. Here is a selection of publications of twenty published in peer-reviewed journals:

1) **Miller, P.K.**, Waghiyi, V., Welfinger-Smith, G., Byrne, S.C., Kava, J., Gologergen, J., Eckstein, L., Scrudato, R., Chiarenzelli, J., Carpenter, D.O., Seguinot-Medina, S. 2013. Community-based participatory research projects and policy engagement to Protect Environmental Health on St. Lawrence Island, Alaska. *International Journal of Circumpolar Health; Circumpolar Health Supplement* 72: 21656. http://dx.doi.org/10.3402/ijch.v72i0.21656
2) Byrne S.C., **Miller, P.K.**, Seguinot-Medina S., Waghiyi, V., Buck, C.L., von Hippel, F.A., Carpenter, D.O. 2018. Associations between serum polybrominated diphenyl ethers and thyroid hormones in a cross-sectional study of a remote Alaska Native population. *Scientific Reports*. 2018. Feb 2;8(1):2198. http://doi:10.1038/s41598-018-20443-9
3) Byrne S.C., **Miller, P.K.**, Seguinot-Medina, S., Waghiyi, V., Buck, C.L., von Hippel, F.A., and Carpenter, D.O. Exposure to perfluoroalkyl substances and associations with serum thyroid hormones in a remote population of Alaska Natives, *Environmental Research*, Volume 166, 2018, pp. 537-543, https://doi.org/10.1016/j.envres.2018.06.014
4) Byrne S.C., Seguinot-Medina, S., Waghiyi, V., Apatiki, E., Immingan, T., **Miller, P.K.**, Buck, C.L., von Hippel, F.A., and Carpenter, D.O. 2022. PFAS and PBDEs in traditional subsistence foods from Sivuqaq, Alaska. *Environmental Science and Pollution Research* 29, 77145–77156 (2022). https://doi.org/10.1007/s11356-022-20757-2
5) **Miller, P.K.** 2023. Protecting the health of future generations in the Arctic through community-based participatory research and action. Explore 19(2):271-272 (2023). https://doi.org/10.1016/j.explore.2022.12.008

# DECLARATION OF RICHARD VULTAGGIO IN SUPPORT OF PETITIONERS' OPENING BRIEF

I, Richard Vultaggio, declare as follows:

1. My name is Richard ("Rich") Vultaggio. I was born and raised in Endicott, New York, and lived there until recently. My family's history in Endicott goes back numerous generations, and we hold land there.

2. I am a member and supporter of Environmental Defense Fund, for almost 20 years now, along with other environmental organizations. For over two decades, I have been supporting environmental work and teaching myself about environmental issues.

3. I really enjoy learning about people who are finding ways to fix our environmental problems, and I believe strongly that this is what our government should be doing as well.

4. I have been concerned about toxic pollution since I was a child. My grandparents originally lived on a street in Endicott that was developed into the IBM campus. IBM, along with a shoe company that used to exist in Endicott, was known to pollute the area with chemicals, including the river here, the Susquehanna.

5. From EDF, I have learned about a type of chemicals called persistent, bioaccumulative, toxic ("PBT") chemicals. I also understand that there is a company in Endicott, the Chrysta-Lyn Chemical Company located on Wayne Street, that has made these types of chemicals, and that these chemicals have been

"exempted" from being fully reviewed for safety by the Environmental Protection Agency. I have also been made aware that that these chemicals could harm people who come into contact with them and that at least one of them could be toxic to river life. I am concerned about how this could have harmed the health of me and my family.

6. I also understand that the Environmental Protection Agency has a regulation that could allow companies including Chrysta-Lyn to make PBTs that are not vetted and safe. I am concerned about the health of the community, and also about the reputation of the community. Like with the toxic contamination from IBM and others, this could make people fear staying in and moving to the Endicott area. The facility is less than two miles from some of my family's area property, some of which is by the river; our property value could be significantly lessened.

7. The government regulation allowing these toxic chemicals to be put onto the market should be changed, and EPA should not approve them unless it fully reviews the chemicals and makes sure they will not harm Endicott or any other places.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 12 October, 2025.

Rich Vultaggio

Rich Vultaggio

I, VIOLA WAGHIYI, declare and state as follows:

1. My name is Pangunnaaq Vi Waghiyi, I am a Sivuqaq Yupik grandmother and citizen of the Native Village of Savoonga, one of 229 federally recognized tribes in Alaska.

2. I was born and raised on Sivuqaq ("the Island"), an island in the Northern Bering Sea, which has been the home for my people for thousands of years.[1] I moved to Nome, Alaska, when I was eight years old so I grew up in both communities. Now, my work at Alaska Community Action on Toxics ("ACAT") also brings me home to the Island. I currently reside in Anchorage, Alaska, with my husband, our four sons, and their families. My husband and I are raising our six-year-old grandson.

3. I am a member and supporter of ACAT, as well as its Environmental Health and Justice Program Director. ACAT is a women-led, non-profit advocacy organization headquartered in Anchorage, Alaska, with a board comprised primarily of Arctic Indigenous women. I have been a member and supporter of ACAT for over 23 years.

4. I first learned about ACAT in October 2002, when I read a press release in the *Anchorage Daily News* about the extremely high levels of polychlorinated biphenyls ("PCBs"), which are a type of persistent,

[1] Sivuqaq is also known as St. Lawrence Island.

bioaccumulative, and toxic ("PBT") chemical, in my people's blood. My people were exposed to PCBs as a result of the release of toxic chemicals from two former Cold War-era military bases established on Sivuqaq. The two former bases were the eyes and ears of the North during the Cold War, but they also poisoned our lands, waters, fish, plants, and berries with legacy military toxics abandoned and buried at the two former bases, leading to significant health harms. The press release really touched me, because it highlighted a reality that I knew, that there were very high rates of cancer in our people who lived on the Island, particularly those whose families lived, worked, or camped at the Northeast Cape down gradient from the military site.

5. My own family who live (or lived) on the Island have experienced high rates of cancer. My dad, John Waghiyi, Sr., died of cancer; my mom, Della Waghiyi, had cancer and many other health harms including heart disease, strokes, diabetes, a stillborn child and mental health harms which we now attribute to the toxic chemicals the military left on our Island. We buried my eldest brother, Fritz Waghiyi, three years ago due to cancer. I am also a cancer survivor and have had 3 miscarriages, which I attribute to military toxics. Cancer treatment can be a life sentence in itself. We now believe it is not a matter of *if I will get cancer* but *when*. I decided, after reading the ACAT press release, that the Creator had plans for me to fight to hold the military accountable and to work to protect our people from

exposure to toxic chemicals. Soon after I read the press release, I was offered a position with ACAT, which I had to think about before I accepted, since I had no experience in this field. Now I can't see myself doing anything else as much as I've come to learn.

6. As the Environmental Health and Justice Program Director for ACAT, I am an advocate for Arctic Indigenous peoples. I have traveled to Geneva, Switzerland five times to participate in meetings of the Conference of the Parties at the United Nation's Stockholm Convention on Persistent Organic Pollutants ("POPs"), an international, legally binding treaty ratified by 182 countries to eliminate the production and use of POPs, which are a subcategory of PBTs. More recently, I've traveled twice for the Intergovernmental Negotiating Committee for the Plastics Treaty. In this role, I represent my people and other Arctic Indigenous peoples by delivering testimony on their behalf. I am motivated by my desire to protect current and future generations from environmental contamination and its associated health harms. As a Global Indigenous Peoples Caucus leader, my role is to lead an Arctic Indigenous Peoples delegation to these conventions and negotiations, to train our delegates, and to be the conscience of the conventions by reminding all convention delegates why the convention began—to protect Arctic Indigenous Peoples from being contaminated by POPs and microplastics without our consent.

7. ACAT hires and trains Sivuqaq community health researchers to ensure that citizens of tribal nations are partners in our work and trained to combat the release of toxic chemicals into the Arctic. I am currently co-leading our Sivuqaq project *Protecting Future Generations: Assessing and Preventing Exposures to Endocrine Disrupting Chemicals on St. Lawrence Island*, which aims to research the effect of endocrine disrupting chemicals on children's ability to learn in Sivuqaq communities. This phase of the *Protecting Future Generations* project began after parents, grandparents, and leadership in our tribal nation grew concerned about children's low test scores and asked us to determine the role that PCBs and toxic flame retardants played in this complex issue. I was also part of a research team that found that the congener BDE-209, which is associated with decaBDE, another PBT, was present in 100% of traditional food samples from Sivuqaq.

8. Through this work I have learned that I and my Yupik people are being contaminated without our consent in our homes, workplaces, and through our traditional foods. I became aware that POPs and other PBTs originate in other parts of the world and travel into the Arctic, placing burdens on us we did not create. I do this work with ACAT because I am a mother and grandmother and want to make sure there are measures in place to protect our most vulnerable, our children and future generations of Arctic Indigenous people and protect our ability

to safely eat our traditional foods, which are a significant part of our identity, spirituality and culture.

9. My people have inhabited Sivuqaq for thousands of years. Our elders refer to the ocean as our farm, and we continue to live off the land and ocean like we have for centuries, as our Creator intended. Seventy to eighty percent of our Sivuqaq families eat only a subsistence diet. Like most Sivuqaq families, my children, grandchildren, and I regularly consume traditional subsistence foods, known as neqipik. Our elders can go no more than three days without eating our traditional foods, because their digestive systems will become irritated from western diet.

10. On Sivuqaq, neqipik includes: bowhead whales, walrus, seals, reindeer, birds, fish, crabs, clams, and sea bird eggs. If it is on our Island, we eat it, always making sure to take only what we need as we believe the marine mammals give themselves up so our people can continue to survive. Walrus in particular is an important part of our diet and supports us during our long winters. Historically the women in our community hand sew the female walrus hides to make skin boats, and our hunters use the tusks for tools and other carvings to make a living.

11. I am a mother of four sons, and my children have eaten neqipik since birth. Our people used frozen whale blubber when our infants are teething. Our mothers also chewed fish and subsistence foods for our babies when they did not

have teeth to chew for themselves. I am currently helping to raise my grandson, who lives with me, and we are feeding him the same traditional diet. My granddaughters were born in Anchorage but lived for a period of time in the village of Shageluk, also eat a subsistence diet, and help their grandfather when he goes fishing and trapping rabbits.

12. In my community, mothers and grandmothers encourage us to eat significant amounts of neqipik when pregnant. My mother made sure that I regularly ate neqipik during my pregnancies. I continued to eat traditional foods when I was breastfeeding. We receive our intake of Vitamin D from marine mammals and view them as superfoods, which can help to maintain a healthy pregnancy.

13. Hunting and fishing for our traditional foods is often a shared experience with family and friends on and off the Island. It takes the entire community to harvest marine mammals during our Spring Hunt. This is often because hunting large marine mammals is difficult, and the climate can change suddenly and become harsh. One example of communal hunting is whaling. Our whaling captains come together to hunt for whales in 18-foot open aluminum skiffs in the Northern Bering Sea, with the utmost respect for the ocean which our elders call our farm, it can now be unforgiving due to rapid climate change. This hunting practice is a way of life that has passed down through the generations and has

sustained our people for many centuries. Once the group strikes a whale, all of the hunters work together to tow the whale to shore. Once it is towed to shore, all the hunters are involved in the harvest of the whale. The whales can be up to 60 feet long.

14. Thewhaling captain who struck the whales then shares food with all the whaling captains who then share it with family members. It is through this communal sharing of food that I now generally receive neqipik. My family members from the Island——make sure that I have traditional foods to eat. My brother recently brought me freshly harvested whale, which is currently in my freezer. He and my other family also brings me fish and other traditional foods which are caught on our Island. In southcentral Alaska, my niece goes fishing and brings me some of the fish she catches. I fish and hunt less now that I am older, but I go berry picking, pick medicinal plants, and harvest local greens.

15. I understand that my traditional diet could expose us to PBTs, since PBT pollution that originates elsewhere is contaminating our neqipik which I, my family, and my people rely on. I am also concerned that the harms to me are compounded by potential exposures in my daily life. I have two televisions in my home, a laptop computer for work, upholstered furniture, and my grandson plays with plastic toys. I bring these items into my home without any way to know whether they can cause toxic exposures which can harm my family's health and

wellbeing. I understand that PBTs could be present in all these items but now try to make informed decisions. I am concerned that my subsistence diet of neqipik, combined with these other sources of exposure, could cause me and my people serious health harms and illness.

16. We cannot give up our traditional practices just to avoid exposure to POPs and other PBTs—it is our way of life as intended by our Creator. However, we are being contaminated without our consent. POPs and other PBTs do not break down readily in the environment. As a result, they end up in our traditional foods and our bodies. I also know that they can be passed from mothers to children during pregnancy and through breast milk.

17. These exposures cause damage to our children's developing brains, affect their immune systems, and can cause cancer and other serious health harms. It affects our children's ability to learn our language, our creation stories, our songs and dances, our culture, and our traditional knowledge including on how to predict the weather and of the migration patterns of the wildlife that sustains us. As a grandmother with seven young Indigenous grandchildren, I am greatly concerned about what this contamination means for their future and our future generations.

18. Our ability to conceive and carry our children and bring them to a healthy term are threatened by the assault from PBTs in our bodies and wombs, our children's first environment. We are witnessing illnesses never seen before in our

people due to military contamination and the greed of multinational corporations that manufacture toxic chemicals without taking our human health, our environment, and our traditional foods into account.

19. Through my work, I am aware that the Toxic Substances Control Act ("TSCA") contains provisions to protect us from some of these harms. I understand that the U.S. Environmental Protection Agency ("EPA") is generally required to review new chemicals before they enter the market, in a process known as premanufacture review. Where a new chemical presents or may present unreasonable risk, including risks to at-risk subpopulations like our Arctic Indigenous people, EPA must regulate the chemical to protect against the risks it poses.

20. I understand that EPA issued a rule last year, which allows EPA to fast-track the review and approval of new POPs and other PBT chemicals outside the standard premanufacture review process. I am concerned that the fast-track approval of new PBTs will lead to the manufacture of unsafe chemicals that regulators and the public do not fully understand and that will further contaminate our traditional foods, the environment, and the products in our homes. This rule does not protect me or my family from burdens we didn't create.

21. EPA should not be weakening the standards for approving new PBTs. I and my Yupik People would benefit from strictest rules to reduce our exposure to

PBTs through our traditional foods, the environment, and the products we bring into our homes and workplaces not knowing they are manufactured with toxic chemicals.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed this 15th day of October, 2025, in Anchorage, AK.

Vi Waghiyi

___________________
Viola Waghiyi