**No. 25-158**
**Consolidated with Nos. 25-572 and 25-573**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

ALASKA COMMUNITY ACTION ON TOXICS, et al.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
and LEE ZELDIN, in his official capacity as
Administrator of the United States Environmental Protection Agency,

*Respondents*.

---

On Petitions for Review of a Final Agency Action of the
United States Environmental Protection Agency
89 Fed. Reg. 102,773 (December 18, 2024)

---

# PETITIONERS' EXCERPTS OF RECORD ADDENDUM

---

October 17, 2025

Tosh Sagar
Earthjustice
1001 G St NW
Suite 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org

Michael Youhana
Earthjustice
48 Wall St., 15th Floor
New York, NY 10005
(212) 284-8033
myouhana@earthjustice.org

*Counsel for Alaska Community Action on Toxics*

Samantha Liskow
Environmental Defense Fund
257 Park Ave S
New York, NY 10010
(212) 616-1247
sliskow@edf.org

*Counsel for Environmental Defense Fund*

# TABLE OF CONTENTS

**Page**

Updates to New Chemicals Regulations Under the Toxic Substances Control Act (TSCA); Final Rule, EPA-HQ-OPPT-2022-0902-0088, Dec. 18, 2024 ("Final Rule") ............ ACAT-ER-004

Response to Comments on the Updates to New Chemicals Regulations under the Toxic Substances Control Act (TSCA), EPA-HQ-OPPT-2022-0902-0105, Dec. 18, 2024 ("Response to Comments") ............ ACAT-ER-033

Comment submitted by Earthjustice et al., EPA-HQ-OPPT-2022-0902-0082, Aug. 8, 2023 ("ACAT Comments") ............ ACAT-ER-140

Comment submitted by Environmental Defense Fund (EDF), EPA-HQ-OPPT-2022-0902-0084, Aug. 8, 2023 ("EDF Comments") ............ ACAT-ER-180

New Chemicals Regulations under the Toxic Substances Control Act; Proposed Rule, EPA-HQ-OPPT-2022-0902-0001, May 26, 2023 ("Proposed Rule") ............ ACAT-ER-234

EPA Policy Statement on Category for Persistent Bioaccumulative and Toxic New Chemical Substances, EPA-HQ-OPPT-2022-0902-0025, Nov. 4, 1999 ("1999 PBT Policy") ............ ACAT-ER-260

Federal Register / Vol. 89, No. 243 / Wednesday, December 18, 2024 / Rules and Regulations 102773

TABLE 1—EPA-APPROVED NON-REGULATORY AND QUASI-REGULATORY MEASURES—Continued

[Excluding certain resolutions and statutes, which are listed in tables 2 and 3, respectively] [1]

| Name of SIP provision | Applicable geographic or nonattainment area or title/subject | State submittal date | EPA approval date | Explanation |
|---|---|---|---|---|
| * * * | * | * | * | * |

[1] Table 1 is divided into three parts: Clean Air Act Section 110(a)(2) State Implementation Plan Elements (excluding Part D Elements and Plans), Part D Elements and Plans (other than for the Metropolitan Phoenix or Tucson Areas), and Part D Elements and Plans for the Metropolitan Phoenix and Tucson Areas.

* * * * *

■ 3. Section 52.145 is amended by adding paragraph (o) to read as follows:

**§ 52.145 Visibility protection.**

* * * * *

(o) *Disapproval.* On August 15, 2022, the Arizona Department of Environmental Quality submitted the ''State Implementation Plan Revision: Regional Haze Program (2018–2028).''

(1) The following portions of the ''State Implementation Plan Revision: Regional Haze Program (2018–2028)'' are disapproved because they do not meet the applicable requirements of Clean Air Act sections 169A and 169B and the Regional Haze Rule in 40 CFR 51.301 through 51.308.

(i) Chapters 2, 6.1, 6.2, 6.3, 7, 8, 9, and 10;

(ii) Appendices B, C, D, E, F, G, H, I, J, and L.

■ 4. Section 52.147 is amended by adding paragraph (f) to read as follows:

**§ 52.147 Interstate transport.**

* * * * *

(f) *Disapproval.* The SIPs submitted on December 11, 2015 and September 24, 2018 do not meet the requirements of Clean Air Act section 110(a)(2)(D)(i)(II) (interfere with measures in any other state to protect visibility, only) for the 2012 $PM_{2.5}$ NAAQS and the 2015 ozone NAAQS, respectively.

[FR Doc. 2024–29508 Filed 12–17–24; 8:45 am]

BILLING CODE 6560–50–P

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 68, 372, 703, 720, 721, 723, 725, and 761

**[EPA–HQ–OPPT–2022–0902; FRL–7906–02–OCSPP]**

**RIN 2070–AK65**

## Updates to New Chemicals Regulations Under the Toxic Substances Control Act (TSCA)

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA or the Agency) is amending the new chemicals procedural regulations under the Toxic Substances Control Act (TSCA). These amendments align the regulatory text with the amendments to TSCA's new chemicals review provisions contained in the Frank R. Lautenberg Chemical Safety for the 21st Century Act, enacted on June 22, 2016, will improve the efficiency of EPA's review processes, and update the regulations based on existing policies and experience implementing the New Chemicals Program. This final rule includes amendments that will increase the quality of information initially submitted in new chemicals notices and improve the Agency's processes for timely, effective completion of individual risk assessments and the new chemicals review process overall. EPA is also finalizing several amendments to the regulations for low volume exemptions (LVEs) and low release and exposure exemptions (LoREXs), which will require EPA approval of an exemption notice prior to commencement of manufacture, make per- and polyfluoroalkyl substances (PFAS) categorically ineligible for these exemptions, and provide that certain persistent, bioaccumulative, toxic (PBT) chemical substances are ineligible for these exemptions.

**DATES:** This final rule is effective January 17, 2025.

**ADDRESSES:** The docket for this action, identified by docket identification (ID) number EPA–HQ–OPPT–2022–0902, is available online at *https://www.regulations.gov.* Additional instructions for visiting the docket, along with more information about dockets generally, is available at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** *For technical information contact:* Tyler Lloyd, New Chemicals Division (7405M), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001; telephone number: (202) 564–4016; e-mail address: *lloyd.tyler@epa.gov.*

*For general information contact:* The TSCA-Hotline, ABVI-Goodwill, 422 South Clinton Ave., Rochester, NY 14620; telephone number: (202) 554–1404; e-mail address: *TSCA-Hotline@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Executive Summary

*A. Does this action apply to me?*

You may be potentially affected by this action if you intend to manufacture a new chemical substance, or manufacture or process a chemical substance for a significant new use. The following list of North American Industrial Classification System (NAICS) codes is not intended to be exhaustive, but rather provides a guide to help readers determine whether this document applies to them. Potentially affected entities may include:

- Chemical Manufacturers (NAICS code 325).
- Petroleum and Coal Products (NAICS code 324).
- Merchant Wholesalers, Nondurable Goods (NAICS code 424).

This list details the types of entities that EPA is aware could potentially be regulated by this action. Other types of entities not listed could also be regulated. To determine whether your entity is regulated by this action, you should carefully examine the applicability criteria found in 40 CFR 720.22, 721.5, 723.50, and 725.1. If you have questions regarding the applicability of this action, please consult the technical person listed under **FOR FURTHER INFORMATION CONTACT**.

*B. What is the Agency's authority for taking this action?*

EPA is promulgating this rule pursuant to its authority in TSCA section 5 (15 U.S.C. 2604). Section 5(a)(1) of the Toxic Substances Control Act (TSCA), 15 U.S.C. 2604(a)(1), as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act of 2016 (Pub. L. 114–182) (herein referred to as the ''2016 Lautenberg

Amendments''), provides that no person, as defined at 40 CFR 720.3, may manufacture (which includes import under TSCA) a new chemical substance or manufacture or process a chemical substance for a use which EPA has determined is a significant new use, unless at least 90 days prior to such manufacture or processing that person submits a notice to EPA containing the information required by TSCA section 5(d). EPA must conduct a review of the notice, make one of five possible determinations pertaining to the likelihood of unreasonable risk of injury to health or the environment, and take any actions required as a result of that determination, all within the applicable review period. The submitted notice must include the information described in TSCA section 5(d)(1): insofar as known to the submitter or reasonably ascertainable, information described in certain provisions of TSCA section 8(a)(2) (*e.g.,* chemical identity, use, and exposure information); in the form and manner prescribed by EPA, information in the possession or control of the submitter related to the health or environmental effects of the chemical substance; and a description of any other information concerning the environmental and health effects of the chemical substance, insofar as known to the submitter or reasonably ascertainable.

*C. What action is the Agency taking?*

EPA is promulgating amendments to the procedural regulations at 40 CFR parts 720, 721, and 725 to align with the requirements in TSCA section 5, as amended by the 2016 Lautenberg Amendments, and to make additional updates. EPA is amending the regulations to specify that EPA must make a determination on each Pre-Manufacture Notice (PMN), Significant New Use Notice (SNUN), and Microbial Commercial Activity Notice (MCAN) received before the submitter may commence manufacturing or processing of the chemical substance that is the subject of the notice, and to list the five possible determinations and the actions required in association with those determinations. In addition, EPA is finalizing amendments that will clarify the level of detail expected for the information that a submitter is required to include in a PMN, SNUN, or exemption notice in order for the notice to be considered complete. EPA is also finalizing amendments to the procedures for reviewing PMNs and SNUNs; specifically, procedures for addressing PMNs and SNUNs that have errors or are incomplete or that are amended during the applicable review period. Additionally, EPA is finalizing several amendments to the regulations at 40 CFR 723.50 for LVEs and LoREXs. These amendments would require EPA approval of an exemption notice before the submitter may commence manufacture, allow EPA to inform an LVE or LoREX holder when the chemical substance that is the subject of the exemption becomes subject to a significant new use rule (SNUR) under TSCA and the chemical identity is confidential, make PFAS categorically ineligible for these exemptions, and make certain PBTs ineligible for these exemptions. Finally, EPA is amending the regulations pertaining to suspensions for all TSCA section 5 notices to allow submitters to request suspensions for up to 30 days via oral or e-mail request. This final rule takes into consideration comments received on the proposed rule (88 FR 34100, May 26, 2023 (FRL–7906–01–OCSPP)). Details on the final rule requirements, including modifications from the proposal, are explained in Unit III.

*D. Why is the Agency taking this action?*

Under amended TSCA, EPA must review all notices submitted under TSCA section 5(a)(1) and make a determination pertaining to the risks of new chemical substances or significant new uses of chemical substances described in such notices before they can proceed to the marketplace. Before the 2016 Lautenberg Amendments, TSCA allowed the PMN or SNUN submitter to commence manufacturing or processing upon expiration of the review period unless EPA made an affirmative finding of unreasonable risk. Under amended TSCA, EPA must review all notices submitted under TSCA section 5(a)(1) and make a determination pertaining to the risks of every new chemical substance or significant new use of a chemical substance described in such notices before they can proceed to the marketplace. To reflect and better meet these requirements, EPA is amending the procedural regulations codified at 40 CFR parts 720, 721, and 725 and making additional updates based on existing policies or lessons learned from administering the New Chemicals Program since TSCA was amended in 2016.

EPA is also finalizing amendments that will clarify the information that is required to be included in PMNs, SNUNs, and exemption notices to reduce the need to redo all or part of the risk assessment (''rework'') due to late submissions of information. This action is expected to reduce rework of risk assessments by minimizing requests from submitters to amend their PMNs, SNUNs, or exemption notices with additional information after the review period has commenced. The Agency is also finalizing amendments to make clear the procedures that will be employed if submitters amend their PMNs or SNUNs during the applicable review period.

EPA is amending the regulations for LVEs and LoREXs so that submitters may not commence manufacture until EPA has issued a decision for the exemption notice, to better ensure that manufacture under LVEs and LoREXs will not present an unreasonable risk. Additionally, EPA is promulgating amendments that allow the Agency to notify submitters if a chemical substance for which they hold an LVE or LoREX is or becomes subject to a proposed or final SNUR and the chemical identity is confidential, so that chemical manufacturers are made aware that they may be subject to additional TSCA requirements. EPA is also finalizing amendments to make PFAS categorically ineligible for an LVE or LoREX, which would ensure that all new PFAS are reviewed through the full PMN process. In addition, EPA is making certain PBTs ineligible for these exemptions, to better manage risks associated with PBT chemical substances that have anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms.

Lastly, EPA is promulgating amendments that will allow informal (oral or e-mail) requests for review period suspensions of up to 30 days to reduce the number of repeated requests for 15-day suspensions, because EPA believes that e-mail may be more expedient than oral communication for many submitters.

*E. What are the estimated incremental impacts of this action?*

EPA has evaluated the costs and benefits of this rulemaking and provided an Economic Analysis (EA) of the potential impacts associated with this rule, titled ''Economic Analysis for the Final Rule: Updates to New Chemicals Regulations under the Toxic Substances Control Act'' (Ref. 1), which is available in the docket and briefly summarized here. The benefits of the rule include increased efficiency in both the submission and review processes for notices submitted through the PMN form. The changes under this rule would clarify the information requirements on the PMN form in the Agency's Central Data Exchange (CDX) to make more transparent the level of detail that EPA needs in order to make

a reasoned evaluation. As submitters provide more complete information in their initial submissions, the changes under this rule are expected to reduce the frequency with which PMNs, SNUNs, and exemption notices are amended with additional information and the amount of rework of risk assessments that the Agency conducts following such amendments.

In addition, the more detailed and comprehensive 90-day review afforded to PMNs allows EPA to make a more informed hazard determination for PFAS, leading to improvement in the expected outcome of these decisions. More informed decision making about a PFAS's potential risks is likely to result in a reduction in the cost of risk-based decision making about the PFAS, and an improvement in the expected outcome of the decisions.

As a result of the changes presented in this rule, the total annual burden to industry is expected to decrease by approximately 4,528 hours, while total annual costs to industry submitters are expected to have a net increase of approximately $203,150. The Agency is expected to experience an annual cost savings of approximately $1,117,132.

## II. Background

### *A. What did EPA propose?*

On May 26, 2023 (88 FR 34100; FRL–7906–01–OCSPP), EPA proposed amendments intended to align the regulatory text with the amendments to TSCA's new chemicals review provisions contained in the 2016 Lautenberg Amendments, to improve the efficiency of EPA's review processes, and update the regulations based on existing policies and experience implementing the New Chemicals Program. Additionally, the proposal included amendments that would reduce the need to redo all or part of a risk assessment by improving information initially submitted in new chemicals notices, which should also help reduce the length of time that new chemicals notices are under review. EPA also proposed several amendments to the regulations for LVEs and LoREXs, which included requiring EPA approval of an exemption notice prior to commencement of manufacture, making PFAS categorically ineligible for these exemptions, and providing that certain PBT chemical substances would be made ineligible for these exemptions, consistent with EPA's 1999 PBT policy. Lastly, the proposal included amendments related to the suspension of the review period.

### *B. How did the 2016 Lautenberg Amendments change TSCA section 5?*

As enacted in 1976, TSCA provided EPA with authority to require reporting, recordkeeping, and testing, and to issue restrictions relating to chemical substances and/or mixtures. TSCA section 5(a)(1) required that a person submit to EPA a notice at least 90 days before commencing manufacture of a new chemical substance or manufacture or processing of a chemical substance for a use which EPA determined to be a significant new use. Under the 1976 law, EPA was not obligated to make a determination or finding regarding unreasonable risk for each notice submitted under TSCA section 5(a)(1). EPA's obligations with respect to making determinations on notices submitted under TSCA section 5(a)(1) fundamentally changed with the passage of the 2016 Lautenberg Amendments. The 2016 Lautenberg Amendments added a new paragraph to TSCA at section 5(a)(3) titled ''Review and Determination,'' under which EPA must review and make one of five determinations pertaining to the likelihood of risk on all notices received under TSCA section 5(a)(1), which include PMNs, SNUNs and MCANs, within the applicable review period. EPA's obligation to take action after making a determination on a notice submitted under TSCA section 5(a)(1) also changed with the passage of the 2016 Lautenberg Amendments.

The 2016 Lautenberg Amendments require EPA to review each notice submitted under TSCA section 5(a)(1), make a determination on that notice, and take the action required in association with that determination within the applicable review period. Under TSCA section 5(i)(3), the ''applicable review period'' means 90 days from the date EPA receives a notice under TSCA section 5(a)(1), or up to 180 days from that date if EPA extends the applicable review period according to the provisions in TSCA section 5(c). The 2016 Lautenberg Amendments also added a new paragraph at TSCA section 5(a)(4) explaining that a failure by EPA to render a determination within the applicable review period would not relieve EPA of any requirement to make such determination, but would, with certain exceptions, result in a fee refund to the notice submitter.

TSCA section 5(h) was not significantly amended by the 2016 Lautenberg Amendments. TSCA section 5(h) provides EPA the authority to exempt a person from certain TSCA section 5 requirements under certain situations. EPA developed the current LVE and LoREX regulations in 1995 pursuant to TSCA section 5(h)(4) (60 FR 16336, March 29, 1995). See Unit II. of the May 26, 2023, proposed rule (88 FR 34100) for further discussion of the 2016 Lautenberg Amendments.

### *C. How are the new chemicals regulations structured?*

EPA's regulations related to TSCA section 5 are codified in Title 40, Chapter I, Subchapter R of the Code of Federal Regulations (CFR). They include:

- Regulations pertaining to PMNs, which are codified at 40 CFR part 720;
- Regulations pertaining to SNUNs, which are codified at 40 CFR part 721;
- Regulations pertaining to certain exemptions, which are codified at 40 CFR part 723; and
- Regulations pertaining to MCANs and microorganism-related exemptions, which are codified at 40 CFR part 725.

The information requirements codified for PMNs in 40 CFR 720.45 generally also apply to SNUNs under 40 CFR part 721 (see 40 CFR 721.1(c) and 721.25(a), which cross-reference 40 CFR part 720) and to LVEs and LoREXs submitted under 40 CFR 723.50 (see 40 CFR 723.50(e)(2), which cross-references 40 CFR 720.45). As a result, the amendments to the requirements in 40 CFR 720.45 apply to PMNs and also to SNUNs, LVEs, and LoREXs. The review procedures for PMNs codified in 40 CFR part 720 generally also apply to SNUNs under 40 CFR part 721 (see 40 CFR 721.25(c)) but not to exemptions under 40 CFR part 723, so the amendments to the part 720 review procedures promulgated by this action apply to PMNs and SNUNs but not to such exemptions. Neither the information requirements nor the review procedures in 40 CFR part 720 apply to MCANs or microorganism-related exemptions under 40 CFR part 725, so EPA is also finalizing certain amendments to the MCAN and microorganism-related exemption regulations at 40 CFR part 725.

### *D. Did EPA receive public comments on the proposed rule?*

EPA received 51 public comments on the proposed rule. Commenters included potentially affected businesses, trade associations, environmental and public health advocacy groups, unions, and other Federal agencies. In this preamble, EPA has responded to many of the significant comments on the proposed rule; however, the more comprehensive version of EPA's response to comments for this rulemaking can be found in the Response to Comments document (Ref.

2). The Response to Comments document summarizes all the comments relevant to the proposal and EPA's response to those comments. In the Response to Comments document, EPA also discusses any changes to and clarifications from the proposed rule made in this final rule.

## III. Overview of the Final Rule

This final rule is based on the May 26, 2023, proposed rule (88 FR 34100) and in consideration of the public comments received on the proposed rule.

### *A. Amendments To Conform Regulations to 2016 Lautenberg Amendments*

EPA is amending the PMN procedural regulations at 40 CFR part 720 to align them with the notice review and determination requirements in TSCA section 5, as amended by the 2016 Lautenberg Amendments. These procedural regulations also generally apply to SNUNs under 40 CFR part 721 (see 40 CFR 721.1(c) and 721.25(c)). EPA is also promulgating similar changes to the MCAN procedural regulations at 40 CFR part 725 to align them with the same notice review and determination requirements added by the 2016 Lautenberg Amendments. EPA has been implementing the amended statutory requirements but, prior to this rulemaking, had not yet codified these updates into the new chemicals procedural regulations. The amendments specify that EPA must make a determination on each PMN, SNUN, and MCAN received before the submitter may commence manufacturing (which includes importing) or processing and lists the five possible determinations and the actions required in association with those determinations. EPA is also adding definitions for new terms and to update existing terminology introduced by the 2016 Lautenberg Amendments.

#### 1. Commencement of Manufacture or Processing

As proposed, EPA is finalizing amendments at 40 CFR 720.75(d) by removing outdated language allowing the submitter to commence manufacture of a chemical substance when the review period expires and adding new language specifying that EPA must issue a determination and take any required action on each PMN before manufacture may commence. EPA is also finalizing an amendment to 40 CFR 721.25(d) to state that any person submitting a SNUN shall not manufacture or process a chemical substance for a significant new use until EPA has issued a determination with respect to the significant new use and taken the actions required in association with that determination. Likewise, EPA is finalizing an amendment at 40 CFR 725.170(b) and (c) by removing similar outdated language allowing the submitter to commence manufacture of a new microorganism or manufacture or processing of a microorganism for a significant new use when the review period expires and adding new language specifying that EPA must issue a determination and take any required action on each MCAN before manufacture or processing may commence.

Some comments on the proposal challenged the EPA's description of how the New Chemicals Program operated prior to the passage of the 2016 Lautenberg Amendments and suggested that the 2016 Lautenberg Amendments had only minor impacts on the Program. EPA disagrees with these comments, as prior to the 2016 Lautenberg Amendments, EPA was not required to conduct a review of and issue a determination for every notice. Following the 2016 Lautenberg Amendments, EPA must review all notices submitted under TSCA section 5(a)(1) and make a determination pertaining to the risks of a new chemical or significant new use of an existing chemical before it is allowed into the marketplace. For a detailed response to these and other comments, please see the Response to Comments document (Ref. 2).

#### 2. Required Determinations and Associated Actions

As proposed, EPA is finalizing amendments at 40 CFR 720.75(d) and 725.170 by listing the five possible determinations that EPA must make for each PMN, SNUN, or MCAN it receives. EPA is also finalizing amendments to 40 CFR 720.75(d) and 725.170(b) to describe the actions that EPA must take in association with its determination for a PMN, SNUN, or MCAN. EPA is codifying those actions, which EPA has been implementing, as applicable, for every PMN, SNUN, and MCAN since the 2016 Lautenberg Amendments, to be clear about EPA's review process to the public.

After EPA issues an order under TSCA section 5(e) or (f) and the applicable review period concludes, the submitter may submit studies, tests, reports, or other additional information. If EPA concludes from an assessment of the additional information that one or more of the prohibitions or limitations contained in the order are no longer necessary to protect against an unreasonable risk of injury to health or the environment, EPA may modify or revoke the prohibitions or limitations of the order. If EPA determines that none of the order terms are warranted after assessment of the additional information, EPA may revoke all the requirements of the order.

Several comments on the proposed rule asserted that EPA not only has the authority to revoke or lessen restrictions in an order after it has been issued, but also can and must strengthen protections in an order based on new information received on a chemical substance that demonstrates the order is insufficient to protect against unreasonable risk. The commenters further urged EPA to clarify that an order may be modified based on new information obtained from any source, not solely the submitter. EPA agrees with these commenters and a detailed response is available in the Response to Comments document (Ref. 2). Upon consideration of these comments, EPA is modifying the proposed amendments at 40 CFR 720.75(d)(3) and 725.170(b)(3) to clarify that new information may be received from any source, and to add that where such information demonstrates that the prohibitions or limitations of the order are not sufficient to protect against an unreasonable risk of injury to health or the environment, EPA may modify the order or take other action, as appropriate, to the extent necessary to protect against such risk.

#### 3. Other Updates

As proposed, EPA is finalizing amendments to the regulation that will replace the undefined terms "notice period," "notification period," "statutory review period," and "notice review period" with the term "applicable review period" throughout 40 CFR part 720 to conform to the new terminology in TSCA section 5 added by the 2016 Lautenberg Amendments. EPA is also finalizing an amendment to add, as proposed, a definition for "applicable review period" to 40 CFR 720.3, which EPA would define as the period starting on the date EPA receives a complete notice under section 5(a)(1) of the Act and ending 90 days after that date or on such date as is provided for in sections 5(b)(1) or 5(c) of the Act. In response to the proposed amendment adding a definition for "applicable review period," commenters expressed difficulty in determining what EPA considers to be a complete notice and requested that the Agency clearly define what constitutes a notice that is "complete." EPA considers a complete notice to be a notice that meets all the procedural requirements indicated in 720.65(c)(1) (*e.g.* a notice that includes

a company signature, is submitted via CDX, includes a second copy of the submission with all confidential information deleted, includes the payment identity number, etc.) and includes all required information that is known to or reasonably ascertainable by the submitter, as described in 720.45 and 720.50. A submission that fails to meet the statutory information requirements is incomplete, and EPA is justified in refusing to review the notice until the information is received. In the Response to Comments document (Ref. 2), EPA discusses in more detail the longstanding definition of ''known to or reasonably ascertainable by'' and its application in specific contexts.

After considering the comments, EPA is finalizing an amendment to add a definition for ''potentially exposed or susceptible subpopulation'' (PESS) to 40 CFR 720.3. For this rule, EPA is defining ''potentially exposed or susceptible subpopulation'' as proposed and using the same definition that was proposed and finalized as part of the rulemaking entitled ''Procedures for Chemical Risk Evaluation under the Toxic Substances Control Act (TSCA)'' (89 FR 37028, May 3, 2024 (FRL–8529–02–OCSPP)).

As a primary matter, the inclusion of ''overburdened communities'' in the list of example subpopulations in this definition is not itself a determination. Rather, it is an example of a subpopulation that EPA may identify as a PESS in future risk assessments, and it is reflective of the reality that, in addition to groups like children and pregnant women, there are communities of people that may experience disproportionate environmental risks from chemicals due to greater exposure or susceptibility to environmental and health harms.

EPA proposed to add a regulatory definition of PESS that includes the term ''overburdened communities'' in the list of example subpopulations. This term, which is an addition to the examples provided in the statutory definition of PESS at TSCA section 3(12), reflects the Agency's understanding and acknowledgment that a chemical substance may disproportionately expose and/or may disproportionately impact communities already experiencing disproportionate and adverse human health or environmental burdens. Such disproportionality can be as a result of greater exposure or vulnerability to environmental hazards, lack of opportunity for public participation, or other factors. Increased exposure or vulnerability may be attributable to an accumulation of negative or lack of positive environmental, health, economic, or social conditions within these populations or places. The term describes situations where multiple factors, including both environmental and socio-economic stressors, may act cumulatively to impact health and the environment and contribute to persistent environmental health disparities. These situations may apply to communities with environmental justice concerns.

While some commenters on the proposed rule objected to the inclusion of ''overburdened communities,'' EPA believes that it is appropriate to include ''overburdened communities'' as an example subpopulation in the definition of PESS. Congress' inclusion of ''such as'' in the statutory definition provides EPA with clear discretion to go beyond the statute's list of examples. EPA further disagrees that this addition is substantively changing the criteria for identification of PESS (i.e., greater exposure or susceptibility and greater risk than general population).

EPA does not believe it is necessary to define ''overburdened communities'' as part of this rule. In the same way that EPA considers whether children or workers or the elderly are a PESS in the context of a specific risk assessment, EPA will look to whether ''overburdened communities'' may become subject to exposure or could be more susceptible than the general population. EPA does not intend for this term to be confined to a location or geographic proximity but would use reasonably available information for each new chemical substance or significant new use to determine the inclusion of specific communities. Those who could potentially experience ''greater exposure'' could include individuals or communities that would experience higher levels of exposure to a chemical substance due to geography (e.g., fenceline communities in close proximity to facilities that could emit air pollutants or living near potential effluent releases to water), unique exposure pathways that differ from those of the general population (e.g., Tribal communities where reliance on subsistence fishing may result in increased exposure via ingestion), and/or aggregate exposure via multiple conditions of use (e.g., a worker potentially exposed to the chemical substance who also lives in close proximity to the facility that may also release the chemical substance through air emissions).

In making these additions to 40 CFR 720.3, EPA is also revising the overall format used to list the definitions in 40 CFR 720.3, by removing the designations for each definition and adopting the alphabetical listing approach consistent with the recommendation of the Office of the Federal Register (OFR). See page 2–27 of the OFR's Document Drafting Handbook, August 2018 Edition (Revision 2.1, dated October 2023), *https://www.archives.gov/federal-register/write/ddh/*. Specifically, EPA is using the revise and republish instructions in the regulatory text of this final rule to reflect the addition of the two definitions and the adoption of the recommended undesignated alphabetical listing format for this definition section. This change also requires corresponding technical corrections to the citation in several other regulations. The existing definitions and these other regulations are otherwise unchanged. Conforming edits to remove the designations for the definitions in 40 CFR 720.3 are being made to 40 CFR 68.115, 372.38, 703.3, and 761.3.

EPA is also promulgating an update to 40 CFR 720.70(b) by revising paragraph (b)(3). Some commenters opposed EPA's proposal to remove the regulatory-only requirement in 40 CFR 720.70(b)(3) to publish a list of test data submitted in accordance with 40 CFR 720.50(a) in the TSCA section 5(d)(2) notice of receipt. EPA disagrees with these comments. As EPA explained in the preamble to the proposed rule (88 FR 34100, May 26, 2023), the Agency believes that its objective of providing such information to the public is now better achieved through ChemView than through publication in the **Federal Register.** Through ChemView, the Agency currently makes the section 5 notice, including test data submitted with it, publicly available generally within 5 business days of receipt, subject to confidentiality protections. EPA is finalizing the change to 720.70(b)(3) as proposed. For additional response to the comments received on the amendments to 40 CFR 720.70(b)(3), see the Response to Comments document (Ref. 2).

*B. Amendments Related to Notice Information Requirements*

EPA is promulgating amendments to the notice information requirements at 40 CFR 720.45, as well as corresponding changes to the PMN form in CDX, to clarify the level of detail expected for information that must be submitted to EPA in PMN, SNUN, and certain exemption notices. EPA is finalizing these amendments largely as proposed, with most changes representing minor clarifications to the proposed regulatory text in response to the comments.

1. Background

A notice submitted under TSCA section 5(a)(1) must include the information described in TSCA section 5(d)(1): (1) insofar as known to the submitter or reasonably ascertainable, information described in certain provisions of TSCA section 8(a)(2); (2) in the form and manner prescribed by EPA, information in the possession or control of the submitter related to the health or environmental effects of any manufacture, processing, distribution in commerce, use, or disposal of the chemical substance or any article containing such substance; and (3) a description of any other information concerning the environmental and health effects of the chemical substance, insofar as known to the submitter or reasonably ascertainable. EPA has promulgated regulations detailing these information requirements in 40 CFR 720.45 and 720.50.

EPA has developed an application form in CDX to collect such information from submitters. The user guide for CDX is listed in the references section of this final rule and can be found in the docket (Ref. 3). This form is prescribed by EPA for submission of PMNs, SNUNs, LVEs, LoREXs, and test marketing exemption (TME) applications. In this preamble, EPA refers to the form as the ''PMN form'' for simplicity, but the changes outlined in this section would impact the other types of notices that use the same form (*i.e.,* PMNs, SNUNs, LVEs, LoREXs, and TMEs).

EPA has observed that most section 5 notices do not contain all required information at the level of detail that EPA needs to perform refined risk assessments. As described in the preamble of the proposed rule, these deficiencies frequently result in EPA using conservative assumptions in its risk assessments due to lack of available data, which can create delays in the timeline for case completion, particularly when submitters provide information to EPA late in a case's review in response to risk estimates stemming from the lack of available data. In recent years, EPA has issued guidance documents (Ref. 3 and 4), established pre-screen processes for incoming cases, and conducted outreach efforts (Ref. 5) to make clearer to submitters the level of detail necessary for timely review of their chemicals, as well as to minimize the need for costly rework of case assessment materials. EPA believes that amending the notice information requirements at 40 CFR 720.45 to specify the level of detail needed, as well as building that additional detail into the CDX user interface, will help submitters provide more detailed section 5 notices and help to minimize the need for EPA to use default values and conservative assumptions in its risk assessments due to the lack of available data. Therefore, EPA is finalizing the amendments to the notice information requirements at 40 CFR 720.45 as well as the corresponding changes to the PMN form in CDX largely as described in the proposed rule.

2. Changes to 40 CFR 720.45, 40 CFR 720.50, and the PMN Form

EPA is amending 40 CFR 720.45 and the PMN form in CDX to clarify the information requirements for a notice. Specifically, EPA is adding details to certain information requirements already contained in 40 CFR 720.45. EPA is also adding additional reporting fields to the PMN form to reflect these details. In this action, EPA is adding these details as separate, unique information requirements in 40 CFR 720.45 and making corresponding changes to the PMN form to clarify the level of detail needed for EPA's review of section 5 notices and to ensure that the fields in the PMN form are consistent with the regulations. In some cases, information requested in the PMN form is not clearly required in the 720.45 regulations, so EPA is adding those details to 40 CFR 720.45 to ensure that the regulations and PMN form are as consistent as possible. Although EPA is finalizing these amendments largely as they were described in the proposed rule, changes, mostly to improve clarity, have been made to some amendments in response to comments received by EPA. In response to comments, EPA is also finalizing additional amendments to the regulations at 720.45 and 720.50, as well as to the PMN form in CDX, that further add clarity and better align the PMN form with the regulations. See Ref. 6, which includes tables that detail the changes that are being made to 40 CFR 720.45, 720.50, and the CDX interface per this final rule. Additionally, EPA has amended 40 CFR 723.50(e) to update a cross-reference to 40 CFR 720.45 based on the amendments made in this rule.

Consistent with TSCA section 5(d)(1), for all information requirements under 40 CFR 720.45, submitters are only required to provide information to the extent that it is known to or reasonably ascertainable by the submitter, as defined at 40 CFR 720.3. Under the amendments to 40 CFR 720.45, a submitter is required to include in the PMN form the detailed information finalized in this action, along with all other information already required, to the extent the information is known to or reasonably ascertainable by the submitter. This is an important point because a submitter may not know or be able to reasonably ascertain certain details about the chemical substance that is the subject of the notice, such as details about manufacturing, processing, or use sites not controlled by the submitter. In those situations, EPA will make conservative assumptions and use default values for any information that is not known to or reasonably ascertainable by the submitter and therefore not provided in the PMN form.

Based on a public comment, EPA is adding language to 720.50(c) to clarify that submitters can submit additional information not otherwise required by 720.50(a)–(b) to facilitate EPA's review of the notice.

a. Physical and Chemical Properties and Environmental Fate Characteristics

The first set of detailed information requirements that EPA is adding to 40 CFR 720.45 concerns the physical and chemical properties and environmental fate characteristics of the chemical substance (see Table 1 in Ref. 6). Currently, if submitters have physical-chemical or environmental fate test data, they must provide the test data or a standard literature citation in accordance with 720.50(a)(2)–(3). EPA collects physical and chemical properties test data required by 40 CFR 720.50, ''Submission of test data and other data concerning the health and environmental effects of a substance,'' in two ways. First, the CDX user interface prompts the submitter to attach relevant documents, such as test data, to the PMN form using an attachment function. Second, the PMN form includes a CDX user interface screen with form fields for physical and chemical properties available for completion via a pick list. Data provided in the PMN form via CDX may be pulled from the test data provided by submitters per 720.50(a)(2)–(3), or the data can be submitted as standalone information for which submitters do not have underlying test data. EPA believes that the information requirements in 40 CFR 720.45 should reflect the PMN form fields. EPA is therefore adding relevant physical and chemical properties information requirements in a new provision at 40 CFR 720.45(j)(1) that are already specified within the PMN form. Submitters must submit physical-chemical and environmental fate information in the corresponding PMN form fields in accordance with new paragraph 720.45(j), which is added as described in the proposed rule.

EPA is also adding several information requirements to 40 CFR 720.45(j)(1) that are not already specified within the PMN form for physical and chemical properties. Specifically, EPA is requiring that data on surface tension and ultraviolet–visible (UV–VIS) absorption, as well as any particle size distribution analysis, be submitted as part of the PMN form, to the extent it is known to or reasonably ascertainable by the submitter. One commenter requested that EPA clarify the language outlined in the proposed rule for the particle size distribution analysis data requirement to make it clear that it includes both the analysis method as well as any data used to develop the particle size distribution value, a suggestion that EPA is incorporating in this final rule. Two commenters requested that EPA include several amendments to the nanomaterial morphology requirements outlined in the proposed rule, recommendations that EPA considers to be overly prescriptive and as such is declining to finalize. Additionally, after considering these comments, EPA anticipates that the proposed requirements at 40 CFR 720.45(j)(1) for information on aspect ratio, thickness, and number of layers or walls for nanomaterials are likely to be applicable only to a narrow subset of nanomaterials. Because this information would not be relevant to most nanomaterials, EPA will not include the proposed nanomaterial data requirements in the final regulations. For all other amendments to 40 CFR 720.45(j), as was proposed in the May 2023 proposed rule, EPA will also add fields for attaching associated data on the physical and chemical properties screen of the PMN form.

As proposed, EPA is also adding information requirements for the environmental fate characteristics of the chemical substance (see Table 1 in Ref. 6) to 40 CFR 720.45(j)(2). Environmental fate characteristics test data are already required by 40 CFR 720.50; however, this provision does not describe in detail what these relevant characteristics include. In addition, this information is already collected by EPA as attachments to the PMN form; however, fields for environmental fate characteristics are not yet included on the CDX user interface screen pick list. EPA is thus adding the relevant environmental fate characteristics to the information requirements at 40 CFR 720.45(j)(2) and form fields to the PMN form by expanding the pick list.

b. Categories of Use

The next set of changes that EPA is finalizing at 40 CFR 720.45 relates to the categories of use of the chemical substance (see Table 2 in Ref. 6). The requirements being finalized include detailed information on commercial and consumer uses, which already have form fields in the PMN form in CDX. Although the regulations at 40 CFR 720.45(f) previously required a description of intended categories of use by function and application, the estimated percent of production volume devoted to each category of use, and the percent of the new substance in the formulation for each commercial or consumer use, certain details on commercial and consumer uses were not specified. The added information requirements include the types of products or articles that would incorporate the new chemical substance (*e.g.,* household cleaners, plastic articles), how and where a product or article incorporating the new chemical substance would be used (*e.g.,* spray applied indoors, brushed on outdoor surfaces), consumption rates and frequency and duration of use for products or articles containing the new chemical substance, and information related to the use of products or articles containing the new chemical substance by potentially exposed or susceptible subpopulations. Additionally, EPA is finalizing at 40 CFR 720.45(f) a requirement to designate applicable consumer and commercial product categories using Organization for Economic Co-operation and Development (OECD)-based functional use codes, which would create consistency with TSCA section 8(a) Chemical Data Reporting (CDR) requirements in 40 CFR part 711. EPA is finalizing corresponding changes to the PMN form fields in CDX for this data element. EPA is also finalizing amendments to 40 CFR 721.25 to ensure that submitters of SNUNs include in their notice both a description of the intended categories of use, as required by 40 CFR 720.45(f)(1), and of all known categories of use, to the extent known to or reasonably ascertainable by the submitter. Such categories of use may include uses that are ongoing and not subject to a significant new use rule (SNUR). Such information is valuable for EPA in determining necessary regulatory action should potential risks be identified during review of a SNUN. In the final rule, this provision appears in a new paragraph (e) of 40 CFR 721.25 rather than as an addition to paragraph (c), and the text was rephrased slightly for clarification. One commenter requested that EPA include a provision at 40 CFR 720.45(f) that would require submitters with chemicals having more than 10 intended uses to designate codes only for the 10 uses that represent the largest proportion of the anticipated production volume of the chemical, a suggestion that EPA is finalizing. EPA, however, will still require submitters to identify in the free form text field of the PMN form all intended or known uses of the chemical substance.

c. Details Concerning Manufacture, Processing, and Use

The third set of information requirements that EPA is finalizing at 40 CFR 720.45 is information related to where and how the chemical substance will be manufactured, processed, or used. These requirements apply to sites controlled by submitters as well as sites controlled by others, and although the information requirements that EPA is finalizing are similar for both, different types of activities often occur at submitter-controlled sites versus those at sites controlled by others (*e.g.,* manufacturing versus processing). Moreover, activities at sites controlled by others are typically not as well characterized by submitters compared to descriptions of the submitters' own activities, since in many cases the identity and number of sites controlled by others is unknown to and not reasonably ascertainable by the submitters when a notice is submitted. As such, some slight differences exist in the requirements EPA is finalizing for information related to sites controlled by submitters versus sites controlled by others. See Ref. 6 for more details.

Both for sites controlled by submitters and for sites controlled by others, EPA is adding information requirements for site addresses (see Table 3 and Table 5 in Ref. 6). For submitter-controlled sites, EPA is also adding requirements for a description of whether a particular chemical substance is manufactured or processed via batch or continuous production, as well as the amount of the chemical substance manufactured or processed in each batch and/or timeframe (see Tables 3, 4, and 5 in Ref. 6). These information requirements already have a corresponding form field in the PMN form in CDX because they are each covered by the existing information requirements in 40 CFR 720.45(g)(1) and (2) and (h) for a process description of operations at such sites. Since these information requirements were not specified in the regulations, EPA is finalizing them at 40 CFR 720.45(g)(1) and (2) for sites controlled by the submitter and 40 CFR

720.45(h)(1) and (2) for sites not controlled by the submitter.

EPA is also adding requirements for detailed information about the process diagram or description for each site controlled by the submitter (see Table 4 in Ref. 6) and for each site not controlled by the submitter (see Table 5 in Ref. 6). These data elements were previously required but not expressly included in the list of required data elements in 40 CFR 720.45. They include descriptions of the identity, approximate weight per batch or per day for continuous production, and entry point of all starting materials and feedstocks; the identity, approximate weight per batch or per day for continuous production, and entry point of all products, recycle streams, and wastes, including frequency of any equipment cleaning; the type of containers used for interim storage and transport of the chemical substance; and identification, by number, of any points of release. EPA is finalizing requirements for this information at 40 CFR 720.45(g)(2) and (h)(2) and in new fields in the PMN form to clarify the level of detail needed and to ensure that the regulations and PMN form are consistent.

One commenter noted that an existing data requirement related to manufacturing, processing, use, and disposal of chemical substances subject to section 5 notification is ambiguous in its scope. 40 CFR 720.45(d) requires submitters to describe any byproducts resulting from the manufacture, processing, use, and disposal of a chemical substance, and the commenter requested that EPA clarify whether its definition of byproduct includes ''degradation products''. In the Response to Comments document (Ref. 2), EPA notes that byproducts are distinct from degradants and that information on degradants is required under the information requirements outlined in 720.45(j)(2).

d. Worker Exposure

EPA is also finalizing requirements for details about the possible worker exposures at each site controlled by the submitter (see Table 6 in Ref. 6), and at each site not controlled by the submitter (see Table 7 in Ref. 6). These requirements include types of potential worker exposure (*e.g.,* dermal, inhalation), descriptions of any protective equipment and engineering controls in place, the moisture content of the chemical substance (if a solid), and the percentage of the chemical substance in the formulation at the time of exposure. In addition, for sites controlled by others, these requirements also include worker activities and descriptions of the physical form of the chemical substance (consistent with information requirements for sites controlled by the submitter). Although these details are already covered by the existing information requirements in 40 CFR 720.45(g)(3) and (h) regarding worker exposure information, and some already have a corresponding form field in the PMN form in CDX, EPA is finalizing them as separate, unique information requirements at 40 CFR 720.45(g)(3) and (h)(3) and in new fields in the PMN form to clarify the level of detail needed and to ensure that the regulations and PMN form are consistent. One commenter requested that EPA revise the proposed text at 40 CFR 720.45(g)(3) and (h)(3) to clarify that the worker exposure information required in 40 CFR 720.45(g)(3)(ii)-(viii) and (h)(3)(ii)-(viii) pertains to each worker activity occurring during the manufacturing, processing, and use of the chemical substance, as identified pursuant to 720.45(g)(3)(i) and 720.45(h)(3)(i). EPA has incorporated this suggestion in the final rule because it provides additional clarity to submitters.

Several commenters made requests related to worker exposure that, if accepted by EPA, would affect the structure of and level of detail contained in the PMN form in CDX. For example, one commenter requested that EPA allow submitters to assign a ''Letter of Activity'' (a field in CDX to link specific worker activities to operations described in the corresponding manufacturing diagram) to activities at submitter-controlled sites; the option to assign a Letter of Activity already exists for activities at sites controlled by others. Another commenter requested that EPA include in the PMN form dropdown options for ''Worker Activity'' and ''Worker Category'' for sites controlled by others—dropdown options that currently exist for submitter-controlled sites in the PMN form. EPA is finalizing all of the aforementioned suggestions by making corresponding changes to the CDX interface. EPA, however, also received several additional suggestions related to worker exposures that EPA is choosing not to adopt. More information on the comments received relating to worker exposure and EPA's responses can be found in the Response to Comments document (Ref. 2).

Additionally, EPA is finalizing proposed amendments to 40 CFR 720.45(g)(3) and (h)(3) to ensure that submitters include worker exposure information from exempt manufacture or related use of the chemical substance under 40 CFR 720.30 (*e.g.,* manufacture of the chemical substance under the byproduct or impurity exemptions) at each site where the chemical substance will be manufactured, processed, or used, if known or reasonably ascertainable. However, to avoid any confusion occasioned by the abbreviated, non-exhaustive list of exemption examples that appeared in a parenthetical in the proposed regulatory text, the final rule does not include the proposed parenthetical and streamlines the text by simply cross-referencing 40 CFR 720.30.

e. Environmental Releases

EPA is finalizing information requirements concerning the potential environmental releases at each site controlled by the submitter (see Table 8 in Ref. 6) and at each site not controlled by the submitter (see Table 9 in Ref. 6). EPA is requiring descriptions of the type of release (*e.g.,* transport, interim storage, disposal, equipment cleaning), as well as the amount of the chemical substance released directly to the environment or into a control technology. EPA is finalizing an amendment to require a description of the amount of the chemical substance released to the environment after use of a control technology. EPA is also requiring for equipment cleaning releases a description of the frequency of equipment cleaning and what is used to clean equipment. EPA is also requiring for transport and storage releases a description of how the chemical substance or the product containing the chemical substance is transported from the site and stored, as well as information about the containers used. For releases into air, EPA is requiring Clean Air Act operating permit numbers and a description of any Leak Detection and Repair program the site has implemented; one commenter requested that EPA amend the language for this data element to require a description of the type of control technology used to treat stack air releases, which EPA is finalizing. For releases into water, EPA is requiring National Pollutant Discharge Elimination System (NPDES) permit numbers and information on the waterbodies and other destinations into which the release occurs; one commenter requested that EPA also require a description of any outfall numbers associated with the known points of release associated with the NPDES permit number(s), a suggestion that EPA is finalizing. For releases into wastewater treatment plants, EPA is requiring information on the publicly owned treatment works (POTW) into which the release occurs. For the

requirement concerning information on POTW, one commenter requested that EPA amend this data requirement to also specifically request information concerning privately owned treatment works to which releases might occur, the type of wastewater technology employed at any treatment facilities, and the known or estimated treatment efficiency at these facilities—all of which are suggestions that EPA is finalizing. In addition, for sites controlled by others, these requirements also include a description of the media of release consistent with the requirement for sites controlled by the submitter.

Although each of these detailed data elements are already covered by the existing information requirements in 40 CFR 720.45(g)(4) and (h) regarding environmental releases, and some already have a corresponding form field in the PMN form in CDX, EPA is finalizing them as separate, unique information requirements at 40 CFR 720.45(g)(4) and (h)(4) and in new fields in the PMN form to clarify the level of detail needed and to ensure that the regulations and PMN form are consistent.

EPA is finalizing amendments to 40 CFR 720.45(g) and (h) to make their formatting and the information required in both consistent. EPA recognizes that a submitter may not possess such information about sites not controlled by the submitter. As mentioned elsewhere in this preamble and in the Response to Comments document (Ref. 2), submitters are only required to supply information that is known to or reasonably ascertainable by them, as defined at 40 CFR 720.3.

Additionally, EPA is finalizing amendments to 40 CFR 720.45(g)(4) and 720.45(h)(4) to ensure that submitters include environmental release information from exempt manufacture or related use of the chemical substances under 40 CFR 720.30 (*e.g.,* manufacture of the chemical substance under the byproduct or impurity exemptions) at each site where the chemical substance will be manufactured, processed, or used, if known or reasonably ascertainable. However, to avoid any confusion occasioned by the abbreviated, non-exhaustive list of exemption examples that appeared in a parenthetical in the proposed regulatory text, the final rule does not include the proposed parenthetical and streamlines the text by simply cross-referencing 40 CFR 720.30.

f. Pollution Prevention Information

Lastly, EPA is adding optional pollution prevention information at 40 CFR 720.45(k) as proposed. The PMN form in CDX currently includes an optional text field and attachment function for submitters who wish to provide pollution prevention information about the chemical substance, such as information about using alternative fuel sources, reducing the use of water and chemical inputs, modifying a production process to produce less waste, implementing water and energy conservation practices, or substituting for riskier existing products.

3. Other Modifications to the PMN Form in CDX

In addition to the amendments intended to clarify the information requirements for a notice and the corresponding changes to the PMN form in CDX outlined in Unit III.B.1. and 2., EPA is also adding statements with accompanying check boxes to certain screens of the PMN form (such as when transitioning between the various worksheets completed by the submitter) that indicate that information fields can only be left blank if such information is not known to or reasonably ascertainable by the submitter. Additionally, a statement would warn the submitter of the potential consequences of leaving the field blank and later amending the field. If a field is left blank, EPA generally follows the scientifically informed approach to make conservative assumptions and use appropriate default values when assessing risk, which could result in more stringent risk management requirements than might be directed if data were provided showing such assumptions or default values were not necessary to use. If a field that has been left blank is later amended during the review process, EPA may declare the original submission incomplete (see Unit III.C.3. for a more detailed discussion on notice amendments indicating that the original submission was incomplete). Several commenters expressed concerns about the potential burden posed by the inclusion of these check boxes in the CDX workflow, concerns with which EPA disagrees. While the inclusion of check boxes might require submitters to spend slightly more time preparing the PMN form for their section 5 notices, EPA believes that the improved quality of submissions resulting from this, and the other changes being finalized to the CDX environment, will save submitters, as well as EPA, more time, and resources in the long run. This check box approach does not have a corresponding regulatory change, as it is consistent with the existing requirements to provide all information that is known to or reasonably ascertainable by the submitter and EPA's longstanding practice to use conservative assumptions and default values in the absence of information. The ICR document accompanying this final rule describes the potential modifications to each screen of the PMN form (Ref. 7).

Some commenters made requests related to the CDX enhancements outlined in the proposed rule that EPA is addressing in this final rule. First, two commenters requested that EPA include in the enhancements to the CDX interface an option for submitters to, if data are not provided for a particular data element, explain why this information is not known or reasonably ascertainable, a suggestion that EPA will incorporate. Another commenter requested that EPA allow submitters to access a ''beta version'' of the enhanced CDX environment before rolling out the changes to the broader CDX environment. EPA will make efforts to do so and plans to share more information with stakeholders via outreach once this final rule is published. The CDX enhancements described in this rulemaking will not be finalized upon publication or effective date of the final rule. The enhancements will take time to develop, and EPA will make the updated CDX interface reflecting these changes publicly available as soon as resources allow. However, submitters are currently able to include all information for the newly specified data elements described in this preamble and the amended regulatory text as generic attachments in the current CDX workflow. EPA will share additional guidance and conduct outreach with stakeholders prior to the rollout of the changes to CDX and will work to extend flexibility to submitters in the event that issues arise related to discrepancies between the regulations and the PMN form before the CDX enhancements can be implemented.

*C. Amendments Related To Pre-Screen, Incomplete Submissions, Correcting Errors, and New Information*

EPA is finalizing amendments to the regulations regarding how EPA acknowledges the receipt of a notice to account for EPA's pre-screen process and to clarify the start of the applicable review period, particularly when a notice contains errors or is incomplete. EPA is also finalizing amendments to align the process for correcting errors in

the notice with the existing process for incomplete submissions. EPA is further clarifying that an initial notice submission may later be deemed incomplete if the submitter submits additional information at any time during the review period that was known to or reasonably ascertainable by the submitter at the time of initial notice submission. Finally, EPA is promulgating amendments that clarify that new information about a chemical substance under EPA review must be submitted electronically via CDX and that certain notification to EPA of new information may be made by e-mail.

1. Pre-Screening Procedures

EPA is finalizing amendments to 40 CFR 720.65(a) to codify the pre-screen process that EPA conducts prior to moving forward to the risk assessment process. The new language would clarify, for purposes of transparency, EPA's current pre-screen practice as described in Unit III.C.1 of the proposed rule preamble. EPA is also finalizing an amendment to 40 CFR 720.70 to clarify that a notice of receipt will be published in the **Federal Register** after EPA receives a complete notice, rather than merely receiving the notice, to accommodate the pre-screening procedures. Additionally, based on public comments, EPA is amending 40 CFR 723.50(e)(3) to add a description of current pre-screen procedures and update/clarify the process for completing an incomplete LVE or LoREX notice, which will better align with similar changes made to 40 CFR 720.65 and with existing electronic submission requirements.

One comment on the proposal asserted that EPA should include in section 5 prescreen a review of all CBI claims for consistency with sections 14(b) and (c) of TSCA and treat any submission that includes a CBI claim that appears to be inconsistent with the requirements of these sections as ''erroneous or incomplete.'' EPA disagrees with these comments as assuring that every CBI claim is consistent with section 14(b) and (c) of TSCA would require a substantive review of each claim, which is well beyond the CBI review requirements described in TSCA section 14(g). For a more detailed response regarding CBI review during pre-screen, please see the Response to Comments document (Ref. 2).

2. Correcting Errors in Notices

As proposed, EPA is finalizing amendments at 40 CFR 720.65(a) and (b) to state that if EPA receives a notice with errors and EPA requests (as part of the pre-screen process or, at latest, within 30 days of receipt of the notice) that the submitter remedy such errors, the applicable review period will not begin until EPA receives a corrected notice. This will align the process for correcting errors with the current process in 40 CFR 720.65 for correcting an incomplete notice.

3. Notice Amendments Indicating Original Notice was Incomplete

EPA is finalizing amendments at 40 CFR 720.65(c)(2) and to 40 CFR 720.65(c)(5)(iii) (moved to 720.65(d)(5)(iii)), to clearly communicate and clarify that EPA may deem an original notice incomplete, and restart the review period at Day 1, if a submitter provides required information during the applicable review period without demonstrating that it was not known to or reasonably ascertainable by the submitter at the time of the initial notice submission. Additionally, EPA is updating the reference to 40 CFR 720.80(b)(2) at 40 CFR 720.65(c)(vii) to instead point to 40 CFR 703.5(c) because the 2023 CBI rule (88 FR 37155, June 7, 2023) moved the language that was previously at 720.80(b)(2) to a new section at 40 CFR 703.5.

As stated in the proposal for this rule (88 FR 34100, May 26, 2023), EPA is changing the longstanding practice of accepting amendments that contain required information that was known or reasonably ascertainable at the time of the original submission and then accepting a request to suspend the review period under 40 CFR 720.75(b).

As explained in Unit II.B., the 2016 Lautenberg Amendments impose additional obligations on EPA. EPA believes that exercising its discretionary authority under the existing regulations to declare an original submission incomplete and restart the applicable review period upon submission of the complete notice (e.g., when an amendment is submitted that makes a notice complete) is appropriate in order for EPA to efficiently meet current statutory requirements. Several comments on the proposed rule objected to these amendments, stating that submitters often are prompted to generate new or additional information during the review period to rebut unforeseen or conservative assumptions made by EPA. To address this comment and assist with efficient review, EPA is also amending the notice information requirements at 40 CFR 720.45 to specify the level of detail needed to perform refined risk assessments, as well as building that additional detail into the CDX user interface, which is detailed in Unit III.B of both the proposed rule (88 FR 34100, May 26, 2023) and this final rule. By specifying more detailed information requirements in 40 CFR 720.45 and data fields in the CDX user interface, EPA should receive more complete submissions upfront and help to minimize the need for EPA to use default values and conservative assumptions in its risk assessment due to a lack of available data. The Agency, however, reiterates that the submitter is required to provide all required information that is known or reasonably ascertainable at the time of the initial submission and not in reaction to risk assessment findings. Submitters must provide all information required by 40 CFR 720.45 and 720.50 upfront to satisfy the requirement of submitting a complete notice.

In response to the proposal, EPA received a comment asking that the Agency provide submitters with an opportunity to explain why information submitted as part of an amendment should not result in restarting the applicable review period. Under the amendment to 40 CFR 720.65(c)(2) being finalized in this action, the submitter of additional or revised information during the review period must demonstrate to EPA's satisfaction that the information was not known to or reasonably ascertainable by the submitter at the time of the original submission to preclude an EPA determination that the original notice was incomplete. Amendments to a notice that will not be considered as amendments indicating that the original notice was incomplete are: (1) Amendments based on new data (as described at 40 CFR 720.40(f) and 720.50(a)(4)); (2) Administrative, non-substantive amendments (*e.g.,* submitter contact information); and (3) Amendments made at the request of EPA. EPA, however, will take case-by-case facts into consideration when determining whether a late submission of information indicates that a notice was incomplete when originally submitted. If a submitter disagrees with EPA's determination that the original notice submission was incomplete, the submitter may object according to the existing procedures at 40 CFR 720.65(c)(4) and (5), as amended in this final rule, which updates and moves these provisions to 40 CFR 720.65(d)(4) and (5).

As explained in the proposed rule, a notice submitted under TSCA section 5(a)(1) is statutorily required to include the information described in TSCA section 5(d)(1) insofar as it is known to the submitter or reasonably ascertainable. In response to various procedural amendments proposed in

this rulemaking, EPA received comments asking the Agency to further define ''known to or reasonably ascertainable by'' beyond the current definition at 40 CFR 720.3. While EPA understands and recognizes the desire to have a more explicitly defined list of criteria or more detailed definition of ''known to or reasonably ascertainable by,'' EPA believes that it is not possible to define ''known to or reasonably ascertainable by'' more explicitly—as was stated in the 1983 final rule entitled ''Premanufacture Notification; Premanufacture Notice Requirements and Review Procedures'' (Ref. 8) and restated in the May 2023 proposed rule (88 FR 34100). EPA has not, in this rulemaking, proposed or finalized any amendment to or undertaken any substantive reconsideration, reexamination, or reinterpretation of the existing definition at 40 CFR 720.3. That said, to assist submitters, EPA has provided additional discussion and examples as to what is meant by ''known to or reasonably ascertainable by'' in the Response to Comments document (Ref. 2).

4. Notifying EPA of the Receipt of New Information on a Chemical Substance Under Review

EPA is finalizing amendments to 40 CFR 720.40(f), 40 CFR 720.50(a)(4)(ii), and 40 CFR 723.50(i) to clarify that new information about a chemical substance under EPA review must be submitted electronically via CDX, consistent with the general electronic submission requirements in 40 CFR 720.40(a). In addition, when submitters receive new information within five days of the end of the review period, EPA is amending the regulations to allow submitters to notify EPA by e-mail of the receipt of new information. Although the regulatory text in 40 CFR 720.40(f) and 40 CFR 723.50(i) are similar, the regulatory text provided along with the proposed rule erroneously showed only the proposed changes to 40 CFR 720.40(f) and did not show proposed changes to 40 CFR 723.50(i). This was an oversight and the regulatory text accompanying this final rule consistently amends both 40 CFR 720.40(f) and 40 CFR 723.50(i).

*D. Amendments to Low Volume Exemptions and Low Release and Exposure Exemptions*

EPA is promulgating several amendments to the current LVE and LoREX regulations. Specifically, EPA is finalizing amendments so that: (1) submitters may not commence manufacture until EPA has approved the LVE or LoREX notice; (2) EPA may proactively inform LVE and LoREX holders if the chemical substance that is the subject of the LVE or LoREX becomes subject to a SNUR and the chemical identity is CBI, or if it is listed on the confidential portion of the TSCA Inventory; (3) PFAS are categorically ineligible for these exemptions; and (4) certain PBT chemical substances are ineligible for these exemptions.

LVE and LoREX regulations are promulgated under the statutory authority of TSCA section 5(h)(4), 15 U.S.C. 2604(h)(4), which provides that EPA may, upon application and by rule, exempt the manufacturer of any new chemical substance from all or part of the requirements of TSCA section 5 if EPA determines that the manufacture, processing, distribution in commerce, use, or disposal of such chemical substance, or that any combination of such activities, ''will not present an unreasonable risk of injury to health or the environment, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified by [EPA] under the conditions of use.''

1. Amendments to Expiration of LVE and LoREX Review Period

EPA is finalizing, as proposed, amendments to the LVE and LoREX regulations at 40 CFR 723.50(g) to require a notification of approval of an LVE or LoREX from EPA prior to commencement of manufacture of the chemical substance under the exemption. Prior to the promulgation of this amendment, 40 CFR 723.50(g)(2) provided that the submitter may begin manufacture of a chemical substance under an LVE or LoREX upon expiration of the 30-day review period if EPA had taken no action. As described in Unit III.A., EPA is also amending the regulations that allow submitters to begin manufacture or processing of chemical substances for which a PMN, MCAN, or SNUN was submitted upon expiration of the review period, so that those regulations would require a determination from EPA prior to commencement of manufacture or processing of such substances. As discussed in Unit III.A., these changes to 40 CFR 720.75, 721.25(d), and 725.170 are being made to conform those regulations to the 2016 Lautenberg Amendments. EPA is finalizing similar amendments to the LVE and LoREX regulations at 40 CFR 723.50 to align with the amendments to the PMN, SNUN, and MCAN regulations and with the statutory framework and to better ensure that chemical substances manufactured under LVEs and LoREXs will not present an unreasonable risk.

2. Notification of LVE and LoREX Holders if the Chemical Substance is Subject to a SNUR or Listed on the Confidential Portion of the TSCA Inventory

EPA is finalizing amendments to 40 CFR 723.50 to allow EPA to inform an LVE or LoREX holder whenever the chemical substance that is the subject of that LVE or LoREX becomes subject to a proposed or final SNUR that describes the chemical substance by a generic chemical name due to a confidentiality claim for its specific chemical identity. This amendment would, as a courtesy, help inform LVE and LoREX holders of regulatory requirements that they may have otherwise been unable to determine on their own without submitting an inquiry to EPA (also known as a *bona fide* notice) pursuant to 40 CFR 721.11. In the proposed rule (88 FR 34100, May 26, 2023), EPA stated that the Agency did not intend to proactively inform current LVE and LoREX holders about SNURs that predate this rule and that EPA would only start the practice of notifying LVE and LoREX holders subject to this amendment after the date of the final rule. However, upon consideration of public comments in support of notifying current exemption holders of preexisting SNURs, EPA intends, subject to availability of resources, to notify current LVE and LoREX holders about preexisting SNURs that describe the chemical substance by a generic chemical name. Given current resource constraints, however, EPA is unable to provide a timeline for when it will begin and complete this notification effort. A lack of receipt of this courtesy notice that a chemical substance is subject to a SNUR does not excuse chemical manufactures and processors from complying with any existing regulations. LVE and LoREX holders who wish to determine whether their chemical substance is subject to a SNUR may always submit an inquiry to EPA (also known as a *bona fide* notice) pursuant to 40 CFR 721.11.

In response to public comments, in addition to notifying LVE and LoREX holders when they are subject to a SNUR, EPA also intends, subject to availability of resources, to begin notifying LVE or LoREX submitters if a substance is added to the confidential portion of the TSCA Inventory as a result of filings by a different submitter that claimed the specific chemical identity of the substance as confidential. As of February 7, 2024, more than 460 LVEs and LoREXs that were granted by EPA pertain to chemical substances that are now listed on the TSCA Inventory.

Once on the Inventory, a chemical substance may be subject to additional requirements under TSCA. Of the more than 390 chemical substances covered by these LVE and LoREX, approximately 125 are on the confidential portion of the TSCA Inventory. Without notice by EPA or by submitting a *bona fide* notice, a submitter is unlikely to know their substance is listed on the confidential portion of the Inventory, unless they also submitted the PMN and subsequent Notice of Commencement that led to the Inventory listing of the substance. While EPA intends to begin providing notice to exemption holders whose chemical substance now appears on the confidential portion of the TSCA Inventory, EPA does not intend to provide notice to those who hold granted LVEs or LoREXs pertaining to chemical substances whose specific chemical identities are added to the public portion of the TSCA Inventory due to the additional resources this would require and to the fact this information is publicly available.

In response to public comment, EPA affirms that once a chemical substance is added to the Inventory, an LVE or LoREX (or any other exemption from PMN requirements) is no longer necessary to manufacture the chemical substance and thus any approved LVE or LoREX is no longer binding on the manufacturer. The premanufacture notice requirements of TSCA section 5(a)(1), the relevant statutory exemption authority at TSCA section 5(h)(4), and the LVE/LoREX regulations at 40 CFR 723.50 all apply to manufacturers of new chemical substances, yet a chemical substance is no longer a ''new chemical substance'' as defined in TSCA section 3(11) once it is added to the Inventory. While EPA intends to begin providing notice to LVE and LoREX submitters once their substance is listed on the confidential portion of the Inventory, EPA does not intend to formally revoke these exemptions under the process described in 40 CFR 723.50(h)(2), as that process pertains to new chemical substances for which manufacture is not otherwise permitted in the absence of a PMN or applicable exemption.

The amendments to the regulations at 40 CFR 723.50 establish that a granted LVE or LoREX notice demonstrates a *bona fide* intent to manufacture the substance, such that a disclosure to an LVE or LoREX holder that the substance is the subject of a proposed or final rule under Part 721 or similarly that the substance is on the confidential portion of the TSCA Inventory will not be considered public disclosure of confidential business information under section 14 of the Act. EPA is not amending the procedures in 40 CFR 723.50(l) for asserting and protecting confidential business information.

3. Making PFAS Categorically Ineligible for LVEs and LoREXs

EPA is finalizing amendments to limit the scope of the LVE and LoREX exemptions that were first promulgated in accordance with TSCA 5(h)(4) in 1985 and 1995 respectively (50 FR 16477 (April 26, 1985) and 60 FR 16346 (March 29, 1995)). TSCA 5(h)(4) allows, but does not require, the Administrator to exempt the manufacturer of any new chemical substance from all or part of the requirements of TSCA section 5 in certain circumstances. The statute does not specify any circumstances under which the Administrator would be required to provide an exemption and EPA's action here is consistent with its authority under 5(h)(4) to create and/or define the scope of exemptions. These amendments make PFAS categorically ineligible for LVEs and LoREXs going forward, using a structural definition of PFAS for purposes of the LVE and LoREX regulations. Upon the effective date of this rule, any LVE or LoREX notice for a PFAS that is submitted to the Agency will be denied upon receipt without substantive review. This includes any chemical substance where any of the reasonably anticipated metabolites, environmental transformation products, byproducts, or reasonably anticipated impurities are a PFAS. Persons who wish to manufacture a PFAS not on the TSCA Inventory will be required to submit a PMN at least 90 days prior to commencing manufacture for a non-exempt commercial purpose. The definition for PFAS that EPA is finalizing is aligned with the recently finalized TSCA section 8(a)(7) rule (88 FR 70516, October 11, 2023) and the Inactive PFAS SNUR (89 FR 1822, January 11, 2024). Although PFAS would no longer be eligible for LVE or LoREX, there may be case-specific circumstances where a use of a new PFAS or a new use of an existing PFAS may be needed by a federal agency to meet its mission or is required in order to meet another critical need. EPA will work with other federal agencies to expedite review of such cases. Furthermore, EPA recognizes the critical role that many new chemicals play, including some PFAS, in the manufacture of semiconductors. The new chemicals program now prioritizes notices for chemicals used in sectors supported by the Creating Helpful Incentives to Produce Semiconductors (CHIPS) and Science Act and the Inflation Reduction Act's (IRA) climate goals. Since beginning the process of prioritizing CHIPS and Science Act and IRA related chemicals, EPA now reviews these new chemicals in a third of the time compared to other sectors. The Agency believes these key sectors are important to growing new jobs as part of the Biden-Harris Administration's domestic manufacturing initiatives. For some new chemicals needed by the semiconductor sector, such as photo-acid generators, EPA's multi-year collaborative effort with the sector has resulted in a regulatory pathway for dozens of these chemicals, and recent submittals have had review timeframes of under 90 days.

As noted in the proposed rule, EPA's New Chemicals Program began implementing a new policy for reviewing and managing LVE notices for PFAS in April 2021. In an April 27, 2021, press release announcing the new PFAS LVE policy (Ref. 9), the Agency stated that ''[g]iven the complexity of PFAS chemistry, potential health effects, and their longevity and persistence in the environment, an LVE notice for a PFAS is unlikely to be eligible for this kind of exemption under the regulations.'' Since 2021, EPA has reviewed 8 LVE notices for PFAS, which were each reviewed on a case-by-case basis. Each of the 8 PFAS were determined to be ineligible for an LVE due to the risks identified and/or an inability to complete the review in 30 days as a result of the complexities of the review or uncertainties in the assessment. EPA has never received or approved any PFAS LoREX notices.

Each of the 8 PFAS that were the subject of LVE notices reviewed since 2021, or the reasonably anticipated metabolites and environmental transformation products of those PFAS, was determined to be a PBT chemical substance. In 5 of the 8 cases, however, the PBT designation included noted uncertainties for each of the substances reviewed. If EPA is unable to score a characteristic (*e.g.,* B ''unknown'' for bioaccumulation), the characteristic is still considered to be potentially a 2 or higher for the purposes of identifying potential PBTs (Ref. 10). In many cases, additional uncertainties were identified for the potential routes of exposure, which included exposures to workers, the general population, a potentially exposed or susceptible subpopulation (*e.g.,* consumers, infants), or the environment. PFAS present a challenge for EPA to evaluate because there is often insufficient information to quantify the risk they may pose and consequently make effective decisions

about how to regulate them (Ref. 11). As currently described in the regulations, EPA may determine that a new chemical substance is ineligible for an LVE or LoREX if there are issues concerning toxicity or exposure that require further review which cannot be accomplished within the 30-day review period. EPA notes that the shortened 30-day review period for LVEs and LoREX is one of the major benefits of these exemptions as it allows companies to introduce new chemical substances more quickly into commerce. The 30-day review period provides a screen for EPA to identify any new chemical substances with issues that require more detailed and comprehensive review and analysis, such as that available in a full PMN review. See 60 FR 16336. Given the shortened 30-day review of an LVE along with the inability to require testing or impose additional restrictions under a section 5(e) or 5(f) order, EPA was unable to address those uncertainties which would be necessary to conclude that the substance would not present an unreasonable risk. Since all of the 8 PFAS that were the subject of LVE notices were deemed ineligible for the exemption, the submitters were required to submit a PMN if they wanted to move forward with the manufacture of the new chemical substances.

For the purpose of making PFAS ineligible for LVEs and LoREXs, EPA is defining ''PFAS'' using a structural definition. In this rule, EPA defines PFAS to mean a chemical substance that contains at least one of these three structures:

(1) R-(CF2)-CF(R′)R″, where both the CF2 and CF moieties are saturated carbons;

(2) R-CF2OCF2-R′, where R and R′ can either be F, O, or saturated carbons; or

(3) CF3C(CF3)R′R″, where R′ and R″ can either be F or saturated carbons.

Manufacturers of substances that do not meet this structural definition and of substances where any of the reasonably anticipated metabolites, environmental transformation products, byproducts, or reasonably anticipated impurities do not meet this structural definition remain eligible to submit an LVE or LoREX notice.

In opposition to these amendments, EPA received comments asserting that because PFAS are a broad category of chemicals, any proposed regulatory action on PFAS should not group PFAS into a single category. Comments also asserted that there was no scientific basis or risk-based evidence for making PFAS ineligible for LVEs and LoREXs. EPA agrees with the comments that PFAS are a broad category of chemical substances with common toxicological properties, exposures, or uses, and notes that the assessment and management of these substances for regulatory purposes should generally be done on a case-by-case basis or as groups of substances with common toxicological properties, exposures, or uses. Furthermore, EPA believes that any assessment of PFAS should be done in line with the scientific standards, weight of scientific evidence, and consideration of any reasonably available information as outlined in section 26 of TSCA. The amendment to make PFAS ineligible for LVEs and LoREXs, however, is not based on an assessment of all PFAS or any PFAS and does not impose risk management restrictions on any PFAS substance. The decision to make PFAS ineligible for LVEs and LoREXs is not a determination of risk for all or any PFAS. While the current state of science and EPA's understanding of PFAS has motivated the decision to make all PFAS ineligible for LVEs and LoREXs, these amendments are not based on EPA findings that particular PFAS chemicals, or all chemicals qualifying as PFAS under this rule, may present unreasonable risks of injury to human health or the environment under the conditions of use due to levels of hazards and exposures identified and evaluated by EPA. Rather, due to the scientific complexities or uncertainties associated with assessing PFAS and the lack of data on most PFAS with regards to toxicity and exposure to human health and the environment, EPA expects in most cases to be unable to determine pursuant to TSCA section 5(h)(4) that a PFAS ''will not present an unreasonable risk'' under the conditions of use within the 30-day review period provided for LVE and LoREX notices. This action is a procedural action based on EPA's experience administering TSCA and reviewing LVEs for PFAS.

Additionally, making PFAS ineligible for the LVE and LoREX exemptions may in fact reduce burden in many instances by avoiding the submission and review of LVEs that are ultimately denied and required to be resubmitted and reviewed anew through the PMN review process. Furthermore, the New Chemicals Program developed the PFAS Framework to help ensure that the Program effectively and efficiently reviews and makes appropriate decisions on new PFAS or significant new uses of existing PFAS reviewed through PMNs and SNUNs. The PFAS Framework will guide EPA's review of PFAS under TSCA section 5, ensuring consistency and efficiency in its review of incoming submissions while advancing the Agency's goals to ensure protection of public health and the environment. Please see the Response to Comments document that accompanies this rule for a more detailed discussion of and response to the comments received on the amendments to make PFAS categorically ineligible for LVEs and LoREXs (Ref. 2).

The definition for PFAS promulgated at 40 CFR 723.50 does not include substances that only have a single fluorinated carbon or unsaturated fluorinated moieties (*e.g.,* fluorinated aromatic rings and olefins), which are more susceptible to chemical transformation than their saturated counterparts, and therefore less likely to persist in the environment. These potentially degradable substances, if submitted to EPA in a LVE or LoREX notice, would still be evaluated by EPA and a decision made to either deny or grant the exemption.

The three-part structural definition for PFAS includes fluoropolymers. Fluoropolymers are made using fluorinated monomers, and often fluorinated processing aides, which contributes to the release of PFAS. In addition, the disposal of fluoropolymers may also result in PFAS releases. EPA has been concerned about potential risks of fluoropolymers for more than a decade. On January 27, 2010 (75 FR 4295, 1/27/2010), EPA amended the 'polymer exemption rule,' to exclude from eligibility polymers containing as an integral part of their composition, except as impurities, certain perfluoroalkyl moieties consisting of a CF3- or longer chain length. EPA issued this amendment because, based on information at the time, EPA could no longer conclude that these polymers will not present an unreasonable risk to human health or the environment under the terms of the polymer exemption rule, which is the determination necessary to support an exemption under section 5(h)(4) of TSCA. While some comments stated that fluoropolymers are safe, there remains debate on the toxicity of fluoropolymers especially when considering their entire life cycle (Ref. 12). EPA's decision to include fluoropolymers as part of the amendment to make PFAS ineligible for LVEs and LoREXs, however, was not based on hazard, exposure, or risk. Fluoropolymers are no less complicated to review than nonpolymeric PFAS, and the Agency expects it would need the longer 90-day review for a PMN.

At the time of finalizing this rulemaking, EPA is not revoking previously granted LVEs for PFAS. EPA, however, may take future action on a case-by-case basis to revoke previously

granted LVEs for PFAS, which would be done in accordance with the existing regulations at 40 CFR 723.50(h)(2). EPA believes that the revocation of any existing LVE should be done on a case-by-case basis. While there are well identified hazards for many PFAS and PFAS studies have repeatedly found harm to human health, EPA has not determined that PFAS as an entire category of chemical substances do not meet the ''will not present unreasonable risk of injury to health or the environment'' standard of TSCA section 5(h)(4). As noted previously, EPA's decision to make future PFAS ineligible for LVEs is not based on hazard or risk but is instead based on EPA's experience administering TSCA and reviewing LVEs for PFAS (please see the Response to Comments document for a more detailed discussion (Ref. 2)).

As EPA continues to consider previously granted PFAS LVEs, EPA will take into consideration the concerns raised about the potential impacts to domestic semiconductor and electric vehicle industry, national defense, or other critical applications. The Biden-Harris Administration is committed to restoring U.S. leadership in semiconductor and electric vehicle manufacturing, supporting good-paying jobs across those supply chains, and advancing U.S. economic and national security. EPA's Framework for Addressing New PFAS and New Uses of PFAS (PFAS Framework) (Ref. 10) outlines EPA's planned approach when reviewing new PFAS and new uses of existing PFAS. The application of the PFAS Framework will help ensure that new PFAS won't harm human health and the environment and allows that certain PFAS be used when exposures and releases can be mitigated, which is critical for important sectors like semiconductors. Under the framework, EPA expects that some PBT PFAS will not result in worker, general population or consumer exposure and are not expected to result in releases to the environment, such as when PFAS are used in a closed system with occupational protections as is generally the practice in the manufacture of some semiconductors and other electronic components. Additionally, EPA continues to work cooperatively with companies who wish to voluntarily withdraw previously granted LVEs for PFAS. As of April 1, 2024, 56 LVEs have been withdrawn through EPA's PFAS Low Volume Exemption Stewardship Program.

4. Codifying EPA's Policy Concerning PBT Chemicals and LVEs and LoREXs

EPA is finalizing amendments to 40 CFR 723.50(d) that would codify EPA's long-standing practice that, whenever EPA identifies a chemical substance under LVE or LoREX review (or any reasonably anticipated metabolites, environmental transformation products, or byproducts of the substance, or any reasonably anticipated impurities in the substance) as PBT with anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms, that substance would be ineligible for the LVE or LoREX. As noted in Unit III.D.3., the LVE and LoREX exemptions were first promulgated in accordance with TSCA section 5(h)(4) in 1985 and 1995 respectively (50 FR 16477, April 26, 1985 (FRL–2742–1) and 60 FR 16346, March 29, 1995 (FRL–4923–1)). TSCA section 5(h)(4) allows, but does not require, the Administrator to exempt the manufacturer of any new chemical substance from all or part of the requirements of TSCA section 5 in certain circumstances. The statute does not specify any circumstances under which the Administrator would be required to provide an exemption and EPA's action here is consistent with both its long-standing practice and with its authority under TSCA section 5(h)(4) to create and/or define the scope of exemptions.

On November 4, 1999, EPA issued its policy statement identifying a category for PBT new chemical substances (Ref. 13). The 1999 policy statement formally acknowledged PBT chemical substances as a category based on shared characteristics to facilitate premanufacture assessment and regulation. In response to the proposed amendment to the LVE and LoREX regulations, EPA received comment asserting that the Agency cannot categorically make all PBT chemicals ineligible for LVEs and LoREXs. EPA did not propose to categorically make all PBT chemicals ineligible for LVEs and LoREXs and is not doing so in this final rule. Rather, EPA proposed and is finalizing amendments to 40 CFR 723.50(d) to codify that whenever EPA identifies a chemical substance under LVE or LoREX review (or any reasonably anticipated metabolites, environmental transformation products, or byproducts of the substance, or any reasonably anticipated impurities in the substance) as PBT with anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms, that substance would be ineligible for the LVE or LoREX. In order to effectuate these amendments for individual exemption notices, EPA would first need to review the exemption notice to determine if the substance is a PBT and then review the environmental releases and exposures to humans or environmental organisms to determine if releases and exposures are expected. Only after EPA has reviewed the hazards and exposures, will EPA make a decision to either grant or deny an LVE or LoREX for a PBT chemical substance.

Based on EPA's experience administering LVEs and LoREXs, EPA expects that most exemptions for PBT chemical substances will not be granted. However, EPA agrees that there are instances where PBT chemical substances can be managed under an exemption. EPA may receive an exemption notice for a PBT chemical substance that will not result in worker, general population, or consumer exposure and that is not expected to result in releases to the environment, such as chemical substances used in a closed system to make semiconductors or other electronic components. In such a negligible exposure and environmental release scenario where worker exposure is fully mitigated and general population exposures are not expected, if EPA has sufficient information on the substance and the conditions of use to ensure that such PBT chemical substances can be disposed of properly and no consumer exposure is expected, EPA generally expects to grant the exemption.

EPA is defining ''PBT chemical substance'' for purposes of 40 CFR 723.50 as ''a chemical substance possessing characteristics of persistence (P) in the environment, accumulation in biological organisms (bioaccumulation (B)), and toxicity (T) resulting in potential risks to humans and ecosystems. For more information on EPA's Policy on new chemical substances that are PBT, see EPA's 1999 policy statement (64 FR 60194; November 4, 1999).''

*E. Amendments Related to Suspensions of the Review Period*

As proposed, EPA is finalizing amendments to 40 CFR 720.75(b)(2) to allow PMN, SNUN, LVE, and LoREX submitters to request a suspension of the notice review period for up to 30 days orally or in writing, including by e-mail, without the need for a formal, written request submitted to EPA via CDX using e-PMN software. EPA is similarly finalizing amendments to 40 CFR 725.54(c) to permit MCAN submitters to request suspensions for up

to 30 days orally or in writing, including by e-mail, without the need for a formal, written request submitted to EPA via CDX using e-PMN software. Some comments to the proposal took issue with increasing the number of suspension days made through oral or e-mail communication from 15 to 30 days. These comments suggested such an amendment would result in less frequent communication from EPA regarding the status of a new chemical review. EPA disagrees with these comments, as the amendments would allow the submitter to request *up to* a 30-day suspension through oral or e-mail communication; however, submitters will still be allowed to suspend the review period for a shorter amount of time if preferred. For a more detailed response to the comments regarding the amendments relating to suspensions of the review period, please see the Response to Comments document (Ref. 2).

*F. Severability*

As explained in this preamble, EPA is finalizing several different types of amendments in this rule, including amendments related to: commencement of manufacture or processing; required determinations and associated actions; terminology and definitions; notice information requirements; pre-screening procedures; correcting errors in notices; incomplete notices; notification of the receipt of new information; expiration of the LVE and LoREX review period; notification of LVE and LoREX holders regarding certain other actions involving their chemical substance; PFAS ineligibility for LVE and LoREX exemptions; certain PBT ineligibility for LVE and LoREX exemptions; and suspensions of the review period. Each type of amendment functions independently, serves a discrete purpose, and is intended to be severable from the other amendments. In the event of litigation staying, remanding, or invalidating a portion of EPA's amendments in this rule, EPA intends to preserve all other amendments in this rule to the fullest extent possible. For example, the amendment to the LVE and LoREX regulations making PFAS ineligible for such exemptions functions independently from the amendment to those regulations making certain PBTs ineligible for the exemptions, such that if either ineligibility provision were stayed or invalidated, it would have no effect on the other, and EPA intends that the other would remain effective. Similarly, any stay or invalidation of the amendment making PFAS ineligible for the LVE and LoREX exemptions would have no effect on amendments related to incomplete notices, and vice versa. These specific examples are not intended to be exhaustive, but rather illustrative of scenarios that reflect EPA's overarching intent that each type of amendment be severable.

Furthermore, within the broader category of amendments to notice information requirements, the rule includes a number of discrete amendments pertaining to different types of information. Each of these specific amendments to notice information requirements functions independently and is intended to be severable from the others. As an example, if amended information requirements regarding the categories of use of the chemical substance were to be stayed or invalidated, it would have no effect on amended information requirements regarding worker exposure, and vice versa.

The limited circumstance in which severability is not intended is where a single type of amendment involved changes to multiple paragraphs or sections of the regulations. For example, in cases where EPA is finalizing the same or similar amendment in multiple parts of the CFR for conformity (e.g., where an amendment to part 721, 723, or 725 is intended merely to conform to the same or similar amendment in part 720), severability is not intended between those provisions. In addition, were the amendment making PFAS ineligible for LVE and LoREX exemptions to be invalidated, the related amendment defining PFAS for purposes of that ineligibility provision would no longer be necessary or helpful. However, EPA does intend severability in the inverse scenario: if the definition of PFAS were stayed or invalidated, EPA intends severability of all other amendments, including the amendment making PFAS ineligible for LVEs and LoREX.

## IV. References

The following is a listing of the documents that are specifically referenced in this **Federal Register** notice. The docket includes these documents and other information considered by EPA, including documents that are referenced within the documents that are included in the docket, even if the referenced document is not physically located in the docket. For assistance in locating these other documents, please consult the technical person listed under **FOR FURTHER INFORMATION CONTACT.**

1. EPA. Economic Analysis for the Final Rule: Updates to New Chemicals Regulations under the Toxic Substances Control Act. December 2024.
2. EPA. Response to Comments on the Proposed Rule Updates to New Chemicals Regulations Under the Toxic Substances Control Act (TSCA). December 2024.
3. EPA. Central Data Exchange Online User Guide. Accessible at: *https://cdx.epa.gov/About/UserGuide.*
4. EPA. Points to Consider When Preparing TSCA New Chemical Notification. OMB Control No.: 2070–0012. June 2018. Accessible at: *https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/points-consider-when-preparing-tsca.*
5. EPA. TSCA New Chemical Engineering Initiative to Increase Transparency and Reduce Rework. Accessible at: *https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/tsca-new-chemical-engineering.*
6. EPA. Tables Detailing the Final Amendments to Add Details to 40 CFR 720.45 Reporting Requirements and Enhancements to the CDX Reporting Form. December 2024.
7. EPA. Supporting Statement for an Information Collection Request (ICR) Under the Paperwork Reduction Act (PRA); TSCA Section 5 Premanufacture Review of New Chemical Substances and Significant New Use Rules for New and Existing Chemical Substances (Revision); EPA ICR No. 1188.15; OMB Control No. 2070–0038]. December 2024.
8. EPA. Premanufacture Notification; Premanufacture Notice Requirements and Review Procedures; Final Rule. **Federal Register.** 48 FR 21722; May 13, 1983 (TSH–FRL 2998–5).
9. EPA. Press Release: EPA Announces Changes to Prevent Unsafe New PFAS from Entering the Market. April 27, 2021.
10. EPA. Framework for TSCA New Chemicals Review of PFAS Premanufacture Notices (PMNs) and Significant New Use Notices (SNUNs). June 2023.
11. Executive Office of the President of the United States. Per- and Polyfluoroalkyl Substances Report. March 2023.
12. Lohmann, Rainer, *et al.* Are fluoropolymers really of low concern for human and environmental health and separate from other PFAS? Environmental science & technology 54.20 (2020): 12820–12828.
13. EPA. Policy Statement on Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances. **Federal Register.** (64 FR 60194, November 4, 1999) (FRL–6097–7).

## V. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

*A. Executive Orders 12866: Regulatory Planning and Review and 14094: Modernizing Regulatory Review*

This action is a ''significant regulatory action'' as defined in Executive Order

12866, as amended by Executive Order 14094 (88 FR 21879, April 11, 2023). Accordingly, EPA submitted this action to the Office of Management and Budget (OMB) for Executive Order 12866 review. Documentation of any changes made in response to the Executive Order 12866 review is available in the docket. The EPA prepared an economic analysis of the potential impacts associated with this action. This analysis, ''Economic Analysis for the Final Rule: Updates to New Chemicals Regulations under the Toxic Substances Control Act'' (Ref. 1), is also available in the docket.

*B. Paperwork Reduction Act (PRA)*

The information collection activities in this rule have been submitted to OMB for review and approval under the PRA (44 U.S.C. 3501 *et seq.*). The Information Collection Request (ICR) document that EPA prepared has been assigned EPA ICR No. 1188.15 (Ref. 7). This ICR represents a revision to the currently approved ICR that covers the information collection activities contained in the existing regulations. The Economic Analysis covers the incremental changes from this action. You can find copies of the Economic Analysis and ICR in the docket, and the ICR is briefly summarized here.

*Respondents/affected entities:* Certain chemical manufacturers (including importers) and processors (see Unit I.A.).

*Respondent's obligation to respond:* Mandatory under TSCA section 5.

*Estimated number of respondents:* 560.

*Frequency of response:* On occasion.

*Total estimated incremental burden:* Estimates show that this rule will decrease existing approved ICR burden by 4,528 hours per year. Burden is defined at 5 CFR 1320.3(b).

*Total estimated incremental cost:* Estimates show that this rule will increase existing approved ICR costs by $203,150 per year. This includes $0 annualized capital or operation and maintenance costs.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations in title 40 of the CFR are listed in 40 CFR part 9. When OMB approves this ICR, the Agency will announce that approval in the **Federal Register** and publish a technical amendment to 40 CFR part 9 to display the OMB control number for the approved information collection activities contained in this final rule.

EPA did not receive any comments on the ICR revision that was posted with the proposed rule. EPA prepared a Response to Comments document (Ref. 2) that summarizes all the comments relevant to the proposal, including comments affecting the Agency's burden estimates related to the rule.

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA, 5 U.S.C. 601 *et seq.* The Agency's basis is briefly summarized here and is detailed in the Economic Analysis (Ref. 1).

The majority of firms that submit a TSCA section 5 notice will realize either no change or a decrease in costs associated with form submission. However, EPA expects that firms that submit LVE notices for PFAS will incur an estimated cost of approximately $61,049 per notice due to the greater burden and non-labor costs associated with submitting a PMN form. EPA estimates that 98 percent of small firms (184 firms) will have cost impacts of less than 1 percent of revenues, less than 1 percent (1 firm) will have cost impacts between 1 and 3 percent of revenues, and 1 percent (2 firms) will have cost impacts greater than 3 percent of revenues.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million (adjusted annually for inflation) or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. EPA has concluded that this action imposes no enforceable duty on any state, local or Tribal governments because, based on EPA's experience with reviewing TSCA section 5 actions, state, local and Tribal governments have not been impacted and EPA does not have any reasons to believe that any state, local, or Tribal government would engage in the activities such that they would be impacted by this rulemaking.

In addition, given that the estimated incremental cost on the private sector is expected to be less than $50,000 (Ref. 1), EPA has concluded that this rulemaking is not expected to result in expenditures by the private sector of $183 million or more in any one year ($100 million in 1995$ adjusted for inflation using the CDP implicit price deflator).

*E. Executive Order 13132: Federalism*

This action does not have federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999), because it will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have Tribal implications as specified in Executive Order 13175 (65 FR 67249, November 9, 2000), because it will not have substantial direct effects on Tribal governments, on the relationship between the Federal Government and the Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

EPA interprets Executive Order 13045 (62 FR 19885, April 23, 1997) as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–201 of the Executive Order. Therefore, this action is not subject to Executive Order 13045 because it does not concern an environmental health risk or safety risk. Since this action does not concern human health risks, EPA's Policy on Children's Health also does not apply. This procedural rule would align the implementing regulations codified at 40 CFR parts 720, 721, and 725 with amended TSCA and make additional updates based on existing policies or lessons learned from administering the New Chemicals Program since TSCA was amended in 2016.

Although this procedural rule itself would not directly affect the level of protection provided to human health or the environment, EPA expects that the rule would improve the Agency's consideration of risks to children—in furtherance of EPA's Policy on Children's Health—and other PESS. In turn, EPA anticipates that the amendments would help better inform the Agency's determinations for each new chemical substance or significant new use for which it received a notice under TSCA section 5(a)(1), pertaining to the likelihood of unreasonable risk to human health or the environment under known, intended or reasonably foreseen conditions of use. EPA uses an integrated approach that draws on knowledge and experience across disciplinary and organizational lines to

identify and evaluate concerns regarding health and environmental effects, and exposure and release.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not a ''significant energy action'' as defined in Executive Order 13211 (66 FR 28355, May 22, 2001), because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards under the NTTAA section 12(d), 15 U.S.C. 272.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All*

EPA believes that this type of action does not concern human health or environmental conditions and therefore cannot be evaluated with respect to potentially disproportionate and adverse effects on communities with environmental justice concerns in accordance with Executive Orders 12898 (59 FR 7629, February 16, 1994) and 14096 (88 FR 25251, April 26, 2023). This action is procedural in nature. Therefore, EPA believes that it is not practicable to assess whether the human health or environmental conditions that exist prior to this action result in disproportionate and adverse effects on communities with environmental justice concerns. Although this action does not concern human health or environmental conditions, EPA identifies and addresses environmental justice concerns by finalizing, among other things, the regulatory definition of PESS to include overburdened communities, the Agency believes that this action would assist EPA and others in determining the potential exposures, hazards and risks to overburdened communities associated with the manufacture, processing, distribution in commerce, use, or disposal of the new chemical substances and significant new uses of chemical substances subject to this rulemaking. EPA anticipates that the inclusion of overburdened communities among the PESS considered in the Agency's review of a TSCA section 5 submission would also enable the Agency, if necessary, to design appropriate future risk management actions to address an unreasonable risk that the Agency may determine is presented by that chemical substance and to consider how such risk management actions would affect communities with environmental justice concerns.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, 5 U.S.C. 801 *et seq.,* and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

**List of Subjects**

*40 CFR Part 68*

Administrative practice and procedure, Air pollution control, Chemicals, Environmental protection, Hazardous substances.

*40 CFR Part 372*

Environmental protection, Reporting and recordkeeping requirements, Toxic substances.

*40 CFR Part 703*

Chemicals, Confidential business information, Environmental protection, Exports, Hazardous substances, Imports, Reporting and recordkeeping requirements.

*40 CFR Parts 720, 721, 723, and 725*

Environmental protection, Chemicals, Hazardous materials, Reporting and recordkeeping requirements.

Dated: December 3, 2024.

**Michal Freedhoff,**

*Assistant Administrator, Office of Chemical Safety and Pollution Prevention.*

Therefore, for the reasons set forth in the preamble, 40 CFR chapter I is amended as follows:

## PART 68—CHEMICAL ACCIDENT PREVENTION PROVISIONS

■ 1. The authority citation for part 68 continues to read as follows:

**Authority:** 42 U.S.C. 7412(r), 7601(a)(1), 7661–7661f.

### § 68.115 Threshold determination.

■ 2. Amend § 68.115(b)(5) by revising the citation ''§ 720.3(ee)'' to read ''§ 720.3.''

## PART 372—TOXIC CHEMICAL RELEASE REPORTING: COMMUNITY RIGHT-TO-KNOW

■ 3. The authority citation for part 372 continues to read as follows:

**Authority:** 42 U.S.C. 11023 and 11048.

### § 372.38 Exemptions.

■ 4. Amend § 372.38(d) by revising the citation ''§ 720.3(ee)'' to read ''§ 720.3.''

## PART 703—CONFIDENTIALITY CLAIMS

■ 5. The authority citation for part 703 continues to read as follows:

**Authority:** 15 U.S.C. 2613.

### § 703.3 Definitions.

■ 6. Amend § 703.3 by:

■ a. Revising in the introductory text the citation ''§ 720.3(ff)'' to read ''§ 720.3;''

■ b. Revising in the definition for ''*Health and safety study*'' the citation ''§ 720.3(k)'' to read ''§ 720.3.''

## PART 720—PREMANUFACTURE NOTIFICATION

■ 7. The authority citation for part 720 continues to read as follows:

**Authority:** 15 U.S.C. 2604, 2607, and 2613.

### § 720.1 Scope.

■ 8. Amend § 720.1 by removing the phrase ''The rule'' and adding in its place the phrase ''This part'' wherever it appears.

■ 9. Revise and republish § 720.3 to read as follows:

### § 720.3 Definitions.

In addition to the definitions under section 3 of the Act, 15 U.S.C. 2602, the following definitions apply to this part.

*Act* means the Toxic Substances Control Act, 15 U.S.C. 2601 *et seq.*

*Applicable review period* means the period starting on the date EPA receives a complete notice under section 5(a)(1) of the Act and ending 90 days after that date or on such date as is provided for in sections 5(b)(1) or 5(c) of the Act.

*Article* means a manufactured item:

(1) Which is formed to a specific shape or design during manufacture;

(2) Which has end use function(s) dependent in whole or in part upon its shape or design during end use; and

(3) Which has either no change of chemical composition during its end use or only those changes of composition which have no commercial purpose separate from that of the article and that may occur as described in § 720.30(h)(5), except that fluids and particles are not considered articles regardless of shape or design.

*Byproduct* means a chemical substance produced without a separate commercial intent during the manufacture, processing, use, or disposal of another chemical substance or mixture.

*Byproduct material, source material,* and *special nuclear material* have the

meanings contained in the Atomic Energy Act of 1954, 42 U.S.C. 2014 *et seq.* and the regulations issued under it.

*Central Data Exchange* or *CDX* means EPA's centralized electronic document receiving system, or its successors.

*Chemical substance* means any organic or inorganic substance of a particular molecular identity, including any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature, and any chemical element or uncombined radical, except that ''chemical substance'' does not include:

(1) Any mixture;

(2) Any pesticide when manufactured, processed, or distributed in commerce for use as a pesticide;

(3) Tobacco or any tobacco product;

(4) Any source material, special nuclear material, or byproduct material;

(5) Any pistol, firearm, revolver, shells, or cartridges; or

(6) Any food, food additive, drug, cosmetic, or device, when manufactured, processed, or distributed in commerce for use as a food, food additive, drug, cosmetic, or device.

*Commerce* means trade, traffic, transportation, or other commerce:

(1) Between a place in a State and any place outside of such State; or

(2) Which affects trade, traffic, transportation, or commerce between a place in a State and any place outside of such State.

*Cosmetic, device, drug, food,* and *food additive* have the meanings contained in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 321 *et seq.,* and the regulations issued under it. In addition, the term ''food'' includes poultry and poultry products, as defined in the Poultry Products Inspection Act, 21 U.S.C. 453 *et seq.;* meats and meat food products, as defined in the Federal Meat Inspection Act, 21 U.S.C. 60 *et seq.;* and eggs and egg products, as defined in the Egg Products Inspection Act, 21 U.S.C. 1033 *et seq.*

*Customs territory of the United States* means the 50 States, Puerto Rico, and the District of Columbia.

*Director* means the Director of the EPA Office of Pollution Prevention and Toxics (OPPT).

*Distribute in commerce* means to sell in commerce, to introduce or deliver for introduction into commerce, or to hold after introduction into commerce.

*EPA* means the U.S. Environmental Protection Agency.

*e-PMN software* means electronic-PMN software created by EPA for use in preparing and submitting Premanufacture Notices (PMNs) and other TSCA section 5 notices and support documents electronically to the Agency.

*Health and safety study* or *study* means any study of any effect of a chemical substance or mixture on health or the environment or on both, including underlying data and epidemiological studies, studies of occupational exposure to a chemical substance or mixture, toxicological, clinical, and ecological, or other studies of a chemical substance or mixture, and any test performed under the Act. Chemical identity is always part of a health and safety study.

(1) Not only is information which arises as a result of a formal, disciplined study included, but other information relating to the effects of a chemical substance or mixture on health or the environment is also included. Any data that bear on the effects of a chemical substance on health or the environment would be included.

(2) Examples include:

(i) Long- and short-term tests of mutagenicity, carcinogenicity, or teratogenicity; data on behavioral disorders; dermatoxicity; pharmacological effects; mammalian absorption, distribution, metabolism, and excretion; cumulative, additive, and synergistic effects; acute, subchronic, and chronic effects; and structure/activity analyses.

(ii) Tests for ecological or other environmental effects on invertebrates, fish, or other animals, and plants, including acute toxicity tests, chronic toxicity tests, critical life stage tests, behavioral tests, algal growth tests, seed germination tests, plant growth or damage tests, microbial function tests, bioconcentration or bioaccumulation tests, and model ecosystem (microcosm) studies.

(iii) Assessments of human and environmental exposure, including workplace exposure, and impacts of a particular chemical substance or mixture on the environment, including surveys, tests, and studies of: Biological, photochemical, and chemical degradation; air, water, and soil transport; biomagnification and bioconcentration; and chemical and physical properties, *e.g.,* boiling point, vapor pressure, evaporation rates from soil and water, octanol/water partition coefficient, and water solubility.

(iv) Monitoring data, when they have been aggregated and analyzed to measure the exposure of humans or the environment to a chemical substance or mixture.

(v) Any assessments of risk to health and the environment resulting from the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance.

*Importer* means any person who imports a chemical substance, including a chemical substance as part of a mixture or article, into the customs territory of the United States. ''Importer'' includes the person primarily liable for the payment of any duties on the merchandise or an authorized agent acting on his or her behalf. The term also includes, as appropriate:

(1) The consignee.

(2) The importer of record.

(3) The actual owner if an actual owner's declaration and superseding bond has been filed in accordance with 19 CFR 141.20; or

(4) The transferee, if the right to draw merchandise in a bonded warehouse has been transferred in accordance with 19 CFR part 144, subpart C. (See ''principal importer.'')

*Impurity* means a chemical substance which is unintentionally present with another chemical substance.

*Intermediate* means any chemical substance that is consumed, in whole or in part, in chemical reactions used for the intentional manufacture of another chemical substance(s) or mixture(s), or that is intentionally present for the purpose of altering the rates of such chemical reactions.

*Inventory* means the list of chemical substances manufactured or processed in the United States that EPA compiled and keeps current under section 8(b) of the Act.

*Known to or reasonably ascertainable by* means all information in a person's possession or control, plus all information that a reasonable person similarly situated might be expected to possess, control, or know.

*Manufacture* means to produce or manufacture in the United States or import into the customs territory of the United States.

*Manufacture for commercial purposes* means:

(1) To manufacture with the purpose of obtaining an immediate or eventual commercial advantage for the manufacturer, and includes, among other things, ''manufacture'' of any amount of a chemical substance or mixture.

(2) The term also applies to substances that are produced coincidentally during the manufacture, processing, use, or disposal of another substance or mixture, including byproducts that are separated from that other substance or mixture and impurities that remain in that substance or mixture. Byproducts and impurities without separate commercial value are nonetheless produced for the purpose of obtaining a commercial advantage, since

they are part of the manufacture of a chemical substance for commercial purposes.

*Manufacture solely for export* means to manufacture for commercial purposes a chemical substance solely for export from the United States under the following restrictions on activities in the United States:

(1) Distribution in commerce is limited to purposes of export or processing solely for export as defined in § 721.3 of this chapter.

(2) The manufacturer and any person to whom the substance is distributed for purposes of export or processing solely for export (as defined in § 721.3 of this chapter), may not use the substance except in small quantities solely for research and development in accordance with § 720.36.

*Manufacturer* means a person who imports, produces, or manufactures a chemical substance. A person who extracts a component chemical substance from a previously existing chemical substance or a complex combination of substances is a manufacturer of that component chemical substance. A person who contracts with a manufacturer to manufacture or produce a chemical substance is also a manufacturer if:

(1) The manufacturer manufactures or produces the substance exclusively for that person; and

(2) That person specifies the identity of the substance and controls the total amount produced and the basic technology for the plant process.

*Mixture* means any combination of two or more chemical substances if the combination does not occur in nature and is not, in whole or in part, the result of a chemical reaction; except ''mixture'' does include:

(1) Any combination which occurs, in whole or in part, as a result of a chemical reaction if the combination could have been manufactured for commercial purposes without a chemical reaction at the time the chemical substances comprising the combination were combined, and if all of the chemical substances comprising the combination are not new chemical substances; and

(2) Hydrates of a chemical substance or hydrated ions formed by association of a chemical substance with water, so long as the nonhydrated form is itself not a new chemical substance.

*New chemical substance* means any chemical substance which is not included on the Inventory.

*Nonisolated intermediate* means any intermediate that is not intentionally removed from the equipment in which it is manufactured, including the reaction vessel in which it is manufactured, equipment which is ancillary to the reaction vessel, and any equipment through which the chemical substance passes during a continuous flow process, but not including tanks or other vessels in which the substance is stored after its manufacture.

*Person* means any natural person, firm, company, corporation, joint-venture, partnership, sole proprietorship, association, or any other business entity, any State or political subdivision thereof, any municipality, any interstate body, and any department, agency or instrumentality of the Federal Government.

*Pesticide* has the meaning contained in the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. 136 *et seq.* and the regulations issued under it.

*Possession or control* means in possession or control of the submitter, or of any subsidiary, partnership in which the submitter is a general partner, parent company, or any company or partnership which the parent company owns or controls, if the subsidiary, parent company, or other company or partnership is associated with the submitter in the research, development, test marketing, or commercial marketing of the chemical substance in question. (A parent company owns or controls another company if the parent owns or controls 50 percent or more of the other company's voting stock. A parent company owns or controls any partnership in which it is a general partner). Information is included within this definition if it is:

(1) In files maintained by submitter's employees who are:

(i) Associated with research, development, test marketing, or commercial marketing of the chemical substance in question.

(ii) Reasonably likely to have such data.

(2) Maintained in the files of other agents of the submitter who are associated with research, development, test marketing, or commercial marketing of the chemical substance in question in the course of their employment as such agents.

*Potentially exposed or susceptible subpopulation* means a group of individuals within the general population identified by EPA who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, the elderly, or overburdened communities.

*Principal importer* means the first importer who, knowing that a new chemical substance will be imported rather than manufactured domestically, specifies the identity of the chemical substance and the total amount to be imported. Only persons who are incorporated, licensed, or doing business in the United States may be principal importers.

*Process* means the preparation of a chemical substance or mixture, after its manufacture, for distribution in commerce:

(1) In the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such substance or mixture, or

(2) As part of a mixture or article containing the chemical substance or mixture.

*Processor* means any person who processes a chemical substance or mixture.

*Small quantities solely for research and development* (or ''small quantities solely for purposes of scientific experimentation or analysis or chemical research on, or analysis of, such substance or another substance, including such research or analysis for the development of a product'') means quantities of a chemical substance manufactured or processed or proposed to be manufactured or processed solely for research and development that are not greater than reasonably necessary for such purposes.

*State* means any State of the United States and the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Canal Zone, American Samoa, the Northern Mariana Islands, and any other territory or possession of the United States.

*Support documents* means material and information submitted to EPA in support of a TSCA section 5 notice, including but not limited to, correspondence, amendments (if notices for these amendments were submitted prior to January 19, 2016), and test data. The term ''support documents'' does not include orders under TSCA section 5(e) (either consent orders or orders imposed pursuant to TSCA section 5(e)(2)(B)).

*Technically qualified individual* means a person or persons:

(1) Who, because of education, training, or experience, or a combination of these factors, is capable of understanding the health and environmental risks associated with the chemical substance which is used under his or her supervision;

(2) Who is responsible for enforcing appropriate methods of conducting scientific experimentation, analysis, or chemical research to minimize such risks; and

(3) Who is responsible for the safety assessments and clearances related to the procurement, storage, use, and disposal of the chemical substance as may be appropriate or required within the scope of conducting a research and development activity.

*Test data* means data from a formal or informal test or experiment, including information concerning the objectives, experimental methods and materials, protocols, results, data analyses, recorded observations, monitoring data, measurements, and conclusions from a test or experiment.

*Test marketing* means the distribution in commerce of no more than a predetermined amount of a chemical substance, mixture, or article containing that chemical substance or mixture, by a manufacturer or processor, to no more than a defined number of potential customers to explore market capability in a competitive situation during a predetermined testing period prior to the broader distribution of that chemical substance, mixture, or article in commerce.

*United States,* when used in the geographic sense, means all of the States.

**§ 720.30 [Amended]**

■ 10. Amend § 720.30 by revising the citations "§ 720.3(e)" in paragraph (a) and "720.3(u)" in paragraph (b) to both read "§ 720.3."

■ 11. Amend § 720.40 by revising paragraph (f) to read as follows:

**§ 720.40 General.**

* * * * *

(f) *New information.* During the applicable review period, if the submitter possesses, controls, or knows of new information that materially adds to or changes the information included in the notice, the submitter must submit that information to EPA within ten days of receiving the new information, but no later than five days before the end of the applicable review period. The new information must be submitted electronically to EPA via CDX and must clearly identify the submitter and the notice to which the new information is related. If the new information becomes available during the last five days of the applicable review period, the submitter must immediately inform its EPA contact for that notice by telephone or e-mail and submit the new information electronically to EPA via CDX.

* * * * *

■ 12. Amend § 720.45 by:

■ a. Revising paragraphs (a)(4) and (5), and (f) through (h); and

■ b. Adding paragraphs (j) and (k).

The revisions and additions read as follows:

**§ 720.45 Information that must be included in the notice form.**

* * * * *

(a) * * *

(4) If an importer submitting the notice cannot provide all the information specified in paragraphs (a)(1) and (2) of this section because it is claimed as confidential by the foreign supplier of the substance, the importer must have the foreign supplier follow the procedures in paragraph (a)(3) of this section and provide the correct chemical identity information specified in paragraphs (a)(1) and (2) of this section directly to EPA in a joint submission or as a letter of support to the notice, which clearly references the importer's notice and PMN User Fee Identification Number. The applicable review period will commence upon receipt of both the notice and the complete, correct information, in accordance with § 720.65.

(5) If a manufacturer cannot provide all the information specified in paragraphs (a)(1) and (2) of this section because the new chemical substance is manufactured using a reactant having a specific chemical identity claimed as confidential by its supplier, the manufacturer must submit a notice directly to EPA containing all the information known by the manufacturer about the chemical identity of the reported substance and its proprietary reactant. In addition, the manufacturer must ensure that the supplier of the confidential reactant submit a letter of support directly to EPA providing the specific chemical identity of the confidential reactant, including the CASRN, if available, and the appropriate PMN or exemption number, if applicable. The letter of support must reference the manufacturer's name and PMN Fee Identification Number. The applicable review period will commence upon receipt of the notice, the letter of support, and the complete, correct information, in accordance with § 720.65.

* * * * *

(f)(1) A description of the intended category or categories of consumer or commercial use by function and application, which includes a description of the following:

(i) The estimated percent of production volume devoted to each category of use.

(ii) The percent of the new chemical substance in the formulation for each commercial or consumer use.

(iii) The types of products or articles that would incorporate the new chemical substance (*e.g.,* household cleaners, plastic articles).

(iv) Information related to the use of products or articles containing the new chemical substance by potentially exposed or susceptible subpopulations.

(v) How and where a product or article containing the new chemical substance would be used (*e.g.,* spray applied indoors, brushed on outdoor surfaces).

(vi) Consumption rates and frequency and duration of use of products or articles containing the new chemical substance.

(2) Using the applicable codes listed in Table 1 to paragraph (f)(2), submitters must designate the consumer and commercial product category or categories that best describe the consumer and commercial products in which the new chemical substance is intended or known to be used. When more than 10 codes apply to the consumer or commercial products in which the new chemical substance is intended or known to be used, submitters should only designate the 10 product categories that represent the highest proportion of the anticipated production volume.

TABLE 1 TO PARAGRAPH (f)(2)—CODES FOR REPORTING CONSUMER AND COMMERCIAL PRODUCT CATEGORIES

| Code | Category |
|---|---|
| | **Chemical Substances in Furnishing, Cleaning, Treatment Care Products** |
| CC101 | Construction and building materials covering large surface areas including stone, plaster, cement, glass and ceramic articles; fabrics, textiles, and apparel. |
| CC102 | Furniture & furnishings including plastic articles (soft); leather articles. |
| CC103 | Furniture & furnishings including stone, plaster, cement, glass, and ceramic articles; metal articles; or rubber articles. |
| CC104 | Leather conditioner. |
| CC105 | Leather tanning, dye, finishing, impregnation, and care products. |

TABLE 1 TO PARAGRAPH (f)(2)—CODES FOR REPORTING CONSUMER AND COMMERCIAL PRODUCT CATEGORIES—Continued

| Code | Category |
| --- | --- |
| CC106 | Textile (fabric) dyes. |
| CC107 | Textile finishing and impregnating/surface treatment products. |
| CC108 | All-purpose foam spray cleaner. |
| CC109 | All-purpose liquid cleaner/polish. |
| CC110 | All-purpose liquid spray cleaner. |
| CC111 | All-purpose waxes and polishes. |
| CC112 | Appliance cleaners. |
| CC113 | Drain and toilet cleaners (liquid). |
| CC114 | Powder cleaners (floors). |
| CC115 | Powder cleaners (porcelain). |
| CC116 | Dishwashing detergent (liquid/gel). |
| CC117 | Dishwashing detergent (unit dose/granule). |
| CC118 | Dishwashing detergent liquid (hand-wash). |
| CC119 | Dry cleaning and associated products. |
| CC120 | Fabric enhancers. |
| CC121 | Laundry detergent (unit-dose/granule). |
| CC122 | Laundry detergent (liquid). |
| CC123 | Stain removers. |
| CC124 | Ion exchangers. |
| CC125 | Liquid water treatment products. |
| CC126 | Solid/Powder water treatment products. |
| CC127 | Liquid body soap. |
| CC128 | Liquid hand soap. |
| CC129 | Solid bar soap. |
| CC130 | Air fresheners for motor vehicles. |
| CC131 | Continuous action air fresheners. |
| CC132 | Instant action air fresheners. |
| CC133 | Anti-static spray. |
| CC134 | Apparel finishing, and impregnating/surface treatment products. |
| CC135 | Insect repellent treatment. |
| CC136 | Pre-market waxes, stains, and polishes applied to footwear. |
| CC137 | Post-market waxes, and polishes applied to footwear (shoe polish). |
| CC138 | Waterproofing and water-resistant sprays. |
| **Chemical Substances in Construction, Paint, Electrical, and Metal Products** | |
| CC201 | Fillers and putties. |
| CC202 | Hot-melt adhesives. |
| CC203 | One-component caulks. |
| CC204 | Solder. |
| CC205 | Single-component glues and adhesives. |
| CC206 | Two-component caulks. |
| CC207 | Two-component glues and adhesives. |
| CC208 | Adhesive/Caulk removers. |
| CC209 | Aerosol spray paints. |
| CC210 | Lacquers, stains, varnishes, and floor finishes. |
| CC211 | Paint strippers/removers. |
| CC212 | Powder coatings. |
| CC213 | Radiation curable coatings. |
| CC214 | Solvent-based paint. |
| CC215 | Thinners. |
| CC216 | Water-based paint. |
| CC217 | Construction and building materials covering large surface areas, including wood articles. |
| CC218 | Construction and building materials covering large surface areas, including paper articles; metal articles; stone, plaster, cement, glass, and ceramic articles. |
| CC219 | Machinery, mechanical appliances, electrical/electronic articles. |
| CC220 | Other machinery, mechanical appliances, electronic/electronic articles. |
| CC221 | Construction and building materials covering large surface areas, including metal articles. |
| CC222 | Electrical batteries and accumulators. |
| **Chemical Substances in Packaging, Paper, Plastic, Toys, Hobby Products** | |
| CC301 | Packaging (excluding food packaging), including paper articles. |
| CC302 | Other articles with routine direct contact during normal use, including paper articles. |
| CC303 | Packaging (excluding food packaging), including rubber articles; plastic articles (hard); plastic articles (soft). |
| CC304 | Other articles with routine direct contact during normal use including rubber articles; plastic articles (hard). |
| CC305 | Toys intended for children's use (and child dedicated articles), including fabrics, textiles, and apparel; or plastic articles (hard). |
| CC306 | Adhesives applied at elevated temperatures. |
| CC307 | Cement/concrete. |
| CC308 | Crafting glue. |
| CC309 | Crafting paint (applied to body). |

TABLE 1 TO PARAGRAPH (f)(2)—CODES FOR REPORTING CONSUMER AND COMMERCIAL PRODUCT CATEGORIES—Continued

| Code | Category |
|---|---|
| CC310 | Crafting paint (applied to craft). |
| CC311 | Fixatives and finishing spray coatings. |
| CC312 | Modelling clay. |
| CC313 | Correction fluid/tape. |
| CC314 | Inks in writing equipment (liquid). |
| CC315 | Inks used for stamps. |
| CC316 | Toner/Printer cartridge. |
| CC317 | Liquid photographic processing solutions. |
| **Chemical Substances in Automotive, Fuel, Agriculture, Outdoor Use Products** | |
| CC401 | Exterior car washes and soaps. |
| CC402 | Exterior car waxes, polishes, and coatings. |
| CC403 | Interior car care. |
| CC404 | Touch up auto paint. |
| CC405 | Degreasers. |
| CC406 | Liquid lubricants and greases. |
| CC407 | Paste lubricants and greases. |
| CC408 | Spray lubricants and greases. |
| CC409 | Anti-freeze liquids. |
| CC410 | De-icing liquids. |
| CC411 | De-icing solids. |
| CC412 | Lock deicers/releasers. |
| CC413 | Cooking and heating fuels. |
| CC414 | Fuel additives. |
| CC415 | Vehicular or appliance fuels. |
| CC416 | Explosive materials. |
| CC417 | Agricultural non-pesticidal products. |
| CC418 | Lawn and garden care products. |
| **Chemical Substances in Products not Described by Other Codes** | |
| CC980 | Other (specify). |
| CC990 | Non-TSCA use. |

(g) For sites controlled by the submitter:

(1) The identity and address of each site where the new chemical substance will be manufactured, processed, or used.

(2) A process description of each manufacture, processing, and use operation which includes a diagram of the major unit operations and chemical conversions; indication of whether batch or continuous manufacturing or processing occurs at the site, and the amount manufactured or processed per batch or per day if continuous and per year; the identity, approximate weight per batch or per day for continuous production, and entry point of all starting materials and feedstocks (including reactants, solvents, catalysts, etc.); the identity, approximate weight per batch or per day for continuous production, and entry point of all products, recycle streams, and wastes, including frequency of any equipment cleaning; the type of interim storage and transport containers used; and the points of release of the new chemical substance numbered. If the new chemical substance is released to two media at the same step in the process, assign a second number for the second medium.

(3) Worker exposure information for each worker activity anticipated or known to occur during manufacture, processing, or use of the new chemical substance, including worker exposure information from exempt manufacture or related use of the new chemical substance under § 720.30. This information includes:

(i) A description of each worker activity.

(ii) Type of potential worker exposure (*e.g.,* dermal, inhalation).

(iii) Protective equipment in place, if any, including a description of the kind of gloves, protective clothing, goggles, or respirator that limit worker exposure.

(iv) Engineering controls in place, if any.

(v) Physical form of the new chemical substance to which workers may be exposed and moisture content if physical form is solid.

(vi) The percent of new chemical substance in formulation at time of worker exposure.

(vii) The number of workers reasonably likely to be exposed.

(viii) The duration of activities.

(4) Information on known or anticipated release of the new chemical substance to the environment, including releases from the exempt manufacture or related use of the new chemical substance under § 720.30. This information includes the type of release (*e.g.,* transport, interim storage, disposal, equipment cleaning), the quantity of the new chemical substance released directly to the environment, the quantity of the new chemical substance released into control technology, the quantity of the new chemical substance released to the environment after control technology, the media of release, the type of control technology used, and the following additional information based on the type of release:

(i) For equipment cleaning releases, frequency of equipment cleaning and what is used to clean the equipment.

(ii) For transport and storage releases, how the new chemical substance or product containing the new chemical substance is transported from the site and stored, whether dedicated containers are used, whether the cleaning and disposal of the containers is under the submitter's control, the container cleaning method, the

frequency of container cleaning, and the amount of release per container cleaning.

(iii) For releases into air, Clean Air Act operating permit numbers, a description of any Leak Detection and Repair program in accordance with 40 CFR parts 60, 61, 63, 65, 264 or 265 (related to the monitoring and management of fugitive releases) the site has implemented, and the type of air pollution control technologies used at the site to treat the stack releases that will contain the new chemical substance.

(iv) For releases into water, the National Pollutant Discharge Elimination System (NPDES) permit number(s), outfall numbers, the name(s) of the waterbody into which the release occurs, and other destination(s) into which the release occurs.

(v) For releases into wastewater treatment plants, the name(s) of the publicly owned treatment works (POTW) or privately owned treatment works into which the release occurs and the corresponding NPDES permit number(s), the type of wastewater treatment technology or technologies employed, and a description of the known or expected treatment efficiency.

(h) For sites not controlled by the submitter:

(1) The identity and address of each site where the new chemical substance will be manufactured, processed, or used.

(2) A description of each type of processing and use operation involving the new chemical substance, including identification of the estimated number of processing or use sites; a process description of each operation which includes a diagram of the major unit operations and chemical conversions; the identity, approximate weight per batch or per day for continuous production, and entry point of all starting materials and feedstocks (including reactants, solvents, catalysts, etc.); the identity, approximate weight per batch or per day for continuous production, and entry point of all products, recycle streams, and wastes, including frequency of any equipment cleaning; the type of interim storage and transport containers used; and the points of release of the new chemical substance numbered. If the new chemical substance is released to two media at the same step in the process, assign a second number for the second medium.

(3) Worker exposure information for each worker activity anticipated or known to occur during manufacture, processing, or use of the new chemical substance, including worker exposure information from exempt manufacture or related use of the new chemical substance under § 720.30. This information includes:

(i) A description of each worker activity.

(ii) Type of potential worker exposure (*e.g.,* dermal, inhalation).

(iii) Protective equipment in place, if any, including a description of the kind of gloves, protective clothing, goggles, or respirator that limit worker exposure, if any.

(iv) Engineering controls in place if any.

(v) Physical form of the new chemical substance to which workers may be exposed and moisture content if physical form is solid.

(vi) The percent of the new chemical substance in formulation at time of worker exposure.

(vii) The number of workers reasonably likely to be exposed.

(viii) The duration of activities.

(4) Information on known or anticipated release of the new chemical substance to the environment, including releases from the exempt manufacture or related use of the new chemical substance under § 720.30. This information includes the type of release (*e.g.,* transport, interim storage, disposal, equipment cleaning), the quantity of the new chemical substance released directly to the environment, the quantity of the new chemical substance released into control technology, the quantity of the new chemical substance released to the environment after control technology, the media of release, the type of control technology used, and the following additional information based on the type of release:

(i) For equipment cleaning releases, frequency of equipment cleaning and what is used to clean the equipment.

(ii) For transport and storage releases, how the new chemical substance or product containing the new chemical substance will be transported from the site and stored, whether dedicated containers are used, whether the cleaning and disposal of the containers is under the submitter's control, the container cleaning method, the frequency of container cleaning, and the amount of release of the new chemical substance per container cleaning.

(iii) For releases into air, Clean Air Act operating permit numbers, a description of any Leak Detection and Repair program in accordance with 40 CFR parts 60, 61, 63, 65, 264 or 265 (related to the monitoring and management of fugitive releases) the site has implemented, and the type of air pollution control technologies used at the site to treat the stack releases that will contain the new chemical substance.

(iv) For releases into water, the National Pollutant Discharge Elimination System (NPDES) permit number(s), outfall numbers, the name(s) of the waterbody into which the release occurs, and other destination(s) into which the release occurs.

(v) For releases into wastewater treatment plants, the name(s) of the publicly owned treatment works (POTW) or privately owned treatment works into which the release occurs and the corresponding NPDES permit number(s), the type of wastewater treatment technology or technologies employed, and a description of the known or expected treatment efficiency.

* * * * *

(j) The physical and chemical properties and environmental fate characteristics of the new chemical substance, which include the following:

(1) For physical and chemical properties, such information includes boiling point, sublimation, density/relative density, dissociation constant, explodability, flammability, melting point, octanol/water partition coefficient, particle size distribution, particle size distribution analysis (*i.e.,* analysis method and data used to develop the particle size distribution), the physical state of the neat substance, pH, solubility, vapor pressure, volatilization from water, volatilization from soil, spectra, UV–VIS absorption data, and surface tension.

(2) For environmental fate characteristics, such information includes hydrolysis, photolysis, aerobic and anaerobic biodegradation, atmospheric oxidation half-lives, Henry's law constant, adsorption/desorption coefficient, bioaccumulation or bioconcentration factor, Incineration Removal Efficiency (Destruction and Removal Efficiencies or DREs), and Sewage Treatment (WWTP) Removals.

(k) Information about pollution prevention efforts, such as using alternative fuel sources, reducing the use of water and chemical inputs, modifying a production process to produce less waste, or implementing water and energy conservation practices, or substituting for riskier existing products. Inclusion of this information is optional.

■ 13. Amend § 720.50 by revising paragraphs (a)(4)(ii) and adding paragraph (c) to read as follows:

**§ 720.50 Submission of test data and other data concerning the health and environmental effects of a substance.**

(a) * * *

(4) * * *

(ii) If a test or experiment is completed before the applicable review period ends, the person must submit the study, report, or test data electronically to EPA via CDX, as specified in paragraph (a)(3)(i) of this section, within ten days of receiving it, but no later than five days before the end of the review period. If the test or experiment is completed during the last five days of the review period, the submitter must inform its EPA contact for that notice by telephone or e-mail prior to the end of the review period and submit the study, report, or test data electronically to EPA via CDX.

* * * * *

(c) *Other information.* A person may submit other information, not otherwise required in this section, to facilitate EPA's review of the notice.

* * * * *

■ 14. Revise § 720.65 to read as follows:

**§ 720.65 Acknowledgement of receipt of a notice; errors in the notice; incomplete submissions; and false and misleading statements.**

(a) *Notification to the submitter.* (1) EPA will acknowledge receipt of each notice by sending a letter via CDX or U.S. mail to the submitter that identifies the premanufacture notice number assigned to the new chemical substance and date on which the applicable review period begins as described in paragraph (a)(2) of this section.

(2) Before EPA sends an acknowledgement of receipt of a notice pursuant to paragraph (a)(1) of this section, EPA will conduct a pre-screen of the notice, typically taking 2–3 days and according to the criteria under paragraphs (b)(1) and (c)(1) of this section.

(i) If EPA concludes that the notice contains errors warranting remedy or is incomplete, EPA will notify the submitter according to paragraph (d)(3) of this section. The applicable review period will not begin. Once the submitter corrects the errors or incomplete submission according to the requirements provided by EPA and re-submits the notice to EPA, EPA will follow the procedures of paragraph (a)(2) of this section.

(ii) If EPA does not identify errors or determine the notice to be incomplete during screening, EPA will notify the submitter according to paragraph (a)(1) of this section. The applicable review period will begin on the date EPA received the complete notice.

(b) *Errors in the notice.* (1) Within 30 days of receipt of the notice, EPA may request that the submitter remedy errors in the notice. The following are examples of such errors:

(i) Typographical errors that cause data to be misleading or answers to any questions to be unclear.

(ii) Contradictory information.

(iii) Ambiguous statements or information.

(2) The applicable review period does not begin for notices containing errors that EPA asks the submitter to remedy until corrections are made following the procedures of paragraph (d) of this section.

(c) *Incomplete submissions.* (1) A submission is not complete, and the applicable review period does not begin, if:

(i) The wrong person submits the notice form.

(ii) The submitter does not sign the notice form.

(iii) Some or all of the information in the notice or the attachments are not in English, except for published scientific literature.

(iv) The submitter does not submit the notice in the manner set forth in § 720.40(a)(2).

(v) The submitter does not provide information that is required by section 5(d)(1)(B) and (C) of the Act and § 720.50.

(vi) The submitter does not provide information required by § 720.45 or indicate that it is not known to or reasonably ascertainable by the submitter.

(vii) The submitter does not submit a second copy of the submission with all confidential information deleted for the public file, as required by § 703.5(c).

(viii) The submitter does not include any information required by section 5(b)(1) of the Act and pursuant to a rule promulgated under section 4 of the Act, as required by § 720.40(g).

(ix) The submitter does not submit data which the submitter believes show that the chemical substance will not present an unreasonable risk of injury to health or the environment, if EPA has listed the chemical substance under section 5(b)(4) of the Act, as required in § 720.40(h).

(x) The submitter does not include an identifying number and a payment identity number as required by § 700.45(e)(3).

(2) The submission may be declared incomplete if at any time during the applicable review period the submitter submits additional or revised information without demonstrating to EPA's satisfaction that the additional or revised information in the amended notice was not known to or reasonably ascertainable by the submitter at the time of initial notice submission (*e.g.,* new information as described in § 720.40(f) or information from testing in progress at the time of the original submission, as described in § 720.50(a)(4)), unless it relates to administrative or non-substantive amendments (*e.g.,* changing the technical point of contact) or amendments made at the request of EPA.

(d) *Corrections to errors in the notice or incomplete submissions.* (1) If EPA receives an incomplete submission or seeks remedy of errors identified in a notice, EPA will notify the submitter within 30 days of receipt that the submission contains errors or is incomplete and that the applicable review period will not begin until EPA receives a correct and complete notice.

(2) If EPA obtains additional information during the applicable review period that indicates the original submission was incomplete, EPA may declare the submission incomplete within 30 days after EPA obtains the additional information and so notify the submitter.

(3) The notification that a submission contains errors or is incomplete under paragraph (d)(1) or (2) of this section will include:

(i) A statement of the basis of EPA's determination that the submission contains errors or is incomplete.

(ii) The requirements for correcting the errors or incomplete submission.

(iii) Information on procedures under paragraph (d)(4) of this section for filing objections to the determination or requesting modification of the requirements for completing the submission.

(4) Within ten days after receipt of notification by EPA that a submission contains errors or is incomplete, the submitter may file written objections requesting that EPA accept the submission as a complete notice or modify the requirements necessary to complete the submission.

(5) EPA will consider the objections filed by the submitter and determine:

(i) Whether the submission was complete or incomplete, or whether to modify the requirements for completing the submission. EPA will notify the submitter in writing of EPA's response within ten days of receiving the objections.

(ii) If EPA determines, in response to the objection, that the submission was complete, the applicable review period will be deemed suspended on the date EPA declared the notice incomplete and will resume on the date that the notice is declared complete. The submitter need not correct the notice as EPA originally requested. If EPA can complete its review within 90 days from the date of the original submission, EPA

may inform the submitter that the running of the review period will resume on the date EPA originally declared it incomplete.

(iii) If EPA modifies the requirements for completing the submission or affirms its original determination that the submission contains errors or is incomplete, or if no objections are filed, the applicable review period will begin (or if previously begun, will restart at Day 1) when EPA receives a complete notice.

(e) *Materially false or misleading statements.* If EPA discovers at any time that a person submitted materially false or misleading statements in the notice, EPA may find that the notice was incomplete from the date it was submitted and take any other appropriate action.

■ 15. Amend § 720.70 by revising paragraphs (a) and (b)(3) to read as follows:

### § 720.70 Notice in the Federal Register.

(a) *Filing notice of receipt.* In accordance with section 5(d)(2) of the Act, after EPA has received a complete notice, EPA will file a notice of receipt with the Office of the Federal Register including the information specified in paragraph (b) of this section.

(b) * * *

(3) For test data submitted in accordance with § 720.40(g), a summary of the data received will be published.

* * * * *

■ 16. Amend § 720.75 by:

■ a. Revising the section heading;

■ b. Removing the phrase ''notice review period'' and adding in its place the phrase ''applicable review period,'' wherever it appears; and

■ c. Revising paragraphs (a), (b), (c)(4) introductory text, (c)(4)(iii), and (d).

The revisions read as follows:

### § 720.75 Applicable review period and determination.

(a) *Length of applicable review period.* The applicable review period specified in section 5(a) of the Act runs for 90 days from the date EPA receives a complete notice, or the date EPA determines the notice is complete under § 720.65(d), unless the Agency extends the applicable review period under section 5(c) of the Act and paragraph (c) of this section.

(b) *Suspension of the running of the applicable review period.* (1) A submitter may voluntarily suspend the running of the applicable review period if EPA agrees. If EPA does not agree, the review period will continue to run, and EPA will notify the submitter. A submitter may request a suspension at any time during the applicable review period. The suspension must be for a specified period of time.

(2) *Requests for suspensions.* (i) A request for a suspension of 30 days or less may be made orally, including by telephone, or in writing, including by e-mail, to the submitter's EPA contact for that notice. Any request for a suspension exceeding 30 days must be submitted in the manner set forth in paragraph (b)(2)(ii) of this section. The running of the applicable review period will be suspended upon approval of the oral or written request by EPA.

(ii) Requests for suspensions exceeding 30 days must be submitted electronically to EPA via CDX using e-PMN software. Requests for suspensions of 30 days or less may also be submitted electronically to EPA via CDX using e-PMN software. See § 720.40(a)(2)(ii) for information on how to access the e-PMN software. The running of the applicable review period will be suspended upon approval of the request submitted electronically to EPA via CDX using e-PMN software by EPA.

(c) * * *

(4) The following are examples of situations in which EPA may find that good cause exists for extending the applicable review period:

* * * * *

(iii) EPA has received significant additional information during the applicable review period, which was not known to or reasonably ascertainable by the submitter at the time of initial notice submission.

(d) *Determinations.* (1) Within the applicable review period, EPA will make one of the following five determinations, as set forth in section 5(a)(3) of the Act:

(i) The chemical substance presents an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(A) of the Act.

(ii) Information available to EPA is insufficient to permit a reasoned evaluation of the health and the environmental effects of the relevant chemical substance, as set forth in section 5(a)(3)(B)(i) of the Act.

(iii) In the absence of sufficient information to permit EPA to make such an evaluation, the chemical substance may present an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(B)(ii)(I) of the Act.

(iv) The chemical substance is or will be produced in substantial quantities, and such substance either enters or may reasonably be anticipated to enter the environment in substantial quantities or there is or may be significant or substantial human exposure to the substance, as set forth in section 5(a)(3)(B)(ii)(II) of the Act.

(v) The chemical substance is not likely to present an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(C) of the Act.

(2) EPA will take the following actions required in association with the determination:

(i) For determinations described in paragraph (d)(1)(i) of this section, EPA will issue the submitter an order to prohibit or limit the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance, or any combination of such activities, to the extent necessary to protect against an unreasonable risk of injury to health or the environment, as set forth in section 5(f) of the Act, or will issue a proposed rule under section 6(a) of the Act, as set forth in section 5(f) of the Act.

(ii) For determinations described in paragraphs (d)(1)(ii), (iii), or (iv) of this section, EPA will issue the submitter an order to prohibit or limit the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance, or any combination of such activities, to the extent necessary to protect against an unreasonable risk of injury to health or the environment, as set forth in section 5(e) of the Act. EPA may issue an order under section 5(e) of the Act that requires certain testing to be conducted and presented to EPA after the applicable review period has concluded.

(iii) For determinations described in paragraph (d)(1)(v) of this section, EPA will issue the submitter a document containing EPA's final determination and will submit for publication in the **Federal Register** a statement of the finding, as set forth in section 5(g) of the Act. Upon EPA's issuance of the determination document, the submitter may commence the manufacture of the chemical substance without waiting for the end of the applicable review period.

(3) EPA may modify or revoke the prohibitions and limitations in an order issued under paragraph (d)(2)(i) or (ii) of this section after the applicable review period has ended if EPA receives additional testing, studies, reports, or other information that EPA determines, upon review, demonstrate that such prohibitions or limitations are no longer necessary to protect against an unreasonable risk of injury to health or the environment. Where such information demonstrates that the prohibitions or limitations of the order are not sufficient to protect against an unreasonable risk of injury to health or the environment, EPA may modify the order or take other action, as

appropriate, to the extent necessary to protect against such risk.

(4) No person submitting a notice in response to the requirements of this part may manufacture a chemical substance subject to this part until EPA has issued a determination in accordance with paragraph (d)(1) of this section and taken the associated action required under paragraph (d)(2) of this section.

* * * * *

## PART 721—SIGNIFICANT NEW USES OF CHEMICAL SUBSTANCES

■ 17. The authority citation for part 721 continues to read as follows:

**Authority:** 15 U.S.C. 2604, 2607, and 2625(c).

■ 18. Amend § 721.25 by:
■ a. Revising paragraph (d); and
■ b. Adding paragraph (e).

The revisions and additions read as follows:

### § 721.25 Notice requirements and procedures.

* * * * *

(d) Any person submitting a significant new use notice in response to the requirements of this part shall not manufacture or process a chemical substance identified in subpart E of this part for a significant new use until EPA has issued a determination with respect to the significant new use and taken the actions required in association with that determination in accordance with the procedures for new chemical substances at § 720.75(d) of this chapter.

(e) When submitting a significant new use notice, in addition to providing a description of the intended categories of consumer or commercial use by function and application as required by § 720.45(f)(1) of this chapter, the submitter must also provide, to the extent known to or reasonably ascertainable by the submitter, a description of known categories of consumer or commercial use by function and application.

■ 19. Amend §§ 721.10647(a)(1), 721.10844(a)(1), 721.10929(a)(1), 721.11149(a)(1), 721.11179(a)(1), 721.11361(a)(1)(iii), and 721.11712(a)(1) by revising the citation ''720.3(c)'' to read ''720.3.''

■ 20. Amend § 721.11777(b) by revising the citations ''720.3(w)'' and ''720.3(d)'' to read ''720.3.''

## PART 723–PREMANUFACTURE NOTIFICATION EXEMPTIONS

■ 21. The authority citation for part 723 continues to read as follows:

**Authority:** 15 U.S.C. 2604.

■ 22. Amend § 723.50 by:
■ a. Revising paragraphs (a)(1);
■ b. Adding paragraphs (b)(11) and (12);
■ c. Revising paragraphs (d);
■ d. Adding paragraphs (e)(2)(xiv);
■ e. Revising paragraphs (e)(3), (g), (h)(2)(v), and (i); and
■ f. Adding paragraph and (p).

The revisions and additions read as follows:

### § 723.50 Chemical substances manufactured in quantities of 10,000 kilograms or less per year, and chemical substances with low environmental releases and human exposures.

(a) * * *

(1) This section grants an exemption from the premanufacture notice requirements of section 5(a)(1)(A)(i) of the Toxic Substances Control Act (15 U.S.C. 2604(a)(1)(A)) for the manufacture of:

* * * * *

(b) * * *

(11) *PFAS* or *per- and poly-fluoroalkyl substance* means a chemical substance that contains at least one of these three structures:

(i) R–(CF2)–CF(R′)R″, where both the CF2 and CF moieties are saturated carbons;

(ii) R–CF2OCF2–R′, where R and R′ can either be F, O, or saturated carbons; or

(iii) CF3C(CF3)R′R″, where R′ and R″ can either be F or saturated carbons.

(12) *PBT chemical substance* means a chemical substance possessing characteristics of persistence (P) in the environment, accumulation in biological organisms (bioaccumulation (B)), and toxicity (T) resulting in potential risks to humans and ecosystems. For more information on EPA's Policy on new chemical substances that are PBTs, see EPA's 1999 policy statement (64 FR 60194, November 4, 1999 (FRL–6097–7)).

* * * * *

(d) *Chemical substances that cannot be manufactured under this exemption.* A new chemical substance cannot be manufactured under this section, notwithstanding satisfaction of the criterion of paragraph (c)(1) or (2) of this section, if EPA determines, in accordance with paragraph (g) of this section, that the substance, any reasonably anticipated metabolites, environmental transformation products, or byproducts of the substance, or any reasonably anticipated impurities in the substance, under anticipated conditions of manufacture, processing, distribution in commerce, use, or disposal of the new chemical substance:

(1) May cause:

(i) Serious acute (lethal or sublethal) effects;

(ii) Serious chronic (including carcinogenic and teratogenic) effects; or

(ii) Significant environmental effects.

(2) Or is:

(i) A PFAS.

(ii) A PBT chemical substance with anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms.

* * * * *

(e) * * *

(2) * * *

(xiv) Physical and chemical properties and environmental fate characteristics (§ 720.45(j)).

(3) *Incomplete notices.* EPA will conduct a pre-screen of the notice, typically taking 2–3 days and according to the criteria under paragraph (e)(2) of this section. If EPA concludes that the notice is incomplete, EPA will notify the submitter and the review period will not begin. Once the submitter corrects the errors or incomplete submission according to the requirements provided by EPA and re-submits the notice to EPA, the review period will begin. If EPA does not identify errors or determine the notice to be incomplete during screening, the review period will begin on the date EPA received the complete notice.

* * * * *

(g) *Review period.* (1) EPA will review the notice submitted under paragraph (e) of this section to determine whether manufacture of the new chemical substance is eligible for the exemption. The review period will run for 30 days from the date EPA receives a complete notice. To provide additional time to address any unresolved issues concerning an exemption application, the exemption applicant may, at any time during the review period, request a suspension of the review period pursuant to the provisions of § 720.75(b) of this chapter.

(2) No person submitting a notice under paragraph (e) of this section may manufacture the new chemical substance until EPA notifies the submitter that the new chemical substance meets the terms of this section.

(h) * * *

(2) * * *

(v) If the Agency determines that manufacture of the new chemical substance does not meet the terms of this section and that the manufacturer did not act with due diligence and in good faith to meet the terms of this section, the manufacturer must cease any continuing manufacture, processing, distribution in commerce, and use of the new chemical substance within 7 days of the written notification

under paragraph (h)(2)(iii) of this section. The manufacturer may not resume manufacture, processing, distribution in commerce, and use of the new chemical substance until it submits a notice under section 5(a)(1) of the Act and part 720 of this chapter and EPA has made one of the five determinations as set forth in section 5(a)(3) of the Act and taken the action required in association with that determination.

* * * * *

(i) *Additional information.* If the manufacturer of a new chemical substance under the terms of this exemption obtains test data or other information indicating that the new chemical substance may not qualify under terms of this section, the manufacturer must submit these data or information to EPA within 15 working days of receipt of the information. If, during the notice review period specified in paragraph (g) of this section, the submitter obtains possession, control, or knowledge of new information that materially adds to, changes, or otherwise makes significantly more complete the information included in the notice, the submitter must submit that information to EPA within ten days of receiving the new information, but no later than five days before the end of the applicable review period. The new information must be submitted electronically to EPA via CDX and must clearly identify the submitter and the exemption notice to which the new information is related. If the new information becomes available during the last 5 days of the notice review period, the submitter must immediately inform its EPA contact for that notice by telephone or e-mail and submit the new information electronically to EPA via CDX.

* * * * *

(p) *Subject to a significant new use rule or listed on TSCA Inventory.* If a significant new use rule is proposed or finalized in part 721 of this chapter for a chemical substance described by a generic chemical name or if the specific chemical identity of a chemical substance is listed on the confidential portion of the TSCA Inventory, EPA may make reasonable efforts to notify any persons who may also manufacture the same chemical substance under the terms of this section. A disclosure to a person with an approved exemption under this section that the chemical substance is subject to a proposed or final rule in part 721 of this chapter or is listed on the confidential portion of the TSCA Inventory will not be considered public disclosure of confidential business information under section 14 of the Act. The notification will inform manufacturers subject to the terms of this section that the chemical substance is subject to a proposed or final significant new use rule under section 5(a)(2) of the Act or is listed on the TSCA Inventory, and identify the proposed or final section in subpart E of part 721 of this chapter that pertains to the chemical substance or the generic name for that substance listed on the public portion of the TSCA Inventory, as applicable.

## PART 725–REPORTING REQUIREMENTS AND REVIEW PROCESSES FOR MICROORGANISMS

■ 23. The authority citation for part 725 continues to read as follows:

**Authority:** 15 U.S.C. 2604, 2607, 2613, and 2625.

■ 24. Amend § 725.8(c)(1) by revising the citation ''720.3(e)'' to read ''720.3.''

■ 25. Amend § 725.54 by revising paragraphs (b)(1), (c) and (d) to read as follows:

### § 725.54 Suspension of the review period.

* * * * *

(b)(1) *Request for suspension.* A request for suspension may only be submitted in a manner set forth in this paragraph. The request for suspension also may be made orally, including by telephone, or in writing, including by e-mail, to the submitter's EPA contact for that notice, subject to paragraph (c) of this section.

* * * * *

(c) An oral or written request for suspension may be granted by EPA for a maximum of 30 days only. Requests for longer suspension must only be submitted in the manner set forth in paragraph (b)(2) of this section.

(d) If the submitter has not made a previous oral or written request, the running of the applicable review period is suspended as of the date of receipt of the CDX submission by EPA.

■ 26. Amend § 725.60 by revising paragraph (a)(1) to read as follows:

### § 725.60 Withdrawal of submission by the submitter.

(a)(1) *Withdrawal of notice by the submitter.* A submitter may withdraw a notice during the applicable review period by submitting a statement of withdrawal in a manner set forth in this paragraph. The withdrawal is effective upon receipt of the CDX submission by EPA.

* * * * *

■ 27. Amend § 725.170 by:

■ a. Revising paragraphs (a) and (b); and

■ b. Removing paragraph (c).

The revisions read as follows.

### § 725.170 EPA review of the MCAN.

* * * * *

(a) *Length of the review period.* The MCAN review period specified in section 5(a) of the Act runs for 90 days from the date EPA receives a complete MCAN, or the date EPA determines the MCAN is complete under § 725.33, unless the Agency extends the period under section 5(c) of the Act and § 725.56.

(b) *Determinations.* (1) Within the applicable review period, EPA will make one of the following five determinations on the microorganism, as set forth in section 5(a)(3) of the Act:

(i) The microorganism presents an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(A) of the Act.

(ii) Information available to EPA is insufficient to permit a reasoned evaluation of the health and the environmental effects of the microorganism, as set forth in section 5(a)(3)(B)(i) of the Act.

(iii) In the absence of sufficient information to permit EPA to make such an evaluation, the microorganism may present an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(B)(ii)(I) of the Act.

(iv) The microorganism is or will be produced in substantial quantities, and such substance either enters or may reasonably be anticipated to enter the environment in substantial quantities or there is or may be significant or substantial human exposure to the substance, as set forth in section 5(a)(3)(B)(ii)(II) of the Act.

(v) The microorganism is not likely to present an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(C) of the Act.

(2) EPA will take the following actions required in association with the determination.

(i) For determinations described in paragraph (b)(1)(i) of this section, EPA will issue the submitter an order to prohibit or limit the manufacture, processing, distribution in commerce, use, or disposal of the microorganism, or any combination of such activities, to the extent necessary to protect against an unreasonable risk of injury to health or the environment, as set forth in section 5(f) of the Act, or will issue a proposed rule under section 6(a) of the Act, as set forth in section 5(f) of the Act.

(ii) For determinations described in paragraphs (b)(1)(ii), (iii), or (iv), EPA will issue the submitter an order to prohibit or limit the manufacture, processing, distribution in commerce,

use, or disposal of the microorganism, or any combination of such activities, to the extent necessary to protect against an unreasonable risk of injury to health or the environment, as set forth in section 5(e) of the Act. EPA may issue an order under section 5(e) of the Act that requires certain testing to be conducted and presented to EPA after the applicable review period has concluded.

(iii) Following determinations described in paragraph (b)(1)(v) of this section, EPA will issue the submitter a document containing EPA's final determination and will submit for publication in the *Federal Register* a statement of the finding, as set forth in section 5(g) of the Act. Upon EPA's issuance of the determination document, the submitter may commence the manufacture of the microorganism without waiting for the end of the applicable review period.

(3) EPA may modify or revoke the prohibitions and limitations in an order issued under paragraph (b)(2)(i) or (ii) of this section after the applicable review period has ended if EPA receives additional information, testing, studies, or reports that EPA determines, upon review, demonstrate that such prohibitions or limitations are no longer necessary to protect against an unreasonable risk of injury to health or the environment. Where such information demonstrates that the prohibitions or limitations of the order are not sufficient to protect against an unreasonable risk of injury to health or the environment, EPA may modify the order or take other action, as appropriate, to the extent necessary to protect against such risk.

(4) No person submitting an MCAN in response to the requirements of this subpart may manufacture a microorganism subject to this subpart until EPA has issued a determination in accordance with paragraph (b)(1) of this section and taken the associated action required under paragraph (b)(2) of this section.

* * * * *

## PART 761—POLYCHLORINATED BIPHENYLS (PCBs) MANUFACTURING, PROCESSING, DISTRIBUTION IN COMMERCE, AND USE PROHIBITIONS

■ 28. The authority citation for part 761 continues to read as follows:

**Authority:** 15 U.S.C. 2605, 2607, 2611, 2614, and 2616.

■ 29. In § 761.3 amend the definition for ''Importer'' by removing the citation ''§ 720.3(l)'' and adding in its place ''§ 720.3.''

* * * * *

[FR Doc. 2024–28870 Filed 12–17–24; 8:45 am]

BILLING CODE 6560–50–P

## DEPARTMENT OF TRANSPORTATION

### Office of the Secretary

### 49 CFR Part 37

**[Docket No. DOT–OST–2024–0090]**

**RIN 2105–AF05**

## Transportation for Individuals With Disabilities; Adoption of Accessibility Standards for Pedestrian Facilities in the Public Right-of-Way

**AGENCY:** Office of the Secretary (OST), U.S. Department of Transportation (DOT or the Department).

**ACTION:** Final rule.

**SUMMARY:** The Department of Transportation (DOT or the Department) is amending its Americans with Disabilities Act regulations to adopt, without modification, the Architectural and Transportation Barriers Compliance Board's Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way (PROWAG) as DOT's regulatory standards for new construction and alterations of transit stops in the public right-of-way.

**DATES:** This rule is effective January 17, 2025.

**FOR FURTHER INFORMATION CONTACT:** For general questions, Holly Ceasar-Fox, Office of the General Counsel, U.S. Department of Transportation, (202) 366–7420, *holly.ceasarfox@dot.gov.* For legal questions related to PROWAG, James T. Esselman, Office of Chief Counsel, Federal Highway Administration, (202) 366–6181, *james.esselman@dot.gov.* For legal questions related to transit, Diane Alexander, Office of Chief Counsel, Federal Transit Administration, (202) 366–3101, *diane.alexander@dot.gov.* For questions related to intercity or high-speed rail, Linda Martin, Federal Railroad Administration, Office of Chief Counsel, 202–689–9408, *Linda.Martin@dot.gov.*

*Electronic Access and Filing:* This document, the notice of proposed rulemaking (NPRM), all comments received, and all background material may be viewed online at *www.regulations.gov* using the docket number listed above. Electronic retrieval help and guidelines are available on the website. It is available 24 hours each day, 365 days each year. An electronic copy of this document may also be downloaded from the Office of the Federal Register's website at *www.federalregister.gov* and the Government Publishing Office's website at *www.GovInfo.gov.*

**SUPPLEMENTARY INFORMATION:** The Americans with Disabilities Act (ADA) directs the Architectural and Transportation Barriers Compliance Board (U.S. Access Board, or the Board) to issue minimum guidelines for accessible design to guide the U.S. Department of Justice (DOJ) and the U.S. Department of Transportation (DOT) in the development of ADA accessibility standards. *See* 42 U.S.C. 12204(a). On August 8, 2023, the Board issued its final rule on Public Rights-of-Way Accessibility Guidelines (PROWAG). (88 FR 53604).

Title II of the ADA sets forth accessibility requirements applicable to public entities. Under Title II, Part B, DOT is authorized to implement the ADA relating to nondiscrimination in the provision of public transportation services. *See* 42 U.S.C. 12149(a). The ADA directs DOT to adopt standards for accessible public transportation facilities that are ''consistent with'' final minimum accessibility guidelines issued by the Board. *Id.* at section 12149(b). Similarly, Title III of the ADA directs DOT to adopt regulations implementing the transportation provisions of Title III, applicable to private entities that provide specified public transportation services and provides that any standards adopted under such regulations must be ''consistent with'' final minimum accessibility guidelines adopted by the Access Board. *Id.* at sections 12186(a), (c).

Under these authorities, DOT issued a notice of proposed rulemaking (NPRM) to adopt the PROWAG into DOT's ADA regulations on August 22, 2024 (89 FR 67922). The NPRM proposed to adopt the entirety of the PROWAG into DOT's ADA regulations but noted that DOT's independent regulatory authority under the ADA extends only to the accessibility of public transportation facilities. *See* 42 U.S.C. 12149(a), 12186(a), (c). As a result, the NPRM proposed that in adopting the PROWAG into DOT's ADA regulations, DOT will apply only those provisions applicable to new construction and alterations of transit stops in the public right-of-way. PROWAG R210 requires transit stops and transit shelters to comply with technical requirements set forth in PROWAG R309. Elements required to be accessible under PROWAG R309 include the boarding and alighting area

**United States**
**Environmental Protection Agency**

**December 2024**
**Office of Chemical Safety and Pollution Prevention**

# Response to Comments on the Updates to New Chemicals Regulations under the Toxic Substances Control Act (TSCA)

**SAN 7906**

**RIN 2070-AK65**

**December 2024**

Prepared by the New Chemicals Division,
Office of Pollution Prevention and Toxics,
Office of Chemical Safety and Pollution Prevention
U.S. Environmental Protection Agency

**TABLE OF CONTENTS**

Table of Contents ..... 1
List of Abbreviations ..... 3
Table of Comment Sources ..... 4
Introduction ..... 5
A. Amendments to Conform Regulations to 2016 Lautenberg Amendments ..... 6
1. Commencement of Manufacture or Processing ..... 6
2. Required Determinations and Associated Actions ..... 8
3. Definitions ..... 15
4. Content of Public Notice of Receipt of PMN ..... 21
B. Amendments Related to Notice Information Requirements ..... 24
1. General ..... 24
2. Physical and Chemical Properties and Environmental Fate Characteristics ..... 32
3. Worker Exposures, Environmental Releases, and Details Concerning EPA Data Requirements ..... 34
4. Categories of Use ..... 42
5. Sites Controlled by Others ..... 44
6. Pollution Prevention Information ..... 47
7. Other Modifications to the PMN Form in CDX ..... 48
8. Guidance ..... 54
C. Amendments Related to Pre-Screen, Incomplete Submissions, Correcting Errors, and New Information ..... 57
1. Pre-Screening Procedures ..... 57
2. Correcting Errors in Notices ..... 60
3. Notice Amendments Indicating Original Notice Was Incomplete ..... 60
4. Notifying EPA of the Receipt of New Information on a Chemical Substance Under Review ..... 74
D. Amendments to LVE and LoREX Exemptions ..... 75
1. Amendments to Expiration of LVE and LoREX Review Period ..... 75
2. Providing Notification TO LVE and LoREX Holders if the Chemical Substance Is Subject to a SNUR ..... 75
3. Making PFAS Categorically Ineligible for LVEs and LoREXs ..... 78
4. Codifying EPA's Policy Concerning PBT Chemicals and LVEs and LoREXs ..... 88
5. Other Comments Related to LVE AND LOREX Regulations and Review Process ..... 93
E. Amendments Related to Suspensions of the Review Period ..... 95

F. Economic Analysis ........ 97
1. Burden Estimates ........ 97
2. Amendments/Upfront Data Submission ........ 99
3. Small Business Impacts ........ 100
G. Other ........ 102
1. Comment Period Extension ........ 102
2. Additional Out of Scope Comments ........ 102
References ........ 105

**LIST OF ABBREVIATIONS**

| | |
|---|---|
| BAF | Bioaccumulation Factors |
| BCF | Bioconcentration Factors |
| BU | Unknown Potential to Bioaccumulate |
| CBI | Confidential Business Information |
| CDR | Chemical Data Reporting |
| CDX | Central Data Exchange |
| CFR | Code of Federal Regulations |
| CMPA | Color Pigments Manufacturers Association |
| CRSS | Chemical Review and Search Strategy |
| EPA | Environmental Protection Agency |
| ESD | Emission Scenario Documents |
| FIFRA | Federal Insecticide, Fungicide, and Rodenticide Act |
| FR | Federal Register |
| GenX | Hexafluoropropyleneoxide Dimer Acid |
| HFPO-DA | Hexafluoropropyleneoxide Dimer Acid |
| ICR | Information Collection Request |
| LoREX | Low Release and Exposure Exemption |
| LVE | Low Volume Exemption |
| MCAN | Microbial Commercial Activity Notice |
| NAM | New Approach Methodology |
| NPDES | National Pollution Discharge Elimination System |
| OECD | Organization for Economic Cooperation and Development |
| OMB | Office of Management and Budget |
| OPPT | Office of Pollution Prevention and Toxics |
| PBT | Persistent, Bioaccumulative, Toxic |
| PESS | Potentially Exposed or Susceptible Subpopulation |
| PFAS | Per- and Polyfluoroalkyl Substances |
| PFBA | Perfluorobutanoic Acid |
| PFHxA | Perfluorohexanoic Acid |
| PFOA | Perfluorooctanoic Acid |
| PFOS | Perfluorooctanesulfuric Acid |
| PMN | Premanufacture Notice |
| PMT | Persistent, Mobile, and Toxic |
| POTW | Publicly Owned Treatment Works |
| PPE | Personal Protective Equipment |
| PRA | Paperwork Reduction Act |
| PU | Unknown Persistence |
| QSAR | Quantitative Structure-Activity Relationship |
| R&D | Research and Development |
| SNUN | Significant New Use Notice |
| SNUR | Significant New Use Rule |
| TSCA | Toxic Substances Control Act |

**TABLE OF COMMENT SOURCES**

| Submitter Name/Organization | Document ID (Docket Number: EPA-HQ-OPPT-2022-0902) |
|---|---|
| D M | 0902-0036 |
| Keller and Heckman LLP on the behalf of TSCA Coalition | 0902-0037 |
| Anonymous | 0902-0038 |
| Physicians Committee for Responsible Medicine (PCRM) | 0902-0039 |
| Environmental Defense Fund (EDF) and Earthjustice | 0902-0040 |
| PPE LLC | 0902-0041 |
| Greater Chicago Legal Clinic, Inc. on behalf of Citizens Against Ruining the Environment | 0902-0043 |
| Alexander Grecu | 0902-0044 |
| Kathy Smachlo | 0902-0045 |
| Experien Health Sciences, Inc. | 0902-0046 |
| American Society of Interior Designers (ASID) | 0902-0047 |
| Semiconductor Industry Association (SIA) | 0902-0048 |
| SEMI | 0902-0049 |
| Anonymous | 0902-0050 |
| Chemical Users Coalition (CUC) | 0902-0051 |
| Bergeson & Campbell, P.C. (B&C) | 0902-0052 |
| Enzyme Technical Association (ETA) | 0902-0053 |
| PPG | 0902-0054 |
| Novozymes North America, Inc. | 0902-0055 |
| North Carolina Conservation Network | 0902-0056 |
| 3M | 0902-0057 |
| RadTech Intl. NA | 0902-0058 |
| Color Pigments Manufacturers Association (CMPA) | 0902-0059 |
| Solugen | 0902-0060 |
| Hach Company | 0902-0061 |
| The Chemours Company | 0902-0062 |
| American Federation of Labor - Congress of Industrial Organizations | 0902-0063 |
| The Adhesive and Sealant Council, Inc. | 0902-0064 |
| Solvay Specialty Polymers USA LLC | 0902-0065 |
| Environmental Defense Fund (EDF) et al. | 0902-0066 |
| Small Business Administration (SBA) | 0902-0067 |
| ASDWA, AMWA, AWWA, and ACWA | 0902-0068 |
| People for the Ethical Treatment of Animals (PETA) | 0902-0069 |
| Household & Commercial Products Association (HCPA) | 0902-0070 |
| Earthjustice et al. | 0902-0071 |
| Alliance for Automotive Innovation | 0902-0072 |
| American Coatings Association (ACA) | 0902-0073 |

| | |
|---|---|
| Fragrance Creators Association | 0902-0074 |
| Society of Chemical Manufacturers and Affiliates (SOCMA) | 0902-0075 |
| Gujarat Fluorochemicals Limited | 0902-0076 |
| The Rechargeable Battery Association | 0902-0077 |
| The Toxic Substances Control Act (TSCA) New Chemicals Coalition (NCC) et al. | 0902-0078 |
| American Chemistry Council | 0902-0079 |
| American Fuel & Petrochemical Manufacturers (AFPM) and American Petroleum Institute (API) | 0902-0080 |
| Keller and Heckman LLP | 0902-0081 |
| Earthjustice et al. | 0902-0082 |
| Anonymous | 0902-0083 |
| Environmental Defense Fund (EDF) | 0902-0084 |
| Silent Spring Institute | 0902-0085 |
| American Chemistry Council (ACC) | 0902-0086 |
| Alternative Fuels & Chemicals Coalition (AFCC) | 0902-0087 |

Note: Each comment summary is followed by the end portion of one or more Federal Docket Management System ID numbers. The numbers identify the public comments used to compile the comment summary. The comments were submitted to the rulemaking docket during the comment period for the proposed rule (Docket # EPA-HQ-OPPT-2022-0902).

## INTRODUCTION

This document is an addendum to the final rule to update the new chemicals procedural regulations under the Toxic Substances Control Act (TSCA), identified by docket identification number EPA-HQ-OPPT-2022-0902.

On May 26, 2023 (88 FR 34100; FRL 7906-01), EPA proposed amendments intended to align the regulatory text with the amendments to TSCA's new chemicals review provisions contained in the Frank R. Lautenberg Chemical Safety for the 21st Century Act, enacted on June 22, 2016, to improve the efficiency of EPA's review processes, and to update the regulations based on existing policies and experience implementing the New Chemicals Program. Additionally, the proposal included amendments that would reduce the need to redo all or part of the risk assessment by improving information initially submitted in new chemicals notices, which should also help reduce the length of time that new chemicals notices are under review. EPA also proposed several amendments to the regulations for low volume exemptions (LVEs) and low release and exposure exemptions (LoREXs), which included requiring EPA approval of an exemption notice prior to commencement of manufacture, making per- and polyfluoroalkyl

substances (PFAS) categorically ineligible for these exemptions, and providing that certain persistent, bioaccumulative, toxic (PBT) chemical substances would be made ineligible for these exemptions, consistent with EPA's 1999 PBT policy. Lastly, the proposal included amendments related to the suspension of the review period. See Unit III of the preamble to the final rule for more details on what provisions EPA is finalizing based on the consideration of comments received on the proposed rule (88 FR 34100, May 26, 2023 (FRL-7906-01-OCSPP)).

EPA received 51 public comments on the proposed rule. Commenters included potentially affected businesses, trade associations, environmental and public health advocacy groups, unions, and other Federal agencies. In the preamble of the final rule, EPA responded to many of the significant comments relevant to the proposed rule; however, this Response to Comments document summarizes all the comments relevant to the proposal and EPA's response to those comments.

## A. Amendments to Conform Regulations to 2016 TSCA Amendments

### 1. COMMENCEMENT OF MANUFACTURE OR PROCESSING

***Comment Summary:*** Several commenters submitted comments that supported EPA's proposed amendments to the procedural regulations at 40 CFR parts 720, 721, and 725 to align with the requirements in TSCA section 5, as amended by the 2016 TSCA Amendments, by removing the outdated language allowing the submitter to commence manufacture of a new chemical substance (part 720), manufacture or processing of a significant new use (part 721), or manufacture of a new microorganism or manufacture or processing of a microorganism for a significant new use (part 725) when the review period expires and adding new language specifying that EPA must issue a determination and take any required action on each notice before manufacture or processing may commence.

***Source:*** 0036, 0045, 0048, 0052, 0053, 0055, 0057, 0061, 0068, 0070, 0080, 0081, 0082, 0086

***Response:*** In consideration of these comments supporting the proposed amendments, EPA is finalizing as proposed amendments which require EPA to conduct a review of each notice submitted under TSCA section 5(a)(1), make a determination on the notice, and take the action required in association with that determination before a submitter can commence the manufacture of a new chemical substance or the manufacture or processing of a chemical

substance for a significant new use. Note, under TSCA, the term "chemical substance" includes microorganisms.

***Comment Summary:*** Three comments questioned EPA's description of how the new chemicals program operated prior to the passage of the 2016 Lautenberg Amendments (2016 TSCA amendments). One commenter said that the following statement, which was made in the preamble of the proposed rule, was grossly misleading: "Before the 2016 Lautenberg Amendments, TSCA allowed the PMN submitter to commence manufacturing or processing upon expiration of the review period, unless EPA made an affirmative finding of unreasonable risk." One comment stated that "the only significant additional requirement in the review process that stems from the [2016 TSCA amendments] is that EPA must now affirm through public notice that a substance does not present an unreasonable risk." Lastly, a comment asserted that prior to 2016, new substances were only "dropped" from full review after EPA concluded that the substance would not present an unreasonable risk.

***Source:*** 0057, 0080, 0086

***Response:*** EPA disagrees with comments suggesting that the 2016 TSCA amendments had only minor impacts on EPA's New Chemicals Program. Prior to the Lautenberg amendments, EPA was not required to conduct a review of and issue a determination for every notice—those requirements were added at TSCA sections 5(a)(1)(B)(ii) and 5(a)(3) by the 2016 TSCA amendments. Previously, submitters only needed to notify EPA that they intended to manufacture a new chemical substance or manufacture or process a chemical substance for a significant new use at least 90 days prior to such manufacture or processing. As previously codified in the first PMN procedural rule in 1983 (48 FR 21722, May 13, 1983) (Ref. 1), the submitter could manufacture or process the chemical substance at the expiration of the review period unless EPA took action under section 5(e), 5(f), or 6(a) of TSCA.

While EPA did review all notices prior to the 2016 TSCA amendments, many cases were "dropped" from further review after a screening assessment, meaning that they did not go through a full risk assessment. EPA did not necessarily make a determination for "dropped" cases that the chemical substance is not likely to present an unreasonable risk. A "dropped" case could have meant EPA did not have enough information to make an unreasonable risk finding or exposure-based finding. As a result of the 2016 TSCA amendments, EPA now clearly has the

option of making a determination that the information available to the Administrator is insufficient to permit a reasoned evaluation of the health and environmental effects of the relevant chemical substance or significant new use. Such a determination now requires EPA to issue an order under TSCA section 5(e) to prohibit or limit certain activities related to the chemical substance to the extent necessary to protect against an unreasonable risk of injury to health or the environment.

Following the 2016 TSCA amendments, EPA must review all notices submitted under TSCA section 5(a)(1) and make a determination pertaining to the risks of a new chemical or significant new use of an existing chemical before it is allowed into the marketplace. If EPA does not make a determination and take the actions required in association with that determination (for example, issuing an order that imposes restrictions to the extent necessary to protect against an unreasonable risk of injury), a submitter cannot commence manufacture or processing, even if the review period has expired and EPA has taken no action. EPA must conduct a risk assessment for each notice to justify any determination that the relevant chemical substance is not likely to present an unreasonable risk or that it presents or may present an unreasonable risk. Absent a risk assessment, the Agency would likely not meet the requirements of TSCA section 26(h) (Scientific Standards), 26(i) (Weight of Scientific Evidence), and 26(k) (Reasonably Available Information).

## 2. REQUIRED DETERMINATIONS AND ASSOCIATED ACTIONS

***Comment Summary:*** Three commenters support the addition of clear language describing the five possible determinations that EPA may make on a notice submission and the associated actions.

***Sources:*** 0053, 0055, 0077

***Response:*** In light of these and other comments, the Agency is finalizing the provisions at 40 CFR 720.75(d)(1) as proposed.

***Comment Summary:*** Three commenters suggest that EPA codify previously published guidance on the meaning of "reasonably foreseen" uses in the new chemicals regulations. The commenters further assert that while TSCA requires that EPA address unreasonable risks based on the known, intended, and reasonably foreseen conditions of use, TSCA does not require EPA to

evaluate all conditions of use at the same time. The commenters assert that if a submitter provides EPA with information about known and intended uses, other uses which are not intended do not need to be part of the review process. The commenters state that EPA's desire to review all conditions of use at once, including hypothetical conditions of use which are not intended by the submitter, is causing new chemicals review to take longer than necessary. The commenters argue that EPA has the authority to first make determinations that chemicals, under known and intended conditions of use, are "not likely" to present unreasonable risk, and EPA should make these known and intended conditions of use a priority. If EPA identifies other circumstances which it believes could occur in the future, even if they are not reasonably foreseen, EPA could identify these uses as significant new uses, which would then require notification to EPA if someone wanted to commence use of the new chemical for these reasonably foreseen uses. The commenters assert that EPA has a long history of using this approach.

***Sources:*** 0059, 0064, 0075

***Response:*** These comments are beyond the scope of this rulemaking because EPA did not propose or solicit public comment on parameters for how the Agency identifies or evaluates "reasonably foreseen" conditions of use when reviewing notices received under TSCA section 5. EPA did not propose to and is not establishing any such parameters or substantive review procedures in this final rule. Moreover, consistent with previously published statements referenced by the commenters, EPA considers the identification of reasonably foreseen conditions of use to necessarily be a case-by-case determination and highly fact-specific. In addition, although it was at one time a practice of the Agency to issue determinations of "not likely to present an unreasonable risk" based on the existence of proposed SNURs, EPA ceased this practice in March 2021 to align with the requirements of TSCA more closely and to ensure protections for human health and the environment. When EPA's review leads to a conclusion that one or more uses may present an unreasonable risk, or when EPA lacks the information needed to make a reasoned evaluation, the Agency will issue an order to address those potential risks. In some cases, EPA may also issue a SNUR following a determination that a chemical substance under its conditions of use is "not likely to present an unreasonable risk." Specifically, where EPA has identified other circumstances that—should they occur in the future, even if not reasonably foreseen—may present risk concerns, EPA may consider identifying those other

circumstances as significant new uses. EPA has a long history of identifying such circumstances as significant new uses in a SNUR.

***Comment Summary:*** A commenter suggests that EPA codify a prohibition on any reliance on SNURs as a basis to issue "not likely to present an unreasonable risk" determinations. The commenter acknowledges that EPA announced it would cease this practice in March 2021, but asserts that this policy decision needs to be incorporated into EPA's new chemicals regulations lest it be able to be reversed in the future without notice or potentially without recourse.
***Sources:*** 0084
***Response:*** As acknowledged by the commenter, the Agency stopped issuing determinations of "not likely to present an unreasonable risk" based on the existence of proposed SNURs in early 2021. EPA did not propose in this rulemaking to codify any particular policies related to SNURs and "not likely" determinations, and did not solicit public comment on this topic. Rather, EPA proposed to list the five possible determinations for PMNs, SNUNs, and MCANs in the regulations to improve clarity and help inform the regulated community about EPA's statutory obligations under TSCA section 5(a)(3), as amended. Therefore, this comment is beyond the scope of this rulemaking. Because EPA's proposed rule did not broach or solicit public comment on the issue raised by the commenter, EPA is not finalizing any regulations addressing this issue as part of this rulemaking; however, EPA may consider proposing additional updates to its regulations in the future.

***Comment Summary:*** Commenters requested that EPA provide for administrative review of its new chemical determinations. The commenters explain that under current law, there is no administrative-level recourse if a submitter disagrees with an EPA determination that the substance requires a Section 5(e) or 5(f) order; rather, the submitter would have to wait until EPA issues an order and then file a petition for judicial review in federal court. The commenters recommend that EPA include in the regulations a procedure for a submitter to challenge an EPA determination earlier in the process (at the administrative level) and the opportunity to have EPA's decision reviewed. One commenter further adds that review of the determination should be *de novo* and conducted by three senior scientists who can objectively render a determination within 60 days of receipt of the appeal, and who need not be EPA employees.

***Sources:*** 0059, 0064, 0075, 0081

***Response:*** The commenters' request to create a new administrative-level appeal process goes beyond the scope of this rulemaking, which is focused on aligning the regulations with amended TSCA, improving the efficiency of EPA's review processes, and updating the regulations based on existing Agency policies and experience implementing the New Chemicals Program. EPA did not propose or solicit public comment on an administrative appeal process, which would be an entirely new procedure that neither implements an amendment to TSCA, improves the efficiency of EPA's reviews, nor reflects an existing policy or practice. Moreover, EPA respectfully disagrees that the Agency should provide for administrative review of its new chemical determinations. EPA remains committed to meeting statutory deadlines for review and determinations on new chemicals submissions under TSCA section 5, and an administrative appeal process cannot reasonably be incorporated within the brief 90-day review period set by the statute, or even within the subsequent 60-day statutory deadline for seeking judicial review of an order. In addition, establishing such a process would almost certainly require the diversion of Agency resources away from other activities, creating additional delays throughout the program and making it more difficult for the Agency to meet its statutory deadlines. TSCA section 19 (15 U.S.C. § 2618) specifically provides for judicial review of orders issued under TSCA section 5(e) or (f), allowing any person to file a petition for review of such order not later than 60 days after the date on which the order is issued. The commenters do not explain why a new administrative appeal process would be either a beneficial addition or a preferable alternative to this statutorily provided judicial review process, or how the two processes could reasonably coexist given the statutory deadlines under TSCA sections 5 and 19. For all these reasons, EPA is not establishing an administrative appeal process in the final rule.

***Comment Summary:*** One commenter stated that EPA's regulations need to address information insufficiency and testing. The commenter further added that EPA should codify that it expects to frequently make the insufficient information finding and will require testing when it does so.

***Sources:*** 0084

***Response:*** EPA does not believe that it is appropriate to preliminarily judge the frequency at which it will make certain determinations. Determinations are made on a case-by-case basis based on the risks identified during the Agency's review. TSCA provides EPA with authority to

require development of new information to characterize the risk pertaining to a chemical substance submitted under TSCA section 5(a). Generally, EPA requires additional information when there is insufficient information to perform a reasoned evaluation of health or environmental effects. Test data can reduce uncertainty in the risk assessment and provide a basis for the Agency to modify its risk management approach. Consistent with these authorities, EPA may, for example, require a submitter to develop and submit test data (e.g., physical/chemical properties, environmental fate, exposure monitoring or modeling, human health or environmental toxicity) before the chemical can enter the market, or upon a submitter manufacturing for a certain time threshold (e.g., based on the time it takes to conduct the testing). Any requirement for testing by EPA, consistent with section 4(h), will be structured to reduce and replace vertebrate animal testing to the extent practicable and scientifically justified. EPA strives to operate within a tiered testing context, under which the results of lower-tiered testing will be used to evaluate whether additional higher-tiered tests are necessary.

***Comment Summary:*** A commenter suggests EPA codify Congress' 2016 requirement that a SNUR must be promulgated following issuance of a section 5(e) or section 5(f) order, or that EPA must publish an explanation of why a SNUR is not needed. The commenter further asserted that the regulations should also specify a deadline for the finalization of the SNUR, which should be as soon after issuance of the order as possible.
***Sources:*** 0084
***Response:*** TSCA section 5(f)(4), as amended, provides that not later than 90 days after taking an action under TSCA section 5(f) or issuing an order under TSCA section 5(e), EPA shall consider whether to promulgate a SNUR that identifies as a significant new use any manufacturing, processing, use, distribution in commerce, or disposal of the chemical substance that does not conform to the restrictions imposed by the action or order, and, as applicable, initiate such a rulemaking or publish a statement describing the reasons of the Administrator for not initiating such a rulemaking. The commenter did not identify any existing regulation that is inconsistent with this statutory provision, explain why a regulation would be needed to implement this statutory provision, or identify any benefit to the regulated community or other stakeholders that would be served by codifying this statutory provision in the regulations. Accordingly, EPA finds that it is unnecessary to codify this statutory provision in the regulations as part of this

rulemaking, and declines to do so in the final rule. As has been the long-standing practice, EPA intends to continue issuing SNURs following TSCA section 5(e) and 5(f) orders for new chemicals to ensure that EPA be given notice and an opportunity to review any uses that differ from those permitted under the 5(e) and 5(f) orders. This also ensures that there is a level playing field as both the submitter and other manufacturers of the same new chemical substance are only allowed to manufacture (without further EPA review) under the conditions established in the TSCA section 5(e) or 5(f) order and the SNUR. With respect to the commenter's suggestion that the regulations specify a deadline for the finalization of a SNUR following issuance of an order, EPA does not agree that it is necessary or appropriate to establish such a regulatory deadline where none is required by the statute. The timeline for finalizing any given SNUR may be affected by many factors, including but not limited to the complexity of the rule, public comments received, and Agency priorities and resources. Though EPA declines to establish a fixed deadline for finalizing SNURs in this rulemaking, EPA intends to continue efforts to finalize SNURs in a timely fashion.

***Comment Summary:*** Three commenters representing several advocacy organizations assert that EPA not only has the authority to revoke or lessen restrictions in an order after it has been issued, but also can and must strengthen protections in an order based on new information received on a chemical substance that demonstrates an order is insufficient to protect against unreasonable risk. The commenters urge EPA to expressly state in 40 CFR 720.75(d)(3), as well as the corollary MCAN provision, that the Agency has authority to modify orders in either direction, rather than codifying only its authority to narrow or revoke an order. The commenters further urge EPA to clarify that an order may be modified based on new information obtained from any source, not solely the submitter. Two of the commenters asserted that the structure and purpose of TSCA, administrative law principles regarding the scope of agency authority to reconsider and modify prior decisions, and EPA's existing practice of including standard language in TSCA section 5(e) consent orders permitting modification of the order to address risk, all support that EPA possesses authority to revise section 5 orders to impose additional prohibitions or limitations in light of new information. A fourth commenter noted that TSCA section 5(e) or (f) orders themselves typically have provisions on modification or revocation, and the commenter expressed general support for the proposed regulatory language providing that

EPA may modify or revoke orders if it receives information that some, or all, of their provisions are unnecessary.

***Sources:*** 0057, 0066, 0082, 0084

***Response:*** EPA agrees that the Agency has the authority to strengthen protections in a section 5 order after the order has been issued, where appropriate and consistent with principles of administrative law, based on the receipt of new information demonstrating that the prohibitions or limitations of the order are not sufficient to protect against an unreasonable risk of injury to health or the environment. EPA agrees that depending on the circumstances, the modification of an order can involve removing or imposing additional restrictions based on new information received on a chemical substance. Additionally, EPA also agrees that new information on a chemical substance can be received from any source, not solely the PMN or MCAN submitter. While section 5(e) orders are designed to be protective of human health and the environment in the absence of sufficient information to make a reasoned evaluation, EPA acknowledges that circumstances may potentially arise in which new information demonstrates that the restrictions or prohibitions in an order are insufficient to protect against an unreasonable risk. As noted by the commenters, the assertion of authority to modify orders under these circumstances is consistent with a provision the Agency already includes in section 5(e) consent orders as a standard practice, and with TSCA section 21, which acknowledges the Agency's authority to amend section 5 orders. EPA notes, however, that modifying a section 5 order is only one of several potential tools to address risk under TSCA, and depending on the circumstances the Agency may find it appropriate, instead or in addition, to pursue action under TSCA section 5(a)(2), 6, or 7, for example.

In consideration of the public comments, EPA modified 40 CFR 720.75(d)(3) and 725.170(b)(3) in the final rule to clarify that new information may be received from any source, and to add that where such information demonstrates that the prohibitions or limitations of the order are not sufficient to protect against an unreasonable risk of injury to health or the environment, EPA may modify the order or take other action, as appropriate, to the extent necessary to protect against such risk.

***Comment Summary:*** Two commenters recommend that EPA mandate prompt action on requests for modifications to TSCA section 5(e) or 5(f) orders, with one asserting that the period for

modifying orders is currently open ended. One of the commenters urges EPA to require Agency review of requests to modify or revoke orders within six months. The other commenter asserted that EPA rarely acts in a timely manner on requests for order modification or revision and recommended that EPA revise proposed 40 CFR 720.75(d)(3) to change "may modify or revoke" to "shall promptly modify or revoke." A third commenter similarly recommended that EPA change "may" to "must," noting that once additional information is received demonstrating that the provisions and limitations in an order are no longer needed to protect against unreasonable risk, there is no statutory reason to keep the order in place. The commenter asserted that leaving the orders, their associated recordkeeping requirements, lower Chemical Data Reporting thresholds, and TSCA section 12(b) export notification requirements in place, even in cases where test results demonstrate that the chemical does not pose an unreasonable risk, creates sustained regulatory burdens without an identified unreasonable risk that requires further controls. A fourth commenter urged EPA to specify in its regulations under what circumstances orders are to be revised based on test results or other new information, and the process used to do so, including providing for public notice and an opportunity to comment.

***Sources:*** 0057, 0070, 0077, 0084

***Response:*** EPA acknowledges the new chemicals program has been operating with insufficient resources to review requests to modify orders in a timely manner. While the statute permits modification of orders where appropriate after the end of the applicable review period, TSCA does not mandate any particular process or timeframe for doing so, and EPA did not propose in this rulemaking to require a specific process or deadline for consideration of order modifications. At this time and in light of the Agency's limited resources and competing priorities, EPA intends to focus its efforts on meeting its statutory requirements, rather than establishing new regulatory requirements that are not mandated by statute. As the Agency continues to train new employees and streamline its review processes, EPA anticipates that it will be able to complete reviews of order modification requests in a timelier manner and may consider proposing additional regulations in the future. Currently, however, EPA is not creating in the final rule a particular process or timeline for reviewing such requests or for otherwise modifying orders upon receipt of new information.

## 3. DEFINITIONS

***Comment Summary:*** One commenter supported the proposed definition of "applicable review period" and its implementation in the new chemical review process but asked that EPA clarify when the definition of "applicable review period" would result in resetting the 90-day clock to Day 1. Another comment asked EPA to consider substantive amendments to a PMN as constituting a new PMN submission, which would have its own applicable review period that starts upon the amendment's submission.

***Sources:*** 0082, 0086

***Response:*** If after the review period starts, a submitter amends their submission in such a way as to indicate that the original notice was incomplete, EPA may restart the review period at Day 1 when the amendment is submitted that makes the notice complete. As stated in the proposed rule (88 FR 34100, May 26, 2023), EPA believes that amendments that would not indicate that the original notice was incomplete are: (1) amendments based on new data (as described at 40 CFR 720.40(f) and 720.50(a)(4)); (2) administrative, non-substantive amendments (e.g., submitter contact information); and (3) amendments made at the request of EPA. EPA would take case-by-case facts into consideration when determining whether a late submission of information indicates that a notice was incomplete when originally submitted. While EPA may restart the clock upon receiving amendments that indicate that the original notice was incomplete, EPA does not think it necessary to consider a substantive amendment as constituting a new PMN submission that has a new PMN number, which would only serve to complicate case management and tracking. Additionally, while substantive amendments late in the review process can lead to significant rework of a case, EPA did not propose that the notice be subject to additional TSCA fees. In the future, however, EPA may propose to require additional TSCA fees to cover part of the costs incurred from substantive amendments.

***Comment Summary:*** Many commenters expressed difficulty in determining what EPA considers to be a complete notice and requested that the Agency clearly define what constitutes a notice that is "complete." The commenters further assert that it is important for the Agency to provide a definition, as the applicable review period can be reset if a notice is deemed incomplete.

One commenter requested that EPA clarify whether a submission would be deemed incomplete if information that could have been submitted with the initial submission was only submitted once EPA raised an issue not foreseen by the submitter.

An example provided by another commenter illustrates that the submitter's role in the supply chain may dictate the type of information that might be known about a chemical at the time of submission. For example, a manufacturer of a new chemical might know the types of markets the new substance may be used in, but the commenter argues that the specific details pertaining to processing and/or use exposures or releases might not be known or reasonably ascertainable to the manufacturer. According to the commenter, this contrasts with an importer who is importing the new chemical for a specific use and can provide concrete use and exposure details.

Lastly, commenters suggested it is not realistic to expect submitters to anticipate uses that they do not intend for their substance, but which EPA considers to be "reasonably foreseen." The commenters asserted that EPA should not consider a notice incomplete if it does not address uses foreseen by EPA but not intended by the submitter.

***Sources:*** 0050, 0057, 0058, 0070, 0086

***Response:*** A complete notice is a notice which meets all the procedural requirements indicated in 40 CFR 720.65(c)(1) (e.g., includes a company signature, is submitted via CDX, includes a second copy of the submission with all confidential information deleted, includes the payment identity number, etc.) and includes all required information that is known to or reasonably ascertainable by the submitter. A submission that fails to meet the statutory information requirements is incomplete, and EPA is justified in refusing to review the notice until the information is received. In Sections B and C.3 of this document, EPA discusses in more detail the longstanding definition of "known to or reasonably ascertainable by" and its application in specific contexts. EPA believes that it is not possible to define "known to or reasonably ascertainable by" more explicitly than the term is currently defined in 40 CFR 720.3, as it depends on the facts of each individual submission. EPA has not, in this rulemaking, proposed or finalized any amendment to or undertaken any substantive reconsideration, reexamination, or reinterpretation of the existing definition at 40 CFR 720.3.

EPA has received several submissions in the past that the Agency believed did not include required information that was known to or reasonably ascertainable by the submitter, as described in the 1983 final rule (48 FR 21722, at 21735, May 13, 1983). EPA describes two examples here to provide additional clarity.

In one example, the submission did not include the molecular structure of the new

chemical substance. EPA scientists determined that representative molecular structures for the substance were in fact known to or reasonably ascertainable by the submitter, because a knowledgeable chemist would be able to derive the structure from process information. Therefore, the notice review period did not begin until this information was provided to EPA. In another case, the submitter described the category of use of a new chemical substance only as "photographic chemical" without specifying its end use in terms of its function and application (e.g., reducing agent in developer solution). The term "photographic chemical" was inadequate for EPA's assessment of potential human exposure and environmental release.

Regarding the comment on the role of the submitter in the supply chain and how it may directly affect what is "known to or reasonably ascertainable by" the submitter, EPA reiterates that the term means "all information in a person's possession or control, plus all information that a reasonable person *similarly situated* might be expected to possess, control, or know." 40 CFR 720.3(emphasis added). As noted in the proposed rule (88 FR 34100, 34110, May 26, 2023), this definition is based on a concept of reasonableness that is fact specific. It requires submitters to evaluate their current level of knowledge of the new chemical substance, as well as evaluate whether there is additional information that a reasonable person, similarly situated, would be expected to know, possess, or control. This standard carries with it an exercise of due diligence, and the information-gathering activities that may be necessary for manufacturers to achieve this standard may vary from case-to-case. Moreover, as described in the 1983 final rule (48 FR 21722, at 21730, May 13, 1983), cost and burden are factors in determining whether information is known to or reasonably ascertainable by the submitter. Information that a submitter could obtain without unreasonable burden or cost is included in "information that a reasonable person … might be expected to possess, control, or know."

Lastly, EPA does not expect submitters to provide information on uses that they do not intend and are not known for their substance but that the Agency may determine are "reasonably foreseen." The submission must include all information that is known to or reasonably ascertainable by the submitter for the intended use. As stated elsewhere in this document, EPA considers the identification of reasonably foreseen conditions of use to necessarily be a case-by-case determination and highly fact-specific, and such conditions of use may affect EPA's determination on the notice.

***Comment Summary:*** A commenter suggests that EPA finalize regulations that would require submitters to provide all required information before the new chemical review process begins.
***Source:*** 0066
***Response**:* As described previously, and in accordance with TSCA section 5(d)(1), submitters are required to submit all information that is known to or reasonably ascertainable by them in their notice. The Agency is finalizing as proposed amendments that clarify that EPA may deem a notice incomplete and restart the applicable review period at Day 1 upon completion of the notice, if a submitter provides required information during the applicable review period without demonstrating that it was not known to or reasonably ascertainable by the submitter at the time of the initial notice submission.

***Comment Summary:*** A commenter explains that checking a box to confirm that information is not known or reasonably ascertainable provides helpful clarity. The commenter suggests that EPA can provide additional clarity and streamline its completeness review if it considers submitted forms that contain information in all fields and have the "not known or reasonably ascertainable" boxes checked to be complete.
***Source:*** 0070
***Response:*** When reviewing a submission, if EPA believes information is missing that is known to or reasonably ascertainable by a submitter and EPA staff cannot quickly obtain the information from the submitter in response to a telephone or e-mail request, EPA will declare the notice incomplete, and the review period will not begin until EPA receives the information.

***Comment Summary:*** EPA received several comments on the proposed definition of "potentially exposed or susceptible subpopulation" (PESS). Some comments stated that EPA should align the regulatory definition of PESS with the TSCA definition and not expand the scope of new chemicals review by adding "overburdened communities" to the definition. Other commenters supported the proposed definition, including the addition of "overburdened communities". One commenter asked that EPA add to the end of the PESS definition, "…including populations who are exposed to a chemical substance or mixture from multiple sources, pathways, or routes and populations whose cumulative exposures to multiple chemicals, mixtures or non-chemical stressors results in increased susceptibility to a chemical substance or mixture."

***Sources:*** 0059, 0064, 0074, 0075, 0082, 0084

***Response:*** EPA is finalizing the definition of PESS as proposed. As EPA explained in the May 3, 2024, final rule, Procedures for Chemical Risk Evaluation Under the Toxic Substances Control Act (89 FR 37028), EPA believes that it is appropriate to include "overburdened communities" in the definition of PESS because it reflects the Agency's understanding and acknowledgment that a chemical substance may expose and/or impact communities already experiencing disproportionate and adverse human health or environmental burdens.

TSCA requires the EPA to evaluate and regulate chemicals to ensure they do not present an unreasonable risk to human health or the environment. In doing so, TSCA requires that EPA consider "potentially exposed or susceptible subpopulations" defined as "group of individuals within the general population identified by the Administrator who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, or the elderly." Additionally, under the plain text of TSCA section 3(12), Congress' inclusion of "such as" allows EPA to identify "a group of individuals" (beyond the statutorily listed groups) who "may be at greater risk than the general population." EPA believes that an "overburdened community" or those that may be disproportionately exposed or impacted by environmental harms, is clearly an example of a group that may frequently be at greater risk than the general population. While overburdened communities may be geographically located close to where releases of chemicals occur, EPA does not consider this a solely place-based definition as overburdened communities may be communities with unique exposure pathways more broadly. For example, Tribal communities who rely on subsistence fishing may be considered an overburdened community as, based on dietary exposure and lifestyle, they are disproportionately exposed to a bioaccumulative chemical compared to the general population.

The inclusion of overburdened communities among the PESS considered in TSCA section 5 risk assessments clarifies the Agency's intent to consider such communities, as relevant and appropriate, when making determinations pertaining to the likelihood of unreasonable risk of injury to health or the environment from new chemical substances and significant new uses and determining appropriate risk management approaches to protect against such risk, including any unreasonable risk to communities disproportionately exposed or impacted by environmental

harms. EPA has included in the preamble of the final rule a discussion of considerations in identifying and assessing the risk to overburdened communities.

Although EPA is declining to add the additional language to the definition of PESS suggested by a commenter, nothing in TSCA or this final rule prevents the Agency from identifying another group or subpopulation as a "potentially exposed or susceptible subpopulation" in a given TSCA section 5 risk assessment and specifically considering those exposures and risks within.

## 4. CONTENT OF PUBLIC NOTICE OF RECEIPT OF PMN

***Comment Summary*:** Several commenters remarked on EPA's proposal to remove the regulatory-only requirement in 40 CFR 720.70(b)(3) to include a list of test data submitted in accordance with 40 CFR 720.50(a) in the TSCA section 5(d)(2) notice of receipt published in the Federal Register. Two commenters suggested they were in favor of the change and three expressed concerns. Of those commenters that expressed concerns, one asserted that compliance with the existing provision furthers transparency and would require only "modest additional effort" by EPA, and the other two recommended that if EPA is going to remove the provision, it should codify in the regulations the practice of making such test data available in ChemView. Some commenters also recommended that EPA codify, expand, and speed up its practice of making section 5 notice information available on ChemView in general.
***Sources:*** 0039, 0068, 0082, 0084, 0086
***Response:*** EPA disagrees with comments opposing its proposal to remove the regulatory-only requirement in 40 CFR 720.70(b)(3) to publish a list of test data in the Federal Register. As EPA explained in the preamble to the proposed rule, TSCA does not require the Agency to publish a list of test data in the Federal Register and while the Agency intends to make test data available to the public, it believes that this is now better achieved through ChemView than through publication in the Federal Register. Through ChemView, the Agency currently makes the section 5 notice, including test data submitted with it, publicly available generally within 5 business days of receipt, subject to confidentiality protections. This means that someone interested in learning more about test data submitted with a section 5 notice can view the test data itself on ChemView, rather than only a list of the test data published in the Federal Register. This approach also calls for fewer EPA resources than Federal Register publication, as the Agency would not have to

generate lists of test data submitted with section 5 notices and submit them to the Office of Federal Register for publication as part of the section 5(d)(2) notices of receipt. For these reasons, EPA is finalizing the change to 720.70(b)(3) as proposed.

With respect to comments recommending that EPA codify, expand, and speed up its ChemView posting practice for section 5 notices in general, many of these recommendations are beyond the scope of this rulemaking, which is focused on aligning the regulations with amended TSCA, improving the efficiency of EPA's review processes, and updating the regulations based on existing Agency policies and experience implementing the New Chemicals Program. EPA did not propose or solicit public comment on public access to information in the New Chemicals Program, other than discrete changes to 40 CFR 720.70(a) and 720.70(b)(3) that are addressed earlier and elsewhere in this document. Therefore, EPA is not establishing regulations governing its ChemView posting practice. EPA acknowledges and shares the desire for improved public access to information in ChemView and in the New Chemicals Program overall and aims to continue making improvements in that regard. Currently, EPA publishes public section 5 submissions, test data, letters of support, communications from submitters received via CDX, and notices of commencement in ChemView that have been deemed complete after the pre-screen process. EPA is not codifying its ChemView posting practices in the regulations at this time because there remains a need for flexibility as the Agency continues to develop and improve processes for making information accessible to the public, but EPA could in the future consider a rulemaking or other actions to further its efforts.

***Comment Summary:*** Two commenters opposed EPA's proposal to clarify in 40 CFR 720.70(a) that the TSCA section 5(d)(2) notice of receipt will be published in the Federal Register after EPA receives a "complete" notice, asserting that the statute requires the Agency to publish notice of receipt for each notice received, even if it is incomplete. One commenter also recommended that EPA codify section 5(d)(2)'s requirement that EPA publish notices of receipt within five business days, with one asserting that the proposed rule "ignores" the plain language of the statute and goes beyond the bounds of EPA's discretion.
***Sources:*** 0082, 0084

***Response:*** EPA disagrees with comments opposing its proposal to clarify that the notice of receipt will be published in the Federal Register after EPA receives a complete notice. First, as EPA explained in the preamble to the proposed rule, the change to 40 CFR 720.70(a) is intended only to "clarify that a notice of receipt will be published in the Federal Register after EPA receives a complete notice, rather than merely receiving the notice, to accommodate the pre-screening procedures" (88 FR 34100, at 34110, May 26, 2023). The change reflects EPA's current practice for publishing TSCA section 5(d)(2) notices of receipt, in which only notices that have been deemed complete during the pre-screen process are included in the section 5(d)(2) publication. Second, the change is consistent with EPA's longstanding interpretation that an incomplete notice does not constitute a "notice" under section 5, as explained in the 1983 final rule establishing the original Part 720 regulations:

> "Under § 720.65(c) of this rule, EPA may determine that a submission is incomplete, and therefore does not constitute a notice under section 5 of the Act. … The Act explicitly requires the submitter to provide certain information in a section 5(a) notice that is known to or reasonably ascertainable by the submitter. A submission that fails to meet the minimum statutory requirements, therefore, is not a complete notice under the Act, and EPA is justified in refusing to review it." (48 FR 21722, at 21735, May 13, 1983)

It follows that EPA is also not required to publish a notice of receipt for an incomplete notice, which does not constitute a "notice" under section 5 and which EPA does not review. For these reasons, EPA is finalizing the change to 720.70(a) as proposed.

EPA also disagrees with the comment recommending that the Agency codify TSCA section 5(d)(2)'s requirement that EPA publish notices of receipt within five business days. The Agency did not propose to change the existing provision in 40 CFR 720.70(a), in place since the 1983 final rule establishing the original Part 720 regulations (see 48 FR 21722, at 21750, May 13, 1983), that the Agency will file a notice of receipt with the Office of the Federal Register "[i]n accordance with section 5(d)(2) of the Act." In turn, section 5(d)(2) provides that EPA "shall publish in the Federal Register a notice" of receipt "not later than five days (excluding Saturdays, Sundays and legal holidays) after the date of the receipt[.]" The commenters did not indicate why the existing provision in 720.70(a) is inconsistent with this statutory provision, explain why a regulation would be needed to implement this statutory provision, or identify any benefit to the regulated community or other stakeholders that would be served by codifying this

statutory provision in the regulations. Accordingly, EPA finds that it is unnecessary to codify this statutory provision in the regulations as part of this rulemaking and declines to do so in the final rule.

## B. Amendments Related to Notice Information Requirements

### 1. GENERAL

***Comment Summary:*** Several commenters voiced support for the proposed amendments concerning data requirements for new chemical and significant new use notices. One commenter noted that they supported EPA's efforts to establish minimum data requirements for new chemical and significant new use notices.

***Sources:*** 0046, 0077, 0078, 0082

***Response:*** EPA appreciates the comments in support of the proposed amendments to 40 CFR 720.45 and, except as otherwise noted in this document, is finalizing the amendments largely as proposed. However, EPA clarifies that no minimum data set is intended to be established via this rulemaking, as submitters are required by TSCA section 5(d)(1) to submit data insofar as such data are known to or reasonably ascertainable by the submitter; if any data are not known to or reasonably ascertainable by submitters at the time of submission of a section 5 notice, EPA would not consider that notice to be inherently deficient or incomplete. Moreover, as discussed in the preamble of the proposed rule, EPA agrees that ensuring the regulatory text at 40 CFR 720.45 is consistent with the PMN form in CDX will help to improve clarity and minimize ambiguity for submitters.

***Comment Summary:*** Several commenters stated that they were opposed to or had concerns with EPA's proposed amendments concerning data requirements for section 5 notices, with one specifically requesting that EPA clarify how establishing more detailed data requirements would benefit EPA's review processes. Many claimed that the proposed level of detail required for submissions would represent a significant burden for submitters. Some commenters claimed that in expanding the details for data requirements for section 5 notices, EPA was establishing a minimum dataset. Another commenter asked whether the proposed data requirements meet the practical utility standard outlined at 5 CFR 1320.3(l) of the Office of Management and Budget's (OMB) regulations pursuant to the Paperwork Reduction Act (PRA). One commenter stated that

they believed that the proposed level of detail for EPA's data requirements would correspond with increased delays and longer review times for section 5 notices.

Several commenters shared detailed lists of their concerns. These concerns included a desire for EPA to allow submitters the opportunity to provide justification for when they believe a particular data element is not relevant to a particular chemical, citing provisions in another statute, the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), that allow submitters to waive certain data elements; recommendations that EPA include references to specific test guidelines that EPA would deem acceptable to substantiate the proposed data elements; and a request to establish a requirement that EPA must consider and use submitter data, rather than conservative assumptions and default values or EPA's own models, whenever such data are provided. Many commenters stated that EPA should have to justify the need for various data requirements on a case-by-case basis. These commenters suggested that EPA only require specific data elements on a case-by-case basis. Referencing FIFRA again, these commenters provided an example wherein chemicals with higher risk concerns or larger production volumes might require more extensive testing requirements, while those with lower production volumes or lower risk profiles would require the submission of less data.

***Sources:*** 0059, 0061, 0062, 0064, 0067, 0068, 0070, 0074, 0075, 0078, 0080, 0081, 0086

***Response:*** EPA acknowledges commenters' concerns for increased burden incurred by more detailed data requirements but disagrees that these updated requirements will pose a significant burden (Ref. 2). Under TSCA section 5(d)(1), submitters are required to submit information about their chemicals, including proposed conditions of use, to the extent such information is known to or reasonably ascertainable by submitters in their section 5 notices; EPA maintains this statutory standard in the amendments to 40 CFR 720.45, which EPA is finalizing largely as proposed. The amendments instead add detail to the existing data requirements that are necessary for EPA to perform refined risk assessments and that reflect the kinds of information that submitters often provide to EPA during the review process rather than upfront, even when such information has been known to or reasonably ascertainable by the submitter all along.

One commenter presented a few hypothetical examples of how EPA's proposed changes to the data requirements might present increased burden. First, this commenter expressed concern that if any of the data elements proposed in this rulemaking were omitted from a section 5 notice, that EPA would by default declare that notice incomplete. In response to this example,

EPA reiterates that submitters have always been responsible for providing all known or reasonably ascertainable information related to their chemicals but also acknowledges that every submission has unique data needs.

In virtually all section 5 notices, certain data elements are left unreported. In many cases, these unreported data elements would be overly burdensome for submitters to generate, and their omission does not mean that the notice is incomplete. These unreported fields, however, may be a source of significant uncertainty and result in conservative assumptions being made in a chemical's review. In other cases, the unreported information is deemed critical to the ability of EPA to conduct a satisfactory review (e.g., chemical identity, precursor materials, or details related to the manufacturing process), and in these cases the submission would likely be deemed incomplete, as such information is expected to be known to or reasonably ascertainable by the submitter. Although EPA is proposing to add more detail to the types of data that submitters should provide, cases will still be deemed complete or incomplete using the same standard that has been employed before this rulemaking. EPA will not call cases incomplete by default if any one data element is missing.

This same commenter also expressed concern that by providing additional details to EPA about chemicals and their intended conditions of use that submitters would be bound to strictly adhere to those details. EPA acknowledges the commenter's concern, but emphasizes that EPA does not currently, nor does it intend to, hold submitters to any condition of use by default. EPA can and does hold submitters to certain conditions of use—be it conditions of disposal, the use of engineering controls intended to minimize worker exposures, or limitations on production volume—whenever the intended or reasonably foreseen conditions of use for a particular chemical may present an unreasonable risk to human health or the environment. This is most often achieved via TSCA section 5(e) orders between EPA and submitters, as well as through Significant New Use Rules (SNURs) promulgated in response to those consent orders. This has been EPA's practice since before this rulemaking, and EPA will continue to regulate conditions of use that may pose unreasonable risk in accordance with the statute. EPA notes again that its intent for requiring this additional detail is to make clear to submitters as early as possible the types of information that are most likely to minimize the need for EPA to use conservative assumptions and default values in assessing risk. When submitters provide more detail about the lifecycle of their chemicals, EPA assessors are able to conduct more refined assessments, and

risk managers are able to draw from this information to propose case-specific risk management strategies when appropriate.

In response to commenters who claimed EPA seeks to establish a minimum dataset via this rulemaking, EPA reiterates its position outlined previously in this response to comments document. No minimum data set is intended to be established via this rulemaking, as submitters are required to only submit to EPA data that are known or reasonably ascertainable; if any of the proposed data requirements are not known to or reasonably ascertainable by the submitter at the time of submission of a section 5 notice, EPA would not consider that notice to be inherently deficient or incomplete. These same commenters requested that EPA clarify the benefits EPA anticipates from adding the proposed detail to the data requirements for section 5 submissions. As outlined in the preamble to the proposed rule, many section 5 notices lack sufficient detail to permit EPA to complete its risk assessments without the use of conservative assumptions and default values. See 88 FR 34100, at 34106 (May 26, 2023). The frequent use of such conservative assumptions and default values often prompts submitters to provide information that, had it been provided in the initial submission, might have mitigated the need for EPA's use of conservative assumptions and default values due to a lack of available data. Not only do submitters use valuable time and resources by iteratively providing information to EPA, but EPA staff must also expend limited time and resources to address data submitted during the review period via rework of risk assessment materials. EPA acknowledges that it can be difficult for submitters to ascertain what information might be most valuable to EPA, and that such considerations likely factor into decisions regarding what information to submit with notices upfront. This is precisely why EPA is attempting to provide clarity concerning the types of details that submitters should provide for the various data elements whenever they are known or reasonably ascertainable.

One commenter inquired as to whether EPA has demonstrated the "practical utility" of the additional level of detail proposed for the data requirements, as that term is defined in 5 CFR 1320.3(l) of OMB's regulations pursuant to the PRA. Section 1320.3(l) defines practical utility to mean in part "the actual, not merely the theoretical or potential, usefulness of information to or for an agency, taking into account its accuracy, validity, adequacy, and reliability, and the agency's ability to process the information it collects (or a person's ability to receive and process that which is disclosed, in the case of a third-party or public disclosure) in a useful and timely

fashion." As explained in the Information Collection Request (ICR) document accompanying the final rule, TSCA requires EPA to review submitters' section 5 notices and make a determination pertaining to the likelihood of risk of new chemical substances or significant new uses of existing chemical substances (identified by EPA in rulemaking) before they are manufactured or processed for non-exempt commercial purposes. To make a reasoned evaluation of the potential risk to human health or the environment associated with new chemicals or significant new uses, EPA needs information on each chemical's structure and properties, manufacturing process, worker exposure, environmental release, production volume, potential industrial, commercial, and consumer use, and potential toxicity related to the substance. EPA needs sufficient information to enable Agency scientists to identify substances with analogous chemical structures and properties, with similar manufacturing processes, and with similar uses. The Agency reviews reasonably available data to evaluate the toxicity of the chemical and estimate potential exposure to the substance to assess the potential risks to human health or the environment. EPA has observed that many data elements in notice submissions often lack the level of detail that EPA needs to make a refined assessment of risk. EPA believes that specifying more detailed information requirements in 40 CFR 720.45 and in the PMN form in CDX will promote more robust submissions upfront and help to minimize the need for EPA to use default values and conservative assumptions in its risk assessment and modeling. The additional level of detail that EPA is finalizing for the data requirements therefore reflects the Agency's data needs to make a refined assessment of risk and is based on the Agency's experience reviewing thousands of notices and amendments to notices. EPA also believes that this additional level of detail will help submitters provide all relevant information in their initial notice submissions. As discussed elsewhere in this Response to Comments document, when EPA can rely on detailed submitter data rather than on conservative assumptions and default values, submitters tend to make fewer amendments or additions to their submissions late in the review of their section 5 notices—an outcome that conserves resources for both EPA and submitters. By receiving as much detail as possible up front, EPA is better equipped to determine appropriate—and, frequently, case-specific—approaches to risk management when necessary. Although EPA acknowledges the commenter's concern that not all data elements are relevant to each chemical substance or intended condition of use, EPA reiterates that such information need only be provided to the extent it is known to or reasonably ascertainable by the submitter. In summary,

the additional level of detail that EPA is finalizing for the data requirements is intended to convey more precisely what information is needed for EPA's review—precisely *because* those data are actually useful during EPA's review of section 5 notices.

One commenter stated that they believe that more detailed data requirements will entail longer review times for section 5 notices. EPA strongly disagrees with this assertion and instead believes these more detailed data elements will allow EPA to more easily meet the timelines established in the statute. Although there is no single cause underlying delays in EPA's review of section 5 notices, as described in the preamble of the proposed rule (see, e.g., 88 FR 34100, at 34105-06, May 26, 2023), a significant driver of these delays is the need for frequent back-and-forth with submitters whenever submitters take issue with default assumptions made by EPA, often when submitter-provided data is deemed insufficient. EPA acknowledges that in some cases submitters provide detailed data, but EPA ultimately decides that default values should be used instead because the submitter-provided data is of poor quality or is poorly substantiated. In these cases, delays caused by significant back-and-forth between submitters and EPA are especially frustrating. These delays affect all submitters with section 5 notices under EPA review, given the limited resources at EPA's disposal. Moreover, when greater detail is provided to EPA upfront, EPA is often able to address risk concerns driven by conservative assumptions through risk management, without the need for rework of risk assessment materials. For example, in many cases where conservative assumptions related to environmental or human health hazards are used based on a lack of hazard data for a chemical substance, EPA can consider submitter-provided details related to engineering controls, intended media of release, and other case details to develop risk management strategies to reach a determination more quickly—a process that is made more difficult when such details are lacking. It is EPA's expectation that the amendments to the data requirements will minimize cases where data is either not provided or is so poorly substantiated that conservative assumptions are used and will also maximize the flexibility that EPA has to work with submitters to address risks without the need for rework even when conservative assumptions are used.

In response to commenters who requested that EPA codify a provision allowing submitters to justify to EPA whenever certain data requirements might not be applicable to their chemicals, EPA reiterates that submitters need only provide information to the extent it is known or reasonably ascertainable at the time of submission of a section 5 notice. EPA acknowledges

that submitters are unlikely to have or obtain information on data elements whenever those data are too burdensome to generate or obtain from others (i.e., whenever such data are not known or reasonably ascertainable), and that submitters are even less likely to do so if they believe that these data are not pertinent to the review of their chemicals. If a submitter believes such data are not relevant to a particular chemical substance, and the data are not known to or reasonably ascertainable by the submitter, the submitter does not have to provide them, and this is unlikely to affect the course of a chemical's review. In some instances, however, forgoing certain data requirements could result in EPA's use of conservative assumptions in the review of their chemical, where EPA determines that such information *is* relevant to the review. EPA encourages submitters to make use of its pre-notice consultation process prior to submitting section 5 notices and will make efforts to discuss data needs for submissions upon request. But EPA cannot determine whether a particular data element is relevant to a chemical's review *a priori*, and generally draws conclusions on the relevance of certain data types during the review of a particular chemical—not before. As such, EPA will not codify the requested provision at this time.

EPA thanks those commenters who requested that EPA include specific test guidelines in the text at 40 CFR 720.45 that EPA would deem acceptable to substantiate the required data elements. Although EPA recognizes the desire for specific test guidelines for all the data elements, every chemical has unique considerations that can confound how test guidelines should be implemented and interpreted. For this reason, EPA is not codifying examples of specific test guidelines for the data elements in 40 CFR 720.45. EPA would also like to use this response to comments to emphasize that it is currently undertaking efforts to understand and incorporate new approach methodologies (NAMs) for alternatives to vertebrate testing and will continue to develop and share guidance on this subject as it becomes available. Finally, EPA is aware of the challenges posed for submitters whenever there is ambiguity regarding what test guidelines are most appropriate for their chemicals and reiterates that the pre-notice consultation process remains the best tool for submitters to consult with EPA to discuss data requirements prior to submission of section 5 notices.

In response to the commenters who requested that EPA accept submitter-provided data in lieu of EPA models whenever provided, EPA respectfully disagrees. EPA already considers all data provided by submitters but is not obligated to use the assumptions and values in those data

if they do not satisfy EPA's standards (e.g., the data are of poor quality or are poorly substantiated). EPA will make efforts to incorporate submitter data when appropriate, and it is a goal of this rulemaking to promote the submission of data that will more consistently satisfy EPA's standards.

In response to the commenters that requested that EPA prescribe data requirements on a case-by-case basis, EPA also respectfully declines to adopt such a provision. As emphasized previously in this response to comments document, EPA has required submitters to provide all known or reasonably ascertainable information regarding their chemicals and their intended conditions of use and will continue to adhere to this standard. In response to those commenters who recommended EPA adopt risked-based exclusions to reporting of certain data requirements, EPA notes that it can only determine risk during the review of a particular chemical substance, not before. These commenters suggested that production volume might be used as a proxy for risk potential and by extension as a criterion for excluding certain data requirements, and again EPA respectfully disagrees with this assertion. Although EPA acknowledges that generally speaking, chemicals with low intended production volumes often present lower risk than those with larger production volumes as evidenced by the Low Volume and Low Release and Exposure exemptions from full section 5 notification, EPA does not make determinations concerning risk prior to the conclusion of a chemical's review—even in the case of exemptions.

***Comment Summary:*** One commenter voiced support for the proposed modifications to the regulations concerning data requirements for new chemicals submissions but emphasized that they also want EPA to apply the same level of precision to the regulations for data requirements for biotechnology submissions such as MCANs. Another commenter recommended that EPA consider developing a dedicated submission form for biotechnology submissions.

Another commenter requested that EPA add language to 40 CFR 725.1 specifying that any decisions made in its review of section 5 notices for microorganisms will be made in keeping with the scientific standards and weight of scientific evidence approach outlined in TSCA section 26.

***Sources:*** 0053, 0055, 0081

***Response:*** While EPA acknowledges that amending the level of detail in its data requirements for TSCA biotechnology submissions and developing a dedicated form for these submission

types could help provide additional clarity for submitters, the information required for these submissions is especially complex and case specific. Moreover, the biotechnology technical team that is responsible for conducting reviews for biotechnology submissions works mostly separately from the workflow for review of more conventional chemicals. Given the significant differences between the data needs for biotechnology submissions compared to those for more conventional new chemical submissions, EPA believes that updates to the biotechnology regulations, aside from the amendments intended to harmonize the changes to TSCA from the 2016 TSCA amendments with the regulations related to section 5 submissions (including biotechnology submissions), are outside the scope of this rulemaking and would likely require a separate rulemaking if EPA were to implement such changes.

In response to the commenter who requested that EPA amend 40 CFR part 725 to specify that the standards in TSCA section 26 will be applied to any decisions made during the review of section 5 notices for microorganisms, EPA is already held to these standards in its decision-making for these notices. As such, EPA respectfully declines to adopt the requested change.

## 2. PHYSICAL AND CHEMICAL PROPERTIES AND ENVIRONMENTAL FATE CHARACTERISTICS

***Comment Summary:*** Some commenters expressed concerns about amendments that EPA is proposing concerning the level of detail required for specific data elements. Some commenters claimed that data pertaining to fate characteristics of chemicals are either impossible or are too time-consuming to generate, citing bioaccumulation and biodegradation, respectively, as examples.

Some commenters requested that EPA provide additional clarity concerning how EPA does or does not employ default models and conservative assumptions when submitter data is and is not provided. Of these commenters, one also requested specific guidance from EPA on how such default assumptions are applied to specific scenarios, such as particle size distribution analyses.

One commenter requested other guidance, such as clarity on how EPA considers different analogues and makes decisions concerning which analogue is most appropriate for a given assessment, as well as input on the morphology boundaries that EPA employs for nanomaterials. They requested that EPA establish baseline criteria for how EPA will consider properties of nanomaterials so that submitters can provide data to contest EPA's assumptions. This commenter

also requested that EPA accept toxicological data for nanomaterials generated via studies using simulated epithelial lung fluid or artificial lysosomal fluid. This commenter also requested that EPA include requirements for surface tension details relevant to identifying surfactant properties; these include droplet size, surface activity, self-assembly into micellar structures, and surfactant type. This commenter also requested that EPA include requirements for data elements per "Jarabek et al. 2021", including particle size distribution, water solubility, reactivity determinations, and biosolubility. This commenter also requested that EPA require viscosity data. Additionally, this commenter was concerned that EPA had proposed changes to the data requirements for fate characteristics without clarifying whether EPA will accept EPISuite outputs versus experimental data on suitable analogues for a particular chemical substance.

***Sources:*** 0064, 0073, 0078

***Response*****:** In response to commenters who claim that generating data on fate characteristics is either impossible or too time-consuming to be practical, EPA notes first that bioaccumulation is, in fact, not impossible to characterize. OECD TG 305 is a widely used test for stable organic chemicals. EPA acknowledges that while biodegradation tests may be labor- and time-intensive, the submission of test data is required per 40 CFR 720.50(a)(1) and TSCA 5(d)(1)(B) if they are in the submitter's possession or control or if the information is known to or reasonably ascertainable by the submitter. If study data are available, they should be submitted.

To the commenter who requested guidance on EPA's analogue selection process and the criteria EPA employs when delineating nanomaterial morphologies, the inclusion of additional data elements relevant to nanomaterials, EPA consideration of toxicological data generated with simulated epithelial lung fluid or artificial lysosomal fluid, and EPA adoption of the specific guidelines proposed by researchers, EPA declines to address these comments in detail as part of this rulemaking. EPA believes that while the commenter's suggestions have merit, the requested guidance, data elements, and test criteria are case-specific and often too prescriptive to include in the regulatory text. In light of this comment, EPA now believes that the nanomaterial language included in the list of data requirements for physical-chemical properties in the proposed rulemaking (e.g., aspect ratio, thickness, and number of layers or walls) are also likely too prescriptive and would apply only to a narrow subset of nanomaterials. Because this information would not be relevant to most nanomaterials, EPA is not finalizing the proposed nanomaterial information requirements at 720.45(j)(1). However, EPA acknowledges the potential value of the

commenter's suggestions. EPA commits to increased transparency with stakeholders concerning its analogue selection. EPA also reiterates that submitters should submit any information that is known to or reasonably ascertainable by them, and if such information includes the data elements described by this submitter, EPA will consider that information; this would include test data for nanomaterials generated via the described methodologies. EPA will continue to develop and update guidance for stakeholders.

To the commenter who requested additional guidance concerning when EPA would accept EPISuite outputs rather than experimental data on a suitable analogue or analogues, EPA reiterates that section 5 submissions should include all known and reasonably ascertainable data. EPA reviews all information submitted for all notices received. When submitters provide model outputs using EPA models (such as EpiSuite), EPA reviews them and does its own modeling to verify the results. EPA follows a data hierarchy in which experimental data on the new chemical substance are considered first (if the experiment or protocol is acceptable), followed by experimental data on an appropriate analogue, and modeled data being last.

In response to this commenter's request for additional data requirements concerning surface tension and viscosity details, EPA acknowledges that surface tension data are valuable in determining the extent and nature of a chemical's surfactant properties, and viscosity data are relevant to toxicological and exposure considerations. However, given the unique considerations for each chemical reviewed under section 5 notices, EPA feels that the data elements proposed by the commenter are overly prescriptive, and as such EPA respectfully declines to incorporate the proposed changes.

## 3. WORKER EXPOSURES, ENVIRONMENTAL RELEASES, AND DETAILS CONCERNING EPA DATA REQUIREMENTS

***Comment Summary:*** Several commenters provided suggestions for additional provisions to be included in the new data requirement regulations and in the PMN form in CDX. One commenter requested that for new chemical submissions and significant new use notifications, that EPA require the submission of analytical reference standards when applicable; the submission of information on any potentially exposed or susceptible subpopulations known to the submitter; the submission of the identity of any chemicals included in articles containing the chemical substance under review, as well as the identity of all chemicals that are used during the

manufacturing or processing of a new chemical substance or as part of a significant new use of an existing chemical; that EPA should require information on degradation products, and clarify whether degradation products are captured in EPA's reference to "byproducts" in 40 CFR 720.45(d); and that EPA remove language at 720.45 excluding information relating solely to exposures and releases that occur outside of the US, as they claim that these exposures can be used as proxies for domestic exposures.

Another commenter requested that EPA require that submitters provide additional information, including an explanation of the basis for estimates of values relevant to worker exposure calculations (e.g., consumption rate, frequency and duration of activities); the specific brand names and model numbers of any protective equipment used during the lifecycle of a chemical; and a description of any administrative controls in place at facilities where a chemical will be manufactured, processed, or used. This commenter also recommended that EPA amend the language at 720.45(g)(3) and 720.45(h)(3) to make it clearer that the required worker exposure information in 720.45(g)(3)(ii)-(viii) and 720.45(h)(3)(ii)-(viii) pertains to each worker activity occurring during manufacturing, processing, and use of the chemical substance, as identified pursuant to 720.45(g)(3)(i) and 720.45(h)(3)(i). This commenter also requested that EPA require submitters to explain the basis for any estimates on the quantity of new chemical substances released to the environment after control technology, along with supporting data to corroborate those estimates. This commenter also requested that EPA require submitters to provide information on the "amount of release per container cleaning", along with supporting data to corroborate those estimates. This commenter also requested that in the proposed regulatory text for data requirements related to activities at sites controlled by submitters and those controlled by others, EPA replace "what is used to clean the equipment" with "the cleaning method used, including any devices used and any chemical substance used and the physical state of the chemical substance." This commenter also requested that EPA amend the proposed text related to Clean Air Act permit numbers at sites controlled by submitters and those controlled by others by adding "and the type of air pollution control technologies used at these facilities to treat the stack releases that will contain the new chemical substance, if known" to proposed 40 CFR 720.45(g)(4)(iii) and 720.45(h)(4)(iii). Similarly, this commenter recommended that submitters also be required at 40 CFR 720.45(g)(4)(iv) and 720.45(h)(4)(iv) to provide the type of wastewater treatment technologies used at these facilities to treat wastewater that contains the

new chemical substance; the known or expected treatment efficiency of the technology(ies); and the "outfall number" from the NPDES permit corresponding to this release point. This commenter requested that the language concerning "the name(s) of the publicly owned treatment work(s) (POTW)" be modified by adding the phrase "or privately owned treatment works" after "(POTW)". This commenter requested that submitters be required in 40 CFR 720.45(g)(3)(v) and 720.45(h)(3)(v), or in 720.45(j)(1), to provide information, if known or reasonably ascertainable, on particle size for the neat (i.e., pure) new chemical substance or formulation of the new chemical substance that is in a solid inhalable form and the test method(s) used to develop these data; this commenter also requested that EPA's proposed requirement for "particle size distribution analysis" be amended to read "particle size distribution analysis (i.e., analysis method and data used to develop the particle size distribution value)."

Another commenter recommended that EPA amend the PMN form to include fields for data recommended by EPA in a recent Engineering Initiative for new chemical and significant new use submissions. The recommended fields include information on engineering controls employed at sites where a chemical will be used, additional information on environmental release media, and additional information on sites not controlled by the submitter. This commenter also recommended that EPA standardize the types of attachments that submitters can provide, since the same types of information are uploaded as attachments in many submissions; the commenter states that this might help to eliminate ambiguity concerning the information that EPA requires from submitters. This commenter also requested that EPA allow submitters to provide substantiation where appropriate to promote EPA relying on submitted data.

Several commenters requested that EPA allow submitters to provide references to public literature relevant to the proposed and existing data requirements rather than provide their own, original data. This commenter also requested that EPA include a provision in the 720.50 regulatory text that would require EPA to accept data provided by submitters, rather than its own models, to address the information requirements outlined in 40 CFR 720.45 and 720.50 unless EPA can demonstrate that its models represent the best available science. This commenter also requested that 40 CFR 720.50(d) be amended to add language allowing submitters to provide "other information" not explicitly required by EPA "to facilitate EPA's review of the notice." Multiple commenters also requested that EPA include a provision in the regulatory text at 40 CFR 720.50 that would require EPA to accept the analogous chemical substances identified by

submitters in their section 5 submissions unless EPA can provide a rationale for its decision not to use those analogues.

Another commenter requested that EPA require testing for induction of hormone synthesis and estrogen receptor activity assays to address the potential of chemicals to cause breast cancer. One commenter suggested that EPA should provide a detailed rationale whenever submitter data is superseded by EPA models.

***Sources:*** 0059, 0061 0064, 0070, 0074, 0075**,** 0081, 0082, 0084, 0085

***Response:*** To the commenter who requested that EPA consider a requirement that submitters provide analytical reference standards with their data whenever applicable, at this time EPA will not codify a requirement for inclusion of this information since the identity, physical attributes, and other relevant properties of the chemicals reviewed under section 5 notices can and should be sufficiently characterized via information provided by submitters. This commenter also requested that EPA require submitters to describe any potentially exposed or susceptible subpopulations (PESS) that might be known to be exposed to their chemicals. EPA respectfully declines to adopt an additional regulatory provision related to PESS because EPA already independently identifies and considers PESS in its assessments, and is finalizing the proposed requirement to provide information related to the use of products or articles containing the new chemical substance by PESS, which the Agency believes will adequately inform EPA's consideration of PESS in its new chemical reviews. This commenter also requested that EPA require submitters to provide the identity of any chemicals present in an article containing a chemical being reviewed under a section 5 notice, as well as the identity of any chemicals other than the chemical being reviewed that will be used in the manufacturing or processing of that chemical. EPA will not adopt this provision since the focus of EPA's reviews under section 5 is on new chemicals and chemicals with significant new uses. This commenter also requested that EPA require submitters to provide a description of any potential degradants formed during the life cycle of their chemicals and clarify whether EPA considers the definition of degradants to be contained within the reference to "byproducts" in the regulatory text at 40 CFR 720.45(d). EPA notes that degradation products form via abiotic and biotic transformations in the environment and are separate from byproducts. Degradation products are considered distinct from byproducts, which are defined at 40 CFR 720.3 to mean "a chemical substance produced without a separate commercial intent during the manufacture, processing, use, or disposal of another chemical

substance or mixture.” EPA considers degradants to be 'environmental transformation products', which are currently referenced at 40 CFR 723.50 in the regulations pertaining to exemptions from notification for certain new chemicals. EPA notes that submitters are currently required to provide information related to the environmental fate of their chemicals, and is finalizing new paragraph 720.45(j)(2) to clarify the scope of the data elements required related to environmental fate; information on biodegradation is required under this paragraph, which would include information on degradants. This commenter requested that EPA also require that submitters describe exposures to and releases of their chemicals that occur outside of the United States, and EPA respectfully declines to adopt such a requirement because exposures and releases that occur solely outside the United States are not necessarily similar or related to exposure and release scenarios within the United States, and thus not necessarily relevant to determining risk of injury to health within the United States or to the environment of the United States. However, companies can and frequently do rely on this information when exposure or release data from domestic activities is lacking.

In response to the commenter who suggested that EPA require submitters to provide a basis for their estimates for various data elements, EPA is not incorporating this requirement. It is already common for submitters to indicate when information provided to EPA is based on measured or known values—either explicitly, by informing EPA in the submission, or implicitly, by providing measured data. When information is based on estimates, submitters are already free to characterize how those estimates were generated. This information can be helpful to EPA reviewers, but typically in the absence of measured data or known values these estimates are superseded by default values and conservative assumptions on the part of EPA. This commenter also requested that EPA require submitters to provide specific brand names and models of any personal protective equipment employed by workers handling their chemicals. While the brand name and model of PPE may be useful information, it is less important to EPA than information concerning the class and protective capabilities of that PPE. EPA does not believe it is necessary to prescriptively require this information in the regulatory text but notes that per the amendments described in the proposed rule, EPA plans to include in the PMN workflow a text prompt that includes name or model number of PPE, as appropriate. This commenter also requested that EPA require submitters to provide descriptions of any known administrative controls that might impact releases of and exposures to their chemicals, a provision that EPA also respectfully

declines to adopt. Although this information is relevant to the review of section 5 notices, EPA believes that most of the relevant details that would be reported will be captured by data elements that are already specified in the amended data requirements (e.g., the frequency and duration of worker activities). Submitters are also free to provide information on any administrative controls as attachments to the PMN form. This commenter also requested that EPA amend the language at 40 CFR 720.45(g)(3) and (h)(3) to make it clearer that the required information concerning worker exposures in 720.45(g)(3)(ii)-(viii) and (h)(3)(ii)-(viii) pertains to each worker activity occurring during manufacturing, processing, and use of the chemical substance, as identified pursuant to 720.45(g)(3)(i) and (h)(3)(i); EPA is incorporating this suggestion in the final rule, since it provides additional clarity to submitters. In response to this commenter's suggestion that EPA amend the equipment cleaning language to include "the cleaning method used, including any devices used and any chemical substance used and the physical state of the chemical substance", EPA is not incorporating this suggestion, since this level of detail concerning equipment cleaning is not likely to impact EPA's approach to reviewing most chemical substances; submitters are free to provide such information, however, if they believe it might be relevant to the review of a particular chemical. In response to the comment requesting that EPA amend the proposed requirement for Clean Air Act permit information to include language concerning air pollution control technology for stack air releases, EPA notes that this additional information is exactly the type of information that it hopes to obtain from Clean Air Act permit information, and as such EPA is adopting the commenter's suggestion. In response to this commenter's request that EPA include additional details in its requirement for descriptions of NPDES permit numbers (e.g., type of treatment technology used, the efficiency of that technology, outfall numbers), EPA is adopting these suggestions since this type of information is often relevant for risk assessors and risk managers; similarly, EPA is adopting this commenter's suggestion that the proposed requirement for the names of any POTW to which a new chemical substance will be discharged to be amended to clarify that publicly- and privately owned treatment works can and should be described, as appropriate. EPA believes that the language in the proposed rulemaking requiring particle size and particle size distribution analysis already sufficiently captures the scope of the information that the commenter suggested be added at 40 CFR 720.45(g)(3)(v) and 720.45(h)(3)(v) or in 720.45(j)(1), and as such EPA is not adopting the commenter's recommendations completely;

however, EPA is adopting the commenter's suggestion to clarify that "particle size distribution analysis" as a data element includes "analysis method and data used to develop the particle size distribution value".

To the commenter who requested that EPA make efforts to ensure that the data types identified by EPA during recent seminars as contributing to the need for rework are requested expressly in any changes to the regulations or PMN form, EPA notes that virtually all the data elements specified in the proposed amendments to the regulations at 40 CFR 720.45 as well as the PMN form are intended to do exactly that, with the goal of eliminating the need for rework. This same commenter recommended that EPA standardize the types of attachments that correspond to the various data elements that are required when preparing section 5 submissions, a provision that EPA respectfully declines to adopt. Although EPA is seeking to eliminate ambiguity with regards to what data submitters should provide with their notices, EPA believes that this is best accomplished by balancing specific information on the required data elements with flexibility in how submitters provide this information. As such, EPA opts instead to rely on the amendments to the regulatory language at 40 CFR Part 720, as well as the form fields visible to submitters as they navigate the PMN workflow in CDX; EPA will make efforts whenever possible to keep prompts to attach documents contained within the portions of the PMN workflow for their corresponding data elements. This commenter requested that EPA allow submitters to substantiate submitted data elements, to which EPA notes that submitters are currently able to provide as much detail as they like with their submitted data—be it documentation related to controls and practices employed at a particular site, detailed descriptions of test protocols, or a written substantiation of a particular data element provided as an attachment. EPA believes that submitters already have the flexibility to sufficiently substantiate the basis for any data they might submit, and as such EPA is not adopting the proposed change. In response to this commenter's request that EPA include an optional "other information" data element at 40 CFR 720.50 to allow submitters to provide information not otherwise required if they believe it will facilitate EPA's review, EPA agrees that such a provision could benefit both the Agency and submitters and has added the language suggested by this commenter to 720.50(c) in the final rule. In response to this commenter's request that EPA accept submitter data by default, EPA cannot commit to accepting submitter data prior to its review and reserves the right to use conservative assumptions and default values whenever

submitters' data are of poor quality. However, EPA does commit to continue efforts to increase transparency with regards to its review of section 5 notices and will make efforts to communicate the rationale underlying risk assessment decisions. In response to commenters requesting that EPA accept analogues recommended by submitters by default, EPA disagrees. EPA cannot commit to accepting submitter analogues prior to their review and reserves the right to use its own conservative assumptions and default values in place of analogues recommended by submitters—even in cases where another analogue might not be available, a situation that sometimes occurs.

In response to the commenters who requested that EPA allow submitters to reference public literature relevant to the requested data elements in lieu of their own, original data, EPA notes that per 40 CFR 720.50 submitters are already able to do so. EPA will continue to allow the submission of both submitter data and public peer reviewed literature to satisfy data requirements.

In response to the commenter who requested that EPA require additional test guidelines aimed at testing for the potential for chemicals to cause breast cancer, EPA notes that its current approach is not to screen for specific health endpoints, but to rely primarily on physical-chemical data, as well as data on structurally analogous chemicals and QSAR modeling, to estimate potential hazard endpoints. Moreover, TSCA section 5(d) limits the generally applicable information requirements for PMNs to information that is known to or reasonably ascertainable by the submitter or is in the submitter's possession or control. If EPA suspects, based on specific moieties, that a chemical could exhibit carcinogenicity, then EPA would take this into account in its determination under TSCA section 5(a)(3), address potential unreasonable risks in any associated risk management action, and, in some cases, require testing to develop additional information. Of course, if submitters suspect that a particular chemical has carcinogenic potential, then they can explore appropriate testing before submitting such chemicals for review under section 5, but at this time EPA is not requiring such a prescriptive set of test guidelines.

In response to the commenter who requested that EPA be required to provide a rationale whenever EPA models take precedence over submitter-provided data, EPA will not codify such a provision at this time. However, EPA does acknowledge that transparency with respect to how it conducts its assessments would help submitters understand the level of detail required for their section 5 submissions. EPA commits to providing information on why EPA uses model data

instead of submitter-provided data whenever requested and will continue to develop guidance that clarifies how it approaches its risk assessments, both generally and with respect to specific chemical classes.

**4. CATEGORIES OF USE**

***Comment Summary:*** Several commenters expressed concerns that EPA's proposed adoption of OECD use codes will eliminate flexibility in how submitters characterize and report the intended uses of new chemicals and significant new uses of existing chemicals. One commenter was concerned about the level of specificity required in the proposed approach, and questioned whether the implementation of this approach would result in the need for significantly more SNUN submissions if EPA were to restrict new uses based on these use codes. This same commenter noted that EPA uses several generic scenarios for occupational exposures and environmental releases of chemical substances in its reviews, and questioned how the OECD use code framework might inform how EPA applies to these generic scenarios. Several commenters noted that they would like more clarity on how these OECD use codes will be used in EPA assessments.

One commenter noted that submitters should report all applicable use codes for their chemicals, and asked if EPA could add the same provision found at 40 CFR 711.15(b)(4)(ii)(A)(2), which states that in cases where 10 or more codes apply to a particular chemical substance, submitters need only to report the 10 use codes that "cumulatively represent the largest percentage of the submitter's production volume for that chemical substance, measured by weight." This same commenter requested that EPA "incorporate by reference" any changes to the OECD use codes so that these changes are automatically incorporated in the proposed regulatory text at 720.45(f).

***Sources:*** 0062, 0073, 0084, 0086

***Response:*** To the commenter concerned that the proposed use of OECD use codes would result in an increase in the need for SNUN submissions, EPA first notes that while it is possible that some uses that might have previously been characterized broadly may be collapsed into narrower categories, there is a code corresponding to "other" uses in the event that a particular use is not captured by any of the other use codes, so all potential use cases will be describable. Second, EPA does not and will not hold submitters to the intended uses described in section 5 notices by

default. EPA does sometimes limit the use of certain chemicals whenever doing so would mitigate the potential for risk to human health or the environment. However, this is an existing practice and is not driven by any proposed changes to how submitters describe the intended uses of their chemicals. This same commenter expressed concern for how EPA might reconcile changes in how submitters describe their chemicals' intended uses with the criteria used by EPA assessors when identifying applicable generic scenarios relevant for those uses. To this, EPA notes that while generic scenario descriptions and OECD use codes might not correspond exactly, submitter-described use case scenarios already frequently don't match the exact language used to delineate EPA's generic scenarios. EPA's practice is to implement the generic scenario parameters that best fit a particular use description—even if the submitter-provided language doesn't match the generic scenario description verbatim. EPA will exercise this same judgement moving forward with regards to the OECD use codes. Lastly, EPA notes that submitters will still have the option to freely describe the intended use(s) of their chemical substance in the use field in the PMN form; these descriptions are valuable for characterizing the specific chemical use that EPA describes in its determination documents, consent orders, and SNURs.

To those submitters who asked for clarity concerning how EPA will benefit from the adoption of OECD-based use codes for section 5 notices, EPA expects that by requiring consistent criteria for describing intended uses, EPA assessors will be able to more quickly determine the routes of exposure, methods of disposal, and the types of control technology common to specific industries (with the understanding that case-specific details will factor into such determinations). EPA also hopes to improve the ease with which it can reference past cases that share similar or the same uses as a case actively under review. EPA would like to emphasize that submitters will still be able to provide case-specific details beyond the required use code, and EPA will not make generic assumptions about aspects of a particular case if adequate information is provided with the submission materials.

To the commenter who requested EPA include a provision that would require submitters with chemicals having 10 or more intended uses to describe only the 10 intended uses representing the largest relative proportion by intended production volume of all intended uses, EPA is adopting this suggestion. This same commenter requested that EPA "incorporate by reference" any updates to the use codes described by OECD in the relevant portion of the

regulations. EPA is not aware of a mechanism that would allow it to "automatically" incorporate by reference updates to the OECD use codes without rulemaking and approval by the Office of Federal Register. Instead, the Agency is taking a similar approach as it did in the 2020 rulemaking related to the CDR regulations, where it promulgated use codes based on the OECD use codes for reporting information related to the manufacture of chemicals used for TSCA-regulated activities (85 FR 20122, April 9, 2020). The use codes used for both CDR and for this final rule differ from the OECD use codes because some of the OECD use codes are for non-TSCA uses, which were folded into the overarching "non-TSCA use" code for purposes of reporting under TSCA. Substances excluded from the "chemical substance" definition in TSCA section 3(2)(B) are considered non-TSCA uses. The use codes that EPA proposed and are now finalizing at 40 CFR 720.45 are aligned with the codes that appear at 40 CFR 711.15(b)(4)(ii)(A) Table 9 column A. EPA did consider referencing the CDR regulations use codes, but instead opted to include them again at 40 CFR part 720 to avoid confusion because Table 9 of the CDR regulations also includes use codes which were phased out after the 2020 CDR submission period.

**5. SITES CONTROLLED BY OTHERS**

***Comment Summary:*** Several commenters expressed concerns with the proposed language related to requirements for data for sites not controlled by the submitter. A number of these commenters were against EPA including language requesting information for sites not controlled by submitters, noting that such information is often unknown, or unobtainable due to confidentiality concerns. Other commenters felt that the proposed language was overly prescriptive, and that procuring information about downstream sites would be overly burdensome.

One commenter requested that EPA include an option in the PMN workflow allowing submitters to delineate sites controlled by others for which they possess information and sites controlled by others for which they do not possess information. One commenter also requested that in the PMN workflow, dropdown options for "Worker Activity" and "Worker Category" be included for sites not controlled by submitters.

One commenter claimed that EPA's definition of "known or reasonably ascertainable" is too vague and mentioned concerns about EPA's implementation of its proposal to add language

for data requirements for sites controlled by others as an example. They noted that when the original PMN regulations were promulgated in 1983, EPA emphasized that submitters are encouraged, but not required, to contact customers to gather information about activities at their facilities. The commenter notes that in the Chemical Data Reporting regulations, however, EPA emphasizes that submitters may need to contact suppliers or customers, or potentially risk violating their regulatory obligations. Given this apparent discrepancy, the commenter seeks clarity as to what EPA considers as "reasonably ascertainable" in the context of sites not controlled by submitters, and more broadly. Other commenters expressed support for the proposed amendments concerning information for sites controlled by others.

***Sources:*** 0046***,*** 0058, 0060, 0062, 0065, 0068, 0080, 0086

***Response:*** In response to the commenters who claimed that the submission of information pertaining to sites not controlled by submitters of section 5 notices is not feasible and would represent a significant burden, EPA acknowledges and understands that not all information will be reasonably ascertainable to submitters, especially information from customer sites which may not be known at the time of submission, and which may not be obtainable due to confidentiality considerations. EPA maintains that submitters only need to provide that information which is known to or reasonably ascertainable by them. However, with these details codified plainly in the regulations and in the PMN form, customers and suppliers of submitters might be more apt to share what information they can with submitters. Likewise, submitters might be more apt to seek this information when it might be available if EPA eliminates ambiguity surrounding the level of detail required for section 5 notices. EPA believes it is in the interest of submitters, as well as their customers and suppliers, to share as much information as can reasonably be ascertained.

To the commenter who requested that EPA codify a provision that would allow submitters to delineate information for sites controlled by others for which the site identity is known versus information for sites for which the identity is unknown, EPA is including a function in the PMN form to allow submitters to describe this information, as this information would be relevant for review of section 5 notices.

To the commenter that requested that EPA update the PMN form to allow submitters to select dropdown options for "Worker Activity" and "Worker Category", EPA is incorporating the requested change to align the data requested for sites controlled by others with that requested for submitter-controlled sites.

To the commenter that sought clarity concerning what obligations, if any, submitters have to reach out to prospective customers for information on sites not controlled by the submitter in order to meet the “known to or reasonably ascertainable by” standard, EPA emphasizes that the existing definition of “known to or reasonably ascertainable by” at 40 CFR 720.3 is based on a concept of reasonableness that is fact-specific. As explained in the preamble to the proposed rule, EPA recognizes that a submitter may not possess detailed information about sites not controlled by the submitter. EPA disagrees with the commenter that there is a discrepancy between Chemical Data Reporting (CDR) and PMN guidance on what constitutes “reasonably ascertainable information” as it relates to sites controlled by others. In the 1983 PMN final rule preamble, EPA explained with regard to information from persons other than the notice submitter, such as processors, other customers, and suppliers, that “[s]ome of this information must be submitted because it is considered to be in the submitter’s possession or control, for example, information that the submitter’s parent company or subsidiary has if the related company was involved with research and development, test marketing, or commercial development of the new chemical. Other information may be reasonably ascertainable by the submitter, if not already known, and therefore also must be included in the notice.” (48 FR at 21730). EPA further stated that the 1983 final rule did not adopt a proposed requirement that submitters contact customers and ask them to submit a Processing and Consumer Use Form. (48 FR at 21730). Thus, EPA eliminated a mandatory customer contact requirement, but still required submitters to include information from other persons to the extent such information is known to or reasonably ascertainable by the submitter. The 2020 TSCA Chemical Data Reporting Instructions, section 4.2, cited by the commenter, similarly emphasize that the “known to or reasonably ascertainable” standard applies on a case-by-case basis. The instructions provide hypothetical examples illustrating the anticipated application of the standard in the context of the collection of processing and use data under the CDR, while noting that because the standard applies on a case-by-case basis, the examples cannot substitute for a complete analysis of a submitter’s particular circumstances. The hypothetical scenarios provided in the examples are based in large part on whether the reporting company usually collects and maintains the relevant data (e.g., marketing data documenting customers’ use of its chemicals, information on how a particular chemical substance is processed or used by its customers), whether it is typical for comparable manufacturers to collect such information as part of their reasonable business

practices, and a concept of reasonableness under the facts provided. Under both the hypothetical scenarios and other CDR guidance, if particular information cannot be derived or reasonably estimated without conducting new customer surveys (i.e., without sending a comprehensive set of identical questions to multiple customers), it would not be "reasonably ascertainable" to the submitter. (See 2020 Chemical Data Reporting Frequent Questions, # 24.1, available at https://www.epa.gov/chemical-data-reporting/2020-chemical-data-reporting-frequent-questions). While the information that is known to or reasonably ascertainable by a PMN submitter pertaining to a new chemical substance may differ from what is known to or reasonably ascertainable by a CDR submitter pertaining to an existing chemical substance, and may differ from one company to another, EPA does not perceive any discrepancy as asserted by the commenter between CDR and PMN guidance.

EPA thanks those commenters who expressed support for EPA's proposed amendments to the data requirements for information pertaining to sites not controlled by submitters of section 5 notices and expects that the additional level of detail for these data elements will be valuable to EPA reviewers, especially since much of the uncertainty that drives the need for the use of conservative values and default assumptions during EPA review of section 5 notices is centered around uncertainty with regards to activities at sites not controlled by submitters.

## 6. POLLUTION PREVENTION INFORMATION

***Comment Summary:*** Several commenters expressed concerns about how EPA considers Pollution Prevention claims in new chemicals submissions. Two of these commenters requested clarification on how and how often EPA uses Pollution Prevention information during its review of new chemicals submissions. Two other submitters encouraged EPA to use submitters' Pollution Prevention claims more consistently during the review of new chemicals submissions. One commenter requested that EPA commit to prioritizing new chemicals with positive impacts on climate change effects relative to other, existing chemicals.

***Sources:*** 0048, 0051, 0053, 0057, 0070, 0077, 0086

***Response:*** EPA cannot share at this time statistics concerning how often Pollution Prevention claims affect risk assessment or risk management outcomes, but EPA does consider such claims whenever they are provided by submitters and uses them when appropriate. To the commenters who requested that EPA use submitters' Pollution Prevention claims more often and to prioritize

new chemicals with purported positive impacts on climate change effects, EPA notes that it does consider all submitter claims in its risk assessments and its approaches to risk management. TSCA, however, does not allow EPA to take into consideration factors other than the potential risk to human health or the environment when conducting its risk assessments or when determining risk management strategies for chemicals and microorganisms reviewed under section 5 notices. EPA does, however, take into consideration certain factors when deciding to expedite the review of certain section 5 submissions; for example, among these factors is a consideration of whether the submission is for a chemical substance that will be used in applications that support the climate goals outlined in the Inflation Reduction Act.

## 7. OTHER MODIFICATIONS TO THE PMN FORM IN CDX

***Comment Summary:*** Several commenters stated that they were opposed to the inclusion of "check boxes" throughout the PMN workflow that would require submitters to acknowledge that any information not provided for a particular data requirement should only be left blank when that information is not known or reasonably ascertainable. Some commenters argued that the inclusion of these check boxes would be too burdensome and time consuming for submitters. Some commenters did not express opposition to the proposed use of check boxes but did voice concerns about how the use of check boxes might affect how both submitters and EPA interact with the PMN workflow. For example, one commenter requested feedback as to whether, if a submitter were to fill out the fields for all known or reasonably ascertainable data elements and check boxes for any unknown information, EPA would consider such a submission complete. Another commenter expressed concern with how standards for "reasonably ascertainable" information might be applied in the use of check boxes.

Other commenters indicated support for the proposed inclusion of check boxes. Some commenters who expressed support for the check box approach requested that EPA include an option for submitters to explain why certain data elements might not be available at the time they submit a section 5 notice.

One commenter suggested that if EPA does include check boxes for data elements requested in the PMN workflow, that EPA opt to only require submitters to acknowledge a single check box indicating their awareness that information fields should only be left blank if the requested information is not known or reasonably ascertainable.

One commenter requested that EPA amend the PMN form to include fields allowing submitters to assign a Letter of Activity to worker activities at submitter-controlled sites. This commenter also requested that EPA add additional language in Part II of the PMN form clarifying whether information requested for worker activities is being provided for the duration of an entire activity, or the duration of the associated exposure.

Another commenter requested that EPA expand Part II, Sections A and B (sites controlled by the submitter and sites controlled by others, respectively) to include separate sections for each manufacturing, process, and use activity. Similarly, this commenter requested that EPA expand the field for control technology and control efficiency in Part II, Section A into two distinct fields and expand the field for protective equipment, engineering controls, and physical form in Part II, Section B into three distinct fields, for clarity. This commenter also recommended that EPA opt to omit the 12-month maximum production volume field in the PMN form, noting that EPA rarely uses this value in its risk assessments or risk management. This commenter also requested that EPA include a provision in 40 CFR 720.40, 723.50, and 725.25 describing obligations that EPA should adhere to with regards to how it uses CDX to communicate with submitters of section 5 notices. Specifically, they note that communications between submitters and EPA should be used to facilitate the timely review of section 5 notices; request that EPA share information related to models and analogues used in EPA risk assessments, including assumptions related to conditions of use; and request that submitters have the ability to respond to EPA communications in a timely fashion.

Some commenters requested that EPA amend the PMN form to allow submitters to list multiple contacts with whom EPA can share communications concerning their section 5 submissions. Several commenters expressed concern as to whether the proposed changes to the CDX interface might inhibit flexibility for submitters when creating new chemicals submissions.

One commenter requested that EPA allow submitters early access to a “beta” version of the updated CDX environment so that potential issues can be identified, and feedback can be shared with EPA before any changes are implemented.

***Sources:*** 0046*,* 0053, 0055, 0059, 0062, 0064, 0065, 0070, 0073, 0074, 0075, 0078, 0081, 0084, 0086

***Response:*** EPA disagrees with the commenters who claimed that the inclusion of check boxes requiring submitters to acknowledge their responsibility to report information that is known or

reasonably ascertainable would represent a significant burden to submitters. Acknowledging the proposed check boxes likely represents seconds of work compared to the significant time and effort required to gather and organize the data required for most section 5 submissions.

In response to the commenter who asked if a submitter were to provide data for all known or reasonably ascertainable data elements and mark the proposed check boxes for any fields where information was left blank whether EPA would consider such a submission complete, EPA notes that it would not consider such a submission complete by default. As described in Unit III.C.1 of the preamble to the proposed rule (88 FR 34100, May 26, 2023), EPA's process for pre-screening submissions for completeness considers not only whether data has been provided for a particular data element, but the substance of the information provided for each data element; EPA cannot determine the completeness of a submission prior to reviewing the submission itself.

To the commenter who urged EPA to avoid potential problems with EPA's standard for what constitutes reasonably ascertainable information as it relates to the proposed check boxes, EPA notes that the inclusion of such check boxes does not represent a change in EPA's position concerning what is or is not reasonably ascertainable to submitters—it would simply require that submitters acknowledge that any information fields left blank indicate that such information is not known to or reasonably ascertainable by them.

EPA acknowledges commenters who voiced support for EPA's proposed use of check boxes in the PMN form and reiterates that its objective in proposing the use of these check boxes is to promote the submission of complete, high-quality information to minimize the need for using conservative assumptions and conducting rework during the review of section 5 submissions—an outcome that would benefit EPA as well as its various stakeholders. To the commenters who requested that EPA include a field in the PMN workflow for submitters to explain why certain data elements might not be known or reasonably ascertainable for their chemicals, EPA notes that the inclusion of this additional context could be helpful for both risk assessors and risk managers at EPA and is incorporating this suggestion in the PMN workflow.

In response to the commenter who requested that EPA require only a single check box for submitters to acknowledge that information in their submission should only be left blank if it is not known or reasonably ascertainable, EPA believes that it is valuable to reinforce iteratively throughout the process of completing the PMN form that submitters must provide all required

information that is known or reasonably ascertainable to them at the time of submission. EPA also believes that including these check boxes at the end of each larger module—as opposed to the end of each page or once at the end of the submission process—strikes a balance between the effectiveness of the check boxes and burden on submitters.

In response to the commenter who requested that EPA amend the PMN form to allow submitters to assign a Letter of Activity (i.e., a field in CDX to link specific worker activities to operations described in the corresponding manufacturing diagram) to worker activities at submitter-controlled sites, EPA is incorporating the ability to add a Letter of Activity in the PMN form. This commenter also requested that EPA amend the PMN form to be clearer as to whether information requested for worker activities pertains to the duration of an activity or the duration of an exposure. Although some slight discrepancies exist between the language in the PMN form for activities at submitter-controlled sites versus activities at sites controlled by others, both portions of the form allow submitters to characterize site-specific details concerning worker exposures. The current version of the PMN form allows submitters to provide any details related to worker exposures that they believe might impact EPA's review, and as such EPA will not incorporate the suggested changes in the PMN form or regulatory text.

To the commenter who requested separate sections for each manufacturing, processing, and use description in the PMN form, as well as separate fields for control technology and control efficiency and protective equipment, engineering controls, and physical form, EPA does not believe it is necessary to adopt the requested changes, since submitters are already able to provide this information with sufficient detail using the current format for these sections of the PMN form. In response to the comment concerning omission of the 12-month maximum production volume, EPA respectfully declines to adopt this change. Although EPA does typically assess and regulate chemicals based on their largest potential production volume, EPA risk assessors and risk managers do benefit from understanding all of a particular chemical's proposed conditions of use, which includes an understanding of how the submitter intends to scale production throughout the lifecycle of the chemical. In response to this commenter's request to include language at 40 CFR parts 720, 723, and 725 outlining obligations that EPA should adhere to with regards to how EPA uses CDX to transmit information to submitters, these comments are beyond the scope of this rulemaking because EPA did not propose or solicit public comment on parameters for how the Agency communicates with submitters of TSCA section 5

notices. EPA, however, notes that since the implementation of CDX, EPA has used CDX to send communications to submitters in as timely a fashion as possible to facilitate review of section 5 notices. EPA has and will continue to share with submitters materials related to the review of their chemicals, and submitters are currently able to respond to EPA communications at their convenience. In recent years, EPA has increasingly relied on CDX to facilitate the sending of assessment documents, orders, and other information to submitters but notes that sometimes it is requested or necessary that EPA use e-mail or other forms of communication with the submitter.

To the commenters who requested that EPA amend the PMN form to allow submitters to list additional contacts, EPA will not incorporate this suggestion at this time. Presently, communications for a particular submission are sent to the Authorized Official that created the submission; the system was designed this way due to security concerns. In the past, EPA has suggested that companies set up group mailboxes for TSCA submissions or establish rules in their own mailboxes so multiple persons can access TSCA related notifications. EPA is currently looking at options to allow more flexible communication with submitters but cannot provide details at the time of this rulemaking.

To the commenters who expressed concern as to whether the inclusion of the proposed check boxes, along with other proposed changes, might inhibit flexibility for submitters as they navigate the PMN workflow, EPA would like to offer assurance that it understands that submitters might for various reasons wish to move freely between sections of the PMN workflow in CDX. EPA will ensure that submitters are able to navigate freely throughout the various sections of their draft submission and will only have to acknowledge check boxes for unknown information to finalize their notice. EPA also notes that users are currently able to navigate between screens in the PMN workflow by clicking the links in the navigation tree on the left side of the application screen. Users should be aware that the screens are dynamic, so not all screens may be available until triggering pieces of information are provided. For example, information on sites controlled by others will not appear until questions related to 'Other sites' are answered. To the commenter who requested that EPA allow submitters the opportunity to access a "beta" version of the CDX environment that incorporates the proposed changes, EPA agrees that feedback from stakeholders would help to identify any issues with the changes that might need to be addressed before a full rollout of the updated CDX environment. As such, EPA will plan to allow submitters to access a beta version when it becomes available with the goal of soliciting

feedback, as resources allow.

***Comment Summary:*** Several commenters noted that technical limitations and reliability issues with EPA's CDX system have affected submitters' ability to dependably upload and access information related to new chemicals submissions. These commenters request that EPA work to increase the maximum file size that can be uploaded via CDX, and to improve the reliability of CDX in general. Some commenters who expressed concerns about the reliability of EPA's CDX interface stated that EPA should seek to improve submitters' ability to save their work while drafting section 5 submissions.

***Sources:*** 0053, 0062, 0070, 0073, 0078

***Response:*** EPA is aware of the technical limitations of CDX and works to regularly improve the overall reliability of CDX. EPA is also currently working to address issues related to file size. The Agency is continually working to identify and address submission related issues. Any issues encountered by users should be reported immediately to the CDX help desk. If issues are not reported, the Agency may be unaware they are occurring.

In response to the commenters who expressed concerns about submitters' ability to save work while drafting section 5 submissions, EPA notes that the section 5 application has multiple functions that support the saving of data. For example, there is a Save button at the bottom of the screen so that users can save their submission at any time. In addition, if a submitter uses the Previous and Next buttons to navigate through the applications, the system will automatically save the entered data, assuming all the required fields are provided. If a submitter opts to use the navigation screen located on the left side of the application screen, they will be notified that if they navigate away from the screen any unsaved data will be lost. If users are concerned about losing data, after saving their submission, they can preview the submission at any time by clicking on the Preview button at the bottom of the application screen, which will generate a PDF copy of their submission as it looks at that time.

***Comment Summary:*** Several commenters expressed support for the proposed CDX enhancements.

***Sources:*** 0048, 0053, 0055

***Response:*** EPA thanks those commenters who expressed support for EPA's proposed CDX

enhancements and reiterates that it believes that these enhancements will enhance user experience while also improving the quality of information that EPA receives for section 5 notices.

**8. GUIDANCE**

***Comment Summary:*** Several commenters requested that EPA provide more guidance to submitters about how EPA will use the requested information, as well as guidance on how submitters should determine whether certain data elements are required for review of their chemicals and how to generate the requested data. Other commenters urged EPA to retain flexibility in its data requirements and emphasized that not all data requirements will be relevant to all new chemicals or significant new uses of existing chemicals.

One commenter requested EPA feedback as to why information pertaining to certain activities with a chemical substance exempt from reporting requirements, such as production of a chemical substance as a byproduct or impurity during the manufacturing, processing, or use, of another chemical, are being requested by EPA in its proposed regulatory text at 40 CFR 720.45. Another commenter acknowledged EPA's proposed language concerning impurities and requested additional clarity concerning the intended scope of that language.

***Sources:*** 0062, 0065, 0073, 0080, 0086

***Response:*** In response to commenters who requested guidance on how EPA will use the additional level of detail for the data elements required for section 5 notices, EPA plans to use this information much as it does currently, which is to say that EPA will consider all submitter data during its review of every section 5 notice. As outlined in EPA's "Points to Consider When Preparing TSCA New Chemical Notifications" (Ref. 3), EPA scientists first consider submitter data in a series of meetings to determine the relevant case details which will inform EPA risk assessment materials. Much of this information is obtained during the chemistry meeting conducted early in the review process and is determined in part from data provided by the submitter. When details are lacking, EPA uses information on analogous chemical substances, values generated using computer models, and values based on the chemical's structure or type to generate its own estimates. Typically, for the Engineering Assessment, the relevant values related to the chemical are its intended production volume, as well as physical-chemical properties including vapor pressure, molecular weight, density, and water solubility. These

values, along with details provided by the submitter concerning activities surrounding the handling of the chemical substance such as information related to occupational exposures and environmental release, are used to generate estimates for risks to human health and the environment. When pertinent details are lacking, EPA will derive estimates using models within ChemSTEER, OECD Emission Scenario Documents (ESDs), and EPA Generic Scenarios. A lack of detailed information can create uncertainties that propagate throughout EPA assessment products. By refining the level of detail for the data requirements outlined in the 720.45 regulations, the hope is that more detail will translate to a need for fewer conservative assumptions on the part of EPA. This additional detail can also inform risk management decisions without the need for additional rework to EPA's assessment or extensive back and forth between EPA and the submitter.

To the commenters who requested guidance on how submitters should determine when certain data elements are or are not relevant to their chemical substance and emphasized that not all data requirements will be relevant to all submissions, EPA notes that there is no generic guidance applicable to all chemicals for all data elements. Each case is unique, and different chemistries will demand different information. Unfortunately, EPA is not able to determine the relevance of the various information requirements prior to a chemical's review; the submitter is better positioned to determine what information is likely to be relevant prior to its review. If there is ambiguity as to what unique considerations might be important for a particular chemical, EPA maintains open lines of communication with submitters and encourages them to schedule pre-notice consultations to address any ambiguity prior to filing their submissions.

In response to comments asking why EPA proposed to require details about exempt manufacture of chemical substances as byproducts or impurities, EPA notes that in recent years there have been cases in which companies have manufactured chemical substances where the same chemical substance is also produced in a different manufacturing stream as a byproduct or impurity. EPA's goal is to account for such activities in its consideration of potential exposures to humans or the environment. To the commenter who requested clarification on the scope of the proposed language concerning impurities at 40 CFR 720.45, EPA notes that its intention is that if a chemical is manufactured as an impurity or byproduct in a process other than the intended manufacture, processing, or use, of the chemical described in the section 5 notice, then the full details of that process (the manufacture of the impurity or byproduct) must be included in the

section 5 notice to the extent it is known to or reasonably ascertainable by the submitter. In the proposed regulatory text, an abbreviated, non-exhaustive list of exemption examples appeared in a parenthetical. To avoid confusion, this parenthetical list is not included in the final rule, and the text is streamlined by simply cross-referencing 40 CFR 720.30.

***Comment Summary:*** Five commenters requested that EPA make updates to the existing guidance documents, including the "Points to Consider When Preparing TSCA New Chemical Notifications" document (Ref. 3), the "New Chemicals Program's Chemical Categories Document" (Ref. 4), and the "Chemistry Assistance Manual for Premanufacture Notification Submitters (Ref. 5). A request was made to continue building upon EPA's "TSCA New Chemical Engineering Initiative to Increase Transparency and Reduce Rework" (Ref. 6) and to "provide more clarity through guidance about exposure scenarios and associated exposure parameters so submitters can understand whether generating new data better informs the assessment."

***Source:*** 0055, 0057, 0070, 0081, 0086

***Response:*** EPA developed and made publicly available the previously mentioned guidance documents to provide information to assist submitters in preparing PMNs, SNUNs, or exemption notices submitted under Section 5 of TSCA. These documents communicate scientific approaches, best practices, and other general guidance. These guidance documents help ensure that the information received accurately and completely reflects the intended manufacture, processing, distribution in commerce, use, and disposal of the new chemical substances subject to the section 5 notice. EPA believes that the use of this guidance has resulted in more robust submissions to the Agency and promoted engagement and communication with EPA.

Although commenters are correct that, with the exception of the launch of the Engineering Initiative in 2022, these guidance documents have not been updated in many years, the information contained in these documents is generally consistent with the review processes in place for section 5 notices. Still, the Agency is committed to transparently explaining its processes and providing guidance to aid submitters in supplying all relevant information in the initial notice. As Agency resources allow, EPA will begin to update these documents or provide other means to promote more complete submissions upfront and help to minimize the need for EPA to use default values and conservative assumptions in its risk assessment due to a lack of available data. EPA notes that guidance documents do not impose legally binding requirements

and may not apply to a particular situation based upon the circumstances. EPA retains the discretion to consider and adopt approaches on a case-by-case basis that may differ from the guidance documents but comply with the statute and applicable regulations.

## C. Amendments Related to Pre-Screen, Incomplete Submissions, Correcting Errors, and New Information

### 1. PRE-SCREENING PROCEDURES

***Comment Summary:*** Three commenters support EPA's proposal to codify the pre-screen process conducted prior to the risk assessment process for PMN submissions. One commenter urges EPA to concentrate more resources on front end screening, so that the review of a submission is not interrupted midway through the risk assessment process. An additional commenter points out that EPA's proposed regulations apply only to PMNs, SNUNs, and MCANs, as they reside in Part 720. The commenter suggests the same pre-screen procedures need also to be applied to exemption applications, and hence should be replicated in Part 723.
***Sources:*** 0053, 0055, 0077, 0082, 0084
***Response:*** In light of the comments received, EPA is finalizing as proposed to codify the pre-screen process conducted prior to the risk assessment process for submissions. EPA agrees with the commenter urging the Agency to concentrate additional resources on front end screening and intends to do so as resources allow. EPA also agrees with the commenter suggesting that pre-screening procedures be applied to exemption applications and has been pre-screening exemption notices under its current practices. In the final rule, EPA is amending 40 CFR 723.50(e)(3) to add a description of current pre-screen procedures and update/clarify the process for completing an incomplete LVE or LoREX notice, which will better align with similar changes made to 40 CFR 720.65 and with existing electronic submission requirements.

***Comment Summary****:* One commenter asserted that EPA should include in section 5 prescreen a review of all CBI claims for consistency with sections 14(b) and (c) of TSCA and treat any submission that includes a CBI claim that appears to be inconsistent with the requirements of these sections as "erroneous or incomplete".
***Source:*** 0084

***Response**:* EPA disagrees with these comments. Assuring that every CBI claim is consistent with section 14(b) and (c) of TSCA would require a substantive review of each claim, which is well beyond the CBI review requirements described in section 14(g) (i.e., all chemical identity claims for substances that have been offered for commercial distribution and at least 25% of all other claims). Mandatory or discretionary review under section 14(f) is appropriate under only the six circumstances described in that section (e.g., in the case that EPA receives a FOIA request for the information or develops reason to believe the information is not entitled to confidentiality protections). That some PMN submitters may assert CBI claims that would not be upheld upon review does not, by itself, constitute grounds for reviewing PMN submissions under section 14(f).

Additionally, developing a significantly expanded CBI review program particular to new chemical submissions, covering all CBI claims, and focused on the health and safety-related restrictions in section 14(b) as well as procedural and sometimes highly technical requirements of 14(c), is beyond the scope of the proposed amendments, which was focused on adding new language to the regulation text that would clarify, for purposes of transparency, EPA's current pre-screen practice—see Unit III.C.1 of the proposed rule for a description of EPA's pre-screen practice (88 FR 34109, May 26, 2023).

Commenters' suggestion that CBI claims which may at first glance appear inappropriate or improperly asserted may be summarily disregarded is consistent with neither section 14 of TSCA, which governs assertion and treatment of CBI claims, nor section 5, which does not require that information claimed as CBI be eligible for confidential treatment in order for EPA to make the determination required under section 5(a)(3). Rejecting an entire section 5 submission as incomplete is an inappropriate means to deal with an inadequate CBI claim—instead, the deficiency provisions included in the recent CBI procedural rule strike a better balance between preserving important intellectual property rights and timely public access to the same information. As discussed in the Response to Comments for the CBI Procedures Rule:

> EPA requires submission of information required under TSCA and its regulations to perform the functions delegated by Congress to the Agency. Rejecting a submission because of inadequacies related to requirements for asserting a CBI claim might deprive the Agency of necessary information. The appropriate remedy for a deficient CBI claim lies with addressing the confidentiality deficiency, not with rejecting the underlying

submission.

While safeguards built into CDX such as validation and automatic incorporation of certification statements are expected to significantly reduce instances where one of the TSCA section 14(c) requirements to assert a claim are missing entirely, EPA has observed that innocent mistakes and technical errors do happen from time to time, and that immediately releasing information for which a CBI claim had evidently been attempted would be unduly punitive. Further, some of the deficiencies that EPA identifies are not necessarily clear cut--whether a study report is appropriately or inappropriately redacted as it concerns a particular piece of information or diagram for instance, or whether a substantiation exemption applies to a particular piece of data. Some reasonable technical debate may be appropriate in the case of some generic names as well. The deficiency provisions allow for clarification of CBI claims and prompt resolution of any initial confusion or disputes over whether redacted information is in fact health and safety study data of the type restricted by section 14(b), and if so, whether that data reveals portion of mixture or process information. Rather than resolve these matters by litigation, or sink costs into reviewing, rejecting, and re-reviewing the same submission, the proposed rule included the deficiency provisions to allow a quick correction of what are likely to be otherwise valid or largely valid CBI claims.

The brief holding period described in 40 CFR 703.5(e) does not serve to reward the submitter for having made an error. The correction period is necessarily short, owing to time constraints built into TSCA, like the 90-day period to review CBI claims and the 90-day period to review PMNs. Moreover, the hold described in the deficiency provisions [10 days] applies to other time-limited reviews, such as section 5 review, meaning section 5 review periods would also be paused while the submitter is afforded a brief opportunity to correct the CBI deficiency. Assuming the deficiency is corrected and it is not necessary to deny the CBI claims, the public would have access to the information that was the subject of the deficiency at the same time the section 5 review period resumes. (If the claim must be denied, the information would become available only after EPA provides notification of the denial to the submitter and waits for a 30-day appeal period to run out.) EPA expects that providing this opportunity to correct deficiencies, albeit a short one, will allow the correction or resolution of most deficiencies, while not overly

delaying CBI review, new chemical review, or public access to information that is not entitled to CBI treatment.

*Confidential Business Information Claims under the Toxic Substances Control Act (TSCA); Final Rule (RIN 2070-AK68), RESPONSE TO COMMENTS DOCUMENT*, pgs. 33-35, (Ref. 7).

**2. CORRECTING ERRORS IN NOTICES**

***Comment Summary:*** One commenter expressed support for the proposed amendments in which the "applicable review period" would not begin until EPA receives a corrected notice.
***Source:*** 0086
***Response:*** In consideration of this and other comments, EPA is finalizing as proposed the amendment clarifying the applicable review period would not begin until EPA receives a corrected notice.

**3. NOTICE AMENDMENTS INDICATING ORIGINAL NOTICE WAS INCOMPLETE**

***Comment Summary:*** EPA received several comments on the amendment to 40 CFR 720.65(c), which added that a notice submission may be declared incomplete if the submitter submits additional or revised information at any time during the review period without demonstrating to EPA's satisfaction that such information was not known to or reasonably ascertainable by the submitter at the time of initial notice submission. One comment requested that EPA accept additional information on engineering controls without deeming a notice to be incomplete, given what they deemed the "lack of specificity in the current and proposed regulations about the required information for engineering controls". One comment supported the exclusion of amendments made at the request of EPA, recommended that EPA not regard the submission of an updated SDS as making the notice incomplete, and asked that EPA provide the submitter an opportunity to explain why the notice is not incomplete before restarting the applicable review period. One comment asked that the inclusion of additional sites not known at the time of submission should not be penalized by declaring the original submission was incomplete, such as if a new site was developed based on the new substance sampled as R&D prior or during review.
***Sources:*** 0057, 0060

***Response:*** EPA does not believe it is appropriate to exclude amendments for engineering controls from the category of amendments which may indicate that the original notice was incomplete. As an initial matter, EPA notes that the final rule, as proposed, adds a specific reference to engineering controls to the information requirements at 40 CFR 720.45(g)(3) and (h)(3) to clarify that information on any engineering controls in place is included in the requirement for worker exposure information. In addition, through guidance and prenotice consultations between the submitter and EPA, the Agency expects to reduce amendments related to engineering controls. In July 2022, as a part of ongoing efforts to increase the efficiency and transparency of its new chemicals review process, the Agency launched the TSCA New Chemical Engineering Initiative to Increase Transparency and Reduce Rework (Engineering Initiative). Through the Engineering Initiative, EPA engaged in a dialogue with stakeholders through a series of webinars on how it evaluates submitted information, particularly information related to engineering information (i.e., occupational exposures and environmental releases). The first of a series of webinars provided an in-depth look at EPA's analysis of common issues or amendments that cause EPA to have to rework risk assessments, which included:

- Additional information on engineering controls companies plan to utilize (e.g., local exhaust ventilation to capture and remove airborne emissions, process enclosures), such as engineering controls that protect workers by removing hazardous conditions or by placing barrier between the worker and the hazard.
- Additional information on environmental release media (e.g., air, water, land) and waste disposal methods. This includes information on how process equipment and transport containers will be cleaned, and how the associated waste will be disposed of (e.g., on-site wastewater treatment, POTW, incineration, landfill).
- Changes to planned batch parameters (e.g., number of operating days per year, mass of chemical produced per production batch), which would affect the calculated throughput of the new chemical substance.
- Changes in planned production volume, which directly impact model outputs (e.g., increase in production volume typically increases the potential for environmental release).
- Additional information on sites not under submitter control (e.g., customers downstream of the manufacturer and/or importer of the new chemical substance).

Subsequent Engineering Initiative webinars described EPA's review process for new chemicals and explained commonly missed information in TSCA section 5 submissions and how EPA evaluates environmental release information for operations that occur at non-submitter sites. Additional information on the Engineering Initiative can be found at: https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/tsca-new-chemical-engineering. If after reviewing the Engineering Initiative guidance and other available guidance, such as the "Points to Consider When Preparing TSCA New Chemical Notification" guidance (Ref. 3), a submitter still has questions regarding what information should be submitted about engineering controls, EPA encourages the submitter to request a pre-notice consultation with the Agency.

EPA is unlikely to consider an update to a SDS as an amendment that would indicate the original notice was incomplete. Updates to SDS are typically made at the request of EPA or done to add hazard information as a result of risk assessment findings or an EPA order, which were not known at the time of the original submission.

EPA agrees that submitters should have an opportunity to object if the submitter disagrees with EPA's determination that the original notice submission was incomplete. If a submitter has information to support the fact that information added to the notice after the review period has begun was not known or reasonably ascertainable at the time of submission, submitters would follow the existing procedures at 40 CFR 720.65(c)(4) and (5), as amended in the final rule, which updates and moves these provisions to 40 CFR 720.65(d)(4) and (5) as proposed.

Lastly, if additional sites are added to the notice which were not known at the time of submission, EPA would not declare the original submission incomplete. EPA, however, asks that submitters provide details to demonstrate to EPA that the information was not known to or reasonably ascertainable by the submitter at the time of the original submission, such as documentation showing that the new site was developed during review.

***Comment Summary:*** Three comments support resetting the applicable review period when new information that was known or reasonably ascertainable at the time of the initial submission is submitted later during the review period and/or the submission is deemed incomplete.

***Sources:*** 0046, 0070, 0082

***Response:*** Considering these and other comments, the Agency is finalizing as proposed the provisions at 40 CFR 720.65(c)(2) and (d)(5)(iii).

***Comment Summary:*** One commenter asserted that a problem with EPA's proposed regulation is that even where EPA does determine that the late-submitted information was known to or reasonably ascertainable by the submitters when they submitted their application, EPA only "may" declare those submissions incomplete and restart the review clock. EPA has given no justification for this "may" language. EPA should instead make clear that when any company, during the new chemicals review period, "submits additional or revised information without demonstrating to EPA's satisfaction that the [information] was not known to or reasonably ascertainable by the submitter at the time of the initial notice submission," the Agency will declare the submission incomplete and restart the review period at Day 1. In other words, the Agency should replace its currently proposed "may" with "will" or "shall."

***Sources:*** 0084

***Response:*** EPA intends to reset the applicable review period in most instances in which known or reasonably ascertainable information provided during the applicable review period results in EPA needing to consider or rework the risk assessment to incorporate such information. However, EPA did not propose, and is not finalizing, any amendment to replace the discretionary language in the existing regulation with mandatory language; rather, EPA's proposed and final rule amendments are for the purpose of clearly communicating to submitters EPA's intent to exercise the Agency's existing discretionary authority to declare original notice submissions incomplete. EPA does not intend to change the regulation language to "will" or "shall," as the Agency anticipates potential scenarios in which a submitter may update their notice with additional information that could be deemed as known or reasonably ascertainable at the time of the initial notice submission, but is minor such that it would not impact the risk assessment findings. Examples of new information that typically would not result in rework include a change in the location of a manufacturing site or the addition of new customers of the new chemical substance.

***Comment Summary*:** Several commenters do not support resetting the applicable review period,

as submitters often are prompted to generate new or additional information during the review period to rebut unforeseen or conservative assumptions EPA staff have made about human exposures or environmental releases. Other commenters argue there are too many variables in the review process for resetting the applicable review period to be a workable, long-term solution. Some commenters suggest that resetting the applicable review period will discourage submitters from providing additional data as it becomes available.

Others disagree with EPA's proposal to deem a notice to be incomplete when the notice submitter provides new information but has not demonstrated "to EPA's satisfaction" that the information was not previously "known to or reasonably ascertainable by the submitter" and state these proposed amendments imply the Agency believes submitters may be intentionally withholding data from their submissions.

***Sources:*** 0048, 0051, 0053, 0059, 0064, 0074, 0075, 0070, 0078, 0086

***Response:*** The Agency would like to reiterate that the submitter is required to provide all information that is known or reasonably ascertainable at the time of the initial submission. The submitter is also required to provide any new information that becomes available within ten days of receiving it, but no later than five days before the end of the review period. New information that was not "known to or reasonably ascertainable by" the submitter at the time of the original submission will not result in restarting the clock.

***Comment Summary*:** Two commenters requested clarification that if a submitter provides one or more analogues with appropriate justification in its original submission, and EPA uses its own preferred analogue(s), a submitter seeking to rebut EPA's analogue selection is not providing new or additional information that the submitter might have provided at the time of submission and the applicable review period should not be reset.

***Sources:*** 0078, 0086

**Response:** If EPA did not consider or review the submitter's analogue justification included in the initial submission, the submitter seeking to rebut EPA's analogue selection would not be providing any new or additional information, the review period would not be reset, and EPA would consider the information that was erroneously missed.

If EPA did consider the submitter's analogue information and provided a rationale for why it was not used in the risk assessment, and the submitter provides new and/or additional

information relating to analogue selection, the submitter should act in accordance with 40 CFR 720.40(f) and demonstrate that such information was not known or reasonably ascertainable at the time of the initial notice submission.

***Comment Summary*:** A commenter requested statistics from EPA on how many submitters have had their review time restarted to help determine whether changes and communications have reduced restart instances.
***Source:*** 0053
***Response:*** Because EPA is only now finalizing the proposed provisions at 40 CFR 720.65(c)(2) and (d)(5)(iii) and changing its practice so as to more routinely exercise its discretionary authority to declare original notice submissions incomplete and restart the applicable review period upon submission of the complete notice, the Agency does not have such statistics at this time. However, the Agency would like to point out that it has implemented a TSCA New Chemical Engineering Initiative to Increase Transparency and Reduce Rework and has also provided an analysis which provides data on instances in which revision(s) to risk assessments (known as 'rework') were triggered due to new information submitted during the applicable review period.

***Comment Summary*:** A commenter states that the receipt of information late in the review process is not helpful to EPA in terms of review and adherence to timeliness. However, the commenter suggests it may better serve EPA to ask the submitter to withdraw the notice, update it with the additional information, then resubmit.
***Source:*** 0055
***Response:*** A submitter may decide to withdraw and resubmit their notice with additional information if they wish. For purposes of the review period, withdrawal and resubmission of a new notice, and completion of a previously submitted incomplete notice, would both have the effect of resetting the applicable review period to Day 1, providing an equal amount of time for EPA to review the additional information.

***Comment Summary*:** Several commenters disagree with resetting the applicable review period, as they assert it will result in even longer new chemicals reviews. Demonstrating that new

information provided was not known at the time of the initial submission will also further add to delays. One commenter adds that EPA cannot undermine the 90-day review period imposed by Congress by creating a perpetual review process by resetting the applicable review period. It was also suggested that EPA has not supported its claim that restarting the review period will increase the efficiency of new chemical reviews or reduce the submission of amendments to address an overly conservative EPA risk assessment. As described, EPA's "restart" proposal is not well-supported.

***Sources:*** 0053, 0059, 0064, 0074, 0075, 0080, 0086

***Response:*** EPA disagrees that resetting the applicable review period and the process of demonstrating that new information provided was not known at the time of the initial submission will result in longer new chemical reviews. When additional information is submitted, EPA reviews it to determine whether it is relevant, adequately documented, and well-supported and whether the Agency needs to revise its risk assessment to incorporate it. Revision(s) to risk assessments take additional time, causing delays in the new chemical review for the submitter which currently are generally addressed via suspensions to the review period under 40 CFR 720.75(b), and which may result in cascading delays in other new chemical reviews. Newly submitted information causes longer new chemical reviews, not the resetting of the applicable review period or the process of demonstrating that new information provided was not known at the time of the initial submission.

The Agency believes that resetting the applicable review period when additional information is provided during the review period will create a more transparent and predictable review process for submitters than the current approach of suspending the review period. In combination with the final rule's amendments clarifying the level of detail expected for information that must be submitted in notices to EPA, the Agency expects the final rule will encourage submitters to provide all relevant information in the PMN form at the initial time of the submission and will result in less rework.

***Comment Summary*****:** One commenter asserted that resetting the applicable review period by adding new data to the submission based on progressing registrations in other countries (for example, the EU) during the (current) very extended assessment time is not helpful to submitters. EPA's policies and regulations should accommodate the reality of commercializing on a global

scale.

***Source:*** 0060

***Response:*** EPA does not intend to penalize submitters for adding new data to their submission based on progressing registrations in other countries. The applicable review period would only be reset when the additional information was already known to or reasonably ascertainable by the submitter at the time of the initial submission. If a test or experiment is completed before the applicable review period ends, the company must submit the data to EPA within ten days of receiving it, but no later than five days before the end of the review period.

***Comment Summary*:** Some commenters are concerned about the high level of subjectivity provided to the EPA in resetting the applicable review period, especially when the Agency has not clearly defined what constitutes a complete submission. These commenters assert that the inability to amend a submission without restarting the review process is inefficient for both submitters and the EPA. If upon review there is a specific question about, for example, a condition of use or workplace exposure, the submitting company could provide a clear and detailed response in a timely manner. The submitter may also learn new information from a customer during the new chemical review process and amend the submission to provide that new information to EPA. Other commenters add that submitters should not be penalized with further delays when they provide information to help clarify or supplement data EPA is requesting from the submitter. It would also be inappropriate for EPA to consider submissions requiring clarification as incomplete, or clarifications provided after the submission as new or additional information that restarts the review period. It is challenging to convert complex technical information into writing with no opportunity to confirm the reader's understanding of the information. Submitters should not be punished if information is provided with an original submission, but revisions are necessary to clarify the information so that EPA assessors better understand that information. One commenter suggests that EPA should be limited in its ability to ask for information that is not required in the updated regulations or to rely on such information in its reviews.

***Sources:*** 0053, 0059, 0062, 0064, 0070, 0074, 0075, 0078, 0080, 0086, 0090

***Response:*** The Agency has provided a discussion on what constitutes a complete submission in Section A.3. of this document. The Agency does not intend to penalize the submitter or reset the

applicable review period each time an amendment is made. If an amendment is made during the risk assessment phase in response to a question from EPA, and the submitter provides an amendment to the submission in a timely manner, the applicable review period would not be reset. This is reflected in the proposed and final regulatory text at 40 CFR 720.65(c)(2), which excludes "amendments made at the request of EPA" from the category of additional or revised information that may trigger a declaration that an original notice was incomplete. If an amendment was made due to new information provided by a customer that was not previously known to or reasonably ascertainable by the submitter, the applicable review period would also not be reset. EPA would like to clarify that while the Agency may ask for information, the submitter is not required to provide such information if it is not known to or reasonably ascertainable by the submitter. EPA may, however, make conservative assumptions in its risk assessments when the Agency lacks available data.

***Comment Summary:*** A commenter argues, based on small business stakeholder feedback, that new information submitted to rebut EPA's assumptions should not trigger a restart of the review period. Even if such information was known to or reasonably ascertainable by the submitter at the time of the initial submission, if the information is responsive to the Agency's conservative assumptions that the submitter could not have anticipated, the review period should not be reset under these circumstances. The commenter adds restarting the review process in this case may cause unjustified delays for small entities which can result in increased costs and other burdens. This can include going out of business, especially if the small entity's business planning relied on a timely approval of their chemical.

***Source:*** 0067

***Response:*** EPA respectfully disagrees that the review period should not be reset when additional information is submitted that was known to or reasonably ascertainable by the submitter at the time of the initial submission. However, EPA does not intend to unfairly penalize small businesses and recognizes that what is known or reasonably ascertainable at the time of a submission may depend on the submitter. As stated in the 1983 final rule (Ref. 1), "[w]hat would be a reasonable effort for one company under certain circumstances might be extremely burdensome for the same company under different circumstances, or for another company in the same situation. […] The nature of the substance, the projected sales volume and profit, and the

size of the company are factors in determining what information can reasonably be obtained."

***Comment Summary:*** Seven commenters requested additional guidance or clarity on the "known to or reasonably ascertainable" standard at TSCA section 5(d)(1). Two commenters remarked on using cost as a standard for determining whether or not information is known or reasonably ascertainable, stating that cost should not be the standard for determining what information is not reasonably ascertainable and does not provide sufficient guidance to submitters on what constitutes appropriate due diligence.

Several commenters asked for additional examples in a guidance document on the situations where the Agency would consider information to be not known or reasonably ascertainable, with one comment asking that EPA include in the regulation text what types of information will be deemed to have been known to or reasonably ascertainable by any new chemical submitter at the time the company submits its application.

One comment stated that information that is accessible only from potential downstream customers or processors should not be considered to be reasonably ascertainable. With regard to new information, one comment noted that there may be situations where a submitter later becomes aware of new test data during the review, which was conducted by a non-U.S. division or parent company. One comment said that the preamble of the proposed rule did not address what "reasonably ascertainable by" means with respect to information that is not expressly required in the PMN form, but which becomes relevant once EPA reviews the potential risk of the proposed new chemical.

Another comment asked EPA to clarify whether or not information only obtainable via animal testing would be considered "not known or reasonably ascertainable." Lastly, a comment asked EPA to make clear that when companies fail to submit all required information with their new chemical applications that is known to or reasonably ascertainable by them, they are potentially subject to enforcement actions.

***Sources:*** 0057, 0070, 0073, 0077, 0078, 0084, 0086

***Response:*** See also response to comments in Section A.3 of this document regarding "known to or reasonably ascertainable by." EPA defines "known to or reasonably ascertainable by" at 40 CFR 720.3 as "all information in a person's possession or control, plus all information that a reasonable person similarly situated might be expected to possess, control, or know." While EPA

understands and recognizes the desire to have a more explicitly defined list of criteria or more detailed definition of "known to or reasonably ascertainable by", EPA believes that it is not possible to define "known to or reasonably ascertainable by" more explicitly—as was stated in the 1983 final rule entitled "Premanufacture Notification; Premanufacture Notice Requirements and Review Procedures" (Ref. 1) and restated in the May 2023 proposed rule (88 FR 34100). EPA has not, in this rulemaking, proposed or finalized any amendment to or undertaken any substantive reconsideration, reexamination, or reinterpretation of the existing definition at 40 CFR 720.3.

EPA believes that "reasonably ascertainable" can be determined only on a case-by-case basis and that notice submitters must be responsible for deciding when and how to obtain required data, and when required information is not reasonably ascertainable. Each section 5 notice submitted to EPA is a unique notice and while every submitter is only required to supply as part of the notice the information that is known or reasonably ascertainable, that information will vary widely based on the identity of the chemical substance and the identity of the submitter. Chemical substances that have already been commercialized in other countries, previously submitted under a section 5 exemption, or are close analogues of a well-known and studied class of chemical substances would generally be expected to have more information available that meets the "known to or reasonably ascertainable by" standard when contrasted against a more novel chemistry—yet, this is a generalization and not always the case. Submitters themselves have a wide degree of variance when it comes to their in-house expertise, knowledge of a chemical substance, or resources available to them (monetary or otherwise), which will impact the degree to which information may be "known to or reasonably ascertainable by" the submitter.

Regarding cost as a factor for determining whether or not information is "known to or reasonably ascertainable by" a submitter, EPA agrees that cost should not be *the* standard but is rather one part of the standard, which will vary based on the submitter and submission. As stated in the 1983 final rule (Ref. 1), "[w]hat would be a reasonable effort for one company under certain circumstances might be extremely burdensome for the same company under different circumstances, or for another company in the same situation. […] The nature of the substance, the projected sales volume and profit, and the size of the company are factors in determining what information can reasonably be obtained."

The PMN form contains data fields for activities at downstream customers or processors and EPA understands that there may be situations where such information may not be known to or reasonably ascertainable by the submitter. As described in the 1983 final rule (Ref. 1), "persons other than the notice submitter may have information necessary or useful for EPA's review. For example, processors and other customers may have information on exposure associated with use or release, and foreign manufacturers and suppliers may have information on chemical identity, impurities, and health and safety data. Some of this information must be submitted because it is considered to be in the submitter's possession or control, for example, information that the submitter's parent company or subsidiary has if the related company was involved with R and D, test marketing, or commercial development of the new chemical. Other information may be reasonably ascertainable by the submitter, if not already known, and therefore also must be included in the notice."

Due diligence should be exercised to ensure that test data conducted by a non-U.S. division or parent company of a submitter is included upfront, but EPA can foresee instances where the submitter was unaware of or unable to obtain such data. If new information becomes available, the submitter should act in accordance with 40 CFR 720.40(f) and demonstrate that such information was not known or reasonably ascertainable at the time of the initial notice submission. EPA, however, is inclined to doubt that information "which becomes relevant once EPA reviews the potential risk of the proposed new chemical" is new, previously unknown, and was not reasonably ascertainable. Information provided after EPA has concluded its assessment of a chemical, which is being provided in an attempt to change the risk findings and able to be obtained within short notice of learning of a risk assessment's conclusions, would very likely be information that could and should have been submitted upfront due to the ease at which it was obtained. Later submission of such additional information constitutes the type of amendments EPA is trying to avoid by providing greater detail in the PMN form and at 40 CFR 720.45.

In response to the comment asking whether information only obtainable via animal testing would be considered not known or reasonably ascertainable, EPA emphasizes that TSCA section 5 notices do not establish a minimum data set or require certain tests. If a company has conducted certain tests, including vertebrate animal testing, prior to submitting a TSCA section 5 notice, they would be required to submit that test data. Amended TSCA directs EPA to reduce and replace, to the extent practicable and scientifically justified, the use of vertebrate animals in

the testing of chemical substances or mixtures; and promote the development and timely incorporation of alternative test methods or strategies (or New Approach Methodologies (NAMs)) that do not require new vertebrate animal testing. NAMs refer to any technology, methodology, approach (including computational/in silico models like QSARs), or combination thereof that can be used to provide information on chemical hazard and risk assessment that avoids the use of intact animals. EPA has and continues to work internally and with stakeholders to identify, develop, and use NAMs to evaluate new and existing chemicals under TSCA. EPA has a long history of using NAMs and encouraging the use of NAMs The Agency would also like to clarify that information that has not been generated by the time of PMN submission and could not be ascertained without conducting new animal testing is not information that is "known or reasonably ascertainable." EPA encourages companies to consult with the Agency on the potential for use of NAMs to generate data to inform risk assessment. EPA encourages dialogue with Agency representatives to help determine how best the submitter can meet both the data needs and the objective of TSCA section 4(h). For more information on NAMs, see: https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/alternative-test-methods-and-strategies-reduce.

Lastly, EPA agrees that withholding information that was known or reasonably ascertainable may result in enforcement action. Failure to comply with any provision of TSCA or its implementing regulations in 40 CFR part 720, 721, 723, or 725 is a violation of section 15 of TSCA. Violators may be subject to the civil and criminal penalties in TSCA section 16 for each violation. Persons who submit materially misleading or false information in connection with the requirements of any provision of the PMN, SNUN, MCAN, or exemption notice requirements may be subject to penalties calculated as if they never filed their notices.

***Comment Summary:*** Two commenters state that EPA should deem a notice incomplete within 14 days, not 30. Another comment asked that EPA alert the submitter of errors or if the notice is incomplete within 15 days. The current regulations state that if EPA receives an incomplete submission or seeks remedy of errors identified in a notice, EPA will notify the submitter within 30 days of receipt that the submission contains errors or is incomplete and that the applicable review period will not begin until EPA receives a correct and complete notice.
***Sources:*** 0048, 0051, 0081

***Response:*** EPA respectfully disagrees that 14 or 15 days is adequate for determining the completeness of a submission and believes 30 days (as provided in the existing regulation) is appropriate. Although EPA has developed a pre-screening process for identifying errors and deficiencies early within the review process, other issues may be found as the review progresses and different disciplines begin their assessments of the new chemical substance. Typically, the pre-screen process only involves an initial chemistry, engineering, and administrative screen of the notice. After a submission has passed the pre-screening process, it moves forward to the risk assessment phase, and the submission is discussed at various EPA meetings, including chemistry, hazard, and scoping meetings. During this phase, EPA assessors from different disciplines may find issues within the submission that were missed during the initial pre-screening, and which prevent EPA from completing a risk assessment for the new chemical substance. Because of this, EPA continues to believe 30 days is appropriate for determining whether a submission is incomplete. Even though all issues may not be identified during pre-screening, EPA does strive to find issues as early in the review process as possible.

***Comment Summary:*** One commenter recommends that submitters be allowed to correct deficiencies within the submission and resubmit as soon as possible, perhaps at a reduced administrative fee, when notified that their submission is incomplete. Another commenter stated that EPA should finalize regulations making clear that if a company submits new information during the new chemicals review process, such amendment constitutes a new submission.
***Sources:*** 0048, 0084
***Response:*** A submission of a new notice, which would carry a new fee, is not necessary for notices that are deemed incomplete. Incomplete notices are not completely rejected from review. Rather, incomplete notices are notices that do not contain sufficient information to start or continue with the review. If determined to be incomplete, the review period will not start until a complete notice is received by EPA. No additional fee is required to complete a previously submitted notice that was deemed incomplete. It is the submitter's responsibility to remedy any deficiencies as soon as possible. Additionally, while EPA may in the future consider an additional fee if a company newly submits information during the review process which results in substantial rework of the case, EPA did not propose such a fee or that amendments should constitute a new submission.

## 4. NOTIFYING EPA OF THE RECEIPT OF NEW INFORMATION ON A CHEMICAL SUBSTANCE UNDER REVIEW

***Comment Summary:*** One commenter recommends that submission deadlines for new information accommodate delays due to problems with Central Data Exchange (CDX) and asks that EPA acknowledge that operating problems within CDX may make timely electronic submission difficult.

***Source:*** 0057

***Response:*** EPA encourages submitters to regularly communicate with their assigned program manager during the review process. Submitters should alert their program manager if they encounter issues while submitting new information through CDX. EPA recognizes that CDX does not always function properly and does not intend to penalize submitters who are unable to timely submit new information due to technical difficulties with CDX.

***Comment Summary:*** EPA is proposing to amend 40 CFR 720.40(f) and 40 CFR 720.50(a)(4)(ii) to clarify that new information about a chemical substance under EPA review must be submitted electronically via CDX, consistent with the general electronic submission requirements in 40 CFR 720.40(a). In addition, when submitters receive new information within five days of the end of the review period, EPA is proposing to allow them to notify EPA by email of the receipt of new information. One commenter suggests that in 40 CFR 720.50(a)(4)(ii) EPA should clarify what the deadline is for submitting new information electronically. One comment also highlighted language similar to 40 CFR 720.40(f) that appears at 40 CFR 723.50(i), which outlines how additional information should be submitted to EPA during the review of an LVE or LoREX, and suggested amending this regulatory text to allow for electronic submission to EPA via CDX.

***Sources:*** 0081, 0084

***Response:*** While PMN submitters must submit a complete notice at the beginning of the review period, EPA recognizes that new information may become available while the case remains in review. The current regulations at 40 CFR 720.50(a)(4)(ii), as amended to provide for electronic submission, provide concrete deadlines for submitting information to EPA: "If a test or experiment is completed before the applicable review period ends, the person must submit the

study, report, or test electronically to EPA via CDX, as specified in paragraph (a)(3)(i) of this section, within ten days of receiving it, but no later than five days before the end of the review period." The phone/email notification that is required if a test or experiment is completed during the last five days of the review period is intended to facilitate suspension or extension of the review period where deemed appropriate to provide time for receipt and consideration of the new study, report, or test. If late in the review period, the submitter may want to suspend the case's review to allow time for EPA to incorporate the new information, or EPA could use 40 CFR 720.75(c) to extend the notice review period up to an additional 90 days. In either case, under the regulation, the submitter would still be required to submit the study, report, or test to EPA within ten days of receiving it.

EPA thanks the commenter that pointed out language similar to 40 CFR 720.40(f) that appears at 40 CFR 723.50(i). EPA is amending 40 CFR 723.50(i) to align with the amendments made to 40 CFR 720.40(f), which are in accordance with the current practice of submitting information to EPA electronically via CDX and contacting EPA by telephone or email.

## D. Amendments to LVE and LoREX Exemptions

### 1. AMENDMENTS TO EXPIRATION OF LVE AND LOREX REVIEW PERIOD

***Comment Summary:*** Several commenters supported and one commenter took no position on EPA's proposal that would require an EPA determination on an LVE or LoREX exemption before manufacture may commence.

***Sources:*** 0036, 0057, 0068, 0086, 0078

***Response:*** EPA appreciates the comments in support of the proposal and, in consideration of these comments, will finalize these amendments as proposed. The amendments to the LVE and LoREX regulations at 40 CFR 723.50(g) will require a notification of approval of an LVE or LoREX from EPA prior to commencement of manufacture of the chemical substance under the exemption. These changes will not change the length of the review period. The review period of an LVE or LoREX will run for 30 days from the date EPA receives a complete notice.

### 2. PROVIDING NOTIFICATION TO LVE AND LOREX HOLDERS IF THE CHEMICAL SUBSTANCE IS SUBJECT TO A SNUR

***Comment Summary:*** EPA proposed to add language to 40 CFR 723.50 to allow EPA to inform an LVE or LoREX holder whenever the chemical substance that is the subject of that LVE or LoREX becomes subject to a proposed or final SNUR that describes the chemical substance by a generic chemical name due to a confidentiality claim for its specific chemical identity. Several comments supported EPA's proposal to notify exemption holders when their chemical substance becomes subject to a proposed or final SNUR. One commenter stated that it is their view that EPA must inform the notice holder(s) prior to EPA proposing a SNUR for the substance. In the proposed rule EPA stated that the Agency does not intend to proactively inform current LVE and LoREX holders about SNURs that predate this rule. EPA would only start the practice of notifying LVE and LoREX holders subject to this amendment after the date of the final rule. Several commenters asked that EPA notification to LVE and LoREX submitters subject to a SNUR not exclude SNURs that predate this rule.

Four commenters requested that the EPA also notify LVE or LoREX submitters if a substance is added to the TSCA Inventory. They state that without knowing a substance is listed, a submitter would not know they have additional obligations under TSCA such as Chemical Data Reporting, 12(b) notifications (if applicable), etc. One comment said that EPA should revoke any LVE or LoREX for a substance that has been added to the TSCA inventory and notify the holder of the exemption.

***Sources:*** 0036, 0048, 0050, 0051, 0057, 0058, 0070, 0078, 0086

***Response:*** EPA appreciates the comments in support of the proposal and, in consideration of these comments, will finalize these amendments. Going forward, EPA plans to proactively inform the LVE or LoREX holder(s) when a proposed SNUR is published that identifies the chemical substance covered by the LVE/LoREX using a generic chemical name, to help inform the LVE/LoREX holder of the proposed requirements and the opportunity to submit comments during the public comment period if desired, as resources allow.

Currently, there are more than 100 granted LVEs or LoREXs for chemical substances that are subject to SNURs that describe the chemical substance by a generic chemical name. These exemption notices were granted as far back as 1986 and the majority were received before EPA started receiving notices via CDX in 2012. LVE and LoREX holders whose exemptions were approved prior to the rollout of CDX would likely need to be contacted via mail. As a result, there are many logistical challenges associated with identifying and contacting all

exemption holders affected by all previously promulgated SNURs, en masse. Nevertheless, upon consideration of the public comments in support of notifying current exemption holders of preexisting SNURs, EPA intends, as a courtesy and subject to availability of resources, to notify current LVE and LoREX holders about preexisting SNURs that describe the chemical substance by a generic chemical name. Given current resources constraints, however, EPA is unable to provide a timeline for when it will begin and complete this notification effort. EPA will likely be unable to reach all impacted entities but will make reasonable efforts to do so. A lack of receipt of this courtesy notice that a chemical substance is subject to a SNUR does not excuse chemical manufacturers and processors from complying with any existing regulations. It is the responsibility of manufactures and processors to be aware of the regulatory status of their chemicals. LVE and LoREX holders who wish to determine whether their chemical substance is subject to a SNUR may always submit an inquiry to EPA (also known as a *bona fide*) pursuant to 40 CFR 721.11.

In response to the public comments, in addition to EPA's intent to notify LVE and LoREX holders when they are subject to a SNUR, EPA also intends to, as a courtesy and subject to availability of resources, begin notifying LVE or LoREX submitters if a substance is added to the confidential portion of the TSCA Inventory as a result of filings by a different submitter. As of February 7, 2024, more than 460 LVEs and LoREXs that were granted by EPA pertain to chemical substances that are now listed on the TSCA Inventory. Once on the Inventory, a chemical substance may be subject to additional requirements under TSCA. Of the more than 390 chemical substances covered by LVE and LoREX, approximately 125 are on the confidential portion of the TSCA Inventory. Without receiving notice from EPA or submitting a *bona fide*, a submitter is unlikely to know their substance is listed on the confidential portion of the TSCA Inventory, unless they also submitted the PMN and subsequent Notice of Commencement that led to the Inventory listing of the substance. While EPA intends to begin providing notice to exemption holders whose chemical substance now appears on the confidential portion of the TSCA Inventory, EPA does not intend to provide notice to those who hold granted LVEs or LoREXs pertaining to chemical substances whose specific chemical identities are added to the public portion of the TSCA Inventory due to the additional resources this would require and to the fact this information is publicly available.

EPA affirms that once a chemical substance is added to the Inventory, an LVE or LoREX

(or any other exemption from PMN requirements) is no longer necessary to manufacture the chemical substance and thus any approved LVE or LoREX is no longer binding on the manufacturer. The premanufacture notice requirements of TSCA section 5(a)(1), the relevant statutory exemption authority at TSCA section 5(h)(4), and the LVE/LoREX regulations at 40 CFR 723.50 all apply to manufacturers of new chemical substances, yet a chemical substance is no longer a "new chemical substance" as defined in TSCA section 3(11) once it is added to the Inventory. While EPA intends to begin providing notice to LVE and LoREX submitters once their substance is listed on the confidential portion of the TSCA Inventory, EPA does not intend to formally revoke these exemptions under the process described in 40 CFR 723.50(h)(2), as that process pertains to new chemical substances for which manufacture is not otherwise permitted in the absence of a PMN or applicable exemption.

### 3. MAKING PFAS CATEGORICALLY INELIGIBLE FOR LVES AND LOREXS

***Comment Summary:*** Several commenters supported EPA's proposal to make PFAS categorically ineligible for the LVE and LoREX exemptions while many others raised concerns with the proposed amendments or completely opposed the amendments.

Many comments stated that it is unnecessary to make PFAS ineligible for the LVE and LoREX exemptions because the exemptions are already protective and "highly restrictive" due to the production volume limits and that submitters are bound by conditions outlined in the notice. A commenter pointed out that EPA is already required by 40 CFR 723.50 to make a substance ineligible for an LVE of LoREX if the substance or its reasonably anticipated metabolites may cause serious acute, chronic, or environmental effects. One comment stated that "EPA mischaracterizes LVE and LoREX reviews by referring to them as 'abbreviated' leading the public to think they have been rubber-stamped without consideration." Commenters asked that EPA continue to review these exemptions for PFAS on a case-by-case basis and allow PFAS with no releases to the environment or human exposures that are used in strictly controlled environments.

Some commenters raised concerns that the amendments will cause more notices to be submitted as PMNs, which will hamper EPA's ability to process notices in the current backlog and increase the Agency's overall workload. Furthermore, comments raised concerns about the potential impacts to the semiconductor and electric vehicle industry, as well as U.S. innovation

in general.

Some comments stated that because PFAS are a broad category of chemicals, any proposed regulatory action on PFAS should not group PFAS into a single category, which "is at odds with the EPA PFAS Strategic Roadmap." Requests were made to specifically exclude fluoropolymers from the proposed amendments because fluoropolymers "are non-mobile, non-bio-accumulative, non-toxic chemicals." Comments stated that there was no scientific basis or risk-based evidence for making PFAS ineligible for the LVE and LoREX exemptions.

One comment pointed to TSCA section 26(c)(2)(A), which does not permit EPA to regulate categories of chemical substances that are grouped together solely because they are new chemical substances. A comment was also made that this action was not in line with TSCA sections 26(h), (i), and (k), on Scientific Standards, Weight of Scientific Evidence, and Reasonably Available Information, respectively.

A comment stated that EPA did not provide research or test data supporting the idea that the Agency will not have sufficient information to render a determination and that there is no evidence to support that "all PFAS are equally data poor and too complex." The comment was made that while "EPA may prefer to conduct a more extensive review of new PFAS under a PMN review process, this is not sufficient justification for eliminating an exemption process for certain substances that has operated in compliance with TSCA Section 5(h)(4)."

***Sources:*** 0043, 0046, 0047, 0048, 0049, 0051, 0052, 0056, 0057, 0059, 0061, 0062, 0064, 0065, 0068, 0070, 0071, 0072, 0073, 0075, 0076, 0078, 0080, 0081, 0082, 0083, 0084, 0085, 0086, 0087

***Response:*** EPA believes that the LVE and LoREX exemptions are an important part of the New Chemical Program's review process and help reduce administrative burdens on EPA and industry, while also expediting the Agency review process of lower risk chemical substances. To ensure that chemical substances that are reviewed as an LVE or LoREX will not present an unreasonable risk, EPA developed procedural safeguards and conditions to the exemptions, including a 30-day review period. While the review of an LVE or LoREX is shorter than non-exempt notices, EPA still conducts a detailed review of the chemical substance to ensure that any granted exemption may not cause serious acute (lethal or sublethal) effects, serious chronic (including carcinogenic and teratogenic) effects, or significant environmental effects.

As noted in the proposed rule, in 2021 the Agency stated that "[g]iven the complexity of PFAS chemistry, potential health effects, and their longevity and persistence in the environment, an LVE notice for a PFAS is unlikely to be eligible for this kind of exemption under the regulations." Since 2021, EPA has reviewed 8 LVE notices for PFAS, which were each reviewed on a case-by-case basis. Each of the 8 PFAS were determined to be ineligible for an LVE due to the risks identified and/or an inability to complete the review in 30 days as a result of the complexities of the review or uncertainties in the assessment. EPA has never received or approved any PFAS LoREX notices.

Each of the 8 PFAS that were the subject of LVE notices reviewed since 2021, or the reasonably anticipated metabolites and environmental transformation products of those PFAS, was determined to be a persistent, bioaccumulative, or toxic (PBT) chemical substance. In 5 of the 8 cases, however, the PBT designation included noted uncertainties for each of the substances reviewed. If EPA is unable to score a characteristic (e.g., B "unknown" for bioaccumulation), the characteristic is still considered to be potentially a 2 or higher for the purposes of identifying potential PBTs (Ref. 8). In many cases, additional uncertainties were identified for the potential routes of exposure, which included exposures to workers, the general population, a potentially exposed or susceptible subpopulation (e.g., consumers, infants), or the environment. PFAS present a challenge for EPA to evaluate because there is often insufficient information to quantify the risk they may pose and consequently make effective decisions about how to regulate them (Ref. 9). As currently described in the regulations, EPA may determine that a new chemical substance is ineligible for an LVE or LoREX if there are issues concerning toxicity or exposure that require further review which cannot be accomplished within the 30-day review period. Given the shortened 30-day review of an LVE along with the inability to require testing or impose additional restrictions under a section 5(e) or 5(f) order, EPA was unable to address those uncertainties which would be necessary to conclude that the substance would not present an unreasonable risk. Since all of the 8 PFAS that were the subject of LVE notices were deemed ineligible for the exemption, the submitters were required to submit a PMN if they wanted to move forward with the manufacture of the new chemical substances.

Rather than increasing the burden on both industry and the Agency, making PFAS ineligible for the LVE and LoREX exemptions may in fact reduce burden in many instances by avoiding the submission and review of LVEs that are ultimately denied and required to be

resubmitted and reviewed anew through the PMN review process. As explained in EPA's recently published Framework for Addressing New PFAS and New Uses of PFAS (Ref. 8), there may be some PFAS that will not result in worker, general population or consumer exposure and are not expected to result in releases to the environment, such as PFAS used in a closed system to make semiconductors or other electronic components. In such a negligible exposure and environmental release scenario, if EPA can ensure that such PFAS can be disposed of properly and no consumer exposure is expected, EPA generally expects to allow the PFAS or the new use of a PFAS to enter commerce, but only after receiving basic information, such as physical-chemical property data, about the substance. Even in instances where EPA expects to allow the PFAS to enter commerce, the Agency still believes it will likely require additional test data in at least some cases. LVEs, by their nature of a start-to-finish 30-day review, are not the appropriate mechanism to review substances that require additional data.

EPA, however, recognizes the concerns raised around the importance of these exemptions for U.S. innovation, particularly for the semiconductor and electric vehicle industry. The primary purpose of the TSCA New Chemicals program—and EPA's mandate under TSCA section 5—is to manage the potential risk to human health and the environment from chemicals new to the marketplace. The program functions as a "gatekeeper" that can identify potential risks of a new chemical before it is entered into commerce. Where such risks are identified, EPA must take actions necessary to protect against unreasonable risks. TSCA section 3(b) indicates that it is the policy of the United States that exercise of TSCA authorities do not create unnecessary economic barriers to technological innovation "while fulfilling the primary purpose of [TSCA] to assure that such innovation and commerce in such chemical substances and mixtures do not present an unreasonable risk of injury to health or the environment." EPA wants the law to work for all stakeholders and for the country, and that means—first and foremost—ensuring safety, while also striving to support innovation and advances in technology.

EPA agrees with the comments that PFAS are a broad category of chemical substances and that the assessment and management of these substances for regulatory purposes should generally be done on a case-by-case basis or as groups of substances with common toxicological properties, exposures, or uses. Furthermore, EPA believes that any assessment of PFAS should be done in line with the scientific standards, weight of scientific evidence, and consider any reasonably available information as outlined in section 26 of TSCA. The amendment to make

PFAS ineligible for the LVE and LoREX exemptions, however, is not based on an assessment of all PFAS or any PFAS and does not impose risk management restrictions on any PFAS substance. The decision to make PFAS ineligible for the LVE and LoREX exemptions is not a determination of risk for all or any PFAS. While the current state of science and EPA's understanding of PFAS has motivated the decision to make all PFAS ineligible for the LVE and LoREX exemptions, these amendments are not based on hazard, exposure, or risk. This action is a procedural action based on the Agency's experience administering TSCA and reviewing LVEs for PFAS.

EPA not only considers the substance itself but also focuses on potential metabolites or degradants when reviewing a PFAS under TSCA section 5. For this reason, fluoropolymers are included in the PFAS definition and subject to this rule's exclusion from LVE/LoREX eligibility (see additional discussion in this section on the PFAS definition used for this rule). Fluoropolymers are made using fluorinated monomers, and often fluorinated processing aides, which contributes to the release of PFAS. In addition, the disposal of fluoropolymers also results in PFAS releases. EPA has been concerned about potential risks of fluoropolymers for more than a decade. On January 27, 2010 (75 FR 4295, 1/27/2010), EPA amended the 'polymer exemption rule,' to exclude from eligibility polymers containing as an integral part of their composition, except as impurities, certain perfluoroalkyl moieties consisting of a CF3- or longer chain length. EPA issued this amendment because, based on information at the time, EPA could no longer conclude that these polymers will not present an unreasonable risk to human health or the environment under the terms of the polymer exemption rule, which is the determination necessary to support an exemption under section 5(h)(4) of TSCA. While some suggest that fluoropolymers are safe, there remains debate on the toxicity of fluoropolymers especially when considering their entire life cycle (Ref. 10). EPA's decision to include fluoropolymers as part of the amendment to make PFAS ineligible for the LVE and LoREX exemptions, however, was not based on hazard, exposure, or risk. Fluoropolymers are no less complicated to review, and the Agency expects it would need the longer 90-day review for a PMN.

EPA disagrees that this action does not align with TSCA section 26(c). EPA is not taking action on "a group of chemical substances which are grouped together solely on the basis of their being new chemical substances." Rather, EPA is taking action on a category of chemical substances, "the members of which are similar in molecular structure." The substances that meet

the PFAS structural definition share a similar structure and are appropriately addressed as a category in this action.

EPA does not believe that *all* PFAS are data poor or that the review would necessarily be complex in all cases. Yet, while there are thousands of different PFAS, only a small fraction has been well studied (e.g., perfluorooctanoic acid (PFOA), perfluorooctanesulfonic acid (PFOS), perfluorohexanoic acid (PFHxA), perfluorobutanoic acid (PFBA), and hexafluoropropylene oxide dimer acid (HFPO-DA) (GenX)). These well studied PFAS are, however, existing chemical substances and would not be submitted as an LVE (but may be used as an analogue for the LVE substance or its metabolites or degradants).

Due to the scientific complexities associated with assessing PFAS and the lack of data on most PFAS with regards to toxicity and exposure to human health and the environment, EPA expects in most cases to be unable to determine that a PFAS "will not present an unreasonable risk" under the conditions of use within the 30-day review period provided for LVE and LoREX notices. Now, EPA submitters will be required to submit new PFAS as a PMN and be reviewed using EPA's Framework for Addressing New PFAS and New Uses of PFAS (Ref. 8). EPA's Framework for Addressing New PFAS and New Uses of PFAS outlines EPA's planned approach when reviewing new PFAS and new uses of existing PFAS to ensure that, if allowed to enter into commerce, they will not impact human health and the environment. The data EPA will obtain on physical/chemical properties for any new PBT PFAS under this Framework and more extensive toxicity and fate data for PFAS with potential exposures or releases will also support EPA's efforts under the National PFAS Testing Strategy and advance the Agency's understanding of PFAS more broadly.

The Agency's action to limit the scope of the LVE exemption based on the Agency's experience administering TSCA and reviewing LVEs for PFAS is consistent with its authority to create and define the scope of premanufacture notice exemptions. The LVE and LoREX exemptions were first promulgated in accordance with TSCA 5(h)(4) in 1985 and 1995 respectively (50 FR 16477 (April 26, 1985) and 60 FR 16346 (March 29, 1995)) and in 1995 EPA also modified the scope of the LVE exemption by increasing the production volume ceiling. TSCA 5(h)(4) allows the Administrator to exempt the manufacturer of any new chemical substance from all or part of the requirements of TSCA section 5 in certain circumstances. The statute does not, however, specify any circumstances under which the Administrator would be

required to provide an exemption. EPA's action here is a reasonable adjustment of the scope of the premanufacture exemptions based on EPA's experience administering the LVE program and is consistent with its authority under TSCA section 5(h)(4) to create and/or define the scope of exemptions.

***Comment Summary:*** Eleven commenters provided feedback on the specific definition of PFAS in the proposed rule. These commenters either were unsupportive of EPA's definition and requested that the Agency narrow the definition of PFAS or requested that EPA broaden the proposed definition of PFAS to recognize chemicals with a single fully fluorinated carbon. One comment agreed that the definition should exclude single fully fluorinated carbons and said that the definition for PFAS should exclude structures in which the only fully fluorinated carbons are unsaturated.

Commenters noted that "EPA's definition excludes PFAS that are covered by the prevailing definitions employed by many other regulators" and requested that EPA adopt a broader definition that includes all chemicals with a fully fluorinated carbon, such as the OECD PFAS definition. One comment requesting a broader definition did so on the basis that, as they state, "the carbon-fluorine bond is one of the strongest bonds in organic chemistry and even a single fully fluorinated carbon can give rise to persistence." One comment requested that the PFAS definition be expanded to include all subclasses of PFAS compounds that have exhibited toxicity.

One comment raised concerns with the use of a structural PFAS definition for a categorical exclusion stating that "there is no data-driven basis to conclude all members of this category present similar risk profiles." One comment said the proposed PFAS definition was completely contrary to the "science-based" approach specified in TSCA section 26 and another comment supported an approach to defining PFAS that is based on science. Several comments requested that the definition not include fluoropolymers and raised concerns that, by including fluoropolymers, U.S.-based semiconductor and battery manufacturing would be impacted.

Commenters noted that the agency has multiple definitions for PFAS and that it can lead to confusion. Commenters also noted that the proposed PFAS definition differs from the previously constituted "working definition" and that the definition no longer specifies that the R groups in

the structure cannot be hydrogen. One commenter requested that EPA address why the definition was expanded from the PFAS definition used in the proposed PFAS reporting rule under TSCA 8(a)(7).

***Sources:*** 0036, 0048, 0051, 0070, 0071, 0077, 0078, 0079, 0081, 0082, 0084

***Response*:** EPA appreciates that there are differences between the definition of PFAS used for this rule, for other actions in the Agency, and by non-EPA entities. However, TSCA does not specify a PFAS definition, let alone require that EPA use a definition used by other regulatory bodies or international organizations. The Agency nevertheless considered adopting the different definitions suggested by the commenters, but ultimately determined those definitions were not appropriate for this rule. In reaching this decision, EPA considered that OECD also stipulates that there may be different definitions of "PFAS" for different entities or for different purposes, and that it may be appropriate for there to be different definitions or interpretations depending on the specific scenario. The July 2021 OECD document ("Reconciling Terminology of the Universe of Per- and Polyfluoroalkyl Substances: Recommendations and Practical Guidance") (Ref. 11) notes that: “the general definition of PFASs is based on molecular structure alone and serves as a starting and reference point to guide individual users to have a comprehensive understanding of the PFAS universe and to keep the big picture of the PFAS universe in mind. At the same time, individual users may define their own working scope of PFASs for specific activities according to their specific needs by combining the general definition of PFASs with additional considerations (e.g., specific properties, use areas).”

For the purposes of this rule, EPA has defined PFAS to include chemical substances whose structures or sub-structures resemble, at least in part, chemicals widely known to be of concern to human health and/or the environment, i.e., PFOA, PFOS, and GenX. The definition also captures substances that may metabolize or degrade to PFAS which may present similar properties to PFOA, PFOS, or GenX. EPA recognized that the proposed definition of “PFAS” differs from the “working definition” previously been used by the Office of Pollution Prevention and Toxics (OPPT), although this definition has evolved over time. For instance, the polymer exemption for PMNs provided a different definition of “perfluoroalkyl” in its PFAS exception rule in 2010 (40 CFR 723.250; 75 FR 4295). Over many years of research and data collection, EPA continues to learn more about these substances and may consider whether modifications to

the definition are appropriate.

After reviewing public comments, EPA is not modifying the proposed definition of PFAS. The proposed definition is aligned with the recently finalized TSCA section 8(a)(7) rule (88 FR 70516, October 11, 2023) and the Inactive PFAS SNUR (89 FR 1822, January 11, 2024). For the purposes of this rule, EPA is defining "PFAS" using a structural definition. PFAS is defined as a chemical substance that contains at least one of these three structures:

1) R-($CF_2$)-CF(R')R'', where both the $CF_2$ and CF moieties are saturated carbons

2) R-$CF_2OCF_2$-R', where R and R' can either be F, O, or saturated carbons

3) $CF_3C(CF_3)$R'R'', where R' and R" can either be F or saturated carbons.

As described in the final rule on the reporting and recordkeeping requirements for PFAS under TSCA 8(a)(7), this definition is focused on substances likely to be present in the environment, thereby focusing on substances with greater potential for exposures to people and/or the environment and by extension more potential to present risks. Substances which only contain -$CF_3$ or -$CF_2$- groups that are not attached or bonded to other perfluorinated alkyl carbons and have no other fluorine molecules, (i.e., the largest subset of fluorinated substances outside this definition of PFAS), are expected to degrade to trifluoracetic acid, which is a well-studied substance. As noted earlier, however, this action is a procedural action based on our experience administering TSCA and reviewing LVEs for PFAS and not on the substances potential to present risk.

EPA believes that the commenter that supported the proposed definition because a "categorical definition for PFAS should exclude structures in which the only fully fluorinated carbons are unsaturated carbons (including vinyl groups and aromatic rings)" misunderstood the proposed definition. The definition EPA proposed and is now finalizing can include fully fluorinated carbons that are unsaturated, and may include vinyl functional groups and fully fluorinated aromatic rings.

While some commenters stated that fluoropolymers should be excluded from the proposed amendments on the basis that they believe that "fluoropolymers are non-mobile, non-bio-accumulative, non-toxic chemicals," EPA disagrees. As discussed previously in this document, fluoropolymers are made using fluorinated monomers, and often fluorinated

processing aides, which contributes to the emission of PFAS. Even if made without the use of fluorinated monomers or processing aids, there could be exposures to byproducts or degredation products that are PBT chemical substances. Therefore, EPA expects that the challenges to reviewing fluoropolymers in 30 days are the same as for other PFAS.

***Comment Summary:*** Six commenters supported and ten commenters opposed revoking previously granted LVEs for PFAS. Four commenters requested that if EPA does decide to move forward with the revocation of any PFAS LVE, that EPA provide substantial transition time.

Those in support of revoking previously granted LVEs for PFAS asked EPA to promptly revoke all existing PFAS LVEs and stated that EPA has effectively already made the preliminary determination that all PFAS do not meet the legal standard for LVEs, based on recent rulemakings, public statements, and by EPA's proposal to make PFAS categorically ineligible for LVEs in the future. Several comments referenced and expressed support for the 2022 petition submitted by EarthJustice that asked EPA to revoke previously granted PFAS LVEs.

Those who opposed revoking all previously granted PFAS LVEs stated that it was overly broad and counter to TSCA section 26 and that any revocation must be done on a case-by-case basis, based on risk identified for specific PFAS LVEs, and done in accordance with the existing authority under 40 CFR 723.50(h)(2). Furthermore, those in opposition expressed that a category-based revocation of previously granted PFAS LVEs would be devasting, especially for the domestic semiconductor and electric vehicle industry, national defense, or other critical applications. Commenters raised concerns over the lack of alternatives, the cost to transition to new chemistries, and/or the delays that would be experienced as a result of submitting PMNs for these substances and waiting for EPA's review and determination. One comment stated that revoking previously granted LVEs for PFAS undermines the fact that LVE and LoREX submissions are reviewed, approved, and highly restricted by EPA staff while other comments stated that the decisions made on previously granted PFAS LVEs are already protective.

Many commenters asked that if EPA decides to move forward with the revocation of any PFAS LVEs, that the Agency provide industry with enough transition time to allow for the review and any PMNs for these PFAS. Additionally, one comment asked that if EPA does not approve a PMN that EPA accommodate time for downstream processors and users to identify suitable alternatives. If EPA decides to pursue revocation, multiple comments suggested that if

manufacturers act with due diligence and in good faith, then the manufacturer should be able to continue to produce the chemical so long as it timely submits a PMN. Yet, one of the same commenters assert that "PFAS manufacturers both knew and hid the dangers of PFAS from EPA and the public [...] [which] constitutes an absence of due diligence."

One comment suggested that EPA prioritize review of PFAS LVEs of greatest concern and work closely with PFAS submitters to ensure that the obligatory protective measures are in place. Another comment asked what EPA will do to manage existing PFAS LVEs if the agency does not move forward with revocation. As an alternative to the proposal, the suggestion was made that EPA expand the PFAS LVE Stewardship Program in lieu of categorical exclusion/revocation of PFAS LVEs.

***Sources:*** 0041, 0043, 0048, 0049, 0050, 0051, 0052, 0056, 0057, 0058, 0062, 0065, 0070, 0071, 0078, 0080, 0082, 0084, 0085, 0086

***Responses:*** At the time of finalizing this rulemaking, EPA is not planning to revoke all previously granted LVEs for PFAS. While there are well identified hazards for many PFAS, EPA has not determined that PFAS as an entire category of chemical substances do not meet the "will not present unreasonable risk of injury to health or the environment" standard of TSCA section 5(h)(4). As noted earlier, EPA's decision to make future PFAS ineligible for LVEs is not based on hazard or risk but is instead based on our experience administering TSCA and reviewing LVEs for PFAS.

As EPA continues to consider previously granted PFAS LVEs, EPA will take into consideration the concerns raised about the potential impacts to domestic semiconductor and electric vehicle industry, national defense, or other critical applications. The Biden-Harris Administration is committed to restoring U.S. leadership in semiconductor and electric vehicle manufacturing, support good-paying jobs across those supply chains, and advancing U.S. economic and national security. In the meantime, EPA continues to work cooperatively with companies who wish to voluntarily withdraw previously granted LVEs for PFAS. As of April 1, 2024, 56 LVEs have been withdrawn through EPA's PFAS Low Volume Exemption Stewardship Program.

## 4. CODIFYING EPA'S POLICY CONCERNING PBT CHEMICALS AND LVES AND LOREXS

***Comment Summary:*** Seven comments clearly opposed EPA's proposal to make certain PBT chemical substances ineligible for LVE and LoREX exemptions while four commenters expressed support for the proposal. Additional comments questioned whether EPA sufficiently established that PBTs should be ineligible for the exemptions or raised questions about the implementation of the proposed amendment.

Those who opposed the proposal to make PBT chemical substances ineligible for the LVE and LoREX exemptions said that the proposal runs counter to TSCA's risk and science-based framework, is in violation of TSCA section 26(h), and that EPA cannot render an entire class of chemicals ineligible "without any data to support that each of the substances no longer meets the unreasonable risk safety standard." One comment said that PBT chemical substances that "pose negligible exposure threat to human health and the environment and bound to less than 10,000 kg/yr are best managed as LVEs." Other comments provided descriptions of scenarios where they believed PBT chemicals should be eligible for LVE and LoREX exemptions, such as in clean rooms or other controlled manufacturing settings. To assist submitters, one commenter recommended reinstating EPA's PBT profiler tool.

One comment asked that EPA clarify that "any identified PBT chemical is categorically ineligible and codify how it will identify PBT chemicals" and stated that if EPA identifies a chemical as PBT, EPA must "deny the exemption application without further analysis." Another comment said that all PBTs should be ineligible for new chemical notice exemptions, regardless of intended releases and preliminary estimated exposures. Commenters asked that EPA codify in the regulatory text how it will use the PBT policy and how EPA will identify chemicals as a PBT, particularly when assessing toxicity and how EPA assessment of toxicity corresponds to the 1-3 scoring for PBTs. It was requested that EPA also make persistent, mobile, and toxic (PMT) chemicals ineligible for new chemicals exemptions.

***Sources:*** 0048, 0049, 0051, 0054, 0059, 0064, 0068, 0070, 0073, 0075, 0081, 0082, 0083, 0084, 0085, 0086

***Response:*** EPA did not propose to categorically make all PBT chemicals ineligible for LVEs and LoREXs. Rather, EPA proposed and is finalizing amendments to 40 CFR 723.50(d) to codify that whenever EPA identifies a chemical substance under LVE or LoREX review (or any reasonably anticipated metabolites, environmental transformation products, or byproducts of the substance, or any reasonably anticipated impurities in the substance) as PBT with anticipated

environmental releases and potentially unreasonable exposures to humans or environmental organisms, that substance would be ineligible for the LVE or LoREX. In order to effectuate these amendments for individual exemption notices, EPA would first need to review the exemption notice to determine if the substance is a PBT and then review the environmental releases and exposures to humans or environmental organism to determine if releases and exposures are expected. Only after EPA has reviewed the hazards and exposures to determine risk, will EPA make a decision to either grant or deny a PBT chemical substance submitted for an LVE or LoREX exemption.

Based on EPA's experience administering the LVE and LoREX exemptions, EPA expects that most exemptions for PBT chemical substances will not be granted. However, EPA agrees that there are instances where PBTs can be managed under an exemption. EPA may receive an exemption notice for a PBT chemical substance that will not result in worker, general population, or consumer exposure and that is not expected to result in releases to the environment, such as chemical substances used in a closed system to make semiconductors or other electronic components. In such a negligible exposure and environmental release scenario where worker exposure is fully mitigated and general population exposures are not expected, if EPA has sufficient information on the substance and the conditions of use to ensure that such PBT chemical substances can be disposed of properly and no consumer exposure is expected, EPA generally expects to grant the exemption.

EPA appreciates the request to bring back the PBT Profiler tool. The PBT Profiler was an online hazard-screening tool that predicted a chemical's potential to persist in the environment, bio-concentrate in food chains, and be toxic, properties which cause concern for human health and the environment. The PBT Profiler was designed to help interested parties voluntarily screen chemicals for persistence, bioaccumulation, and aquatic toxicity characteristics when no experimental data are available. While many found the PBT Profiler tool to be useful, it had limitations and was not used as a basis for decisions by the New Chemicals Program for identifying a PBT. For this reason, EPA will not bring back the PBT Profiler tool at this time.

Rather than codify in the regulations the detailed process for how EPA will identify chemicals as a PBT, the Agency has decided to reference the November 4, 1999, PBT policy statement (64 FR 60194) (Ref. 12). The 1999 PBT policy statement established EPA's current criteria for identifying PBTs for the New Chemicals Program, which involves using physical-

chemical properties, as well as structural activity alerts, analogue data, and test data to quantify on a scale of 1 to 3 the potential for persistence (P), bioaccumulation (B), and toxicity (T) for a given new chemical substance. If a compound scores a 2 or above for all three characteristics, EPA considers the compound a PBT. EPA emphasized in responses to comments received on the October 1998 draft policy released for public comment that the decision to identify and assess a new chemical substance as a PBT would be based on the available data and would be made on a case-by-case basis.

EPA's New Chemicals Program considers persistence to mean an overall half-life greater than two months or characteristics that indicate a chemical substance is potentially persistent. EPA estimates a substance's persistence based on one or both of the following, as appropriate:

(a) its overall persistence based on experimental data or, in limited cases, fugacity modeling; or

(b) its longest measured or estimated half-life for degradation in the environmental medium (e.g., air, water, soil, sediment) in which it is anticipated to predominantly reside.

A chemical substance is expected to have limited persistence, or P1 in the scoring system mentioned earlier, if (a) and/or (b) are predicted to be two months or less. It is considered persistent (P2) if (a) and/or (b) are greater than two months but less than or equal to six months, or very persistent (P3) if (a) and/or (b) are greater than or equal to six months. This determination may be made using directly measured data on the chemical substance, data for analogue(s), and/or modeling. Chemical substances for which a reliable prediction of persistence cannot be made due to lack of information are classified as having unknown persistence (PU) and are conservatively treated as persistent, meaning they are eligible to be considered PBTs. When determining a chemical substance's bioaccumulation potential, EPA may take into consideration several types of information, including measured or modeled bioconcentration factors (BCFs) or bioaccumulation factors (BAFs) in aquatic and other species, monitoring data, and other characteristics relevant to bioaccumulation. When the determination is based on measured or modeled BCF or BAF values, the chemical substance is considered to have low potential to bioaccumulate (B1) if the highest reliable value is less than 1,000 (typically expressed in L/kg wet weight); to be bioaccumulative (B2) if the highest value is greater than or equal to 1,000 but less than 5,000; and to be very bioaccumulative (B3) if the highest value is

greater than or equal to 5,000.

Determinations of bioaccumulation potential may also be made based on empirical observations of accumulation in human tissues or in foods typically consumed by humans (e.g., fish). When they are available, such data take precedence over measured or modeled BCFs and BAFs. As in the case of persistence, when insufficient information is available, chemical substances are considered to have unknown potential to bioaccumulate (BU) and are conservatively treated as bioaccumulative, meaning they are eligible to be considered PBTs. Most chemical substances associated with bioaccumulation concerns are hydrophobic and partition to organism lipids, causing them to be enriched within organisms and food chains. However, some types of chemical substances, including certain metals and organometallics, nanomaterials, and perfluoroalkyl and polyfluoroalkyl substances (PFAS), are known or predicted to bioaccumulate by other mechanisms. BCFs and BAFs are not meaningful metrics for these substances, so the numeric cutoffs described earlier are not applicable. Instead, such substances are categorized either B*low, indicating the lipophilic partitioning mechanism is not applicable and there is low concern they will bioaccumulate by other means, or B*high, indicating there is high concern they will bioaccumulate by other means. Chemical substances rated B*low are not considered PBTs, but those rated B*high may be, depending on their persistence and toxicity ratings.

As described in EPA's 2018 Points to Consider document (Ref. 3), EPA determines whether the new chemical substance meets the T criterion for aquatic organisms based on the chronic hazard concern level. Table 1 shows the chronic endpoints (mg/L) used to generate the ecotoxicity rating and Hazard Concern Level for new chemical substances. The T score is not designated for acute toxicity (i.e., short-term aquatic organism exposure), as these types of toxicity and exposure routes are not typically associated with persistent and bioaccumulative chemicals. Furthermore, algae are not considered when assessing the T component within the overall PBT score due to the typical short-life span of green algae (e.g., *Raphidocelis subcapitata*) as well as its inherent 3- to 4-day study exposure.

**Table 1. TSCA New Chemical Environmental Hazard Chronic Concern Levels**

| Hazard Concern Level | Ecotox Rating | Chronic Endpoints |
|---|---|---|
| Low | 1 | > 10 mg/L |

| | | |
|---|---|---|
| Moderate | 2 | 0.1-10 mg/L |
| High | 3 | < 0.1 mg/L |

In order to establish the T scores, chronic toxicity endpoints are determined for the parent chemical and any degradation products that receive a ≥P2B2 (or U/* High). The chronic hazard concern level and the source of the information will be used to determine individual T scores. Professional judgment using all available evidence (e.g., P and B score; chronic data points in the ECOSAR chemical class-specific training set; production volume of the new chemical; acute test data with sub-lethal adverse effects) are considered before providing a T score based on modeled data when there is no acceptable chronic experimental test data.

The T score for human health toxicity is based on developmental/reproductive and/or chronic hazards to the general population and it is not designated for acute toxicity. The human health score is typically based on qualitative considerations such as hazard endpoints. Human health toxicity is not typically used for hazards identified by the dermal or inhalation routes of exposure, as these types of toxicity and exposure routes are not typically associated with persistent and bioaccumulative chemicals.

While EPA is not codifying that persistent, mobile, and toxic (PMT) chemicals would be ineligible for new chemicals exemptions, EPA expects that PMT chemical substances would generally not meet the exemption criteria in 40 CFR 723.50.

## 5. OTHER COMMENTS RELATED TO LVE AND LOREX REGULATIONS AND REVIEW PROCESS

***Comment Summary:*** EPA received several additional comments suggesting further amendments to the LVE and LoREX regulations. One commenter asked that EPA consider proposing a 45-day review period instead of excluding entire categories of chemicals from consideration while another comment asked EPA to consider excluding other "potential high-risk chemical categories from eligibility". One comment specifically asked EPA to mandate that chemicals with potential biological activity relevant to breast cancer, or for which relevant tests have not been conducted, should be ineligible for exemptions.

One comment asked EPA to consider the creation of an additional, lower LVE manufacturing tier for the regulation of the manufacture of very low volumes of chemicals,

suggesting a limit of 1,000 or 2,000 kg per year. One commenter, who is a submitter, shared their framework for reviewing LVEs prior to submitting to EPA and invited EPA to underscore the frameworks utility, stating that the framework "process can be useful for businesses that frequently submit LVEs for low volume specialty materials."

***Sources:*** 0051, 0054, 0062, 0083, 0084, 0085

***Response:*** EPA appreciates the suggestion to extend the review period for LVEs and LoREXs to 45-days and may consider doing so in the future. While LVES and LoREXs have a much shorter review period than PMNs, EPA conducts a similar risk assessment which takes a considerable amount of time and it can be difficult to complete in 30 days. Increasing the review period may provide a more realistic timeline for the review of LVEs and LoREXs but EPA will not be amending the length of the review period at this time. Increasing the length of the review period would reduce one of the major benefits of these exemptions, which is to allow companies to more quickly introduce new chemical substances into commerce. As noted previously, however, EPA does believe it is warranted to exclude PFAS as a category of chemicals from these exemptions. In the future, EPA may consider excluding other additional categories of chemicals, but does not intend to do so at this time. Regarding chemicals with biological activity relevant to breast cancer, if EPA finds that a chemical substance, under the anticipated conditions of use, may cause serious chronic (including carcinogenic and teratogenic) effects, the regulations already state that such a chemical substance cannot be manufactured under the exemption. EPA, however, is not requiring that all exemption notices include specific test data. Rather, EPA continues to require that exemption notices contain all information known to or reasonably ascertainable by the submitter (consistent with the requirements applicable to PMNs) and meet the other eligibility criteria under the regulations.

The original 1985 low volume exemption regulations were for persons who manufacture certain chemical substances in quantities of 1,000 kg or less per year (50 FR 16477, April 26, 1985). The Agency set the annual production volume at 1,000 kg because, at the time, EPA determined that the Agency could not exempt a previously proposed 10,000 kg category of chemical substances without requiring certain procedural safeguards designed to ensure low risk, such as requiring manufacturers to obtain a qualified expert review of their exemption application prior to submission. EPA decided it could not adequately impose those safeguards given its level of experience in 1985 and still make the section 5(h)(4) findings that activities

associated with the exempted chemical substance would not present an unreasonable risk. However, after implementing the low volume exemption and gaining further expertise in chemical risk assessments, EPA enhanced its technical assessment capabilities considerably and believed that the production volume ceiling for the low volume exemption could be raised to 10,000 kilograms or less per year. In 1995, EPA increased the volume limit to 10,000 kilograms or less a year (60 FR 16336, March 29, 1995). While EPA increased the production volume ceiling from 1,000 kg to 10,000 kg, submitters wishing their exemptions to be reviewed based upon annual production volumes lower than 10,000 kilograms may so indicate in their exemption notice by specifying the lesser production volume and marking the binding box adjacent to the production volume space on the form—doing so will lead EPA to assess the chemical substance at the lower production volume. Because submitters are able to bind themselves to a lower production volume, EPA does not feel it is necessary to develop a separate exemption for chemicals produced at a lower volume.

Lastly, EPA appreciates the commenter that submitted the framework they use to determine if a chemical substance should be submitted as an exemption. While EPA is not endorsing this particular framework, EPA recognizes the effort that went into their framework and that other submitters may consider similar lines of thinking when submitting LVE and LoREX exemptions. As clearly stated in the regulations for the exemptions, chemical substances cannot be manufactured under these exemptions if EPA determines that the substance may cause serious acute, serious chronic, or significant environmental effects. If, based on a submitter's own analysis, the submitter believes that a substance may cause serious acute, serious chronic, or significant environmental effects, it may be advisable to submit the substance under a PMN.

## E. Amendments Related to Suspensions of the Review Period

***Comment Summary:*** Four commenters support EPA's proposal to increase the number of days permissible for suspensions based on requests submitted outside of CDX from 15 to 30 days. Four other commenters disagree with EPA's proposal and suggest it will result in less frequent communication from EPA. The commenters also explain that requesting a suspension of the review period is often one of the few opportunities for submitters to receive updates on the status of a review.

***Sources:*** 0046, 0059, 0060, 0064, 0070, 0075, 0077, 0080

***Response:*** EPA respectfully disagrees that increasing the number of days permissible for suspension requests submitted orally or in writing (including by email) outside of CDX will result in less frequent communication from the Agency. An EPA program manager is assigned to each submission early within the review process and is the submitter's main point of contact for the submission. Submitters can reach out to the program manager at any time they like to receive updates regarding the status of a review. Furthermore, the proposal would allow *up to* 30-day suspension requests to be made through oral or email communication; however, submitters would still be allowed to suspend the review period for a shorter amount of time if preferred. Accordingly, after consideration of comments both supporting and opposing the proposal, EPA is finalizing this amendment as proposed.

***Comment Summary:*** Several comments request that EPA clarify submitters are not required to request a suspension of the review period. Furthermore, the commenters explain there should be a distinction between instances where submitters request voluntary suspensions on their own accord due to the submitter's need for additional time and instances where EPA solicits these suspensions due to EPA's need for additional time. The commenters suggest that EPA institute policies that limit its solicitation of review period suspensions to ensure that the requests are both in name and in practice "voluntary" and in compliance with TSCA.
***Sources:*** 0070, 0078, 0086
***Response:*** EPA acknowledges that submitters are not required to request a suspension of the review period and that requests to do so are voluntary. EPA also recognizes that suspensions can result in review periods greatly exceeding 30- or 90-days. The new chemicals program is actively streamlining and improving its review processes to be able to complete new chemical reviews in a timelier manner. This final rule includes amendments that will increase the quality of information initially submitted in new chemicals notices and improve the Agency's processes for timely, effective completion of individual risk assessments and the new chemicals review process overall, which should reduce the need for suspension requests.

***Comment Summary:*** One commenter recommends that EPA develop clear criteria for "good cause" justifying an extension of the review period under 40 CFR 720.75(c)(4).
***Sources:*** 0073

***Response:*** Consistent with the existing regulation, EPA's proposed amendments to 40 CFR 720.75(c)(4) would continue to outline instances in which the Agency believes that good cause exists for extending the review period. The proposed and final amendments would make minor revisions to align parts of this text with other amendments related to the consequences for failure to remedy errors in a notice, and for submission during the review period of information that was known to or reasonably ascertainable by the submitter at the time of the original notice submission. Under those scenarios, EPA would no longer need extensions of the review period, because the review period would not begin until EPA receives a corrected or completed notice. The list in 40 CFR 720.75(c)(4), however, is not exhaustive and there may be other circumstances in which there is good cause for an extension. However, the Agency does not believe that additional clarity is needed, as the examples described capture most instances in which EPA would extend the review period. The Agency also notes that EPA has only unilaterally extended the review period a select number of times. Accordingly, in the final rule, EPA is amending 40 CFR 720.75(c)(4) as proposed.

***Comment Summary:*** Four commenters suggest EPA permit submitters to request information regarding where their section 5 notice stands in the "queue" of notices. These commenters further explain it would allow submitters to better understand the expected timing for EPA to complete their review. Three additional commenters add that EPA should make improvements to the CDX portal to provide status updates on reviews or explore other IT solutions.
***Sources:*** 0050, 0059, 0064, 0070, 0074, 0075, 0081
***Response:*** EPA suggests submitters reach out to the program manager assigned to their review for status updates. The program manager can provide detailed information to submitters on where their case is within the review process. Submitters are also able to look up the status of their notice on the New Chemicals Statistics Webpage. However, EPA does agree that improvements can be made to increase transparency and provide estimated review timeframes to submitters and is currently exploring different IT solutions to do so.

## F. Economic Analysis

### 1. BURDEN ESTIMATES

***Comment Summary:*** Commenters expressed concern that EPA's burden estimates were understated, and that the impact on PFAS chemical producing firms—whose new PFAS would no longer be eligible for LVE or LoREX, and would thus need to be submitted as PMNs—is underestimated. Commenters also expressed concern that EPA's burden estimates were understated due to the possibility that the burden of reviewing a PMN for a PFAS chemical may be greater than that of a non-PFAS chemical. Lastly, EPA received a comment stating that the Economic Analysis did not take into account the impact of revoking existing LVEs.

***Sources:*** 0048, 0051, 0052, 0065, 0078, 0083, 0086

***Response:*** EPA estimated the marginal burden on PFAS submitters whose new PFAS would no longer be eligible for LVE or LoREX exemptions, and who would therefore be required to submit a PMN, by referencing *TSCA Section 5 Premanufacture Review of New Chemical Substances and Significant New Use Rules for New and Existing Chemical Substances* (ICR No.: 1188.13, Docket ID No.: EPA-HQ-OPPT-2021-0660)(Ref. 13), and comparing the relative burdens of submitting a PMN versus a LVE or LoREX. Due to the unique nature of PFAS chemicals, EPA understands that the burden of preparing and submitting a PMN may be greater for a PFAS chemical relative to non-PFAS chemical. The Agency, however, has no basis for concluding that the reporting burden for *all* PMN submissions for PFAS will be greater than for any non-PFAS, as reporting burden differs for each and every chemical substance.

EPA reviewed its *Framework for TSCA New Chemicals Review of PFAS Premanufacture Notices (PMNs) and Significant New Use Notices (SNUNs)*(Ref. 8), released in June 2023 (after the publication of the proposed rule), and concludes that an alternative burden estimate for reviewing a PFAS PMN is not necessary. While the procedures and testing requirements outlined in the PFAS framework constitute "a rigorous review […] process," this level of rigorous review could be applied to any PMN. Any chemical, PFAS or non-PFAS, can be subject to additional review dependent on a number of variables (e.g., exposure scenarios, conditions of use, etc). As such, EPA finds that the average expected burden for reviewing a PMN accurately covers PMN review of PFAS chemicals.

EPA disagrees that the Agency will spend significantly more time reviewing notices for PFAS as a result of making PFAS ineligible for LVE and LoREX exemptions. As previously noted, EPA has denied each LVE notice received since 2021, requiring the chemical substance to be resubmitted as a PMN if the submitter wishes to manufacture or import the chemical

substance. Thus, making PFAS ineligible for the LVE and LoREX exemptions may in fact reduce burden in many instances by avoiding the submission and review of LVEs that are ultimately denied and required to be resubmitted and reviewed anew through the PMN review process. Furthermore, the New Chemicals Program developed the PFAS Framework to help ensure that the Program effectively and efficiently reviews and makes appropriate decisions on new PFAS or significant new uses of existing PFAS reviewed through PMNs and SNUNs. The PFAS Framework will guide EPA's review of PFAS under TSCA Section 5, ensuring consistency and efficiency in its review of incoming submissions while advancing the Agency's goals to ensure protection of public health and the environment.

Lastly, the commenters are correct that the EPA did not calculate the impact associated with revoking previously granted LVEs for PFAS. As stated earlier, at the time of finalizing this rulemaking, EPA is not revoking previously granted LVEs for PFAS.

**2. AMENDMENTS/UPFRONT DATA SUBMISSION**

***Comment Summary:*** EPA received comments that argued that the provision of this rulemaking requiring submitters to provide the complete set of information required by section 5 submissions upfront would constitute an additional burden, in that firms would be required to submit additional information.

***Sources:*** 0051, 0065, 0067, 0078, 0080, 0086

***Response:*** The information requirements addressed in this rulemaking are neither new nor additional; rather, they are intended to clarify broader existing information requirements and to specify the level of detail EPA needs to perform refined risk assessments. EPA currently requests that all firms provide all of the information in question when preparing a section 5 submission. EPA also states that, if a given set of information is not provided at the time of submission, EPA will proceed with reviewing the submission using what are likely more conservative assumptions about the chemical properties. It is only after firms ascertain the impact of these more conservative assumptions that they choose to gather and submit the data they failed to provide initially and amend the submission. This scenario comprises a significant portion of TSCA section 5 amendments. The rulemaking is not requesting new input requirements from submitters; rather, it intends to encourage submitters to provide more information upfront, better inform them of what results when information is not submitted, and ultimately avoid the scenario

described.

***Comment Summary:*** One commenter, an environmental advocacy organization, noted that, according to EPA's estimates for this rulemaking, a significant number of new chemical applications would still need to be amended after their initial submission, and that the resulting reduction in amendments is not significant enough.

***Sources:*** 0084

***Response:*** EPA deliberately chose more conservative assumptions in creating its amendment reduction estimates to minimize the risk of overstating the positive impact – the reduction in amendments for TSCA section 5 submissions – of this rulemaking. In reality, the reduction in amended submissions (and related time savings) may be greater than what is estimated in the economic analysis.

### 3. SMALL BUSINESS IMPACTS

***Comment Summary:*** One commenter, an office of a federal government agency, argued that EPA's definition of small entities was too broad, and that the revenue distributions and cost-to-revenue ratios estimated according to such definitions were not meaningful.

***Source:*** 0067

***Response:*** EPA appreciates this approach to industry definition and its respective revenue distribution. However, EPA notes that the sample size of this "narrower group of firms," that is, small entities producing new PFAS that would no longer be eligible for LVE or LoREX exemptions, is quite small. EPA estimated that only 4 small firms would fit this category; a sample size this small may not be statistically meaningful for estimating a revenue distribution, so EPA will move forward with its initial industry definition.

***Comment Summary:*** One commenter, an office of a federal government agency, noted that the RFA certification of this rulemaking did not accurately assess the impact on small entities.

***Source:*** 0067

***Response:*** EPA estimated the marginal burden to small entity PFAS submitters – the small entities expected to incur additional burden as a result of this rulemaking – whose new PFAS would no longer be eligible for LVE or LoREX exemptions and who would therefore be required

to submit a PMN (the largest burden of this proposed rulemaking), by referencing *TSCA Section 5 Premanufacture Review of New Chemical Substances and Significant New Use Rules for New and Existing Chemical Substances* (ICR No.: 1188.13, Docket ID No.: EPA-HQ-OPPT-2021-0660), and comparing the relative burdens of submitting a PMN versus a LVE or LoREX. Due to the unique nature of PFAS chemicals, EPA understands that the burden to small entities of preparing and submitting a PMN may be greater for PFAS chemicals relative to non-PFAS chemicals. The Agency, however, has no basis for concluding that the reporting burden for *all* PMN submissions by small entities for PFAS will be greater than for any non-PFAS, as reporting burden differs for each and every chemical substance.

***Comment Summary:*** One commenter, an office of a federal government agency, argued that providing the full set of information required for a section 5 submission upfront would present an additional compliance burden for small entities.
***Source:*** 0067
***Response:*** EPA disagrees that the proposed amendments to notice information requirements and corresponding changes to the electronic reporting form would present an additional compliance burden for submitters, including small entities. As explained in greater detail in Unit III.B. of the proposed rule preamble, EPA's amendments to the regulations and updates to the CDX user interface are intended to clarify the level of detail that EPA needs to perform refined risk assessments, in an effort to help submitters provide all relevant information in their initial notice submissions and reduce inefficiencies and delays in the review process associated with late submissions of information. Consistent with the information submission requirements of TSCA section 5(d), EPA already requests that all firms – small and non-small – provide the information in question when preparing a section 5 submission, insofar as it is known to or reasonably ascertainable by the submitter, and this rulemaking would not change that standard. In the proposed rule, EPA also states that when a submission is lacking detail, EPA typically uses conservative assumptions and default values to ensure the assessment is protective of human health and the environment. It is often only after firms ascertain the impact of these more conservative assumptions that they choose to gather and submit data they did not provide initially and amend the submission. This rulemaking is not requesting new input requirements from submitters; rather, it intends to encourage submitters to provide more complete information

upfront by more clearly explaining what information is requested, better inform submitters of what may result when information is not submitted, and ultimately avoid the scenario described.

***Comment Summary:*** One commenter, an office of a federal government agency, noted that the estimates in a table were understated by a factor of three.
***Source:*** 0067
***Response:*** EPA clarifies that the "Expected Number of Submissions" column in 5-2 of the Economic Analysis (Ref. 14), refers to total number of TSCA section 5 submissions by small and non-small entities. The subsequent "Number of Affected Firms" column refers to submissions by small businesses. EPA estimates that approximately 35 percent of TSCA section 5 submissions are from small businesses – which is shown in footnote 1 of table 5-2. This corresponds to 4 small firms affected, or 1 submission per firm.

## G. Other

### 1. COMMENT PERIOD EXTENSION

***Comment Summary:*** Two commenters requested that EPA extend the comment period, which was set to close on July 25, 2023.
***Sources:*** 0037, 0040
***Response:*** On July 19, 2023, EPA granted the request and published in the Federal Register (88 FR 46125) an extension of the comment period. The comment period was extended for an additional 14 days and closed on August 8, 2023.

### 2. ADDITIONAL OUT OF SCOPE COMMENTS

***Comment Summary:*** EPA received several unsolicited comments addressing issues that were not within the scope of the proposed rule. The out-of-scope comments related to how EPA defines and assesses conditions of use, fees related to TSCA section 5, the need to hire additional EPA staff, the training of Agency staff and the regulated community, furthering the use and requirement of NAMs, codifying the pre-notice consultation process, how New Chemicals risk assessments are conducted, codifying the requirements of TSCA section 26, developing further

sector-specific approaches for the review and management of chemicals, the restarting and implementation of the Sustainable Futures program, additional suggestions for ways to increase transparency, suggestions of ways to increase protection of and better hazard communication for workers, and other comments on the New Chemicals Program that were not within the scope of the proposed rule.

***Sources:*** 0039, 0043, 0033, 0036, 0055, 0057, 0059, 0060, 0063, 0064, 0066, 0069, 0070, 0071, 0073, 0074, 0075, 0077, 0078, 0079, 0081, 0082, 0083, 0084, 0085, 0086, 0087

***Response:*** The comments summarized here are outside the scope of this rulemaking. While EPA appreciates the additional information provided by stakeholders, the Agency notes that this rulemaking is limited to discrete amendments to the new chemicals procedural regulations described in the Notice of Proposed Rulemaking. EPA did not propose or solicit public comment on any new regulations or regulatory amendments addressing, for example, how the Agency conducts risk assessment and risk management in the New Chemicals Program, TSCA fees, training, NAMs, consultation processes, expanding public access to information in the New Chemicals Program, or the Sustainable Futures program.

For the comments related to the fees or refunds, EPA did not propose amendments to any TSCA fees. Please see the recently finalized rule, Fees for the Administration of the Toxic Substances Control Act (TSCA), for the Agency's most recent updates to the fees for new chemical submissions under TSCA section 5 (89 FR 12961, February 21, 2024). With regard to the comments relating to hiring and training, EPA has made great efforts over the past year to hire needed staff across all disciplines. The new staff, once trained, will improve the rate at which the Agency is able to carefully review and make determination on the new chemicals notices EPA receives. Additionally, EPA plans to continue recent efforts to train not only EPA staff but the public on how it conducts risk assessments and risk management under section 5 of TSCA.

Several comments were received related to NAMs for alternatives to vertebrate testing, some of which have been addressed in earlier responses, but were not related to regulatory amendments proposed as part of this rulemaking. EPA remains committed to reducing and replacing, to the extent practicable and scientifically justified, the use of vertebrate animals in the testing of chemical substances or mixtures. With regard to pre-notice consultations, EPA received comment asking that the Agency include procedures in the regulations for pre-

submission meetings to clarify how submitters submit a request for a pre-submission meeting and what EPA is obligated to do as part of pre-notice consultation. EPA did not propose amendments to add pre-notice consultation procedures to the regulations. That said, companies are encouraged to contact EPA's new chemicals program to set up a pre-submission meeting before submitting their PMN. The pre-submission meeting is an opportunity to discuss the new chemical submission and to understand the Agency's approach to screening new chemicals for potential risks. Submitters can request a pre-notice meeting using the online Pre-Submission Meeting form located on EPA's website: https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/forms/program-contacts-and.

While EPA did not propose regulatory amendments to codify how the Agency conducts risk assessments in the new chemicals program, EPA appreciates the feedback and suggestions provided. EPA is committed to continuing to improve its risk assessments and ensure that they align with the best available science. Several comments asked that EPA incorporate TSCA section 26 science standards into the new chemicals regulations and pointed out that an existing chemicals rule codified these statutory requirements. While EPA did not propose to codify TSCA section 26 into these procedural regulations for new chemicals submissions, EPA has and continues to implement TSCA section 26 science standards in accordance with the statute.

EPA appreciates the request to develop additional sector-specific approaches for the review and management of chemical substances but did not propose such changes as part of this rulemaking process. Recent sector or chemical specific approaches have been developed by the New Chemicals program but have been done outside of rulemaking. As appropriate and as resources allow, the Agency may develop additional sector-specific or chemical specific approaches to help streamline the review process.

Several commenters recommended that EPA do more in this rulemaking to improve public access to information in the New Chemicals Program, including by codifying procedures to ensure timely public access to section 5 notices, documents EPA generates during its review of notices, and decisions that come out of those reviews. Many of these recommendations are beyond the scope of this rulemaking, which is focused on aligning the regulations with amended TSCA, improving the efficiency of EPA's review processes, and updating the regulations based on existing Agency policies and experience implementing the New Chemicals Program. EPA did not propose or solicit public comment on public access to information in the New Chemicals

Program, other than two discrete proposals to (1) clarify in 40 CFR 720.70(a) that the TSCA section 5(d)(2) notice of receipt will be published in the Federal Register after EPA receives a "complete" notice, and (2) remove a non-statutory requirement in 40 CFR 720.70(b)(3) to publish a list of test data in the section 5(d)(2) notice of receipt, which are addressed elsewhere in this document. Therefore, EPA is not establishing regulations governing public access to information as the commenters have proposed. EPA acknowledges the desire for improved public access to information in the New Chemicals Program and aims to continue making improvements in that regard.

One commenter expressed dissatisfaction with EPA's current efforts to provide public access to information in the New Chemicals Program, deeming such efforts inadequate for providing timely or meaningful information about chemical substances to workers and their unions. The comment instead recommended that EPA codify regulations requiring section 5 notice submitters to take certain steps to notify and make information available to workers and their unions. This recommendation is beyond the scope of this rulemaking, which is focused on aligning the regulations with amended TSCA, improving the efficiency of EPA's review processes, and updating the regulations based on existing Agency policies and experience implementing the New Chemicals Program. Other than discrete proposals to change 40 CFR 720.70(a) and 720.70(b)(3), which are addressed elsewhere in this document, EPA did not propose or solicit public comment on access to information in the New Chemicals Program for the general public or for workers and their unions. Therefore, EPA is not establishing regulations requiring submitters to notify and make information available to workers and their unions as the commenters have proposed. EPA acknowledges the desire for improved access to information for workers, unions, and others uniquely impacted by the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance that is the subject of a section 5 notice and welcomes conversations on how to better provide information to these stakeholders.

## References

The following is a listing of the documents that are specifically referenced in this document. The docket includes these documents and other information considered by EPA, including documents that are referenced within the documents that are included in the docket, even if the referenced document is not physically located in the docket.

1. EPA. Premanufacture Notification; Premanufacture Notice Requirements and Review Procedures; Final Rule. *Federal Register*. 48 FR 21722; May 13, 1983 (TSH-FRL 2998-5).
2. EPA. Supporting Statement for an Information Collection Request (ICR) Under the Paperwork Reduction Act (PRA); Updates to New Chemicals Regulations under the Toxic Substances Control Act; Final Rule (RIN 2070-AK65); EPA ICR No. 2749.01; OMB Control No. 2070-[NEW]. December 2024.
3. EPA. Points to Consider When Preparing TSCA New Chemical Notification. OMB Control No.: 2070-0012. June 2018. Accessible at: https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/points-consider-when-preparing-tsca
4. EPA. New Chemicals Program's Chemical Categories Document. Accessible at: https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/new-chemicals-program-under-tsca
5. EPA. Chemistry Assistance Manual for Premanufacture Notification Submitters. Accessible at: https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/chemistry-assistance-manual
6. EPA. TSCA New Chemical Engineering Initiative to Increase Transparency and Reduce Rework. Accessible at: https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/tsca-new-chemical-engineering
7. EPA. Confidential Business Information Claims under the Toxic Substances Control Act (TSCA); Final Rule (RIN 2070-AK68), Response to Comments Document, pgs. 33-35. Docket ID: EPA-HQ-OPPT-2021-0419-0059.
8. EPA. Framework for TSCA New Chemicals Review of PFAS Premanufacture Notices (PMNs) and Significant New Use Notices (SNUNs). June 2023. Accessible at:

https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/framework-addressing-new-pfas-and

9. Executive Office of the President of the United States. Per- and Polyfluoroalkyl Substances Report. March 2023.
10. Lohmann, Rainer, et al. Are fluoropolymers really of low concern for human and environmental health and separate from other PFAS? Environmental science & technology 54.20 (2020): 12820-12828.
11. OECD. Reconciling Terminology of the Universe of Per- and Polyfluoroalkyl Substances: Recommendations and Practical Guidance. July 9, 2021. Accessed at: https://one.oecd.org/document/ENV/CBC/MONO(2021)25/En/pdf.
12. EPA. Policy Statement on Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances. *Federal Register*. (64 FR 60194, November 4, 1999) (FRL-6097-7)
13. EPA. TSCA Section 5 Premanufacture Review of New Chemical Substances and Significant New Use Rules for New and Existing Chemical Substances (ICR No.: 1188.13, Docket ID No.: EPA-HQ-OPPT-2021-0660)
14. EPA. Economic Analysis for Proposed Updates to New Chemicals Regulations under the Toxic Substances Control Act (TSCA). May 2023.

August 8, 2023

***<u>Submitted via Regulations.gov</u>***
Dr. Michal Freedhoff
Assistant Administrator
Office of Chemical Safety and Pollution Prevention
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

**Re: Updates to New Chemicals Regulations Under the Toxic Substances Control Act (TSCA), 88 Fed. Reg. 34,100 (May 26, 2023); Docket No. EPA–HQ–OPPT–2022-0902**

Dear Assistant Administrator Freedhoff:

The undersigned organizations submit these comments on the Environmental Protection Agency's ("EPA's" or the "Agency's") proposed "Updates to New Chemicals Regulations Under the Toxic Substances Control Act" ("TSCA") (the "Proposed Rule").[1]

EPA's Proposed Rule sets out to "align" the regulations for reviewing and regulating the manufacture of new chemical substances with the sweeping changes enacted in the 2016 TSCA Amendments.[2] The new chemicals program requires significant changes to align it with the text and purposes of the amended TSCA. However, with the exception of proposed changes relating to per- and polyfluoroalkyl substances ("PFAS") and persistent, bioaccumulative, and toxic ("PBT") chemicals, EPA just tinkers around the edges. Thus, the Proposed Rule does not bring EPA's regulations into alignment with the statute, and represents a significant missed opportunity.

The 2016 Amendments mandated a sea change in EPA's approach to reviewing new chemicals. Prior to the 2016 Amendments, the vast majority of new chemicals entered commerce without EPA fully reviewing the risks they posed. Thus, the TSCA new chemicals program allowed dangerous new chemicals onto the market and into our air, water, homes, and workplaces.

The 2016 Amendments sought to put a stop to this and achieve one of TSCA's core purposes: that the public not be used as a "testing ground" for dangerous new chemicals.[3] First, Congress mandated that before a new chemical is manufactured, EPA must review the chemical's potential risk, reach a risk determination, and regulate any chemical that EPA could not affirmatively conclude does not present unreasonable risk. Crucially, Congress mandated that

---

[1] *See* Updates to New Chemicals Regulations Under the Toxic Substances Control Act (TSCA), 88 Fed. Reg. 34,100, 34,100 (proposed May 26, 2023) (to be codified at 40 C.F.R. pts. 720, 721, 723, 725).
[2] *Id.*
[3] S. Rep. No. 94-698, at 3 (1976).

EPA protect those groups of people who are likely most at risk from the chemical substance: potentially exposed or susceptible subpopulations.

But in the nearly seven years since TSCA was amended, EPA continues to allow dangerous new chemicals onto the market.

- EPA continues to regularly approve the manufacture of toxic new PFAS, despite the overwhelming evidence that such chemicals present unreasonable risk.
- EPA recently was caught approving dozens of new plastic-waste-derived fuels. EPA found that many of these chemicals posed unreasonable risks, including extreme cancer risks to fenceline communities—including members of Cherokee Concerned Citizens—and workers. Rather than prohibiting (or even significantly restricting) the manufacture and processing of these plastic-waste fuels, EPA dismissed its own risk findings and then negotiated wholly inadequate protections with the manufacturer, Chevron.
- EPA approves hundreds of new chemicals every year under exemptions to the PMN review process, even though these exemptions were created before the 2016 Amendments and are untethered from the revised statutory mandates.

Substantively, EPA is not fulfilling its obligations to protect the public and the environment from toxic new chemicals.

These substantive problems stem directly from EPA's unlawful processes. EPA negotiates with chemical companies in secret the terms of regulatory measures applicable to new chemicals and often imposes only those measures the chemical companies consent to. EPA refuses to let the public participate in these back-room negotiations, and hides information about the new chemicals and EPA's decision making that TSCA mandates EPA disclose.

Such significant problems require significant regulatory changes. Yet, EPA does not attempt to make the necessary changes in this rule. Nevertheless, we offer comments on the following aspects of EPA's Proposed Rule.

1. We support EPA's proposal to restrict PFAS and other PBT chemicals from eligibility under the low volume exemption ("LVE") and low releases and exposure exemption ("LoREX"). The terms of these exemptions are plainly insufficient to protect against the risk posed by such toxic chemicals. Accordingly, EPA has a mandatory obligation to make such chemicals ineligible for approval under the exemptions and, instead, require they be assessed through the pre-manufacture notice ("PMN") program. Additionally, EPA must revoke all previously granted PFAS LVEs as quickly as possible.

2. We support EPA's proposals to require a risk determination before any new chemical can be manufactured, as required by TSCA.

3. We object to EPA's proposed codification of its authority to modify section 5 orders, because it does not codify the Agency's authority to strengthen the protections in an order after it has been issued.

4. We support EPA's proposals to define the term "potentially exposed or susceptible subpopulations" and to set minimum information submission requirements, and we offer suggestions to further improve those proposals.

5. We offer suggestions on how EPA can address the impact of re-work in calculating the applicable review period for PMNs.

6. We oppose many of the proposals regarding the release of information to the public, which do little to remedy the lack of transparency in the new chemicals review process.

## I. EPA MUST STOP ALLOWING THE MANUFACUTER OF PFAS AND OTHER PBT CHEMICALS UNDER EXEMPTIONS TO THE PMN REVIEW PROCESS.

We generally support limiting the use of exemptions, which circumvent the PMN review process. Industry has said that they view PMN exemptions as the "attractive option for [getting] high-toxicity substances," approved for manufacture.[4] Communities and the environment are harmed by EPA's failure to close exemption loopholes.

Section 5(h)(4) sets a high statutory bar for exempting a chemical from PMN review, one that PFAS and PBT chemicals cannot meet. Making obviously toxic chemicals—like PFAS and other PBT chemicals—ineligible under the LVE and LoREX is an obvious and necessary first step in reforming the new chemicals review program under section 5.

We offer the following comments on EPA's proposals regarding PFAS and PBT chemicals:

1. We strongly support making PFAS categorically ineligible for LVE and LoREX exemptions.

2. EPA must expeditiously revoke all previously granted PFAS LVEs, particularly in light of its conclusion that PFAS are categorically ineligible for this exemption.

3. EPA's current definition of PFAS is unduly narrow; consistent with the best available science, EPA must use a definition for PFAS that includes all chemicals with a fully fluorinated carbon, the chemical structure that confers persistence on all PFAS.

---

[4] Keller & Heckman LLP, *The Constantly Pending PMN: Low Volume Exemption Applications Are Living Documents*, Martindale (Mar. 11, 2011), https://www.martindale.com/chemicals/article_Keller-Heckman-LLP_1255440.htm.

4. We also strongly support making all PBT chemicals ineligible for LVEs and LoREXs. EPA must clarify that any identified PBT chemical is categorically ineligible and codify how it will identify PBT chemicals.

5. EPA must act as quickly as possible to put an end to allowing PFAS and other PBT chemicals to enter the environment and communities through the LVE and LoREX exemptions. EPA knows that the terms of these exemptions do not protect people or the environment. The Agency cannot wait until 2025 to act.

### A. EPA Must Make All PFAS Categorically Ineligible for the LVE and LoREX Exemptions.

PFAS are a class of incredibly toxic, persistent, and bioaccumulative chemicals. They subject every community in the United States to harmful exposures, which will cause serious illnesses both today and for generations to come.

As a result of the toxicity of PFAS, the terms of the LVE and LoREX are insufficient to protect people or the environment from these chemicals. The LVE and LoREX exemptions fail to account for risks to those people at the greatest risk, such as: fenceline communities living near manufacturing sites or incinerators; workers; and other groups that experience greater risks due to their increased chemical exposures, increased susceptibility to harm, or both.[5] Permitting the manufacture of PFAS through these exemptions exacerbates the ongoing PFAS contamination crisis.

Accordingly, PFAS must undergo full PMN review and EPA is correct to propose making PFAS categorically ineligible for LVEs and LoREXs—doing so is self-evident and long overdue. Indeed, EPA has acknowledged for several years that PFAS should not be approved under these exemptions, because they are unlikely to meet the "will not present unreasonable risk" standard required for a PMN exemption.

Thus, EPA <u>must</u> make PFAS categorically ineligible for LVEs and LoREXs—this action is compelled by TSCA, the scientific evidence regarding PFAS, and is years overdue. First, EPA has recognized that it has a mandatory legal obligation to make chemical classes categorically ineligible for PMN exemptions. Second, there are at least two independent reasons why EPA's duty is triggered here.

#### 1. TSCA requires EPA to make chemical classes ineligible for an exemption if EPA cannot affirmatively determine the class "will not present an unreasonable risk."

1. EPA has significant authority to narrow existing regulatory exemptions to the PMN process because the creation of a PMN exemption is discretionary: EPA "<u>may,</u> upon

[5] 15 U.S.C. § 2604(a)(3) (requiring EPA to assess new chemicals' risks to "potentially exposed or susceptible subpopulation[s]"); *id.* § 2602(12) (defining "potentially exposed or susceptible subpopulation").

application and by rule, exempt the manufacturer of any new chemical substance from all or part of the [PMN] requirements."[6] Because the creation of exemptions is wholly discretionary, EPA has the authority to eliminate any existing exemption for any non-arbitrary reason. This necessarily includes the lesser authority to narrow or restrict an existing exemption, including by making chemicals ineligible for the exemption.[7]

2. EPA also has an affirmative obligation to eliminate or narrow an exemption when EPA knows the exemption no longer satisfies the statutory standard—i.e., the terms of the exemption cannot ensure that new chemical substances "will not present unreasonable risk." The standard for creating or granting an exemption under section 5(h)(4) is exacting—EPA must determine that, under the terms of the exemption, "the manufacture, processing, distribution in commerce, use, or disposal of such chemical substance, or that any combination of such activities, will not present an unreasonable risk of injury to health or the environment, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified by the Administrator under the conditions of use."[8]

In implementing the "will not present unreasonable risk" standard, EPA has an ongoing duty to consider new scientific information that may bear on whether any exemption ensures that the standard is met. For example, in another TSCA context, the Ninth Circuit Court of Appeals has twice held that EPA has an ongoing duty to account for new scientific information regarding the level of lead that presents a hazard, whenever that information becomes available.[9]

---

[6] 15 U.S.C. § 2604(h)(4) (emphasis added).
[7] *See, e.g., Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1052 (D.C. Cir. 1987) ("[T]he greater surely includes the lesser . . . ."); *Universal Mar. Serv. Corp. v. Spitalieri*, 226 F.3d 167, 174 (2d Cir. 2000) (concluding that a "grant of greater power logically includes grant of lesser power" (citing *Lussier v. Runyon*, 50 F.3d 1103, 1108 (1st Cir. 1995))).
[8] 15 U.S.C. § 2604(h)(4).
[9] *See A Cmty. Voice v. EPA*, 997 F.3d 983, 993–94 (9th Cir. 2021) (finding that EPA had an "ongoing" duty to use new information to update lead hazard standards under TSCA subchapter IV to "account for new information and 'modify initial standards when necessary to further Congress's intent'" (quoting *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017)).

Courts have similarly ruled that scientific advances compel revision of rules and standards that are intended to be health protective in other contexts too. For example, in *Pub. Citizen Health Research Group. v. Auchter*, a citizen group sought a court-ordered deadline for the Occupational Safety and Health Administration ("OSHA") to lower the permissible exposure limit for ethylene oxide ("EtO"). 702 F.2d 1150, 1153 (D.C. Cir. 1983). The governing statute there did not explicitly compel OSHA to take the regulatory action sought, but the D.C. Circuit nevertheless ordered the agency to issue a proposed rulemaking within thirty days, noting the "obvious need, apparent to OSHA, for an EtO standard that reflects, as the current standard does not, the mutagenic and carcinogenic potential of the chemical" revealed by studies over the previous decade. *Id.* at 1153–54; *see also In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (finding that OSHA must exercise its authority to revise permissible exposure limit for cadmium where new science shows that a lower standard "is necessary to workers' well-being").

3. Given EPA's authority to regulate chemical classes,[10] this obligation means that EPA must exclude a chemical class from eligibility under a PMN exemption if EPA can no longer conclude that the class will not present an unreasonable risk if manufactured pursuant to the terms of the exemption. Indeed, EPA has previously acknowledged this affirmative obligation, stating that excluding a class of chemicals from eligibility for an exemption is "necessary [when] . . . EPA can no longer conclude that [such chemicals] will not present an unreasonable risk to human health or the environment, which is the determination necessary to support an exemption under TSCA."[11] EPA recognized this obligation exists where either: (1) EPA has information suggesting that the conditions for an exemption under section 5(h)(4) are not met or those chemicals may in fact present an unreasonable risk; or (2) EPA has insufficient data and review experience to support a finding that the chemical or category of chemicals will not present an unreasonable risk.[12]

EPA cannot exempt chemicals from the PMN process "and then walk away"; rather, it has an ongoing duty to "account[] for new information," and "modify" the terms of an exemption "when necessary to further Congress's intent."[13]

**2. EPA has a mandatory obligation to make PFAS ineligible for the LVE and LoREX exemptions.**

We support EPA's proposal to make PFAS categorically ineligible for approval under the LVE and LoREX exemptions. EPA's obligation to do so is triggered here for at least three independent reasons. First, EPA's stated rationale is sufficient to make PFAS ineligible because the terms of the LVE and LoREX are insufficient to ensure that new PFAS chemicals will not present unreasonable risk. Second, the best available science demonstrates that the class of PFAS chemicals do present unreasonable risk and therefore must be regulated, rather than approved outside of PMN review. Third, the best available science establishes that PFAS "may cause" a number of serious effects, even if produced pursuant to the terms of the LVE, and thus are ineligible pursuant to 40 C.F.R. § 723.50(d). Any of these three reasons require EPA to categorically exclude PFAS from eligibility under the exemptions.

1. Here, EPA admits that it lacks sufficient information about the PFAS class to conclude that any class member will not present unreasonable risk even when manufactured in compliance with the terms of the LVE or LoREX exemptions. Accordingly, EPA concludes "due

[10] 15 U.S.C. § 2625(c).
[11] Premanufacture Notification Exemption for Polymers; Amendment of Polymer Exemption Rule to Exclude Certain Perfluorinated Polymers, 71 Fed. Reg. 11,484, 11,484 (proposed Mar. 7, 2006) (to be codified at 40 C.F.R. § 723.250) (cleaned up); *see also* Premanufacture Notification Exemption for Polymers; Amendment of Polymer Exemption Rule to Exclude Certain Perfluorinated Polymers, 75 Fed. Reg. 4,295, 4,295 (Jan. 27, 2010) (codified at 40 C.F.R. § 723.250); 71 Fed. Reg. at 11,498 (explaining that 15 U.S.C. § 2604(h)(4) authorizes EPA to amend and repeal rules it enacted under that section).
[12] *E.g.,* 71 Fed. Reg. at 11,484; 75 Fed. Reg. at 4,295.
[13] *In re A Cmty. Voice*, 878 F.3d at 784.

to the scientific complexities associated with assessing PFAS and the lack of data on most PFAS with regards to toxicity and exposure to human health and the environment, EPA expects in most cases to be unable to determine pursuant to TSCA section 5(h)(4) that a PFAS 'will not present an unreasonable risk.'" [14] This builds on EPA's prior acknowledgment that "given the complexity of PFAS chemistry, potential health effects, and their longevity and persistence in the environment, an LVE notice for a PFAS is unlikely to be eligible for this kind of exemption under the regulations."[15]

This recognition requires EPA to make PFAS ineligible for review under the LVE and LoREX exemptions, just as the lack of sufficient information regarding PFAS polymers required EPA to make them ineligible under the polymer exemption.[16]

2. Indeed, the best available science demonstrates that PFAS, as a class, do present unreasonable risk to health—particularly to the health of potentially exposed and susceptible subpopulations—and to the environment.

PFAS, as a class, present unreasonable risks to human health and the environment. First, because of their chemical structure, all PFAS are highly persistent, "indicat[ing] the potential for long-lasting environmental and human exposure to a chemical that is difficult to control and reverse."[17] PFAS released today will often remain in the environment for decades and burden generations to come.[18] PFAS are also often highly mobile, meaning they spread quickly throughout the environment once released and are difficult to capture and remediate.[19]

Well-studied PFAS have been linked to cancer, immunotoxicity, reproductive and developmental harm, and other serious health effects at extremely low exposure levels.[20] Indeed, in the years since several organizations first submitted comments urging EPA to stop approving new PFAS under TSCA in April 2020, the science concerning PFAS risks has only grown stronger. In addition to corroborating the association between PFAS and the foregoing health effects, the latest studies have also identified additional harms that were not previously documented in the scientific literature. These include epidemiological studies linking in utero PFAS exposures to motor impairments in infants and an increased risk of non-alcoholic fatty liver disease in children, a disease that is now estimated to affect up to one in ten children living

[14] 88 Fed. Reg. at 34,113 (quoting 15 U.S.C. § 2604(h)(4)).
[15] *Id* (cleaned up).
[16] *See* 71 Fed. Reg. at 11,484.
[17] *See, e.g.,* Ian T. Cousins et al., *Why is High Persistence Alone a Major Cause of Concern?*, 21 Env't Sci. Processes & Impacts 781, 781–82 (2019), https://doi.org/10.1039/C8EM00515J.
[18] *Id.* at 782.
[19] John A. Simon, *PFAS Experts Symposium: Statements on Regulatory Policy, Chemistry and Analytics, Toxicology, Transport/Fate, And Remediation for Per- And Polyfluoroalkyl Substances (PFAS) Contamination Issues*, 29 Remediation: J. Env't Cleanup Costs, Tech., & Techniques 31 (2019), https://doi.org/10.1002/rem.21624.
[20] *See* Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Perfluoroalkyls* 7–27 (May 2021), https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

in the United States.[21] A recent in vitro toxicity screening study examining over 200 cancer-related mechanistic outcomes for 23 unique PFAS found that the majority of the examined PFAS were associated with at least one cancer-related outcome, strengthening the association between multiple PFAS and cancer.[22] Several recent human birth cohort studies reported associations between environmental PFAS exposures during pregnancy and serious adverse health outcomes, including an increased risk of gestational diabetes and altered glucose levels in pregnant mothers and altered levels of thyroid hormones in pregnant mothers and newborns.[23]

Many PFAS are toxic even at very low levels. For example, some of the most potent toxic chemicals, like cyanide, are considered toxic at exposure concentrations of parts per billion.[24] However, some PFAS have the potential to exert toxicity at the low parts per trillion level or parts per quadrillion; this means that these PFAS are linked to harm at exposure levels

---

[21] Vishal Midya et al., *Association of Prenatal Exposure to Endocrine-Disrupting Chemicals with Liver Injury in Children*, 5 JAMA Network Open Art. No. e2220176 (2022), https://doi.org/10.1001/jamanetworkopen.2022.20176; Qian Yao et al., *Prenatal Exposure to Per- and Polyfluoroalkyl Substances, Fetal Thyroid Hormones, and Infant Neurodevelopment*, 206 Env't Rsch. Art. No. 112561 (2022), https://doi.org/10.1016/j.envres.2021.112561.

[22] Nalin Singh and Ching Yi Jennifer Hsieh, *Exploring Potential Carcinogenic Activity of Per- and Polyfluorinated Alkyl Substances Utilizing High-Throughput Toxicity Screening Data*, 40 Int'l J.Toxicology 355 (2021), https://doi.org/10.1177/10915818211010490.

[23] Xin Liu et al., *Identification and Prioritization of the Potent Components for Combined Exposure of Multiple Persistent Organic Pollutants Associated with Gestational Diabetes Mellitus*, 409 J. Hazardous Materials Art. No. 124905 (2021), https://www.sciencedirect.com/science/article/abs/pii/S030438942032896X?via%3Dihub; Guoqi Yu et al., *Environmental Exposure to Perfluoroalkyl Substances in Early Pregnancy, Maternal Glucose Homeostasis and the Risk of Gestational Diabetes: A Prospective Cohort Study*, 156 Env't Int'l Art. No. 106621 (2021), https://doi.org/10.1016/j.envint.2021.106621; Rahel L. Birru et al., *A Pathway Level Analysis of PFAS Exposure and Risk of Gestational Diabetes Mellitus*, 20 Env't Health Art. No. 63 (2021), https://ehjournal.biomedcentral.com/articles/10.1186/s12940-021-00740-z; Blanca Sarzo et al., *Maternal Perfluoroalkyl Substances, Thyroid Hormones, and DIO Genes: A Spanish Cross-Sectional Study*, 55 Env't Sci. Tech. 11144 (2021), https://doi.org/10.1021/acs.est.1c01452; Arash Derakhshan et al., *Association of Per- and Polyfluoroalkyl Substances with Thyroid Homeostasis During Pregnancy in the SELMA Study*, 167 Env't Int'l Art. No. 107420 (2022), https://doi.org/10.1016/j.envint.2022.107420; Jensen Richard Christian et al., *Higher Free Thyroxine Associated with PFAS Exposure in First Trimester. The Odense Child Cohort*, 212(pt. D) Env't Rsch. Art. No. 113492 (2022), https://doi.org/10.1016/j.envres.2022.113492; Jianqiu Guo et al., *Umbilical Cord Serum Perfluoroalkyl Substance Mixtures in Relation to Thyroid Function of Newborns: Findings from Sheyang Mini Birth Cohort Study,* 273 Chemosphere Art. No. 129664 (2021), https://doi.org/10.1016/j.chemosphere.2021.129664; Qian Yao et al., *Prenatal Exposure to Per- and Polyfluoroalkyl Substances, Fetal Thyroid Hormones, and Infant Neurodevelopment*, 206 Env't Rsch. Art. No. 112561 (2022), https://doi.org/10.1016/j.envres.2021.112561.

[24] *See* Earthjustice on behalf of Advance Carolina et al., Petition to Prohibit the Use of Certain Exemptions to the Premanufacture Notice Requirements of TSCA for PFAS 7 (Apr. 27, 2021) ("2021 Petition"), https://earthjustice.org/wp-content/uploads/pfas_pmn_exemptions_petition_04-27-2021.pdf. A copy of this petition is attached hereto as **Exhibit A.**

1,000 times lower than cyanide.[25] Indeed, EPA recently emphasized the harms associated with low-level PFAS exposure, explaining that "there is no dose below which" PFOA, a widely used PFAS, "is considered safe."[26] EPA has used PFOA as its chosen analog for many new PFAS, and research into less-studied members of the PFAS class has revealed many of the same hazards presented by better-studied, highly toxic PFAS.[27]

The approval of new PFAS magnifies the harm people face from exposure to existing PFAS in the environment. People are continuously exposed to a range of different PFAS, including mixtures of PFAS, throughout their lifetime, creating the potential for cumulative risks that worsen the threat to impacted individuals and communities. The United States Geological Survey recently found that "at least 45% of the nation's tap water is estimated to have one or more [PFAS]," despite testing for only 32 of more than 1,000 commercially produced PFAS.[28] More than 98 percent of the people tested in the United States have multiple PFAS in their blood,[29] and EPA has found that exposure to multiple PFAS can result in cumulative, or "additive," effects.[30] When EPA approves the manufacture of a new PFAS pursuant to the LVE or LoREX, it adds to the existing chemical burden.

Consequently, PFAS are especially likely to pose unreasonable risk to potentially exposed or susceptible subpopulations. A prior petition to EPA provided substantial evidence that certain subpopulations are more vulnerable to the adverse health effects of PFAS exposure; these include occupational workers, firefighters, communities living in polar regions, nursing mothers and women of childbearing age, children, infants, and the developing fetus.[31]

For example, LVEs and LoREXs for PFAS would likely result in concentrations of PFAS in humans and the environment that would disproportionately harm these subpopulations.[32] This

---

[25] *Id.*; Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36,848, 36,848 (establishing health advisory level for PFOA of 0.004 ppt); *see also Ground Water and Drinking Water*, EPA, https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations (last updated Jan. 9, 2023).

[26] PFAS National Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18,638, 18,639 (proposed Mar. 29, 2023) (to be codified at 40 C.F.R. pts. 141, 142); *see also id.* (explaining that, for PFOA, "the level at which no known or anticipated adverse effects on the health of persons is expected to occur is well below current analytical quantitation levels").

[27] Carol F. Kwiatkowski et al., *Scientific Basis for Managing PFAS as a Chemical Class*, 7 Env't Sci. & Tech. Letters 532 (2020), https://doi.org/10.1021/acs.estlett.0c00255.

[28] *Tap Water Study Detected PFAS 'Forever Chemicals' Across the U.S.*, U.S. Geological Survey (July 5, 2023), https://www.usgs.gov/news/national-news-release/tap-water-study-detects-pfas-forever-chemicals-across-us.

[29] *See* Antonia M. Calafat et al., *Polyfluoroalkyl Chemicals in the U.S. Population: Data from the National Health and Nutrition Examination Survey (NHANES) 2003–2004 and Comparisons with NHANES 1999–2000*, 115 Env't Health Persps. 1596 (2007), https://doi.org/10.1289/ehp.10598.

[30] 88 Fed. Reg. at 18,647.

[31] 2021 Petition at 12–14.

[32] 2021 Petition at 33–36.

is especially so considering their cumulative exposure to multiple PFAS.[33] Moreover, the communities where a toxic chemical is manufactured, used, and disposed are potentially exposed or susceptible subpopulations, as they face greater exposures to the chemical and often more susceptibility to harm based on their cumulative exposures to multiple chemicals and non-chemical stressors.[34] For example, a recent empirical study that was not submitted in the prior petitions demonstrates that "[p]eople who live in communities with higher proportions of Black and Hispanic/Latino residents are more likely to be exposed to harmful levels of per- and polyfluoroalkyl substances (PFAS) in their water supplies than people living in other communities."[35]

Importantly, EPA did not consider risks to potentially exposed or susceptible subpopulations when it established these exemptions. Thus, EPA cannot rationally determine that the exemptions protect such subpopulations from the risks posed by PFAS.

Because PFAS present unreasonable risk—even at incredibly low levels—EPA cannot determine that production of new PFAS, pursuant to the terms of the LVE and LoREX exemptions, will not present unreasonable risk. Therefore, PFAS must make PFAS categorically ineligible for approval under these exemptions.

3. EPA must also conclude that, notwithstanding compliance with the terms of the LVE and LoREX, PFAS may cause serious harm to human health and the environment and are thus ineligible for these exemptions. EPA's regulations state that even if a chemical meets the terms of the LVE or LoREX, EPA must reject the exemption application if the chemical "substance, any reasonably anticipated metabolites, environmental transformation products, or byproducts of the substance, or any reasonably anticipated impurities in the substance <u>may cause</u>, under anticipated conditions of manufacture, processing, distribution in commerce, use, or disposal of the new chemical substance" serious effects to human health or significant environmental effects.[36]

The best available science demonstrates that many PFAS do cause serious human health effects and significant environmental effects. For example, PFAS have been linked with cancer,

---

[33] EPA recognizes the potential for cumulative risk. *See* EPA, *PFAS Strategic Roadmap: EPA's Commitments to Action 2021-2024*, at 8, 15 (Oct. 2021), https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf.

[34] *See* 2021 Petition at 47–48 (explaining that exposure to multiple PFAS may present additional risks on top of those presented by one but EPA did not consider that when approving LVE or LoREX for PFAS).

[35] *Communities of Color Disproportionately Exposed to PFAS Pollution in Drinking Water*, Harvard T.H. Chan School of Pub. Health (May 15, 2023), https://www.hsph.harvard.edu/news/press-releases/communities-of-color-disproportionately-exposed-to-pfas-pollution-in-drinking-water; *see also* Jahred M. Liddie et al., *Sociodemographic Factors Are Associated with the Abundance of PFAS Sources and Detection in U.S. Community Water Systems*, 57 Env't Sci. & Tech. 7902 (2023). A copy of this study is attached hereto as **Exhibit B**.

[36] 40 C.F.R. § 723.50(d) (emphasis added).

obesity, pre-eclampsia, liver and kidney damage, and endocrine disruption—all of which meet EPA's definition of a serious chronic effect.[37] Similarly, PFAS are linked with significant environmental effects, such as immune and liver dysfunction in fish species, including the commercially important species of striped bass in North Carolina's Cape Fear River—such damage is likely irreversible, and even if reversible would likely persist beyond a single generation.[38] Other evidence links PFAS to toxicity in species of algae, invertebrates, and amphibians. [39]

EPA has admitted that it lacks toxicity and exposure data on most PFAS substances and recognized that the terms of the LVE and LoREX exemptions do not enable EPA to evaluate the risks of PFAS and reach a determination that they will not present unreasonable risk. Given that uncertainty, EPA must also recognize that the existing evidence of serious effects from PFAS means that PFAS "may cause" serious effects in humans and serious environmental effects even if produced pursuant to the terms of the LVE and LoREX. Because EPA cannot affirmatively determine that such effects will not result, this provides a third, independent basis for making them categorically ineligible.

### B. EPA Must Revoke Previously Granted PFAS LVEs.

In the Proposed Rule, EPA solicits comment on whether it should revoke "previously granted LVEs for PFAS pursuant to the process set forth in 40 C.F.R.723.50(h)(2) and requir[e] those who wish to continue manufacture [those PFAS] to submit a PMN."[40] EPA has previously approved over 600 LVEs for PFAS chemicals, which are now contaminating our water and air. Because PFAS as a class cannot satisfy the standard of eligibility for a PMN exemption, these previously granted PFAS LVEs are unlawful. Therefore, EPA has a mandatory obligation under the statute and its regulations to revoke previously granted PFAS LVEs. EPA should begin revocation as soon as possible, using the process outlined in 40 C.F.R. § 723.50(h)(2).

EPA itself recognizes that PFAS cannot meet the terms of an LVE exemption. EPA admits in the Proposed Rule that "in most cases [EPA will] be unable to determine pursuant to TSCA section 5(h)(4) that a PFAS 'will not present an unreasonable risk' under the conditions of use within the 30-day review period provided for LVE and LoREX notices."[41] The Agency made a similar finding in an April 27, 2021, press release when EPA declared that LVE notices for

[37] *Id.* § 723.50(b)(7) ("Serious chronic effects means human disease processes or other adverse effects that have long latency periods for development, result from long-term exposure, are long-term illnesses, or are a combination of these factors and that are likely to result in death, severe or prolonged incapacitation, disfigurement, or severe or prolonged loss of the ability to use a normal bodily or intellectual function with a consequent impairment of normal activities.").
[38] *See id.* § 723.50(b)(8) (defining significant environmental effects); 2021 Petition at 8–9.
[39] 2021 Petition at 8.
[40] 88 Fed. Reg. at 34,113–14.
[41] *Id.* at 34,113 (quoting 15 U.S.C. § 2604(h)(4)).

PFAS would be "unlikely to be eligible for this kind of exemption under the regulations."[42] Prior petitions and these comments establish at least two other bases for concluding that all PFAS do not meet the standard for these exemptions and establishing EPA's duty to revoke previously granted PFAS LVEs.[43]

Despite this evidence, EPA has not done its duty to revoke previously granted PFAS LVEs, which would thereby mitigate the risk posed by PFAS chemicals produced pursuant to the exemption. Instead, EPA has repeatedly attempted to solicit manufacturers to voluntarily action by chemical manufacturers to withdraw their PFAS LVEs. In 2016, EPA tried voluntary methods to withdraw LVEs for long chain PFAS; more recently in 2021, EPA launched a PFAS LVE stewardship program, under which the Agency solicited voluntary withdrawals of PFAS LVEs.[44]

These attempts to secure voluntary action have failed. EPA's attempt in 2016 was largely unsuccessful—nearly half of long chain PFAS LVEs remain active.[45] And since the announcement of the PFAS LVE stewardship program, less than ten percent of the nearly 600 outstanding PFAS LVEs have been voluntarily withdrawn.[46]

EPA's failed attempts to secure voluntary withdrawals of PFAS LVEs, in combination with the Agency's failure to revoke those exemptions, have permitted the continued manufacture of hundreds of PFAS chemicals and allowed an ongoing risk to communities and the environment. Revocation authority exists to safeguard against that very outcome—EPA has a mandatory duty to use that authority, and must use it to protect communities and the environment from PFAS.

**1. EPA has an affirmative duty to revoke previously granted LVEs for chemicals that no longer meet the standard for the exemption.**

EPA has an ongoing obligation to revoke a previously granted LVE if EPA determines that the chemical no longer meets the statutory or regulatory standards for an LVE, an obligation EPA has expressly recognized. Under EPA's regulations, if, "at any time," EPA determines that the legal standard for the exemption is no longer met, EPA will revoke a previously granted LVE.[47] Thus, EPA must revoke where it determines: that a previously granted LVE no longer

---

[42] *EPA Announces Changes to Prevent Unsafe New PFAS from Entering the Market*, EPA (Apr. 27, 2021), https://www.epa.gov/chemicals-under-tsca/epa-announces-changes-prevent-unsafe-new-pfas-entering-market.
[43] *See supra* Section I.A.2; *see also* Earthjustice on behalf of Advance Carolina et al., Petition to Revoke Approval of 600 PFAS Exempted from PMN Requirements (Oct. 13, 2022), https://earthjustice.org/documents/legal-document/"petition-to-remove-half-of-forever-chemicals-in-commerce. A copy of this petition is attached hereto as **Exhibit C**.
[44] *Program Participation,* Subsection in *PFAS Low Volume Exemption Stewardship Program* https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/pfas-low-volume-exemption#participation (last updated July 20, 2023).
[45] *Id.*
[46] 88 Fed. Reg. at 34,113.
[47] 40 C.F.R. § 723.50(h)(2).

meets the requirements for an LVE; that it has information that the chemical "may cause" one of the effects identified in 40 C.F.R. § 723.50(d); or that EPA is otherwise no longer able to conclude that the chemical meets the "will not present unreasonable risk" standard.

When EPA adopted the LVE and LoREX exemptions, the Agency explained that its revocation authority is a critical safeguard against unreasonable risk, and therefore foundational to the legality of the exemptions themselves. EPA described revocation as the "[m]ost important" safeguard against unreasonably risky chemicals being approved through LVEs and LoREXs.[48] The Agency also explained that the authority to revoke an LVE or LoREX based on ongoing consideration of new scientific evidence "ensure[s] that eligibility for the exemption will be determined on the basis of the best available information, regardless of when the information becomes available."[49] Furthermore, EPA has reassured commenters that it would "revoke an exemption if new information indicates that the chemical substance does not meet the criteria for an exemption."[50] EPA has also refused to rescind its authority to revoke PMN exemptions despite pressure from industry, and has repeated its position that revocation is the "[m]ost important" safeguard against unreasonable risk.[51]

Even apart from its revocation regulations, EPA has an inherent obligation to consider new scientific information that may bear on whether the Agency's past decisions or standards are health-protective, and to modify past decisions to ensure legal requirements are met. Thus, EPA has authority to revisit or modify its prior decisions—including when the Agency seeks to correct an error or protect the integrity of its own proceedings,[52] or when the Agency exercises the authority to "ensure the [statute]'s statutory purpose is followed."[53] And, as explained above, the Ninth Circuit Court of Appeals has twice held, under TSCA, that EPA has an ongoing duty to account for new scientific information.[54]

As noted above, there are multiple independent reasons why EPA is required to determine that PFAS are categorically ineligible for approval under the LVE exemption.[55] In turn, such a determination would require EPA to revoke previously granted PFAS LVEs. A categorical finding that PFAS are ineligible necessarily applies to the entire class of PFAS

---

[48] Premanufacture Notification Exemption; Exemption for Chemical Substances Manufactured in Quantities of 1,000 Kg or Less Per Year, 50 Fed. Reg. 16,477, 16,487 (Apr. 26, 1985) (codified at 40 C.F.R. pt. 723).
[49] *Id.*
[50] *Id.* at 16,478.
[51] Premanufacture Notification Exemption; Revision of Exemption for Chemical Substances Manufactured in Small Quantities; Low Release and Exposure Exemption; Final Rule, 60 Fed. Reg. 16,336, 16,346 (Mar. 29, 1995) (codified at 40 C.F.R. pt. 723).
[52] *See Tokyo Kika Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1361–62 (Fed. Cir. 2008)
[53] *Ranbaxy Lab'ys, Ltd. v. Burwell*, 82 F. Supp. 3d 159, 193 (D.D.C. 2015).
[54] *See A Cmty. Voice v. EPA*, 997 F.3d at 993–94 (finding that EPA had an "ongoing" duty to use new information to update lead hazard standards under TSCA subchapter IV to "account for new information and 'modify initial standards when necessary to further Congress's intent'" (quoting *In re A Cmty. Voice*, 878 F.3d at 784)).
[55] *See supra* Section I.A.2.

chemicals, including those for which an exemption was previously granted. It is a recognition that the terms of the exemption have never been sufficient to make the "will not present" finding for any PFAS chemical.[56] Thus, EPA's proposal to make PFAS categorically ineligible for the LVE exemption, when finalized, necessarily requires EPA to revoke previously granted PFAS LVEs.

**2. EPA must revoke previously granted PFAS LVEs as expeditiously as possible.**

EPA must begin the revocation process without delay; it does not need to wait to finalize its proposal to make PFAS categorically ineligible for the LVE exemption. For years, communities have been exposed to many highly toxic PFAS that were approved under the LVE. The goal of revocation should be to stop these exposures and the resultant harm to communities as quickly as possible, which requires EPA to start the revocation process now.

1. To revoke a PFAS under EPA's regulations, EPA must first make a "preliminary determination" that the chemical substance in question "does not meet the terms of this section."[57] After EPA sends the preliminary determination to the manufacturer, the manufacturer has an opportunity to object.[58] EPA is then required to consider the objections before making any final revocation decision.[59]

EPA already has made the requisite findings to support the conclusion that previously granted PFAS LVEs do not meet the terms of the LVE. Since at least 2021, EPA has publicly concluded that the terms of the LVE likely cannot ensure that any PFAS meets the "will not present unreasonable risk" standard.[60] EPA reiterates that conclusion here, which provides a sufficient basis for revoking all previously granted PFAS LVEs.

Indeed, that conclusion is tantamount to the "preliminary determination" that triggers EPA's mandatory obligation to begin the revocation process.[61] Having already arrived at the necessary findings to begin revocation years ago, it would be arbitrary for EPA to further delay acting to protect communities from these PFAS chemicals.

2. EPA recognizes that the consequence of revoking previously granted PFAS LVEs is that manufacturers who had been granted a PFAS LVE would be required to submit a PMN to continue manufacturing.[62] But EPA does not further clarify that manufacturers could be required to cease manufacturing while such PMNs are reviewed.

---

[56] 88 Fed. Reg. at 34,113 (quoting 15 U.S.C. § 2604(h)(4)).
[57] 40 C.F.R. § 723.50(h)(2)(i)(A).
[58] *Id.* § 723.50(h)(2)(ii).
[59] *Id.* § 723.50(h)(2)(iii).
[60] *EPA Announces Changes to Prevent Unsafe New PFAS from Entering the Market*, EPA (Apr. 27, 2021), https://www.epa.gov/chemicals-under-tsca/epa-announces-changes-prevent-unsafe-new-pfas-entering-market.
[61] 40 C.F.R. § 723.50(h)(2)(i)(A).
[62] 88 Fed. Reg. at 34,114.

EPA's regulations require EPA to determine whether the manufacturer acted "with due diligence and in good faith to meet the terms of [the LVE]." [63] If EPA concludes the manufacturer did not do so, then the manufacturer must stop production of the chemical within seven days. The manufacturer may resume production of the chemical only after it submits a PMN and EPA makes a final determination on the PMN allowing manufacture.[64] If, by contrast, EPA finds that the manufacturer did act with due diligence and in good faith, then the manufacturer may continue to produce the chemical so long as it timely submits a PMN. In that circumstance, manufacture of the chemical can continue for the duration of EPA's review of the PMN under the terms of the revoked LVE.[65]

During the revocation process, EPA must consider the ample evidence that chemical manufacturers who were granted PFAS LVEs did not act with due diligence or good faith and must make such findings where appropriate. PFAS manufacturers were aware of the harms their PFAS chemical products posed, and the Agency should find that these manufacturers did not act in good faith.[66] DuPont (including Chemours), 3M, and likely other PFAS manufacturers both knew and hid the dangers of PFAS from EPA and the public.[67] Evidence further shows that chemical manufacturers specifically use the LVE approval process as the "attractive option for high-toxicity substances" in lieu of submitting PMNs.[68]

Such knowing conduct constitutes an absence of due diligence and good faith and requires EPA to mandate the near-immediate cessation of any revoked PFAS LVE.[69] Where EPA can make such a finding, it cannot allow continued manufacturing of a PFAS chemical under a revoked LVE.

Communities throughout the country are at serious risk because of widespread exposure to PFAS. These communities have waited far too long—and can wait no longer—for EPA to

[63] 40 C.F.R. § 723.50(h)(2)(vi).
[64] *Id.* § 723.50(h)(2)(v); 15 U.S.C. § 2604(a)(1).
[65] 40 C.F.R. § 723.50(h)(2)(vi)
[66] We note that the requirement that EPA find a lack of due diligence and good faith in order to immediately halt the manufacture of a new chemical is contrary to the amended TSCA. A person may only manufacture a new chemical without submitting a PMN if EPA determines that the chemical "will not present unreasonable risk." 15 U.S.C. § 2604(h)(4). Whether a manufacturer acted in good faith is irrelevant to that determination. Thus, once EPA makes a final determination that that standard cannot be met and an LVE must be revoked, TSCA requires the manufacturer to submit a PMN and wait until EPA makes a final determination on the PMN before resuming manufacture of the chemical.
[67] *See, e.g.*, Nadia Gaber et al., *The Devil They Knew: Chemical Documents Analysis of Industry Influence on PFAS Science*, 89 Annals Global Health Art. No. 37, https://doi.org/10.5334/aogh.4013.
[68] Keller & Heckman LLP, *The Constantly Pending PMN: Low Volume Exemption Applications Are Living Documents*, Martindale (Mar. 11, 2011), https://www.martindale.com/chemicals/article_Keller-Heckman-LLP_1255440.htm.
[69] 40 C.F.R. § 723.50(h)(2)(v) (requiring cessation of manufacture, processing, distribution and use within seven days of EPA's determination).

fulfill its obligations under TSCA. EPA cannot continue to shirk its legal duties, and instead hope that manufacturers will voluntarily withdraw their LVEs, thereby doing the Agency's job for it. It is EPA's duty to revoke all PFAS LVEs, and it must do so promptly.

### C. EPA's Definition of PFAS Is Unduly Narrow.

EPA's undercuts its proposed modifications to the PMN exemptions by adopting an overly narrow definition of the PFAS class, which excludes many PFAS that have been recognized by the Organization of Economic Co-operation and Development ("OECD"),[70] leading scientists,[71] Congress,[72] and multiple states.[73] As explained in prior comments, PFAS are united by the presence of at least one fully fluorinated carbon atom, the chemical structure that gives PFAS their persistence. Instead of that widely used and science-based definition, however, the Proposed Rule defines PFAS as "a chemical substance that contains at least one of these three structures: (1) R-(CF2)-CF(R′)R″, where both the CF2 and CF moieties are saturated carbons[;] (2) R-CF2OCF2-R′, where R and R′ can either be F, O, or saturated carbons[; or] (3) CF3C(CF3)R′R″, where R′ and R″ can either be F or saturated carbons."[74]

Thus, EPA's definition excludes PFAS that are covered by the prevailing definitions employed by many other regulators. Indeed, EPA expressly states that "[t]he proposed definition for PFAS does not include substances that only have a single fluorinated carbon."[75] As a result of its unduly narrow definition, EPA excludes many hydrofluorocarbons ("HFCs"), hydrofluoroolefins ("HFOs"), and fluoropolymers. Like other PFAS, these HFCs and HFOs are highly persistent in the environment, and they can degrade into short-chain PFAS like trifluoroacetic acid.[76] If that definition is further codified in EPA's Proposed Rule, many widely recognized PFAS will remain eligible for PMN exemptions and will not receive the more

[70] Env't Directorate Chems. & Biotechnology Comm., Org. for Econ. Co-operation & Dev., *Reconciling Terminology of the Universe of Per- and Polyfluoroalkyl Substances: Recommendations and Practical Guidance* 18 (July 9, 2021), https://www.oecd.org/officialdocuments/publicdisplaydocumentpdf/?cote=ENV/CBC/MONO(2021)25&docLanguage=En.
[71] Carol F. Kwiatkowski et al., *Scientific Basis for Managing PFAS as a Chemical Class*, 7 Env't Sci. & Tech. Letters 532, 532 (2020), https://doi.org/10.1021/acs.estlett.0c00255.
[72] National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 332(c)(3), 133 Stat. 1198, 1314 (2019) (defining PFAS as "perfluoroalkyl and polyfluoroalkyl substances that are man-made chemicals with at least one fully fluorinated carbon atom").
[73] S. 1044, 2019 Leg., Reg. Sess. (Cal. 2020); H.R. 19-1279, 72nd Gen. Assemb., Reg. Sess. (Colo. 2019); H.R. 1043, 129th Leg., Reg. Sess. (Me. 2019); S. 20, 2021 Gen. Assemb., Reg. Sess. (Vt. 2021); S. 5135, 66th Leg., Reg. Sess. (Wash. 2019).
[74] 88 Fed. Reg. at 34,114.
[75] *Id.*
[76] *ATMO America: Scientist Urges U.S. EPA to Broaden Definition of PFAS to Include F-Gases, TFA*, R744 (June 20, 2022), https://r744.com/atmo-america-scientist-urges-u-s-epa-to-broaden-definition-of-pfas-to-include-f-gases-tfa/ ("The OECD's definition of PFAS includes certain F-gases like R134a (an HFC) and R1234yf (an HFO), as well as TFA, which is formed in the atmosphere by the breakdown of 100% of R1234yf and up to 20% of R134a. The EPA definition excludes F-gases and TFA, and many other harmful chemicals.").

comprehensive PMN review that TSCA requires.[77] EPA's definition for purposes of this rule would also exclude the chemical HQ-115, which EPA's own Office of Research and Development has identified as a toxic PFAS.[78]

EPA's failure to recognize chemicals with a single fully fluorinated carbon as members of the PFAS class is illogical and arbitrary because such chemicals share—in common with other PFAS—the perfluoroalkyl moiety which makes them persistent. EPA acknowledges that a defining feature of the PFAS class is their persistence and that this persistence is central to the potential risk they pose. Thus, EPA reaffirms its view that the "longevity and persistence in the environment" of PFAS made them of special concern and likely ineligible for exemption from PMN review.[79] And on the basis of likely persistence, EPA proposes to recognize additional chemicals as PFAS beyond those EPA had previously recognized in its working definition.[80]

Defining the class based on the shared characteristic of persistence is a sound approach to establishing a regulatory definition. For example, the European Union is now considering a broad PFAS phaseout, based primarily on their shared persistence. That proposal recognizes that persistence "is the key hazardous property common to all PFASs in this restriction proposal. Consequently, if releases of PFASs are not minimised, humans and other organisms will be exposed to progressively increasing amounts of PFASs until such levels are reached where effects become inevitable."[81]

Thus, EPA is correct to focus on persistence arising from the fluorine-carbon bond as a defining characteristic of PFAS, but wrong to exclude PFAS with a single fully fluorinated carbon. Such PFAS also have the potential for persistence and thus must be recognized in EPA's

[77] This is not an idle concern; EPA's recently released *Framework for Addressing New PFAS and New Uses of PFAS* adopts a similarly narrow PFAS definition. EPA, *Framework for TSCA New Chemicals Review of PFAS Premanufacture Notices (PMNs) and Significant New Use Notices (SNUNs)* 3–4 (June 28, 2023), https://www.epa.gov/system/files/documents/2023-06/PFAS%20Framework_Public%20Release_6-28-23_Final_508c.pdf.
[78] EPA, *ORD Human Health Toxicity Value for Lithium bis[(trifluoromethyl)sulfonyl]azanide (HQ-115)* (July 2023), https://cfpub.epa.gov/si/si_public_file_download.cfm?p_download_id=547108&Lab=CPHEA.
[79] 88 Fed. Reg. at 34,113 (cleaned up).
[80] *Id.* at 34,114 (adding the "third sub-structure" to EPA's prior definition of PFAS based on likely persistence).
[81] Eur. Chems. Agency, *Annex XV Restriction Report* 13 (Mar. 22, 2023), https://echa.europa.eu/documents/10162/1c480180-ece9-1bdd-1eb8-0f3f8e7c0c49 ("All PFASs in the scope of this restriction proposal are either very persistent themselves, or degrade into very persistent PFASs in the environment. This is the key hazardous property common to all PFASs in this restriction proposal.").

definition of PFAS.[82] As leading scientists have recognized, the carbon-fluorine bond is one of the strongest bond in organic chemistry and even a single fully fluorinated carbon can give rise to persistence.[83] Thus, even if EPA were correct that PFAS with a single fluorinated carbon are "less likely to persist in the environment" than PFAS with multiple fluorinated carbons, it must nonetheless recognize their shared potential for persistence and include them in its definition of PFAS.[84]

In making PFAS categorically ineligible for approval under the LVE and LoREX, EPA should adopt a definition of PFAS that captures all persistent fluorinated chemicals. And it should also apply that definition to identify PFAS LVEs for revocation.

### D. EPA Must Make All Identified PBT Chemicals Categorically Ineligible for the LVE and LoREX Exemptions.

We support making PBT chemicals categorically ineligible for LVE and LoREX exemptions. Like PFAS, which are themselves PBTs, PBT chemicals do not meet the statutory or regulatory criteria for exemption from PMN review. Unfortunately, EPA's Proposed Rule does not make PBT chemicals categorically ineligible.

In the Proposed Rule, EPA purports to codify a 1999 PBT policy document ("1999 PBT Policy")— that sets forth Agency policy governing the identification, assessment, and regulation of new PBT chemicals under the PMN review process—and apply that policy in the context of determining eligibility for LVEs and LoREXs. Specifically, EPA proposes to amend 40 C.F.R. § 723.50(d) such that whenever the Agency "identifies a chemical substance under LVE or LoREX review (or any reasonably anticipated metabolites, environmental transformation products, or byproducts of the substance, or any reasonably anticipated impurities in the substance) as PBT with anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms, that substance would be ineligible for the LVE or LoREX."[85] However, as even EPA recognizes, its proposal would make only "certain PBTs ineligible for these exemptions" and thus would not establish that PBT chemicals are categorically ineligible.[86]

---

[82] As noted above, scientists have recommended regulating PFAS as a class based on their shared persistence, explaining that "PFAS are the most environmentally persistent substances among organic chemicals" and that "high persistence alone should be established as a sufficient basis for [PFAS] management." Ian T. Cousins et al., *The High Persistence of PFAS is Sufficient for their Management as a Chemical Class*, 22 Env't Sci.: Processes & Impacts 2307, 2308–09 (2020), https://doi.org/10.1039/D0EM00355G; *see, e.g.,* Ian T. Cousins et al., *Why is High Persistence Alone a Major Cause of Concern?,* 21 Env't Sci. Processes & Impacts 781, 782 (2019), https://doi.org/10.1039/C8EM00515J ( "Persistent chemicals are at the center of many of the most serious cases of environmental contamination in the last 50 years.").

[83] Ian T. Cousins et al., *The High Persistence of PFAS is Sufficient for their Management as a Chemical Class*, 22 Env't Sci.: Processes & Impacts 2307, 2308 (2020).

[84] 88 Fed. Reg. at 34,114.

[85] *Id.* at 34,115.

[86] *Id.* at 34,101 (emphasis added).

Instead, EPA must make PBT chemicals categorically ineligible for approval under the LVE and LoREX exemptions. Under such an approach, if EPA receives an application under one of the exemptions and identifies the chemical as PBT, it must deny the exemption application without further analysis. Codifying such an approach requires the Agency to amend its proposal in two ways. First, EPA should automatically deny LVEs and LoREXs once EPA has identified a chemical as PBT, and EPA should not require any additional showing of "anticipated environmental releases" or "potentially unreasonable exposures."[87] Second, the proposed regulatory text merely cites to the 1999 PBT Policy, without stating how various aspects of the policy will be used. Instead, EPA should codify the 1999 PBT Policy's thresholds for determining persistence and bioaccumulation and clarify how EPA intends to assess toxicity.

### 1. EPA must make identified PBTs categorically ineligible for the LVE and LoREX exemptions, without requiring further analysis of their potential releases or exposures.

PBT chemicals by their very nature "may cause" one of the harmful effects enumerated in 40 C.F.R. § 723.50(d), and cannot satisfy the "will not present" standard for PMN exemption eligibility under TSCA section 5(h)(4). Therefore, if a manufacture seeks EPA approval to manufacture a chemical under the LVE or LoREX exemption and EPA identifies the chemical as PBT, that should be the end of the matter; EPA should deem the chemical categorically ineligible for approval under the LVE or LoREX exemptions and instead require the manufacturer to seek PMN review. EPA must not require any additional analysis of exposures or releases of an identified PBT chemical as a condition of denying an LVE or LoREX for an identified PBT chemical substance.

Unfortunately, EPA proposes to deny LVE and LoREX eligibility only for those PBT chemicals "with anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms."[88] The plain reading of this language is that an LVE or LoREX will be denied only if EPA: (2) identifies a chemical as a PBT; and (2) also finds that there are "anticipated environmental releases" and "potentially unreasonable exposures."

This additional requirement is unnecessary and unlawful. EPA recognizes that where there are expected exposures to PBT chemicals, then "serious acute or chronic effects or significant environmental effects[] [are] generally likely to occur," meaning that the chemical should be ineligible for an LVE or LoREX exemption under 40 C.F.R. § 723.50(d).[89] And the best available science confirms that PBTs are inherently likely to be released to the environment under their conditions of use and such releases will result in exposure. Consequently, once EPA has identified a chemical as a PBT, any additional analysis of its releases and exposures are unnecessary to determining its ineligibility for these exemptions. Requiring such additional analysis is therefore unlawful and arbitrary.

---

[87] *Id.* at 34,115.
[88] 88 Fed. Reg. at 34,115; *see also id.* at 34,124 (proposed 40 C.F.R. § 723.50 (d)(2)(ii)).
[89] *Id.* at 34,115.

There is ample evidence that PBT chemicals release into the environment at some point under the conditions of use. For example, EPA has concluded that decabromodiphenyl ether ("decaBDE") is released during manufacturing into the air via fugitive dust.[90] Similarly, EPA has concluded that both decaBDE and hexabromocyclododecane ("HBCD") are released during processing during chemical recycling.[91] Releases continue when products containing PBT chemicals are used, as the chemicals migrate from the products into homes and workplaces. For example, decaBDE releases from common household articles—computers, televisions, children's products—may occur when decaBDE migrates from the articles during use (e.g., in homes and business settings), disposal, and waste management. Similarly, HCBD is often found in electronics, clothing, fabrics, and furnishings,[92] as well as jewelry, undergarments, dolls and other children's toys.[93] Phenol, isopropylated phosphate (3:1) ("PIP (3:1)") is of particular concern to industry workers because it is found in hydraulic fluid vapors, engine smoke or fumes, and is contained within adhesives, sealants, and coatings.[94] Finally, when products containing PBTs are disposed of—whether in landfills or incinerators—they cause significant environmental releases.[95] Indeed, EPA recognizes that PBTs—such as HBCD and PFAS—are often very difficult to destroy, meaning that disposal processes, like incineration, may actually cause additional releases.[96]

Thus, releases of PBT chemicals under the conditions of use are highly likely, if not a near certainty; and given those releases, it is likely that serious adverse effects will occur. As EPA recognizes, "once PBT chemicals are released into the environment, they are often difficult

---

[90] *See* Regulation of Persistent, Bioaccumulative, and Toxic Chemicals Under TSCA Section 6(h), 84 Fed. Reg. 36,728, 36,740–42 (proposed July 29, 2019) (to be codified at 40 C.F.R. pt. 751); *see* EPA, Document No. EPA-740-R1-8002, *Exposure and Use Assessment of Five Persistent, Bioaccumulative, and Toxic Chemicals* 20 (June 2019) ("Exposure and Use Assessment"), https://www.regulations.gov/document/EPA-HQ-OPPT-2019-0080-0518.
[91] 84 Fed. Reg. at 36,740–42; EPA, Doc. No. 740-R1-8006, *Risk Evaluation for Cyclic Aliphatic Bromide Cluster (HBCD)* 144 (Sept. 2020), https://www.epa.gov/sites/default/files/2020-09/documents/1._risk_evaluation_for_cyclic_aliphatic_bromide_cluster_hbcd_casrn25637-99-4_casrn_3194-5_casrn_3194-57-8.pdf (describing releases from EPS/XPS foam recycling).
[92] Exposure and Use Assessment at 21–22.
[93] *See* 84 Fed. Reg. at 36,740–42; Exposure and Use Assessment at 126.
[94] *See* Exposure and Use Assessment at 170–72, 178.
[95] *See id.* at 113, 176–77.
[96] *See* 84 Fed. Reg. at 36,731(noting that PBT chemicals were of concern because PBT chemicals are "toxic chemicals that are not removed from the environment at rates adequate to prevent exposure to . . .  organisms" and noting that the persistent nature of PBT chemicals meant that they "remain in the environment for long periods of time"); *Persistent Bioaccumulative Toxic (PBT) Chemicals Rules Under the TRI Program*, EPA, https://www.epa.gov/toxics-release-inventory-tri-program/persistent-bioaccumulative-toxic-pbt-chemicals-rules-under-tri (last updated Oct. 26, 2022) (explaining that "PBT chemicals are of particular concern not only because they are toxic but also because they remain in the environment for long periods of time, are not readily destroyed, and build up or accumulate in body tissue").

or impossible to remediate."[97] And once in the environment, their "persistence in the environment increases the likelihood of exposure."[98] "When exposure of the environment or biological organisms (including humans) to a PBT chemical is expected, one or more of the conditions above (i.e., serious acute or chronic effects or significant environmental effects) is generally likely to occur."[99]

In sum, the best available science shows that PBT chemicals "may cause" serious adverse effects to health and the environment.[100] Accordingly, an identified PBT is ineligible for approval under EPA's own regulations at 40 C.F.R. § 723.50(d) and cannot meet the statutory will not present unreasonable risk standard. Thus, EPA cannot approve the manufacture of an identified PBT chemical under the LVE and LoREX exemptions. Instead, EPA must commit that once it identifies a chemical as PBT, it will automatically deny the LVE or LoREX notice, without conducting any further analysis into "releases" or "exposures." Consistent with this commitment, EPA must strike the following language from the Proposed Rule:

40 C.F.R. § 723.50

(d) *Chemical substances that cannot be manufactured under this exemption.*

***

(ii) A PBT chemical substance ~~with anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms~~.[101]

**2. EPA should codify its approach to identifying PBT chemicals in its regulations.**

The proposed regulatory text lacks clarity as to how EPA will identify whether a chemical is a PBT when a manufacturer seeks a LVE or LoREX. In the preamble to the Proposed Rule, EPA purports to codify its 1999 PBT Policy, but the regulatory text does not do so.

1. The 1999 PBT Policy provides guidance on how EPA identifies, assesses, and ultimately regulates PBT chemicals within the PMN process.[102] Under the policy, chemical substances are evaluated for three criteria: persistence (P), bioaccumulation (B), and toxicity (T). The Agency developed a scoring system in which a rating of 1 to 3 is assigned for each of P, B,

---

[97] 88 Fed. Reg. at 34,114.
[98] *Id.*; *see also* 64 Fed. Reg. at 60,199 (explaining how following release into the environment, "[r]epeated exposures result from a PBT chemical . . . usually via contaminated water, sediments, or food").
[99] 88 Fed. Reg. at 34,115.
[100] 40 C.F.R. § 723.50(d).
[101] 88 Fed. Reg. at 34,124 (proposed 40 C.F.R. § 723.50(d)(2)(ii)).
[102] Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances, 64 Fed. Reg. 60,194 (Nov. 4, 1999).

and T. [103] The 1999 PBT Policy establishes certain numerical thresholds for assessing persistence and bioaccumulation (as depicted in the table below):

**NEW CHEMICALS PROGRAM PBT CATEGORY CRITERIA AND PROCESS**

| | TSCA Section 5(e) Action | |
|---|---|---|
| | 5(e) Order Pending Testing/Significant New Use Rule (SNUR)[1] | 5(e) Ban Pending Testing[2] |
| Persistence (transformation half-life). | > 2 months ...... | > 6 months |
| Bioaccumulation (Fish BCF or BAF)[3]. | ≥ 1,000 ............ | ≥ 5,000 |
| Toxicity ....... | Develop toxicity data where necessary[4]. | Develop toxicity data where necessary[4] |

[1]Exposure/release controls included in order; testing required.
[2]Deny commercialization; testing results may justify removing chemical from "high risk concern".
[3]Chemicals must also meet criteria for MW (< 1000) and cross-sectional diameter (< 20A, or < 20 × $10^{-8}$ cm).
[4]Based upon various factors, including concerns for persistence, bioaccumulation, other physical/chemical factors, and toxicity based on existing data.

Based on the 1999 PBT Policy and subsequent EPA guidance, it appears that:

- For Persistence (P):
  - a score of 1 is given for half-life under 2 months;
  - a score of 2 is given for half-life greater than or equal to 2 months; and
  - a score of 3 is given for half-life greater than 6 months.
- For Bioaccumulation (B)
  - a score of 1 is given for a Fish Bioconcentration Factor ("BCF") or bioaccumulation factor ("BAF") under 1000;
  - a score of 2 is given for a Fish BCF or BAF greater than or equal to 1000;
  - a score of 3 is given for a Fish BCF or BAF greater than 5000.[104]

---

[103] *Id.* at 60,199.
[104] *Id.* at 60,202; *see also* EPA, *TSCA Work Plan Chemicals: Methods Document* 15(Feb. 2012) ("Work Plan Document"), https://www.epa.gov/sites/default/files/2014-03/documents/work_plan_methods_document_web_final.pdf.

Unlike for persistence and bioaccumulation, the 1999 PBT Policy does not use numerical thresholds for determining a score for toxicity. Instead, it provides a list of qualitative assessment factors EPA uses to score toxicity.[105]

2. Although the Proposed Rule purports to codify the 1999 PBT Policy, it does not do so. The regulatory text only references the Policy without saying how it will be used:

> [A] chemical substance possessing characteristics of persistence (P) in the environment, accumulation in biological organisms (bioaccumulation (B)), and toxicity (T) resulting in potential risks to humans and ecosystems. For more information on EPA's Policy on new chemical substances that are PBTs, see EPA's 1999 policy statement.[106]

And while the preamble states that "[i]f a substance scores a 2 or above for all three characteristics, EPA considers the substance to be PBT," that is not reflected anywhere in the regulations proposes to codify.[107] Thus, EPA does not say how it will score chemicals.

3. To remedy that deficiency, EPA should take two steps. First, EPA should expressly codify in the regulatory text how it will use the 1999 PBT Policy to identify PBTs. In particular, EPA should commit to using the policy's numerical thresholds for assessing persistence and bioaccumulation. These thresholds are supported by scientific research, and are consistent with the Stockholm Convention thresholds for identifying persistent organic pollutants.[108] Having such bright-line criteria is important to protect against PBT chemicals being approved under the LVE.

In doing so, EPA should state it will find that a chemical:
(1) is persistent if it has a transformation half-life greater than two months; and
(2) is bioaccumulative if it has a BCF or BAF of 1,000 or more.[109]

Second, EPA must clarify whether it intends to continue to use the qualitative factors under the 1999 PBT Policy to assess toxicity (T). If so, EPA must provide additional information

[105] 64 Fed. Reg. at 60,199
[106] *See* 88 Fed. Reg. at 34,124 (citing 64 Fed. Reg. 60,194) (proposed 40 C.F.R. § 723.50(b)(12)).
[107] 88 Fed. Reg. at 34,114.
[108] *See* UN, Rep. No. UNEP/POPS/POPRC.3/20, *Report of the Persistent Organic Pollutants Review Committee on the Work of Its Third Meeting* 33–54 (2007), http://chm.pops.int/Portals/0/Repository/poprc3/UNEP-POPS-POPRC.3-20.English.PDF; UN, UN, *Stockholm Convention on Persistent Organic Pollutants (POPs) (2009)*, at 53–54, http://chm.pops.int/Portals/0/sc10/files/a/stockholm_convention_text_e.pdf.
[109] EPA should *also* clarify that EPA retains discretion to identify a chemical as persistent or bioaccumulative even where the thresholds are not exceeded on a case-by-case basis, where warranted.

on how these qualitative factors correspond to the 1-3 scoring system that EPA suggests it will use.

### E. EPA Should Act as Quickly as Possible to Make PFAS and PBTs Ineligible for the LVE and LoREX Exemptions.

EPA must work to finalize the proposal to make PFAS and PBTs ineligible under the LVE and LoREX exemptions (with the suggested changes) as soon as possible. Currently, EPA proposes to wait until February 2025 to finalize this rulemaking.[110] That is far too late.

As demonstrated above, EPA already has all the information it needs to finalize these changes. Indeed, they are consistent with and build upon EPA's existing policies and scientific conclusions.

Given the threat these chemicals pose, there is no reason to wait even a day longer than is needed to prepare a final rule executing these changes. Whatever that date is, it is far sooner than February 2025, and the Agency must act with urgency.

## II. SUBSTANTIVE CHANGES TO NEW CHEMICALS REVIEW

The Proposed Rule proposes a number of other changes to EPA's review and decision-making process for PMNs and other applications to manufacture new chemical substances. We offer comments on fours aspects of the proposal:

1. EPA must finalize its proposal requiring that manufacture of a new chemical cannot begin until EPA has made a final determination on the application, whether a PMN, significant new use notice ("SNUN"), LVE, or LoREX.
2. EPA's proposed regulation codifying its authority to modify section 5 orders after they have been issued is unlawful and arbitrary because it omits EPA's authority to strengthen protections contained in an order.
3. EPA's proposal to revise the definition of potentially exposed and susceptible populations to include "overburdened communities" is warranted and should be further improved to provide greater clarity as to the meaning of that term.
4. EPA must clarify and expand its proposed information submission requirements to better enable it to collect information relevant to risk, particularly risks to potentially exposed and susceptible subpopulations.

[110] Rule Status for *Updates to New Chemicals Regulations Under the Toxic Substances Control Act*, OMB, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202304&RIN=2070-AK65 (last visited Aug. 7, 2023).

### A. EPA Should Not Allow a New Chemical to be Manufactured Until EPA Makes a Final Regulatory Determination on the New Chemical Application.

We support EPA's proposals to clarify that a company that submits an application to manufacture a new chemical substance may not begin manufacture until EPA has made a final regulatory determination authorizing manufacture of the new chemical.[111]

One of the significant reforms enacted in the 2016 Amendments was to require EPA to make a determination as to the risk posed by a new chemical substance before its manufacture could commence.[112] This change ensures that any new chemical, for which a manufacturer has submitted a PMN, is subject to EPA pre-manufacture review before it enters the market. In doing so, the 2016 Amendments end the situation in which a manufacturer could begin manufacturing a new chemical substance after the statutory review period had ended, even if EPA had failed to make a determination as to the chemical's risks. Indeed, prior to the 2016 Amendments, 80 percent of the chemicals for which a PMN was submitted entered the market without EPA completing a risk review and determination.[113]

Here, EPA correctly proposes to align its regulations for PMNs to ensure that manufacture cannot commence until after EPA has made the required section 5 determination. Similarly, EPA proposes that it must make a regulatory determination before manufacture of a new chemical can begin pursuant to the LVE and LoREX exemptions.[114] While the undersigned commenters have significant concerns regarding the legality of these exemptions, we agree that EPA should not allow manufacture pursuant to an exemption until it has reviewed the application and made a final regulatory determination.

### B. EPA Has Authority to Modify Section 5 orders—Including by Expanding the Restrictions Contained in the Order—but Unlawfully Proposes to Codify Only Its Authority to Narrow or Revoke an Order.

EPA proposes to codify its authority to modify orders issued under section 5(e) and 5(f) of TSCA,[115] but the proposed language fails to state that EPA can expand the prohibitions or limitations in an order, in addition to narrowing or removing them. The proposed amendment states that "EPA may modify or revoke the prohibitions and limitations in an order . . . if the submitter submits to EPA additional testing, studies, reports, or other information that EPA determines, upon review, demonstrate that such prohibitions or limitations are no longer

[111] *See* 88 Fed. Reg. at 34,104.
[112] 15 U.S.C. § 2604(a)(1)(B).
[113] *Statistics for the New Chemicals Review Program Under TSCA,* EPA, https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/statistics-new-chemicals-review (last updated Aug. 3, 2023).
[114] 88 Fed. Reg. at 34,102.
[115] *Id.* at 34,105 (noting that "current regulations do not specify that EPA may modify or revoke the prohibitions and limitations in an issued order" but the proposed amendments "would codify current practices" and "fulfill the requirements of TSCA section 5").

necessary to protect against an unreasonable risk of injury to health or the environment."[116] The proposal does not, however, codify EPA's corollary authority to modify orders by imposing more stringent protections when new information (whether from the submitter or any other source) demonstrates an order is insufficient to protect against unreasonable risk.

While the proposed regulation does not expressly prohibit or limit EPA's existing authority to strengthen the protections contained in section 5 orders, the exclusively deregulatory nature of the proposal is nevertheless troubling. The proposed language is inconsistent: with EPA's statutory duties under TSCA; administrative law principles regarding the scope of agency authority to modify prior decisions; and EPA's existing practices. In finalizing amendments to 40 C.F.R. § 720.75(d)(3), EPA should expressly state that it has authority to modify section 5 orders in either direction.[117]

A foundational administrative law principle is that "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions."[118] The Court of Appeals for the D.C. Circuit has articulated this as "statutorily implicit" authority,[119] which is subject to limits imposed by statutory language.[120] Such limitations could come from a statute's provision with an express "mechanism capable of rectifying [the agency's] mistaken actions," which would then displace the agency's inherent authority.[121] Thus, courts have found that an

---

[116] *Id.*at 34,124 (proposing to amend 40 C.F.R. § 720.75(d)(3) related to review of PMNs); *see also id.* at 34,125 (proposing to amend 40 C.F.R. § 725.170(b)(3) related to review of MCANs).
[117] EPA uses similarly restrictive language in its proposed § 725.170(b)(3) amendments governing Microbial Activity Notices (MCANs), *see id.* at 34,125, and should likewise revise the language to codify its authority to strengthen provisions in an MCAN order.
[118] *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014); *see Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002) ("[I]n the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions."); *Dun & Bradstreet Corp. Found. v. United States*, 946 F.2d 189, 193 (2d Cir. 1991) ("It is widely accepted that an agency may, on its own initiative, reconsider its interim or even its final decisions, regardless of whether the applicable statute and agency regulations expressly provide for such review.").
[119] *Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023) (cleaned up) (clarifying that the authority is found implicitly in the power delegated to agencies by Congress).
[120] *Ivy Sports Med.*, 767 F.3d at 86 (acknowledging that "Congress . . . undoubtedly can limit an agency's discretion to reverse itself" with statutory language (quoting *New Jersey v. EPA,* 517 F.3d 574, 583 (D.C. Cir. 2008))).
[121] *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 835 (D.C. Cir. 1984); *see Ivy Sports Med.*, 767 F.3d at 86.

agency's inherent authority is limited where the agency's revision of its prior decision would have the effect of nullifying a provision of the statute.[122]

Because no such limits are established in TSCA, EPA has the authority under TSCA to modify section 5 orders. Indeed, the Agency clearly acknowledges it possesses such authority by including the modification provision in its proposed regulation.[123] However, unlike the proposed regulatory language, EPA's authority to modify orders is not limited to deregulatory modifications but also includes the authority to expand the protections contained in an order after it has been issued.

Nothing in TSCA divests EPA of its "statutorily implicit" authority to expand the prohibitions or limitations in section 5 orders.[124] There is no provision in TSCA that authorizes EPA to weaken the terms of section 5 orders while restricting EPA's ability to expand the prohibitions or limitations in section 5 orders. Nor is there any provision of TSCA that would be effectively nullified if EPA modified an order by strengthening the protections it contains. Thus, there is no textual basis for concluding that EPA's authority to modify orders is limited to deregulation.

To the contrary, the structure and purpose of TSCA confirm that EPA does possess the authority to revise section 5 orders to impose additional prohibitions or limitations in light of new information. First, TSCA's structure is consistent with this authority. Section 21(a) allows people to petition EPA to issue, amend, or repeal a section 5 order by setting forth the facts necessary to establish that such a change is needed.[125] Thus, section 21 affirmatively authorizes EPA to strengthen the protections in section 5 orders at the behest of petitioners. Nothing suggests Congress only authorized EPA to strengthen the protections in a section 5 order in response to a section 21 petition but denied EPA the authority to do so on its own initiative.

Second, the purpose of section 5(e) is to provide EPA with a means to "prohibit or limit the manufacture, processing, distribution in commerce, use, or disposal of [new chemicals] to protect against an unreasonable risk of injury to health or the environment" in the absence of enough information for EPA to make a definitive finding about unreasonable risks under sections

---

[122] *New Jersey v. EPA,* 517 F.3d at 583 (holding EPA did not have the authority to discretionarily remove electric utility steam generating units from the list of sources regulated under section 112 of the Clean Air Act because section 112(c)(9) provided specific delisting requirements which "unambiguously limit[] EPA's discretion to remove sources"); *see also Ala. Env't Council v. Adm'r, EPA*, 711 F.3d 1277, 1291 (11th Cir. 2013) (applying the same logic to find EPA is limited in its authority to revise a State Implementation Plan under the Clean Air Act because sections 110(k)(5) and (k)(6) provide specific procedures for doing so).
[123] 88 Fed. Reg. at 34,124–25.
[124] *Nat. Res. Def. Council*, 67 F.4th at 401 (cleaned up).
[125] 15 U.S.C. § 2620(a) ("Any person may petition the Administrator to initiate a proceeding for the issuance, amendment, or repeal of . . . an order under section 2603 or 2604(e) or (f) . . . ."); *id.* § 2620(b)(1) ("Such petition shall be filed in the principal office of the Administrator and shall set forth the facts which it is claimed establish that it is necessary to issue, amend, or repeal a rule under . . . section 2603 or 2604(e) or (f) . . . .").

5(a)(3)(A) or 5(a)(3)(C).[126] In such circumstances, EPA must regulate the use of those chemicals "while any required information is being developed."[127] Logically, when new information is developed that demonstrates a chemical is riskier than EPA had originally determined, EPA should impose additional restrictions as necessary to fulfill the purpose of section 5(e).[128] This also furthers the broader policy goals of TSCA to develop adequate information about the effects of chemicals on health and the environment, and use that information to regulate chemicals to protect against "unreasonable risk of injury to health or the environment."[129]

Finally, EPA's practices reflect its understanding that it possesses this "statutorily implicit" authority under TSCA. In a number of section 5(e) orders, EPA has adopted standard language regarding modification in which the agency specifies that it may modify the order, after it has been issued, to strength its protections. These orders state that "EPA may, at any time, upon the receipt or evaluation of any information, new or existing, determine that these New Chemical Substances presents or may present an unreasonable risk of injury to health or the environment, and may issue a rule to regulate the substance or modify this Order to address any risks."[130] They additionally state that EPA "may modify or revoke provisions of this Order if EPA determines that specific requirements of this Order are no longer necessary to protect against a previously identified risk, or upon consideration of any information, new or existing,

---

[126] *Id.* § 2604(e)(1)(A); *id.* § 2604(a)(3)(A), (C).
[127] *Id.* § 2604(e)(1)(A).
[128] EPA is especially equipped to do this given TSCA's provisions for the ongoing collection of information about chemicals' environmental and health impacts. *See id.* § 2603(a)(1) (requiring testing on substances "with respect to the health and environmental effects for which there is an insufficiency of information" if testing "is necessary to develop such information"); *id.* §§ 2607(a)(1)(A), (a)(2)(E) (requiring manufacturers to maintain records and send reports to EPA, including "all existing information concerning the environmental and health effects of such substance or mixture"); *id.* § 2607(a)(3)(A)(ii) (applying the reporting requirements to manufacturers and processors operating under section 5(e) orders).
[129] *See id.* § 2601(b)(1)–(2).
[130] *See, e.g.,* EPA, TSCA Section 5 Order for a New Chemical Substance for Chevron U.S.A. Inc. 13 (Aug. 25, 2022) (emphasis added), https://chemview.epa.gov/chemview/proxy?filename=sanitized_consent_order_p_21_0144c.pdf; EPA, TSCA Section 5 Order for a New Chemical Substance for Crison, LLC 13 (May 2, 2022), https://chemview.epa.gov/chemview/proxy?filename=sanitized_consent_order_p_21_0032c.pdf; EPA, TSCA Section 5 Order for a New Chemical Substance for Corteva Agriscience LLC 11 (Mar. 3, 2022), https://chemview.epa.gov/chemview/proxy?filename=sanitized_consent_order_p_22_0013.pdf.

that these New Chemical Substances are not likely to present an unreasonable risk of injury to health or the environment."[131]

Thus, contrary to EPA claims that the proposed amendments "would codify current practices,"[132] EPA's current practice is not limited to reducing or revoking the requirements in section 5(e) orders. Instead, EPA's current practice recognizes its authority to expand limitations or prohibitions in section 5 orders. Therefore, it would be arbitrary to only codify EPA's authority to modify section 5 orders by weakening or eliminating protections.[133]

### C. We Support and Urge EPA to Expand Its Proposed Revisions to the Definition of "Potentially Exposed or Susceptible Subpopulation."

The Proposed Rule would clarify that the definition of "potentially exposed or susceptible subpopulation" includes "overburdened communities."[134] We support this change, which is consistent with the statutory definition of potentially exposed or subpopulation as "a group of individuals within the general population identified by [EPA] who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture."[135] The statute provides a non-exhaustive list of potentially exposed or susceptible subpopulation, which include, depending on the chemical substances, "infants, children, pregnant women, workers, or the elderly."[136] Because overburdened communities are also likely to experience greater risks because of greater susceptibility, greater exposure, or both, EPA is right to include them in its regulatory definition.

However, the Proposed Rule does not define "overburdened community" or explain why they fall within the scope of potentially exposed or susceptible populations. Such communities often live in proximity to polluting facilities or waste disposal sites, and have greater levels of

---

[131] *See, e.g.,* EPA, TSCA Section 5 Order for a New Chemical Substance for Chevron U.S.A. Inc. 13 (Aug. 25, 2022), https://chemview.epa.gov/chemview/proxy?filename=sanitized_consent_order_p_21_0144c.pdf; EPA, TSCA Section 5 Order for a New Chemical Substance for Crison, LLC 13 (May 2, 2022), https://chemview.epa.gov/chemview/proxy?filename=sanitized_consent_order_p_21_0032c.pdf; EPA, TSCA Section 5 Order for a New Chemical Substance for Corteva Agriscience LLC 11 (Mar. 3, 2022), https://chemview.epa.gov/chemview/proxy?filename=sanitized_consent_order_p_22_0013.pdf.
[132] 88 Fed. Reg. at 34,105.
[133] *See WildEarth Guardians v. EPA*, 770 F.3d 919, 941 (10th Cir. 2014) (noting that "unexplained deviation from past practice can render an agency's decision arbitrary and capricious").
[134] 88 Fed. Reg. at 34,105.
[135] 15 U.S.C. § 2602(12).
[136] *Id.*

toxic chemicals in their air, water, homes, and food sources.[137] This "greater exposure" places them at "greater risk than the general population."[138] In addition, overburdened communities are often exposed to multiple chemical or non-chemical stressors, such as income insecurity, racial discrimination, preexisting health conditions.[139] These cumulative exposures make them more susceptible to harm from a new chemical. The term "overburdened community" includes, but is not limited to, the populations that EPA has defined as "fenceline communities."[140] While people who live around polluting facilities are disproportionately burdened by chemical exposures, so are Indigenous populations whose diets and cultural practices leave them more exposed to harmful chemicals;[141] residents of the Arctic communities where "global distillation" results in

---

[137] *See, e.g.,* Robert D. Bullard et al., United Church of Christ, *Toxic Wastes and Race at Twenty 1987—2007*, at 52 (2007), https://www.ucc.org/wp-content/uploads/2021/03/toxic-wastes-and-race-at-twenty-1987-2007.pdf (reporting that 56% of the nine million people living within three kilometers of a commercial hazardous waste facility were people of color); Jill E. Johnston et al., *Wastewater Disposal Wells, Fracking, and Environmental Injustice in Southern Texas*, 106 Am. J. Pub. Health 550 (2016), https://pubmed.ncbi.nlm.nih.gov/26794166/ (finding that oil and gas wastewater disposal wells are more than two times more common in areas with at least 80% people of color than in predominantly white communities); Ronald White et al., *Life at the Fenceline: Understanding Cumulative Health Hazards in Environmental Justice Communities* (2018), https://ej4all.org/assets/media/documents/Life%20at%20the%20Fenceline%20-%20English%20-%20Public.pdf; Jane Kay & Cheryl Katz, *Pollution, Poverty and People of Color: Living with Industry*, Sci. Am. (June 4, 2012), https://www.scientificamerican.com/article/pollution-poverty-people-color-living-industry/.

[138] 15 U.S.C. § 2602(12).

[139] Mary B. Collins et. al., *Linking 'Toxic Outliers' to Environmental Justice Communities*, 11 Env't Rsch. Letters Art. No. 015004 (2016), https://iopscience.iop.org/article/10.1088/1748-9326/11/1/015004 (finding that air pollution from industrial facilities is likely to disproportionately impact low-income communities of color, and that these disproportionalities become even greater when considering the smaller group of facilities that generate the majority of air pollution exposure risk); Elizabeth Hoover et al., *Indigenous Peoples of North America: Environmental Exposures and Reproductive Justice*, 120 Env't Health Perspectives 1645 (2012), https://doi.org/10.1289/ehp.1205422; Lara Cushing et al., *Racial/Ethnic Disparities in Cumulative Environmental Health Impacts in California: Evidence From a Statewide Environmental Justice Screening Tool (CalEnviroScreen 1.1)*, 105 Am. J. of Pub. Health 2341 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4605180/pdf/AJPH.2015.302643.pdf.

[140] See EPA, Document No. EPA-744-D-22-001, *Draft TSCA Screening Level Approach for Assessing Ambient Air and Water Exposures to Fenceline Communities Version 1.0*, at 9 (2022), https://www.regulations.gov/document/EPA-HQ-OPPT-2021-0415-0012 (defining "fenceline communities" as communities who: (1) are proximate to facilities that release the chemical at issue to the air or (2) "may interact with" surface water bodies that receive releases of the chemical).

[141] *See* Sam Byrne et al., *PFAS and PBDEs in Traditional Subsistence Foods from Sivuqaq, Alaska*, 29 Env't Sci. & Pollution Rsch. 77145 (2022) https://doi.org/10.1007/s11356-022-20757-2.

higher concentrations of persistent organic pollutants;[142] women of color who experience greater levels of toxic exposures in their consumer and personal care products;[143] and others.

While all of those populations are encompassed by the broad, statutory definition of potentially exposed or susceptible subpopulation, to provide guidance to notice submitters and EPA risk assessors they should be referenced as examples in EPA's regulatory definition as well. We therefore urge EPA to adopt the following definition of potentially exposed or susceptible subpopulation (proposed additions in bold):

> Potentially exposed or susceptible subpopulation means a group of individuals within the general population identified by EPA who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants~~,~~**;** children~~,~~**;** pregnant women~~,~~**;** workers~~,~~**;** the elderly~~,~~**;** ~~or~~ overburdened communities, **including populations who are exposed to a chemical substance or mixture from multiple sources, pathways, or routes and populations whose cumulative exposures to multiple chemicals, mixtures or non-chemical stressors results in increased susceptibility to a chemical substance or mixture.[144]**

### D. EPA Must Clarify and Expand the Information That Must be Submitted With a PMN.

To ensure the elimination of new chemicals' unreasonable risks, including risks to potentially exposed or susceptible populations, EPA must have sufficient information to meaningfully assess those chemicals' toxicity and exposure. Yet PMNs (and other applications to manufacture new chemicals, like SNUNs and applications under the LVE) are routinely submitted with little to no toxicity and exposure data, let alone information about cumulative exposures that can increase risk to fenceline communities and other potentially exposed or susceptible subpopulations.[145]

---

[142] Frank A. Von Hippel et al., *Endocrine Disruption and Differential Gene Expression in Sentinel Fish on St. Lawrence Island, Alaska: Health Implications for Indigenous Residents*, 234 Env't Pollution 279, 279 (2018), https://www.ohchr.org/sites/default/files/documents/issues/toxicwaste/toxics-indigenous-peoples/inputsreceived/2022-07-13/alaska-community-action-toxics%20%286%29.pdf.

[143] Ami R. Zota et al., *The Environmental Injustice of Beauty: Framing Chemical Exposures from Beauty Products as a Health Disparities Concern*, 217 Am. J. Obstetrics & Gynecology 418.E1 (2017), https://www.ajog.org/article/S0002-9378(17)30862-1/fulltext.

[144] Because the term "potentially exposed or susceptible subpopulation" is used and defined in EPA's TSCA risk evaluation rule as well, we urge EPA to adopt this definition in its upcoming revisions to that rule.

[145] *See* 88 Fed. Reg. at 34,105–06 ("EPA has observed that most PMN, SNUN, and exemption notices do not contain all required information at the level of detail that EPA needs to perform refined, quantitative risk assessments.").

The Proposed Rule would clarify and expand the types of information that must be submitted along with a PMN and other applications to manufacture new chemicals, in an effort to "improve the accuracy of EPA's risk assessment[s]" and "help submitters provide all relevant information in their initial notice submissions."[146] We support those proposed changes and urge EPA to expand upon them and require additional information that is needed to fully assess a new chemical's exposures and risks.

The contents of a PMN are governed by TSCA section 5(d)(1), which states that a PMN "shall include:" (1) "the information described in subparagraphs (A), (B), (C), (D), (F), and (G) of [TSCA section 8(a)(2)],"[147] (2) "any information . . . related to the effect of any manufacture, processing, distribution in commerce, use, or disposal of such substance or any article containing such substance, or of any combination of such activities, on health or the environment," and (3) "a description of any other information concerning the environmental and health effects of such substance."[148] "As the Supreme Court has recognized, the ordinary meaning of 'related to' is 'broad': 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'"[149] Any information with any "bearing or concern" on the effects of a new chemical substance—including information about aggregate and cumulative exposures that can exacerbate the chemical's effects—must therefore be submitted to the extent such information is "in the possession or control of the" the PMN submitter.[150] Information about cumulative and aggregate exposures is also required for EPA to evaluate new chemicals' risks to potentially exposed or susceptible subpopulations, as TSCA requires, since exposure to multiple chemicals that pose similar or synergistic effects can render a group more susceptible to harm from the new chemical substance.[151] EPA has implemented the foregoing requirements through 40 C.F.R. § 720.45, which specifies "information" a PMN "must include . . . to the extent it is known to or reasonably ascertainable by the submitter," and 40 C.F.R. § 720.50, which provides "each [PMN] must contain all test data in the submitter's possession or control which are related to the effects on health or the environment . . . of the new chemical substance or any mixture or article containing the new chemical substance."

The Proposed Rule would "add details to certain information requirements already contained in 40 CFR 720.45 and . . . add additional reporting fields to the PMN form to reflect

---

[146] *Id* at 34,106.
[147] 15 U.S.C. § 2604(d)(1)(A). The referenced sections of TSCA section 8 include, among other things, "the number of individuals exposed, and reasonable estimates of the number who will be exposed, to such substance or mixture in their places of employment and the duration of such exposure" and "the manner or method of . . . disposal." *Id.* § 2607(a)(2)(F), (G).
[148] *Id.* § 2604(d)(1)(B), (C).
[149] *United States v. Agrawal*, 726 F.3d 235, 247 (2d Cir. 2013) (quoting *Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992)) (cleaned up).
[150] *Id.*; 15 U.S.C. § 2604(d)(1)(B).
[151] 15 U.S.C. § 2604(a)(3)(A) (requiring EPA to determine whether a new chemical substance presents "unreasonable risk to a potentially exposed or susceptible subpopulation"); *id.* § 2602(12) (defining "potentially exposed or susceptible subpopulation" as a "group of individuals within the general population . . . who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population").

these details."[152] Those "add[ed] details" include, among other information, "the types of products or articles that would incorporate the new chemical substance (e.g., household cleaners, plastic articles)," "consumption rates and frequency and duration of use for products or articles containing the new chemical substance," "identification . . . of any points of release," and "the amount of the chemical substance released directly to the environment or into control technology."[153]

While we agree that added information is necessary to evaluate new chemical submissions, EPA's proposed changes would still leave the Agency without the information it needs to fully assess a new chemical's risks. Indeed, as EPA acknowledges, most of that added information is already solicited by EPA's existing CDX PMN submission system, yet it has not provided "the level of detail that EPA needs to perform refined, quantitative risk assessments."[154] We therefore urge EPA to expand it revisions to 40 C.F.R. § 720.45 and § 720.50 and to require the submission of the following information:

- Any potentially exposed or susceptible subpopulations who may be exposed to the new chemical substance. The evaluation of potentially exposed or susceptible subpopulations is "related to the effect" of the new chemical "on health or the environment,"[155] and, as described above, is a statutorily required part of the new chemical review process.[156]
- If the substance is intended, known or reasonably foreseen to be used in a product or article, any other chemicals that are present in the product or article. The identification of chemical co-exposures is "related to the effect" of the new chemical on "health or the environment,"[157] and required part of the section 5 analysis, since such co-exposures to chemicals that present similar or synergistic health effects can increase workers' or consumers' susceptibility to the new chemical substance.[158]
- Other chemicals that are used in manufacturing or processing of the new chemical substance. The identification these potential co-exposures is "related to the effect" of the new chemical "on health or the environment,"[159] and in particular its risks to

[152] 88 Fed. Reg. at 34,106.
[153] *Id.* at 34,106–08.
[154] *Id.* at 34,105–06.
[155] 15 U.S.C. § 2604(d)(1)(B).
[156] *See supra* Section II.C.
[157] 15 U.S.C. § 2604(d)(1)(B).
[158] See, e.g., EPA, *Draft Proposed Approach for Cumulative Risk Assessment of High-Priority Phthalates and a Manufacturer-Requested Phthalate under the Toxic Substances Control Act* 11 (Feb. 2023), https://www.regulations.gov/document/EPA-HQ-OPPT-2022-0918-0009 ("Phthalates are a group of ubiquitous environmental chemicals that are used in many industrial and consumer products . . . . Because humans are co-exposed to some phthalates and because some phthalates can cause common adverse effects on the developing male reproductive system, EPA believes that the best approach to assess risk to human health may be to look at the combined risk to health from exposure to multiple phthalates.").
[159] 15 U.S.C. § 2604(d)(1)(B).

potentially exposed or susceptible subpopulations, since they may render workers and surrounding communities more susceptible to harm from the new chemical substance.[160]

- The chemical's degradation products. Current EPA regulations require submitters to identify "[t]he impurities anticipated to be present in the substance" and "[a] description of the byproducts resulting from the manufacture, processing, use, and disposal of the new chemical substance," but they do not mention the products of the chemical's degradation in the environment.[161] EPA should clarify that the reference to "byproducts" in 40 C.F.R. § 720.45(d) includes degradation products, which can also present a significant source of exposure and risk.
- Analytical reference standards. EPA currently requires notice submitters to provide "test data in the submitter's possession or control which are related to the effects on health or the environment . . . of the new chemical substance or any mixture or article containing the new chemical substance."[162] But TSCA's submission requirements are not limited to "test data"; instead, section 5(d)(1) requires the submission of "any information in the possession or control of the person giving such notice which are related to the effect of . . . such substance or any article containing such substance . . . on health or the environment."[163] In addition to "test data," EPA should also require

[160] See Nat'l Rsch. Council, *Science and Decisions: Advancing Risk Assessment* 214 (2009), https://www.nap.edu/catalog/12209/science-and-decisions-advancing-risk-assessment ("[E]ven if the regulatory decision of interest were related to strategies to address a single chemical with a single route of exposure, consideration of other compounds and other factors may be necessary to inform the decision. Ignoring numerous agents or stressors that affect the same toxic process as the chemical of interest and omitting background processes could lead to risk assessments that, for example, assume population thresholds in circumstances when such thresholds may not exist."). For additional information on the connection between cumulative chemical exposures, non-chemical stressors, and increased susceptibility, *see, e.g.*, Rachel Morello-Frosch et al., *Understanding the Cumulative Impacts of Inequalities in Environmental Health: Implications for Policy*, 30 Health Affs. 879 (2011), https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2011.0153; Cliona M. McHale et al., *Assessing Health Risks from Multiple Environmental Stressors: Moving from G×E to I×E*, 775 Mutational Rsch. 11 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5863617/; Devon C. Payne-Sturges et al., *Methods for Evaluating the Combined Effects of Chemical and Nonchemical Exposures for Cumulative Environmental Health Risk Assessment*, 15 Int'l. J. Env't Rsch. & Pub. Health 2797 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6313653/; Gina M. Solomon et al., *Cumulative Environmental Impacts: Science and Policy to Protect Communities*, 37 Ann. Rev. Pub. Health 83, 87–88 (2016), https://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-032315-021807; Patricia D. Koman et al., *Population Susceptibility: A Vital Consideration in Chemical Risk Evaluation Under the Lautenberg Toxic Substances Control Act*, 17 PLoS Biology Art. No. e3000372, at 4 (2019), https://journals.plos.org/plosbiology/article?id=10.1371/journal.pbio.3000372.

[161] 40 C.F.R. § 720.45(b), (d).

[162] *Id.* § 720.50(a)(1).

[163] 15 U.S.C. § 2604(d)(1)(B).

the submission of analytical reference standards, or a compound of high purity and known concentration that can be used to calibrate laboratory equipment to detect the substance at issue. An analytical reference standard is "related to the effect" of a chemical on human health or the environment since it enables regulators and impacted communities to detect the chemical in the environment and to determine whether environmental exposures are associated with adverse health effects.

- Information about environmental non-compliance and unplanned chemical releases. EPA currently does not require notice submitters to provide any information about past environmental violations or unplanned chemical releases at the facilities where a new chemical is intended to be manufactured, processed, used or disposed. This information is also "related to the effect" of the new chemical "on health or the environment,"[164] because if the submitters or intended downstream users have a track record of environmental non-compliance then it is "reasonably foreseen" that such uses may recur in the future, resulting in greater chemical exposures and risks.[165]

Finally, EPA should eliminate the loophole in 40 C.F.R. § 720.45 which states that "no person is required to include information which relates solely to exposure of human or ecological populations outside of the United States."[166] Although EPA may not be able to regulate exposures outside of the United States under TSCA, given how little exposure data exists for most new chemicals the consideration of foreign exposure may represent the best source of information available. In such cases, foreign exposures can be used as a proxy for domestic exposures or an input in EPA's exposure modeling. With many new chemicals commercialized in Europe or Asia before they are introduced in the United States, there is no legal basis for EPA to exclude information about non-domestic exposures from the new chemical review process.

## III. PROCEDURAL CHANGES TO NEW CHEMICALS REVIEW

### A. EPA's Proposals to End Re-work Are Insufficient.

We support EPA codifying its pre-screening processes and its proposal to reset the applicable review period upon a determination that a PMN is incomplete.[167] EPA recognizes that such changes are needed to address the problem of "re-work," in which: EPA conducts its review of a PMN; EPA finds that the new chemical presents (or may present) unreasonable risk; the submitter then disputes EPA's findings by providing purportedly new information relating to risk; and EPA then uses the new information to redo its risk assessment, often leading to weaker substantive protections.[168]

---

[164] *Id.*
[165] *Id.*§ 2604(a)(3)(A) (requiring EPA to evaluate the risks from a new chemical substance "under the conditions of use"); *id.* § 2602(4) (defining "conditions of use" as "the circumstances . . . under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of").
[166] 40 C.F.R. § 720.45.
[167] *See* 88 Fed. Reg. at 34,110–11; *id.* at 34,122–23 (proposed 40 C.F.R. § 720.65).
[168] *Id.* at 34,109–11.

1. At the outset, we note that the problem of re-work, while real, stems from EPA's bilateral approach to PMN review and regulation, which EPA should end. EPA admits that after it has evaluated PMNs and made a preliminary risk determination, it routinely engages in extended back-and-forth with chemical manufacturers who seek to water down EPA's risk findings and resulting regulations. EPA then negotiates the terms of the regulations with chemical manufacturers, such that it regularly issues "consent" orders under section 5(e). In other words, rather than imposing restrictions on manufacturers necessary to protect the public, EPA establishes restrictions that manufacturers can live with.

The public—particularly fenceline communities living near chemical manufacturing plants—is wholly shut out of these bilateral negotiations. Unlike chemical manufacturers, the public is not given a chance to see EPA's initial risk determinations, provide critiques on why a determination is insufficient, or to weigh in on the choice of potential restrictions in a section 5 order.

EPA's proposal thus misses the forest for the trees. The problem is not re-work, but EPA's behind-closed-doors, negotiated approach to regulating toxic new chemicals. EPA should end those practices, which would have the collateral benefit of reducing the re-work problem.

2. Nevertheless, EPA correctly recognizes that re-work leads to longer PMN reviews and delays the Agency's ability to issue a determination on a PMN. And perversely, the delays created by re-work are then used by chemical manufacturers as a political cudgel, in a cynical attempt to further weaken the already anemic PMN review program.[169] Accordingly, until EPA ends its bilateral approach to PMN review, EPA should seek to address the re-work problem so that time spent on re-work review is properly attributed to chemical manufacturers and accounted for in correctly assessing the applicable review period. The current proposal, while taking some warranted steps, should do more.

Under EPA's proposal, the applicable review period commences upon receipt of a "complete" PMN application.[170] If EPA's pre-screen process finds that the PMN is incomplete, "the applicable review period will not begin until EPA receives a complete notice, consistent with the existing regulation at 40 CFR 720.65(c)(2)(i)."[171] Further, even if EPA deems the PMN application complete in the prescreen, EPA may still determine that the application is incomplete within 30 days of receipt of the submission.[172]

In addition, if a PMN submitter amends their notice—for example, by submitting additional information pertaining to the risks of the chemical after the initial PMN submission—

---

[169] *EPA Unveils Outreach Plan to Boost Data for TSCA New-Chemical Reviews*, Inside EPA (Aug. 3, 2023), https://insideepa.com/tsca-news/epa-unveils-outreach-plan-boost-data-tsca-new-chemical-reviews ("Industry officials and legislators have repeatedly castigated EPA for delays and backlogs that have plagued the new-chemicals review program since Congress rewrote TSCA in 2016 while maintaining the original 90-180 day deadline.").
[170] 88 Fed. Reg. at 34,110.
[171] *Id.*
[172] *Id.*

and EPA in turn determines the new information was "known to or reasonably ascertainable" by the submitter, EPA will deem the initial PMN incomplete and reset the applicable review period.[173] However, EPA further explains that, if EPA determines that the information in the amended PMN was not known to or reasonably ascertainable by the submitter, EPA will not deem the initial PMN submission incomplete and the amended PMN will not restart the review period.[174]

We agree that EPA has the authority to start the applicable review period only on the receipt of a complete PMN and to reset the applicable review period when EPA discovers that the initial PMN was incomplete. Thus, we agree that EPA can deem an application incomplete—because a PMN submitter amends the PMN with information that was "known to or reasonably ascertainable" by the submitter when it initially submitted the PMN—and that EPA should reset the review period on that basis.

3. Nevertheless, EPA's proposal should be simplified. EPA should recognize that when a submitter makes substantive amendments to a PMN—i.e., amendments that could affect EPA's risk determination—the amendment constitutes a new PMN, which has its own applicable review period that starts upon the amendment's submission. This approach is fully supported by the statutory text and structure. And it is a more administrable rule than what EPA proposes.

Beginning with the text, TSCA mandates that EPA "conduct[] a review of <u>the notice</u>"—i.e., the PMN application and, based on that review of such notice, make a determination "within the applicable review period."[175] TSCA requires that the submitter "include" specific information in the notice,[176] and EPA must then review "such notice" in making its risk determination.[177] Finally, EPA's obligation to complete its review of the notice within the applicable review period commences "on the date the Administrator receives a notice."[178] Taken together, EPA is directed to review each notice and the information contained therein; the applicable review period is specific to each notice (and necessarily, information included in the notice); and the review period runs from the date on which that notice is received.

Therefore, any amendment is properly understood as its own notice with its own applicable review period. In the typical scenario where a PMN submitter submits an initial notice, "PMN 1.0," and then substantively amends the PMN by submitting an amended PMN with new information, "PMN 2.0," if EPA bases its determination on the amended PMN 2.0, EPA's review and determination is no longer based on PMN 1.0, or the information contained therein. Instead, EPA has reviewed PMN 2.0 and made a determination on the basis of its review of that notice. Indeed, as EPA recognizes, the whole reason manufacturers amend PMNs is in the hopes that EPA will reach a different risk determination on the amended PMN 2.0 than it would on the original PMN 1.0 and, consequently a different set of risk management protections.

---

[173] *Id.*; *id.* at 34,122 (proposed 40 C.F.R. § 720.65(c)(2)).
[174] *Id.* at 34,111.
[175] 15 U.S.C. § 2604(a)(1)(B)(ii) (emphasis added).
[176] *See id.* § 2604(d)(1) (identifying information that must be "include[d]" in the notice).
[177] *Id.* § 2604(a)(3) (providing that EPA "shall review such notice and determine").
[178] *Id.* § 2604(i)(3).

Because PMN 2.0 is a different notice, it necessarily has its own applicable review that commences on the receipt of the complete PMN 2.0. Therefore, where EPA receives a substantive amendment, it must restart the applicable review period.

Such a provision is also consistent with the statutory structure and purposes, particularly the provisions governing EPA's obligations to timely review PMNs within the applicable review period. Those provisions require EPA to refund fees to the PMN submitter if EPA does not render a determination within the applicable review period.[179] Those provisions arguably reflect Congress' intent that EPA complete reviews within the applicable review period and that submitters not be made to pay for EPA's delays. But where the delay is due to the action of the submitter—where a submitter voluntarily chooses to submit new information that requires the Agency to rework its risk evaluation—e.g., it would make little sense to deprive EPA of fees for the resulting delays. As EPA explains, the prototypical scenario in which a PMN is amended arises when a submitter disagrees with EPA's risk assessment and potential regulations, and seeks to "provide additional information intended to demonstrate that risks are lower than EPA estimated."[180] In such a scenario, any delay is due to the submitter's dissatisfaction with EPA's preliminary risk findings and own attempts to gain more favorable treatment. Therefore, it is fully consistent with TSCA to reset the applicable review period.[181]

Finally, this rule is more administrable than the one EPA proposes. Under EPA's Proposed Rule, EPA states that it will engage in a "case-by-case" analysis of whether to reset the applicable review period based on the receipt of new information.[182] This fact-specific analysis will turn on EPA's determination of whether the information was known to or reasonably ascertainable by the submitter at the time of the PMN submission. And EPA's determination would be subject to an objection process by the submitter that could be time and resource intensive.[183]

All of this process is wholly unnecessary in deciding how much time EPA has to review the PMN. As EPA itself recognizes based on its review of thousands of PMNs, "it should be very uncommon for a submitter to amend their notice during the review period by adding information that they could not have known or reasonably ascertained at the time of the original submission."[184] Rather than establishing a fact-intensive review period for such an uncommon event, EPA should establish the easily administrable, bright-line rule that substantive amendments made by a submitter reset the statutory review period, either because they demonstrate the application was incomplete when filed or because they constitute a new application.

---

[179] *Id.* § 2604(a)(4)(A).
[180] 88 Fed. Reg. at 34,109–10.
[181] *Id.*
[182] *Id.* at 34,111.
[183] *Id.*
[184] *Id.*

### B. The Proposed Rule Fails to Provide Much Needed Transparency into EPA's Review Process.

The Proposed Rule recognizes EPA's obligations to "provid[e] relevant information to the public in terms of the PMNs submitted and under review with EPA" but it does not meaningfully increase transparency.[185] Instead, the proposal ignores EPA's statutory mandates to provide the public with meaningful notice.

The Proposed Rule contains three parts. First, EPA proposes to only publish notices of receipt in the Federal Register after it has received a "complete" notice.[186] Second, EPA proposes that, in the Federal Register notices of receipt, it will no longer publish "a list of data submitted with the PMN in accordance with 40 CFR 720.50(a)."[187] Third, EPA indicates that it intends to use EPA's website—in particular ChemView and an EPA page listing new chemical submissions—to provide transparency.[188]

These changes are divorced from what the statute requires; indeed, in some cases EPA expressly recognizes that they violate its legal obligations. TSCA mandates that EPA publish notice of receipt of a PMN in the Federal Register within five business days of receipt of the PMN.[189] It also mandates that these notices of receipt include key information pertaining to the PMN, making clear that Congress intended that EPA use the Federal Register to make the public aware of pending applications before the Agency and thereby enable public participation in EPA's review and regulation of new chemicals.[190]

EPA should revise its rules to bring it into alignment with its statutory obligations and to provide greater transparency, not less. First, EPA should commit to publishing notice of receipt in the Federal Register within five business days of receipt of any notice, whether complete or not. That is what the plain text of TSCA commands and EPA lacks authority to disregard that command.

Second, while it is welcome that EPA formally recognizes its use of ChemView to provide the public with information about new chemicals, the proposed regulations do nothing to codify that practice. Currently, there is no mention in any of the federal regulations that EPA will post information about new chemicals to ChemView. Instead, EPA's regulations state that it will make PMNs available either: (1) at the EPA Docket Center in Washington, DC; or (2) in a docket placed at regulations.gov.[191] EPA currently does neither with any consistency. Thus, only

---

[185] *Id.* at 34,105.
[186] *Id.*; *id.* at 34,123 (proposing to codify 720.70).
[187] *Id* at 34,105.
[188] *Id.*
[189] 15 U.S.C. § 2604(d)(2).
[190] *See* Premanufacture Notification; Premanufacture Notice Requirements and Review Procedures, 48 Fed. Reg. 21,722, 21,737 (May 13, 1983) (codified at 40 C.F.R. pt. 720).
[191] 40 C.F.R. § 720.95 (stating that docket materials are available either in an electronic docket, pursuant to 40 C.F.R. § 700.17(b)(1), or at the EPA Docket Center in Washington DC, pursuant to 40 C.F.R. § 700.17(b)(2)).

members of the public who are already familiar with EPA's existing practices are likely to be able to find on ChemView information about PMNs and other new chemicals.

If EPA intends to use ChemView as a means of providing the public with information about new chemicals, then it should expressly codify that practice in its regulations so that the public knows where to look and has enforceable rights to the information.[192] Accordingly, to fulfill its statutory duty to make PMNs available for public inspection, EPA's regulations should specify that EPA will post all non-confidential materials submitted to EPA on ChemView. Additionally, because EPA intends to use ChemView to provide the public with notice of receipt of PMNs, it must commit to putting the PMN file on ChemView within five business days, rather than simply following an informal practice of making a PMN available "generally within 5 workdays of receipt."[193]

## CONCLUSION

We urge EPA to quickly act to end the manufacture of PFAS and other PBT chemicals under the LVE and LoREX exemptions to the PMN review process. Such action, along with the additional revisions suggested in these comments, are simply a starting point for the needed reforms to the new chemicals review program. We urge EPA to reach out to impacted communities, workers, and other groups representing people most affected by toxic chemicals to begin the process of bringing needed reform to the new chemicals regulations so that they actually do align with TSCA's mandates.

If you have any questions about these comments, please contact Tosh Sagar, Earthjustice, at tsagar@earthjustice.org.

Respectfully submitted,

Alaska Community Action on Toxics
Cherokee Concerned Citizens
Delaware Riverkeeper Network
Earthjustice
Natural Resources Defense Council (NRDC)
PfoaProjectNY

[192] Codifying the use of ChemView in EPA's regulations would supplement, but not supplant, the statutory requirements to make information available. Thus, EPA may use ChemView to give notice of receipt of a PMN, but that is not a lawful substitute for its express, statutory obligations to publish such notices in the Federal Register.
[193] 88 Fed. Reg. at 34,105.

**Environmental Defense Fund**

**Comments on "Updates to New Chemicals Regulations Under the Toxic Substances Control Act"**

**Docket ID**: EPA-HQ-OPPT-2022-0902; 88 Fed. Reg. 34100 (May 26, 2023)

**Submitted**: August 8, 2023

EPA has a major opportunity to improve the New Chemicals Program by crafting regulations that ensure EPA conducts robust, transparent, and objective reviews of all new chemicals that will fully protect human health and the environment, including for those people at greatest potential risk. In its proposed rule, "Updates to New Chemicals Regulations Under the Toxic Substances Control Act," EPA has put forth some limited changes that, if finalized, represent improvements. However, EPA's proposal falls significantly short of implementing the fundamental changes needed to ensure the safety of any new chemicals allowed onto the market.

EPA states that it has three goals for its proposal: to align its new chemicals regulations with Congress' 2016 reform of the Toxic Substances Control Act ("TSCA"); to improve the efficiency of its new chemicals reviews; and to update the regulations based on the Agency's existing policies and its experience with implementing the New Chemicals Program. In EDF's view, there are numerous additional TSCA goals that should inform this important rulemaking, including providing for meaningful public involvement, ensuring transparency, restoring public trust in the TSCA New Chemicals Program, and – consistent with the primary purpose of TSCA – ensuring that chemicals do not present unreasonable risks to people or the environment.

But even viewed from EPA's relatively narrow perspective, the proposal ("Proposed Rule") falls short of each of the Agency's stated goals. EPA recognizes that Congress, with its major amendments to TSCA in 2016, made fundamental changes to the Agency's new chemicals obligations.[1] However, many of Congress' key reforms to the law are not reflected in the Agency's proposed regulations. Second, the proposed regulations would codify inefficient processes, such as EPA's proposed plan to finalize regulations that continue the practice of sharing its new chemical risk findings with the submitters seeking approval, and then allowing the companies to submit information late in the process to refute the findings.

And as for EPA's third stated purpose for this rulemaking – to employ its experience in implementing the New Chemicals program to update the regulations – there is a serious disconnect between the slight changes EPA proposes to certain procedures and the scope and

[1] EPA, "Updates to New Chemicals Regulations under the Toxic Substances Control Act (TSCA)," 88 Fed. Reg. 34100, 34102-03, May 26, 2023, https://www.regulations.gov/document/EPA-HQ-OPPT-2022-0902-0001.

nature of the problems faced by the New Chemicals Program. We have seen a severe decline in public confidence in the objectivity and scientific rigor of decisions made under the program. In our view, this is in part traceable to how the program has long been structured, which has included practices that make the program vulnerable to undue industry access and influence. These problems are made even worse in times of damaging interference by political appointees, when EPA leadership changes and prioritizes industry interests over public interests – as we saw vividly under the previous administration. Despite these significant concerns and challenges, EPA has now proposed, perhaps unintentionally, to codify one-sided, industry-favoring practices. For example, EPA proposes to reopen its orders regulating new chemicals upon receipt of new information only from the companies who profit from the chemicals, and not from members of the public or any other stakeholder. EPA's description of how such new information would be used only includes the possibility of weakening or revoking its regulations of the chemicals, rather than strengthening health and environmental protections.

EDF describes in detail in these comments why and how, instead of finalizing such problematic proposals, EPA can and should take this opportunity to rebuild a new chemicals program that truly serves the public's interests even in the face of possible future efforts to do otherwise.[2]

[2] EPA should obtain public comment on a significantly broader set of regulatory proposals than is included in the Proposed Rule, and then finalize a more comprehensive rule.

## Summary of Points

**<u>Section I</u>: EPA's Proposed Rule Will Perpetuate Industry's Undue Influence Over New Chemical Reviews and Will Not Halt EPA's Resource-Draining "Rework" To Address Industry Complaints.**

***Key problems***

- The New Chemicals Program is severely hampered by delays and resource drains due to "rework" of assessments and determinations largely resulting from late submissions of information by industry.
- As EPA has recognized, companies sometimes submit information during the new chemicals review process to challenge EPA's risk determinations.

***Needed changes***

- EPA should align its new chemicals reviews with TSCA by preventing industry interference in its assessment and management of risks.
- EPA should prevent industry interference in EPA's reviews of new chemicals by barring unilateral industry access to draft risk findings, assessments, determinations, or proposed regulatory actions:
  - During the course of its reviews, EPA has shared with submitters its draft risk findings and, sometimes, assessments and allowed them to challenge the outcomes.
  - The sharing of draft risk findings or documents has no basis in TSCA, and the practice invites undue industry influence, as well as creating unnecessary "rework" for the Agency.
  - EPA should explicitly disavow this practice and codify its decision to no longer share draft risk findings or documents with industry during the course of risk reviews of new chemicals.
- EPA should add additional information submission requirements to its proposal.
- EPA should mandate consequences for companies that submit information during the new chemicals review process that they knew, or that was reasonably ascertainable, at the beginning.
- EPA should treat the submission of new information during the new chemicals review period as a new submission.

**<u>Section II</u>: EPA's Regulations Must Do Far More to Increase Transparency, Public Access to Information, and Public Participation in the New Chemicals Program.**

***Key Problem***

- EPA's proposed rule does little to codify regulatory provisions to increase the transparency and accountability of, and public engagement in, the New Chemicals Program, and to rebuild public trust.

***Needed changes***

- EPA should expand its pre-screen process to exclude confidential business information (CBI) claims that are ineligible or do not meet basic TSCA requirements.

- EPA must post all received notices to the Federal Register as required by TSCA.
- EPA should codify TSCA's requirement to post new chemical notices to the Federal Register within five days of receipt.
- EPA should codify its ChemView publication procedures to ensure timely public access to new chemical information.
- EPA's regulations should provide a timely, formal public comment opportunity on new chemical applications received.

**Section III: EPA Must Provide For Possible Revisions to Its Regulatory Orders Based on Information Submitted by the Public and Information that Warrants Strengthening Regulation.**

***Key problems***

- EPA appears to contemplate and codifies a role only for the chemical company submitter to provide information to EPA after EPA has issued an order. EPA proposes regulatory text that omits reference to information about a chemical developed or submitted by any other party, including scientific researchers, health advocates, workers, unions, other governmental agencies, or any member of the public.
- EPA's proposed language only indicates that submitted information could lead to the weakening of an order. It fails to include the possibility that additional information could warrant strengthening of protections against potential unreasonable risk.

***Needed changes***

- EPA's regulations must make clear that EPA will consider information from all stakeholders – not just from company submitters – and also that such information may warrant strengthening the order to ensure protection of human health and the environment.

**Section IV: EPA Should Fully Align Its New Chemicals Regulations with Congress' Mandates in Amended TSCA and Describe How It Will Implement the Key Reforms.**

***Key Problem***

- EPA has not fully met its stated purpose of aligning its regulations with Congress' requirements in reformed TSCA. In purporting to codify the requirements of TSCA, the Agency has been troublingly selective.

***Needed changes***

- EPA's regulations need to address information insufficiency and testing.
- EPA's reviews of new chemicals and significant new uses need to evaluate reasonably foreseen conditions of use.
- EPA's reviews of new chemicals and significant new uses need to assess risk to vulnerable subpopulations.
- EPA needs to provide public notice of and access to "not likely" determinations.
- EPA's regulations need to include requirements relating to significant new use rules (SNURs).

- EPA's regulations need to include additional requirements relating to new chemical exemptions.

**Section V: No PFAS Should Be Eligible for the Low Volume and Low Release/Exposure Exemptions, Including All Such Previously Granted PFAS Exemptions.**

- EPA is correct to make PFAS categorically ineligible for low volume and low release/exposure exemptions.
- EPA should categorically revoke existing PFAS low volume and low release/exposure exemptions.
- EPA should adopt the OECD PFAS definition.
- EPA should consider excluding other potential high-risk chemical categories from eligibility for low volume and low release/exposure exemptions.

**Section VI: EPA Should Make All PBT Chemicals Ineligible for the Low Volume and Low Release/Exposure Exemptions.**

- EPA has not proposed to codify its 1999 PBT policy, despite claiming to do so. EPA should make all PBT chemicals categorically ineligible for low volume and low release/exposure exemptions, in addition to other new chemical exemptions, consistent with the agency's PBT policy.
- EPA should codify the actual 1999 PBT policy.
- EPA should consider making persistent, mobile, and toxic (PMT) chemicals ineligible for new chemical notice exemptions, in addition to PBTs.[3]

[3] On April 5, 2022, EDF submitted to the Agency an outline titled "Areas of needed reform in regulations governing EPA's New Chemicals Program, Including 40 C.F.R. Sections 720, 721 and 723" (This outline is available in the docket for this rulemaking, at https://www.regulations.gov/document/EPA-HQ-OPPT-2022-0902-0023). While the body of these new comments delve in greater depth into most aspects of what we included in our outline, we incorporate all of our outline as part of these comments.

## Table of Contents

**I.The Proposed Rule Will Perpetuate Industry's Undue Influence Over New Chemical Reviews and Will not Halt EPA's Resource-Draining "Rework" to Address Industry Complaints ........ 8**

A. The New Chemicals Program is Severely Hampered by Delays and Resource Drains Due to "Rework" of Assessments and Determinations ........ 9

B. As EPA Has Recognized, Companies Sometimes Submit Information During the New Chemicals Review Process to Challenge EPA's Risk Determinations ........ 10

C. EPA Should Align its New Chemicals Reviews with TSCA by Preventing Industry Interference in its Assessment and Management of Risks ........ 12

D. EPA Should Prevent Industry Interference in EPA's Review of New Chemicals by Barring Unilateral Industry Access to Draft Risk Findings, Assessments, Determinations, or Proposed Regulatory Actions ........ 13

i. EPA has routinely shared draft risk findings and sometimes assessments with submitters during the course of its new chemicals reviews ........ 13

ii. The sharing of draft risk findings or documents has no basis in TSCA, and the practice invites undue industry influence – as well as creating unnecessary "rework" for the Agency 14

iii. EPA should explicitly disavow this practice and codify its decision to no longer share draft risk findings or documents with industry during the course of risk reviews of new chemicals ........ 15

E. EPA Should Add Additional Requirements to the Proposed Requirements to Provide Additional Information in Submissions ........ 16

F. EPA Should Mandate Consequences for Companies that Late Submit Information During the New Chemicals Review Process that They Knew or Could Reasonably Ascertain at the Beginning ........ 20

G. EPA Should Treat the Submission of New Information During the New Chemicals Review Period as a New Submission ........ 22

**II. EPA's Regulations Must Do Far More to Increase Transparency, Public Access to Information, and Public Participation in the New Chemicals Program ........ 23**

A. EPA Should Expand Its Pre-Screen Process to Exclude Confidential Business Information ("CBI") Claims that Are Ineligible or Do Not Meet Basic TSCA Requirements ........ 23

B. EPA Must Post All Received Notices to the Federal Register as Required by TSCA ........ 26

C. EPA Should Codify TSCA's Requirement to Post New Chemical Notices to the Federal Register Within Five Days of Receipt ........ 27

D. EPA Should Codify its ChemView Publication Procedures to Ensure Timely Public Access to New Chemical Information ........ 27

E. EPA's Regulations Should Provide a Timely, Formal Public Comment Opportunity on New Chemical Applications Received ........ 30

**III. EPA Must Provide for Possible Revisions to its Regulatory Orders Based on Information Submitted by the Public and Information that Warrants Strengthening Regulation ........ 31**

**IV. EPA Should Fully Align its New Chemicals Regulations with Congress' Mandates in Amended TSCA and Describe How it Will Implement the Key Reforms ........ 34**

A. EPA's Regulations Need to Address Information Insufficiency and Testing: ........ 34

B. EPA's Reviews of New Chemical and Significant New Uses Need to Evaluate Reasonably Foreseen Conditions of Use ........ 35

C. EPA's Reviews of New Chemicals and Significant New Uses Need to Assess Risk to Vulnerable Subpopulations ........ 37

D. EPA Needs to Provide Public Notice of and Access to "Not Likely" Determinations ..... 39

E. EPA's Regulations Need to Include Requirements Relating to Significant New Use Rules ("SNURs") ........ 39

F. EPA's Regulations Need to Include Additional Requirements Relating to New Chemical Exemptions ........ 42

**V.No PFAS Should Be Eligible for the Low Volume and Low Release/Exposure Exemptions.. ........ 43**

A. EPA is Correct to Make PFAS Categorically Ineligible for Low Volume and Low Release/Exposure Exemptions ........ 43

B. EPA Should Categorically Revoke Existing PFAS Low Volume and Low Release/Exposure Exemptions ........ 43

C. EPA Should Adopt the OECD PFAS Definition ........ 45

D. EPA Should Consider Excluding Other Potential High-risk Chemical Categories from Eligibility for LVE and LoREX ........ 45

**VI. EPA Should Make All PBT Chemicals Ineligible for the Low Volume and Low Release/Exposure Exemptions ........ 46**

A. EPA Should Codify the Actual 1999 PBT Policy ........ 46

B. EPA Has Not Proposed to Codify its 1999 PBT Policy, Despite Claiming to Do So ....... 50

C. EPA Should Make all PBT Chemicals Categorically Ineligible for Low Volume and Low Release/Exposure exemptions, in Addition to Other New Chemical Exemptions, Consistent with the Agency's PBT Policy ........ 51

D. EPA Should Consider Making Persistent, Mobile, and Toxic (PMT) Chemicals Ineligible for New Chemical Notice Exemptions, in Addition to PBTs ........ 53

## I. THE PROPOSED RULE WILL PERPETUATE INDUSTRY'S UNDUE INFLUENCE OVER NEW CHEMICAL REVIEWS AND WILL NOT HALT EPA'S RESOURCE-DRAINING "REWORK" TO ADDRESS INDUSTRY COMPLAINTS

Chemical companies have long been permitted to engage in back and forth with EPA about the Agency's review of their new chemicals. This back and forth during the new chemical review process, and the resulting additional work for the Agency (which EPA calls "rework"), have been the cause of significant problems. These problems include substantial delays and resource drains, described vividly by EPA; the potential to draw undue agency attention to company submitters' concerns to the exclusion of the public's concerns; the appearance of or actual conflicts of interest; a lack of transparency and ability for the public to have confidence in the program's procedures and decisions; and the subjection of EPA scientists and program managers to pressure and distraction from their mission to thoroughly review the safety of new chemicals. At the same time that the chemical companies have prolonged the review of new chemicals through the late submission of information and back-and-forth engagement, the companies and their trade associations have complained frequently that EPA's reviews are not being completed in 90 calendar days.

There may well be instances in which EPA needs clarifying information from submitters, and the Agency's inquiry then results in some communication with companies. However, the industry has taken advantage of EPA's allowance for industry to communicate with the Agency during its reviews of their new chemicals to gain undue access and influence over the new chemicals review process. EPA itself recognizes that companies may be submitting information that was available to the companies, but not included in their original new chemical submissions, and then engages in back and forth with the Agency, in an effort to change EPA's determination of their new chemicals' risks.[4]

TSCA requires companies to provide required information at the time of the new chemical notice submission ("new chemical submission" or "new chemical application"). The information that chemical companies often provide EPA well after initiation of the new chemical review period – i.e., not as part of the original submission – frequently concerns information well known to the company about its own process, such as its engineering controls, environmental releases, and operating days per year for batch processes.[5] In an attempt to be responsive to the companies submitting the new chemical applications, and to allow and incorporate such late information, EPA has inadvertently supported non-compliance with the basic requirements of TSCA section 5(d) that submitters provide in their submissions all relevant information known to or reasonably ascertainable by them.

Below, we describe the steps that EPA should take to deal with these and other structural issues in the New Chemicals Program, which would substantially improve the program's efficiency,

---

[4] See subsection B, below.

[5] EPA, "Analysis of Engineering Information Submitted for TSCA Section 5 New Chemical Submissions," https://www.epa.gov/system/files/documents/2022-06/Engineering%20Initiative%20Analysis.pdf.

bring the program in line with Congress' reforms, and promote health and environment-protective decisions on new chemicals.

### A. The New Chemicals Program is Severely Hampered by Delays and Resource Drains Due to "Rework" of Assessments and Determinations

EPA has recognized the significant problems posed by industry submitting information after initiation of the new chemicals review process, which engenders what the Agency calls "rework."[6]

> Intake, review, and inclusion of new data and information takes time. When additional information is submitted, EPA reviews it in order to determine whether it is relevant, adequately documented, and well-supported and whether the Agency needs to revise its risk assessment to incorporate it. Revision(s) to risk assessments (known as 'rework') take additional time, causing delays in the new chemical review for the submitter as well as other companies whose new chemical reviews are also delayed.[7]

In 2022, EPA analyzed nearly 100 new chemical reviews and found that, due to industry actions, risk assessments "may be **reworked anywhere from one to five times**, with each rework being the result of an additional information submission, and that the reworks could add at least several months to the case review."[8] The Agency determined that companies submitted such additional information late (as it could and should have been submitted with the new chemical application), resulting in rework in approximately 30 percent of all new chemical submissions.[9]

EPA further found that "in many cases, the same types of information were submitted multiple times by a submitter because they were not accepted by EPA due to a lack of supporting data or documentation" which "can result in several rounds of EPA review and rework."[10] Indeed,

---

[6] One definition that EPA provides of "rework" is "intake, review, and revision(s) to risk assessments when additional information is submitted" by companies seeking a new chemical review. EPA, "TSCA New Chemical Engineering Outreach Initiative to Increase Transparency and Reduce Rework (Webinar 2)," October 18, 2022, https://www.epa.gov/system/files/documents/2022-10/TSCA%20Engineering%20Outreach%20Webinar%20-%20Info%20Evaluation%20Consideration%202022-10-12%20508.pdf, at 3.

[7] EPA, "TSCA New Chemical Engineering Initiative to Increase Transparency and Reduce Rework," https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/tsca-new-chemical-engineering.

[8] EPA, "Analysis of Engineering Information Submitted for TSCA Section 5 New Chemicals Submissions," https://www.epa.gov/system/files/documents/2022-06/Engineering%20Initiative%20Analysis.pdf, at 3 (emphasis in original).

[9] *Id*. at 4.

[10] EPA, "TSCA New Chemical Engineering Initiative to Increase Transparency and Reduce Rework: Analysis of New Chemicals Rework Issues," July 22, 2022,

concludes the Agency, "the frequency and amount of information submitted after EPA has started its evaluation causes substantial rework and delays in completing the analysis."[11]

In other words, EPA deals with a large number of new chemical cases where it is burdened with the task of reviewing information that was known to or reasonably ascertainable by companies at the time they submitted their new chemical applications, but that the companies did not include. If warranted, EPA must then redo the risk assessment and risk management analyses and prepare new documents based on companies' belated provision of information that they were required to but failed to include when they submitted their new chemical application request.

It is important to note that these burdens are being placed on an EPA division that is already under a notably tight timeframe for completing its reviews. New chemical reviews under TSCA must generally be completed within 90 days (with possible extensions up to an aggregate of 90 days[12]) for "premanufacture notices," and even shorter periods for exemption applications (30-45 days). And the chemical industry, despite being a major cause of delays, puts pressure on the Agency, continuously complaining that EPA is not wrapping up all of its reviews within 90 days.

### B. As EPA Has Recognized, Companies Sometimes Submit Information During the New Chemicals Review Process to Challenge EPA's Risk Determinations

In addition, and particularly troublingly, EPA reports that companies at times submit additional information, triggering rework, in order "to refute EPA's initial risk determination."[13] Indeed, there is ample evidence that industry has used the opportunity that EPA provides during the new chemicals review process for companies to revise and add to their submissions, and to engage in

---

https://www.epa.gov/system/files/documents/2022-07/TSCA%20New%20Chemical%20Engineering%20Initiative%2C%20Analysis%20Methodology%20and%20Results.pdf, at 8-9.

[11] *Id.* at 8. *See also* EPA, "Economic Analysis for the Proposed Rule: Updates to New Chemicals Regulations under the Toxic Substances Control Act," page 1-3, May 2023, https://www.regulations.gov/document/EPA-HQ-OPPT-2022-0902-0035 ("[S]ubmitters may provide new information in response to EPA's initial risk assessment. Submitters have typically been allowed to provide additional information after the time of the initial submission. As a result, submitters may attempt to mitigate the risk in EPA's initial risk assessment by removing a new use or decreasing a production volume. When EPA receives such late information, it may require EPA to repeat the assessments with the new information. The submission of late information results in inefficient use of EPA resources and can jeopardize EPA's ability to conclude its review and make its determination within the review period outlined in the statute").

[12] 15 U.S.C. § 2604(c) ("TSCA section 5(c)").

[13] EPA, "TSCA New Chemical Engineering Outreach Initiative to Increase Transparency and Reduce Rework, Kickoff Meeting," July 27, 2022, https://www.epa.gov/system/files/documents/2022-07/TSCA%20New%20Chemical%20Engineering%20Initiative%2C%20Kick%20Off%20Meeting%20Materials.pdf, at 4.

back and forth with the Agency, in an attempt to influence scientific and regulatory decisions in which they have a strong vested financial interest.[14]

Such a regime imposes real costs on the Agency. In its supplemental proposal for fees for the administration of TSCA, EPA explicitly highlighted the "costs incurred by EPA for multiple rounds of revision to the risk assessment due to late submission of information or rebuttals by companies" and the resulting "multiple rounds of risk management actions, redactions and posting of final reports to meet transparency commitments while safeguarding CBI."[15] Each time that EPA receives late information from companies, or has to engage in back-and-forth with submitters over the revisions to the risk assessment or risk management, the Agency expends additional resources beyond what is already required to conduct a new chemical evaluation. Ironically, companies in the industry, their hired law and consulting firms, and especially their trade associations, frequently complain publicly and to members of Congress about EPA's inability to complete new chemical reviews within 90 days when, in fact, it is the chemical companies' back-and-forth actions, and their late provision of information that should have been provided to EPA at the beginning, that are often the source of the delays.[16]

In addition to the costs placed on the Agency, for EPA to allow industry to review and challenge its new chemicals risk determinations and any risk management measures it intends to impose is to give wide and unilateral access to EPA's decisionmaking to the very participants who stand to gain or lose financially from EPA's decisions about their chemicals.[17] Exacerbated by a lack of transparency and the complete exclusion of the public from the process, this practice leads to erosion of public trust in the quality and independence of EPA's reviews of new chemicals.

---

[14] *See* EDF, "Loosening Industry's Grip on the New Chemicals Program," September 22, 2021, https://blogs.edf.org/health/2021/09/22/loosening-industrys-grip-on-epas-new-chemicals-program/; Sharon Lerner, "EPA Exposed," *Intercept* series, July 2, 2021-August 1, 2022, https://theintercept.com/series/epa-exposed/.

[15] "Fees for the Administration of the Toxic Substances Control Act (TSCA)," 87 Fed. Reg. 68647, 68651 (Nov. 16, 2022), https://www.regulations.gov/document/EPA-HQ-OPPT-2020-0493-0072.

[16] As a recent example of industry's attempt to put pressure on EPA without acknowledging its key role in delays, *see* the American Chemistry Council's "Tracking Progress: ACC Launches Tool to Signal Concerns with EPA's Approach to TSCA New Chemical Reviews," June 20, 2023, https://www.americanchemistry.com/chemistry-in-america/news-trends/press-release/2023/tracking-progress-acc-launches-tool-to-signal-concerns-with-epa-s-approach-to-tsca-new-chemical-reviews.

[17] Even if such exclusive access does not always lead to changes in the outcome (i.e., EPA generally considers but is not required to accept the validity of and use the provided information, particularly when the information is not supported or otherwise substantiated), it gives at least the appearance of undue influence because this one interested (and potentially conflicted) party is permitted to provide additional information that it deems to be relevant to (and hopes will lead to a more favorable) assessment of potential hazard, exposure and risk.

### C. EPA Should Align its New Chemicals Reviews with TSCA by Preventing Industry Interference in its Assessment and Management of Risks

As described above, EPA has adopted practices not grounded in TSCA that compel it to engage in extensive back and forth with companies over their submissions, and to provide those submitters access to and influence over the new chemicals review process that are opaque, not afforded any other stakeholder, and fail to account for the inherent conflict of interest submitters have with respect to EPA decisions about their new chemicals. Given these pervasive problems, EDF calls for EPA to bring its New Chemicals Program into alignment with TSCA's provisions, including Congress' 2016 reforms to those provisions. EPA's regulations must prevent undue influence by industry during the new chemicals review process.[18] As a start, the finalized new chemicals rule should require industry to submit robust new chemical applications that truly include all relevant information that is known to or reasonably ascertainable by the submitter, and thus do not need to be significantly supplemented during the new chemical review process.

Specifically, EDF urges EPA to finalize a rule that aligns its New Chemicals Program with TSCA. The most straightforward process that best reflects the plain language of the statute would operate in this way:

1) Only if a company's new chemical submission is deemed complete, including all relevant information known to or reasonably ascertainable by the company at the time it submits, as required by TSCA section 5(d)(1),[19] EPA conducts its review of the submission. This should not trigger a back-and-forth process with the company. (EPA has provided ample guidance to companies about what they need to submit – and in the current Proposed Rule has proposed further enhancements that we support – and companies should be expected to use that guidance and regulatory enhancements to prepare new chemical submissions that do not need to be supplemented during the review period.)

2) EPA's risk review and determination are based only on the information that is known or reasonably ascertainable to the submitter and is provided with and at the time of the submission, and any clarifying information requested from the submitter by EPA and submitted as an amendment within the initial time period.

3) Based on EPA's review of that information, EPA makes its statutory determination and, where applicable, takes the appropriate risk management action.

4) The regulatory decisions made by EPA on a new chemical submission are not subject to back and forth with industry. (EPA may choose to codify procedures providing that when EPA notifies submitters of its regulatory decision, submitters have the option to exercise

[18] EDF, "Comments on Fees for the Administration of the Toxic Substances Control Act," Jan. 17, 2023, https://www.regulations.gov/comment/EPA-HQ-OPPT-2020-0493-0111.

[19] Per the criteria for premanufacture notices as proposed by EPA in proposed 40 C.F.R. § 720.65, along with EDF's suggested additions to that proposed part (see subsection E, below); the criteria for exemptions of § 723.50(e); and the criteria for microorganisms of §§ 725.32 and 725.33.

their right within a short time period to withdraw their submission, per 40 C.F.R. § 720.75(e).)

5) With the exception of test data (described in 40 C.F.R. § 720.50(a)(4)(ii)), if additional or revised information becomes available to the submitter during the review period that the submitter wants EPA to consider in its assessment (whether or not the information was known to or reasonably ascertainable by the submitter at the time of initial notice submission), the submitter shall withdraw the original submission and make a new submission to EPA that includes the additional or revised information.

Codifying the above practice would prevent the current practice – which has no basis in TSCA – of EPA engaging in back-and-forth negotiations with new chemical application submitters and their representatives over EPA's determinations of risk. Instead, EPA must independently review and make decisions on new chemical applications in a manner that is without influence, or the perception of influence, by those companies.

In sum, TSCA's plain language sets forth a clear procedure under which companies submit applications that must meet TSCA requirements, and EPA then reviews each such application, reaches one of several specific determinations, and takes the action applicable to the determination it makes.[20] Following the straightforward process laid out in TSCA would help address the serious problems described above, and recognized by EPA, with the operations of the New Chemicals Program.

**D. EPA Should Prevent Industry Interference in EPA's Review of New Chemicals by Barring Unilateral Industry Access to Draft Risk Findings, Assessments, Determinations, or Proposed Regulatory Actions**

*i. EPA has routinely shared draft risk findings and sometimes assessments with submitters during the course of its new chemicals reviews*

EPA gives submitters of new chemical applications exclusive access to the draft risk findings, and in some cases has shared draft risk assessments or related documents.[21]

[20] *See* 15 U.S.C. §§ 2604(a)(1), (a)(3), (c), (e), (f) (h) ("TSCA sections 5(a)(1), (5)(a)(3), 5(c), 5(e), 5(f), and 5(h)").

[21] Among the examples of these practices:

- EPA's response to a 2019 EDF FOIA request included an email exchange between then-EPA chemicals office head Alexandra Dunn and the chemical industry lawyer Lynn Bergeson. Bergeson writes to complain about EPA redoing its assessments of one of her client's new chemicals. She is concerned that her firm does "not *yet* have the updated hazard and health assessments to know the basis of the disagreement" and that the revised draft risk assessment is "not *yet* forthcoming" (emphases added), and she alerts Ms. Dunn that "we may need to elevate this case." This example illustrates that EPA's draft documents had been shared with the industry law firm, that the firm had a clear expectation that it would be given the updated documents to review.
- Two articles in *The Intercept* reported on whistleblower disclosures made by five EPA scientists in the New Chemicals Program that documented numerous instances of communications between EPA

Not only has the Agency provided draft risk findings to submitters before finalizing the risk assessment, it has allowed the submitter to provide additional information with the intent of leading EPA to modify its assessment. In the preamble to the Proposed Rule, EPA readily acknowledges providing such exclusive opportunities for the submitters to attempt to influence the outcome, stating:

> Currently, after EPA completes its risk assessment of a chemical substance, EPA reaches out to the submitter to explain the findings of the risk assessment and any proposed prohibitions or limitations on the manufacturing, processing, distribution in commerce, use, or disposal of the chemical substance. If the submitter disagrees with the potential risks identified in the risk assessment, the submitter may provide additional information intended to demonstrate that risks are lower than EPA estimated.[22]

*ii. The sharing of draft risk findings or documents has no basis in TSCA, and the practice invites undue industry influence – as well as creating unnecessary "rework" for the Agency*

Such practices are prone to abuse, especially because these draft findings and, in some cases, draft documents are currently made available only to the submitter, and the process operates entirely out of the public's view. Moreover, there is no language in TSCA that seems to authorize or even contemplate this practice.[23] Nowhere does TSCA mention, suggest, encourage, or require that EPA share draft risk findings or documents with industry or seek industry feedback on them before they are finalized. Second, providing draft risk findings or documents to submitters allows the companies to attempt to influence EPA's findings or decisions, but no such opportunity is made available to any other stakeholders, such as public health advocates, unions, and community advocates.[24] This means EPA receives one-sided input from only the industry. Third, engaging only with industry regarding the draft risk findings is contrary to one of TSCA's core policy goals of increasing public access to information about chemicals subject

staff and companies or law firms representing companies who had submitted new chemical applications in which the staff conveyed and discussed draft risk findings or assessment-related documents. The scientists indicate that these conversations frequently led to changes being made to the documents in response to company complaints. Sharon Lerner, "Whistleblowers expose corruption in EPA chemical safety office," *The Intercept*, July 2, 2021, https://theintercept.com/2021/07/02/epa-chemical-safety-corruption-whistleblowers/; Sharon Learner, "Leaked audio shows pressure to overrule scientists in 'hair-on-fire' cases," *The Intercept*, August 4, 2021, https://theintercept.com/2021/08/04/epa-hair-on-fire-chemicals-leaked-audio/.

[22] 88 Fed. Reg. at 34109.

[23] 15 U.S.C. § 2604 ("TSCA section 5").

[24] In addition, when EPA orally discloses its draft risk assessments to chemical industry submitters – such as by doing so over the phone – there is likely to be no record of the communication that the public may access under FOIA, through ChemView, via a Federal Register Notice, or through any other method, making such back and forth even more problematically opaque and one-sided.

to the statute. Engaging in closed-door conversation with industry and sharing initial findings outside of the public eye is also contrary to Congress' directive to give greater consideration to groups who may be at higher risk from toxic chemicals than the general population.[25] Lack of public access to industry's feedback or other information provided to EPA is also contrary to TSCA's provisions of public access to information such as those requiring EPA to disclose all non-confidential information contained in new chemical submissions.[26]

Further, this practice clearly creates the need for "rework," where industry will submit additional information that EPA must review and may decide needs to be incorporated into its analysis. EPA states that one of the purposes of the Proposed Rule is to reduce rework of risk assessments.[27] It defines rework as redoing all or part of a risk assessment as a result of late submissions of information that delay its review of new chemicals submissions.[28] The Agency's description of its practice of sharing draft risk findings or assessments with submitters – and accepting additional information from submitters (and potentially modifying risk assessments as a result of the additional information) – falls squarely within this definition.[29]

*iii. EPA should explicitly disavow this practice and codify its decision to no longer share draft risk findings or documents with industry during the course of risk reviews of new chemicals*

EPA has not taken the opportunity to explicitly prohibit this practice going forward. In fact, the Proposed Rule highlights EPA's practice of allowing industry to interfere with new chemical reviews and outcomes by sharing draft risk findings only with industry and not with the public, without stating that this practice will be prohibited. EPA should discontinue this practice for the reasons EDF has provided above, and should codify its decision to cease this practice.

If EPA nevertheless insists that it must convey to submitters the results of its risk assessments and/or share draft findings or any documents, they must be made public at the same time so that all other interested stakeholders may review and comment. Any communication by EPA to a company of its risk findings entails information that the public is entitled to in order to be fully informed about the agency's assessment of and decision on the new chemical, and to ensure public accountability of the new chemical review process. (And if EPA does provide for the

[25] *See* 15 U.S.C. §§ 2602(12) and 2604(a)(3) and ("TSCA sections 3(12) and 5(a)(3)").

[26] 15 U.S.C. §§ 2604(d)(1), 2613 ("TSCA sections 5(d)(1) and 14").

[27] 88 Fed. Reg. at 34102.

[28] 88 Fed. Reg. at 34102.

[29] 88 Fed. Reg. at 34110.

sharing of these materials, its regulations should also provide for the pausing of the new chemical review time period to allow adequate time for public review and comment.[30])

In addition, if EPA proposes to enter into a "consent order" with a chemical company on its new chemical,[31] such an order should not be developed and finalized in a way that excludes public participation. In its final regulations, EPA should codify the following procedure: Immediately upon proposing a consent order, EPA notifies the public in the Federal Register of the proposed order and terms, and provides adequate time for the public to comment on them.[32] Such procedures are, at the minimum, what is necessary to bring any public accountability and transparency to what up to now has been a black box process for reviewing new chemicals under TSCA.

### E. EPA Should Add Additional Requirements to the Proposed Requirements to Provide Additional Information in Submissions

EDF fully supports EPA's proposal to clarify and expand on the information on potential uses, exposures, releases, etc. that is a required part of new chemical submissions under TSCA section 5(d). These proposed requirements should reduce the amount of assessment "rework" that the Agency currently conducts and rightfully place the burden on the submitters to provide, at the time of their initial submissions, detailed information that is known or reasonably ascertainable by them. As described below, EDF encourages EPA to propose additional requirements that will enhance EPA's ability to more efficiently and confidently conduct its assessments.

1) EPA is proposing to require that submitters provide "Consumption rates and frequency and duration of use of products or articles incorporating the new chemical substance."[33] EDF believes that it would be useful to EPA to also require submitters to identify the source or basis of the consumption rate/frequency/duration information that they provide in their submission so that EPA can better evaluate the validity of the submitted information. Knowing the data source(s) would also potentially be useful for EPA for assessing potential exposures to other chemicals with similar use patterns.

2) EPA is proposing to require submitters to "designate applicable consumer and commercial product categories using Organisation for Economic Co-operation and Development

---

[30] As one means to allow sufficient time for comment and for EPA to consider those comments before completing its review, EPA has the authority to unilaterally extend the new chemical review period. 15 U.S.C. § 2604(c) ("TSCA section 5(c)").

[31] We note that TSCA does not provide for consent orders; it provides only for orders issued by EPA to regulate the unreasonable risk posed by a new chemical.

[32] As one means to allow sufficient time for comment and for EPA to consider those comments before the finalization of any such order, EPA has the authority to unilaterally extend the new chemical review period. 15 U.S.C. § 2604(c) ("TSCA section 5(c)").

[33] Proposed 40 C.F.R. § 720.45(f)(1)(vi).

(OECD)-based functional use codes, which would create consistency with TSCA section 8(a) Chemical Data Reporting (CDR) requirements in 40 C.F.R. part 711." Specifically, EPA is proposing to require that "Using the applicable codes listed in Table 1 to paragraph (f)(2), submitters must designate the consumer and commercial product category or categories that best describe the consumer and commercial products in which the new chemical substance is intended or known to be used."[34] EDF has two comments/questions about these proposed edits:

- The CDR regulations in 40 C.F.R. § 711.15(b)(4)(ii)(A)(2) provide more guidance than is provided in the 40 C.F.R. part 720 proposed regulatory text on how to utilize the OECD list of applicable functional use codes; specifically, how many use codes should be reported. EDF recommends that, preferably, all applicable codes be reported by the submitter or that this additional text (or comparable text) from the 40 C.F.R. § 711 regulations be incorporated into § 720.45(f)(2):
  - "If more than 10 codes apply to a chemical substance, submitters need only report the 10 codes for the chemical substance that cumulatively represent the largest percentage of the submitter's production volume for that chemical, measured by weight. If none of the listed consumer and commercial product categories accurately describes the consumer and commercial products in which each reportable chemical substance is used, the category "Other" may be used, and must include a description of the use."
- Presumably, OECD may at some time revise its functional use codes to reflect new products/new technology. EPA should consider whether it can "incorporate by reference" this OECD document so that any future updates to the OECD functional use codes will "automatically" update 40 C.F.R. § 720.45(f).

3) EPA is proposing to require that submitters provide certain information on worker exposures.[35] EDF recommends that EPA revise the wording in 40 C.F.R. § 720.45(g)(3) and 720.45(h)(3) to make clear that the information that must be provided in response to 720.45(g)(3)(ii)-(vii) and 720.45(h)(3)(ii)-(vii) pertains to each worker activity listed in the submission in response to 720.45(g)(3)(i) and 720.45(h)(3)(i). Suggested wording is to add "for each worker activity of the manufacturing/processing/use operations" after the phrase "(3) Worker exposure information." Wording similar to this suggested wording is used in EPA's Points to Consider document.

4) EPA is proposing to require that submitters provide certain information on protective equipment in place.[36] EDF recommends that EPA add the phrase "including specific brand names/model numbers."

5) Although "administrative controls" are probably only seldom identified by submitters as a technique used to mitigate worker exposures, EDF recommends that "Administrative

[34] Proposed 40 C.F.R. § 720.45(f)(2).

[35] Proposed 40 C.F.R. §§ 720.45(g)(3)(i) and 720.45(h)(3)(i).

[36] Proposed 40 C.F.R. §§ 720.45(g)(3)(iii) and 720.45(h)(3)(iii).

controls in place, if any" be added as a requirement to proposed 40 C.F.R. §§ 720.45(g)(3)(iii) and 720.45(h)(3). Thus, all components of the hierarchy of controls would be included in the final regulations.

6) EPA is proposing to require that submitters provide information on the "quantity of the new chemical substance released to the environment after control technology."[37] EDF recommends that submitters also be required to explain the basis/rationale and provide supporting data for the estimates provided. EPA would then have a better basis on which to judge the validity of the estimate. This information would be known or reasonably ascertainable and is similar to what has long been required for Toxics Release Inventory ("TRI") reporting. To assist companies in completing the TRI reporting forms, EPA has developed a table in the TRI instruction manual of various rationales.[38] EPA should incorporate the table of various rationales into the 40 C.F.R. Part 720 regulations.

7) EPA is proposing to require that submitters provide information on "what is used to clean the equipment."[39] EDF recommends that this somewhat vaguely worded phrase be replaced with the following phrase to provide more clarity: "the cleaning method used, including any devices used and any chemical substance used and the physical state of the chemical substance." This suggested wording is based on text from EPA's Points to Consider document.

8) EPA is proposing to require that submitters provide information on the "amount of release per container cleaning."[40] EDF recommends that submitters also be required to explain the basis/rationale for the estimate provided (for example, including a statement such as "estimate based on measured data for the new chemical substance or for similar chemical substances or estimate generated by [name of model]"). EPA would then have a better basis on which to judge the validity of the estimates.

9) The current proposed regulations address fugitive releases to some extent by requiring that the submitter provide "a description of any Leak Detection and Repair program in accordance with 40 C.F.R. parts 60, 61, 63, 65, 264 or 265 (related to the monitoring and management of fugitive releases) the site has implemented."[41] To address stack releases, EDF is recommending that EPA add the language "and the type of air pollution control technologies used at these facilities to treat the stack releases that will contain the new chemical substance, if known" to proposed 40 C.F.R. §§ 720.45(g)(4)(iii) and

---

[37] Proposed 40 C.F.R. §§ 720.45(g)(4) and 720.45(h)(4).

[38] *See* EPA, TRI Program: Reporting Forms and Instructions, 6.1 Column B: Basis of Estimate, https://guideme.epa.gov/ords/guideme_ext/f?p=guideme:rfi:::::rfi:4_6_1_2.

[39] Proposed 40 C.F.R. §§ 720.45(g)(4)(i) and 720.45(h)(4)(i).

[40] Proposed 40 C.F.R. §§ 720.45(g)(4)(ii) and 720.45(h)(4)(ii).

[41] Proposed 40 C.F.R. §§ 720.45(g)(4)(iii) and 720.45(h)(4)(iii).

720.45(h)(4)(iii). Although such information may be available to EPA from the Clean Air Act operating permit numbers provided by the submitter, it would require extra effort on EPA's part to find and carry that information over, and may not be obvious from the permit.

10) EPA is proposing to require that submitters provide information on releases to water for facilities with NPDES permits.[42] In addition to the name of the navigable waterway(s) into which the new chemical substance is released, EDF recommends that the submitter also be required to provide the type of wastewater treatment technologies used at these facilities to treat the wastewater that will contain the new chemical substance; the known or expected treatment efficiency of the technology(ies); and the "outfall number" from the NPDES permit corresponding to this release point. Although such information may be available to EPA from the Clean Water Act NPDES permit number(s) provided by the submitter, it would require extra effort on EPA's part to find and carry that information over and may not be obvious from the permit.

11) EPA is proposing to require that submitters provide information on releases to wastewater treatment plants that presumably are not owned by the submitter or potential processors or users of the new chemical substance.[43] Most such facilities would be Publicly Owned Treatment Works (POTWs), which are included in the proposed regulations. Because some privately owned treatment works could receive wastewater, EDF suggests that the phrase "the name(s) of the publicly owned treatment work(s) (POTW)" be modified by adding the phrase "or privately owned treatment works" after "(POTW)." EDF recommends that submitters also provide information on any wastewater pre-treatment technologies employed at the site that are used to remove or degrade any of the new chemical substance from wastewater before discharge to the wastewater treatment plant.

12) EPA is proposing to add a requirement to 40 C.F.R. §§ 720.45(g)(3)(v) and 720.45(h)(3)(v) that submitters provide information on the "Physical form of the new chemical substance to which workers may be exposed and moisture content if physical form is solid." EDF suggests that submitters be required in these sections or in § 720.45(j)(1) to provide information, if known or reasonably ascertainable, on particle size for the neat (i.e., pure) new chemical substance or formulation of the new chemical substance that is in a solid inhalable form and the test method(s) used to develop these data.

13) EPA is proposing to require that any "particle size distribution" be submitted as part of the premanufacture notice ("PMN") form as well as the "particle size distribution analysis."[44] EPA indicates that the term "particle size distribution analysis" refers to the "analysis data used to develop the" (particle size distribution) "value."[45] To avoid any potential misunderstanding of the regulatory text at 40 C.F.R. § 720.45(j)(1), EDF recommends that

[42] Proposed 40 C.F.R. §§ 720.45(g)(4)(iv) and 720.45(h)(4)(iv).

[43] Proposed 40 C.F.R. §§ 720.45(g)(4)(v) and 720.45(h)(4)(v).

[44] Proposed 40 C.F.R. § 720.45(j)(1).

[45] 88 Fed. Reg. at 34107.

the phrase "particle size distribution analysis" be amended to read "particle size distribution analysis (i.e., analysis method and data used to develop the particle size distribution value."

14) EPA is proposing minor edits to 40 C.F.R. § 720.50(a)(4)(ii) concerning required notification of EPA when a test or experiment is completed before the applicable review period ends. If the test or experiment is completed within the last five days of the review period, the submitter must inform its EPA contact "by telephone or email prior to the end of the review period and submit the study, report, or test electronically to EPA via CDX." EPA should clarify in the regulatory text what the deadline is for submitting the study, report, or test electronically.

**Modifications to the Submission Procedure**
EPA is proposing to add statements with accompanying check boxes to certain screens of the PMN form that indicate that information fields can only be left blank if such information is not known to or reasonably ascertainable by the submitter. If a submitter leaves one of these information fields blank, the submitter would have to check a box on the screen to affirm that the information is not known to or reasonably ascertainable before advancing to the next screen. Additionally, a statement would warn the submitter that if a field that has been left blank is later amended, EPA may declare the original submission incomplete. As an alternative to this check box approach, EPA is considering adding automatic checks in CDX to make certain critical fields mandatory such that the user could not advance to the next screen in the PMN form or submit the form without entering information into the field.

EDF supports the approach preferred by EPA but will also support the alternative approach. Both approaches will better ensure that submitters provide complete and accurate information to EPA in the initial new chemical notification. However, EDF also believes that EPA and the public will have even more confidence that submitters will submit complete and accurate information if EPA amends the Certification Page of PMN Form 7710-25 (which requires the signature of the Authorized Official for the submitter) to include an additional statement (i.e., an additional 4th statement) that clearly states that the Authorized Official certifies that the information fields specified by EPA can only be left blank if such information is not known to or reasonably ascertainable by the submitter and that if a field that has been left blank is later amended, EPA may declare the original submission incomplete.

### F. EPA Should Mandate Consequences for Companies that Late Submit Information During the New Chemicals Review Process that They Knew or Could Reasonably Ascertain at the Beginning

EPA has described the many problems associated with late submissions of additional information by industry throughout the review process (see subsection A, above) and there is no reason why EPA should be allowing this "longstanding practice"[46] in the first place. We urge EPA to finalize regulations, consistent with TSCA, that continue to require new chemical applicants to submit all

[46] 88 Fed. Reg. at 34106.

information known or reasonably ascertainable up front,[47] and make clear that EPA will then proceed to review the submission, make a risk determination, and take risk management action if appropriate (see subsection C, above).

EPA states that it intends with its Proposal to ensure that it receives more robust new chemicals submissions that should reduce Agency rework. But instead of taking the opportunity to comprehensively eliminate unnecessary rework, EPA has proposed regulations that would explicitly allow companies to submit late information, during the time that EPA is reviewing their new chemicals, that they should have provided with their new chemical submission. And under the Proposal, these companies would only see a minimal potential consequence: their new chemical review period may be reset to Day 1. Although it is a step in the right direction for EPA to give itself some time to deal with companies' late submissions of information, EPA's proposed regulatory revision is unlikely to substantially deter companies' current behavior – failing to submit required information at the time of the new chemical application and then helping themselves to continuous late submissions thereafter – that so drains the resources of EPA's New Chemicals Program.

A primary problem with EPA's proposed regulation is that even where EPA does determine that the late-submitted information was known to or reasonably ascertainable by the submitters when they submitted their application, EPA only *may* declare those submissions incomplete and restart the review clock. EPA has given no justification for this "may" language.[48] EPA should instead make clear that when any company, during the new chemicals review period, "submits additional or revised information without demonstrating to EPA's satisfaction that the [information] was not known to or reasonably ascertainable by the submitter at the time of the initial notice submission,"[49] the Agency *will* declare the submission incomplete and restart the review period at Day 1. In other words, the Agency should replace its currently-proposed "may"[50] with "will" or "shall."

Second, the Agency should make clear that when companies fail to submit all required information with their new chemical applications that is known to or reasonably ascertainable by them, they are potentially subject to enforcement actions. Failure of a submitter to comply with TSCA section 5(d)(1) constitutes a violation of TSCA pursuant to sections 15(1) and/or (3)(B).[51] Such violations are in turn subject to penalties pursuant to section 16.[52]

---

[47] 40 C.F.R. § 720.40(d).

[48] Proposed 40 C.F.R. § 720.65(c)(2).

[49] *Id.*

[50] *Id.*

[51] 15 U.S.C. § 2614

[52] 15 U.S.C. § 2615

Third, EPA should spell out in the final regulations what types of information will be deemed to have been known to or reasonably ascertainable by any new chemical submitter at the time the company submits its application. For example, EPA states in the Proposal that companies reasonably would know, at the time they submit their new chemical applications, "information on basic physical and chemical properties and on anticipated releases or worker exposure at any sites controlled by the submitter" and that "EPA believes that it is extremely unlikely that a submitter would neither know nor be able to reasonably ascertain such information, but could know or ascertain it 20 or 40 or 60 days after the original submission…"[53] This is an example of a category of information that EPA should define in the final regulations as known or reasonably ascertainable to new chemicals submitters at the time of original submission.

### G. EPA Should Treat the Submission of New Information During the New Chemicals Review Period as a New Submission

EPA proposes not to restart the review clock at all when companies submit information during the new chemicals review period that "was not known to or reasonably ascertainable by the submitter at the time of the notice submission." This means that even when a company gives such "new" information to EPA mere days before the Agency is required to issue a determination about a new chemical, EPA would be obligated to consider the late information and possibly rework its complete risk assessment, all without any additional time. Second, EDF is concerned that EPA's proposal to treat differently information that is "new" versus known to or reasonably ascertainable by submitters at the time they submitted their new chemical applications could engender disputes and additional back and forth between industry and EPA over which category particular information coming in mid- or late-review falls under. If this occurs, it may drain additional EPA resources despite EPA's intent for its proposal to reduce such burdens.

To address these issues, EPA should finalize regulations making clear that if a company submits new information during the new chemicals review process, such amendment constitutes a new submission.[54] Accordingly, EPA would have the full applicable period to review the information, starting over as for any new chemical submission. Under this procedure, EPA would gain the time that it often needs in any case that it receives new information during the review process; however, unlike in the cases where companies submit information late that was known or reasonably ascertainable to them when they submitted their new chemical applications, these submissions would not be deemed "incomplete," nor would the company be subject to enforcement.

In its economic analysis, EPA estimates that even with its proposed regulations in place, 60 percent of new chemicals applications will still be "amended" after they are submitted, and half

---

[53] 88 Fed. Reg. at 34111.

[54] EPA may wish to except new information that it receives per the Agency's own request.

of those applications will be amended more than once.[55] EPA should no longer tolerate such wasteful practices, and should put in place procedures that maximize the submissions of complete applications up front so that New Chemicals Program staff may complete their assessments without distraction, interference, and delay.

**----**

EDF urges the Agency to make the necessary changes described above, aligning its New Chemicals program with TSCA and dealing with the major problems of industry interference in the new chemicals review process and the significant burden on EPA of reworking its reviews. EPA should codify all these changes in final new chemicals regulations.

## II. EPA'S REGULATIONS MUST DO FAR MORE TO INCREASE TRANSPARENCY, PUBLIC ACCESS TO INFORMATION, AND PUBLIC PARTICIPATION IN THE NEW CHEMICALS PROGRAM

EPA should go further in codifying regulatory provisions aimed at rebuilding public trust by increasing the transparency and accountability of, and public engagement in, the New Chemicals Program. The Agency has the increased ability and responsibility under Congress's amendments to TSCA, to take the following actions, which EDF elaborates on below. First, EPA should codify a pre-screen process that incorporates TSCA's confidential business information ("CBI") provisions in order to exclude CBI claims that are inadequately supported or that are for information ineligible for TSCA protection. Second, EPA should post to the Federal Register notices of receipt for all new chemical applications, not just those that are deemed "complete." Third, EPA should codify the statutory requirement that it post notices of receipt to the Federal Register within five days. Fourth, if EPA intends to continue posting new chemical information on ChemView, the Agency needs to codify a requirement that it do so, in order to prevent abrupt changes to agency policy and to preserve public access to key information. Finally, EPA should provide through regulations a comment period on new chemical applications in order to allow the public to provide input on any noticed chemicals of interest before the Agency determines those chemicals' risks.

### A. EPA Should Expand Its Pre-Screen Process to Exclude Confidential Business Information ("CBI") Claims that Are Ineligible or Do Not Meet Basic TSCA Requirements

While we appreciate EPA's proposal to codify the new chemicals pre-screen process that EPA conducts before moving forward to risk assessment, we are concerned that EPA has excluded nearly all of TSCA's CBI requirements from that process.

---

[55] EPA, "Economic Analysis for the Proposed Rule: Updates to New Chemicals Regulations under the Toxic Substances Control Act," page 3-6, May 2023, https://www.regulations.gov/document/EPA-HQ-OPPT-2022-0902-0035. Moreover, each amendment involves "10 technical hours and 2 managerial hours" of EPA staff time. *Id.* Based on EPA's estimate of annual number of submissions, under EPA's current proposal, EPA would still be spending over 2,400 technical hours and 480 managerial hours each year dealing with companies' late submissions of information. *Id.* at page 3-6 and page 5-4.

The only reference to confidential information requirements EPA proposes to include is that a submission is not complete if: "[t]he submitter does not submit a second copy of the submission with all confidential information deleted for the public file, as required by § 720.80(b)(2)."[56] While that provision is certainly warranted and should be retained in the final regulations, there is no basis for EPA to include only this CBI-related requirement among all of those specified in TSCA.

EPA needs to expand its pre-screen to include all basic requirements and limitations for CBI claims specified in TSCA. Claims for ineligible information or claims that do not meet TSCA's basic CBI requirements should be disallowed from the outset. They neither need nor warrant the full review of CBI claims described in TSCA section 14(g)(1). Absent a robust pre-screen for clearly problematic CBI claims in new chemical notices, EPA would both fail to align its regulations with TSCA as amended in 2016, and would deny the public timely access to new chemical notices redacted only to the extent allowed under TSCA. Failure to expand EPA's pre-screen of CBI claims would perpetuate the many instances EDF and others have identified in which notices and associated documents made available to the public are improperly "sanitized."[57] In contrast, screening out unwarranted CBI claims during the pre-screen would be more transparent, more effective, and more efficient for the Agency. Forcing the public to wait until the Agency goes through a full CBI review pursuant to TSCA section 14(g) would be inconsistent with TSCA's clear delineation of certain exclusions from eligibility for CBI protection and up-front requirements that must be met when first asserting a CBI claim.[58]

Specifically, the final regulations need to identify as erroneous or incomplete any submission that asserts any CBI claim: (1) that does not meet TSCA's basic requirements for assertion, and where required, substantiation, of CBI claims, as specified under TSCA sections 14(c)(1)(A) and (B), (c)(3) and (c)(5);[59] (2) for information that is ineligible for protection from disclosure

---

[56] Proposed 40 CFR § 720.65(c)(1)(vii).

[57] See EDF's blog highlighting numerous instances of deficient or entirely lacking substantiations for CBI claims in new chemicals submissions. Richard Denison, PhD, "No justification: Substantiations for rampant new chemical CBI claims are deficient or lacking altogether," February 16, 2018, https://blogs.edf.org/health/2018/02/16/no-justification-substantiations-for-rampant-new-chemical-cbi-claims-are-deficient-or-lacking-altogether/. *See also* Amended Complaint, *Environmental Defense Fund v. EPA*, 1:20-cv-00762 (D.D.C. March 18, 2020) PP 136-37 (highlighting 90 instances in which PMNs were released to the public without substantiation documents for the CBI claims that were asserted).

[58] TSCA Section 14(c)(3) requires a submitter asserting a CBI claim to substantiate the claim in order to assert it (where substantiation is required). 15 U.S.C. § 2613(c)(3).

[59] Such claims include unwarranted or erroneous assertions by the submitter that particular information in the new chemical application falls under one of the exemptions from substantiation requirements for information identified in TSCA Section 14(c)(2). EDF has identified numerous examples of PMNs whose submitters erroneously asserted that particular information they were claiming to be confidential fell under provisions of Section 14(c)(2); further, in many of these cases, the information so asserted constitutes health and safety information, such as information about occupational exposure or environmental release, that is ineligible for protection from disclosure in the first place.

pursuant to TSCA section 14(b);[60] (3) for specific chemical identity that fails to include a sufficiently descriptive generic name that meets the requirements of TSCA section 14(c)(2); and (4) for specific use of the chemical that fails to include a sufficiently descriptive generic use description that: (a) EPA is required to include in its notice of receipt published in the Federal Register pursuant to TSCA section 5(d)(2)(B), and (b) is consistent with TSCA section 14(b)(3)(B)'s designation of general chemical use information as ineligible for protection from disclosure under TSCA.[61]

We recognize that the Agency codified a different approach to addressing what it calls "deficient" CBI claims in its recent CBI rulemaking, which we advocated strongly against in our public comments on the rule.[62] Under EPA's newly created process at 40 C.F.R. § 703.50(e), "any applicable review period for the underlying submission will be suspended until either the deficiency is corrected or the 10 business days elapse without such correction." As discussed in more detail in section 16 of our CBI comments:

- While the regulations do state that certain errors or omissions by claimants (for example, failure to provide a public copy of a submission asserting a CBI claim) renders a submission "deficient," identification of that deficiency does not result in rejection of the submission or claim, let alone public access to the information, at that point, if ever.
- Instead, it triggers a wholly new procedure in 40 C.F.R. § 703.5(e)(2) under which EPA will only place a hold on the submission to allow the company to address the deficiency; even if the company fails to do so, EPA will merely proceed with a review of the deficient claim and even then equivocally states only that the Agency "***may*** deny the CBI claim(s)."

We urge EPA to modify its suspension approach, which provides virtually no incentive for companies to avoid making "deficient" claims and only serves to delay if not ultimately deny the public access to information to which it is entitled. If EPA adopts the approach we describe above, at least these and other "deficient" CBI claims will be identified up front and the review clock on the new chemical will not start ticking until the deficiency is remedied.

Finally, EPA's proposed regulations apply only to premanufacture notices ("PMNs"), significant new use notifications ("SNUNs") and microbial commercial activity notices ("MCANs"), as they reside in Part 720. The same pre-screen procedures – modified to address our comments above – need also to be applied to exemption applications, and hence should be replicated in Part 723.

---

[60] With respect to health and safety studies or associated information described in TSCA section 14(b)(2), EPA should disallow any CBI claim asserted for information that does not fall under the exceptions provided in that provision.

[61] These factors should be added to the proposed rule at 40 C.F.R. § 720.65(b)(1) and (c)(1).

[62] EDF, Comments on "Proposed Rule: Confidential Business Information Claims Under the Toxic Substances Control Act (TSCA)," EPA-HQ-OPPT-2021-0419 (July 11, 2022), 45-48 https://www.regulations.gov/comment/EPA-HQ-OPPT-2021-0419-0026.

### B. EPA Must Post All Received Notices to the Federal Register as Required by TSCA

EDF opposes EPA's proposal to narrow the types of notices it will post to the Federal Register from any "notice" to any "complete notice." Under EPA's proposed pre-screen procedures, there may be one or more versions of a notice on a given new chemical that are deemed erroneous or incomplete before EPA receives a version of the notice EPA deems complete and ready for review. Thus, under the proposed pre-screen process, there may be multiple notice versions associated with the same new chemical. If EPA were only to post the notice of receipt of the complete notice, this would prevent the public from being able to follow the new chemical notice from its origin. The public would be unable to determine whether the notice was initially deemed erroneous or incomplete, the reason for such determinations, and what changed to make the notice complete. Ensuring that this pre-screening process is a transparent and accountable process is important.

Unlike EPA's proposed process, EPA's current process for posting notices of receipt of new chemical notices to the Federal Register records each such submission and indicates when a version of a notice received is an original notice or an amended or revised version of the original notice. Notice amendments are marked by an "A" following the PMN or SNUN number and a version number is included to indicate the sequential number of the amendment. Moreover, through ChemView, EPA posts each amendment and often provides a useful summary sentence describing the reason for the amendment.

EPA should not abandon its years-long practice of clearly communicating its receipt of new chemical notice amendments to the public. The posting of both original and subsequent amendment notices is critical for the public to be able to meaningfully understand, follow, and engage in the new chemicals review process at EPA. We recognize that the Agency is resource-constrained but given that EPA has for years already been identifying receipt of amended notices in the Federal Register, maintaining this practice would not add additional work for the Agency.

In addition to these practical reasons, only posting "complete notices" to the Federal Register as proposed in 40 C.F.R. § 720.70 is not in accordance with TSCA section 5(d)(2). TSCA section 5(d)(2) states that "not later than five days… after the date of the receipt of ***a notice*** under subsection (a)… the Administrator shall publish in the Federal Register a notice…" (emphasis added).[63] Similarly unambiguous language is used in TSCA section 5(d)(3) pertaining to the monthly listings EPA is required to publish in the Federal Register.[64] TSCA makes clear EPA's obligation to post each notice received, regardless of whether it contains errors or is incomplete. Thus, 40 C.F.R. § 720.70 needs to be consistent with the plain language of TSCA section 5(d)(2).

We urge the Agency to maintain the existing language at 40 C.F.R. § 720.70(a) rather than amend the regulation to only notice in the Federal Register "complete notices" as proposed.

[63] 15 U.S.C. § 2604(d)(2) ("TSCA section 5(d)(2)").

[64] 15 U.S.C. § 2604(d)(3) ("TSCA section 5(d)(3)").

### C. EPA Should Codify TSCA's Requirement to Post New Chemical Notices to the Federal Register Within Five Days of Receipt

In addition to maintaining its regulation stating that the Agency will post notice of receipt of any notice it receives in the Federal Register, EPA should codify a requirement that the notice be posted within five days. First, this is statutorily mandated.[65] Congress has delegated to EPA the authority to implement the requirements of TSCA within the bounds that Congress has set forth.[66] EPA's proposal to ignore the plain language of the statute goes outside of the bounds of any discretion Congress has set for the Agency. Second, EPA's statement in the preamble to the Proposed Rule that it generally posts a notice of receipt of PMNs to ChemView within five days is insufficient.[67] The qualifying language that EPA "generally" posts within five days indicates that it does not always do so. Nor does EPA's reference in the preamble to its practice of posting to ChemView, rather than in the regulatory text itself, provide any guarantee that the Agency will continue to do so.[68] Leaving the practice uncodified makes it possible for the Agency to change course in the future without providing any notice, comment opportunity, or ability to legally challenge such a change in the Agency's practice. Third, even if the publication schedule of the Federal Register means that a submitted notice may not always necessarily be published within the five-day window, EPA should at the minimum codify a requirement that the Agency will send the publication notice to the Federal Register within at most five days of receipt.[69]

### D. EPA Should Codify its ChemView Publication Procedures to Ensure Timely Public Access to New Chemical Information

EPA justifies its proposal to remove the requirement in 40 C.F.R. § 720.70(b)(3) to "include a list of data submitted with the PMN in accordance with 40 C.F.R. § 720.50(a)" by pointing to its use of ChemView, the Agency's primary database for new and existing chemical information under TSCA. EPA claims that its transparency goals can be "better achieved through other more efficient and effective mechanisms that negate the need to publish that information [at 40 C.F.R. § 720.50(a)] in the Federal Register."[70] EPA further states that it currently "makes the PMN

---

[65] 15 U.S.C. § 2604(d)(2) ("TSCA section 5(d)(2)").

[66] 15 U.S.C. § 2601(c) ("TSCA section 2(c)").

[67] 88 Fed. Reg. at 34105.

[68] *Id*.

[69] TSCA explicitly requires publication in the Federal Register within five business days. 15 U.S. C. § 2604(d)(2). EPA's current practice violates this statutory provision, and the Agency does not propose any codification of the provision (rather, EPA merely states in the preamble that it "generally" posts information to Chemview within five days). Assuming EPA acts on its stated intention not to codify the TSCA Federal Register requirements, EDF recommends this regulatory provision in order at least to help ensure public access to information as soon as possible.

[70] 88 Fed. Reg. at 34105.

itself, including test data submitted with it, available on ChemView (subject to confidentiality claims) generally within 5 workdays of receipt."[71]

As avid users of ChemView, EDF greatly appreciates EPA's current practice of relatively promptly posting new chemical notice information to the database as a supplement to information it publishes in the Federal Register. While some significant limitations and challenges remain, ChemView has evolved to be an important resource to interested stakeholders seeking to engage in the New Chemicals Program at EPA. Given the importance of this data resource, we are greatly concerned that EPA has not proposed to codify its ChemView posting procedures and practices in this rulemaking, even as it proposes to remove from its regulations statutory and regulatory information access requirements for its Federal Register notices. To the extent EPA intends to rely on ChemView, and to ensure that ChemView remains a useful resource to the Agency and the public, EPA should codify in detail its commitments to timely publish new chemical information, including all information it is currently required to provide under TSCA or its existing regulations, but is proposing to remove from the regulations, including its reliance on ChemView for these purposes.[72]

In codifying its ChemView procedures and practices, EPA should ensure the public has timely access (within a few days at most, to allow the public time to comment – see subsection E, below), for all new chemical applications (including exemption applications),[73] to the following information:[74]

- the date of receipt of each application;
- the identity of the applicant, unless claimed CBI in a manner that complies with all applicable TSCA requirements for such claims;
- the identity of the substance or, if claimed CBI, a generic name that conforms with EPA guidance;[75]

---

[71] *Id*.

[72] EDF again notes that TSCA explicitly requires publication of notices in the Federal Register, so the Agency's Proposed Rule would violate the statutory requirements. 15 U.S.C. § 2604(d)(2). Assuming EPA acts on its stated intention not to codify the TSCA Federal Register requirements, EDF recommends these regulations in order at least to help ensure that EPA provides improved public access to this critical information.

[73] These include premanufacture notices ("PMNs") as well as applications for various exemptions from the PMN review process, including low-volume exemptions ("LVEs"), low-release/exposure exemptions ("LoREXs"), byproduct exemptions, and polymer exemptions. Some of the listed categories of information are currently being publicly provided by EPA for PMNs. EPA should codify a requirement to provide public access to all the categories of information for all new chemical applications.

[74] In the proposal, EPA does note its posting of PMNs to ChemView, but does not codify in its regulations even a requirement that it do so. It proposes to cease publishing in the Federal Register a list of the data received with a PMN. EPA argues its practice of posting to ChemView is sufficient, but again fails to codify any requirement in the regulations that ensures it will continue to do so.

[75] EPA's description of its pre-screen does not mention any review of generic names as to their adequacy.

- the specific chemical use of the substance or, if claimed CBI, a generic use description that conforms with EPA guidance;[76]
- whether the chemical falls within any of the Agency's new chemical categories;
- the public files, including all attachments to the application (and all versions of the application and attachments);[77]
- for exemption applications, whether EPA has granted or denied an exemption for the same chemical or very similar chemicals in the past; and
- all correspondence between EPA and submitters.

In addition, upon completion of its review of a new chemical notice or application, EPA should promptly make public the final risk assessments and standardized reports it developed during the review, any associated determinations and findings it reached, and any orders it issues. The public should also be given prompt access to each new chemical's initial risk assessments and associated documents, as well as any revised versions developed over the course of the review.

With respect to EPA decisions on exemption applications, the conditions applicable to EPA's approval of any application should also be made public, as well as any associated determinations and findings EPA reaches. EPA should specifically indicate the rationale behind "conditional" interim decisions, and for any exemption decision that changes from an initial "conditional denial" to a final "grant," EPA should explain why and how the status changed.

This information should be coded in fields, along with dates the information was posted, to enable ready identification of newly added information and export and analysis of new chemical data. Moreover, EPA should make the necessary changes to ChemView to ensure that a new chemical's journey and timeline from first submission as a new chemical to an existing chemical can be followed. EPA needs to ensure that PMN numbers and similar tracking numbers for other applications (e.g., Low Volume Exemptions ("LVE") numbers) are tied to Chemical Abstract Service ("CAS") numbers (consistent with TSCA section 14), unique identifiers, and other appropriate identifiers. This can be facilitated by combining PMN/CAS ChemView entries into one entry per chemical, which will help to keep all relevant documents on a given chemical (PMN, consent order, significant new use rule ("SNUR"), test data, etc.) in one place.

Alternatively, if EPA will not codify in its regulations procedures detailing what information must be posted to ChemView and when, the Agency should not delete existing 40 C.F.R. § 720.70(b)(3) and should instead expand upon it to encompass and require Federal Register publication of all of the above information. Subsection 720.70(b)(3) is the only codified requirement regarding what information must be provided to the public when EPA gives notice that it has received a PMN. As explained above, unless EPA codifies in its regulations a policy

---

[76] EPA's description of its pre-screen does not mention any review of generic use descriptions as to their adequacy.

[77] It is unclear whether EPA's intention is still to post amended versions of PMNs to ChemView, assuming it implements its proposal to reset the review clock if an amended version is submitted. EPA should codify that it will continue to do so, for the reasons EDF discusses above in subsection B, about the need to post all notices of receipt of PMNs, not just "complete" ones.

and required procedures that it will use to provide public access to this critical information, EPA could potentially stop doing so at any time. Codification of such requirements is needed to fulfill one of the core policy goals of TSCA – ensuring public access to robust information on chemicals and their potential or actual risks.

### E. EPA's Regulations Should Provide a Timely, Formal Public Comment Opportunity on New Chemical Applications Received

Providing the public with timely notices of receipt of, and timely access to, new chemical applications (discussed in the preceding subsections) is necessary but not sufficient to ensure the public has a meaningful opportunity to provide input to EPA regarding the new chemicals or significant new uses industry seeks to commercialize. EPA should also codify procedures to establish a formal public comment opportunity on new chemical applications. These procedures should provide sufficient time for the public to access and review the available information on a new chemical and prepare and submit comments when they so choose. The procedures also need to ensure EPA has ample time to review and consider any public comments received in the course of its own review of a new chemical before making any determination.

Timely publication of notices of receipt in the Federal Register is vital because such Federal Register notices are the only viable means by which EPA can establish a formal notice-and-comment process, which includes an ability for members of the public to post their comments to a formal public docket and an assurance that EPA receives and considers those comments before making any regulatory decisions about a new chemical.

We recognize that EPA currently provides a 30-day comment period in the Federal Register notices it publishes listing certain new chemical applications it received in a given month.[78] However, such listings frequently are not timely published (despite efforts by EPA in recent years to speed up the process), and typically appear many weeks after the review periods for some of the listed new chemicals applications have begun. For example, the listing for May 2023 was not published until June 21, 2023.[79] That listing included a number of new chemical applications first received by EPA early in May, and at least one received in late April. Assuming EPA initiated its review upon receipt of those applications, the public first learned of them six weeks or more after the start of the 90-day (13-week) review period. By the time EPA received any public comments, as few as four weeks of any timely-initiated review period (assuming there was no extension or suspension of the period) would have remained, leaving scant if any time for EPA to consider comments received.

In establishing a requirement in TSCA section 5(d)(2) that EPA publish notice in the Federal Register of its receipt of a new chemical notice within five days, Congress sought to ensure the public is promptly informed when a new chemical application is submitted. This five-day period

---

[78] *See*, for example, EPA, "Certain New Chemicals; Receipt and Status Information for June 2023," 88 Fed. Reg. 46157, July 19, 2023, https://www.federalregister.gov/documents/2023/07/19/2023-15301/certain-new-chemicals-receipt-and-status-information-for-june-2023.

[79] EPA, "Certain New Chemicals; Receipt and Status Information for May 2023," 88 Fed. Reg. 40257, June 21, 2023, https://www.govinfo.gov/content/pkg/FR-2023-06-21/pdf/2023-13165.pdf.

is noticeably short compared to other deadlines Congress imposes upon EPA, such as the 90-day period that the Agency is generally provided to review most new chemical applications. This stark difference in timing is clearly intentional. It is strongly to be inferred that Congress set that admittedly short window to ensure that the public could provide its input well before the Agency is required to make a decision on a given new chemical.

Meaningful public review and comment also requires public access to the new chemical application itself (including attachments). We appreciate EPA's efforts to strive to make such materials available via ChemView within five days, but have discussed several serious limitations concerns about this approach in subsection D, above. Assurance of prompt public access is critical here, which makes it all the more important that EPA's reliance on ChemView be codified and include strict timelines.

But while ChemView postings are essential, they do not themselves establish a formal public comment opportunity. And while EDF and others have taken advantage of the informal comment opportunities EPA currently provides in its monthly Federal Register listings, even that insufficiently timely process could be discontinued at any time.

EPA should codify in its regulations a process and timeline to ensure a timely, formal opportunity sufficient for the public to develop and submit meaningful comments on new chemical applications in which it has an interest, one that also leaves sufficient time for EPA to fully consider any comments it receives. For this reason, EPA's regulations need to specify that EPA will not make final determinations on any chemical subject to public comment until after the close of the comment period.

## III. EPA MUST PROVIDE FOR POSSIBLE REVISIONS TO ITS REGULATORY ORDERS BASED ON INFORMATION SUBMITTED BY THE PUBLIC AND INFORMATION THAT WARRANTS STRENGTHENING REGULATION

EPA has proposed a troubling addition to its new chemical "determinations" provisions. Specifically, EPA proposes to add regulatory language stating that after it issues an order under TSCA sections 5(e) or 5(f):

> EPA may modify or revoke the prohibitions and limitations in [the orders] after the applicable review period has ended if the submitter submits to EPA additional testing, studies, reports, or other information that EPA determines, upon review, demonstrate that such prohibitions or limitations are no longer necessary to protect against an unreasonable risk of injury to health or the environment.[80]

This proposed provision is troubling for two main reasons. First, EPA appears to contemplate and codify a role only for the chemical company submitter. EPA's proposal provides that if the company, which has a financial interest in manufacturing the chemical subject to the order, comes to the Agency with additional information, EPA will consider that information. While EPA certainly needs to consider information the company develops and submits, including from

[80] Proposed 40 C.F.R. §§ 720.75(d)(3) and 725.170(d)(3).

any testing EPA has required in the order, its proposed provision is too narrow. Specifically, EPA proposes regulatory text discussing only the consideration of information about that chemical developed or submitted by the company, and not by any other party, including scientific researchers, health advocates, workers, unions, other governmental agencies, or any member of the public at all.

Second, the proposed language indicates *only* the *weakening* of the Agency's regulation of the risky chemical. The provision fails to include the possibility that additional information, including information required to be developed by the order, could warrant *strengthening* of protections against potential unreasonable risk, i.e., increasing protection against harms to people or the environment from chemicals that are subject to section 5 orders. Indeed, numerous orders issued by EPA require companies to conduct testing on their new chemicals. In the cases that such testing shows the chemicals to pose additional, potential unreasonable risk to people or the environment beyond those EPA had identified in the risk assessments underlying the original orders, TSCA requires EPA to impose additional regulations sufficient to address those risks. EPA's regulations should require, not preclude, such actions.

In finalizing regulatory language about possible modifications to section 5 orders, EPA must make clear that EPA will consider information from all stakeholders – not just chemical company submitters – and also that such information may warrant strengthening the order to ensure protection of human health and the environment. Therefore, EPA should revise its currently one-sided proposed 40 C.F.R. § 720.75(d)(3) (and, as applied to MCANs, proposed § 725.170(d)(3)) to make clear the Agency will consider new information from all parties and take actions necessary to protect human health and the environment.[81]

EPA has the authority to modify an existing order to make it more protective of public health or the environment. TSCA itself indicates EPA has the authority to modify orders to make them more stringent or protective: Section 21[82] refers to a petition to amend an order issued under section 5(e) or 5(f). Clearly, for Congress to have authorized section 21 petitions to amend orders, Congress intended that they could be modified by EPA. As section 21 petitions would not be filed until after the close of the applicable review period under section 5 of TSCA, and most certainly not resolved until after the end of the review period, Congress clearly anticipated modifications to section 5 orders occurring after the time period for issuing initial section 5 orders. Congress added the reference to section 5(f) in 2016 when it passed the Lautenberg Act, thereby confirming Congress' view in the context of its statutory revisions to section 5.

EPA's authority to revise orders to make them more stringent is consistent with agencies' general inherent authority to reconsider and modify earlier decisions. Courts have repeatedly

[81] Such necessary actions may include revising orders based on new risk information developed over time on categories of chemicals, such as PFAS.

[82] 15 U.S.C. § 2620.

recognized that agencies have that authority in the absence of specific statutory limitations.[83] TSCA does not bar reconsideration of orders; indeed, as described above, it contemplates the revision of section 5 orders by EPA.

The Agency has already taken this more even-handed approach in its standardized "consent order" language, such as:

> EPA may, at any time, upon the receipt or evaluation of any information, new or existing, determine that these New Chemical Substances presents or may present an unreasonable risk of injury to health or the environment, and may issue a rule to regulate the substance or modify this Order to address any risks.[84]

Such language, both recognizing the reality that EPA receives new information indicating unreasonable risk and EPA's authority and duty to address it, should be included in the final regulations.

We note that many section 5 orders, particularly older orders, exist that are not explicit about EPA's ability to reopen the orders based on risk, while at the same time providing a one-sided opening only to weaken the order's restrictions. Therefore, we urge EPA to make clear in its final regulations that whether or not certain "reopener" language appears in its section 5 orders, EPA may reopen those orders at any time based on new information relevant to risk and take any and all needed and appropriate action in response. The ability for EPA to reopen orders does not depend on whether the agency happened to include such language when it issued the order. As explained above, EPA clearly has the legal authority to modify section 5 orders, including "consent orders," regardless of whether there is express language recognizing that authority. Moreover, an attempt to argue that EPA could agree with a private party not to exercise its statutory authority to protect public health and the environment by eliminating unreasonable risks would run afoul of constitutional doctrines of separation of powers.

EDF also urges the Agency to specify in its regulations under what circumstances orders are to be revised based on test results or other new information,[85] and the process used to do so, including providing for public notice and an opportunity to comment.

---

[83] *See Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed. Cir. 2008); *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) (collecting cases).

[84] EPA, TSCA Section 5 Order for a New Chemical Substance for Chevron U.S.A. Inc., at 13 (Aug. 25, 2022), https://www.documentcloud.org/documents/23607053-sl-sanitized_consent_order_p_21_0144c.

[85] For example, where the new information alters risk levels sufficiently to warrant changing a level of release allowed under the order, or where the new information identifies a significant potential risk from an activity allowed under the order that should now be restricted.

## IV. EPA SHOULD FULLY ALIGN ITS NEW CHEMICALS REGULATIONS WITH CONGRESS' MANDATES IN AMENDED TSCA AND DESCRIBE HOW IT WILL IMPLEMENT THE KEY REFORMS

Congress clearly required, in its 2016 reform of TSCA, that manufacture of a new chemical will not begin until EPA makes a determination on a new chemical application and takes the required Section 5 action on the determination. Congress's change to the law, which previously allowed manufacture of new chemicals even in the absence of EPA's review, represented a bedrock reform to new chemicals review and regulation. As EPA notes, the current regulations are inconsistent with this change, and EDF supports the Agency's proposed modification to 40 C.F.R. § 720.75(d) to align the regulations with this key Congressional reform. EDF also supports EPA's proposed incorporation of the five possible determinations and associated actions, one of which EPA must take in response to each new chemical application (specifically, a PMN, SNUN, and MCAN), at 40 C.F.R. § 720.75(d).

However, EPA has not fully met its stated purpose of aligning its regulations with Congress' requirements in reformed TSCA. In purporting to codify the requirements of TSCA, the Agency has been troublingly selective. We urge EPA to fully bring the regulations into conformance with the 2016 amendments by including the following in the final regulations.[86]

### A. EPA's Regulations Need to Address Information Insufficiency and Testing

EPA should clearly spell out in the regulations its authority both to limit or prohibit the manufacture, processing, distribution in commerce, use and disposal of a new chemical substance and to require testing of the new chemical when it finds that information about the chemical is insufficient. One of the key reforms made to TSCA in 2016 was to establish "insufficient information" as a stand-alone finding about a new chemical, which, when made, by itself triggers mandatory regulation of the substance.[87] This was an important change from TSCA as originally enacted, under which information insufficiency could only lead to regulation if EPA also found that the new chemical "may present" unreasonable risk or is produced in large amounts and expected to lead to large environmental releases or human exposures. Under amended TSCA, EPA is to make separate findings as to information sufficiency and potential risk or high release/exposure; if either finding is made, EPA must then issue an order regulating the new chemical.

EPA briefly notes in the preamble to the Proposed Rule that, after a finding of insufficient information, the Agency "may" issue a section 5(e) order requiring testing to be conducted. And it proposes at 40 C.F.R. § 720.75(d)(2)(ii) only that when it makes such a finding, "EPA may issue an order under section 5(e) of the Act that requires certain testing to be conducted and presented to EPA after the applicable review period has concluded." This proposed language

[86] EPA states that its proposal, among other purposes, is "intended to align the regulatory text with the amendments to TSCA's new chemicals review provisions" contained in reformed TSCA. 88 Fed. Reg. at 34100.

[87] 15 U.S.C. § 2604(e)(1)(A)(i) ("TSCA section 5(e)(1)(A)(i)").

raises several concerns. First, the Agency does not discuss – let alone codify in the proposed regulations – that it expects frequently to make determinations of insufficient information. Many new chemicals lack sufficient information for EPA to make the "may present an unreasonable risk" finding or the substantial release or exposure findings. Second, EPA nowhere states that when it does find information is insufficient, it will require testing. EPA has not explained how it would, absent such testing, address the identified insufficiencies.

Nor does the Agency explain how it would go about making insufficient information determinations, such as by including a description in the regulations of what criteria EPA will consider to decide whether available information is sufficient or insufficient. As one example, EPA cannot estimate risk when available information is insufficient to establish a point of departure ("POD"), needed to estimate a risk value. In the final regulations, EPA should include such criteria.[88]

In addition, the Agency should spell out what it will do upon making an insufficient information determination. When EPA issues such an order under TSCA section 5(e), it should include testing requirements to address any data gaps EPA identifies. Such testing should address and be sufficient to resolve any uncertainties in the risk analysis due to the use of analog substances or assumptions and confirm or negate the appropriateness of the use of such analogs or assumptions.

Finally, unless EPA concludes that there will be no exposure to the chemical, the order should bar commercialization of the chemical until the testing is completed and reviewed by EPA, and the Agency factors the results into a new determination. EPA's proposed language at 40 C.F.R. § 720.75(d)(2)(ii) should be modified to state clearly that EPA can, and in some cases will, require testing to be conducted up front, before allowing commercialization.

All of the above requirements should be spelled out in EPA's final regulations.

### B. EPA's Reviews of New Chemical and Significant New Uses Need to Evaluate Reasonably Foreseen Conditions of Use

EPA should include in the final regulations Congress' key 2016 reform of TSCA requiring EPA to evaluate reasonably foreseen as well as intended conditions of use when reviewing a new chemical or a significant new use. The regulations should include the following:

---

[88] EPA needs to develop specific criteria – based on risk and not on cost or other non-risk factors – for: (1) making information sufficiency determinations; (2) deciding what testing is needed to address identified insufficiencies; (3) deciding when test results are to be submitted; and (4) deciding what conditions are to apply while required testing is being conducted, which may include a ban on commercialization pending completion of the testing and assessment of the results. The categories of testing that the criteria need to address include:

- upfront testing, i.e., required before or as a condition of commencement, to address either information insufficiencies or significant hazard concerns;
- triggered testing, i.e., due before certain conditions are met or can be exceeded; and
- pended testing, which should be required before any modification of the order can be considered.

- EPA must conduct an *upfront* evaluation of reasonably foreseen conditions of use in combination with intended conditions of use (TSCA sections 3(4) and 5(a)(3)).[89]
- EPA must take a broad, inclusive approach to identifying reasonably foreseen conditions of use. TSCA's definition of "conditions of use" (TSCA section 3(4)), into which "reasonably foreseen" is integrated, is itself broad and inclusive, expressly including "the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." This definition encompasses the full lifecycle of the chemical, requiring EPA to adopt a broad approach to identifying conditions of use, including those that are reasonably foreseen as intended or already known to occur.
- EPA should identify information and factors that at a minimum must be considered in determining reasonably foreseen conditions of use, and evaluate them in combination with intended conditions of use. These should include:
    - any known, intended and/or reasonably foreseen conditions of use of new chemical structural analogs;
    - the potential for expanded or changed use patterns, such as consumer use of a chemical initially intended only for industrial use;
    - production volume increases, with a focus on aggregate production across multiple sites/manufacturers (aggregate production volume increases are reasonably foreseen and must be accounted for);
    - deviations from intended conditions of use, e.g., releases or higher than intended releases to water, air, or other media;[90]
    - potential domestic production of a chemical whose manufacturer only intends to import the substance (raising potential for domestic worker exposure and releases from manufacturing/ processing sites);
    - any potential uses identified in patent searches;
    - any known uses of the PMN substance in other countries; and
    - attributes of the chemical itself – particularly physical-chemical attributes – in order to determine, for example, how readily it will move through or build up in the environment and biota or contaminate environmental media, and how

[89] TSCA section 3(4) provides the definition of "conditions of use," which does not provide any basis for separately (temporally or otherwise) considering reasonably foreseen vs. intended conditions of use; both are relevant to understanding the future risk posed by a new chemical once it is on the market, since both may occur during the same period of time or expose the same individuals or groups. 15 U.S.C. § 2602(4). TSCA section 5(a)(3) in turn specifies the requirement to conduct the review and make the determination for the new chemical under its conditions of use. 15 U.S.C. § 2604(a)(3).

[90] Existing SNUR regulations illustrate how EPA already considers deviations from intended conditions of use to identify significant new uses – that same approach could be applied to identify reasonably foreseen conditions of use.

easily the contaminated environment can be remediated (all critical factors to determine the risks from downstream conditions of use).

### C. EPA's Reviews of New Chemicals and Significant New Uses Need to Assess Risk to Vulnerable Subpopulations

EPA should address Congress' key TSCA reform requiring EPA to assess whether a new chemical or new use of a chemical poses an unreasonable risk to vulnerable subpopulations.

With respect to workers:

- EPA should integrate into its regulations its key worker protection policies the following:
  - EPA should codify its 2021 policy indicating it will not assume workers use and are adequately protected by personal protective equipment ("PPE") as a basis for dismissing or minimizing identified hazards to workers.[91] EPA should never assume that workers can and will use PPE, and should certainly consider lack of its use to be reasonably foreseen. Nor should EPA ever assume for a new chemical that the hierarchy of controls ("HOC") is in place for workplaces engaged in activities involving that chemical.
  - EPA should codify the HOC. The HOC is a basic tenet of industrial hygiene and is a longstanding foundational element of the Occupational Safety and Health Administration's ("OSHA") workplace safety policy[92] and of the National Institute for Occupational Safety and Health's ("NIOSH") workplace safety guidance.[93]
  - In addition, EPA should not assume that compliance with OSHA regulations will mitigate TSCA unreasonable risks, as the Agency unfortunately continues to do.[94]
- EPA should codify the requirement to assess the risks of a new chemical across its entire lifecycle, recognizing that exposure and risks to vulnerable subpopulations can occur at any stage of the lifecycle of a chemical or products containing a chemical. For example, releases directly from manufacturing facilities or after disposal of products may lead to exposures.

---

[91] EPA," Important Updates on EPA's TSCA New Chemicals Program," March 29, 2021, https://www.epa.gov/chemicals-under-tsca/important-updates-epas-tsca-new-chemicals-program.

[92] *See* OSHA, "Chemical Hazards and Toxic Substances: Controlling Exposure," https://www.osha.gov/chemical-hazards/controlling-exposure.

[93] *See* NIOSH, "Workplace Safety & Health Topics: Hierarchy Of Controls," https://www.cdc.gov/niosh/topics/hierarchy/.

[94] For example, see EPA, EPA Sanitized TSCA Section 5 Order for a New Chemical Substance, Premanufacture Notice (PMN) Numbers: P-21-0144-0147, P-21-0148-0150, P-21-0152-0154, P-21-155-0158 and P-21-0160-0163, Submission Dates: 06/07/2021, 06/07/2021, 06/14/2021,06/08/2021, and 06/14/2021. Received 08/23/2022.

With respect to fenceline communities, EPA should routinely assess fenceline community exposures to new chemicals from intended as well as reasonably foreseen conditions of use, via all pathways and routes.

In assessing risks to vulnerable subpopulations, including fenceline communities, EPA needs to account for the potential for such groups to be subject to combined/multiple exposures to provide a more accurate picture of the risks these subpopulations face from the new chemical:

- EPA should combine dermal, inhalation, and oral exposures to the same subpopulation when assessing exposure and risk.
- EPA must evaluate combined exposures from multiple sources/uses, including increased exposure due to:
    - expansion of a chemical's production/uses over time;
    - additional companies manufacturing/processing/using/disposing of a chemical;
        - This includes additional exposures arising from approval of a SNUN, which must be evaluated in combination with those conditions of use in the original PMN;
    - occupational and consumer exposures, as well as general population;
    - increased exposures to fenceline communities;
    - non-TSCA uses of the new chemical ("background exposures");
    - other sources of exposure to the same byproducts or impurities associated with the new chemical (e.g., dioxins) ("background exposures"); and
    - consideration of cumulative exposures to similar chemicals that have the potential to cause the same or similar toxic endpoint.[95]

Finally, EDF appreciates the intent behind EPA's proposed addition of "overburdened communities" to its regulatory definition of "potentially exposed or susceptible subpopulation."[96] The subpopulations listed in TSCA's definition of the term (section 3(12)) are clearly only examples (the list is preceded by "such as"), and EPA has ample authority to expand the list in its regulatory definition. However, we have several concerns about EPA's proposed inclusion of the adjective "overburdened." First, in the list of example subpopulations, only "communities" is modified by any adjective, let alone the adjective "overburdened," which is not defined. All workers warrant consideration as potentially exposed or susceptible, and so should all communities. We do not see any basis to narrow the scope of only this term, which deviates from the parallel construction of the statutory list.

We also believe "overburdened" – especially the "over" part of the adjective – is setting too high a bar. Potential exposure or susceptibility greater than the general population – terms that already apply to each listed example subpopulation – is what the statute says. Would application of this

---

[95] Workers, fenceline communities, and consumers are often exposed to multiple chemicals that cause similar harms. For example, workers who use diisocyanates are often exposed to multiple diisocyanates, fenceline communities are exposed to multiple PFAS, and consumers can be exposed to multiple flame retardants and plasticizers (e.g., trimellitate esters).

[96] Proposed 40 C.F.R. § 720.3(mm).

additional term require EPA to show more, e.g., that the burden on a community exceeds some threshold? Such a test is not applied to any of the other example subpopulations.

For these reasons, EPA should not use "overburdened" and instead just add "communities" to the list. All of the other examples (infants, etc.) merely describe a group of individuals that may be more susceptible or exposed, so adding the term "communities" is in parallel with the other group listings and should/need not be further qualified.

### D. EPA Needs to Provide Public Notice of and Access to "Not Likely" Determinations

EPA has indicated in the preamble of the proposed rule that notice of EPA's issuance of a "not likely" determination is only provided to the submitter of the subject notice, not the public.[97] It is notable that providing such notice to submitters, and only submitters, is not addressed in TSCA. EPA's regulations need to address and provide for timely public access to the "not likely" determination notices provided to submitters, or at least specify a maximum length of time, which should be as short as possible, between EPA reaching such a determination and notifying the submitter and the subsequent public notice. TSCA section 5(g) requires that EPA publish in the Federal Register a public statement of the finding "as soon as practicable before the expiration of such period [presumably, the applicable review period]"; it is not clear that EPA is always doing so. That TSCA provision also notes that publication of the statement is not a prerequisite to commencement of manufacture by the submitter. EPA should codify the timing requirement for public notice; TSCA provides no basis for submitters to know the outcome of EPA's review before the public is informed.

### E. EPA's Regulations Need to Include Requirements Relating to Significant New Use Rules ("SNURs")

EPA should codify several new provisions and make changes to existing provisions to align them with the 2016 reforms made to TSCA.

First, EPA should codify Congress' 2016 requirement that a significant new use rule ("SNUR") must be promulgated following issuance of a section 5(e) or section 5(f) order, or that EPA must publish an explanation of why a SNUR is not needed.[98] The regulations should also specify a deadline for the finalization of the SNUR, which should be as soon after issuance of the order as possible.

Second, EPA should modify its existing regulation at 40 C.F.R. § 721.160(b)(1) to add "reasonably foreseen conditions of use" to those that EPA may include in SNURs as significant new uses. For a number of years, EPA has often considered reasonably foreseen uses in issuing

---

[97] 88 Fed. Reg. at 34104.

[98] 15 U.S.C. § 2604(f)(4) ("TSCA section 5(f)(4)").

new chemical SNURs,[99] such as when EPA includes "use in a consumer product" or "particle size less than 1 micron" as a significant new use, even when the use was not included in the premanufacture notice, before the 2016 reforms to TSCA EPA was not mandated to do this. EPA should codify that practice, which is consistent with the requirements of amended TSCA.

EPA should also codify a requirement that when reviewing a significant new use notice ("SNUN"), EPA must consider reasonably foreseen conditions of use related to the intended condition(s) of use that are notified by the submitter of the SNUN, particularly given there may be reasonably foreseen uses in addition to those identified when EPA promulgated the SNUR.

Third, EPA cannot rely on its issuance of a SNUR (or its intent to issue a SNUR) as a basis for issuing a "not likely" determination. This illegal and unhealth-protective practice was routine under the previous administration, and EDF provided detailed legal, scientific, and policy critiques of it.[100] In March 2021, EPA announced it would cease this practice.[101] However, this policy decision needs to be incorporated into EPA's new chemicals regulations lest it be able to be reversed in the future without notice or potentially without recourse. EPA should codify a prohibition on any reliance on SNURs as a basis to issue "not likely" determinations even for chemicals or new uses that EPA finds may present unreasonable risk.

Finally, we urge EPA to make some significant modifications to its current provisions that generally exempt articles from coverage under SNURs (including TSCA Section 5(a)(5), added by the 2016 amendments):

1. EPA should revoke the exemption applicable to processing or import of a chemical as part of an article (40 C.F.R. § 721.45(f)) from its SNUR regulations.
    - While EPA currently has authority to revoke the exemption on a case-by-case basis, and has done so in a number of SNURs, the presumption behind the exemption is flawed: "that people and the environment will generally not be exposed to substances in articles."[102]

---

[99] EPA has also considered reasonably foreseen uses when issuing SNURs for existing chemicals, including so-called "dead-chemical" SNURs. *See*, for example, EPA, "Significant New Use Rules on Certain Chemical Substances (22-1.5e)," 87 Fed. Reg. 74072, December 2, 2022, https://www.regulations.gov/docket/EPA-HQ-OPPT-2021-0847.

[100] *See*, for example, EDF, "Comments on Updated Working Approach To Making New Chemical Determinations Under the Toxic Substances Control Act (TSCA)," EPA–HQ–OPPT–2019–0684, February 18, 2020, sections 3.B and 3.C, https://www.regulations.gov/document/EPA-HQ-OPPT-2019-0684-0013.

[101] *See* EPA, "Important Updates on EPA's TSCA New Chemicals Program," March 29, 2021, https://www.epa.gov/chemicals-under-tsca/important-updates-epas-tsca-new-chemicals-program.

[102] EPA, "Significant New Uses of Chemical Substances; Certain Chemicals," 49 Fed. Reg. 35011, 35014, Sept. 5, 1984, https://www.govinfo.gov/content/pkg/FR-1984-09-05/pdf/FR-1984-09-05.pdf.

- EPA itself has noted that our knowledge of the potential for chemical exposures from articles has evolved greatly since the exemption was created (in 1984) and that the rationale the agency provided for it at that time was "minimal."[103]
- The legislative history of TSCA Section 5(a)(5), added by the 2016 amendments, makes clear the provision was not intended to set a high bar for EPA to require notification of processing or import of a chemical as part of an article, and that EPA needs to have clear authority to review – and regulate as necessary – such processing or import.

2. In deciding whether to require notification for articles, EPA need not and should not differentiate among categories or types of articles based on how the chemical substances are contained in the articles.
    - Nothing in TSCA Section 5(a)(5) compels or necessitates EPA to do so. It only requires EPA to affirmatively find a "reasonable potential for exposure to the chemical substance from the article."
    - The Trump EPA's 2020 PFAS SNUR inappropriately narrowed the category of PFAS-containing articles subject to the SNUR from that originally proposed in 2015 to include only those where PFAS is present in a surface coating, ignoring evidence in the record demonstrating potential for exposure to PFAS when present in an article other than in a surface coating.
    - The 2015 proposal appropriately acknowledged that exposure may result at downstream stages of the lifecycle due to "aging, wear, and disposal of products containing them," processes that would act to expose and release chemicals present in articles in ways other than just in coatings on their surfaces.
3. When subjecting a chemical to a SNUR, EPA should generally require notification of the processing or import of the chemical as part of an article, barring a compelling rationale and evidence bases for not doing so.
    - The purpose of a SNUR is to provide EPA with an opportunity to review a significant new use if there a change in the magnitude, type and duration of exposure and determine whether there is a potential unreasonable risk from such a use, and if so, to regulate the use.
    - EPA should not pre-judge whether there is in fact significant exposure (as opposed to merely a reasonable potential for exposure) to a chemical from an article by excluding such a use from a SNUR; to do so would mean EPA could not obtain and review information on:
        - the precise nature of the article and its lifecycle,
        - the form and manner in which the chemical is added to and present in the article, and
        - how the product is handled during all stages of its lifecycle, including potential exposures and risks from recycling and disposal as well as

[103] EPA, "Benzidine-Based Chemical Substances; Di-n-pentyl Phthalate (DnPP); and Alkanes, C12-13, Chloro; Significant New Use Rule," 79 Fed. Reg. 77898, Dec. 29, 2014, https://www.govinfo.gov/content/pkg/FR-2014-12-29/pdf/2014-29887.pdf.

production and use, and to vulnerable subpopulations including workers and fenceline communities.

EPA does not generally have such information, and the very purpose of a SNUR is for EPA to be able to get that information through the notification and review requirements.

- Similarly and for the same reasons, EPA should not set a *de minimis* threshold level of a subject chemical in an article that would trigger notification because it cannot determine prior to obtaining information whether the exposures are truly *de minimis*.

4. Should EPA nevertheless decide to retain the revocable article exemption in the current regulation (40 C.F.R. § 721.45(f)), it should explicitly incorporate the factors discussed above to ensure that the exemption will be revoked whenever warranted and that the bar for doing so is low, and will be consistent with TSCA's requirement that EPA merely find there is a "reasonable potential for exposure" to a chemical from an article to require notification. Specifically, EPA should make clear in its regulation that it will, in determining whether the exemption should apply:
   - not pre-judge whether there is in fact significant exposure to a chemical from an article or set a *de minimis* threshold level of a subject chemical that would trigger notification;
   - not differentiate among categories or types of articles based on how the chemical substances are contained in the articles (e.g., assume there will not be exposure other than from surface coatings);
   - consider the entire lifecycle of the chemical and article, including downstream activities and processes that could lead to the release of and exposure to the chemical; and
   - consider potential exposures of and risks to vulnerable subpopulations, including fenceline communities and workers.

### F. EPA's Regulations Need to Include Additional Requirements Relating to New Chemical Exemptions

EDF supports EPA's regulatory amendments that require EPA's approval of certain new chemical exemption applications before companies can begin to manufacture the subject chemicals.[104] (This is in line with TSCA sections 5(h)(1), (4), and (5), which give EPA the authority to grant exemptions from only certain of the requirements of section 5(a), and therefore to apply other section 5(a) requirements to exemption applications, including the requirement for EPA to review and make a determination on the new chemical before manufacture.) However, EPA only applies this amendment to low volume and low release and exposure exemption applications; EPA should extend this requirement to all new chemical exemption applications, including those for the test marketing exemption, the byproduct exemption, and any additional exemption the Agency provides under TSCA section 5(h)(4). EPA should also include a

[104] *See* Proposed 40 C.F.R. § 732.50(g)(2).

requirement in the final regulations that EPA provide public notice of its determinations and actions, not just notification to the company submitters.

## V. NO PFAS SHOULD BE ELIGIBLE FOR THE LOW VOLUME AND LOW RELEASE/EXPOSURE EXEMPTIONS

### A. EPA is Correct to Make PFAS Categorically Ineligible for Low Volume and Low Release/Exposure Exemptions

We commend EPA for proposing to make PFAS categorically ineligible for low volume and low environmental releases and human exposure exemptions ("LVE" and "LoREX") under TSCA. This action follows calls in a 2021 petition to EPA sent by us and other organizations to disallow new chemical notice exemptions for PFAS given the chemical class's ubiquitous presence in the environment, animals, and humans, as well as their wide variety of health harms.[105] While EPA had previously suggested in an April 2021 press release that it "generally expects that pending and new LVE submissions for PFAS would be denied,"[106] the codification of ineligibility will improve consistency and efficiency in exemption reviews and increase predictability for interested stakeholders. Further, this is well within EPA's authority. The Agency has discretion to grant exemptions only where the chemical substances will not present an unreasonable risk to human health or the environment.[107] Scientific evidence demonstrates the many risks that PFAS pose to human health and the environment as a category – so the Agency has the statutory authority to make these dangerous chemicals ineligible for the discretionary exemptions.

### B. EPA Should Categorically Revoke Existing PFAS Low Volume and Low Release/Exposure Exemptions

While we appreciate EPA's efforts to address PFAS LVEs and LoREXs in this rulemaking, we are disappointed that EPA did go further and categorically revoke these existing exemptions. In our second petition to EPA on this matter, sent in 2022, we and other groups urged EPA to revoke existing exemptions for PFAS given that the weight of the scientific evidence is unequivocal that PFAS, even in very small quantities, pose a risk of cancers, immune system suppression, cardiovascular diseases, as well as human development harms and liver disease in children. Cumulative exposure to PFAS increase the risks to, and disproportionately impact, potentially exposed or susceptible subpopulations such as nursing mothers, women of reproductive age, and communities near where PFAS are manufactured, processed, used, and

---

[105] Earthjustice, et al., "Petition to The United States Environmental Protection Agency: To prohibit the use of certain exemptions to the premanufacture notice requirements of the Toxic Substances Control Act for per- and polyfluoroalkyl substances (PFAS)," April 27, 2021, https://earthjustice.org/wp-content/uploads/pfas_pmn_exemptions_petition_04-27-2021.pdf.

[106] EPA, "EPA Announces Changes to Prevent Unsafe New PFAS from Entering the Market," April 27, 2021, https://www.epa.gov/chemicals-under-tsca/epa-announces-changes-prevent-unsafe-new-pfas-entering-market.

[107] 15 U.S.C. § 2604(h) ("TSCA section 5(h)").

disposed. Further PFAS bioaccumulate and are extremely persistent, mobile in the environment.[108]

As a result of the well-established harms that PFAS pose to human health and the environment, EPA cannot continue to conclude that PFAS "will not present an unreasonable risk of injury to health or the environment, including an unreasonable risk to a potentially exposed or susceptible subpopulation," which is the finding that is required for an LVE or LoREX application to satisfy TSCA.[109] By continuing to allow the manufacture and use of PFAS that have not undergone the full PMN review process, while simultaneously relying on ineffective voluntary programs that fail to meaningfully limit the manufacture, processing, use, and disposal of PFAS LVEs and LoREXs, EPA is violating TSCA, its own regulations, and the Administrative Procedure Act.

In addition to the arguments laid out in our 2022 petition, EPA itself has made the case for revoking these exemptions, including statements such as the following:

- "Due to the scientific complexities associated with assessing PFAS, and the hazard potential associated with various sub-classes of PFAS, it is challenging to conduct an appropriately robust review of LVE requests for PFAS in the 30 days the regulations allow,"[110]
- "Given the complexity of PFAS chemistry, potential health effects, and their longevity and persistence in the environment, an LVE submission for a PFAS is unlikely to be eligible for this kind of exemption under the regulations,"[111] and
- "Under the existing regulations at 40 C.F.R. 723.50(h)(2), at any time after EPA approves an LVE or LoREX notice, EPA can determine that manufacture of the new chemical substance does not meet the exemption criteria."[112]

Given that the Agency has demonstrated that PFAS do not meet the LVE or LoREX criteria, EPA must revoke existing PFAS LVEs and LoREXs and require companies that wish to continue manufacturing these substances to submit a PMN for a full safety review, because EPA cannot continue to find that PFAS will not present an unreasonable risk. Doing this would "allow the agency additional time to conduct a more thorough review through the pre-manufacture notice review process and, as appropriate, put measures in place to mitigate the potential risk of

---

[108] Earthjustice, et al., "Petition to The United States Environmental Protection Agency: To revoke the approval of approximately 600 per- and polyfluoroalkyl substances (PFAS) that were granted through low-volume or low-release and low-exposure exemptions to the premanufacture notice requirements of the Toxic Substances Control Act," October 13, 2022, https://earthjustice.org/wp-content/uploads/pfas_revocation_petition_submitted.pdf.

[109] 15 U.S.C. § 2604(h)(4) ("TSCA section 5(h)(4)").

[110] EPA, "EPA Announces Changes to Prevent Unsafe New PFAS from Entering the Market," April 27, 2021, https://www.epa.gov/chemicals-under-tsca/epa-announces-changes-prevent-unsafe-new-pfas-entering-market.

[111] *Id.*

[112] 88 Fed. Reg. at 34113.

these chemicals"[113] – a stated goal of EPA's policy changes "to prevent unsafe new PFAS from entering the market."[114]

### C. EPA Should Adopt the OECD PFAS Definition

EDF urges EPA to modify its definition of what constitutes a PFAS and adopt a definition that is consistent with that used by other authoritative bodies in the United States and around the world, such as the Organization for Economic Cooperative Development (OECD).[115] The application of the proposed definition to this rulemaking may result in the exclusion of potentially public health relevant PFAS.

Furthermore, given that it is more effective – including cost effective – to assess and mitigate risk from new PFAS *before* they enter the market, it would be appropriate to adopt a more widely recognized definition, such as the OECD PFAS definition, to ensure that all PFAS are ineligible for these exemptions and must go through a comprehensive safety review through the PMN process, rather than assuming that certain PFAS may not pose a risk. Certainly, this is warranted given the history of PFAS and the numerous PFAS approvals EPA has issued for chemicals that have contaminated us and our environment.

### D. EPA Should Consider Excluding Other Potential High-risk Chemical Categories from Eligibility for LVE and LoREX

Moving forward, EDF encourages EPA to consider whether other high-risk chemical categories should also be ineligible for LVEs or LoREXs. In the 1982 proposed rule in which EPA proposed to grant a TSCA section 5(h)(4) exemption from the requirements of section 5(a)(1)(A) for companies that manufacture certain new site-limited intermediates in any quantity or certain other new chemical substances in quantities of 10,000 kg or less per year, EPA requested comment on an approach suggested by the Dyes Environmental and Toxicology Organization, Inc (DETO) to exclude from exemption eligibility certain high-risk chemical categories.[116] Under this approach, EPA would identify the list of potential high-risk categories based on chemical structure. Several commenters supported this approach. However, EPA chose not to

[113] EPA, "EPA Announces Changes to Prevent Unsafe New PFAS from Entering the Market," April 27, 2021, https://www.epa.gov/chemicals-under-tsca/epa-announces-changes-prevent-unsafe-new-pfas-entering-market.

[114] *Id.*

[115] OECD, "Reconciling Terminology of the Universe of Per- and Polyfluoroalkyl Substances: Recommendations and Practical Guidance," 2021, https://www.oecd.org/officialdocuments/publicdisplaydocumentpdf/?cote=ENV/CBC/MONO(2021)25&docLanguage=en.

[116] EPA, "Premanufacture Notification; Proposed Exemption for Site-Limited Intermediate Chemical Substances and Chemical Substances Manufactured in Quantities of 10,000 Kg or Less Per Year; Proposed Rule," 47 Fed. Reg. 33896, August 4, 1982, https://archives.federalregister.gov/issue_slice/1982/8/4/33856-33919.pdf#page=41.

finalize this approach, stating that it would be resource intensive.[117] EDF recommends that EPA consider this approach as part of a supplemental proposed rule or a future rulemaking. Given EPA's experience in reviewing thousands of PMNs, LVEs, and LoREXs since 1985, it should be much less resource intensive to identify potentially high-risk categories of chemicals than it was 40 years ago. The existence of these categories will provide more transparency for the regulated community and other stakeholders. Further, it would be more in keeping with the statutory standard of section 5(h)(4), which limits exemptions to new chemical substances that will not present an unreasonable risk.

## VI. EPA SHOULD MAKE ALL PBT CHEMICALS INELIGIBLE FOR THE LOW VOLUME AND LOW RELEASE/EXPOSURE EXEMPTIONS

EDF supports excluding PBT chemicals from eligibility for TSCA section 5(h)(4) exemptions. However, EPA's proposal must be modified: all PBTs should be excluded from eligibility from section 5(h)(4) exemptions, not just the subset of PBTs to which EPA refers. PBT chemicals are of special concern because of their ability to build up in the environment and in people and other organisms. Even small releases of these longer-lived toxic chemicals that can bioaccumulate have the potential to presents risks to human health and the environment. Given this concern about PBTs, in 1999 EPA issued a TSCA section 5 policy statement, "Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances: Policy (1999 PBT Policy)," that identified persistence and bioaccumulation criteria for two tiers of PBTs, a testing strategy for both tiers of PBT chemicals, and the evaluation process for both tiers of new PBT chemical substances.[118]

In this Federal Register notice, EPA stated that "[t]his policy statement is important in our new chemical assessment and TSCA regulatory programs, and represents the first formal statement of national policy regarding new chemical ''persistent organic pollutants.'' Under our domestic program, the policy statement provides guidance criteria for persistence, bioaccumulation, and toxicity for new chemicals and advises the industry about our regulatory approach for chemicals meeting the criteria."[119]

### A. EPA Should Codify the Actual 1999 PBT Policy

In choosing to exclude from eligibility for the LVE and LoREX only a subset of what the 1999 PBT Policy identifies as PBTs, EPA incorrectly states that it is codifying this policy. EPA further mischaracterizes the policy as generic and states it is also codifying its "long-standing practice"

---

[117] EPA, "Premanufacture Notification; Proposed Exemption for Site-Limited Intermediate Chemical Substances and Chemical Substances Manufactured in Quantities of 10,000 Kg or Less Per Year; Final Rule," 50 Fed. Reg. 16477, April 26, 1985, https://www.govinfo.gov/content/pkg/FR-1985-04-26/pdf/FR-1985-04-26.pdf.

[118] EPA, "Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances," 64 Fed. Reg. 60196, November 4, 1999, https://www.govinfo.gov/content/pkg/FR-1999-11-04/pdf/99-28888.pdf.

[119] *Id.* at 60196

that considers PBTs "with anticipated environmental releases and potentially unreasonable exposures." What EPA characterizes as its "long-standing practice" is neither a continuously "long-standing practice" nor consistent with the 1999 PBT Policy.[120]

In pointing to the Agency's 1999 PBT Policy, EPA has mischaracterized it by stating that it provides only "generic guidance regarding how it determines the PBT status of chemical substances" and that "the policies and science used to ascribe discrete scores (i.e., 1–3) to the persistence, bioaccumulative potential, and toxicity of a particular chemical substance are based on the available data and made on a case-by-case basis."[121] In contrast to EPA's claim, even a cursory glance at the 1999 PBT Policy makes clear that EPA did not provide "generic guidance" on how EPA identified PBT chemicals. Rather, it provides clear, explicit, and discrete criteria for identifying chemicals that are persistent and bioaccumulative, as well as very persistent and very bioaccumulative (vPvB) toxic chemicals. The Agency's criteria for identifying PBT and vPvBT chemicals underwent notice and comment rulemaking, and as explained in EPA's response to comments, the criteria for the higher tier PBTs are consistent with the criteria of the Stockholm Convention on Persistent Organic Pollutants.[122] The criteria for the lower tier PBTs are consistent with the criteria adopted by other international authoritative bodies.[123]

---

[120] Indeed, from 2014 to 2017, any LVE exemption application that was identified as meeting the criteria of the 1999 PBT policy was <u>required</u> to be raised to the-then EPA Chemical Control Division director. (This procedure was reflected in a 2017 New Chemical Program SOP.) Essentially all were denied because they were PBTs. There was no determination of "potentially unreasonable exposures." Thus, the statement that this was a "long-standing practice" is factually incorrect.

[121] 88 Fed. Reg. at 34115.

[122] EPA, "Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances," 64 Fed. Reg. 60196, November 4, 1999, https://www.govinfo.gov/content/pkg/FR-1999-11-04/pdf/99-28888.pdf. "The proposed TSCA PBT category has been provided to the Criteria Expert Group (CEG) established at the first session of the Intergovernmental Negotiating Committee (INC) for an International Legally Binding Instrument for Implementing International Action on Certain Persistent Organic Pollutants, in accordance with the mandate given by the Governing Council of the United Nations Environment Programme (UNEP) in paragraph 9 of its decision 19/13 C (http://irptc.unep.ch/pops/gcpops¥e.html). The CEG is an open ended technical working group with a mandate to present to the INC proposals for science-based criteria and a … Note that the CEG, at the October 26–30, 1998 Bangkok meeting described in Unit II.B. of this document, developed indicative numeric values as bracketed criteria text which included persistence of 2 vs. 6 months in water and log Kow of 4 vs. 5 (equivalent to a BCF of approximately 1,000 vs. 5,000, respectively).

[123] *Id.* at 60199. "As outlined in EPA's recent proposal to lower the reporting thresholds for PBT chemicals that are subject to reporting under section 313 of EPCRA (64 FR 688; January 5, 1999), similar values have been proposed by several authorities, including the Ontario, Canada Ministry of Environment and Energy (MOEE) for its Candidate Substances List for Bans or Phaseouts (MOEE, 1992, see Unit VI.10.); the Canadian initiative for Accelerated Reduction/Elimination of Toxics (ARET) (ARET, 1995 and ARET, 1994, see Unit VI.11. and 12.); the International Joint Commission (IJC)'s Great Lakes Water Quality Agreement (GLWQA) (IJC, 1993, see Unit VI.13.); and the United Nations Economic Commission for Europe Convention on Long-Range Transboundary Air Pollution (UNECE LRTAP),

The "specific identification criteria" and associated processes for use in evaluating new chemical PBT substances EPA adopted are shown in the following excerpt (see Fig. 1 below) from the 1999 PBT Policy.[124] None of the specific criteria in the 1999 PBT Policy refers to "unreasonable exposures." The 1999 PBT Policy considers and establishes criteria for the persistence and bioaccumulation of the new chemical, not criteria for exposure. EPA also fails to note that the 1999 PBT Policy discusses the specific types of testing that would be considered for both tiers of PBT chemicals and the regulatory approaches for these two tiers of PBT chemicals.

which did adopt 2 months as the persistence criterion of record for water (UNECELRTAP, 1998, see Unit VI.14.)."

[124] EPA, "Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances," 64 Fed. Reg. 60196, November 4, 1999, https://www.govinfo.gov/content/pkg/FR-1999-11-04/pdf/99-28888.pdf.

**Fig. 1 Criteria from EPA's 1999 PBT Policy**

**IV. Final TSCA New Chemicals Program Policy for PBT Chemical Substances**

*A. Evaluation Criteria and Process for New PBT Chemical Substances*

EPA is adopting the following specific identification criteria and associated process for use in evaluating new chemical substances.

NEW CHEMICALS PROGRAM PBT CATEGORY CRITERIA AND PROCESS

| | TSCA Section 5(e) Action | |
|---|---|---|
| | 5(e) Order Pending Testing/Significant New Use Rule (SNUR)[1] | 5(e) Ban Pending Testing[2] |
| Persistence (transformation half-life). | > 2 months ...... | > 6 months |
| Bioaccumulation (Fish BCF or BAF)[3]. | ≥ 1,000 ............ | ≥ 5,000 |
| Toxicity ....... | Develop toxicity data where necessary[4]. | Develop toxicity data where necessary[4] |

[1]Exposure/release controls included in order; testing required.

[2]Deny commercialization; testing results may justify removing chemical from "high risk concern".

[3]Chemicals must also meet criteria for MW (< 1000) and cross-sectional diameter (< 20Å , or < $20 \times 10^{-8}$ cm).

[4]Based upon various factors, including concerns for persistence, bioaccumulation, other physical/chemical factors, and toxicity based on existing data.

Further, EPA states that "the policies and science used to ascribe discrete scores ( *i.e.*, 1–3) to the persistence, bioaccumulative potential, and toxicity of a particular chemical substance are based on the available data and made on a case-by-case basis." While of course EPA considers each new chemical and any available data on a case-by-case basis, that does not negate the PBT policy criteria. Further, EPA's internal rankings (using 1, 2 and 3) of persistence and bioaccumulation are simple numerical rankings based on the criteria specified in the 1999 PBT Policy. They are not unique. The use of these numerical rankings is not specific to persistence and bioaccumulation. EPA also uses 1, 2, and 3 to rank human health toxicity and ecotoxicity.

The PBT policy is a TSCA section 5(e) regulatory and testing strategy. It does not include any exemptions, indicating EPA's intent to assess PBT chemicals under section 5(e). The PBT policy consists of two primary components: regulation under a section 5(e) consent order and testing requirements (trigger or ban pending testing, depending on the extent of persistence and bioaccumulation). Neither of these core components of the PBT policy are included in EPA's new chemicals proposal for PBTs.

To codify the 1999 PBT Policy, EPA should make all PBT chemicals categorically ineligible for LVEs and LoREX, in addition to other exemptions, consistent with the Agency's 1999 PBT Policy. All PBTs should be ineligible for new chemical notice exemptions, regardless of intended releases and preliminary estimated exposures.

### B. EPA Has Not Proposed to Codify its 1999 PBT Policy, Despite Claiming to Do So

EPA claims to be codifying its 1999 PBT Policy in this rulemaking[125] but has in fact proposed regulatory text that is inconsistent with the Agency's PBT policy, and has omitted additional amendments needed to meaningfully codify the policy. Under the guise of codifying the 1999 PBT Policy, it is actually codifying internal procedures that are inconsistent with the 1999 PBT Policy.

For one, EPA is introducing a new concept of "unreasonable exposure" that does not appear in the 1999 PBT Policy. The 1999 PBT Policy covers all PBTs as defined by discrete persistence and bioaccumulation levels. In contrast, EPA's proposed amendments do not apply to "all PBT chemicals" as EPA claimed in its press release,[126] but rather only to those that have "anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms." These exposure criteria are not mentioned in the Agency's 1999 PBT Policy. As such, it appears EPA created the concept of "unreasonable exposure" to narrow the scope of PBT chemicals subject to this rulemaking, without providing an accompanying definition or explanation.

Additionally, EPA has not proposed to make PBT chemicals ineligible for all new chemical notice exemptions as its policy indicates. EPA's 1999 PBT Policy demonstrates the Agency's intent to review PBT chemicals under section 5(e), given their status as chemicals of special concern. Indeed, exemptions for PBTs are not mentioned once in the Agency 1999 PBT Policy.

EPA has also failed to propose amendments to the PMN regulations that would implement the bulk of the policy; namely, its PMN regulatory and testing scheme for new PBT chemicals. The policy outlines regulatory and testing requirements based on discrete physical-chemical property cut-off values. Neither regulation under section 5(e) nor testing, based on the criteria established

[125] EPA, "Biden-Harris Administration Proposes Reforms to New Chemical Review Process to Protect Public Health, Promote Efficiency and Consistency," May 16, 2023, https://www.epa.gov/newsreleases/biden-harris-administration-proposes-reforms-new-chemical-review-process-protect.

[126] *Id.*

in the 1999 PBT Policy, are included in this proposed new chemical rulemaking. Additional amendments to the PMN regulations 40 C.F.R. 720 are necessary to effectively codify the regulatory and testing regime for PBT chemicals set forth in the Agency's 1999 PBT Policy.

Given the specificity of the persistence and bioaccumulation criteria, the types of testing for persistence and bioaccumulation that would likely be required, the comments and responses on the PBT criteria and the policy's regulatory and testing requirements for the different subsets of PBTs, it is incorrect to suggest that the PBT policy provides only "generic guidance" for identifying PBT chemicals.

We are concerned about the inconsistencies between what EPA has proposed and the Agency's 1999 PBT Policy. Because of these inconsistences, omissions, and mischaracterizations, we argue that EPA has not proposed to codify its 1999 PBT Policy, despite claiming to do so. Rather, under the guise of codifying the 1999 PBT Policy, the Agency is actually codifying internal procedures that are inconsistent with the 1999 PBT Policy.

The Supreme Court has stated that an agency that changes its policy must "display awareness that it is changing position" and "show that there are good reasons for the new policy."[127] Further, an "[u]nexplained inconsistency" in agency policy can be "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice,"[128] and "an arbitrary and capricious regulation of this sort is itself unlawful."[129] In order to protect its rule, EPA should acknowledge that its past practice has not conformed with the 1999 PBT Policy, and should codify its 1999 PBT Policy with the proposals EDF includes below.

### C. EPA Should Make all PBT Chemicals Categorically Ineligible for Low Volume and Low Release/Exposure exemptions, in Addition to Other New Chemical Exemptions, Consistent with the Agency's PBT Policy

In this new chemical rulemaking, EPA proposed to make any "PBT chemical substance with anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms" ineligible for LVEs and LoREXs.

While EDF appreciates EPA's efforts to address PBT chemicals in the context of new chemical notice exemptions, we are disappointed that EPA has only proposed to address a subset of the relevant exemptions – LVEs and LoREXs – and has created problematic criteria limiting which PBTs will be ineligible for these exemptions.

As introduced above, EPA has proposed to narrow the universe of PBT chemicals ineligible for LVEs and LoREXs from all PBT chemicals to any "PBT chemical substance with anticipated

[127] *FCC. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[128] *National Cable & Telecommunications Assn. v. Brand X Internet Services*, 545 U.S. 967, 981-982 (2005).

[129] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

environmental releases and potentially unreasonable exposures to humans or environmental organisms." The proposed exposure criteria for ineligible PBT chemicals are inconsistent with both the Agency's 1999 PBT Policy, as discussed in more detail above, as well as EPA's May 2023 press release on the rulemaking. EPA states in its press release for the rulemaking that its proposed amendments to existing LVE and LoREX regulations would "ensure that *all* PBT chemicals are also ineligible for these exemptions" (emphasis added).[130] Despite this claim, the proposed amendments do not apply to "all PBT chemicals," but rather only to those that have "anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms."[131]

In addition to these inconsistencies, it is unclear what EPA means by the term "unreasonable exposure." The term is not defined in the Proposed Rule, nor does it appear in the Agency's 1999 PBT Policy, scientific risk assessment literature, or media universe. It appears that EPA created this new term for purposes of narrowing the universe of PBT chemicals subject to this rulemaking without providing a clear definition of the term in the preamble or proposed regulatory text at 40 C.F.R. § 723.50(b). Given that the term is not defined, it is also unclear how "unreasonable exposure" differs from "unreasonable risk" under TSCA. EDF questions whether it is possible for the Agency to make a determination regarding potential releases and "unreasonable exposures" without first conducting an exposure and risk assessment. A determination of "unreasonable exposure" seems to necessitate a comparison of estimated exposures to a reference dose for the chemical, which represents an assessment of unreasonable risk. Finally, it is unclear how the newly created concept of "unreasonable exposures" interacts with the low volume and exposure requirements of the exemptions subject to this rulemaking.

There are additional reasons beyond policy inconsistencies and unclear terminology that argue against EPA's proposed exposure criteria for PBT LVE and LoREX ineligibility. First, EPA's exposure models typically used in the TSCA New Chemicals Program do not capture persistence and bioaccumulation well and are not well-suited for the review of PBT chemicals. EPA has more complex models, such as EXAMS and others, that can be used for this purpose. These are not typically used in the TSCA New Chemicals Program. Second, careful attention must be given to ensuring a comprehensive assessment of releases and exposures given the problematic nature of PBT chemicals at even very low levels in the environment and products. This may include an assessment of production processes, engineering controls, wastewater treatment removal efficiencies, disposal release, and more. It is unclear how EPA expects to, or whether it even can, conduct this type of comprehensive release and exposure assessment for new PBT LVEs and LoREXs in the expedited 30-day review period for these exemptions.

For the reasons discussed above, and to ensure consistency with the Agency's 1999 PBT Policy and previous statements, EDF strongly recommends that EPA remove all references to anticipated environmental releases and "unreasonable exposures" and instead categorically make

[130] EPA, "Biden-Harris Administration Proposes Reforms to New Chemical Review Process to Protect Public Health, Promote Efficiency and Consistency," May 16, 2023, https://www.epa.gov/newsreleases/biden-harris-administration-proposes-reforms-new-chemical-review-process-protect.

[131] Proposed 40 C.F.R. § 723.50(d)(2)(ii).

all PBT chemicals ineligible for LVE and LoREXs exemptions. EPA clearly demonstrates in the preamble to this rulemaking that PBT chemicals are of special concern and meet the criteria of 40 C.F.R. § 723.50(d) for low volume and low release/exposure exemption ineligibility (i.e., serious acute or chronic effects or significant environmental effects). We urge EPA to make the entire PBT chemical category ineligible for these exemptions given the characteristics of these chemicals and the potential threat of even very small levels of release/exposure.

While we strongly recommend against it, if EPA were to move forward with any determination of "unreasonable exposure," we remind the Agency that under TSCA it must consider all intended and reasonably foreseen conditions of use across a chemical's lifecycle, and should do so in aggregate rather than in isolation. Evaluating exposure across a chemical's lifecycle is critical, especially for PBT chemicals given their ability to persist in the environment and bioaccumulate in humans and biota.

### D. EPA Should Consider Making Persistent, Mobile, and Toxic (PMT) Chemicals Ineligible for New Chemical Notice Exemptions, in Addition to PBTs

Moving forward, EPA should consider whether persistent, mobile, and toxic chemicals (PMTs) should also be ineligible for LVEs, LoREXs, and other TSCA exemptions given the threat these chemicals pose to water resources.[132] The mobility of these substances "refers to the fact that they can travel long distances with water, even in the subsurface and thus are able to spread over large spatial and temporal scales."[133] Additionally, "many PMT/vPvM [very persistent, very mobile] substances are extremely difficult to remove from water resources especially when waste water is recycled for drinking water purposes," leading to increases in exposure with continuing emissions.[134]

Significant advancements in the scientific assessment and regulation of persistent, mobile, and toxic (PMT) chemicals have taken place in recent years. For example, the European Commission in its 2020 Chemical Strategy for Sustainability committed to: (1) "propose new hazard classes and criteria in the CLP [(Classification, Labeling and Packaging)] Regulation" to fully address

[132] In 2019, the German Environment Agency developed criteria for identifying persistent, mobile and toxic (PMT) substances and very persistent and very mobile (vPvM) substances under EU Regulation REACH (EC) No 1907/2006. EPA should consult this resource as it works to systematically address PMT chemicals under TSCA. https://www.umweltbundesamt.de/sites/default/files/medien/1410/publikationen/2019-11-29_texte_127-2019_protecting-sources-drinking-water-pmt.pdf

[133] Hale, S. E., Neumann, M., & Schliebner, I. (2022). Getting in control of persistent, mobile and toxic (PMT) and very persistent and very mobile (vPvM) substances to protect water resources: strategies from diverse perspectives. *Environmental Sciences Europe, 34*, 22. https://doi.org/10.1186/s12302-022-00604-4.

[134] *Id.*

persistency and mobility[135] and (2) introduce "persistent, mobile and toxic and very persistent and very mobile [vPvM] substances as categories of substances of very high concern" under European Union's Registration, Evaluation, Authorisation and Restriction of Chemicals (REACH).[136] Moreover, a recent scientific analysis of substances determined to be PMT or vPvM under REACH regulation concluded that "PMT/vPvM substances cause an equivalent level of concern as PBT/vPvB substances and as such should be regulated [as substances of very high concern] under Article 57 in REACH."[137]

Given growing attention on the potential risks from PMTs and evidence that these chemicals present an equivalent level of concern as PBTs, EPA should consider designating PMT chemicals in addition to PBT chemicals as ineligible for new chemical review exemptions.

[135] In April 2023, the European Commissions amended CLP Regulation by adding PMT and vPvM chemicals as a new hazard class, among others. ECHA, "New hazard classes 2023," 2023, https://echa.europa.eu/new-hazard-classes-2023.

[136] European Commission. Communication From The Commission To The European Parliament, The Council, The European Economic And Social Committee And The Committee Of The Regions: Chemicals Strategy for Sustainability Towards a Toxic-Free Environment, Brussels, 14.10.2020 COM(2020) 667 final. https://eur-lex.europa.eu/resource.html?uri=cellar:f815479a-0f01-11eb-bc07-01aa75ed71a1.0003.02/DOC_1&format=PDF, at 13.

[137] Hale, S. E., Arp, H. P. H., Schliebner, I. & Neumann, M. (2020). Persistent, mobile and toxic (PMT) and very persistent and very mobile (vPvM) substances pose an equivalent level of concern to persistent, bioaccumulative and toxic (PBT) and very persistent and very bioaccumulative (vPvB) substances under REACH. *Environmental Sciences Europe, 32*, 155. https://doi.org/10.1186/s12302-020-00440-4.

(i) European Union Aviation Safety Agency (EASA) AD 2022–0243, dated December 8, 2022.

(ii) Kidde Aerospace & Defense Service Bulletin CFD–26–3, dated January 13, 2022.

(iii) Kidde Aerospace & Defense Service Bulletin CFD–26–3, Revision 1, dated March 29, 2022.

**Note 1 to paragraph (l)(2)(iii):** The revision level of this document is identified on only the transmittal page; no other page of the document contains this information.

(3) For EASA AD 2022–0243, contact EASA, Konrad-Adenauer-Ufer 3, 50668 Cologne, Germany; telephone +49 221 8999 000; email *ADs@easa.europa.eu;* website *easa.europa.eu.* You may find this EASA AD on the EASA website at *ad.easa.europa.eu.*

(4) For Kidde Aerospace & Defense service information identified in this AD, contact Kidde Aerospace & Defense, 4200 Airport Drive, NW, Building B, Wilson, NC 27896; telephone 319–295–5000; website *kiddetechnologies.com/aviation.com.*

(5) You may view this service information at the FAA, Airworthiness Products Section, Operational Safety Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195.

(6) You may view this service information that is incorporated by reference at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, email *fr.inspection@nara.gov,* or go to: *www.archives.gov/federal-register/cfr/ibr-locations.html.*

Issued on May 22, 2023.

**Michael Linegang, Acting Director,**

*Compliance & Airworthiness Division, Aircraft Certification Service.*

[FR Doc. 2023–11233 Filed 5–25–23; 8:45 am]

BILLING CODE 4910–13–P

## DEPARTMENT OF EDUCATION

### 34 CFR Part 300

**[Docket ID ED–2023–OSERS–0052]**

**RIN 1820–AB82**

### Assistance to States for the Education of Children With Disabilities; Correction

**AGENCY:** Office of Special Education and Rehabilitative Services, Department of Education.

**ACTION:** Proposed rule; correction.

**SUMMARY:** On May 18, 2023, the Department of Education (Department) published in the **Federal Register** a notice of proposed rulemaking (NPRM) to amend regulations under Part B of the Individuals with Disabilities Education Act (Part B of IDEA or the Act) that govern the Assistance to States for the Education of Children with Disabilities program, including the Preschool Grants program. We are correcting the Docket ID used for submitting public comments. All other information in the NPRM remains the same.

**DATES:** This correction is applicable May 26, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rebecca Walawender, U.S. Department of Education, 400 Maryland Avenue SW, Room 5130, Potomac Center Plaza, Washington, DC 20202–5076. Telephone: (202) 245–7399. Email: *Rebecca.Walawender@ed.gov.*

If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

**SUPPLEMENTARY INFORMATION:** On May 18, 2023, we published the NPRM in the **Federal Register** (88 FR 31659) with a Docket ID of ED–2022–OSERS–0052. We are correcting the NPRM to reflect the correct Docket ID ED–2023–OSERS–0052.

Other than correcting the Docket ID, all other information in the NPRM remains the same.

*Program Authority:* 20 U.S.C. 1221e-3, 1406, 1411– 1419, and 3474; Pub. L. 111–256, 124 Stat. 2643.

*Correction:*

In FR Doc. 2023–10542, appearing on page 31659 of the **Federal Register** of May 18, 2023 (88 FR 31659), we make the following correction:

On page 31659, in the right column, below the heading ''34 CFR part 300'', remove ''[Docket ID ED–2022–OSERS–0052]'' and add, in its place, ''[Docket ID ED–2023–OSERS–0052]''.

*Accessible Format:* On request to the program contact person listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document and the NPRM in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (TXT), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**Miguel A. Cardona,**

*Secretary of Education.*

[FR Doc. 2023–11256 Filed 5–25–23; 8:45 am]

BILLING CODE 4000–01–P

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 720, 721, 723, and 725

**[EPA–HQ–OPPT–2022–0902; FRL–7906–01–OCSPP]**

**RIN 2070–AK65**

### Updates to New Chemicals Regulations Under the Toxic Substances Control Act (TSCA)

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The United States Environmental Protection Agency (EPA) is proposing amendments to the new chemicals procedural regulations under the Toxic Substances Control Act (TSCA). These amendments are intended to align the regulatory text with the amendments to TSCA's new chemicals review provisions contained in the Frank R. Lautenberg Chemical Safety for the 21st Century Act, enacted on June 22, 2016, improve the efficiency of EPA's review processes, and update the regulations based on existing policies and experience implementing the New Chemicals Program. The proposal includes amendments that would reduce the need to redo all or part of the risk assessment by improving information initially submitted in new chemicals notices, which should also help reduce the length of time that new chemicals notices are under review. EPA is also proposing several amendments to the regulations for low volume exemptions (LVEs) and low release and exposure exemptions (LoREXs), which include requiring EPA approval of an exemption notice prior to commencement of manufacture, making per- and polyfluoroalkyl substances (PFAS) categorically ineligible for these exemptions, and providing that certain persistent, bioaccumulative, toxic (PBT) chemical substances are ineligible for these exemptions, consistent with EPA's 1999 PBT policy.

**DATES:** Comments must be received on or before July 25, 2023.

**ADDRESSES:** Submit your comments, identified by docket identification (ID) number EPA–HQ–OPPT–2022–0902 through the Federal eRulemaking Portal at *https://www.regulations.gov.* Follow the online instructions for submitting comments. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Additional instructions on commenting or visiting the docket, along with more information about dockets generally, is available at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** *For technical information contact:* Tyler Lloyd, New Chemicals Division (7405M), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001; telephone number: (202) 564–4016; email address: *lloyd.tyler@epa.gov.*

*For general information contact:* The TSCA-Hotline, ABVI-Goodwill, 422 South Clinton Ave., Rochester, NY 14620; telephone number: (202) 554–1404; email address: *TSCA-Hotline@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

### *A. Does this action apply to me?*

You may be potentially affected by this action if you intend to manufacture a new chemical substance, or manufacture or process a chemical substance for a significant new use. The following list of North American Industry Classification System (NAICS) codes is not intended to be exhaustive, but rather provides a guide to help readers determine whether this document applies to them. Potentially affected entities may include:

- Chemical Manufacturers (NAICS code 325).
- Petroleum and Coal Products (NAICS code 324).
- Merchant Wholesalers, Nondurable Goods (NAICS code 424).

If you have any questions regarding the applicability of this action, please consult the technical person listed under **FOR FURTHER INFORMATION CONTACT**.

### *B. What is the Agency's authority for taking this action?*

Section 5(a)(1) of the Toxic Substances Control Act (TSCA), 15 U.S.C. 2604(a)(1), as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act of 2016 (Pub. L. 114–182) (herein referred to as the ''2016 Lautenberg Amendments''), provides that no person, as defined at 40 CFR 720.3, may manufacture (which includes import under TSCA) a new chemical substance or manufacture or process a chemical substance for a use which EPA has determined is a significant new use, unless at least 90 days prior to such manufacture or processing that person submits a notice to EPA containing the information required by TSCA section 5(d). EPA must conduct a review of the notice, make one of five possible determinations pertaining to the likelihood of unreasonable risk of injury to health or the environment, and take any actions required as a result of that determination, all within the applicable review period. The submitted notice must include the information described in TSCA section 5(d)(1): insofar as known to the submitter or reasonably ascertainable, information described in certain provisions of TSCA section 8(a)(2) (*e.g.,* chemical identity, use, and exposure information); in the form and manner prescribed by EPA, information in the possession or control of the submitter related to the health or environmental effects of the chemical substance; and a description of any other information concerning the environmental and health effects of the chemical substance, insofar as known to the submitter or reasonably ascertainable. EPA is issuing this proposed rule under TSCA section 5, 15 U.S.C. 2604.

### *C. What action is the Agency taking?*

When EPA receives a premanufacture notice (PMN), significant new use notice (SNUN), or microbial commercial activity notice (MCAN), the Agency is required to assess the risk associated with the new chemical substance or significant new use that is the subject of the notice under the conditions of use and make a determination for the chemical substance pertaining to the likelihood of such risk. Under TSCA, the term ''chemical substance'' includes microorganisms. To improve the effectiveness and efficiency of these reviews, EPA is proposing to amend the procedural regulations at 40 CFR parts 720, 721, and 725 to align with the requirements in TSCA section 5, as amended by the 2016 Lautenberg Amendments, and to make additional updates. In particular, EPA is proposing to amend the regulations to specify that EPA must make a determination on each PMN, SNUN, and MCAN received before the submitter may commence manufacturing or processing of the chemical substance that is the subject of the notice, and to list the five possible determinations and the actions required in association with those determinations. In addition, EPA is proposing to clarify the level of detail expected for the information that a submitter is required to include in a PMN, SNUN, or exemption notice in order for the notice to be considered complete. EPA is also proposing amendments to the procedures for reviewing PMNs and SNUNs; specifically, procedures for addressing PMNs and SNUNs that have errors or are incomplete or that are amended during the applicable review period. Additionally, EPA is proposing to make several amendments to the regulations at 40 CFR 723.50 for low volume exemptions (LVEs) and low release and exposure exemptions (LoREXs). These amendments would require EPA approval of an exemption notice before the submitter may commence manufacture, allow EPA to inform an LVE or LoREX holder when the chemical substance that is the subject of the exemption becomes subject to a significant new use rule (SNUR) under TSCA and the chemical identity is confidential, make perfluoroalkyl and polyfluoroalkyl substances (PFAS) categorically ineligible for these exemptions, and codify EPA's use of the 1999 PBT policy for these exemptions by making certain PBTs ineligible for these exemptions. Finally, EPA is proposing to amend the regulations pertaining to suspensions for all TSCA section 5 notices to allow submitters to request suspensions for up to 30 days via oral or email request.

### *D. Why is the Agency taking this action?*

Under amended TSCA, EPA must review all notices submitted under TSCA section 5(a)(1) and make a determination pertaining to the risks of new chemical substances or significant new uses of chemical substances described in such notices before they can proceed to the marketplace. Before the 2016 Lautenberg Amendments, TSCA allowed the PMN submitter to commence manufacturing or processing upon expiration of the review period, unless EPA made an affirmative finding of unreasonable risk. Under amended TSCA, EPA must review all notices submitted under TSCA section 5(a)(1) and make a determination pertaining to the risks of every new chemical substance or significant new use of chemical substances described in such notices before they can proceed to the marketplace. To reflect and better meet these requirements, EPA is proposing to align the procedural regulations codified at 40 CFR parts 720 and 725 with amended TSCA and to make additional updates based on existing policies or lessons learned from

administering the New Chemicals Program since TSCA was amended in 2016.

EPA is also proposing to clarify the information that is required to be included in PMNs, SNUNs, and exemption notices and to clarify EPA review procedures to make the review process more efficient, promote more complete submissions, and reduce the need to redo all or part of the risk assessment (''re-work'') due to late submissions of information that delay EPA review of PMNs, SNUNs, and exemption notices. In order to continue to meet amended TSCA's requirement for the Agency to make determinations for all PMNs and SNUNs within an applicable review period of 90 days from receipt (or up to 180 days with an extension), EPA needs to identify and implement efficiencies in the PMN and SNUN review process, ensure notices are complete and reduce re-work of risk assessments. This action, if finalized, is expected to reduce re-work of risk assessments by minimizing requests from submitters to amend their PMNs, SNUNs, or exemption notices with additional information after the review period has commenced. The Agency is also proposing to clarify the procedures that will be employed if submitters amend their PMNs or SNUNs during the applicable review period.

EPA is also proposing to amend the regulations for LVEs and LoREXs so that submitters may not commence manufacture until EPA has issued a decision for the exemption notice, to better ensure that manufacture under LVEs and LoREXs will not present an unreasonable risk. Additionally, EPA is proposing amendments that would allow the Agency to notify submitters if a chemical substance for which they hold an LVE or LoREX becomes subject to a proposed or final SNUR and the chemical identity is confidential, so that chemical manufacturers are made aware that they may be subject to additional TSCA requirements.

EPA is also proposing to make PFAS categorically ineligible for an LVE or LoREX, which would ensure that all new PFAS are reviewed through the full PMN process. In addition, EPA is proposing to codify EPA's 1999 PBT policy by making certain PBTs ineligible for these exemptions.

Lastly, EPA is proposing to allow informal (oral or email) requests for review period suspensions of up to 30 days to reduce the number of repeated requests for 15-day suspensions, and because EPA believes that email may be more expedient than oral communication for many submitters.

### *E. What are the estimated incremental impacts of this action?*

EPA has evaluated the potential incremental impacts of this rulemaking in an economic analysis (EA), titled ''Economic Analysis for the Proposed Rule: Updates to New Chemicals Regulations under the Toxic Substances Control Act'' (Ref. 1), which is available in the docket, discussed in Unit IV, and briefly summarized here. The benefits of the rule include increased efficiency in both the submission and review processes for notices submitted through the PMN form. The changes under this proposed rule would clarify the information requirements on the PMN form in the Agency's Central Data Exchange (CDX) to make more transparent the level of detail that EPA needs in order to make a reasoned evaluation. As submitters provide more complete information in their initial submissions, the changes under this proposed rule are expected to reduce the frequency with which PMNs, SNUNs, and exemption notices are amended with additional information and the amount of re-work of risk assessments that the Agency conducts following such amendments.

As a result of the changes presented in this proposed rule, the total annual burden to industry is expected to decrease by approximately 4,518 hours, while total annual costs to industry submitters are expected to have a net increase of $45,120. The Agency is expected to experience an annual cost savings of approximately $923,280.

### *F. What should I consider as I prepare my comments for EPA?*

1. Submitting CBI

Do not submit CBI to EPA through *https://www.regulations.gov* or email. If you wish to include CBI in your comment, please follow the applicable instructions at *https://www.epa.gov/dockets/commenting-epa-dockets#rules* and clearly mark the part or all of the information that you claim to be CBI. In addition to one complete version of the comment that includes information claimed as CBI, a copy of the comment that does not contain the information claimed as CBI must be submitted for inclusion in the public docket. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR part 2.

2. Tips for Preparing Your Comments

When preparing and submitting your comments, see the commenting tips at *https://www.epa.gov/dockets/commenting-epa-dockets.*

## II. Background

As enacted in 1976, TSCA provided EPA with authority to require reporting, recordkeeping, and testing, and to issue restrictions relating to chemical substances and/or mixtures. TSCA section 5(a)(1) required that a person submit to EPA a notice at least 90 days before commencing manufacture of a new chemical substance or manufacture or processing of a chemical substance for a use which EPA determined to be a significant new use. TSCA section 5(e) provided that EPA could issue a proposed order to regulate a chemical substance for which a notice was submitted under TSCA section 5(a)(1) if it determined that: (1) the information available to EPA is insufficient to permit a reasoned evaluation of the health and environmental effects of the chemical substance, and (2) the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance may present an unreasonable risk of injury to health or the environment in the absence of sufficient information, or the chemical substance is or will be produced in substantial quantities and may either enter the environment in substantial quantities or result in significant or substantial human exposure. Further, TSCA section 5(f) required EPA to issue a proposed rule or proposed order to regulate the chemical substance, or to seek an injunction to prohibit the manufacture, processing, or distribution in commerce of the chemical substance, if it found that there is a reasonable basis to conclude that the chemical substance presents or will present an unreasonable risk of injury to health or the environment.

Under the 1976 law, EPA was not obligated to make a determination or finding regarding unreasonable risk for each notice submitted under TSCA section 5(a)(1). However, if EPA decided to take action under TSCA section 5(e) or 5(f), TSCA required EPA to do so within 90 days of receiving the notice (or up to 180 days if EPA extended the notice period pursuant to TSCA section 5(c)). If EPA did not take action during that time, manufacturing or processing of the chemical substance could commence.

EPA's obligations with respect to making determinations on notices submitted under TSCA section 5(a)(1) fundamentally changed with the passage of the 2016 Lautenberg Amendments. The 2016 Lautenberg Amendments added a new paragraph to TSCA at section 5(a)(3) titled ''Review and Determination,'' under which EPA must review and make a determination

pertaining to the likelihood of risk on all notices received under TSCA section 5(a)(1), which include PMNs, SNUNs and MCANs, within the applicable review period and lists five types of risk determinations available to EPA.

EPA's obligation to take action after making a determination on a notice submitted under TSCA section 5(a)(1) also changed with the passage of the 2016 Lautenberg Amendments. Under amended TSCA, EPA is required to issue an order pursuant to TSCA section 5(e) when it makes a determination under TSCA section 5(a)(3)(B) that: (1) the information available to EPA is insufficient to permit a reasoned evaluation of the health and environmental effects of the chemical substance or significant new use; (2) in the absence of sufficient information, the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance may present an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation (PESS) identified as relevant by EPA; or (3) the chemical substance is or will be produced in substantial quantities and may either enter the environment in substantial quantities or result in significant or substantial human exposure. EPA must issue an order to prohibit or limit the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance to the extent necessary to protect against an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by EPA under the conditions of use.

Furthermore, TSCA section 5(f) requires EPA to issue either an order or a proposed rule under TSCA section 6(a) when EPA makes a determination under TSCA section 5(a)(3)(A) that a chemical substance or significant new use presents an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by EPA under the conditions of use. If EPA issues an order under TSCA sections 5(e) or 5(f), it must do so no later than 45 days before the expiration of the applicable review period.

Lastly, when EPA makes a determination under TSCA section 5(a)(3)(C) that a chemical substance or significant new use is not likely to present an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by EPA under the conditions of use, EPA must publish a statement of its finding in the **Federal Register** according to TSCA section 5(g).

In summary, the 2016 Lautenberg Amendments require EPA to review each notice submitted under TSCA section 5(a)(1), make a determination on that notice, and take the action required in association with that determination within the applicable review period. Under TSCA section 5(i)(3), the "applicable review period" means 90 days from the date EPA receives a notice under TSCA section 5(a)(1), or up to 180 days from that date if EPA extends the applicable review period according to the provisions in TSCA section 5(c). TSCA section 5(c) allows EPA to extend the original 90-day review period by up to another 90 days for good cause and requires the reasons for the extension to be published in the **Federal Register**. The 2016 Lautenberg Amendments also added TSCA section 5(a)(4) explaining that a failure by EPA to render a determination within the applicable review period would not relieve EPA of any requirement to make such determination, but would, with certain exceptions, result in a fee refund to the notice submitter.

TSCA section 5(h) was not significantly amended by the 2016 Lautenberg Amendments. TSCA section 5(h) provides EPA the authority to exempt a person from certain TSCA section 5 requirements under certain situations, such as if the person will manufacture the chemical substance for test marketing purposes, in small quantities for scientific experimentation, or under other conditions that will not present an unreasonable risk of injury to health or the environment, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified by EPA under the conditions of use. EPA developed the LVE and LoREX regulations in 1995 pursuant to TSCA section 5(h)(4) (60 FR 16336, March 29, 1995).

EPA's regulations related to TSCA section 5 are codified in Title 40, Chapter I, Subchapter R of the Code of Federal Regulations (CFR). They include:

- Regulations related to PMNs, which are codified at 40 CFR part 720;
- Regulations pertaining to SNUNs, which are codified at 40 CFR part 721;
- Regulations pertaining to certain exemptions, which are codified at 40 CFR part 723; and
- Regulations pertaining to MCANs and microorganism-related exemptions, which are codified at 40 CFR part 725.

The information requirements codified for PMNs in 40 CFR 720.45 generally also apply to SNUNs under 40 CFR part 721 (see 40 CFR 721.1(c) and 721.25(a), which cross-references 40 CFR part 720) and to LVEs and LoREXs submitted under 40 CFR 723.50 (see 40 CFR 723.50(e)(2), which cross-references 40 CFR 720.45). As a result, the proposed amendments to the requirements in 40 CFR 720.45 would apply to PMNs and also to SNUNs, LVEs, and LoREXs. The review procedures for PMNs codified in 40 CFR part 720 generally also apply to SNUNs under 40 CFR part 721 (see 40 CFR 721.25(c)) but not to exemptions under 40 CFR part 723, so the amendments to the part 720 review procedures proposed in this action would apply to PMNs and also to SNUNs but not to such exemptions. Neither the information requirements nor the review procedures in 40 CFR part 720 apply to MCANs or microorganism-related exemptions under 40 CFR part 725, so EPA is also proposing amendments to the MCAN and microorganism-related exemption regulations at 40 CFR part 725.

## III. Summary of Proposed Rule

### *A. Amendments To Conform Regulations to 2016 Lautenberg Amendments*

EPA is proposing changes to the PMN procedural regulations at 40 CFR part 720 to align them with the notice review and determination requirements in TSCA section 5, as amended by the 2016 Lautenberg Amendments. These procedural regulations also generally apply to SNUNs under 40 CFR part 721 (see 40 CFR 721.1(c) and 721.25(c)). EPA is also proposing similar changes to the MCAN procedural regulations at 40 CFR part 725 to align them with the same notice review and determination requirements added by the 2016 Lautenberg Amendments. EPA has been implementing the amended statutory requirements but has not yet codified these updates into the new chemicals procedural regulations. The Agency is now proposing to amend the regulations to specify that EPA must make a determination on each PMN, SNUN, and MCAN received before the submitter may commence manufacturing (which includes importing) or processing and to list the five possible determinations and the

actions required in association with those determinations. EPA is also proposing to add definitions for new terms and to update existing terminology introduced by the 2016 Lautenberg Amendments.

1. Commencement of Manufacture or Processing

Prior to the passage of the 2016 Lautenberg Amendments, TSCA did not require EPA to make a risk determination on each notice submitted under TSCA section 5(a)(1). Rather, TSCA required the submission of a notice at least 90 days before manufacturing a new chemical substance, or manufacturing or processing a chemical substance for a significant new use. If EPA did not take any regulatory action on a notice, the submitter could commence the manufacturing or processing after 90 days (or up to 180 days if EPA extended the notice period pursuant to TSCA section 5(c)). Promulgated in 1983, the PMN procedural regulation at 40 CFR 720.75(d) reflects that prior statutory provision and states that ''in the absence of regulatory action by EPA under section 5(e), 5(f), or 6(a) of the Act, the submitter may manufacture or import the chemical substance even if the submitter has not received notice of expiration [of the review period].'' A similar provision was promulgated in the MCAN procedural regulations in 1997 at 40 CFR 725.170(b) and (c).

The 2016 Lautenberg Amendments changed the requirements of TSCA section 5(a) by adding section 5(a)(1)(B)(ii) and (a)(3), which require EPA to conduct a review of each notice submitted under TSCA section 5(a)(1), make a determination on the notice, and take the action required in association with that determination before a submitter can commence the manufacture of a new chemical substance or the manufacture or processing of a chemical substance for a significant new use. Since amended TSCA went into effect, EPA has been implementing the new law by making a determination and taking any required action on each PMN, SNUN, and MCAN received. However, the outdated regulatory text at 40 CFR 720.75(d) and 725.170(b) and (c) is still in place, even though it has been superseded by the amendments to the statute.

Therefore, in this action, EPA is proposing to amend 40 CFR 720.75(d) by removing the outdated language allowing the submitter to commence manufacture of a chemical substance when the review period expires and adding new language specifying that EPA must issue a determination and take any required action on each PMN before manufacture may commence. EPA is also proposing to amend 40 CFR 721.25(d) to state that any person submitting a SNUN shall not manufacture or process a chemical substance for a significant new use until EPA has issued a determination with respect to the significant new use and taken the actions required in association with that determination. Likewise, EPA is proposing to amend 40 CFR 725.170(b) and (c) by removing similar outdated language allowing the submitter to commence manufacture of a new microorganism or manufacture or processing of a microorganism for a significant new use when the review period expires and adding new language specifying that EPA must issue a determination and take any required action on each MCAN before manufacture may commence.

2. Required Determinations and Associated Actions

As previously described, the 2016 Lautenberg Amendments added a new paragraph at TSCA section 5(a)(3) titled ''Review and Determination,'' which lists the five possible determinations that EPA may make on a notice. To improve clarity and help inform the regulated community about EPA's statutory obligations under TSCA section 5(a)(3), EPA is proposing to further amend 40 CFR 720.75(d) and 725.170 by listing the five possible determinations for each PMN, SNUN, or MCAN.

EPA is also proposing to add language to 40 CFR 720.75(d) and 725.170(b) to describe the actions that EPA must take in association with its determination for a PMN, SNUN, or MCAN. EPA is proposing to codify those actions, which EPA has been implementing, as applicable, for every PMN, SNUN, and MCAN since the 2016 Lautenberg Amendments, to be clear about EPA's review process to the public. The five possible determinations and associated actions are as follows:

- When EPA makes a determination for a PMN, SNUN, or MCAN according to TSCA section 5(a)(3)(C) that the new chemical substance or significant new use is not likely to present an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by EPA under the conditions of use, EPA issues a determination document to the submitter of the PMN, SNUN, or MCAN. The submitter may commence manufacturing or processing of the chemical substance once they receive the determination document. As required by TSCA section 5(g), EPA also submits for publication in the **Federal Register** a statement of the ''not likely'' finding.
- When EPA makes a determination for a PMN, SNUN, or MCAN according to TSCA section 5(a)(3)(B) that (1) the information available to EPA is insufficient to permit a reasoned evaluation of the health and environmental effects of the new chemical substance or significant new use, (2) in the absence of sufficient information, the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance may present an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by EPA, or (3) the chemical substance is or will be produced in substantial quantities and may either enter the environment in substantial quantities or result in significant or substantial human exposure, EPA must issue an order pursuant to TSCA section 5(e). The order prohibits or limits the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance to the extent necessary to protect against an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by EPA under the conditions of use. EPA may issue an order under TSCA section 5(e) that requires testing to be conducted and presented to EPA after the applicable review period has concluded.
- When EPA makes a determination for a PMN, MCAN, or SNUN according to TSCA section 5(a)(3)(A) that the chemical substance or significant new use presents an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by EPA under the conditions of use, EPA must take one of the following actions described in TSCA section 5(f) to the extent necessary to protect against such risk: (1) issue an immediately effective proposed rule to limit the amount of such substance that may be manufactured, processed, or distributed in commerce or to impose other requirements described in TSCA

section 6(a), or (2) issue an order to prohibit or limit the manufacture, processing or distribution in commerce of the substance, to take effect on the expiration of the applicable review period.

After EPA issues an order under TSCA section 5(e) or (f) and the applicable review period concludes, the submitter may submit studies, tests, reports, or other additional information. If EPA concludes from an assessment of the additional information that one or more of the prohibitions or limitations contained in the order are no longer necessary to protect against an unreasonable risk of injury to health or the environment, EPA may modify or revoke the prohibitions or limitations of the order. If EPA determines that none of the order terms are warranted after assessment of the additional information, EPA may revoke all the requirements of the order. EPA is proposing amendments to 40 CFR 720.75(d) and 725.170 to state that EPA may modify or revoke the prohibitions and limitations in an order after the applicable review period has ended if the submitter submits to EPA additional testing, studies, reports, or other information that EPA determines, upon review, demonstrate that such prohibitions or limitations are no longer necessary to protect against an unreasonable risk of injury to health or the environment. While the current regulations do not specify that EPA may modify or revoke the prohibitions and limitations in an issued order, the proposed amendments at 40 CFR 720.75(d) and 725.170 would codify current practices. EPA believes that these existing processes and actions for modifying or revoking the prohibitions and limitations in an issued order fulfill the requirements of TSCA section 5, as amended by the 2016 Lautenberg Amendments.

3. Other Updates

EPA is proposing to replace the terms ''notice period,'' ''notification period,'' ''statutory review period,'' and ''notice review period'' with the term ''applicable review period'' throughout 40 CFR part 720 to conform to the new terminology in TSCA section 5 added by the 2016 Lautenberg Amendments. EPA is proposing to add a definition for ''applicable review period'' to 40 CFR 720.3, which EPA would define as ''the period starting on the date EPA receives a complete notice under section 5(a)(1) of the Act and ending 90 days after that date or on such date as is provided for in sections 5(b)(1) or 5(c) of the Act.'' This proposed definition is based on the TSCA section 5(i)(3) definition for ''applicable review period.''

EPA is also proposing to add a definition for ''potentially exposed or susceptible subpopulation'' to 40 CFR 720.3, a term added to TSCA by the 2016 Lautenberg Amendments. Based on the definition in TSCA section 3(12), EPA would define ''potentially exposed or susceptible subpopulation'' as ''a group of individuals within the general population identified by EPA who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, the elderly, or overburdened communities.''

EPA is also proposing to update 40 CFR 720.70(b) by revising paragraph (b)(3). The language in paragraph (b) describes the content of the document that EPA routinely publishes in the **Federal Register** under TSCA section 5(d)(2) to announce the receipt of PMNs submitted to EPA. Although not required by TSCA section 5(d)(2), the first sentence in 40 CFR 720.70(b)(3) specifies that the document EPA publishes in the **Federal Register** pursuant to TSCA section 5(d)(2) will also include a list of data submitted with the PMN in accordance with 40 CFR 720.50(a). In proposing to establish this requirement in the original 40 CFR part 720 regulations, EPA described its objective as providing relevant information to the public in terms of the PMNs submitted and under review with EPA. See *e.g.,* 44 FR 2242, 2253 (January 10, 1979). That transparency goal is now better achieved through other more efficient and effective mechanisms that negate the need to publish that information in the **Federal Register**. Specifically, to provide streamlined access to information EPA receives and develops about chemicals, EPA has built and is constantly expanding content in an online searchable data base called ChemView (*https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/introduction-chemview*), and currently makes the PMN itself, including test data submitted with it, available on ChemView (subject to confidentiality claims) generally within 5 workdays of receipt. In addition, EPA is making the list of new chemical submissions received available in one place on our website to increase transparency and make information on new chemicals easier to find (see *https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/new-chemical-notices-received-epa*). This approach was adopted several years ago to provide an alternative to searching individual **Federal Register** notices and dockets on *https://www.regulations.gov.* The links below provide a listing of the following types of new chemical submissions received. The lists on the website are updated on a regular basis and allow anyone to track the status of active new chemical cases by visiting our page on statistics for the new chemicals review program (*https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/statistics-new-chemicals-review*).

*B. Amendments Related to Notice Information Requirements*

EPA is proposing changes to the notice information requirements at 40 CFR 720.45, as well as corresponding changes to the reporting form in CDX, to clarify the level of detail expected for information that must be submitted to EPA in the PMN, SNUN, and certain exemption notices.

1. Background

A notice submitted under TSCA section 5(a)(1) must include the information described in TSCA section 5(d)(1): (1) insofar as known to the submitter or reasonably ascertainable, information described in certain provisions of TSCA section 8(a)(2); (2) in the form and manner prescribed by EPA, information in the possession or control of the submitter related to the health or environmental effects of any manufacture, processing, distribution in commerce, use, or disposal of the chemical substance or any article containing such substance; and (3) a description of any other information concerning the environmental and health effects of the chemical substance, insofar as known to the submitter or reasonably ascertainable. EPA has promulgated regulations detailing these information requirements in 40 CFR 720.45 and 720.50.

EPA has developed an application form in CDX to collect such information from submitters. The user guide for CDX is listed in the references section of this proposed rule and can be found in the docket (Ref. 2). This form is prescribed by EPA for submission of PMNs, SNUNs, LVEs, LoREXs, and test marketing exemption (TME) applications. In this preamble, EPA refers to the form as the ''PMN form'' for simplicity, but the proposed changes outlined in this section would impact the other types of notices that use the same form (*i.e.,* PMNs, SNUNs, LVEs, LoREXs, and TMEs).

EPA has observed that most PMN, SNUN, and exemption notices do not contain all required information at the

level of detail that EPA needs to perform refined, quantitative risk assessments. When a submission is lacking detail, EPA typically uses conservative assumptions and default values to ensure the assessment is protective of human health and the environment. The Agency may make predictions using models concerning physical and chemical properties, environmental transport and partitioning, environmental fate, environmental toxicity, human health, engineering releases to the environment, and environmental concentrations—see the document titled ''Points to Consider When Preparing TSCA New Chemical Notification'' (Ref. 3) for more information on EPA's use of predictive models in the new chemical review process. EPA has repeatedly observed, however, that when submitters see the level of risk estimated by EPA using such conservative assumptions and default values, as well as the risk mitigation measures developed by EPA as a result, submitters often amend their initial notices to provide additional detailed information. In an effort to improve the accuracy of EPA's risk assessment, submitters often either provide information that was missing in their initial notice or clarify details about the manufacturing process. When EPA receives such information during the review process, EPA takes the information into consideration and may redo its risk assessments (''re-work'') to factor in the additional information. This longstanding practice of submitters amending their initial notices to provide additional information after the beginning of the review period and EPA having to consider the information late in the review process results in re-work by EPA and diverts EPA attention from processing new notices. This creates delays in the review of notices generally.

EPA has previously worked to address the inefficiency of the review process associated with late submission of information by issuing several supplemental documents to aid submitters in providing all relevant information in the initial notice. EPA published a Points to Consider document in 2018 (Ref. 3) and provides a user guide and resource tab that are accessible within the CDX application and provide instructions on how to complete the submission (Ref. 2). To further address this issue, EPA began implementing a pre-screen process for notices in April 2020, which is detailed in Unit III.C. of this document. And in July 2022, the Agency launched the TSCA New Chemical Engineering Initiative to Increase Transparency and Reduce Re-work that included a broad outreach effort to describe and discuss with stakeholders how the Agency evaluates data provided with notices and common issues that cause EPA to have to re-work risk assessments (Ref. 4).

EPA believes that amending the notice information requirements at 40 CFR 720.45 to specify the level of detail needed, as well as building that additional detail into the CDX user interface, would help submitters provide all relevant information in their initial notice submissions. EPA has observed that many data elements in notice submissions often lack the level of detail that EPA needs. EPA believes that specifying more detailed information requirements in 40 CFR 720.45 and data fields in the CDX user interface would promote more complete submissions upfront and help to minimize the need for EPA to use default values and conservative assumptions in its risk assessment. Therefore, EPA is proposing to amend the notice information requirements at 40 CFR 720.45, as well as implementing corresponding changes to the PMN form in CDX.

2. Proposed Changes to 40 CFR 720.45 and the PMN Form

EPA is proposing to amend 40 CFR 720.45 and the PMN form in CDX to clarify the information requirements for a notice. Specifically, EPA is proposing to add details to certain information requirements already contained in 40 CFR 720.45 and to add additional reporting fields to the PMN form to reflect these details. This detailed information is already required by the broader information requirements contained in 40 CFR 720.45 and 720.50 and is reflected in the CDX user interface. In this action, EPA is proposing to add these details as separate, unique information requirements in 40 CFR 720.45 and make corresponding changes to the PMN form to clarify the level of detail needed for EPA's review of a notice and to ensure that the fields in the PMN form are consistent with the regulations. In some cases, reporting fields for detailed information are already included in the PMN form because they are covered by broader information requirements contained in 40 CFR 720.45 or 720.50. EPA is proposing to add those details to 40 CFR 720.45 so that the regulations and PMN form are consistent. See Ref. 5, which provides tables that list the detailed information requirements proposed to be added to 40 CFR 720.45 and indicate whether reporting fields for that information are already included in the PMN form.

Consistent with TSCA section 5(d)(1), for all information requirements under 40 CFR 720.45, submitters are only required to provide information to the extent that it is known to or reasonably ascertainable by the submitter, as defined at 40 CFR 720.3(p). Under the proposed changes to 40 CFR 720.45, a submitter would be required to include in the PMN form the detailed information proposed in this action, along with all other information already required, to the extent the information is known to or reasonably ascertainable by the submitter. This is an important point because a submitter may not know or be able to reasonably ascertain certain details about the chemical substance that is the subject of the notice, such as details about manufacturing, processing, or use sites out of the submitter's control. In those situations, EPA would make conservative assumptions and use conservative default values for any information that is not known to or reasonably ascertainable by the submitter and therefore not provided in the PMN form.

Currently, if submitters have physical-chemical or environmental fate test data, they must provide the test data or a standard literature citation in accordance with 720.50(a)(2)–(3). Submitters must *also* submit this information in the corresponding PMN form fields in accordance with the proposed changes to 720.45(j). Data provided in the PMN form via CDX may be pulled from the test data provided by submitters per 720.50(a)(2)–(3), or the data can be submitted as standalone information for which submitters do not have underlying test data.

a. Physical and Chemical Properties and Environmental Fate Characteristics

The first set of detailed information requirements that EPA is proposing to add to 40 CFR 720.45 is about the physical and chemical properties and environmental fate characteristics of the chemical substance (see Table 1 in Ref. 5). EPA currently collects physical and chemical properties test data required by 40 CFR 720.50, ''Submission of test data and other data concerning the health and environmental effects of a substance,'' in two ways. First, the CDX user interface prompts the submitter to attach relevant documents, such as test data, to the PMN form using an attachment function. Second, the PMN form includes a CDX user interface screen with form fields for physical and chemical properties available for completion via a pick list. To ensure that the regulations are clear about what

information fields are included in the PMN form itself, EPA believes that the information requirements in 40 CFR 720.45 should reflect the PMN form fields. EPA is therefore proposing to add relevant physical and chemical properties information requirements in a new provision at 40 CFR 720.45(j)(1) that are already specified within the PMN form.

EPA is proposing several information requirements at 40 CFR 720.45(j)(1) that are not already specified within the PMN form for physical and chemical properties. EPA is proposing to require in 40 CFR 720.45(j)(1) that data on surface tension and ultraviolet–visible (UV–VIS) absorption, as well as any particle size distribution analysis, be submitted as part of the PMN form, to the extent it is known to or reasonably ascertainable by the submitter. Data on surface tension and UV–VIS absorption are not currently included on the pick list for physical and chemical properties in CDX, and their inclusion there as well as in the proposed regulations at 40 CFR 720.45(j)(1) will promote more complete submissions. The particle size distribution value is already a physical and chemical property that appears in the pick list on the CDX user interface screen, but it would improve EPA's ability to assess risk if the value were accompanied by the analysis data used to develop the value. Additionally, EPA proposes to require at 40 CFR 720.45(j)(1) information for aspect ratio, thickness, and number of layers or walls for nanomaterials. Information requirements for nanomaterial morphology do not currently appear on the pick list for physical and chemical properties on the CDX user interface screen or in the regulations. Requiring data for these properties will allow EPA to offer additional clarity to submitters providing notices for nanomaterials, since submitters might otherwise omit such data. Therefore, EPA is proposing to add these requirements to the regulations at 40 CFR 720.45(j)(1) and to add fields for attaching associated data on the physical and chemical properties screen of the PMN form.

EPA also proposes to add information requirements for the environmental fate characteristics of the chemical substance (see Table 1 in Ref. 5) to 40 CFR 720.45(j)(2). Environmental fate characteristics test data are already required by 40 CFR 720.50; however, this provision does not describe in detail what these relevant characteristics include. In addition, this information is already collected by EPA as attachments to the PMN form; however, fields for environmental fate characteristics are not yet included on the CDX user interface screen pick list. EPA is proposing to add the relevant environmental fate characteristics to the information requirements at 40 CFR 720.45(j)(2) and to add form fields to the PMN form by expanding the pick list.

b. Categories of Use

The next set of information requirements that EPA is proposing to add to 40 CFR 720.45 relates to the categories of use of the chemical substance (see Table 2 in Ref. 5). The proposed requirements include detailed information on commercial and consumer uses, which already have form fields in the PMN form in CDX specifying in greater detail the broader information requirement in the regulations at 40 CFR 720.45(f) regarding categories of use. Although the regulations at 40 CFR 720.45(f) currently require a description of intended categories of use by function and application, the estimated percent of production volume devoted to each category of use, and the percent of the new substance in the formulation for each commercial or consumer use, certain specific information requirements for details on commercial and consumer uses are not yet specified. These information requirements include the types of products or articles that would incorporate the new chemical substance (*e.g.,* household cleaners, plastic articles), how and where a product or article incorporating the new chemical substance would be used (*e.g.,* spray applied indoors, brushed on outdoor surfaces), consumption rates and frequency and duration of use for products or articles containing the new chemical substance, and information related to the use of products or articles containing the new chemical substance by potentially exposed or susceptible subpopulations. EPA is proposing to add these requirements to 720.45(f). Additionally, EPA is proposing to add to 40 CFR 720.45(f) a requirement to designate applicable consumer and commercial product categories using Organisation for Economic Co-operation and Development (OECD)-based functional use codes, which would create consistency with TSCA section 8(a) Chemical Data Reporting (CDR) requirements in 40 CFR part 711. EPA is also proposing corresponding changes to the PMN form fields in CDX.

c. Details Concerning Manufacture, Processing, and Use

The third set of information requirements that EPA is proposing to add to 40 CFR 720.45 is information related to each site where the chemical substance will be manufactured, processed, or used. These requirements apply to sites controlled by submitters as well as sites controlled by others, and although the information requirements that EPA is proposing are similar for both, different types of activities (*e.g.,* manufacturing versus processing) often occur at submitter-controlled sites versus those at sites controlled by others. Moreover, activities at sites controlled by others are typically not as well characterized by submitters compared to descriptions of the submitters' own activities, since in many cases the identity and number of sites controlled by others is unknown to the submitters when a notice is submitted. As such, some slight differences exist in the requirements EPA is proposing for information related to sites controlled by submitters versus sites controlled by others.

For both sites controlled by submitters and sites controlled by others, EPA is proposing to add information requirements for site addresses (see Table 3 and Table 5 in Ref. 5). For submitter-controlled sites, EPA is also proposing to add requirements for whether a particular chemical substance is manufactured or processed via batch or continuous production, as well as the amount of the chemical substance manufactured or processed in a given batch and/or timeframe (see Table 5 in Ref. 5). These proposed information requirements already have a corresponding form field in the PMN form in CDX because they are each covered by the existing information requirements in 40 CFR 720.45(g)(1) and (2) and (h) for a process description of operations at such sites. Since these proposed information requirements are not yet specified in the regulations, EPA is proposing to add them at 40 CFR 720.45(g)(1) and (2) for sites controlled by the submitter and 40 CFR 720.45(h)(1) and (2) for sites not controlled by the submitter.

EPA is also proposing to add requirements for detailed information about the process diagram or description for each site controlled by the submitter (see Table 4 in Ref. 5) and for each site not controlled by the submitter (see Table 5 in Ref. 5). These requirements include descriptions of the identity, approximate weight per batch or per day for continuous production, and entry point of all starting materials and feedstocks; the identity, approximate weight per batch or per day for continuous production, and entry point of all products, recycle streams, and wastes, including frequency of any equipment cleaning; the type of containers used for interim storage and transport of the chemical substance; and

identification, by number, of any points of release. Although these details are already covered by the existing information requirements in 40 CFR 720.45(g)(2) and (h) for a process description of operations at such sites, EPA is proposing to add them as separate, unique information requirements at 40 CFR 720.45(g)(2) and (h)(2) and in new fields in the PMN form to clarify the level of detail needed and to ensure that the regulations and PMN form are consistent.

d. Worker Exposure

EPA is also proposing to add requirements for detailed information about the possible worker exposure at each site controlled by the submitter (see Table 6 in Ref. 5), and at each site not controlled by the submitter (see Table 7 in Ref. 5). These requirements include types of potential worker exposure (*e.g.,* dermal, inhalation), descriptions of any protective equipment and engineering controls in place, the moisture content of the chemical substance (if a solid), and the percentage of the chemical substance in the formulation at the time of exposure. In addition, for sites controlled by others, these requirements also include worker activities and descriptions of the physical form of the chemical substance. Although these details are already covered by the existing information requirements in 40 CFR 720.45(g)(3) and (h) regarding worker exposure information, and some already have a corresponding form field in the PMN form in CDX, EPA is proposing to add them as separate, unique information requirements at 40 CFR 720.45(g)(3) and (h)(3) and in new fields in the PMN form to clarify the level of detail needed and to ensure that the regulations and PMN form are consistent.

e. Environmental Releases

Finally, EPA is proposing to add detailed information requirements about the potential environmental releases at each site controlled by the submitter (see Table 8 in Ref. 5) and at each site not controlled by the submitter (see Table 9 in Ref. 5). These requirements include descriptions of the type of release (*e.g.,* transport, interim storage, disposal, equipment cleaning); the amount of the chemical substance released directly to the environment or into control technology; the amount of the chemical substance released to the environment after control technology; for equipment cleaning releases, frequency of equipment cleaning and what is used to clean equipment; for transport and storage releases, how the chemical substance or the product containing the chemical substance is transported from the site and stored and information about the containers used; for releases into air, Clean Air Act operating permit numbers and a description of any Leak Detection and Repair program the site has implemented; for releases into water, National Pollutant Discharge Elimination System (NPDES) permit numbers and information on the navigable waterways and other destinations into which the release occurs; and for releases into wastewater treatment plants, information on the publicly owned treatment works (POTW) into which the release occurs. In addition, for sites controlled by others, these requirements also include a description of the media of release. Although each of these details are already covered by the existing information requirements in 40 CFR 720.45(g)(4) and (h) regarding environmental releases, and some already have a corresponding form field in the PMN form in CDX, EPA is proposing to add them as separate, unique information requirements at 40 CFR 720.45(g)(4) and (h)(4) and in new fields in the PMN form to clarify the level of detail needed and to ensure that the regulations and PMN form are consistent.

If the information is not known to or reasonably ascertainable by the submitter for one or more sites, EPA makes conservative assumptions and uses default values to replace the missing information whether the site is controlled by the submitter or not. Therefore, EPA believes that the level of detail in the regulations for process description, worker exposure, and environmental release information for sites controlled by the submitter at 40 CFR 720.45(g) should mirror the level of detail in the regulations for process description, worker exposure, and environmental release information for sites not controlled by the submitter at 40 CFR 720.45(h). EPA is proposing to amend 40 CFR 720.45(g) and (h) to make them consistent. EPA recognizes that a submitter may not possess such information about sites not controlled by the submitter. Submitters are only required to supply information that is known to or reasonably ascertainable by them as defined at 40 CFR 720.3(p).

Additionally, EPA is proposing clarifying amendments to 40 CFR 720.45(g)(3) and (4) and 720.45(h)(3) and (4) to ensure that submitters include worker exposure and environmental release information from exempt manufacture or related use of the chemical substances under 40 CFR 720.30 (*e.g.,* a chemical substance manufactured under the byproduct or impurity exemptions) at each site where the chemical substance will be manufactured, processed, or used, if known or reasonably ascertainable. EPA is also proposing clarifying amendments to 40 CFR 721.25(c) to ensure that submitters of SNUNs include in their notice both a description of the significant new use for which they are submitting a SNUN and of all other known or intended categories of use. Such categories of use may include uses that are ongoing and not subject to a significant new use rule (SNUR). Such information is valuable for EPA in determining necessary regulatory action should potential risks be identified during review of a SNUN.

f. Pollution Prevention Information

Lastly, EPA is proposing to add optional pollution prevention information at 40 CFR 720.45(k). The PMN form in CDX currently includes an optional text field and attachment function for submitters who wish to provide pollution prevention information about the chemical substance, such as information about using alternative fuel sources, reducing the use of water and chemical inputs, modifying a production process to produce less waste, implementing water and energy conservation practices, or substituting for riskier existing products.

EPA estimates that the proposed amendments, which are intended to clarify the level of detail required for existing data requirements under 40 CFR 720.45 and 720.50, would have a very minor impact on submitter burden because they are largely reflected in existing fields in the PMN form in CDX that submitters already are prompted to complete. Moreover, they are also already included in the Points to Consider document (Ref. 3) that submitters are encouraged to review before completing a notice. EPA's estimate of the burden impacts of these proposed information requirement amendments are presented in an Information Collection Request (ICR) document (Ref. 6), a copy of which is in the docket and is summarized in Unit VI.B.

EPA is seeking comment specifically on its burden estimate and on the general pros and cons of clarifying these information requirements in the regulations and making corresponding changes to the PMN form. EPA is also seeking comment from the public, including those who have submitted a notice to EPA in the past, on any information requirement details that are

not clearly explained in the PMN form or the regulations.

3. Other Modifications to the PMN Form in CDX

In addition to the proposed amendments to clarify the information requirements for a notice and the corresponding changes to the PMN form in CDX outlined in Unit III.B.1. and 2., EPA is also considering adding statements with accompanying check boxes to certain screens of the PMN form (such as when transitioning between the various worksheets completed by the submitter) that indicate that information fields can only be left blank if such information is not known to or reasonably ascertainable by the submitter. In other words, if a submitter leaves information fields blank, they would have to check a box on the screen to affirm that the information is not known to or reasonably ascertainable by the submitter before advancing to the next screen. Additionally, a statement would warn the submitter of the potential consequences of leaving the field blank and later amending the field. If a field is left blank, EPA would make conservative assumptions and use conservative default values when assessing risk, which could result in more stringent risk management requirements. If a field that has been left blank is later amended during the review process, EPA may declare the original submission incomplete (see Unit III.C.3. for a more detailed discussion on notice amendments indicating that the original submission was incomplete). This check box approach would not have a corresponding regulatory change, as it is consistent with the existing requirements to provide all information that is known to or reasonably ascertainable by the submitter and EPA's longstanding practice to use conservative assumptions and default values in the absence of information. The ICR document accompanying this proposed rule describes the potential modifications to each screen of the PMN form (Ref. 6).

As an alternative to this check box approach, EPA considered adding automatic checks in CDX to make certain critical fields mandatory such that the user could not advance to the next screen in the PMN form or submit the form without entering information into the field. EPA does not favor this approach because information required on the PMN form is required to the extent it is known to or reasonably ascertainable by the submitter, and EPA understands that there may be situations where such information may not be known to or reasonably ascertainable by the submitter. EPA also considered adding a statement and check box to every screen in the PMN form that information in the form is required if it is known to or reasonably ascertainable by the submitter, and not just to certain screens as described above. EPA does not favor this approach because it would require significant resources to program such statements and check boxes on each screen. Furthermore, the PMN form is designed to allow users the flexibility of moving back and forth through the screens, skipping screens, and returning to previous screens as needed. EPA feels that implementing such check boxes on every screen may impede this flexibility and unnecessarily increase the burden of completing a PMN form. EPA seeks comment on these alternatives, as well as on whether there are other approaches to modifying the PMN form to encourage complete submission of data.

*C. Amendments Related to Pre-Screen, Incomplete Submissions, Correcting Errors, and New Information*

EPA is proposing amendments to the regulations regarding how EPA acknowledges the receipt of a notice to account for EPA's pre-screen process and to clarify the start of the applicable review period, particularly when a notice contains errors or is incomplete. EPA is also proposing amendments to align the process for correcting errors in the notice with the existing process for incomplete submissions. EPA is also clarifying that a notice is not considered complete at the time of the initial notice submission if the submitter submits additional information at any time during the review period that was known to or reasonably ascertainable by the submitter at the time of initial notice submission. Finally, EPA is proposing amendments to clarify that new information about a chemical substance under EPA review must be submitted electronically via CDX and that certain notification to EPA of new information may be made by email.

1. Background

The first step that EPA takes after the receipt of a new chemicals notice before the risk assessment begins is to conduct a pre-screen of the notice, which typically takes 2–3 days. During the pre-screen process, EPA determines whether a notice is required for the chemical substance under TSCA. For example, EPA determines whether the chemical substance is already on the TSCA Chemical Substance Inventory (also called the ''TSCA Inventory'' or ''Inventory''), not a ''chemical substance'' as defined in TSCA section 3(2), or will be manufactured solely for export. If EPA determines that a notice is not required, EPA notifies the submitter that they are not required to submit a notice under TSCA in order to proceed commercially. EPA rejects the notice, and an applicable review period does not begin. See 40 CFR 720.62.

During this pre-screen process, EPA also initiates a chemistry, engineering, and administrative screen of the notice. EPA chemists evaluate whether the chemical identity of the new chemical substance is clear, the starting materials add up to the final chemical substance, and the chemical structure is consistent with the name. EPA engineers evaluate whether certain information is contained in the notice, such as complete site identification information, manufacturing process descriptions, and information on environmental releases and worker exposure for each site. EPA also evaluates whether any of the other conditions for incomplete submissions outlined in 40 CFR 720.65(c)(1) have been met, such as a failure to properly sanitize for CBI a second copy of the notice or the failure to submit the notice in English. Finally, EPA checks for other errors in the notice. See 40 CFR 720.65(b).

If EPA deems the notice complete after the pre-screen process, then the notice moves forward to the risk assessment process. If EPA does not deem the notice complete during the pre-screen period, EPA notifies the submitter that the notice is incomplete and explains the requirements for correcting the incomplete submission, per 40 CFR 720.65(c)(3). Once the submitter submits a complete notice according to the requirements previously provided by EPA, the applicable review period begins.

Currently, after EPA completes its risk assessment of a chemical substance, EPA reaches out to the submitter to explain the findings of the risk assessment and any proposed prohibitions or limitations on the manufacturing, processing, distribution in commerce, use, or disposal of the chemical substance. If the submitter disagrees with the potential risks identified in the risk assessment, the submitter may provide additional information intended to demonstrate that risks are lower than EPA estimated. The additional information may be detailed information on worker exposures or environmental releases that was missing from the initial notice submission, or it may be previously unsubmitted testing on the chemical substance to better characterize the

potential risk that EPA identified in its assessment. These and other amendments could indicate that the original notice was incomplete if the additional information was known to or reasonably ascertainable by the submitter at the time of the original submission. See 40 CFR 720.65(c)(1)(v) and (vi), (c)(2)(ii). If an original notice is later found to have been incomplete, EPA may restart the review period at Day 1 when additional information is submitted that then makes the notice complete.

Under its current practice, EPA may consider the additional information and, if warranted, conduct the risk assessment again to factor in the additional information. This is in line with EPA's longstanding objective to take into consideration reasonably available information and account for real-world conditions during manufacturing, processing, distribution, use, or disposal of a chemical substance. While this practice has the benefit of refining the risk assessments, it uses EPA resources inefficiently and adds significant time to the review process.

2. Pre-Screening Procedures

EPA is proposing to amend 40 CFR 720.65(a) to codify the pre-screen process that EPA conducts prior to moving forward to the risk assessment process. The new language would clarify, for purposes of transparency, EPA's current pre-screen practice as described in Unit III.C.1. If through the pre-screen process EPA finds that the initial notice submission is complete, Day 1 of the applicable review period is the day the notice was received by EPA via CDX, consistent with the existing regulations at 40 CFR 720.75(a). If the pre-screen process finds that the initial submission is incomplete, the applicable review period will not begin until EPA receives a complete notice, consistent with the existing regulation at 40 CFR 720.65(c)(2)(i). After the pre-screen, EPA may still determine within 30 days of receipt of the submission, once the risk assessment is underway and the information submitted more thoroughly evaluated, that the notice is incomplete, as currently described at 40 CFR 720.65(c)(2)(i). However, it has been EPA's experience that the pre-screen process helps minimize the number of submissions identified as incomplete or containing errors later in the review period. EPA is also proposing an amendment to 40 CFR 720.70 to clarify that a notice of receipt will be published in the **Federal Register** after EPA receives a complete notice, rather than merely receiving the notice, to accommodate the pre-screening procedures.

3. Correcting Errors in Notices

EPA is proposing amendments to 40 CFR 720.65(a) and (b) to state that if EPA receives a notice with errors and EPA requests (as part of the pre-screen process or, at latest, within 30 days of receipt of the notice) that the submitter remedy such errors, the applicable review period will not begin until EPA receives a corrected notice. This proposed amendment will align the process for correcting errors with the current process for correcting an incomplete notice at 40 CFR 720.65(c)(2) through (5). The 1983 final rule that established the current process for correcting errors stated that ''the submitter is under no obligation to make the correction, but failure to do so may cause EPA to extend the review period under section 5(c) of the Act.'' ((Ref. 7) (48 FR 21735, May 13, 1983). While the current regulations and the proposed amendment give EPA discretion to request remedy of errors, EPA now believes that if the Agency exercises that discretion to request that the submitter remedy an error, review of the notice should not move forward until the error is corrected. EPA does recognize that some errors may be minor and not require correction prior to EPA initiating review of the notice, such as easily recognized spelling errors or an incorrectly numbered list—EPA does not intend to request correction of such errors. EPA's notification to the submitter that a submission contains errors would include (i) a statement of the basis of EPA's determination that the submission contains errors, (ii) the requirements for correcting the errors, and (iii) information on procedures for filing objections to the determination or requesting modification of the requirements for completing the submission. Additionally, EPA is proposing an amendment to remove ''failure to date the notice form'' as an example of an error because the electronic PMN form submitted through CDX automatically dates the notice upon submission and this error is no longer possible.

4. Notice Amendments Indicating Original Notice Was Incomplete

If information required under 40 CFR 720.45 and 720.50 and specified in the PMN form is known to or reasonably ascertainable by a submitter, the submitter must report the information in the notice. EPA defines ''known to or reasonably ascertainable by'' at 40 CFR 720.3(p) to mean ''all information in a person's possession or control, plus all information that a reasonable person similarly situated might be expected to possess, control, or know.'' This definition is not overly prescriptive and is based on a concept of reasonableness that is fact specific. Furthermore, the existing regulation at 40 CFR 720.65(c)(2)(ii) states that if EPA obtains additional information during the review period that indicates the original submission was incomplete, EPA may declare the submission incomplete. Accordingly, if a submitter amends their notice during the applicable review period to add information required under 40 CFR 720.45 or 720.50 that was known to or reasonably ascertainable by the submitter at the time of the original submission, EPA would have cause to declare that the original submission was incomplete. Because the applicable review period does not begin until a submission is complete, EPA can restart the applicable review period to Day 1 if a submission is later amended during the review period and such amendment demonstrates that the original submission was incomplete.

To date, EPA has generally not exercised its discretionary authority under section 720.65(c)(2)(ii) to declare original submissions incomplete when the Agency has received late submissions of information required by 40 CFR 720.45 or 720.50 that may have been known to or reasonably ascertainable by the submitter at the time of the original notice submission. Instead, EPA has considered the additional information and if applicable, conducted re-work on its risk assessments. To accomplish this re-work during the applicable review period, EPA has generally granted a submitter's request for a suspension of the review period, per 40 CFR 720.75(b).

EPA intends to change this longstanding practice of accepting amendments that contain information that was known or reasonably ascertainable at the time of the original submission and then accepting a request to suspend the review period under 40 CFR 720.75(b). As explained in Unit II.B., the 2016 Lautenberg Amendments impose additional obligations on EPA, and EPA believes that exercising its discretionary authority under the existing regulations to declare an original submission incomplete and restart the applicable review period upon submission of the complete notice is appropriate in order for EPA to efficiently meet current statutory requirements. Overall, amendments and re-work often lead to an inefficient use of EPA resources and a review timeline that is not predictable and/or reliable for all stakeholders. EPA would continue to

accept amendments and, as necessary, refine risk assessments based on these amendments, but believes that the shift to restart the applicable review period would create a more transparent and predictable review process for submitters.

To clearly communicate this intended change in longstanding practice, EPA is proposing to amend 40 CFR 720.65(c) by adding a paragraph (2), which would state that a notice submission may be declared incomplete if the submitter submits additional or revised information at any time during the review period without demonstrating to EPA's satisfaction that such information was not known to or reasonably ascertainable by the submitter at the time of initial notice submission. Additionally, EPA is proposing an amendment at 40 CFR 720.65(d)(5)(iii) to clarify that if EPA obtains additional information during the review period that leads EPA to declare the initial notice submission incomplete, in accordance with 40 CFR 720.65(d)(2) (proposed to be redesignated from current 40 CFR 720.65(c)(2)(ii)), the applicable review period would restart at Day 1 upon receipt of the complete notice.

It is EPA's view that information on basic physical and chemical properties and on anticipated environmental releases or worker exposures at any sites controlled by the submitter, as required at 40 CFR 720.45, would be known to or reasonably ascertainable by the submitter at the time of the original submission. Furthermore, EPA believes that it is extremely unlikely that a submitter would neither know nor be able to reasonably ascertain such information at the time of the original submission, but could know or ascertain it 20 or 40 or 60 days after the original submission or at other times during the review period. In this action and with the amendment proposed at 40 CFR 720.65(c)(2), EPA is communicating to stakeholders that they must provide all information required by 40 CFR 720.45 and 720.50 upfront and submit a complete notice.

Based on its experience reviewing thousands of notices and amendments, EPA believes that it should be very uncommon for a submitter to amend their notice during the review period by adding information that they could not have known or reasonably ascertained at the time of the original submission, such as for new information as described at 40 CFR 720.40(f) or information from testing in progress at the time of the original submission, as described at 40 CFR 720.50(a)(4). Under the proposed amendment at 40 CFR 720.65(c)(2), the submitter of additional or revised information during the review period would have to demonstrate to EPA's satisfaction that the information was not known to or reasonably ascertainable by the submitter at the time of the original submission to preclude an EPA determination that the original notice was incomplete. As a matter of policy, EPA believes that the only amendments to a notice that would not indicate that the original notice was incomplete are: (1) amendments based on new data (as described at 40 CFR 720.40(f) and 720.50(a)(4)); (2) administrative, non-substantive amendments (*e.g.,* submitter contact information); and (3) amendments made at the request of EPA. EPA, however, would take case-by-case facts into consideration when determining whether a late submission of information indicates that a notice was incomplete when originally submitted. If a submitter disagrees with EPA's determination that the original notice submission was incomplete, the submitter may object according to the existing procedures at 40 CFR 720.65(c)(4) and (5) (proposed to be redesignated as 40 CFR 720.65(d)(4) and (5)). Amendments based on new data, administrative or non-substantive amendments, and amendments made at the request of EPA would not impact the completeness of a submission.

EPA offers the following example to illustrate the intended change to its longstanding practice: If a submitter leaves blank a field in the PMN form for information required under 40 CFR 720.45 to the extent it is known to or reasonably ascertainable by the submitter, EPA may use a conservative assumption or default factors in place of that information for the risk assessment and conclude that certain prohibitions or limitations on the chemical substance may be warranted. If after learning the findings of EPA's risk assessment, the submitter then amends its original notice in CDX by providing information in the field previously left blank, EPA would notify the submitter, according to the existing regulation at 40 CFR 720.65(c)(2)(ii) and (c)(3) (proposed to be redesignated as 40 CFR 720.65(d)(2) and (3)), that the original submission was incomplete. The submitter may then file an objection to the determination that the original notice was incomplete, at which time they may seek to demonstrate that the additional or revised information was not known to or reasonably ascertainable by them at the time of initial notice submission. If in response to the objection, EPA determines the original notice was complete, the applicable review period will be deemed suspended on the date EPA declared the notice incomplete and will resume on the date that the notice is declared complete. However, if EPA considers the objections and still determines that the original notice was incomplete, or if no objections are filed, EPA will restart the applicable review period and the new Day 1 will be the date the additional information that completed the notice was submitted to EPA.

EPA believes that the meaning of ''known to or reasonable ascertainable by'' described in this preamble is generally consistent with EPA's original interpretation laid out in the 1983 final rule entitled ''Premanufacture Notification; Premanufacture Notice Requirements and Review Procedures'' (Ref. 7). That final rule states that ''EPA believes that it is not possible to define 'known to or reasonably ascertainable' more explicitly''; ''EPA believes that 'reasonably ascertainable' can be defined only on a case-by-case basis''; and ''EPA generally can judge from the notice itself whether it includes information that is known to or reasonably ascertainable by the submitter'' (Ref. 7 at page 21730). Further, that final rule provides an example of what would not be reasonably ascertainable to illustrate a rather high bar for information to qualify as not reasonably ascertainable: ''Certainly, in most instances, data-gathering that is so costly as to preclude commercialization is not reasonable.'' (Ref. 7 at page 21730)

EPA is seeking comment on the proposed new provision at 40 CFR 720.65(c)(2) and proposed amendment to 40 CFR 720.65(c)(5)(iii) (proposed to be redesignated as 720.65(d)(5)(iii)), which clarify that EPA may deem an original notice incomplete, and restart the review period at Day 1 upon completion of the notice, if a submitter provides required information during the applicable review period without demonstrating that it was not known to or reasonably ascertainable by the submitter at the time of the initial notice submission. EPA is seeking comment on situations when this interpretation may not be appropriate.

5. Notifying EPA of the Receipt of New Information on a Chemical Substance Under Review

EPA acknowledges that in some cases new information can become available about a chemical substance during the course of its review. When this occurs, submitters are required to inform EPA in writing and provide the new information within ten days of receiving

the new information, but no later than five days before the end of the notice review period. 40 CFR 720.40(f) and 40 CFR 720.50(a)(4)(ii) address the requirements for informing EPA of receipt of new information (including a study, report, or test that is completed during the notice review period), which require submitters to communicate receipt of new information to EPA via mail correspondence, or via telephone if the new information is received within five days of the end of the notice review period. EPA is proposing to amend 40 CFR 720.40(f) and 40 CFR 720.50(a)(4)(ii) to clarify that new information about a chemical substance under EPA review must be submitted electronically via CDX, consistent with the general electronic submission requirements in 40 CFR 720.40(a). In addition, when submitters receive new information within five days of the end of the review period, EPA is proposing to allow them to notify EPA by email of the receipt of new information. Email communication would provide an alternative means of notifying EPA of the receipt of new information in the event that an EPA contact is unavailable to receive a phone call. While the submitter could use phone or email to notify EPA of the receipt of new information, all new information would be submitted electronically to EPA via CDX. Additionally, emails should not contain CBI.

*D. Amendments to Low Volume Exemptions and Low Release and Exposure Exemptions*

EPA is proposing several amendments to the current LVE and LoREX regulations. Specifically, EPA is proposing that: (1) submitters may not commence manufacture until EPA has approved the LVE or LoREX notice; (2) EPA may proactively inform LVE and LoREX holders if the chemical substance that is the subject of the LVE or LoREX becomes subject to a SNUR and the chemical identity is CBI, (3) PFAS be categorically ineligible for these exemptions; and (4) the regulations codify the ineligibility for exemptions of certain PBTs as described in EPA's 1999 PBT policy (Ref. 8).

1. Amendments to Expiration of LVE and LoREX Review Period

By way of background, 40 CFR 723.50(a)(2)(i) currently requires that LVE and LoREX applicants submit a notice of intent to manufacture a chemical substance under an LVE or LoREX 30 days before commencing manufacture. 40 CFR 723.50(g)(1) provides that EPA will review the LVE or LoREX notice to determine whether manufacture of the chemical substance is eligible for the exemption. LVE and LoREX regulations are promulgated under the statutory authority of TSCA section 5(h)(4), 15 U.S.C. 2604(h)(4), which provides that EPA may, upon application and by rule, exempt the manufacturer of any new chemical substance from all or part of the requirements of TSCA section 5 if EPA determines that the manufacture, processing, distribution in commerce, use, or disposal of such chemical substance, or that any combination of such activities, ''will not present an unreasonable risk of injury to health or the environment, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified by [EPA] under the conditions of use.'' At present, 40 CFR 723.50(g)(2) provides that the submitter may begin manufacture of a chemical substance under an LVE or LoREX upon expiration of the 30-day review period if EPA has taken no action. In practice, EPA would move to deny an LVE or LoREX notice at the end of the review period if it were not able to conclude by that time that the substance will not present unreasonable risk on the basis that there are issues concerning toxicity or exposure that require further review which cannot be accomplished within the 30-day review period. EPA's current practice when other delays occur during the review of an LVE is to agree to submitter requests to suspend the running of the review period while EPA completes its review and determines whether to approve or deny the exemption notice. See 40 CFR 723.50(g)(1).

Elsewhere in this rulemaking, EPA is proposing to amend the regulations that allow submitters to begin manufacture or processing of chemical substances for which a PMN, MCAN, or SNUN was submitted upon expiration of the review period, so that those regulations would require a determination from EPA prior to commencement of manufacture or processing of such substances. As discussed in Unit III.A., these proposed changes to 40 CFR 720.75, 721.25(d), and 725.170 are intended to conform those regulations to the 2016 Lautenberg Amendments. EPA is proposing similar amendments to the LVE and LoREX regulations at 40 CFR 723.50 to align with the proposed amendments to the PMN, SNUN, and MCAN regulations and with the statutory framework and to better ensure that chemical substances manufactured under LVEs and LoREXs will not present an unreasonable risk. Specifically, EPA is proposing to amend the LVE and LoREX regulations at 40 CFR 723.50(g) to require a notification of approval of an LVE or LoREX from EPA prior to commencement of manufacture of the chemical substance under the exemption.

2. Notification of LVE and LoREX Holders if the Chemical Substance Is Subject to a SNUR

At present, when a chemical substance is reviewed via a PMN and becomes subject to a SNUR, confidentiality claims for the specific chemical identity in the PMN and reflected in the associated SNUR may, in the absence of submitting a *bona fide,* prevent holders of current LVEs and LoREXs for that same substance from being informed that the chemical substance is now subject to a SNUR. EPA is proposing to add language to 40 CFR 723.50 to allow EPA to inform an LVE or LoREX holder whenever the chemical substance that is the subject of that LVE or LoREX becomes subject to a proposed or final SNUR that describes the chemical substance by a generic chemical name due to a confidentiality claim for its specific chemical identity. This proposed amendment would, as a courtesy, help inform LVE and LoREX holders of regulatory requirements that they may have otherwise been unable to determine on their own without submitting an inquiry to EPA (also known as a *bona fide*) pursuant to 40 CFR 721.11. EPA is proposing to amend the regulations at 40 CFR 723.50 to establish that a granted LVE or LoREX notice demonstrates a *bona fide* intent to manufacture the substance, such that a disclosure to an LVE or LoREX holder that the substance is the subject of a proposed or final rule under Part 721 will not be considered public disclosure of confidential business information under section 14 of the Act. EPA is not proposing in this rulemaking any revisions to the procedures in 40 CFR 723.50(l) for asserting and protecting confidential business information.

This amendment would also help inform certain LVE and LoREX holders that they may now or in the future become subject to chemical data reporting (CDR) requirements. The CDR requirements described at 40 CFR 711.8 differ for chemical substances subject to certain TSCA actions (*e.g.,* SNURs). The annual production volume threshold at which reporting is ordinarily required is 25,000 pounds, and as such LVE holders are generally exempt, and LoREX holders may be exempt, from such reporting even if their chemical substance has been added to the Inventory. However, if a chemical substance previously approved as an LVE or LoREX is later reviewed as a

PMN and becomes subject to certain new actions under TSCA (such as a SNUR) as well as being added to the Inventory, the threshold for reporting is lowered to 2,500 pounds annually. This creates the potential for inadvertent non-compliance with CDR requirements by those LVE and LoREX holders.

EPA does not intend to proactively inform current LVE and LoREX holders about SNURs that predate this rule. EPA is seeking comment on its proposal to allow EPA to proactively inform an LVE or LoREX holder whenever the chemical substance that is the subject of that LVE or LoREX becomes subject to a proposed or final SNUR that describes the chemical substance by a generic chemical name. EPA would only start the practice of notifying LVE and LoREX holders subject to this proposed amendment after the date of the final rule.

3. Making PFAS Categorically Ineligible for LVEs and LoREXs

EPA is proposing amendments to make PFAS categorically ineligible for LVEs and LoREXs going forward and proposing a structural definition of PFAS for purposes of the LVE and LoREX regulations. The Agency is proposing the same chemical structure definition for PFAS as the definition proposed in the recent rule entitled ''Per- and Poly-fluoroalkyl Chemical Substances Designated as Inactive on the TSCA Inventory; Significant New Use Rule'' (known as the ''Inactive PFAS SNUR'') (88 FR 4937, January 26, 2023 (FRL–9655–01–OCSPP)).

In April 2021, EPA's New Chemicals Program began implementing a new policy for reviewing and managing LVE notices for PFAS. In the April 27, 2021 press release announcing the new PFAS LVE policy (Ref. 9), the Agency stated that ''[g]iven the complexity of PFAS chemistry, potential health effects, and their longevity and persistence in the environment, an LVE notice for a PFAS is unlikely to be eligible for this kind of exemption under the regulations.'' Prior to the new policy, EPA had approved more than 600 LVE notices for PFAS—many of which were granted prior to the 2016 Lautenberg Amendments and were often intended to be substitutes for longer chain PFAS, *i.e.,* substances having a fluorinated carbon chain length of C8 or longer. (In the past, long-chain PFAS were generally thought to present greater risks to humans and the environment than shorter-chain PFAS). In June 2021, EPA launched the ''PFAS LVE Stewardship Program'' to encourage the voluntary withdrawal of the more than 600 previously granted PFAS LVEs. Under that program, an eligible company that wishes to participate is asked to submit a voluntary withdrawal of their LVE. As of April 2023, there are 45 PFAS LVEs that have been voluntarily withdrawn under the PFAS LVE Stewardship Program. EPA has not granted an LVE for a PFAS since May 2020. EPA has not ever received or approved any PFAS LoREX notices.

Under the current policy, manufacturers may still submit LVE and LoREX notices for PFAS, which EPA must review individually. The proposed amendments to the LVE and LoREX regulations would make PFAS categorically ineligible to be considered for these exemptions. Under the proposal, any LVE or LoREX notice for a PFAS that is submitted to the Agency would be denied upon receipt without substantive review. This includes any chemical substance where any of the reasonably anticipated metabolites, environmental transformation products, byproducts, or reasonably anticipated impurities are a PFAS. Persons who wish to manufacture a PFAS not on the TSCA Inventory would instead be required to submit a PMN at least 90 days prior to commencing manufacture for a non-exempt commercial purpose.

The LVE and LoREX are predicated on strict production volume or release/exposure limits, respectively, and notices are subject to an abbreviated 30-day review by EPA designed to serve as a procedural safeguard to screen out substances that pose potential risks, rather than the more detailed and comprehensive 90-day review afforded to PMNs. See 60 FR 16336, March 29, 1995 (FRL–4923–1). The existing LVE and LoREX regulations at 40 CFR 723.50(h)(1) provide that if EPA determines during the review period that manufacture of the new chemical substance does not meet the terms of the LVE or LoREX requirements or that there are issues concerning toxicity or exposure that require further review which cannot be accomplished within the 30-day review period, EPA will notify the manufacturer that the substance is not eligible for the exemption.

When EPA initially proposed and then finalized the LVE requirements, EPA considered compiling a list of chemical categories, based on structure, that would not be eligible for the exemption. See the proposed rule entitled ''Premanufacture Notification; Proposed Exemption for Site-Limited Intermediate Chemical Substances and Chemical Substances Manufactured in Quantities of 10,000 Kg or Less Per Year'' (47 FR 33896, 33907, August 4, 1982 (FRL–2105–1)); and the final rule entitled ''Premanufacture Notification Exemption; Exemption for Chemical Substances Manufactured in Quantities of 1,000 Kg or Less Per Year'' (50 FR 16477, 16483, April 26, 1985 (FRL–2742–1)). EPA did not adopt categorical exclusions at the time because EPA believed that identifying such categories upfront would be unnecessarily resource-consuming and would provide no more protection than that already provided by EPA's LVE notice review requirements (50 FR at 16483). Neither reason, however, is currently persuasive for chemical substances that meet the proposed structural definition of PFAS. Under TSCA section 26(c), any action taken by EPA on a single chemical substance may also be taken with respect to a category of chemical substances, ''the members of which are similar in molecular structure.'' Here, it is not difficult or resource-consuming to identify a category to exclude, as the substances that meet the PFAS structural definition share a similar structure and are appropriately addressed as a category in this action. EPA has also committed to ''[b]uild the evidence base on individual PFAS'' and ''use its authorities to impose appropriate limitations on the introduction of new unsafe PFAS into commerce and will, as appropriate, use all available regulatory and permitting authorities to limit emissions and discharges from industrial facilities.'' (Ref. 10). Additionally, due to the scientific complexities associated with assessing PFAS and the lack of data on most PFAS with regards to toxicity and exposure to human health and the environment, EPA expects in most cases to be unable to determine pursuant to TSCA section 5(h)(4) that a PFAS ''will not present an unreasonable risk'' under the conditions of use within the 30-day review period provided for LVE and LoREX notices. Reviewing all new PFAS as PMNs also will preserve EPA's authority to address information gaps when there is insufficient information on the chemical substance and further support the Agency's PFAS Strategic Roadmap, which lays out a whole-of-agency approach to addressing PFAS (see *https://www.epa.gov/pfas/pfas-strategic-roadmap-epas-commitments-action-2021-2024*).

Under the existing regulations at 40 CFR 723.50(h)(2), at any time after EPA approves an LVE or LoREX notice, EPA can determine that manufacture of the new chemical substance does not meet the exemption criteria. If the Agency does so, it would notify the manufacturer by certified letter that EPA believes that the new chemical substance does not meet the

terms for the exemption. With these considerations in mind, EPA solicits comment on revoking previously granted LVEs for PFAS pursuant to the process set forth in 40 CFR 723.50(h)(2) and requiring those who wish to continue manufacture to submit a PMN.

For the purpose of making PFAS ineligible for LVEs and LoREXs, EPA is proposing to define ''PFAS'' using a structural definition. EPA is proposing to define PFAS as a chemical substance that contains at least one of these three structures:

(1) R–(CF2)–CF(R′)R″, where both the CF2 and CF moieties are saturated carbons

(2) R–CF2OCF2–R′, where R and R′ can either be F, O, or saturated carbons

(3) CF3C(CF3)R′R″, where R′ and R″ can either be F or saturated carbons.

Manufacturers of substances that do not meet this structural definition would remain eligible to submit an LVE or LoREX notice. The proposed chemical structure definition for PFAS is the same definition used for the Inactive PFAS SNUR (88 FR 4937, January 26, 2023).

EPA determined that a structural definition was most appropriate for this rulemaking rather than developing a list of specifically identified substances. Since the substances that would be submitted in LVE or LoREX notices are new chemical substances, it is impractical to generate a comprehensive list of PFAS not on the TSCA Inventory that may be submitted in the future. Additionally, other TSCA requirements have relied on a structural definition when appropriate (*e.g.,* the long-chain perfluoroalkyl carboxylate (LCPFAC) SNUR defines covered substances using a structural definition (40 CFR 721.10536), and the polymer exemption from PMN requirements defines covered PFAS polymers using structural definitions (40 CFR 723.250)). Furthermore, other scientific and regulatory bodies such as the OECD (Ref. 11) have defined PFAS using various structural definitions. Thus, there is clear precedent for using a structural definition for TSCA rules and other actions addressing PFAS.

The proposed definition for PFAS does not include substances that only have a single fluorinated carbon or unsaturated fluorinated moieties (*e.g.,* fluorinated aromatic rings and olefins), which are more susceptible to chemical transformation than their saturated counterparts, and therefore less likely to persist in the environment. These potentially degradable substances, if submitted to EPA in a LVE or LoREX notice, would still be evaluated by EPA and a decision made to either deny or grant the exemption. The proposed three-part structural definition for PFAS includes fluoropolymers.

The first sub-structure (R–(CF2)–C(F)(R′)R″), where both the CF2 and CF moieties are saturated carbons and none of the R groups (R, R′ or R″) can be hydrogen, has been the working definition of PFAS used by EPA's Office of Pollution Prevention and Toxics when identifying PFAS on the TSCA Inventory. For this rulemaking, EPA has decided to expand the working definition to include two additional sub-structures.

The second sub-structure (R-CF2OCF2-R′, where R and R′ can either be F, O, or saturated carbons) aims to capture certain fluorinated ethers. Examples of substances that meet this sub-structure include, PFMOAA (CASRN 674–13–5) and other chemicals, with properties similar to hexafluoropropylene oxide (HFPO) dimer acid and its ammonium salt (known as ''GenX chemicals''), that have been found in the Cape Fear River.

Finally, the third sub-structure (CF3C(CF3)R′R″, where R′ and R″ can either be F or saturated carbons) aims to capture fluorinated substances that are more branched and would not otherwise meet the first or second sub-structure definitions due to their non-adjacent carbons. Although these substances have carbons that are not fully fluorinated and that may be more susceptible to degradation and metabolism, highly fluorinated moieties of the substance are still likely to be persistent.

This proposed definition may not be identical to other definitions of PFAS used within EPA or by other organizations. The term ''PFAS'' has been used varyingly by many organizations for their distinct research and/or regulatory needs, and different definitions of the term ''PFAS'' may be appropriate for such purposes. The Agency notes that this perspective, that different users may have distinct needs and that no single PFAS characterization or definition meets all needs, is shared by many other organizations, including OECD (see page 29, Ref. 11). EPA proposes that the above definition of ''PFAS'' is the most appropriate definition for the proposal to make PFAS ineligible for future LVEs and LoREXs and acknowledges that there may be other rules or programs that apply different definitions to meet their own needs.

### 4. PBT Chemicals and LVEs and LoREXs

#### a. Background

Currently, 40 CFR 723.50(d) describes certain criteria that EPA uses to determine the eligibility of chemical substances for manufacture under an LVE and LoREX. These criteria include the potential of a chemical substance to cause serious acute or chronic effects or significant environmental effects under anticipated conditions of manufacture, processing, distribution in commerce, use, or disposal. These criteria also extend to any reasonably anticipated metabolites, environmental transformation products, or byproducts of the chemical substance, as well as any reasonably anticipated impurities in the substance.

Although numerous factors can contribute to the potential of a particular chemical substance to cause serious acute or chronic effects or significant environmental effects as described in 40 CFR 723.50(d), chemical substances that are persistent, bioaccumulative, and toxic (PBT) are of special concern because: (1) their persistence in the environment increases the likelihood of exposure of biological systems to those chemicals; (2) their bioaccumulative potential increases the probability that they will move vertically through and become embedded in trophic chains; and (3) their persistence and bioaccumulation potential, coupled with toxicity concerns, can result in risk to biological systems. Once PBT chemicals are released into the environment, they are often difficult or impossible to remediate.

On November 4, 1999, EPA issued its policy statement (64 FR 60194) (Ref. 8) identifying a category for PBT new chemical substances. The 1999 policy statement formally acknowledged PBT chemical substances as a category based on shared characteristics to facilitate premanufacture assessment and regulation. Furthermore, the PBT policy statement established EPA's current criteria for identifying PBT chemical substances for the New Chemicals Program, which involves using physical-chemical properties, as well as structural activity alerts, analogue data, and test data to quantify on a scale of 1 to 3 the potential for persistence (P), bioaccumulation (B), and toxicity (T) for a given new chemical substance. If a substance scores a 2 or above for all three characteristics, EPA considers the substance to be PBT. EPA emphasized in responses to comments received on the October 1998 draft policy released for public comment that the decision to identify and assess a new chemical

substance as PBT would be based on the available data and would be made on a case-by-case basis.

b. Codifying EPA's Policy Concerning PBT Chemicals and LVEs and LoREXs

At present, the exemption regulations at 40 CFR 723.50 do not expressly disqualify PBT chemical substances from eligibility for the LVE or LoREX. However, under TSCA section 5(h)(4), EPA may exempt a chemical substance from section 5 requirements upon application and by rule only if EPA determines the manufacture, processing, distribution in commerce, use, or disposal of the substance will not present an unreasonable risk. And as explained above, the regulations at 40 CFR 723.50(d) provide that chemical substances that may cause serious acute or chronic effects or significant environmental effects are not eligible for the LVE or LoREX. When exposure of the environment or biological organisms (including humans) to a PBT chemical is expected, one or more of the conditions above (*i.e.,* serious acute or chronic effects or significant environmental effects) is generally likely to occur, often making the PBT chemical ineligible for the exemptions. Whenever the potential for unreasonable exposures to a PBT chemical is identified during the review of an LVE or LoREX notice, EPA's longstanding policy has been to deny the exemption notice. However, EPA's specific concerns for PBT chemicals as they relate to LVEs and LoREXs are not separately codified in the existing regulations at 40 CFR 723.50.

EPA is therefore proposing amendments to 40 CFR 723.50(d) that would codify EPA's long-standing practice that, whenever EPA identifies a chemical substance under LVE or LoREX review (or any reasonably anticipated metabolites, environmental transformation products, or byproducts of the substance, or any reasonably anticipated impurities in the substance) as PBT with anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms, that substance would be ineligible for the LVE or LoREX. The proposed amendments clarify that PBT chemicals with anticipated environmental releases and potentially unreasonable human or environmental organism exposures would be ineligible for the LVE or LoREX but would not prevent companies from submitting an exemption notice for a given substance. The finding that a substance is PBT would be made by EPA during the review of the notice. While EPA has offered generic guidance regarding how it determines the PBT status of chemical substances, the policies and science used to ascribe discrete scores (*i.e.,* 1–3) to the persistence, bioaccumulative potential, and toxicity of a particular chemical substance are based on the available data and made on a case-by-case basis. As such, a submitter may not be able to determine in advance of submitting an exemption notice if EPA would find the substance to be PBT. Although EPA is ultimately responsible for assessing whether chemical substances are potentially PBT, submitters who possess data indicating that their new chemical substances could be PBT and could be handled in such a way as to result in anticipated or unreasonable exposures may be less likely to expend the time and resources to submit an LVE or LoREX notice for EPA review of those substances if the outcome of the review would almost certainly be denial of the notice.

EPA is further proposing to define ''PBT chemical substance'' for purposes of 40 CFR 723.50 as ''a chemical substance possessing characteristics of persistence (P) in the environment, accumulation in biological organisms (bioaccumulation (B)), and toxicity (T) resulting in potential risks to humans and ecosystems. For more information on EPA's Policy on new chemical substances that are PBT, see EPA's 1999 policy statement (64 FR 60194; November 4, 1999).''

*E. Amendments Related to Suspensions of the Review Period*

EPA is proposing to amend 40 CFR 720.75(b)(2) to allow PMN, SNUN, LVE, and LoREX submitters to request a suspension of the notice review period for up to 30 days orally or in writing, including by email, without the need for a formal, written request submitted to EPA via CDX using e-PMN software. EPA is similarly proposing to amend 40 CFR 725.54(c) to permit MCAN submitters to request suspensions for up to 30 days orally or in writing, including by email, without the need for a formal, written request submitted to EPA via CDX using e-PMN software. EPA would continue to require that all requests for suspensions exceeding 30 days be submitted electronically to EPA via CDX using e-PMN software.

When the notice or exemption review period for a PMN, SNUN, LVE, or LoREX approaches its end, submitters may request that EPA suspend the running of the notice review period so that the review period does not expire (40 CFR 720.75(b); see also 40 CFR 721.25(c) and 723.50(g)(1), applying the 720.75(b) suspension procedures to SNUNs, LVEs, and LoREXs). The existing regulations at 720.75(b) specify that such requests can be made orally to EPA, so long as the length of the suspension does not exceed 15 days; suspensions exceeding 15 days must be submitted to EPA in writing via CDX using EPA's e-PMN software. At the submitter's request, EPA can suspend a notice review period until the review is complete and a decision has been made for the notice. Once a final decision is made, any remaining suspension days are rescinded.

Currently, the regulations at 40 CFR 725.54, which pertain to the suspension of the review period for MCANs and exemptions related to microorganisms (*e.g.,* TSCA Environmental Release Applications (TERA) and Tier II submissions) mirror those at 720.75(b) for PMNs, SNUNs, LVEs, and LoREXs. As in 40 CFR 720.75(b), the language at 40 CFR 725.54 indicates that submitters may suspend a notice or exemption review period for up to 15 days via oral request, or for greater than 15 days via a formal, written request submitted to EPA via CDX using EPA's e-PMN software. Although suspensions occur less frequently during the reviews of notices and exemptions for microorganisms than during reviews for PMNs, SNUNs, LVEs, and LoREXs, submitters do occasionally request suspensions in order to develop additional information.

Given the relative ease and value of suspending a notice review period via informal oral request, most submitters who seek suspensions opt to suspend for 15 days whenever their case is nearing expiration of its review period to allow EPA to finalize its review. If a case is suspended, it is often suspended more than once, and submitters typically informally request multiple 15-day suspensions rather than requesting a longer suspension in writing via CDX. As such, EPA is proposing to allow for informal suspensions up to 30 days to reduce the number of repeated informal requests. Additionally, EPA believes that email may be more expedient than oral communication for many submitters. Therefore, EPA is proposing amendments to allow submitters to request suspensions for up to 30 days either orally or via email.

EPA is seeking comment on its proposal to increase the number of days permissible for suspensions not requiring a formal, written request submitted to EPA via CDX using e-PMN software. Specifically, EPA requests comment on its proposal to permit requests for suspensions up to 30 days to be communicated orally or via email, and to update the relevant regulations

pertaining to suspension of microorganism-related submissions under 40 CFR 725.54 to mirror the proposed changes for suspension of PMNs, SNUNs, LVEs, and LoREXs. EPA is not considering, proposing, or requesting comment on any additional changes to the regulations regarding suspensions at this time.

## IV. Economic Analysis

The estimated incremental impacts of this rulemaking are briefly summarized in this unit and the complete Economic Analysis (Ref. 1) is available in the docket. The proposed rule is expected primarily to affect two types of firms:

(1) Manufacturers of PFAS who would have submitted an LVE or LoREX in the baseline but would need to submit a PMN under the proposed rule due to the proposed amendment to make PFAS ineligible for the exemptions; and

(2) Firms submitting any TSCA section 5 notices through the PMN form (PMNs, SNUNs, LVEs, LoREXs, TMEs) that are expected to submit fewer amendments to their original submissions due to the amended procedural requirements of the proposed rule.

While the proposed rule includes additional amendments to the new chemicals regulations under TSCA, EPA expects that these additional amendments will not result in incremental burden or savings because they are largely already performed in the baseline.

As a result of this proposed rule, EPA expects that the average number of amendments per notice will decrease from 1.81 to 0.9, with a decrease in burden to EPA of 12 hours per avoided amendment. In addition, EPA expects that the 12 annual average of LVE submissions for PFAS will instead be submitted as PMNs. It is expected that individual submitters of PMNs will experience an overall decrease in burden of 13 hours with an associated decrease in cost of approximately $1,120 per notice.

Additionally, improvements in the submission process are expected to reduce inefficiency in the Agency's review process. As a result of the changes under the proposed rule, it is expected that the cost to the Agency associated with reviewing PMNs, SNUNs, and exemption notices will decrease by ten percent. Therefore, it is expected that the Agency will experience an annual cost savings of approximately $923,280.

## V. References

The following is a listing of the documents that are specifically referenced in this document. The docket includes these documents and other information considered by EPA, including documents that are referenced within the documents that are included in the docket, even if the referenced document is not physically located in the docket. For assistance in locating these other documents, please consult the technical person listed under **FOR FURTHER INFORMATION CONTACT**.


1. EPA. Economic Analysis for Proposed Updates to New Chemicals Regulations under the Toxic Substances Control Act (TSCA). May 2023.
2. EPA. Central Data Exchange Online User Guide. Accessible at: *https://cdx.epa.gov/About/UserGuide.*
3. EPA. Points to Consider When Preparing TSCA New Chemical Notification. OMB Control No.: 2070–0012. June 2018. Accessible at: *https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/points-consider-when-preparing-tsca.*
4. EPA. TSCA New Chemical Engineering Initiative to Increase Transparency and Reduce Re-work. Accessible at: *https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/tsca-new-chemical-engineering.*
5. EPA. Tables Detailing the Proposed Amendments to Add Details to 40 CFR part 720.45 Reporting Requirements and Enhancements to the CDX Reporting Form. May 2023.
6. EPA. Supporting Statement for an Information Collection Request (ICR) Under the Paperwork Reduction Act (PRA); Updates to New Chemicals Regulations under the Toxic Substances Control Act; Proposed Rule (RIN 2070–AK65); EPA ICR No. 2749.01; OMB Control No. 2070–[NEW]. May 2023.
7. EPA. Premanufacture Notification; Premanufacture Notice Requirements and Review Procedures; Final Rule. **Federal Register**. 48 FR 21722; May 13, 1983 (TSH–FRL 2998–5).
8. EPA. Policy Statement on Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances. **Federal Register**. (64 FR 60194, November 4, 1999) (FRL–6097–7).
9. EPA. Press Release: EPA Announces Changes to Prevent Unsafe New PFAS from Entering the Market. April 27, 2021.
10. EPA. PFAS Strategic Roadmap: EPA's Commitments to Action 2021–2024. October 18, 2021. Accessed at: *https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf.*
11. OECD. Reconciling Terminology of the Universe of Per- and Polyfluoroalkyl Substances: Recommendations and Practical Guidance. July 9, 2021. Accessed at: *https://one.oecd.org/document/ENV/CBC/MONO(2021)25/En/pdf.*


## VI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### *A. Executive Orders 12866: Regulatory Planning and Review and 14094: Modernizing Regulatory Review*

This action is not a significant regulatory action as defined in Executive Order 12866 (58 FR 51735, October 4, 1993), as amended by Executive Order 14094 (88 FR 21879, April 11, 2023), and was therefore not subject to review under Executive Order 12866.

### *B. Paperwork Reduction Act (PRA)*

The information collection activities in this proposed rule have been submitted to OMB for review and approval under the PRA (44 U.S.C. 3501 *et seq.*). The Information Collection Request (ICR) document that EPA prepared has been assigned EPA ICR No. 2749.01 (Ref. 6). This ICR represents an amendment to the currently approved ICR that covers the information collection activities contained in the existing regulations, which are approved under OMB control number 2070–0012 (EPA ICR No. 574.15). Estimates presented in the ICR below reflect the minor incremental changes associated with the rule that are presented in the Economic Analysis (Ref. 1). EPA is proposing amendments to the new chemicals procedural regulations under TSCA. These amendments are intended to align the regulatory text with the amendments to TSCA's new chemicals review provisions and improve the efficiency of EPA's review processes and update the regulations based on existing policies and experience implementing the New Chemicals Program. You can find copies of the Economic Analysis and ICR in the docket, and the ICR is briefly summarized here.

*Respondents/affected entities:* Certain manufacturers (including importers) and processors (see Unit I.A.).

*Respondent's obligation to respond:* Mandatory under TSCA section 5.

*Estimated number of respondents:* 560.

*Frequency of response:* On occasion, *i.e.,* upon submission of a PMN, SNUN, LVE, LoREX, or MCAN.

*Total estimated incremental burden:* Estimates show that this proposed rule will decrease existing approved burden by 4,518 hours per year. Burden is defined at 5 CFR 1320.3(b).

*Total estimated incremental cost:* Estimates show that this proposed rule

will increase existing approved costs by $45,120 per year. This includes $0 annualized capital or operation and maintenance costs.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations in 40 CFR are listed in 40 CFR part 9.

Submit your comments on the Agency's need for this information, the accuracy of the provided burden estimates and any suggested methods for minimizing respondent burden to EPA using the docket identified at the beginning of this rulemaking. EPA will respond to any ICR-related comments in the final rule. You may also send your ICR-related comments to OMB's Office of Information and Regulatory Affairs using the interface at *https://www.reginfo.gov/public/do/PRAMain.* Find this particular ICR by selecting ''Currently under Review—Open for Public Comments'' or by using the search function. OMB must receive comments no later than July 25, 2023.

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA, 5 U.S.C. 601 *et seq.* The Agency's basis is briefly summarized here and is detailed in the Economic Analysis (Ref. 1).

The majority of firms that submit a TSCA section 5 notice will realize either no change or a decrease in costs associated with form submission. However, EPA expects that firms that submit LVE notices for PFAS will incur an estimated cost of approximately $45,863 per notice due to the greater burden and non-labor costs associated with submitting a PMN form. EPA estimates that 99 percent of small firms (185 firms) will have cost impacts of less than 1 percent of revenues, less than 1 percent (1 firms) will have cost impacts between 1 and 3 percent of revenues, and 1 percent (2 firms) will have cost impacts greater than 3 percent of revenues.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments and the incremental cost on the private sector is estimated to be less than $50,000. Based on EPA's experience with reviewing actions under TSCA section 5, state, local, and tribal governments have not been impacted by these rulemakings, and EPA does not have any reasons to believe that any state, local, or tribal government would engage in the activities such that they would be impacted by this rulemaking. In addition, based on the Economic Analysis prepared for this proposed rule (Ref. 1), EPA concludes that this rulemaking is not expected to result in expenditures by the private sector of $100 million or more (when adjusted annually for inflation) in any one year. Accordingly, this rulemaking is not subject to the requirements of UMRA sections 202, 203, or 205. The Economic Analysis (Ref. 1) for this action is summarized in Unit IV. and is available in the docket.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999), because it will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications as specified in Executive Order 13175 (65 FR 67249, November 9, 2000), because it will not have substantial direct effects on tribal governments, on the relationship between the Federal Government and the Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

EPA interprets Executive Order 13045 (62 FR 19885, April 23, 1997) as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–201 of the Executive Order. Therefore, this action is not subject to Executive Order 13045 because it does not concern an environmental health risk or safety risk. Since this action does not concern human health risks, EPA's Policy on Children's Health also does not apply. This procedural rule would align the procedural regulations codified at 40 CFR parts 720 and 725 with amended TSCA and make additional updates based on existing policies or lessons learned from administering the New Chemicals Program since TSCA was amended in 2016.

Although this procedural rule itself would not directly affect the level of protection provided to human health or the environment, EPA expects that the rule would improve the Agency's consideration of risks to children—in furtherance of EPA's Policy on Children's Health—and other PESS. In turn, EPA anticipates that the proposed amendments would help better inform the Agency's determinations for each new chemical substance or significant new use for which it received a notice under TSCA section 5(a)(1), pertaining to the likelihood of unreasonable risk to human health or the environment under known, intended or reasonably foreseen conditions of use. EPA uses an integrated approach that draws on knowledge and experience across disciplinary and organizational lines to identify and evaluate concerns regarding health and environmental effects, and exposure and release.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not a ''significant energy action'' as defined in Executive Order 13211 (66 FR 28355, May 22, 2001), because it is not likely to have a significant adverse effect on the supply, distribution or use of energy and has not otherwise been designated as a significant energy action by the Administrator of the Office of Information and Regulatory Affairs.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards under the NTTAA section 12(d), 15 U.S.C. 272.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

Executive Order 12898 (59 FR 7629, February 16, 1994) directs Federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations (people of color and/or Indigenous peoples) and low-income

Case: 25-158, 10/17/2025, DktEntry: 27.1, Page 252 of 270



populations. This action is procedural in nature. Therefore, EPA believes that it is not practicable to assess whether the human health or environmental conditions that exist prior to this action result in disproportionate and adverse effects on people of color, low-income populations and/or Indigenous peoples. By proposing, among other things, to include overburdened communities in the regulatory definition of PESS.

The Agency believes that this action would assist EPA and others in determining the potential exposures, hazards and risks to overburdened communities associated with the manufacture, processing, distribution in commerce, use, or disposal of the new chemical substances and significant new uses of chemical substances subject to this rulemaking. EPA anticipates that the inclusion of overburdened communities among the PESS considered in the Agency's review of a TSCA section 5 submission would also enable the Agency, if necessary, to design appropriate future risk management actions to address an unreasonable risk that the Agency may determine is presented by that chemical substance and to consider how such risk management actions would affect communities with environmental justice concerns.

**List of Subjects in 40 CFR Parts 720, 721, 723, and 725**

Environmental protection, Chemicals, Hazardous materials, Reporting and recordkeeping requirements.

Dated: May 16, 2023.

**Michal Freedhoff,**

*Assistant Administrator, Office of Chemical Safety and Pollution Prevention.*

Therefore, for the reasons set forth in the preamble, 40 CFR chapter I is amended as follows:

## PART 720—PREMANUFACTURE NOTIFICATION

■ 1. The authority citation for part 720 continues to read as follows:

**Authority:** 15 U.S.C. 2604, 2607, and 2613.

### § 720.1 [Amended]

■ 2. Amend § 720.1 by removing the phrase ''The rule'' and adding in its place the phrase ''This part'' wherever it appears.

■ 3. Amend § 720.3 by adding new paragraphs (ll) and (mm) to read as follows:

### § 720.3 Definitions.

* * * * *

(ll) *Applicable review period* means the period starting on the date EPA receives a complete notice under section 5(a)(1) of the Act and ending 90 days after that date or on such date as is provided for in sections 5(b)(1) or 5(c) of the Act.

(mm) *Potentially exposed or susceptible subpopulation* means a group of individuals within the general population identified by EPA who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, the elderly, or overburdened communities.

* * * * *

■ 4. Amend § 720.40 by revising paragraph (f) to read as follows:

### § 720.40 General.

* * * * *

(f) *New information.* During the applicable review period, if the submitter possesses, controls, or knows of new information that materially adds to or changes the information included in the notice, the submitter must submit that information to EPA within ten days of receiving the new information, but no later than five days before the end of the applicable review period. The new information must be submitted electronically to EPA via CDX and must clearly identify the submitter and the notice to which the new information is related. If the new information becomes available during the last five days of the applicable review period, the submitter must immediately inform its EPA contact for that notice by telephone or email and submit the new information electronically to EPA via CDX.

* * * * *

■ 5. Amend § 720.45 by:

■ a. Revising paragraphs (a)(4) and (5);

■ b. Revising paragraphs (f) through (h); and

■ c. Adding paragraphs (j) and (k).

The revisions and additions read as follows:

### § 720.45 Information that must be included in the notice form.

(a) * * *

(4) If an importer submitting the notice cannot provide all the information specified in paragraphs (a)(1) and (2) of this section because it is claimed as confidential by the foreign supplier of the substance, the importer must have the foreign supplier follow the procedures in paragraph (a)(3) of this section and provide the correct chemical identity information specified in paragraphs (a)(1) and (2) of this section directly to EPA in a joint submission or as a letter of support to the notice, which clearly references the importer's notice and PMN User Fee Identification Number. The statutory review period will commence upon receipt of both the notice and the complete, correct information, in accordance with § 720.65.

(5) If a manufacturer cannot provide all the information specified in paragraphs (a)(1) and (2) of this section because the new chemical substance is manufactured using a reactant having a specific chemical identity claimed as confidential by its supplier, the manufacturer must submit a notice directly to EPA containing all the information known by the manufacturer about the chemical identity of the reported substance and its proprietary reactant. In addition, the manufacturer must ensure that the supplier of the confidential reactant submit a letter of support directly to EPA providing the specific chemical identity of the confidential reactant, including the CAS number, if available, and the appropriate PMN or exemption number, if applicable. The letter of support must reference the manufacturer's name and PMN Fee Identification Number. The statutory review period will commence upon receipt of the notice, the letter of support, and the complete, correct information in accordance with § 720.65.

* * * * *

(f)(1) A description of the intended category or categories of consumer or commercial use by function and application, which includes a description of the following:

(i) The estimated percent of production volume devoted to each category of use.

(ii) The percent of the new chemical substance in the formulation for each commercial or consumer use.

(iii) The types of products or articles that would incorporate the new chemical substance (*e.g.,* household cleaners, plastic articles).

(iv) Information related to the use of products or articles containing the new chemical substance by potentially exposed or susceptible subpopulations.

(v) How and where a product or article incorporating the new chemical substance would be used (*e.g.,* spray applied indoors, brushed on outdoor surfaces).

(vi) Consumption rates and frequency and duration of use of products or articles incorporating the new chemical substance.

(2) Using the applicable codes listed in table 1 to paragraph (f)(2), submitters must designate the consumer and commercial product category or categories that best describe the

Case: 25-158, 10/17/2025, DktEntry: 27.1, Page 253 of 270



consumer and commercial products in which the new chemical substance is intended or known to be used.

TABLE 1 TO PARAGRAPH (f)(2)—CODES FOR REPORTING CONSUMER AND COMMERCIAL PRODUCT CATEGORIES

| Code | Category |
|---|---|
| **Chemical Substances in Furnishing, Cleaning, Treatment Care Products** | |
| CC101 | Construction and building materials covering large surface areas including stone, plaster, cement, glass and ceramic articles; fabrics, textiles, and apparel. |
| CC102 | Furniture & furnishings including plastic articles (soft); leather articles. |
| CC103 | Furniture & furnishings including stone, plaster, cement, glass and ceramic articles; metal articles; or rubber articles. |
| CC104 | Leather conditioner. |
| CC105 | Leather tanning, dye, finishing, impregnation and care products. |
| CC106 | Textile (fabric) dyes. |
| CC107 | Textile finishing and impregnating/surface treatment products. |
| CC108 | All-purpose foam spray cleaner. |
| CC109 | All-purpose liquid cleaner/polish. |
| CC110 | All-purpose liquid spray cleaner. |
| CC111 | All-purpose waxes and polishes. |
| CC112 | Appliance cleaners. |
| CC113 | Drain and toilet cleaners (liquid). |
| CC114 | Powder cleaners (floors). |
| CC115 | Powder cleaners (porcelain). |
| CC116 | Dishwashing detergent (liquid/gel). |
| CC117 | Dishwashing detergent (unit dose/granule). |
| CC118 | Dishwashing detergent liquid (hand-wash). |
| CC119 | Dry cleaning and associated products. |
| CC120 | Fabric enhancers. |
| CC121 | Laundry detergent (unit-dose/granule). |
| CC122 | Laundry detergent (liquid). |
| CC123 | Stain removers. |
| CC124 | Ion exchangers. |
| CC125 | Liquid water treatment products. |
| CC126 | Solid/Powder water treatment products. |
| CC127 | Liquid body soap. |
| CC128 | Liquid hand soap. |
| CC129 | Solid bar soap. |
| CC130 | Air fresheners for motor vehicles. |
| CC131 | Continuous action air fresheners. |
| CC132 | Instant action air fresheners. |
| CC133 | Anti-static spray. |
| CC134 | Apparel finishing, and impregnating/surface treatment products. |
| CC135 | Insect repellent treatment. |
| CC136 | Pre-market waxes, stains, and polishes applied to footwear. |
| CC137 | Post-market waxes, and polishes applied to footwear (shoe polish). |
| CC138 | Waterproofing and water-resistant sprays. |
| **Chemical Substances in Construction, Paint, Electrical, and Metal Products** | |
| CC201 | Fillers and putties. |
| CC202 | Hot-melt adhesives. |
| CC203 | One-component caulks. |
| CC204 | Solder. |
| CC205 | Single-component glues and adhesives. |
| CC206 | Two-component caulks. |
| CC207 | Two-component glues and adhesives. |
| CC208 | Adhesive/Caulk removers. |
| CC209 | Aerosol spray paints. |
| CC210 | Lacquers, stains, varnishes and floor finishes. |
| CC211 | Paint strippers/removers. |
| CC212 | Powder coatings. |
| CC213 | Radiation curable coatings. |
| CC214 | Solvent-based paint. |
| CC215 | Thinners. |
| CC216 | Water-based paint. |
| CC217 | Construction and building materials covering large surface areas, including wood articles. |
| CC218 | Construction and building materials covering large surface areas, including paper articles; metal articles; stone, plaster, cement, glass and ceramic articles. |
| CC219 | Machinery, mechanical appliances, electrical/electronic articles. |
| CC220 | Other machinery, mechanical appliances, electronic/electronic articles. |
| CC221 | Construction and building materials covering large surface areas, including metal articles. |
| CC222 | Electrical batteries and accumulators. |

TABLE 1 TO PARAGRAPH (f)(2)—CODES FOR REPORTING CONSUMER AND COMMERCIAL PRODUCT CATEGORIES—Continued

| Code | Category |
| --- | --- |
| **Chemical Substances in Packaging, Paper, Plastic, Toys, Hobby Products** | |
| CC301 | Packaging (excluding food packaging), including paper articles. |
| CC302 | Other articles with routine direct contact during normal use, including paper articles. |
| CC303 | Packaging (excluding food packaging), including rubber articles; plastic articles (hard); plastic articles (soft). |
| CC304 | Other articles with routine direct contact during normal use including rubber articles; plastic articles (hard). |
| CC305 | Toys intended for children's use (and child dedicated articles), including fabrics, textiles, and apparel; or plastic articles (hard). |
| CC306 | Adhesives applied at elevated temperatures. |
| CC307 | Cement/concrete. |
| CC308 | Crafting glue. |
| CC309 | Crafting paint (applied to body). |
| CC310 | Crafting paint (applied to craft). |
| CC311 | Fixatives and finishing spray coatings. |
| CC312 | Modelling clay. |
| CC313 | Correction fluid/tape. |
| CC314 | Inks in writing equipment (liquid). |
| CC315 | Inks used for stamps. |
| CC316 | Toner/Printer cartridge. |
| CC317 | Liquid photographic processing solutions. |
| **Chemical Substances in Automotive, Fuel, Agriculture, Outdoor Use Products** | |
| CC401 | Exterior car washes and soaps. |
| CC402 | Exterior car waxes, polishes, and coatings. |
| CC403 | Interior car care. |
| CC404 | Touch up auto paint. |
| CC405 | Degreasers. |
| CC406 | Liquid lubricants and greases. |
| CC407 | Paste lubricants and greases. |
| CC408 | Spray lubricants and greases. |
| CC409 | Anti-freeze liquids. |
| CC410 | De-icing liquids. |
| CC411 | De-icing solids. |
| CC412 | Lock de-icers/releasers. |
| CC413 | Cooking and heating fuels. |
| CC414 | Fuel additives. |
| CC415 | Vehicular or appliance fuels. |
| CC416 | Explosive materials. |
| CC417 | Agricultural non-pesticidal products. |
| CC418 | Lawn and garden care products. |
| **Chemical Substances in Products Not Described by Other Codes** | |
| CC980 | Other (specify). |
| CC990 | Non-TSCA use. |

(g) For sites controlled by the submitter:

(1) The identity and address of each site where the new chemical substance will be manufactured, processed, or used.

(2) A process description of each manufacture, processing, and use operation which includes a diagram of the major unit operations and chemical conversions; indication of whether batch or continuous manufacturing or processing occurs at the site, and the amount manufactured or processed per batch or per day if continuous and per year; the identity, approximate weight per batch or per day for continuous production, and entry point of all starting materials and feedstocks (including reactants, solvents, catalysts, etc.); the identity, approximate weight per batch or per day for continuous production, and entry point of all products, recycle streams, and wastes, including frequency of any equipment cleaning; the type of interim storage and transport containers used; and the points of release of the new chemical substance numbered. If the new chemical substance is released to two media at the same step in the process, assign a second number for the second medium.

(3) Worker exposure information, including worker exposure information from exempt manufacture or related use of the new chemical substance under § 720.30 (*e.g.,* byproduct, impurity). This information includes:

(i) Worker activities.

(ii) Type of potential worker exposure (*e.g.,* dermal, inhalation).

(iii) Protective equipment in place, if any, including a description of the kind of gloves, protective clothing, goggles, or respirator that limit worker exposure, if any.

(iv) Engineering controls in place, if any.

(v) Physical form of the new chemical substance to which workers may be exposed and moisture content if physical form is solid.

(vi) The percent of new chemical substance in formulation at time of worker exposure.

(vii) The number of workers reasonably likely to be exposed.

(viii) The duration of activities.

(4) Information on release of the new chemical substance to the environment, including releases from the exempt manufacture or related use of the new

chemical substance under § 720.30 (*e.g.,* byproduct, impurity). This information includes the type of release (*e.g.,* transport, interim storage, disposal, equipment cleaning), the quantity of the new chemical substance released directly to the environment, the quantity of the new chemical substance released into control technology, the quantity of the new chemical substance released to the environment after control technology, the media of release, the type of control technology used, and the following additional information based on the type of release:

(i) For equipment cleaning releases, frequency of equipment cleaning and what is used to clean the equipment.

(ii) For transport and storage releases, how the new chemical substance or product containing the new chemical substance is transported from the site and stored, whether dedicated containers are used, whether the cleaning and disposal of the containers is under the submitter's control, the container cleaning method, the frequency of container cleaning, and the amount of release per container cleaning.

(iii) For releases into air, Clean Air Act operating permit numbers and a description of any Leak Detection and Repair program in accordance with 40 CFR parts 60, 61, 63, 65, 264 or 265 (related to the monitoring and management of fugitive releases) the site has implemented.

(iv) For releases into water, the National Pollutant Discharge Elimination System (NPDES) permit number(s), the name(s) of the navigable waterway(s) into which the release occurs, and other destination(s) into which the release occurs.

(v) For releases into wastewater treatment plants, the name(s) of the publicly owned treatment work(s) (POTW) into which the release occurs and the corresponding NPDES permit number(s).

(h) For sites not controlled by the submitter:

(1) The identity and address of each site where the new chemical substance will be manufactured, processed, or used.

(2) A description of each type of processing and use operation involving the new chemical substance, including identification of the estimated number of processing or use sites; a process description of each operation which includes a diagram of the major unit operations and chemical conversions; the identity, approximate weight per batch or per day for continuous production, and entry point of all starting materials and feedstocks (including reactants, solvents, catalysts, etc.); the identity, approximate weight per batch or per day for continuous production, and entry point of all products, recycle streams, and wastes, including frequency of any equipment cleaning; the type of interim storage and transport containers used; and the points of release of the new chemical substance numbered. If the new chemical substance is released to two media at the same step in the process, assign a second number for the second medium.

(3) Worker exposure information, including worker exposure information from exempt manufacture or related use of the new chemical substance under § 720.30 (*e.g.,* byproduct, impurity). This information includes:

(i) Worker activities.

(ii) Type of potential worker exposure (*e.g.,* dermal, inhalation).

(iii) Protective equipment in place, if any, including a description of the kind of gloves, protective clothing, goggles, or respirator that limit worker exposure, if any.

(iv) Engineering controls in place if any.

(v) Physical form of the new chemical substance to which workers may be exposed and moisture content if physical form is solid.

(vi) The percent of new chemical substance in formulation at time of worker exposure.

(vii) The number of workers reasonably likely to be exposed.

(viii) The duration of activities.

(4) Information on release of the new chemical substance to the environment, including releases from the exempt manufacture or related use of the new chemical substance under § 720.30 (*e.g.,* byproduct, impurity). This information includes the type of release (*e.g.,* transport, interim storage, disposal, equipment cleaning), the quantity of the new chemical substance released directly to the environment, the quantity of the new chemical substance released into control technology, the quantity of the new chemical substance released to the environment after control technology, the media of release, the type of control technology used, and the following additional information based on the type of release:

(i) For equipment cleaning releases, frequency of equipment cleaning and what is used to clean the equipment.

(ii) For transport and storage releases, how the new chemical substance or product containing the new chemical substance is transported from the site and stored, whether dedicated containers are used, whether the cleaning and disposal of the containers is under the submitter's control, the container cleaning method, the frequency of container cleaning, and the amount of release of the new chemical substance per container cleaning.

(iii) For releases into air, Clean Air Act operating permit numbers and a description of any Leak Detection and Repair program in accordance with 40 CFR parts 60, 61, 63, 65, 264 or 265 (related to the monitoring and management of fugitive releases) the site has implemented.

(iv) For releases into water, the National Pollutant Discharge Elimination System (NPDES) permit number(s), the name(s) of the navigable waterway(s) into which the release occurs, and other destination(s) into which the release occurs.

(v) For releases into wastewater treatment plants, the name(s) of the publicly owned treatment work(s) (POTW) into which the release occurs and the corresponding NPDES permit number(s).

* * * * *

(j) The physical and chemical properties and environmental fate characteristics of the new chemical substance, which includes the following:

(1) For physical and chemical properties, such information includes boiling/sublimation temperature, density/relative density, dissociation constant, explodability, flammability, melting temperature, octanol/water partition coefficient, particle size distribution, particle size distribution analysis, the physical state of the neat substance, pH, solubility, vapor pressure, volatilization from water, volatilization from soil, spectra, UV–VIS absorption data, and surface tension. For nanomaterials, such information also includes aspect ratio, thickness, and number of layers or walls.

(2) For environmental fate characteristics, such information includes hydrolysis, photolysis, aerobic and anaerobic biodegradation, atmospheric oxidation half-lives, Henry's law constant, adsorption/desorption coefficient, bioaccumulation or bioconcentration factor, Incineration Removal Efficiency (Destruction and Removal Efficiencies or DREs), and Sewage Treatment (WWTP) Removals.

(k) Information about pollution prevention efforts, such as using alternative fuel sources, reducing the use of water and chemical inputs, modifying a production process to produce less waste, or implementing water and energy conservation practices, or substituting for riskier existing products. Inclusion of this information is optional.

■ 6. Amend § 720.50 by revising paragraph (a)(4)(ii) to read as follows:

**§ 720.50 Submission of test data and other data concerning the health and environmental effects of a substance.**

(a) * * *

(4) * * *

(ii) If a test or experiment is completed before the applicable review period ends, the person must submit the study, report, or test electronically to EPA via CDX, as specified in paragraph (a)(3)(i) of this section, within ten days of receiving it, but no later than five days before the end of the review period. If the test or experiment is completed during the last five days of the review period, the submitter must inform its EPA contact for that notice by telephone or email prior to the end of the review period and submit the study, report, or test electronically to EPA via CDX.

* * * * *

■ 7. Amend § 720.65 by:

■ a. Revising paragraphs (a) through (c);

■ b. Redesignating paragraph (d) as paragraph (e);

■ c. Adding a new paragraph (d); and

■ d. Revising newly redesignated paragraph (e).

The revisions and addition read as follows:

**§ 720.65 Acknowledgement of receipt of a notice; errors in the notice; incomplete submissions; and false and misleading statements.**

(a) *Notification to the submitter.* (1) EPA will acknowledge receipt of each notice by sending a letter via CDX or U.S. mail to the submitter that identifies the premanufacture notice number assigned to the new chemical substance and date on which the applicable review period begins as described in paragraph (a)(2) of this section.

(2) Before EPA sends an acknowledgement of receipt of a notice pursuant to paragraph (a)(1) of this section, EPA will conduct a pre-screen of the notice, typically taking 2–3 days and according to the criteria under paragraphs (b)(1) and (c)(1) of this section.

(i) If EPA concludes that the notice contains errors warranting remedy or is incomplete, EPA will notify the submitter according to paragraph (d)(3) of this section. The applicable review period will not begin. Once the submitter corrects the errors or incomplete submission according to the requirements provided by EPA and re-submits it to EPA, EPA will follow the procedures of paragraph (a)(2) of this section.

(ii) If EPA does not identify errors or determine the notice to be incomplete during screening, EPA will notify the submitter according to paragraph (a)(1) of this section. The applicable review period will begin on the date EPA received the complete notice.

(b) *Errors in the notice.* (1) Within 30 days of receipt of the notice, EPA may request that the submitter remedy errors in the notice. The following are examples of such errors:

(i) Typographical errors that cause data to be misleading or answers to any questions to be unclear.

(ii) Contradictory information.

(iii) Ambiguous statements or information.

(2) The applicable review period does not begin for notices containing errors that EPA asks the submitter to remedy until corrections are made following the procedures of paragraph (d) of this section.

(c) *Incomplete submissions.* (1) A submission is not complete, and the applicable review period does not begin, if:

(i) The wrong person submits the notice form.

(ii) The submitter does not sign the notice form.

(iii) Some or all of the information in the notice or the attachments are not in English, except for published scientific literature.

(iv) The submitter does not submit the notice in the manner set forth in § 720.40(a)(2).

(v) The submitter does not provide information that is required by section 5(d)(1)(B) and (C) of the Act and § 720.50.

(vi) The submitter does not provide information required by § 720.45 or indicate that it is not known to or reasonably ascertainable by the submitter.

(vii) The submitter does not submit a second copy of the submission with all confidential information deleted for the public file, as required by § 720.80(b)(2).

(viii) The submitter does not include any information required by section 5(b)(1) of the Act and pursuant to a rule promulgated under section 4 of the Act, as required by § 720.40(g).

(ix) The submitter does not submit data which the submitter believes show that the chemical substance will not present an unreasonable risk of injury to health or the environment, if EPA has listed the chemical substance under section 5(b)(4) of the Act, as required in § 720.40(h).

(x) The submitter does not include an identifying number and a payment identity number as required by 40 CFR 700.45(e)(3).

(2) The submission may be declared incomplete if at any time during the applicable review period the submitter submits additional or revised information without demonstrating to EPA's satisfaction that the additional or revised information in the amended notice was not known to or reasonably ascertainable by the submitter at the time of initial notice submission (*e.g.,* new information as described in § 720.40(f) or information from testing in progress at the time of the original submission, as described in § 720.50(a)(4)), unless it relates to administrative or non-substantive amendments (*e.g.,* changing the technical point of contact) or amendments made at the request of EPA.

(d) *Corrections to errors in the notice or incomplete submissions.* (1) If EPA receives an incomplete submission or seeks remedy of errors identified in a notice, EPA will notify the submitter within 30 days of receipt that the submission contains errors or is incomplete and that the applicable review period will not begin until EPA receives a correct and complete notice.

(2) If EPA obtains additional information during the applicable review period that indicates the original submission was incomplete, EPA may declare the submission incomplete within 30 days after EPA obtains the additional information and so notify the submitter.

(3) The notification that a submission contains errors or is incomplete under paragraph (d)(1) or (2) of this section will include:

(i) A statement of the basis of EPA's determination that the submission contains errors or is incomplete.

(ii) The requirements for correcting the errors or incomplete submission.

(iii) Information on procedures under paragraph (d)(4) of this section for filing objections to the determination or requesting modification of the requirements for completing the submission.

(4) Within ten days after receipt of notification by EPA that a submission contains errors or is incomplete, the submitter may file written objections requesting that EPA accept the submission as a complete notice or modify the requirements necessary to complete the submission.

(5)(i) EPA will consider the objections filed by the submitter. EPA will determine whether the submission was complete or incomplete, or whether to modify the requirements for completing the submission. EPA will notify the submitter in writing of EPA's response within ten days of receiving the objections.

(ii) If EPA determines, in response to the objection, that the submission was complete, the applicable review period will be deemed suspended on the date EPA declared the notice incomplete, and will resume on the date that the notice is declared complete. The submitter need not correct the notice as EPA originally requested. If EPA can complete its review within 90 days from the date of the original submission, EPA may inform the submitter that the running of the review period will resume on the date EPA originally declared it incomplete.

(iii) If EPA modifies the requirements for completing the submission or affirms its original determination that the submission contains errors or is incomplete, or if no objections are filed, the applicable review period will begin (or if previously begun, will restart at Day 1) when EPA receives a complete notice.

(e) *Materially false or misleading statements.* If EPA discovers at any time that a person submitted materially false or misleading statements in the notice, EPA may find that the notice was incomplete from the date it was submitted and take any other appropriate action.

■ 8. Amend § 720.70 by revising paragraphs (a) and (b)(3) to read as follows:

### § 720.70 Notice in the Federal Register.

(a) *Filing notice of receipt.* In accordance with section 5(d)(2) of the Act, after EPA has received a complete notice, EPA will file a notice of receipt with the Office of the Federal Register including the information specified in paragraph (b) of this section.

(b) * * *

(3) For test data submitted in accordance with § 720.40(g), a summary of the data received.

* * * * *

■ 9. Amend § 720.75 by:

■ a. Revising the section heading;

■ b. Removing the phrase ''notice review period'' and adding in its place the phrase ''applicable review period;'' wherever it appears; and

■ c. Revising paragraphs (a), (b), (c)(4) and (d) to read as follows:

### § 720.75 Applicable review period and determination.

(a) *Length of applicable review period.* The applicable review period specified in section 5(a) of the Act runs for 90 days from the date EPA receives a complete notice, or the date EPA determines the notice is complete under § 720.65(d), unless the Agency extends the applicable review period under section 5(c) of the Act and paragraph (c) of this section.

(b) *Suspension of the running of the applicable review period.* (1) A submitter may voluntarily suspend the running of the applicable review period if EPA agrees. If EPA does not agree, the review period will continue to run, and EPA will notify the submitter. A submitter may request a suspension at any time during the applicable review period. The suspension must be for a specified period of time.

(2)(i) *Requests for suspension 30 days or less.* A request for a suspension of 30 days or less may be made orally, including by telephone, or in writing, including by email, to the submitter's EPA contact for that notice. Any request for a suspension exceeding 30 days must be submitted in the manner set forth in paragraph (b)(2)(ii) of this section. The running of the applicable review period will be suspended upon approval of the oral or written request by EPA.

(ii) *Requests for suspensions greater than 30 days.* Requests for suspensions exceeding 30 days must be submitted electronically to EPA via CDX using e-PMN software. Requests for suspensions of 30 days or less may also be submitted electronically to EPA via CDX using e-PMN software. See § 720.40(a)(2)(ii) for information on how to access the e-PMN software. The running of the applicable review period will be suspended upon approval of the request submitted electronically to EPA via CDX using e-PMN software by EPA.

(c) * * *

(4) The following are examples of situations in which EPA may find that good cause exists for extending the applicable review period:

(i) EPA has reviewed the notice and determined that there is a significant possibility that the chemical substance will be regulated under sections 5(e) or 5(f) of the Act, but EPA is unable to initiate regulatory action within the initial 90-day period.

(ii) EPA has reviewed the submission and is seeking additional information.

(iii) EPA has received significant additional information during the applicable review period, which was not known to or reasonably ascertainable by the submitter at the time of initial notice submission.

(d) *Determinations.* (1) Within the applicable review period, EPA will make one of the following five determinations, as set forth in section 5(a)(3) of the Act:

(i) The chemical substance presents an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(A) of the Act.

(ii) Information available to EPA is insufficient to permit a reasoned evaluation of the health and the environmental effects of the relevant chemical substance, as set forth in section 5(a)(3)(B)(i) of the Act.

(iii) In the absence of sufficient information to permit EPA to make such an evaluation, the chemical substance may present an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(B)(ii)(I) of the Act.

(iv) The chemical substance is or will be produced in substantial quantities, and such substance either enters or may reasonably be anticipated to enter the environment in substantial quantities or there is or may be significant or substantial human exposure to the substance, as set forth in section 5(a)(3)(B)(ii)(II) of the Act.

(v) The chemical substance is not likely to present an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(C) of the Act.

(2) EPA will take the following actions required in association with the determination:

(i) For determinations described in paragraph (d)(1)(i) of this section, EPA will issue the submitter an order to prohibit or limit the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance, or any combination of such activities, to the extent necessary to protect against an unreasonable risk of injury to health or the environment, as set forth in section 5(f) of the Act, or will issue a proposed rule under section 6(a) of the Act, as set forth in section 5(f) of the Act.

(ii) For determinations described in paragraphs (d)(1)(ii), (iii), or (iv) of this section, EPA will issue the submitter an order to prohibit or limit the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance, or any combination of such activities, to the extent necessary to protect against an unreasonable risk of injury to health or the environment, as set forth in section 5(e) of the Act. EPA may issue an order under section 5(e) of the Act that requires certain testing to be conducted and presented to EPA after the applicable review period has concluded.

(iii) Following a determination described in paragraph (d)(1)(v) of this section, EPA will issue the submitter a document describing that determination and will submit for publication in the **Federal Register** a statement of the finding, as set forth in section 5(g) of the Act. Upon EPA's issuance of the determination, the submitter may commence the manufacture of the

chemical substance without waiting for the end of the applicable review period.

(3) EPA may modify or revoke the prohibitions and limitations in an order issued under paragraph (d)(2)(i) or (ii) of this section after the applicable review period has ended if the submitter submits to EPA additional testing, studies, reports, or other information that EPA determines, upon review, demonstrate that such prohibitions or limitations are no longer necessary to protect against an unreasonable risk of injury to health or the environment.

(4) No person submitting a notice in response to the requirements of this part may manufacture a chemical substance subject to this part until EPA has issued a determination in accordance with paragraph (d)(1) of this section and taken the associated action required under paragraph (d)(2) of this section.

## PART 721—SIGNIFICANT NEW USES OF CHEMICAL SUBSTANCES

■ 10. The authority citation for part 721 continues to read as follows:

**Authority:** 15 U.S.C. 2604, 2607, and 2625(c).

■ 11. Amend § 721.25 by revising paragraphs (c) and (d) to read as follows:

### § 721.25 Notice requirements and procedures.

* * * * *

(c) EPA will process the notice in accordance with the procedures of part 720 of this chapter, except to the extent they are inconsistent with this part. When submitting a SNUN the provision at § 720.45(f)(1) of this chapter is modified to require a description of both known and intended categories of consumer or commercial use by function and application.

(d) Any person submitting a significant new use notice in response to the requirements of this part shall not manufacture or process a chemical substance identified in subpart E of this part for a significant new use until EPA has issued a determination with respect to the significant new use and taken the actions required in association with that determination in accordance with the procedures for new chemical substances at § 720.75(d) of this chapter.

## PART 723—PREMANUFACTURE NOTIFICATION EXEMPTIONS

■ 12. The authority citation for part 723 continues to read as follows:

**Authority:** 15 U.S.C. 2604.

■ 13. Amend § 723.50 by:

■ a. Revising paragraph (a)(1);

■ b. Adding paragraphs (b)(11) and (12);

■ c. Revising paragraphs (d), (g), and (h)(2)(v); and

■ d. Adding paragraph (p).

The revisions and additions read as follows:

### § 723.50 Chemical substances manufactured in quantities of 10,000 kilograms or less per year, and chemical substances with low environmental releases and human exposures.

(a) * * *

(1) This section grants an exemption from the premanufacture notice requirements of section 5(a)(1)(A)(i) of the Toxic Substances Control Act (15 U.S.C. 2604(a)(1)(A)) for the manufacture of:

* * * * *

(b) * * *

(11) *PFAS* or *per- and poly-fluoroalkyl substance* means a chemical substance that contains at least one of these three structures:

(i) R–(CF2)–CF(R′)R″, where both the CF2 and CF moieties are saturated carbons;

(ii) R–CF2OCF2–R′, where R and R′ can either be F, O, or saturated carbons; or

(iii) CF3C(CF3)R′R″, where R′ and R″ can either be F or saturated carbons.

(12) *PBT chemical substance* means a chemical substance possessing characteristics of persistence (P) in the environment, accumulation in biological organisms (bioaccumulation (B)), and toxicity (T) resulting in potential risks to humans and ecosystems. For more information on EPA's Policy on new chemical substances that are PBTs, see EPA's 1999 policy statement (64 FR 60194, November 4, 1999 (FRL–6097–7)).

* * * * *

(d) *Chemical substances that cannot be manufactured under this exemption.* A new chemical substance cannot be manufactured under this section, notwithstanding satisfaction of the criterion of paragraph (c)(1) or (2) of this section, if EPA determines, in accordance with paragraph (g) of this section, that the substance, any reasonably anticipated metabolites, environmental transformation products, or byproducts of the substance, or any reasonably anticipated impurities in the substance, under anticipated conditions of manufacture, processing, distribution in commerce, use, or disposal of the new chemical substance:

(1) May cause:

(i) Serious acute (lethal or sublethal) effects;

(ii) Serious chronic (including carcinogenic and teratogenic) effects; or

(ii) Significant environmental effects.

(2) Or is:

(i) A PFAS.

(ii) A PBT chemical substance with anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms.

* * * * *

(g) *Review period.* (1) EPA will review the notice submitted under paragraph (e) of this section to determine whether manufacture of the new chemical substance is eligible for the exemption. The review period will run for 30 days from the date EPA receives a complete notice. To provide additional time to address any unresolved issues concerning an exemption application, the exemption applicant may, at any time during the review period, request a suspension of the review period pursuant to the provisions of § 720.75(b) of this chapter.

(2) No person submitting a notice under paragraph (e) of this section may manufacture the new chemical substance until EPA notifies the submitter that the new chemical substance meets the terms of this section.

(h) * * *

(2) * * *

(v) If the Assistant Administrator determines that manufacture of the new chemical substance does not meet the terms of this section and that the manufacturer did not act with due diligence and in good faith to meet the terms of this section, the manufacturer must cease any continuing manufacture, processing, distribution in commerce, and use of the new chemical substance within 7 days of the written notification under paragraph (h)(2)(iii) of this section. The manufacturer may not resume manufacture, processing, distribution in commerce, and use of the new chemical substance until it submits a notice under section 5(a)(1) of the Act and part 720 of this chapter and EPA has made one of the five determinations as set forth in section 5(a)(3) of the Act and taken the action required in association with that determination.

* * * * *

(p) *Subject to a significant new use rule.* If a significant new use rule is proposed or finalized in part 721 of this chapter for a chemical substance described by a generic chemical name, EPA may make reasonable efforts to notify any persons who may also manufacture the same chemical substance under the terms of this section. A disclosure to a person with an approved exemption under this section that the chemical substance is subject to a proposed or final rule in part 721 of this chapter will not be considered public disclosure of

confidential business information under section 14 of the Act. The notification will inform manufacturers subject to the terms of this section that the chemical substance is subject to a proposed or final significant new use rule under section 5(a)(2) of the Act, and identify the proposed or final section in subpart E of part 721 of this chapter that pertains to the chemical substance.

## PART 725—REPORTING REQUIREMENTS AND REVIEW PROCESSES FOR MICROORGANISMS

■ 14. The authority citation for part 725 continues to read as follows:

**Authority:** 15 U.S.C. 2604, 2607, 2613, and 2625.

■ 15. Amend § 725.54 by revising paragraphs (b)(1), (c) and (d) to read as follows:

### § 725.54 Suspension of the review period.

* * * * *

(b)(1) *Request for suspension.* A request for suspension may only be submitted in a manner set forth in this paragraph. The request for suspension also may be made orally, including by telephone, or in writing, including by email, to the submitter's EPA contact for that notice, subject to paragraph (c) of this section.

* * * * *

(c) An oral or written request for suspension may be granted by EPA for a maximum of 30 days only. Requests for longer suspension must only be submitted in the manner set forth in paragraph (b)(2) of this section.

(d) If the submitter has not made a previous oral or written request, the running of the applicable review period is suspended as of the date of receipt of the CDX submission by EPA.

■ 16. Amend § 725.60 by revising paragraph (a)(1) to read as follows:

### § 725.60 Withdrawal of submission by the submitter.

(a)(1) *Withdrawal of notice by the submitter.* A submitter may withdraw a notice during the applicable review period by submitting a statement of withdrawal in a manner set forth in this paragraph. The withdrawal is effective upon receipt of the CDX submission by EPA.

* * * * *

■ 17. Amend § 725.170 by:

■ a. Revising paragraphs (a) and (b); and

■ b. Removing paragraph (c).

The revisions read as follows.

### § 725.170 EPA review of the MCAN.

* * * * *

(a) *Length of the review period.* The MCAN review period specified in section 5(a) of the Act runs for 90 days from the date EPA receives a complete MCAN, or the date EPA determines the MCAN is complete under § 725.33, unless the Agency extends the period under section 5(c) of the Act and § 725.56.

(b) *Determinations.* (1) Within the applicable review period, EPA will make one of the following five determinations on the microorganism, as set forth in section 5(a)(3) of the Act:

(i) The microorganism presents an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(A) of the Act.

(ii) Information available to EPA is insufficient to permit a reasoned evaluation of the health and the environmental effects of the microorganism, as set forth in section 5(a)(3)(B)(i) of the Act.

(iii) In the absence of sufficient information to permit EPA to make such an evaluation, the microorganism may present an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(B)(ii)(I) of the Act.

(iv) The microorganism is or will be produced in substantial quantities, and such substance either enters or may reasonably be anticipated to enter the environment in substantial quantities or there is or may be significant or substantial human exposure to the substance, as set forth in section 5(a)(3)(B)(ii)(II) of the Act.

(v) The microorganism is not likely to present an unreasonable risk of injury to health or the environment, as set forth in section 5(a)(3)(C) of the Act.

(2) EPA will take the following actions required in association with the determination.

(i) For determinations described in paragraph (b)(1)(i) of this section, EPA will issue the submitter an order to prohibit or limit the manufacture, processing, distribution in commerce, use, or disposal of the microorganism, or any combination of such activities, to the extent necessary to protect against an unreasonable risk of injury to health or the environment, as set forth in section 5(f) of the Act, or will issue a proposed rule under section 6(a) of the Act, as set forth in section 5(f) of the Act.

(ii) For determinations described in paragraph (b)(1)(ii), (iii), or (iv), EPA will issue the submitter an order to prohibit or limit the manufacture, processing, distribution in commerce, use, or disposal of the microorganism, or any combination of such activities, to the extent necessary to protect against an unreasonable risk of injury to health or the environment, as set forth in section 5(e) of the Act. EPA may issue an order under section 5(e) of the Act that requires certain testing to be conducted and presented to EPA after the applicable review period has concluded.

(iii) For determinations described in paragraph (b)(1)(v) of this section, EPA will issue the submitter a document describing that determination and will submit for publication in the **Federal Register** a statement of the finding, as set forth in section 5(g) of the Act. Upon EPA's issuance of the determination, the submitter may commence the manufacture of the microorganism without waiting for the end of the applicable review period.

(3) EPA may modify or revoke the prohibitions and limitations in an order issued under paragraph (b)(2)(i) or (ii) of this section after the applicable review period has closed if the submitter submits to EPA additional information, testing, studies, or reports that EPA determines, upon review, demonstrate that such prohibitions or limitations are no longer necessary to protect against an unreasonable risk of injury to health or the environment.

(4) No person submitting a MCAN in response to the requirements of this subpart may manufacture a microorganism subject to this subpart until EPA has issued a determination in accordance with paragraph (b)(1) of this section and taken any action as required under paragraph (b)(2) of this section.

[FR Doc. 2023–10735 Filed 5–25–23; 8:45 am]

BILLING CODE 6560–50–P

### III. What is the Agency Authority for Taking This Action?

Section 6(f)(1) of FIFRA provides that a registrant of a pesticide product may at any time request that any of its pesticide registrations be amended to delete one or more uses. The Act further provides that, before acting on the request, EPA must publish a notice of receipt of any such request in the **Federal Register**. Thereafter, the Administrator may approve such a request.

### IV. Procedures for Withdrawal of Request

Registrants who choose to withdraw a request for use deletion must submit such withdrawal in writing to James A. Hollins, at the address given above, postmarked May 2, 2000.

### V. Provisions for Disposition of Existing Stocks

The Agency has authorized the registrants to sell or distribute product under the previously approved labeling for a period of 18–months after approval of the revision, unless other restrictions have been imposed, as in special review actions.

### List of Subjects

Environmental protection,

Dated: October 4, 1999.

**Richard D. Schmitt,**

*Acting Director, Information Resources & Services Division.*

[FR Doc. 99–28890 Filed 11–3–99; 8:45 am]

**BILLING CODE 6560–50–F**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[FRL–6458–9]**

## Sanders Aviation Superfund Site, Proposed Notice of Administrative Settlement

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice; request for public comment.

**SUMMARY:** In accordance with section 122(i) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended (''CERCLA''), 42 U.S.C. 9622(i), notice is hereby given of a proposed administrative settlement for recovery of past response costs concerning the Sanders Aviation Superfund Site in Tempe, Arizona with the Alfred P. Sanders Trust (''Trust'') and the trustees of the Trust. Pursuant to the Agreement, the Trust will arrange for the sale of the Trust property. Seventy-five percent of the proceeds of the sale will be paid to the Hazardous Substance Superfund and twenty-five percent will be paid to the Trust. This allocation is a close approximation of the costs each party has contributed to cleaning up the site. The settlement includes a covenant not to sue the settling parties pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. 9606, 9607(a). For thirty (30) days following the date of publication of this notice, EPA will receive written comments relating to the settlement. EPA will consider all comments received and may modify or withdraw its consent to the settlement if comments received disclose facts or considerations which indicate that the settlement is inappropriate, improper, or inadequate.

The United States' response to any comments received will be available for public inspection at the U.S. Environmental Protection Agency, 75 Hawthorne Street, San Francisco, CA 94105.

**DATES:** Comments must be submitted on or before December 6, 1999.

**ADDRESSES:** Comments should reference the Sanders Aviation Removal Site, Tempe, Arizona and EPA Docket No. 99–06 and should be addressed to Kara Christenson, Office of Regional Counsel, U.S. Environmental Protection Agency, 75 Hawthorne Street, San Francisco, CA 94105.

**AVAILABILITY:** The proposed settlement is available for public inspection at the U.S. Environmental Protection Agency, 75 Hawthorne Street, San Francisco, CA 94105. A copy of the proposed settlement may be obtained from Kara Christenson, Office of Regional Counsel U.S. Environmental Protection Agency, 75 Hawthorne Street, San Francisco, CA 94105; and at the Tempe Public Library, 3500 South Rural Road, Tempe, Arizona.

**FOR FURTHER INFORMATION CONTACT:** Kara Christenson, Office of Regional Counsel U.S. Environmental Protection Agency, 75 Hawthorne Street, San Francisco, CA 94105, telephone: (415) 744–1330.

Dated: October 25, 1999.

**Michael Feeley,**

*Deputy Director, Superfund Division, Region IX.*

[FR Doc. 99–28885 Filed 11–3–99; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[OPPTS–53171A; FRL–6097–7]**

## Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Policy statement.

**SUMMARY:** EPA groups new chemical substances with similar structural and toxicological properties into categories to facilitate premanufacture assessment and regulation. These groupings enable both Toxic Substances Control Act (TSCA) section 5(a)(1) Premanufacture Notice (PMN) submitters and EPA reviewers to benefit from accumulated data and decisional precedents and have streamlined the process for Agency review of and regulatory follow-up on new chemical substances. Consistent with TSCA section 26(c), which allows EPA action under TSCA with respect to categories of chemical substances or mixtures, EPA is issuing this policy statement regarding a category of persistent, bioaccumulative, and toxic (PBT) new chemical substances.

**DATES:** This document will become effective January 3, 2000.

**FOR FURTHER INFORMATION CONTACT:** For general information contact: Christine Augustyniak, Associate Director, Environmental Assistance Division (7408), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 401 M St., SW., Washington, DC 20460; telephone numbers: 202–554–1404 and TDD: 202–554–0551; e-mail address: TSCA-Hotline@epa.gov.

For technical information contact: Kenneth Moss, Chemical Control Division (7405), Environmental Protection Agency, 401 M St., SW., Washington, DC 20460; telephone number: 202–260–3395; fax number: 202–260–0118; e-mail address: moss.kenneth@epa.gov.

**SUPPLEMENTARY INFORMATION:** On October 5, 1998 (63 FR 53417) (FRL–5571–6), EPA published a **Federal Register** notice soliciting comments on proposed criteria for identifying PBT chemical substances and their supporting scientific rationale. This policy statement responds to comments on the proposed criteria for identifying PBT new chemical substances and their supporting scientific rationale. Please consult the October 5, 1998 (63 FR 53417) **Federal Register** notice for further information on the TSCA new chemicals program. The docket control

number for this document is OPPTS–53171A.

## I. General Information

### *A. Does This Document Apply to Me?*

You may be potentially affected by this document if you are or may in the future be a submitter of a PMN under TSCA. Potentially affected entities may include, but are not limited to the following:

| Category | NAICS Code | SIC Codes | Examples of Potentially Affected Entities |
|---|---|---|---|
| Chemical manufacturers or importers | 325, 32411 | 28, 2911 | Anyone who plans to manufacture or import a new chemical substance (as defined in TSCA Section 3) for a non-exempt commercial purpose is required to provide the EPA with a PMN at least 90 days prior to the activity. Any TSCA chemical substance that is not on the TSCA Inventory is classified as a new chemical. New chemical substances submitted by chemical manufacturers or importers as PMNs and which are determined by EPA to meet the PBT criteria described here may be subject to regulatory controls under TSCA section 5(e). |

This listing is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be affected by this document. Other types of entities not listed above could also be affected. The four-digit Standard Industrial Classification (SIC) codes or the six-digit North American Industrial Classification System (NAICS) codes have been provided to assist you and others in determining whether or not this document might apply to certain entities. To determine whether you or your business is affected by this document, you should carefully examine the applicability provisions in 40 CFR 720.22. If you have any questions regarding the applicability of this document to a particular entity, consult the technical person listed in the ‘‘FOR FURTHER INFORMATION CONTACT’’ section.

### *B. How Can I Get Additional Information, Including Copies of This Document and Other Related Documents?*

1. *Electronically*. You may obtain copies of this document from the EPA Internet Home Page at http://www.epa.gov/. On the Home Page select ‘‘Laws and Regulations’’ and then look up the entry for this document under the ‘‘**Federal Register** - Environmental Documents.’’ You can also go directly to the ‘‘**Federal Register**’’ listings at http://www.epa.gov/fedrgstr/. To access information about the TSCA New Chemicals Program, go directly to the Home Page for the New Chemicals Program, within the Office of Pollution Prevention and Toxics, at http://www.epa.gov/opptintr/newchms/.

2. *In person*. The Agency has established an official record for this document under docket control number OPPTS–53171A. The official record consists of the documents specifically referenced in this document, any public comments received during an applicable comment period, and other information related to this document, including any information claimed as Confidential Business Information (CBI). This official record includes the documents that are physically located in the docket, as well as the documents that are referenced in those documents. The public version of the official record does not include any information claimed as CBI. The public version of the official record, which includes printed, paper versions of any electronic comments submitted during an applicable comment period, is available for inspection in the TSCA Nonconfidential Information Center, Rm. NE B–607, Waterside Mall, 401 M St., SW., Washington, DC. The Center is open from 12 noon to 4 p.m., Monday through Friday, excluding legal holidays. The telephone number of the Center is 202–260–7099.

3. *By phone*. If you need additional information about this document, you may also contact the person identified in the ‘‘FOR FURTHER INFORMATION CONTACT’’ section.

## II. Background

### *A. Overview of the PMN Process*

Under section 5(a) of TSCA, persons must notify EPA at least 90 days before manufacturing or importing a new chemical substance for non-exempt purposes. A new chemical substance, as defined in section 3(9) of TSCA, is any chemical substance (as defined by section 3(2)) that is not included on the Inventory compiled under section 8(b) of TSCA.

Section 5 of TSCA gives EPA 90 days to review a PMN (also referred to as a ‘‘section 5 notice’’). However, the review period can be extended under TSCA section 5(c) for good cause; it may also be suspended voluntarily by the mutual consent of EPA and the PMN submitter. During the review period, EPA may take action under TSCA section 5(e) or (f) to prohibit or limit the production, processing, distribution in commerce, use, and disposal of new chemical substances that raise health or environmental concerns. If EPA has not taken action under TSCA section 5(e) or (f), the PMN submitter may manufacture or import the new chemical substance when the review period expires.

No later than 30 days after the PMN submitter initiates manufacturing or importing, it must provide EPA with a notice of commencement of manufacture or import. Section 8(b) of TSCA provides that, upon receipt of such a notice, EPA must add the substance to the TSCA Inventory. Thereafter, other manufacturers and importers may engage in activities involving the new substance without submitting a PMN, unless the Agency has used its Significant New Use Rule (SNUR) authority under TSCA section 5(a)(2) to designate a use of a chemical substance as a ‘‘significant new use.’’ Section 5(a)(1)(B) of TSCA would then require persons to submit a Significant New Use Notice (SNUN) to EPA at least 90 days before they manufacture, import, or process the substance for the use designated as significant. The required SNUN provides EPA with the opportunity to evaluate the intended use, and if necessary, to prohibit or limit that activity before it occurs.

### *B. History*

Since 1979, EPA has reviewed over 30,000 TSCA section 5 submissions for new chemical substances. During the intervening years, EPA has implemented various initiatives which have enabled the Agency to review a greater number of new chemicals more

efficiently. In 1988, for example, EPA's Office of Toxic Substances (now the Office of Pollution Prevention and Toxics) first used its accumulated experience to group chemical substances with similar physicochemical, structural, and toxicological properties into working categories (USEPA, 1988, see Unit VI.8.). These categories, including the subject one for PBT chemical substances, are developed by EPA based on available data and experience reviewing PMNs on similar substances. Such groupings enable both PMN submitters and EPA reviewers to benefit from the accumulated data and decisional precedents and facilitates the assessment of new chemical substances.

PBT chemical substances possess characteristics of persistence (P) in the environment, accumulation in biological organisms (bioaccumulation (B)), and toxicity (T) that make them priority pollutants and potential risks to humans and ecosystems. Prominent examples of PBT chemical substances include the insecticide DDT and polychlorinated biphenyls (PCBs).

Establishment of a PBT category alerts potential PMN submitters to possible assessment or regulatory issues associated with PBT new chemicals review. It also provides a vehicle by which the Agency may gauge the flow of PBT chemical substances through the TSCA New Chemicals Program and measure the results of its risk screening and risk management activities for PBT new chemical substances; as such, it is a major element in the Agency's overall strategy to further reduce risks from PBT pollutants.

As described in the **Federal Register** notice of October 5, 1998 (63 FR 53417), development of the TSCA new PBT chemicals policy has occurred in coordination with U.S. national, U.S./Canada binational, and international efforts to identify and control the environmental release of persistent organic pollutants (POPs). The proposed TSCA PBT category has been provided to the Criteria Expert Group (CEG) established at the first session of the Intergovernmental Negotiating Committee (INC) for an International Legally Binding Instrument for Implementing International Action on Certain Persistent Organic Pollutants, in accordance with the mandate given by the Governing Council of the United Nations Environment Programme (UNEP) in paragraph 9 of its decision 19/13 C (http://irptc.unep.ch/pops/gcpops_e.html). The CEG is an open-ended technical working group with a mandate to present to the INC proposals for science-based criteria and a procedure for identifying additional POPs as candidates for future international action. The CEG is to incorporate criteria pertaining to persistence, bioaccumulation, toxicity and exposure in different global regions and should take into account the potential for regional and global transport, including dispersion mechanisms for the atmosphere and the hydrosphere, migratory species, and the need to reflect possible influences of marine transport and tropical climates. At its first meeting, October 26–30, 1998 in Bangkok, the CEG recommended that the INC consider developing a provision encouraging countries and regions to include in their new chemicals schemes elements relating to development and introduction of new chemical POPs. The U.S. described its proposed TSCA new chemicals program policy for the category of PBT new chemicals, and the full text of the October 5, 1998 **Federal Register** notice was distributed to all delegations as a Conference Room Paper. The CEG's recommendation was accepted at the second meeting of the INC (January 25–29, 1999 in Nairobi) and the INC will consider it further in its deliberations.

This policy statement is important in our new chemical assessment and TSCA regulatory programs, and represents the first formal statement of national policy regarding new chemical ''persistent organic pollutants.'' Under our domestic program, the policy statement provides guidance criteria for persistence, bioaccumulation, and toxicity for new chemicals and advises the industry about our regulatory approach for chemicals meeting the criteria. Internationally, the **Federal Register** notice of October 5, 1998 (63 FR 53417) alerted the parties involved in negotiation of the POPs Convention to the need for inclusion of a new chemicals provision in the Convention. The issuance of the final policy statement will reaffirm US leadership on this issue and serve as a model for other countries in taking steps to discourage the introduction of POPs as new chemicals and pesticides.

## III. Discussion of Final Policy Statement and Response to Comments

Today's policy statement adopts the criteria and testing strategy of the **Federal Register** notice of October 5, 1998 (63 FR 53417), with minor revisions. The Agency reviewed and considered all comments received on the October 5, 1998 (63 FR 53417) notice. A complete copy of all comments received is available in the public docket for this document. A discussion of the policy statement, including a summary of significant comments and the Agency's response follows:

### *A. Pigments*

*Comment 1-Pigments.* Commenters suggested that EPA not identify pigments as bioaccumulators and were concerned that testing could end up being expensive for pigments, which are persistent by design.

*Response.* EPA assesses PMN chemical substances for PBT attributes on a chemical-by-chemical basis, regardless of whether or not they fall into a chemical use category such as pigments. Not all pigments are the same and a precise definition of the term ''pigment'' is not available. As a result, EPA does not have general ''pigments'' or ''dyes'' assessment categories; there are, however, more specifically described categories of dyes or pigments that have been described by EPA (e.g., acid or amphoteric dyes, dichlorobenzidine-based pigments, and others; see categories document at http://www.epa.gov/opptintr/newchms/chemcat.htm). Moreover, the fact that a substance is ''persistent by design'' by itself is not a sufficient basis for identifying a PBT new chemical substance. Persistence is only one of three criteria used to identify a chemical as PBT. When combined with a potential to bioaccumulate, toxicity concern, and sufficient release to the environment to result in potential risk or significant exposure, pigments may be of concern, whether or not they are persistent by design. If a PMN chemical is persistent by design, and becomes subject to testing requirements by EPA, it would be counterproductive to test initially for persistence, but rather to address the ''B'' and ''T'' criteria instead.

### *B. Ready Biodegradability Testing*

*Comment 2-Ready biodegradability testing.* Commenters suggested that EPA avoid the use of strict pass/fail criteria for ready biodegradability of poorly water-soluble substances.

*Response.* Poor water solubility does not necessarily lead to inability to pass a ready biodegradability test, as amply demonstrated by the fact that many fats, oil, petroleum hydrocarbons, etc. easily pass ready biodegradability tests. While strict OECD (Organization for Economic Co-operation and Development) pass/fail criteria are given in the OPPTS Ready Biodegradability test guidelines (see http://www.oecd.org//ehs/test/degrad.htm and Testing Strategy for PBT Chemical Substances, Unit IV.B. of this document), the Agency recognizes the limitations in applying such criteria

rigidly given that many substances of concern as potential PBTs are unlikely to pass ready biodegradability tests. A variety of critical aspects beyond the pass/fail result will be considered when evaluating potential new chemical PBTs or when testing decisions are made about specific PMN substances. These more critical aspects include those related to chemical structure (e.g., degree of branching) and bioavailability (e.g., uptake of a substance by fish or microorganisms), and their influence on both biodegradation and bioaccumulation.

*C. Bioconcentration Factor and Kow*

*Comment 3-Bioconcentration factor.* Commenters requested clarification on how bioconcentration factor (BCF) will be estimated using calculations based on octanol-water partition coefficient.

*Response.* The octanol-water partition coefficient (Kow) is correlated with the potential for a chemical to bioaccumulate in organisms; the BCF can be predicted from log Kow, via computer programs based on structure activity relationship (SAR). The Agency process for predicting bioaccumulation factors (BAFs) and BCFs, along with literature references, is described in some detail in the proposed rule for lowering of reporting thresholds for certain PBT toxic chemicals subject to reporting under section 313 (Toxic Release Inventory, or TRI) of the Emergency Planning and Community Right-to-Know Act (EPCRA) of 1986 (January 5, 1999 (64 FR 688) (FRL–6032–3), see page 704).

*Comment 4-Log Kow and low solubility chemicals.* Commenters suggested that the October 5, 1998 (63 FR 53417) **Federal Register** notice identified methods for calculating log Kow that are not appropriate for organic pigments, which are insoluble in octanol. They wanted to know how EPA handles low octanol or water soluble chemicals.

*Response.* EPA believes that the methods cited in the October 5, 1998 (63 FR 53417) **Federal Register** notice for experimental measurement of the octanol/water partition coefficient (Kow), or SAR to predict Kow, are appropriate, and the results of either can then be used to predict the Fish BCF. Chemicals are unlikely to be accorded special treatment in the new chemicals review process solely because of low solubility in octanol or water alone. The test guidelines (OPPTS 830.7570 or 830.7560) cited in the October 5, 1998 (63 FR 53417) **Federal Register** notice are viewed as the most appropriate for measuring Kow, and alternatively, the shake-flask method (OPPTS 830.7550 test guideline) or the new ''slow-stir'' method currently under development by the OECD, can be used. However, if the chemical manufacturer still views these methods as inappropriate for a given chemical, it would be advisable to proceed to more definitive testing to address bioaccumulation potential (i.e., the Fish BCF study). This approach can be applied to other testing endpoints as well; for example, based on physicochemical properties of a particular PMN chemical substance, a company might forgo a lower tier acute Daphnia toxicity study in favor of the chronic study because it would yield the best information for the screening level risk assessment.

*Comment 5-Use of octanol solubility data alone.* Commenters wanted to know if octanol or fat solubility data can be used before determining which chemical substances have the potential for bioaccumulation.

*Response.* By itself, solubility in octanol (as a surrogate for fat) is not a good predictor of potential bioaccumulation in fish. Kow is correlated with the potential for a chemical to bioaccumulate in organisms; the bioconcentration factor (BCF) can be predicted from log Kow, via SAR. Kow is a coefficient which serves as a surrogate for the partitioning of chemicals between water and fat, and cannot be accurately estimated via separate determinations of solubility in pure octanol and water (i.e., by calculating the ratio of the pure-solvent solubilities) (Sijm et al., 1999, see Unit VI.1.). The Agency uses and recommends the use of computer models to predict Kow where there are no measured data.

*D. Environmental Half-Life*

*Comment 6-Calculation of half-life.* Commenters wanted to know how half-life is calculated in the review of PBT new chemicals.

*Response.* Multimedia fate models like the Environmental Quality Criteria (EQC) model (Mackay et al., 1996, see Unit VI.2.) require compartmental half-lives for air, water, soil and sediment, which cannot necessarily be interpreted as half-lives for any specific process such as biodegradation. Data on air half-lives for input to models would be either measured or derived from the Atmospheric Oxidation Program (AOP or AOPWIN) or similar methodology. Studies by Boethling et al. (1995, see Unit VI.3.) and Federle et al. (1997, see Unit VI.4.) suggest that half-lives in bulk soil may be assumed for screening purposes to be about the same as for surface water, and that sediment half-lives may be assumed to be 3–4 times longer. EPA's current suggested approach to finding water half-life is to use the Ultimate Survey Model (USM) in the EPI BIOWIN program (Boethling et al., 1994, see Unit VI.5.). Estimation of bulk compartment half-lives from USM model data requires several assumptions, including that (1) biodegradation is the only significant fate process in water, soil, sediment; (2) water and soil half-lives are the same; and (3) sediment is dominated by anaerobic conditions and therefore sediment half-life is four times longer than water half-life.

*E. Computer Models and the Use of Models vs. Actual Data*

*Comment 7-Use of models vs. actual data.* Commenters support the use of the Mackay/EQC model, but stressed the importance of having a process for using actual data in place of the model.

*Response.* This is a reasonable suggestion. The EQC model is based on the fugacity approach and subsequently applied to numerous environmental processes. It uses an ''evaluative environment'' in which environmental parameters such as bulk compartment dimensions and volumes (e.g., total area, volume of soil and sediment, etc.) are standardized, so that overall persistence for chemicals with different properties and rates of transformation may be compared on an equal basis. In general, measured values of toxicity, chemical properties, compartmental transformation half-lives, etc., provided the data are of acceptable quality, are preferred over those that are predicted or estimated via a model or computer program.

*Comment 8-Modeling of air releases.* Commenters noted that the October 5, 1998 (63 FR 53417) **Federal Register** notice considered only biodegradation and aqueous hydrolysis and asked about fate of a chemical upon release to air. They suggested that EPA estimate atmospheric oxidation using AOPWIN.

*Response.* Although the testing strategy for this policy statement focuses on biodegradability, all relevant transport and transformation processes will be considered in evaluating the potential for a PMN substance to behave as a PBT. Transformation processes not mentioned in the **Federal Register** notice but which may be important for specific PMN substances include atmospheric oxidation and photolysis, photolysis in water, and redox transformations (of which there are various types) in water, soil, and sediment. Although EPA believes that for most organic chemicals, biodegradation in water, soil, and sediment will be the most important

transformation process, each suspected PBT chemical substance will be evaluated on its use and disposal patterns.

Clearly the atmosphere is an important environmental medium, and is especially relevant where a substance is emitted directly to the atmosphere or transported there via volatilization or aerosolization. We know by deduction that it is only, or at least chiefly, through the atmosphere that POPs like dioxins and Polychlorinated biphenyls (PCBs) reach remote locations, and it will be an important factor in determining the ultimate fate of many PMN substances as well. It is through multimedia fate models such as EQC that atmospheric fate will be considered in developing an overall prediction of environmental persistence for suspected PBT substances. Where measured data are not available, appropriate estimation methods such as that in the AOPWIN program will be used to generate screening-level estimates of atmospheric half-lives.

*F. Use of ''Weight of Evidence'' and Professional Judgment*

*Comment 9-Laboratory vs. field behavior of chemicals.* Commenters indicated that EPA needs to incorporate any differences between lab and field behavior of chemicals into its analysis of new chemical substances, acknowledge the limitations of screening-level biodegradation tests, and acknowledge the value of using professional judgment when interpreting data from extended (> 60 day) degradation studies.

*Response.* EPA recognizes that laboratory tests at best provide a snapshot of expected environmental behavior, which ideally is studied in the field. But since field testing is nearly always impractical for PMN chemical substances, it is necessary to conduct laboratory tests and to apply scientific judgment in extrapolating from lab to field. EPA similarly acknowledges the limitations of ready biodegradability and other screening tests as indicators of ultimate environmental behavior. Finally, it is well known that even this policy statement's higher tier (Testing Tiers 2 and 3) environmental fate guidelines, despite being designed to provide test conditions closer to those expected in the field, become less reliable when tests are run for longer than the maximum duration specified in the guidelines. EPA will give appropriate weight to these and other complexities in its assessments.

*Comment 10-''Check the box'' vs. ''weight of evidence.''* Commenters noted that the TSCA PMN requirements for PBT chemicals look more like ''check-the-box'' than ''weight of evidence'' and wanted to know how EPA will make professional judgment and use SAR and assessment methods to identify PBT new chemicals.

*Response.* These tools (professional judgment, SAR, computer models, assessment methods, etc.) would be applied to potential PBT chemical substances in the same way they are applied to any other chemical substance in the PMN review process. Using predictive tools (in the absence of test data) and professional judgment, EPA leans towards a ''reasonable worst case'' when there is lack of chemical-specific data. Industry always has the option of assisting and enhancing the Agency's determinations by submitting scientifically valid test data. There are a number of existing documents describing the PMN process and the critical role played by SAR and professional judgment in that process, including the Chemistry Assistance Manual for Premanufacture Notification Submitters (USEPA, 1997, see Unit VI.6.) and parts of the report on the joint U.S./European Union study that evaluated the predictive power of the SAR (USEPA, 1994, see Unit VI.7.). EPA believes that, where no or insufficient actual toxicity data exist upon which to base a decision, toxicity estimates generated by SARs and other predictive techniques may constitute sufficient evidence to be used in human health and environmental hazard and environmental fate assessment as components in certain risk determinations under TSCA (see also the **Federal Register** of December 1, 1993 (58 FR 63507) for a similar statement related to meeting section 313 listing criteria under EPCRA of 1986).

*Comment 11-Implement PBT policy within risk assessment framework.* Commenters suggested that EPA risk management decisions should not be made solely on hazard information; these PBT criteria should be implemented within a risk assessment framework. They indicated that toxicity has been largely overlooked in the PBT scheme and no criteria have been provided for toxicity. Commenters suggested that EPA needs to take into account P and B and T before requiring further testing or identifying a chemical as a ''true'' PBT, and asked whether persistence and log Kow would be sufficient to determine that a PBT PMN chemical substance may pose a significant risk. Commenters also suggest that EPA should except non-toxic and low exposure/release substances from consideration under this category and were concerned that the current proposed criteria do not consider any health and safety benefits of a PBT chemical substance.

*Response.* New chemicals identified as potential PBT chemicals are assessed on a case-by-case basis. Section 5(e) of TSCA authorizes EPA to control commercial activities involving a new chemical substance for which available information is insufficient to permit a reasoned evaluation of potential health and environmental effects if EPA determines either (1) that the manufacture (including import), processing, distribution in commerce, use, or disposal of the substance may present an unreasonable risk of injury to health or the environment (''risk-based'' finding), or (2) that the substance is or will be produced in substantial quantities, and such substance either enters or may reasonably be anticipated to enter the environment in substantial quantities or there is or may be significant or substantial human exposure to the substance (''exposure-based'' finding). The restrictions under TSCA section 5(e) are imposed pending the development of the test data or other information needed to evaluate the new substance's health or environmental effects. EPA draws on information and data submitted with the PMN form, other information available to the Agency, and modeling (e.g., exposure, release, SAR, etc.).

The Agency will consider P and B and T, individually and together, and exposure in making risk-based judgments. Risk, specific to the PMN substance as well as its risk relative to substitutes currently on the market, is predicted as a function of the potential hazard of the substance and the expected exposure. In other instances, as discussed in the October 5, 1998 (63 FR 53417) **Federal Register** notice, during PMN review EPA may determine that a new substance will be produced in substantial quantities and ''may reasonably be anticipated to enter the environment in substantial quantities or there is or may be significant or substantial human exposure to the substance,'' and that the available information is insufficient to determine the effects of the substance. For such exposure-based determinations on suspected PBT new chemicals, EPA will use a case-by-case approach for making findings by applying considerations beyond P and B (i.e., toxicity or physical/chemical properties), and consider P and B aspects as factors which might argue for regulatory action under TSCA section 5(e) at lower levels of production or exposure/release than are described in the general guidelines for the new chemicals program's

exposure-based policy (USEPA, 1988, USEPA, 1989, see Unit VI.8. and 9.). Overall, companies are not being prevented from developing and using new substances that are judged to be potential PBT chemicals, but EPA may require certain controls (e.g., limiting the release of the PMN chemical to the environment) or testing as a result of its assessments.

In order to be so identified as a PBT new chemical based on a risk-based finding, all three criteria must be satisfied. The Agency has adopted a 1 to 3 rating system for each of P, B, and T. If chemical has a low Kow (i.e., ''B1,'' with BCF estimated as less than 1,000), the B1 rating does not support the new chemical's identification as a potential ''PBT chemical.'' For example, some surfactants could be P3B1T3; they are highly persistent in the environment and chronically toxic to organisms, but with low bioaccumulation potential. However, Agency action may still be taken under TSCA on chemicals not meeting all of the PBT criteria, if they otherwise meet the risk or exposure-based elements of TSCA section 5(e). Similarly, calcium would also not be considered a PBT chemical, as it would be ranked P3B3T1; it is persistent in the environment, it bioaccumulates, but it is not considered toxic. Although the Agency does not promote the environmental discharge of more persistent materials, the environmental ''desirability'' of a given chemical often depends on a balance of various factors, including toxicity and ability of the chemical to bioaccumulate. Like the previous surfactant example, the Agency may nonetheless take action on a P3B3T1 chemical (not calcium per se), most likely under its exposure-based authority.

The toxicity rating for a PBT chemical applies to repeated exposures which result in human or environmental toxicity, including, for example, systemic toxicity, mutagenic damage, reproductive toxicity, or developmental toxicity. An example of this is chronic toxicity towards aquatic organisms of organotins from contaminated marine environments, which ultimately resulted in the regulation of use of tributyl tin in marine anti-fouling paints. Repeated exposures result from a PBT chemical after it has been released into the environment, usually via contaminated water, sediments, or food. The classic PBT problems (i.e., PCBs and Dichloro diphenyl trichloroethane (DDT)) have been associated with food chain contamination.

*G. Scientific Justification for PBT Technical Criteria*

*Comment 12-Support for lower threshold criteria for ''P'' and ''B.''* Commenters believed that there is little precedent, scientific justification, evidence or data to support the lower regulatory threshold of bioaccumulation factor of 1,000 and environmental persistence of 2 months. They suggested that EPA needs a rationale for these criteria beyond ''...are characterized by a tendency to accumulate in organisms.''

*Response*. There is no ''bright line'' that clearly identifies a bioaccumulation factor of 1,000 or a half-life of 2 months as the best bioaccumulation or persistence criterion from a scientific perspective. However, it is not accurate to state that there is no precedent or basis for using these values. As outlined in EPA's recent proposal to lower the reporting thresholds for PBT chemicals that are subject to reporting under section 313 of EPCRA (64 FR 688; January 5, 1999), similar values have been proposed by several authorities, including the Ontario, Canada Ministry of Environment and Energy (MOEE) for its Candidate Substances List for Bans or Phaseouts (MOEE, 1992, see Unit VI.10.); the Canadian initiative for Accelerated Reduction/Elimination of Toxics (ARET) (ARET, 1995 and ARET, 1994, see Unit VI.11. and 12.); the International Joint Commission (IJC)'s Great Lakes Water Quality Agreement (GLWQA) (IJC, 1993, see Unit VI.13.); and the United Nations Economic Commission for Europe Convention on Long-Range Transboundary Air Pollution (UNECE-LRTAP), which did adopt 2 months as the persistence criterion of record for water (UNECE-LRTAP, 1998, see Unit VI.14.).

In determining the thresholds for this policy statement, EPA concluded that it would be appropriate to reflect the levels of concern that the various PBT chemicals presented, based on the differing degrees to which the chemicals persist and bioaccumulate. The Agency ultimately chose to adopt a two-tier approach, and to establish two separate thresholds to reflect the chemicals' varying potentials to persist and bioaccumulate, as well as to reflect the Agency's belief that the different levels of regulatory action under TSCA are warranted for the two tiers. As discussed in detail in the preamble to the mentioned EPCRA proposed rule, EPA found that generally the criteria selected by various U.S. and international regulatory bodies for either persistence or bioaccumulation clustered around two values. For persistence in water, soil, and sediment, the criteria were grouped around half-lives of 1 to 2 months and 6 months, and for persistence in air, either 2 or 5 days. Bioaccumulation criteria were grouped around BAF/BCF values of 1,000 and 5,000. The preamble to the EPCRA proposed rule states ''Bearing in mind that one of Congress' articulated purposes for EPCRA section 313 was to provide local communities with relevant information on the release and other waste management activities of chemicals in their community that may present a hazard, EPA determined that the criteria that were most consistent with these purposes were, for persistence, half-lives of 2 months for water, sediment, and soil, and 2 days in air, and for bioaccumulation, bioaccumulation/bioconcentration factor values of 1,000 or greater'' (64 FR 692; January 5, 1999). EPA is making a similar determination for the PBT new chemicals policy under TSCA. The PMN process is one of EPA's cornerstone Pollution Prevention programs and plays a critical gatekeeper role in making sure that all new chemical substances do not present unreasonable risks when they are commercialized. Given this, and the uncertainty which often accompanies Agency review of a PMN chemical substance due to lack of data, the TSCA new chemicals program is and must be conservative by nature, which suggests that a half-life shorter than 6 months and a BCF criterion lower than 5,000—values that were selected solely or primarily to isolate substances already widely acknowledged to be POPs are appropriate for regulatory scrutiny of new chemicals under TSCA. Note that the CEG, at the October 26–30, 1998 Bangkok meeting described in Unit II.B. of this document, developed indicative numerical values as bracketed criteria text which included persistence of 2 vs. 6 months in water and log Kow of 4 vs. 5 (equivalent to a BCF of approximately 1,000 vs. 5,000, respectively).

A series of PMNs submitted to EPA in 1990 (Zeeman et al., 1999, see Unit VI.15.) illustrates (1) why EPA believes that the persistence criterion for bioaccumulating substances in soil, water, or sediment should be set substantially lower than 6 months; and (2) that concern for potential exposures to persistent and bioaccumulative toxics must extend beyond the UNEP's 12 widely acknowledged POPs. The substances in question were alkylated diphenyls, for which EPA expected discharge to receiving streams and rivers. The submitter supplied data on use and disposal, aquatic toxicity, and

biodegradability. The submitted environmental fate data and EPA estimates of biodegradability based on structural analogs suggested that half-lives in water would be well below 6 months, but not necessarily lower than 2 months. As a result of concerns expressed by EPA, use was limited to sites where resulting water concentrations could be limited to 1 microgram per liter or less; concomitantly, the submitter was also informed of EPA's belief that a potential for long-term risk existed, but that EPA could not quantify this risk since assessments typically evaluated releases over a period of only 1 year. In 1998, results of monitoring revealed that the PMN substances had been found in fish fillets and sediment samples from the receiving stream. If, for these 1990 PMNs, EPA were to have had in place the 2 month persistence criterion described in today's policy statement, further scrutiny under the new chemicals program would have been warranted, and beyond simply informing the PMN submitter of the potential for long-term risk, the Agency would likely have required further testing to obtain an experimental value for environmental persistence of the chemicals. This in turn would have given the Agency a better picture of the behavior of the chemicals in the environment and the environmental half-life relative to the 2 month value.

*Comment 13-Deny commercialization to lower threshold PBT chemicals.* Some commenters supported exercising the ''Precautionary Principle'' by not allowing commercialization under a TSCA 5(e) consent order or SNUR pending testing of the PMN chemicals which meet the P=2 month and BCF=1,000 criteria. They suggested that these chemicals should be banned instead, pending the necessary testing.

*Response.* Whereas a half-life of 2 months and BCF of 1,000 can be justified as lower-tier cutoffs in a deliberately conservative TSCA new chemicals program that is designed to prevent commercialization of potentially risky substances, it would not be appropriate to automatically trigger a ''ban pending testing'' at these cutoffs given the uncertainties about substance properties, release, and environmental behavior that normally characterize PMN review. The Agency believes that the available predictive tools and current knowledge of POPs lend support for this two-phased approach to screening of PBT chemicals and collection of information ''sufficient to permit a reasoned evaluation of potential health and environmental effects'' if EPA makes the requisite risk- or exposure-based findings under TSCA section 5(e).

*Comment 14-Relationship of P, B, and T criteria.* Commenters suggested that the October 5, 1998 (63 FR 53417) notice is inaccurate when it states that 2 months is adequate for detecting many long-term toxic effects as well as any tendency for a substance to bioaccumulate in aquatic organisms. Commenters pointed out that the persistence criterion is not related to detection of long-term toxicity.

*Response.* The statement in question was intended simply to note that the 2 months half-life in water persistence criterion closely tracks the duration of long-term environmental toxicity or bioaccumulation tests. If a new chemical substance is predicted to or measurably demonstrates chronic toxicity, potential to bioaccumulate, and environmental persistence over that same time period (2 months), it would meet the minimum TSCA PBT criteria. It is true that, in general, half-life cutoffs for identifying POPs warranting international action (e.g., in programs like UNECE-LRTAP and UNEP Global Negotiations on POPs) have not been selected based on the duration of toxicity or bioaccumulation tests. There are no cutoffs or ''fence lines'' for environmental persistence criteria that emerge as immutable quantities solely from scientific analysis; the choice of screening criteria is a policy decision guided by the anticipated scope of a negotiation or regulatory activity. In the case of the PMN program, 2 months represents a reasonable screening level value for ''persistence'' which is more than the 1-month period in a ready biodegradation study and less than the 6 month value widely agreed to internationally (U.S.-Canada binational agreement to control the discharge or release of POPs in the Great Lakes Basin, UNECE-LRTAP, North American Free Trade Agreement Commission for Environmental Cooperation (NAFTA-CEC), etc.) as reflecting the persistence of known POPs chemicals (e.g., DDT, hexachlorobenzene). As mentioned in the previous response, there is international support, through the CEG, for persistence values of 2 or 6 months in water.

*Comment 15-Relationship of P and B.* Commenters suggested that the October 5, 1998 (63 FR 53417) notice's statement, ''Generally, persistent bioaccumulators are chemical substances that partition to water, sediment or soil and are not removed at rates adequate to prevent their bioaccumulation in aquatic or terrestrial species,'' should be revised to reflect that persistence alone is not sufficient to cause a substance to bioaccumulate.

*Response.* EPA did not intend that the sentence be read to mean that persistence alone is sufficient to result in bioaccumulation. The point that was intended to be conveyed was that a certain level of persistence is a necessary condition for bioaccumulation to occur. There are other conditions that affect bioaccumulation, such as bioavailability and the metabolic transformation rate in the target species. These and other factors will be evaluated by EPA in the determination of the PBT concern level for PMN chemical substances.

### *H. Relationship of TSCA PBT Policy to Other Agency and International PBT Initiatives*

*Comment 16-Finalize overall Agency multimedia strategy first.* Commenters suggested that the PBT classification criteria being proposed for TSCA section 5(e) may have broader application, e.g., international or other Agency PBT initiatives, and may be used to establish precedent in other programs. In addition to the TSCA October 5, 1998 (63 FR 53417) **Federal Register** notice, there have been three other notices published in **Federal Register** dealing with (1) the promotion of voluntary waste minimization efforts to reduce the generation of those PBT chemicals which are found in hazardous waste regulated under the Resource Conservation and Recovery Act (RCRA) (63 FR 60332; November 9, 1998 (FRL–6186–7)), (2) the Agency draft Multimedia PBT Strategy (63 FR 63926; November 17, 1998 (FRL–6045–2)), and (3) the lowering of reporting thresholds for certain PBT toxic chemicals subject to reporting under section 313 (Toxic Release Inventory, or TRI) of EPCRA of 1986 (64 FR 688; January 5, 1999). These commenters stated that the TSCA notice is premature, occurring before adoption of the overall Agency strategy, and is inconsistent with other initiatives, domestic and international, which have lists of chemicals and more selective criteria (i.e., specific to environmental media, fate and transformation processes). Commenters recommended that EPA finalize the Agency strategy first, before proceeding with the TSCA, RCRA, and TRI actions, and that there should be coordination among them all with uniform PBT criteria as part of the Agency strategy.

*Response.* The PBT Multimedia Strategy formalizes an Agency process for integration of program activities involving these types of substances. While the strategy intends to coordinate Agency PBT-related activities under its

framework, the strategy does not establish rigid criteria with respect to PBTs. Program offices must operate within the parameters of their legislative mandates and established regulatory and policy frameworks. For some programs such as the Toxics Release Inventory, the TSCA New Chemicals Program and the RCRA National Waste Minimization Plan, actions involving PBTs are a historical reality and their experience has, in fact, largely shaped the strategy. Therefore, EPA does not intend to halt all ongoing work involving PBTs until the strategy is ''finalized.'' With respect to the PMN process, it is important to understand and acknowledge its fundamental purpose, which is to allow EPA to evaluate the hazards, exposures, and risks of new chemicals, and the opportunity to protect against unreasonable risks, if any. The structure of that process and the tools used to implement it flow logically from its statutory purpose and suggest that the category approach outlined in this policy statement is the most appropriate means of addressing potential concerns for substances possessing PBT characteristics. It is EPA's intention that the strategy be a living document. Therefore, the strategy will be updated based upon public comment; it will not be ''finalized'' in the more traditional sense of a rulemaking. EPA does agree that consistency is a laudable goal where the criteria are meant to be used for similar purposes and is seriously considering comments within the context of the strategy regarding establishment of consistent criteria for priority PBTs.

*Comment 17-Carefully communicate lower thresholds*. Commenters suggested that EPA should use only the environmental persistence of 6 months/ BCF of 5,000 screening levels for consistency among EPA and U.S./ international programs and should carefully communicate proposed lower criteria internationally.

*Response*. As discussed in the response to Comment 12, EPA believes that a lower tier of 2 month/BCF of 1,000 is appropriate for risk screening activities under TSCA. Communication is occurring in the international forum. Unit II.B. of this document discusses the CEG for POPs, established under UNEP mandate. At its first meeting, on October 30, 1998 in Bangkok, the CEG recommended that the INC consider developing a provision encouraging countries and regions to include in their new chemicals schemes elements relating to development and introduction of new chemical POPs. The U.S. described its proposed TSCA new chemicals program policy for the category of PBT new chemicals, and the full text of the October 5, 1998 (63 FR 53417) **Federal Register** notice was distributed to all delegations as a Conference Room Paper. The CEG's recommendation was accepted at the second meeting of the INC (January 25–29, 1999 in Nairobi) and the INC will consider it further in its deliberations.

*I. Testing Strategy*

*Comment 18-Toxicity testing*. Commenters asked whether toxicity was considered at each testing tier or only in tier 3. It was not clear to them when toxicity testing would be requested, nor what results will be considered acceptable by the Agency.

*Response*. Each of P and B and T are weighed in the Agency's assessment. The testing strategy outlined in this policy statement is intended to build the case, starting with testing to establish persistence and bioaccumulation, and then determining toxicity and confirming a chemical's status as a PBT chemical in tier 3. Once a chemical becomes distributed in the environment at low concentrations, the combination of persistence and bioconcentration in organisms can result in residues high enough to approach a toxic dose. The first two tiers focus on P and B because of the critical role these aspects play in PBT determinations and because of their relatively lower cost to determine P and B. Thus, chronic toxicity testing, which is expected to be the most expensive testing, is reserved until tier 3 where it serves to establish PBT status. Although the early tier P and B testing may either obviate the need for toxicity testing or result in more directed and cost-effective toxicity testing, the need for toxicity testing is considered in each testing tier and will be obtained in lower tiers where needed on a case-specific basis. As with all new chemicals reviewed by the Agency under TSCA, the potential toxicity of the chemical is determined from test data, if any, or by analogy to structurally similar chemicals. If a company knows or suspects prior to testing that their chemical is likely to be persistent and bioaccumulative, consideration should be given to conducting chronic toxicity testing in the first tier. For any suspected PBT chemicals for which a risk finding has not been made, but which meet production, release, and exposure thresholds under the Agency's exposure-based policy (USEPA, 1988, USEPA, 1989, see Unit VI.8. and 9.), the standard screening level battery of testing (or an appropriate subset thereof) currently utilized for exposure-based cases in the new chemicals program could be required in addition to PBT testing.

*Comment 19-Equivalent tests*. Commenters suggested that all tests referenced in the testing strategy should also state ''or an equivalent test.''

*Response*. EPA realizes that often there are a number of different but acceptable means to providing testing information. However, EPA's acceptance of a guideline not specified in this policy statement and/or use of data generated under such guidelines depends on multiple factors including the specifics of the test substance, purpose of the testing, familiarity with specific procedures and equipment, validation of the method, etc. Typical TSCA 5(e) consent orders require that testing performed pursuant to the order must be conducted according to TSCA Good Laboratory Practice Standards at 40 CFR part 792 and using methodologies generally accepted at the time the study is initiated. Before starting to conduct any such study, the PMN submitter must obtain approval of test protocols from EPA by submitting written protocols. Published test guidelines specified in the Test Strategy section (see Unit IV. B. of this document) provide general guidance for development of test protocols, but are not themselves acceptable protocols.

*J. Applicability of PBT Criteria to Metals*

*Comment 20-PBT criteria are not appropriate for metals*. Commenters suggested that the application of Persistence and Bioaccumulation criteria appropriate for organic chemicals does not make sense for metals and metal compounds. They also suggested that EPA needs criteria to identify potential problems generated by organometals.

*Response*. The approach and the criteria are sufficiently flexible to apply to organic chemicals, inorganic metals and organometallics. It is important to distinguish between criteria for identifying potential PBTs, on the one hand, and on the other: (1) the means of generating information on the P, B, and T endpoints for comparison to the criteria, and (2) the applicability of existing test guidelines for generating such information experimentally.

EPA understands that metals are intrinsically not degradable in the sense of ultimate degradation of organics (although they may undergo biologically as well as chemically induced changes in, e.g., oxidation state), and therefore are persistent by definition, but nevertheless may not be bioaccumulative. It is widely accepted that elemental metals are persistent by definition, since they may take different

forms that can be interconverted, but the elemental metal itself cannot be destroyed. All elemental metals therefore meet the 6 month half-life criterion. Given this, it is not correct that EPA's proposed persistence criteria cannot be applied to metals. It may be more accurate to state that the persistence criteria are not themselves very helpful in screening or assessing metals and metal compounds with respect to the potential for risk, whether from direct exposure or through bioaccumulation. Relative to applicability of test guidelines, the same level of judgment will be brought to bear such that, for example, EPA would not require ready biodegradability testing for a metal or metal salt. (EPA may, however, request such testing for organometallics, which, depending on chemical structure, could still show significant degradation in such tests.)

EPA understands that bioavailability is important in determining the potential for risk, and notes that the same generalization applies to any substance whether metallic or not. Metals and organometallic compounds are no different from other organic chemicals with respect to the applicability of the proposed criteria for identifying persistent, bioaccumulative, and toxic substances, except that Kow determination may not be relevant for metals (although the fish BCF study is relevant). Similarly, it is not necessary to develop different criteria or assessment strategies for pigments (see first comments/responses in this policy statement) or any other specific classes of organics. What is necessary is to consider what is known about the behavior of substances like metals during the TSCA PMN review process, both in the assessment of whether a given chemical substance meets the established criteria and in subsequent testing decisions. For any untested PMN chemical substance, if there are no close analogs with data and no clear evidence that available estimation methods are unreliable for this or closely related substances, then the estimation methods can be assumed to apply and the resulting data compared to PBT criteria. Put another way, a metal or organometallic (or, similarly, a pigment) that is judged sufficiently persistent and meets the criteria for bioaccumulation potential and toxicity is of concern for ''PBTness'' regardless of theoretical arguments or generalizations.

The key is how persistence and bioaccumulation potential are determined in the PMN process, and by implication, how bioavailability is determined. This policy statement leaves unspecified how EPA intends to do this, but the Agency will consider all available and relevant data, and will use its professional judgment in considering issues like bioavailability of metals. Using lead as an example, many processes commonly observed in the environment can result in the presence of bioavailable (ionic) lead where it can be bioaccumulated by organisms. These processes may occur in soil and aquatic environments with low pH and low levels of organic matter. Under these conditions, the solubility of lead is enhanced and, in the absence of sorbing surfaces and colloids, lead ion can remain in solution for a sufficient period to be taken up by biota. Lead sorption to soil organic matter has been shown to be pH dependent. Decreasing pH can lead to increasing concentrations of lead in soil and water. Microbial transformations in soil, water, and sediment are also important in determining the overall fate of metals and metal compounds, and therefore the potential for formation of bioavailable forms. Metals are generally taken into cells by nutrient metal transport systems, and these are not sufficiently specific to completely exclude nonessential metals, some of which may be toxic and/or bioaccumulative. In this situation, nutrient metals can be displaced from their binding sites by undesirable, toxic metals, which then gain access to the cell interior with concomitant exclusion of the essential metal (Stumm and Morgan, 1996 see Unit VI.16.). Toxic metal ions are then free to react with critical enzymes or otherwise disrupt cellular functions if they reach certain levels. EPA concludes that under many environmental conditions, metals and metal compounds may be available to express toxicity and to bioaccumulate, and that these effects are not necessarily limited to metals that are not essential nutrients. It is appropriate, therefore, to be concerned about the potential for risk from these effects. It is the policy of the TSCA New Chemicals Program that if the metal in a metal compound cannot become available as a result of biotic or abiotic processes then the metal will not be available to express its toxicity, and by extension, to bioaccumulate. If the intact metal compound is not toxic and the metal is not available from the metal compound, then such a chemical would not be a strong candidate for regulation under TSCA section 5(e).

## IV. Final TSCA New Chemicals Program Policy for PBT Chemical Substances

### *A. Evaluation Criteria and Process for New PBT Chemical Substances*

EPA is adopting the following specific identification criteria and associated process for use in evaluating new chemical substances.

NEW CHEMICALS PROGRAM PBT CATEGORY CRITERIA AND PROCESS

| | TSCA Section 5(e) Action | |
|---|---|---|
| | 5(e) Order Pending Testing/Significant New Use Rule (SNUR)[1] | 5(e) Ban Pending Testing[2] |
| Persistence (transformation half-life). | > 2 months | > 6 months |
| Bioaccumulation (Fish BCF or BAF)[3]. | ≥ 1,000 | ≥ 5,000 |
| Toxicity | Develop toxicity data where necessary[4]. | Develop toxicity data where necessary[4] |

[1]Exposure/release controls included in order; testing required.

[2]Deny commercialization; testing results may justify removing chemical from ''high risk concern''.

[3]Chemicals must also meet criteria for MW (< 1000) and cross-sectional diameter (< 20Å, or < 20 × $10^{-8}$ cm).

[4]Based upon various factors, including concerns for persistence, bioaccumulation, other physical/chemical factors, and toxicity based on existing data.

Chemical substances suspected as persistent bioaccumulators under the criteria listed in the table in Unit IV.A. of this document may need to undergo testing on ''P'' and ''B'' endpoints which, if confirmed, would be followed by appropriate toxicity testing to identify ''PBT chemical substances.'' Control action under TSCA section 5(e) may be needed in varying degrees, based upon the level of risk concern. Agency control actions taken under TSCA section 5(e) for chemical substances meeting these criteria would be based upon the level of certainty for the PBT properties of a PMN substance (e.g., measured vs. estimated values), the magnitude of Agency concerns, and conditions of expected use and release of the chemical. For example, new chemical substances meeting the PBT criteria listed under ''5(e) Order Pending Testing/Significant New Use Rule (SNUR)'' could be addressed via a negotiated consent agreement under

which necessary testing is ''triggered'' by specific production limits. While the PMN submitter would be allowed to commercialize the substance, certain controls could be stipulated, including annual TRI-type reporting on environmental releases of the PMN substance and specific limits on exposures, releases, or uses. The ''ban pending testing'' criteria are equivalent to those that have been used internationally to identify POPs. For the chemical substances meeting these criteria, the concern level is higher and the Agency would look carefully at any and all environmental releases. Because of the increased concern, more stringent control action would be a likely outcome, up to a ban on commercial production until data are submitted which allow the Agency to determine that the level of risk can be appropriately addressed by less restrictive measures. The control actions described in the table in Unit IV.A. of this document represent just one body of possible decisions and should not be considered as exclusive of other risk management options.

*B. Testing Strategy for PBT Chemical Substances*

Where EPA is unable to adequately determine the potential for bioaccumulation, persistence in the environment, and toxicity which may result from exposure of humans and environmental organisms to a possible PBT chemical substance, the Agency may conclude, pursuant to sections 5(e)(1)(A)(i) and 5(e)(1)(A)(ii)(I) and (II) of TSCA, that the information available to the Agency is insufficient to permit a reasoned evaluation of the human health and environmental effects of that PMN substance, that the manufacturing, processing, distribution in commerce, use, or disposal of the substance may present an unreasonable risk of injury to human health or the environment, and/or that the PMN substance will be produced in substantial quantities and that there may be significant or substantial human exposure to the substance or the PMN substance may reasonably be anticipated to enter the environment in substantial quantities. Accordingly, the Agency may find it appropriate to prohibit or otherwise limit the manufacture, import, processing, distribution in commerce, use, or disposal of the PMN substance in the United States pending the development of information necessary for a reasoned evaluation of these effects. The following testing strategy describes test data which EPA believes are needed to evaluate the persistence, bioaccumulation, and toxicity of a PBT chemical substance for which EPA has made the above described risk and/or exposure-based findings under section 5(e)(1)(A)(i) and (ii) of TSCA. The tests are tiered; depending upon the circumstances, such as magnitude of environmental releases, results of testing, or SAR, testing could begin above Tier 1 or additional, higher levels of testing may be required. As discussed in the response to Comment 19 in Unit III.I. of this document, testing must be conducted according to TSCA Good Laboratory Practice Standards at 40 CFR part 792 and using methodologies generally accepted at the time the study is initiated. Before starting to conduct any such study under the terms of a Consent Order under TSCA section 5(e), the PMN submitter must obtain approval of test protocols from EPA by submitting written protocols. Published test guidelines specified in Unit IV.B. of this document provide general guidance for development of test protocols, but are not themselves acceptable protocols.

*Tier 1*. If, based upon available test data, SAR, and professional judgment, the Agency identifies a new chemical substance as a possible PBT chemical substance, Log Kow should be determined experimentally, using either the liquid chromatography (OPPTS 830.7570 test guideline) or generator column (OPPTS 830.7560 test guideline) method. Hydrolysis in water (OPPTS 835.2110 test guideline) should be determined if, based upon SAR, susceptibility to hydrolysis is suspected. Ready biodegradability should be determined according to either one of the following test guidelines:

1. Ready biodegradability (OPPTS 835.3110 test guideline) 6 methods (choose one): DOC Die-Away, $CO_2$ Evolution, Modified MITI (I), Closed Bottle, Modified OECD Screening, Manometric Respirometry.

2. Sealed-vessel $CO_2$ production test (OPPTS 835.3120 test guideline).

If the measured log Kow is < 4.2 (equivalent to an estimated BCF of 1,000) or if the test chemical passes (pass criteria are described in the test guidelines) the ready biodegradability test (i.e., not persistent in the environment), no further PBT-related testing is required. If the measured log Kow is greater than or equal to 4.2, and the chemical does not pass the ready biodegradability test, no further testing will normally be deemed necessary in tier 1; the Agency would likely require tier 2 testing. If hydrolysis testing is conducted and results in a half-life of < 60 days, further testing may not be needed, but the need for testing must be determined after consideration of factors specific to the case, such as physical/chemical properties, persistence and bioaccumulative qualities of hydrolysis products, and the nature of the expected releases.

*Tier 2*. Biodegradability should be determined according to the Shake-flask die-away test (OPPTS 835.3170 test guideline). This test is based on the principle of aerobic incubation of the test chemical in natural water with and without suspended sediment, requires a chemical-specific analytical method, and allows for the development of a first-order rate constant and half-life. It provides information on persistence that is relevant to the natural environment and is intermediate in cost between ready biodegradability tests (tier 1) and sediment/water microcosm biodegradation test (tier 3).

Bioaccumulation potential should be determined by experimental measurement of the bioconcentration factor (BCF), using the Fish bioconcentration test (OPPTS 850.1730 test guideline (public draft)). Measured BCF should be based on 100 percent active ingredient and measured concentration(s).

If the measured biodegradation half-life is > 60 days and measured BCF is > 1,000, tier 3 testing will normally be required. If only one condition is met, releases and exposure are further considered to determine if additional testing is required.

*Tier 3*. Toxicity/advanced environmental fate testing. Human health hazards should be determined in the combined repeated dose oral toxicity with the reproductive/developmental toxicity screening test (OECD No. 422 test guideline) in rats. Other health testing will be considered where appropriate.

Environmental fate testing should be conducted according to the Sediment/water microcosm biodegradation test (OPPTS 835.3180 test guideline). The principle of this method is the determination of the test chemical's fate, including transport and transformation, in core chambers containing intact benthic sediment and overlying site water. The method permits more accurate and reliable extrapolation to natural aquatic environments than is possible with lower tier test methods.

Chronic toxicity to fish (rainbow trout) and daphnids should be determined according to 40 CFR 797.1600 (same as OPPTS test guideline 850.1400 (public draft)) and 40 CFR 797.1330 (same as OPPTS test guideline 850.1300 (public draft)), respectively. Additional testing to evaluate other biota (e.g., avian, sediment dwelling organisms) or other effects (e.g.,

Case: 25-158, 10/17/2025, DktEntry: 27.1, Page 270 of 270



endocrine disrupting potential) will be considered where appropriate.

### V. Intended Legal Affect of this Policy Statement

The policy discussed in this document provides general guidance on the Agency's use of a category grouping for PBT new chemical substances to facilitate the PMN assessment process for PMN submitters and EPA reviewers. EPA uses groupings of new chemical substances with similar structural and toxicological properties to allow PMN submitters and EPA reviewers to benefit from accumulated data and decisional precedents, as well as streamlined procedural requirements related to the review of and follow-up for new chemical substances.

As guidance, the policy presented in this document is not binding on either EPA or any outside parties, and this document is not intended, nor can it be relied upon, to create any rights enforceable by any party in litigation with the United States. Although this guidance provides a starting point for assessing PBT new chemical substances, EPA will depart from its policy where the facts or circumstances warrant. In such cases, EPA will explain why a different course was taken. Similarly, outside parties remain free to assert that this policy is not appropriate for a specific PMN or that the circumstances surrounding a specific PMN demonstrate that this policy should not be applied. Although the Agency has provided an opportunity for public comment on the guidance provided in this policy statement and is likely to request additional feedback if changes are necessary at some point in the future, the Agency may revise, clarify, or update the text of this guidance without public notice.

### VI. References

The OPPTS harmonized test guidelines referenced in this document are available on EPA's World Wide Web site (http://www.epa.gov/OPPTS_Harmonized/).

1. Sijm, D.T.H.M., Schuurmann, G., de Vries, P.J., Opperhuizen, A. Aqueous Solubility, Octanol Solubility, and Octanol/Water Partition Coefficient of Nine Hydrophobic Dyes. *Environ. Toxicol. and Chem*. 18:1109–1117.

2. Mackay, D., Di Guardo, A., Paterson, S., Cowan, C.E. 1996. Evaluating the environmental fate of a variety of types of chemicals using the EQC model. *Environ. Toxicol. Chem*. 15:1627–1637.

3. Boethling RS, PH Howard, JA Beauman and ME Larosche. 1995. Factors for intermedia extrapolation in biodegradability assessment. *Chemosphere* 30: 741–752.

4. Federle TW, SD Gasior and BA Nuck. 1997. Extrapolating mineralization rates from the ready CO2 screening test to activated sludge, river water, and soil. *Environ. Toxicol. Chem*. 16: 127–134.

5. Boethling RS, Howard PH, Meylan W, Stiteler W, Beauman J, Tirado N. 1994. Group contribution method for predicting probability and rate of aerobic biodegradation. *Environ. Sci. Technol*. 28: 459–465.

6. USEPA. March, 1997. Chemistry Assistance Manual for Premanufacture Notification Submitters. EPA 744–R–97–003. Also available as Premanufacture Notification: Chemistry Assistance for Submitters, by Steven C. DeVito and Carol A. Farris (ISBN: 0–471–19151–5) through the publisher, John Wiley and Sons, at 1–800–225–5945 or the TSCA Hot Line, at 202–554–1404.

7. USEPA. March, 1994. U.S. EPA/EC Joint Project on the Evaluation of (Quantitative) Structure Activity Relationships. EPA 743–R–94–001.

8. USEPA. 1988. Letter from Charles L. Elkins to Geraldine V. Cox (Chemical Manufacturers Association). Office of Toxic Substances, USEPA (September 22, 1988).

9. USEPA. 1989. Letter from Charles L. Elkins to Geraldine V. Cox (Chemical Manufacturers Association). Office of Toxic Substances, USEPA (August 31, 1989).

10. Ministry of Environment and Energy for Ontario (MOEE). 1992. Candidate substances list for bans or phase-outs. Report perpared by the Hazardous Contaminants Branch and the Water Resources Branch, MOEE. Ontario, Canada, ISBN 0–7729–9764–0.

11. Accelerated Reduction/Elimination of Toxics (ARET) Secretariat. 1995. Environment leaders 1. Voluntary commitments to action on toxics through ARET. March 95.

12. Accelerated Reduction/Elimination of Toxics (ARET) Secretariat. 1994. The ARET substance selection process and guidelines. January 94.

13. International Joint Commission (IJC). 1993. A strategy for the virtual elimination of persistent toxic substances. Vol. 1, report of the Virtual Elimination Task Force to the IJC. Windsor, Ontario, Canada, 72 pp.

14. United Nations Economic Commission for Europe, Convention on Long-Range Transboundary Air Pollution (UNECE-LRTAP). 1998. Draft composite negotiating text for a protocol on persistent organic pollutants. UNECE, EB.AIR/1998/2, 31 March 1998.

15. Zeeman, M., D Rodier, and JV Nabholz. 1999. Chapter 2. Ecological Risks of a New Industrial Chemical. Under TSCA. In Ecological Risk Assessment in the Federal Government (Executive Office of the President, National Science and Technology Council, Committee on Environment and Natural Resources, Ed.). CENR/5–99/001, May, 1999, pp 2–1 to 2–30.

16. Stumm, W. and JJ Morgan. 1996. *Aquatic Chemistry*, 3rd ed. New York: Wiley.

### List of Subjects

Environmental protection, Chemical substances, Hazardous substances, Reporting and recordkeeping requirements.

Dated: October 22, 1999.

**Susan H. Wayland,**

*Deputy Assistant Administrator for Prevention, Pesticides and Toxic Substances.*

[FR Doc. 99–28888 Filed 11–3–99; 8:45 am]

BILLING CODE 6560–50–F

---

## ENVIRONMENTAL PROTECTION AGENCY

**[FRL–6469–6]**

## Notice of Proposed Assessment of Clean Water Act Class II Administrative Penalty and Opportunity To Comment

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** EPA is providing notice of a proposed administrative penalty for alleged violations of the Clean Water Act. EPA is also providing notice of opportunity to comment on the proposed penalty.

EPA is authorized under section 311(b)(6) of the Clean Water Act, 33 U.S.C. 1321(b)(6), to assess a civil penalty after providing the person subject to the penalty notice of the proposed penalty and the opportunity for a hearing, and after providing interested persons public notice of the proposed penalty and a reasonable opportunity to comment on its issuance. Under section 311(b)(6), any owner, operator, or person in charge of a vessel, onshore facility, or offshore facility in violation of the regulations issued under section 311(j) of the Clean Water Act, 33 U.S.C. 1321(j), (''Oil Pollution Prevention Regulations''—40 CFR part 112) may be assessed a civil penalty of up to $137,500 by EPA in a ''Class II'' administrative penalty proceeding. Class II proceedings under section 311(b)(6) of the Clean Water Act are