**No. 25-158**
**Consolidated with Nos. 25-572 and 25-573**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

ALASKA COMMUNITY ACTION ON TOXICS, et al.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
and LEE ZELDIN, in his official capacity as
Administrator of the United States Environmental Protection Agency,

*Respondents*.

---

On Petitions for Review of a Final Agency Action of the
United States Environmental Protection Agency
89 Fed. Reg. 102,773 (December 18, 2024)

---

**PETITIONERS' REPLY BRIEF**

---

April 22, 2026

Tosh Sagar
Earthjustice
1250 I Street NW
4th Floor
Washington, DC 20005
(202) 793-2075
tsagar@earthjustice.org

Michael Youhana
Earthjustice
48 Wall St., 15th Floor
New York, NY 10005
(212) 284-8033
myouhana@earthjustice.org

*Counsel for Alaska Community Action on Toxics*

Samantha Liskow
Environmental Defense Fund
257 Park Ave S
New York, NY 10010
(212) 616-1247
sliskow@edf.org
*Counsel for Environmental Defense Fund*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..............................................................................iv

GLOSSARY OF ACORNYMS AND ABBREVIAITONS.................................vii

INTRODUCTION ............................................................................................1

ARGUMENT ....................................................................................................2

    I.   Case-by-Case Adjudication of Each Application Is Necessary, but Not Sufficient. ...........................................................................................4

        A.   EPA reads the "by rule" requirement out of TSCA.............................5

        B.   Petitioners' reading is the best reading.................................................6

        C.   Petitioners' reading is simply EPA's own long-standing reading..........9

    II.  The Terms of the LVE and LoREX Exemption Regulations Do Not Sufficiently Protect People or the Environment from New PBTs, Violating TSCA.........................................................................................14

        A.   EPA's brief confirms that the terms of the Exemption regulations are deficient. ..........................................................................................14

        B.   EPA relies on regulatory provisions that do not ensure safety *ex ante* but simply permit EPA to reject chemicals case-by-case....................17

    III. EPA's Reliance on Pre-2016 Provisions and Practices Cannot Save its Unlawful Exemptions. ..............................................................................19

    IV. EPA Cannot Rely on its Purported Discretion to Keep its Unlawful Exemptions on the Books. ........................................................................23

    V.  Industry Amicus and EPA Confirm the Importance of Closing the Loophole of Fast-Tracked Review for New PBTs....................................25

        A.   The chemical industry supports the Fast-Track Provision because it is a loophole to avoid the Standard Review Process. ............................25

        B.   EPA's brief confirms that zero-release-zero-exposure PBTs are a fiction.............................................................................................27

    VI. The Court Should Remedy Petitioners' Injuries by Partially Vacating the Fast-Track Provision. ...............................................................................28

        A.   Courts, including this Court, do strike particular words from regulations. .....................................................................................29

        B.   Partial vacatur is the appropriate remedy here.................................33

iii

## TABLE OF AUTHORITIES

**CASES**

**Page number(s)**

*Andreiu v. Ashcroft*,
253 F.3d 477 (9th Cir. 2001) ................................................................8

*Ass'n of Battery Recyclers, Inc. v. EPA*,
208 F.3d 1047 (D.C. Cir. 2000) ..........................................................18

*EPA v. Calumet Shreveport Ref.*,
145 S.Ct. 1735 (2025) ...........................................................................6

*Flores v. Rosen*,
984 F.3d 720 (9th Cir. 2020) ...........................................30, 31, 33, 34

*In re A Cmty. Voice*,
878 F.3d 779 (9th Cir. 2017) ..............................................................24

*In re Flyers Rts. Educ. Fund, Inc.*,
61 F.4th 166 (D.C. Cir. 2023) ...............................................................6

*Jajati v. United States Customs & Border Prot.*,
102 F.4th 1011 (9th Cir. 2024) ...........................................................25

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020) .............................................................29

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..............................................................................9

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ........................................................................24, 25

*MD/DC/DE Broadcasters Ass'n v. FCC*,
236 F.3d 13 (D.C. Cir. 2001) .........................................................33, 34

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .............................................................................29

*Mont. Wildlife Fed'n v. Haaland*,
127 F. 4th 1 (9th Cir. 2025) ................................................................................29

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................13, 15, 18, 23

*Neighbors of the Mogollon Rim, Inc. v. United States Forest Serv.*,
No. 22-15259, 2023 WL 3267846 (9th Cir. May 5, 2023) .........29, 30, 35, 36

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) ..........................................................................35

*Prairie Rivers Network v. Dynegy Midwest Generation*,
976 F.3d 761 (7th Cir. 2020) ..........................................................................26

*Secs. & Exch. Comm'n v. Chenery Corp.*,
318 U.S. 80 (1943) ..............................................................................................5

*South Coast Air Quality Mgmt. Dist. v. EPA*,
882 F.3d 1138 (D.C. Cir. 2018) ..........................................................31, 32, 33

*United States v. Neal*,
776 F.3d 645 (9th Cir. 2015) ............................................................................6

*United States v. Palomar-Santiago*,
593 U.S. 321 (2021) ............................................................................................6

*Waterkeeper All. v. EPA*,
140 F.4th 1193 (9th Cir. 2025) ......................................................................29

**STATUTES**

15 U.S.C. § 2604(h)(1) ............................................................................................8

15 U.S.C. § 2604(h)(2) ............................................................................................8

15 U.S.C. § 2604(h)(4) .............................................. 1, 2, 3, 4, 5, 7, 14, 17

15 U.S.C. § 2604(h)(5) ............................................................................................8

15 U.S.C. § 2618(c)(2) ..........................................................................................29

## REGULATIONS

40 C.F.R. § 51.1105(a)(3) ................................................................32, 33

40 C.F.R. § 723.50 ..........................................................................9, 15

40 C.F.R. § 723.50(d)(1) .....................................................................18

40 C.F.R. § 723.50(d)(2)(i) ..................................................................35

40 C.F.R. § 723.50(d)(2)(ii) ..........................................................1, 18, 34

40 C.F.R. § 723.50(h)(1) ...........................................................18, 19, 34, 35

40 C.F.R. § 723.175 .............................................................................9

40 C.F.R. § 723.250 .............................................................................9

## FEDERAL REGISTER NOTICES

47 Fed. Reg. 24308 (June 4, 1982) .........................................................11

49 Fed. Reg. 46066 (Nov. 21, 1984) ...........................................11, 12, 13, 14, 15

60 Fed. Reg. 16316 (Mar. 29, 1995).....................................................11, 13

60 Fed. Reg. 16336 (Mar. 29, 1995).....................................................10, 11

75 Fed. Reg. 4295 (Jan. 27, 2010) ..........................................................13

84 Fed. Reg. 44392 (Aug. 23, 2019) .....................................................30, 31

## OTHER AUTHORITIES

Charles W. Tyler & E. Donald Elliott, *Administrative Severability Clauses*,
124 Yale L.J. 2286 (2015) .......................................................33

EPA, *Guidelines for Carcinogen Risk Assessment* (Mar. 2005),
https://www.epa.gov/sites/default/files/201309/documents/cancer_guidelines
final_3-25-05.pdf ..................................................................20

POSIT, Black's Law Dictionary (12th ed. 2024) .................................................27

## GLOSSARY OF ACORNYMS AND ABBREVIAITONS

For the convenience of the Court, the following is a glossary of acronyms and abbreviations used in this brief.

| | |
|---|---|
| 2024 Rule | Updates to New Chemical Regulations under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 102773 (Dec. 18, 2024) |
| EPA or Agency | Respondent U.S. Environmental Protection Agency |
| Exemptions | Low Volume Exemption and Low Release and Exposure Exemption to the Standard Premanufacture Notice Review Process under 40 C.F.R. § 723.50 |
| Fast-Track Provision | 40 C.F.R. § 723.50(d)(2)(ii) |
| Industry Amicus | Amicus American Chemistry Council |
| LVE | Low Volume Exemption |
| LoREX | Low Release and Exposure Exemption |
| PBTs | Persistent, bioaccumulative, and toxic chemicals |
| PFAS | Per- and Polyfluoroalkyl substances |
| Standard Review Process | Standard Premanufacture Notice (PMN) Review Process, 15 U.S.C. § 2604(a)(1) |
| TSCA | Toxic Substances Control Act |

## INTRODUCTION

EPA's brief confirms that the terms of the LVE and LoREX Exemptions—e.g., limits on production volume or water and air releases—do not meet the strict statutory standards for safeguarding people or the environment, let alone susceptible subpopulations like Native Alaskans or children, from new PBTs. Petitioners demonstrated that EPA has never evaluated whether the Exemptions' limits establish adequate protections from new PBTs, particularly under TSCA's new requirements to protect subpopulations; EPA does not dispute the point. *Compare* Petrs. Br. at 37-39, *with* EPA Br. (absence).

Moreover, EPA concedes that the Exemptions' terms cannot ensure in advance that any new PBT "will not present an unreasonable risk." 15 U.S.C. § 2604(h)(4); *see* EPA Br. at 2, 36. EPA confirms that the only new PBTs it could identify in advance that meet the will-not-present standard are a hypothetical set that result in zero release and zero exposure. EPA Br. at 27, 34-35. But the Fast-Track Provision does not impose a zero-exposure limit, instead allowing EPA to approve any new PBT, even those that result in some exposure. 40 C.F.R. § 723.50(d)(2)(ii); Petrs. Br. at 46-49. In other words, the terms of the LVE and LoREX Exemptions, including the Fast-Track Provision, have no rational connection to whether a new PBT meets TSCA's will-not-present standard.

1

Instead, EPA claims (at 18-35) that it can ensure that new PBTs meet the will-not-present standard through case-by-case review of individual applications, but EPA's exclusive reliance on case-by-case review simply proves Petitioners' point. Congress allowed exemptions for the lowest-risk chemicals, those that EPA could identify in advance "by rule" and then approve "upon application." 15 U.S.C. § 2604(h)(4). EPA's approach reads "by rule" out of the Act. If EPA can only assess the risks of new PBTs case-by-case, then the Standard Review Process is the proper mechanism, not fast-tracked review and approval.

The proper remedy is partial vacatur of the Fast-Track Provision to make new PBTs categorically ineligible for the Exemptions and thereby require each new PBT to go through the Standard Review Process. The comments of Industry Amicus in the record confirm that they use the Exemptions to evade the Standard Review Process. And EPA's promulgation of the Fast-Track Provision confirms that EPA intends to continue that end-run. Partial vacatur is the only remedy that can end the use of these regulatory loopholes to speed the approval of dangerous new PBT chemicals and ensure the safety of Petitioners' members.

## ARGUMENT

EPA's four merits arguments fail. First, EPA argues (at 19-24) that it can review each Exemption application case-by-case, but EPA reads "by rule" out of TSCA, which requires EPA to act "upon application <u>and by rule</u>" to grant an

2

exemption. 15 U.S.C. § 2604(h)(4) (emphasis added); *infra* Section I.A. Case-by-case review of individual applications is necessary, but not sufficient; and EPA's rules must ensure in advance that new chemicals meet the will-not-present standard. *Infra* Sections I.B–I.C.

Second, EPA argues (at 24-35) that its Exemption regulations are nevertheless well-reasoned, but EPA's concessions and omissions demonstrate that they are unlawful and arbitrary. *Infra* Section II.A. And the three regulatory provisions EPA relies on simply allow for case-by-case rejections of new PBTs, and only if EPA can make an affirmative, evidenced-based determination that the chemical may be dangerous. This innocent until proven guilty approach turns the statutory standard on its head. *Infra* Section II.B.

Third, EPA's reliance (at 31-34) on supposedly long-standing policies fails, because Congress significantly raised the bar for reviewing and approving new chemicals in the 2016 TSCA Amendments and EPA cannot show that it raised the regulatory bar to match. *Infra* Section III.

Fourth, EPA argues (at 22-24) that it was under no obligation to act to remedy any legal deficiencies in the terms of the Exemptions, because the statute confers discretion. But here EPA chose to exercise its authority to regulate new PBTs as a category, and was therefore required to do so in compliance with TSCA and in a non-arbitrary manner. *Infra* Section IV.

3

Finally, the submissions of the chemical industry, including the Industry Amicus brief, establish that the Exemptions have functioned as loopholes to facilitate the approval of new PBTs and that EPA's hypothetical justifications for maintaining those loopholes are meritless. *Infra* Section V.

As to remedy, EPA argues (at 35-38) that this Court lacks the authority to partially vacate the Provision by striking specific words, but this Court has done so before and EPA itself has asked for and received that very remedy. *Infra* Section VI.

## I. Case-by-Case Adjudication of Each Application Is Necessary, but Not Sufficient.

EPA does not contest that the "will not present [] unreasonable risk" standard governs here, 15 U.S.C. § 2604(h)(4), or that the standard imposes a heightened bar that requires EPA to ensure safety before approving a new chemical under an exemption. *Compare* Petrs Br. at 33-35, *with* EPA Br. (absence). Instead, EPA disputes that the terms of a regulation creating an exemption must clear the "will not present" bar "in advance." *Compare* EPA Br. at 22-23, *with* Petrs. Br. at 18. According to EPA, an exemption regulation is lawful so long as it commits EPA to "consider exemption requests 'upon application'"—i.e. "on a case-by-case basis." EPA Br. at 22–23 (quoting 15 U.S.C. § 2604(h)(4)).

EPA's argument that case-by-case review is sufficient fails as a basic matter of statutory interpretation because it reads the "by rule" requirement out of the

4

statute. 15 U.S.C. § 2604(h)(4); *infra* Section I.A. TSCA requires that EPA determine, *ex ante*, that the terms of an exemption rule ensure chemicals meet the will-not-present standard <u>and</u> that EPA conducts case-by-case review of each application to ensure that each new chemical meets the will-not-present standard. *Infra* Section I.B. Indeed, EPA has applied that reading of TSCA for decades, repeatedly making categories of chemicals ineligible for exemptions because EPA could not make the required *ex ante* determination. *Infra* Section I.C. EPA's reliance on an unlawful interpretation, which is at odds with its own practices, renders the Fast-Track Provision unlawful and arbitrary. *See* Petrs. Br. at 33-36, 45-46; *see also Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (holding unlawful agency action where "agency has misconceived the law.").

### A. EPA reads the "by rule" requirement out of TSCA.

1. EPA's argument—that TSCA "explicitly authorizes EPA to consider exemptions by 'application' on a case-by-case basis"— reads key language out of the statute. EPA Br. at 20 (quoting 15 U.S.C. § 2604(h)(4)). The controlling provision states that EPA "may, <u>upon application and by rule</u>, exempt the manufacturer of any new chemical substance from [the Standard Review Process] if the Administrator determines that…such chemical substance" meets the will-not-present standard. 15 U.S.C. § 2604(h)(4) (emphasis added).

5

Neither EPA's brief, nor the brief of Industry Amicus, ever discusses the meaning or function of the "by rule" requirement. "By rule" appears twice in EPA's brief, and only when EPA quotes the statute. EPA Br. at 6, 20. Industry Amicus never mentions this requirement. Industry Amicus Br. (absence).

In arguing that case-by-case review of individual applications is sufficient, EPA's reading would impermissibly turn the statutory "and" into an "or" and make the "by rule" requirement surplusage. *See In re Flyers Rts. Educ. Fund, Inc.*, 61 F.4th 166, 167-68 (D.C. Cir. 2023); *United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021).

2.     Adopting EPA's reading—that case-by-case adjudication is itself sufficient—would allow EPA to create an exemption regulation with no safeguards or eligibility criteria other than case-by-case adjudication. That reading must be rejected because it would allow an end-run around the Standard Review Process. *EPA v. Calumet Shreveport Ref.*, 145 S.Ct. 1735, 1751 (2025) ("Congress, after all, is unlikely to intend for an exception to swallow the rule.").

## B.   Petitioners' reading is the best reading.

Reading the statute as a whole and giving effect to the by rule requirement is fatal to EPA's position. *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015) ("[Courts] must interpret the statute as a whole." (citation modified)).

1.       TSCA only allows EPA to exempt a chemical from the Standard Review Process if EPA determines "upon application <u>and by rule</u>" that a new chemical "will not present an unreasonable risk." 15 U.S.C. § 2604(h)(4) (emphasis added). The text is plain: EPA must determine both (1) that the terms of the "rule" ensure new chemicals "will not present an unreasonable risk" <u>and</u> (2) that each "application" to manufacture a particular chemical demonstrates that the chemical meets the will-not-present standard. *Id.* In other words, Congress required two levels of safeguards: (1) that EPA establish criteria to identify low-risk chemicals in advance by rule; and (2) that EPA evaluate each application to ensure it meets the rule's criteria and the will-not-present standard. Accordingly, case-by-case adjudication of each application is always necessary, but never sufficient.

That reading follows from EPA's own position in this litigation. EPA concedes, correctly, that the "upon application and by rule" clause means that, when conducting case-by-case review of each application, EPA must determine that the application establishes that the chemical meets the will-not-present standard. EPA Br. at 20-22. EPA must accept the grammatical corollary of that position, that the clause also requires that EPA's determination of no unreasonable risk must be made "by rule." Thus, EPA must determine that the terms of an exemption rule ensure that chemicals meet the will-not-present standard at the time the rule is created or modified.

7

2.	Adjacent exemption provisions confirm that straightforward reading, because they allow EPA to act "upon application" alone, and Congress's choice of different language must be given effect. 15 U.S.C. § 2604(h)(1), (2), (5). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Andreiu v. Ashcroft,* 253 F.3d 477, 480 (9th Cir. 2001) (en banc) (citation modified).

In those other statutorily created exemptions, Congress created general rules and then directed EPA "upon application" to conduct a case-by-case review to ensure each application met the terms of the Congressionally created exemption. For example, Congress directed EPA to exempt new chemicals manufactured for "test marketing purposes" from the Standard Review Process "upon application" if the applicant could show the chemical will not present unreasonable risk. 15 U.S.C. § 2604(h)(1). Congress identified the protective terms in advance—that the chemical be used for test marketing—and then directed EPA to ensure case-by-case that each chemical meets those terms. By contrast, in Section 2604(h)(4), Congress authorized EPA to issue exemptions only after EPA created general rules that established sufficient safeguards in advance <u>and</u> then required EPA to review each application to ensure those safeguards were met.

8

### C. Petitioners' reading is simply EPA's own long-standing reading.

Indeed, EPA has long read "by rule" to require EPA to determine <u>in advance</u> that the terms of an exemption rule ensure that new chemicals eligible for the exemption will not present an unreasonable risk. *Contra* EPA Br. at 22-23. And, as part of that required *ex ante* determination, EPA has repeatedly made chemical categories ineligible for an exemption where EPA concluded it could not make such a determination. *Contra id.* This further confirms Petitioners' reading is the best reading. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of the government…can inform a court's determination of what the law is." (citation modified)).

1.     EPA has created several exemptions under Section 2604(h)(4)—the LVE and LoREX Exemptions at issue here; the instant photographic film exemption; and the polymer exemption. 40 C.F.R. §§ 723.50, 723.175, 723.250. For each of these exemptions EPA: (1) established criteria that defined the category that would be eligible for the exemption; and (2) conducted a scientific risk assessment to determine, in advance, that the eligibility criteria ensured the category of eligible chemicals would not present an unreasonable risk. Each time, EPA described this *ex ante* determination as required under Section 2604(h)(4). *Contra* EPA Br. at 22-23.

When EPA created the LVE and LoREX Exemptions in 1995, EPA stated that it was using its authority to regulate by category to "exempt[] two categories of chemical substances: those with production volumes less than or equal to 10,000 kilograms/year, and those with low human exposure and low release to the environment." 60 Fed. Reg. 16336, 16345 (Mar. 29, 1995) (citing 15 U.S.C. § 2625(c)).

EPA read TSCA to require an *ex ante* determination that the eligibility criteria ensured each category met the will-not-present-standard—i.e. "that new chemical substances eligible for the exemptions will not present an unreasonable risk…under the terms of the exemptions." *Id.* (describing EPA's statutory interpretation). To make that determination, EPA conducted a scientific risk assessment, evaluating the magnitude of exposures and the likelihood of human or environmental harm that would result from new chemicals that met the eligibility criteria (i.e. new chemicals in the LVE and LoREX categories). *Id.* at 16342-44. Using that analysis, EPA determined "that the risk presented by exempting these two categories of new chemical substances is low" and ultimately that they met the will-not-present standard.[1] *Id.* at 16346.

---

[1] At the time, EPA did not evaluate the risks posed by new PBTs or risks to subpopulations, a point EPA does not contest. *Compare* Petrs. Br at 38-39, *with* EPA Br. (absence).

Similarly, when EPA created and later modified the polymer exemption, the Agency: stated that it was establishing eligibility criteria that defined a category of exempt polymers, 49 Fed. Reg. 46066, 46068 (Nov. 21, 1984); conducted a scientific risk assessment of the polymer category, *id.* at 46080-83; and then, using that assessment, explained how the eligibility terms minimized risk and ensured that polymers approved under the exemption met the will-not-present standard, *id.* at 46083-85. EPA took the same approach when it later modified the category of eligible polymers, and when it exempted the category of instant film chemicals. [2]

In these rulemakings, EPA made *ex ante* determinations for each category, such as a "general finding that the[] [eligible] categories of new chemical substances will not present an unreasonable risk under the terms of the exemptions." *E.g.,* 60 Fed. Reg. at 16345 (emphasis added).

2.      Because the terms of an exemption must ensure that the category of eligible chemicals meet the will-not-present standard, EPA has recognized that it must exclude categories of chemicals that cannot meet the standard. *Contra* EPA

---

[2] 60 Fed. Reg. 16316, 16326 (Mar. 29, 1995) (making a "statutory finding that polymers manufactured under terms of the exemption will not present an unreasonable risk"), 16330 (similar); 47 Fed. Reg. 24308, 24312 (June 4, 1982) (determining the exempt category "will not present an unreasonable risk of injury to health or the environment under the conditions of this exemption rule").

11

Br. at 22-23, 31-32 (arguing that neither the statute nor its own precedents require it to make chemicals categorically ineligible).

For example, when EPA created the initial polymer exemption in 1984, EPA "excluded seven categories of [new] polymers" from eligibility "regardless of whether they met the other conditions of the exemption. These polymers were excluded because of data indicating potential for adverse health and/or environmental effects." 49 Fed. Reg. at 46069; *see id.* at 46082.

EPA explained that it had to make those seven subcategories ineligible because it could not make an *ex ante* determination that they met the will-not-present standard: "The Agency has simply found that it cannot <u>at this time</u> make the no unreasonable risk finding for the categories of substances excluded from this exemption." *Id.* at 46069 (emphasis added). Excluding these categories was "an important component of EPA's finding that [the eligible] polymers manufactured under the terms of the exemption will not present an unreasonable risk." *Id*. In other words, making a chemical category ineligible is just like any other eligibility criteria needed to ensure the exemption rule, as a whole, meets the will-not-present standard. *Contra* EPA Br. at 22-24, 32.

And EPA excluded these categories entirely, notwithstanding the possibility that an excluded category encompassed individual chemicals that might meet the will-not-present standard. 49 Fed. Reg. at 46070 (acknowledging that the excluded

12

category might encompass individual chemicals of "known low toxicity"); *id.* at 46073 (excluding category that encompassed chemicals that "may not present significant risks").

In multiple other rulemakings, EPA has similarly made a category of chemicals ineligible for an exemption because the Agency could not make an *ex ante* determination that the category met the will-not-present standard. 60 Fed. Reg. at 16317 (describing multiple "[c]lasses of polymers ineligible for exemption"), 16318-20; Petrs. Br. at 34, 45-46 (citing 75 Fed. Reg. 4295 (Jan. 27, 2010) (similarly excluding a category of polymers containing PFAS or PFAC)).

3.      EPA's attempts (at 31-32) to distinguish its own precedents fail. EPA argues that its 2010 exclusion of PFAS polymers is inapposite because at that time the polymer exemption had "*no* application process and *no* opportunity for EPA review." EPA Br. at 32.[3] However, that was not part of EPA's rationale in the 2010 rulemaking. *See* 75 Fed. Reg. 4295 (absence).

Moreover, that argument cannot explain the 1984 polymer exemption, where EPA excluded seven categories of polymers, even though EPA required applications and conducted case-by-case review at that time. *See* 49 Fed. Reg. at

---

[3] EPA's counsel's belated attempts to distinguish the 2010 polymer rule were not part of EPA's rationale in the 2024 Rule and thus are impermissible "*post hoc* rationalizations." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

46082-83 (requiring "submission of a limited [application] to EPA"), 46088. Thus, the polymer exemption at that time was directly "analogous" to the LVE and LoREX Exemptions here. *Contra* EPA Br. at 32.

4.      Because EPA does not acknowledge that its new reading of the statute departs from its own long-held position, that renders its revised regulations arbitrary and capricious. *See* Petrs. Br. at 45-46.

## II.      The Terms of the LVE and LoREX Exemption Regulations Do Not Sufficiently Protect People or the Environment from New PBTs, Violating TSCA.

### A.      EPA's brief confirms that the terms of the Exemption regulations are deficient.

1.      The terms of the Exemptions do not ensure that new PBTs "will not present an unreasonable risk" because EPA has not established eligibility criteria to ensure new PBTs meet the standard in advance, as even EPA concedes. 15 U.S.C. § 2604(h)(4); EPA Br. at 2, 36 (conceding EPA could not make that determination "*ex ante*"). EPA does not dispute that it has never assessed, let alone determined, that the terms of the Exemptions ensure that new PBTs will not present an unreasonable risk to relevant subpopulations, as required by the amended TSCA. *Compare* Petrs. Br. at 37-39, *with* EPA Br. (absence); *see supra* Section I.C (EPA interpreted TSCA to require such risk assessments when establishing exemptions.).

Moreover, EPA confirms that the only new PBTs that could meet the will-not-present standard in advance are a hypothetical set with zero-release and zero-

14

exposure. EPA Br. at 27 (positing new PBTs could meet the standard if they "will not result in worker, general population, or consumer exposure" (citation omitted)), 34-35 (similar); *see also* Petrs. Br. at 46-49. But none of the Exemption provisions impose a zero-exposure requirement—not the production and volume limits, nor the Fast-Track Provision itself. *See* 40 C.F.R. § 723.50 (absence). Indeed, the Fast-Track Provision plainly allows EPA to approve any new PBT that causes some level of exposure, so long as EPA does not determine, case-by-case, that the exposures are "unreasonable," a point EPA does not dispute. *Compare* Petrs Br. at 40-45, 49, *with* EPA Br. (absence).

Thus, EPA's brief further confirms that the terms of the Exemptions have no rational connection to whether any new PBT meets the will-not-present standard. *State Farm*, 463 U.S. at 43 (Agency action is arbitrary if there is not a "rational connection between the facts found and the choice made." (citation omitted)).

2.      EPA argues that the mere "possibility" that some new PBT might hypothetically meet the will-not-present standard prevents EPA from making new PBTs categorically ineligible for the Exemptions. EPA Br. at 31, 34. But that is at odds with EPA's past precedents, where EPA excluded any "categor[y]…for which the Agency cannot make the finding of no unreasonable risk," *ex ante*. 49 Fed. Reg. at 46082; *see supra* Section I.C. Because EPA could not make that *ex ante*

15

finding here, EPA was required to make new PBTs ineligible for the LVE and LoREX Exemptions.

Indeed, EPA's refusal to make new PBTs ineligible for the LVE and LoREX Exemptions cannot be squared with EPA's action in this very rulemaking, in which it made PFAS categorically ineligible. In the 2024 Rule, EPA asserted that it "expects in most cases to be unable to determine pursuant to [Section 2604(h)(4)] that a PFAS 'will not present an unreasonable risk.'" ACAT-ER-016 (emphasis added). On that basis, EPA made all PFAS categorically ineligible for the Exemptions, notwithstanding EPA's implicit acknowledgement that some PFAS could possibly meet the standard. *Id.* Similarly, in "most" (if not all) cases, EPA cannot make the will-not-present determination for new PBTs, EPA. Br. at 27, yet EPA has arbitrarily refused to make them ineligible.

3. EPA's arguments (at 2)—that there might be some "possible scenario" in which a new PBT meets the will-not-present standard and that possibility alone justifies allowing case-by-case review of every new PBT under the Exemptions— is simply an admission that the Exemptions are unlawful. Congress created the Standard Review Process for chemicals that need case-by-case review, and that process, not the Exemptions, is how new PBTs should be evaluated.

16

Thus, the promulgation of the Fast-Track Provision was unlawful and arbitrary because it makes eligible and authorizes the approval of new PBTs that do not meet the will-not-present standard.

### B. EPA relies on regulatory provisions that do not ensure safety *ex ante* but simply permit EPA to reject chemicals case-by-case.

EPA argues that any deficiencies in the terms of the Exemptions are cured by three regulatory provisions that govern its case-by-case review. *See* EPA Br. at 21, 29-31 (citing 40 C.F.R. § 723.50(d)(1), (d)(2), (h)(1)). But taken together or individually, the three provisions simply permit EPA to reject new PBTs case-by-case, and only where EPA makes an affirmative determination, based on evidence, that a particular PBT is potentially dangerous. That is contrary to the statute, which prohibits EPA from exempting a new chemical, unless EPA can establish it meets the will-not-present standard. In other words, these three provisions treat every new PBT as innocent until proven guilty, when the statute requires the opposite. *See* Petrs. Br. at 40-42, 44.

1. No provision imposes a zero-exposure limit on new PBTs, which EPA itself concedes is necessary to ensure in advance that new PBTs meet the will-not-present standard. *See supra* at 14-15.

2. No provision requires EPA to reject a new PBT unless EPA affirmatively establishes safety—i.e. that the PBT "will not present an unreasonable risk." 15 U.S.C. § 2604(h)(4). Instead, each provision places the

burden on EPA to make affirmative "determin[ations]" in order to deny an application for a new PBT. 40 C.F.R. § 723.50(d)(1), (2), (h)(1). And such affirmative determinations must be based on evidence. *State Farm,* 463 U.S. at 43 (There must be a "rational connection between the facts found and the choice made." (citation omitted)); *e.g., Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1064 (D.C. Cir. 2000) (rejecting agency determination based on lack of factual support).

The Fast-Track Provision permits EPA to reject an Exemption application for a new PBT, but only if "EPA <u>determines</u>…that the substance…is…[a] PBT chemical substance with…potentially unreasonable exposures." 40 C.F.R. § 723.50(d)(2)(ii) (emphasis added). Thus, EPA must have evidence that the new PBT causes exposures and that those exposures are "unreasonable" to reject an application.[4] *Id.*

Section 723.50(d)(1) also permits EPA to reject an Exemption application, but similarly requires that "EPA <u>determine[]</u>" that "the substance…[m]ay cause" one of a number of "serious" or "significant" health or environmental effects. *Id.* § 723.50(d)(1) (emphasis added). This provision also requires an affirmative

---

[4] EPA does not respond to Petitioners' argument that the term "unreasonable exposure" in the Fast-Track Provision is nonsensical under TSCA and, therefore, arbitrary. *Compare* Petrs. Br at 43-45, *with* EPA Br. (absence).

determination that a new PBT may be dangerous before EPA can deny the application. The third provision, Section 723.50(h)(1), similarly permits EPA to reject exemption applications case-by-case if "EPA <u>determines</u> during the review period…that there are issues concerning toxicity or exposure." *Id*. § 723.50(h)(1) (emphasis added). That provision does not establish any objective safeguards, but instead generically permits EPA to reject new chemicals case-by-case.

Thus, even after EPA identifies a new chemical as a PBT, EPA must make some further affirmative determination, with evidentiary support, in order to reject the application. If EPA cannot make such a determination, the new PBT remains eligible for approval. Accordingly, under the plain terms of these three regulations, every new PBT is eligible for an exemption unless EPA can make an affirmative determination that the new chemical may be unsafe just as Petitioners contended. *Contra* EPA Br. at 28-31; *see* Petrs. Br. at 40-42, 44. These provisions confirm that EPA has turned the statutory structure on its head, treating any new PBT as presumptively safe and eligible for an exemption unless there is affirmative evidence of danger.

### III. EPA's Reliance on Pre-2016 Provisions and Practices Cannot Save its Unlawful Exemptions.

EPA and the Industry Amicus rely on supposedly long-standing practices to defend EPA's rule. *See* EPA Br. at 25-28, 31-34; Industry Amicus Br. at 10-13. Specifically, EPA contends that the Fast-Track Provision creates an additional layer

of protection on top of its prior LVE and LoREX Exemption regulations by codifying supposedly long-standing practices for reviewing new PBTs. *See* EPA Br. at 25-34. But decades-old regulations and practices have little relevance here because Congress significantly rewrote the provisions governing new chemicals review in 2016, and specifically raised the bar for all exemptions.

1.     As an initial matter, the Fast-Track Provision does not provide any protection, but imposes a hurdle EPA must clear before rejecting a new PBT. *See supra* at 18.

2.     Moreover, it is precisely because EPA's pre-existing regulations are long-standing that they cannot suffice. In the 2016 TSCA Amendments, Congress raised the bar for exemptions by requiring EPA to ensure the protection of potentially exposed and susceptible subpopulations, like children, who can face an order of magnitude greater risk from a chemical than a member of the general population. *E.g.,* EPA, Guidelines for Carcinogen Risk Assessment at 1-17 (Mar. 2005), https://www.epa.gov/sites/default/files/2013-09/documents/cancer_guidelines_final_3-25-05.pdf.

But EPA does not argue that it has ever determined that the LVE or LoREX Exemptions protect subpopulations, either before the 2016 Amendments or in the 2024 Rule. *Compare* Petrs. Br at 38-39, *with* EPA Br. (absence). Indeed, EPA does not discuss subpopulations at all.

Thus, EPA's argument—that the 2024 Rule "did not *lower* the standard for granting these exemptions for new PBT chemicals"—misses the mark. EPA Br. at 18. Congress raised the bar in the 2016 Amendments and EPA did nothing in the 2024 Rule to raise the bar commensurately.

Indeed, in relying on EPA's pre-2016 practices to save its 2024 Rule, both EPA and Industry Amicus ignore that Congress fundamentally restructured TSCA, including and especially the new chemical review program. *Contra* Industry Amicus Br. at 2-3 (arguing Congress left the Section 2605(h)(4) "fundamentally unaltered"). Not only did Congress require the protection of at-risk subpopulations, it also ended EPA's long-standing practice of deemed approvals in which companies could begin manufacture of a new chemical when EPA did not timely act on an application. Petrs. Br. at 24-25; EPA Br. at 4-5. Congress also redefined "unreasonable risk" to prevent EPA from balancing harms to health and the environment against the economic benefits of commercialization. *See* Petrs. Br. at 24. Now, in evaluating both new and existing chemicals, EPA cannot consider costs or other non-risk factors in determining whether a risk is unreasonable.

Given these fundamental alterations to TSCA's new chemical review program, EPA's defective Fast-Track Provision cannot be saved by regulatory provisions that predate the 2016 Amendments or supposed consistency with pre-amendment practices.

21

3.     Even if EPA's prior policies or practices were relevant, EPA has not established that such policies or practices existed. Again and again, EPA asserts that the Fast-Track Provision's "unreasonable exposure" criteria codifies supposedly "longstanding" pre-2016 practices. *E.g.,* EPA Br. at 26, 28, 33. But repetition does not make reality, and EPA fails to grapple with Petitioners' arguments that no such prior policy or practice existed.

Comments submitted by a former EPA official responsible for reviewing new chemicals argued that "[w]hat EPA characterizes as its 'long-standing practice' is neither [1] a continuously 'long-standing practice' nor [2] consistent with the 1999 PBT Policy." ACAT-ER-226; *see* ACAT-ER-225-30; *see also* Petrs. Br. at 50-51.[5] Commenters further argued that "unreasonable exposure" was a new and illogical concept that was disconnected from the statute. *See* Petrs. Br at 43-45.

First, EPA does not argue that it offered any response in the rulemaking to these comments, and has thus forfeited any defense. EPA Br. (absence). EPA's failure to respond to any of these comments, alone, renders EPA's action arbitrary. *See* Petrs. Br. at 43-45, 50-51 (citing *Ohio v. EPA*, 2605, 293-94 (2024)).

---

[5] Thus, EPA (at 32) misconceives Petitioners' arguments as solely about a "depart[ure] from EPA's 1999 PBT Policy."

22

Second, the new responses in EPA's brief are too little, too late: "[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action" *State Farm*, 463 U.S. at 50.

Third, the new arguments pressed by EPA's counsel fail on their own terms because they do not demonstrate such a long-standing policy or practice existed. EPA Br. at 25-28, 31-34. If the Fast-Track Provision reflected long-standing policy, EPA should have been able to provide some record evidence—*e.g.,* a policy statement, a guidance document, or a summary of prior EPA actions—but it did not. Instead, each of the underlying record citations offered by EPA's counsel simply asserts the existence of a long-standing policy or practice, without support or citation. EPA Br. at 25-28, 33-34 (citing ACAT-ER-120-22 (absence); ACAT-ER-017 (absence); ACAT-ER-249 (absence)). And EPA disclaims the sole policy document that does exist, the 1999 Policy, stating it does not address LVE or LoREX Exemption applications. EPA Br. at 32-33.

## IV. EPA Cannot Rely on its Purported Discretion to Keep its Unlawful Exemptions on the Books.

EPA argues that it was under no duty to make its Exemption regulations lawful as to new PBTs, because TSCA says EPA "'may'" regulate chemicals by category, thereby conferring discretion on EPA. EPA Br. at 23-24 (quoting 15 U.S.C. § 2625(c)(1)). That argument fails for two independent reasons.

23

1.      EPA has a duty under TSCA to make new PBTs ineligible for the LVE and LoREX Exemptions. These Exemptions establish <u>categories</u> of exempt chemicals, *supra* at 10, and the terms of the regulations must ensure each eligible category meets the will-not-present standard. Because EPA cannot conclude that new PBTs meet the will-not-present standard under those Exemptions' terms, it must exclude new PBTs—i.e. make them categorically ineligible. *Supra* Sections I.C, II.A. The mere fact that TSCA says EPA "may" regulate by category is not dispositive, because an agency can have a mandatory obligation to maintain lawful regulations even where the statute uses "'may.'" *In re A Cmty. Voice*, 878 F.3d 779, 784-86 (9th Cir. 2017) (quoting 15 U.S.C. § 2687).

2.      Whatever the scope of EPA's discretion, EPA chose to exercise that discretion by taking action as to the category of new PBTs here, and an agency that chooses to exercise even discretionary authority must do so in a lawful and reasoned manner. *See Massachusetts v. EPA*, 549 U.S. 497, 533 (2007) (An agency's "reasons for action or inaction must conform to the authorizing statute."). EPA <u>chose</u> to conduct a rulemaking to "align" its regulations with the new, more stringent requirements of the 2016 Amendments. Petrs. Br. at 25-26; *see, e.g.,* ACAT-ER-004, ACAT-ER-234. EPA <u>chose</u> to modify the terms of the Exemptions. Petrs. Br. at 26. And, ultimately, EPA <u>chose</u> to propose and finalize new Exemption regulations that addressed the category of new PBTs, building off EPA's

24

identification of new PBTs as a distinct category of new chemicals in 1999. *See id.* at 26-28, 50-51; EPA Br. at 9-10, 25.

Once EPA chose to exercise its discretion to regulate new PBTs as a category, the Agency did not have "a roving license to ignore the statutory text" and adopt a rule that does not meet the will-not-present standard. *Massachusetts*, 549 U.S. at 533. "The fact that an agency has broad discretion in choosing whether to act does not establish that the agency may justify its choice on specious grounds." *Jajati v. United States Customs & Border Prot.*, 102 F.4th 1011, 1017 (9th Cir. 2024) (citation omitted).

3.      Petitioners are arguing that EPA had to make new PBTs categorically ineligible because EPA recognized the inherent risks of new PBTs in this rulemaking, not "simply because EPA [] defined th[e] category" in 1999. *Contra* EPA Br. at 24.

## V.      Industry Amicus and EPA Confirm the Importance of Closing the Loophole of Fast-Tracked Review for New PBTs.

### A.      The chemical industry supports the Fast-Track Provision because it is a loophole to avoid the Standard Review Process.

The arguments pressed by Industry Amicus are largely irrelevant, offering generalities about the Exemptions, while failing to grapple with unique risks of PBTs. And Industry Amicus errs in claiming that Congress left the exemptions

provision "fundamentally unaltered" when Congress crafted an essentially brand-new statutory regime. *Compare* Industry Amicus Br. at 3, *with supra* Section III.

But the chemical industry's participation confirms the importance it places on maintaining a loophole for new PBTs to evade the Standard Review Process. *See Prairie Rivers Network v. Dynegy Midwest Generation*, 976 F.3d 761, 763 (7th Cir. 2020) (noting that many amicus briefs "serve…as a show of hands on what interest groups are rooting for what outcome"). During the rulemaking, Industry Amicus submitted comments asserting that Exemptions are important for bringing new PBTs onto the market. *See* ACAT-FER-016-17. They also noted that the chemical industry uses the Exemptions across "all sectors" of the economy. ACAT-FER-017.

Industry's comments confirm the use of the Exemptions to secure new PBT approval, refuting EPA's claims here that "EPA rarely (if ever) granted these exemptions for PBT chemicals prior to this regulation." EPA Br. at 34. And Industry Amicus' support for the Fast-Track Provision here confirms the Provision will operate as an ongoing loophole to the Standard Review Process, further belying EPA's contention that the Fast-Track Provision provides "additional" protections. *Contra* EPA Br. at 18.

### B. EPA's brief confirms that zero-release-zero-exposure PBTs are a fiction.

EPA has no answer to Petitioners' arguments that PBTs eventually release into the environment and cause exposure, such that EPA's invocation of zero-release-zero-exposure PBTs was "sheer speculation." Petrs. Br. at 48 (quoting *Sinclair Wyoming Refining Company LLC v. EPA*, 114 F.4th 693, 713-14 (D.C. Cir. 2024)). PBTs will release into the environment at some point: no landfill is perfect; no incinerator destroys 100% of a chemical. And EPA's brief does not dispute that EPA determined that any such releases of PBTs necessarily result in human exposure and serious injury. *Compare* Petrs. Br. at 47-48, *with* EPA Br. at 34-35.

EPA's brief does not identify anything in the record demonstrating that the Agency responded to those comments, instead reiterating EPA's bald assertion that such a zero-release-zero exposure hypothetical "could actually happen." EPA Br. at 35. EPA did "posit" such a hypothetical scenario, EPA Br. at 34, but offered no evidence in the record for it, confirming that EPA acted arbitrarily based on speculation, not facts. Petrs. Br. at 46-48; *see* POSIT, Black's Law Dictionary (12th ed. 2024) ("To presume true"). Indeed, given the chemical industry's use of the LVE and LoREX Exemptions for new PBTs, EPA should have been able to identify an actual example of zero-release-zero-exposure PBT, but it did not.

27

### VI. The Court Should Remedy Petitioners' Injuries by Partially Vacating the Fast-Track Provision.

The Fast-Track Provision expressly authorizes the continued use of the Exemptions as a loophole to evade the Standard Review Process for new PBTs. To stop the use of this unlawful loophole, the proper remedy is vacatur of a part of the Fast-Track Provision—striking the language that allows EPA to approve any PBT unless certain exposure and release criteria are met. *See* Petrs. Br. at 52 ("A PBT chemical substance ~~with anticipated environmental releases and potentially unreasonable exposures to humans or environmental organisms~~." (quoting 40 C.F.R. § 723.50(d)(2)(ii)).

EPA incorrectly contends that the Court lacks the authority to provide that relief, and that the Court's only choices are to remand without vacatur or to "vacate the *full*…regulation." EPA Br. at 36. But this Court and others have struck particular words from agency regulations by applying principles of severability and partial vacatur, including at EPA's own request. *Infra* Section VI.A. Applied here, those principles confirm that partial vacatur of the Fast-Track Provision is the proper remedy to guarantee that new PBTs go through the Standard Review Process as Congress intended. *Infra* Section VI.B.

28

### A. Courts, including this Court, do strike particular words from regulations.

Instead of addressing the relevant legal questions, EPA relies on cases that do not address partial vacatur or severability, and invokes generalities against courts rewriting statutes. EPA Br. at 35-38.[6] Those generalities are irrelevant because Petitioners' proposed remedy is authorized by ordinary vacatur and severability principles and precedents. Indeed, EPA has requested and received the very same remedy—striking selected words from a regulation—that it now claims the Court is powerless to grant. *Contra* EPA at 36.

1. EPA argues (at 35-36) that the Court lacks authority to enter partial vacatur, but partial vacatur is expressly authorized by TSCA, which recognizes that circuit courts may "set[] aside, in whole <u>or in part</u>, any rule." 15 U.S.C. § 2618(c)(2) (emphasis added). Indeed, it is a long-standing administrative law remedy. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) (Alito, J.) (recognizing the remedy of "partial…vacatur" in challenges to agency action).

2. This Court has used partial vacatur to strike out and replace specific words from a final agency action. *Neighbors of the Mogollon Rim, Inc. v. United*

---

[6] EPA relies on three cases, none of which discuss "partial vacatur" or "severability." *See Waterkeeper All. v. EPA*, 140 F.4th 1193 (9th Cir. 2025) (absence); *Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020) (absence); *Mont. Wildlife Fed'n v. Haaland*, 127 F. 4th 1 (9th Cir. 2025) (absence).

*States Forest Serv.*, No. 22-15259, 2023 WL 3267846 at *4 (9th Cir. May 5, 2023). For example, after this Court held unlawful an agency's final decision to allow grazing on a particular parcel, the Court ordered "partial vacatur" of the decision "to the extent that they allow grazing…more than the equivalent of 374 adult cattle." *Neighbors,* 2023 WL 3267846 at *4, n.1. The agency had originally calculated the parcel could support grazing at a level of "1,154 Animal Unit Months." *Id.* at *4 n.1. The Court stated that its "partial vacatur is intended to ensure that grazing is not authorized beyond the level supported by the [agency's analysis,]" but conducted its own calculation to arrive at the 374 number. *Id.* The Court replaced the agency's words with the Court's own. *Contra* EPA Br. at 35-36.

3.      This Court's precedents on severability also support Petitioners. *Contra* EPA Br. at 37-38.

In *Flores v. Rosen*, this Court concluded that part of a single regulatory subsection was unlawful and invalidated only the unlawful words while retaining the rest. 984 F.3d 720, 736, n.7 (9th Cir. 2020) (partially invalidating 45 C.F.R. § 410.810(a)). There, the challenged regulatory subsection provided that: "A[n unaccompanied minor] may request that an independent hearing officer employed by HHS determine, through a written decision, whether the [minor] would present a risk of danger to the community or risk of flight if released." 84 Fed. Reg. 44392, 44535 (Aug. 23, 2019) (codifying 45 C.F.R. § 410.810(a)). The plaintiffs

30

successfully challenged the provision as unlawful because it authorized a written hearing upon "request" rather than providing a hearing unless refused. *Flores,* 984 F.3d at 736.

Rather than invalidate the entire subsection, the Court determined the regulation was severable and invalidated only specific words. *Id.* Specifically, the Court enjoined the requirement that a minor must request a hearing and ordered the agency to "provide a hearing unless one is refused." *Id.* At the same time, the Court refused to "invalidate [the regulation] to the extent that it provides unaccompanied minors with the right" to a written determination *Id.* at n.7.

Thus, following the Court's order the partially enjoined regulation now effectively reads "A[n unaccompanied minor] may request that [A]n independent hearing officer employed by HHS [must] determine, through a written decision, whether the [unaccompanied minor] would present a risk of danger to the community or risk of flight if released, *unless the hearing is refused by the [unaccompanied minor]*." 84 Fed. Reg. at 44535 (strikethroughs represent deletions, and *italics* additions).

4.     EPA itself has requested and received the remedy it now claims is impermissible—that a court partially vacate an unlawful regulation by striking specific words from individual subsections. *See South Coast Air Quality Mgmt. Dist. v. EPA* ("*South Coast*"), 882 F.3d 1138, Order, Doc. No. 1632634 (Aug. 29,

31

2016); *South Coast,* EPA Mot. at 1-2, 6, Doc No. 1626154 (Jul. 21, 2016) (requesting partial vacatur of "40 C.F.R. § 51.1105(a)(3), (a)(4), (b); *id.* Part 51, App. S, Sec. VII(B)"). EPA had promulgated several Clean Air Act regulations establishing anti-backsliding measures for regions that were potentially subject to three different ozone standards: the 1979 one-hour standard; the 1997 eight-hour standard; and a 2008 eight-hour standard. *See South Coast,* EPA Mot. at 2-6. The respective scope and applicability of each regulation was tied to one or more of the three ozone standards. *Id.* For example, one regulation stated, in part: "For an area designated attainment for the 2008 ozone NAAQS, and designated nonattainment for the 1997 ozone NAAQS as of April 6, 2015 or for both the 1997 and the 1-hour ozone NAAQS as of the respective dates of their revocations, the area is no longer subject to nonattainment NSR." 40 C.F.R. § 51.1105(a)(3).

EPA requested that the Court partially vacate specific regulatory subsections, but only as to "portions of the Final Rule that address anti-backsliding requirements for the [1979] One-Hour [standard]." *South Coast,* EPA Mot. at 6. EPA admitted that it arbitrarily failed to explain the basis for the regulations as applied to the 1979 one-hour standard. *Id.* at 7. In requesting partial vacatur, EPA invoked the very severability principles that Petitioners invoke here. *Compare Id.* at 9, *with* Petrs. Br. at 52-54 (similar).

32

The Court granted EPA's request for partial vacatur of the regulations, only as to the "1979 'One-Hour' [] Standards." *South Coast*, Order at 1. The effect was to strike from each regulatory subsection only the specific portion that was dependent on the 1979 one-hour standard, e.g.: "For an area designated attainment for the 2008 ozone NAAQS, and designated nonattainment for the 1997 ozone NAAQS as of April 6, 2015 ~~or for both the 1997 and the 1-hour ozone NAAQS as of the respective dates of their revocations~~, the area is no longer subject to nonattainment NSR." 40 C.F.R. § 51.1105(a)(3) (strikethroughs represent deletions).

### B.  Partial vacatur is the appropriate remedy here.

Applying either severability or vacatur principles (or both) confirms that the Court should partially vacate the Fast-Track Provision to make new PBTs categorically ineligible for the Exemptions.

1.  The Provision is severable under the governing two-part test, in which severability "depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *see Flores*, 984 F.3d at 736 (citing *MD/DC/DE Broadcasters*); s*ee also* Charles W. Tyler & E. Donald Elliott, *Administrative Severability Clauses*, 124 Yale L.J. 2286, 2296 (2015) (similar).

33

First, EPA's careful severability analysis in the 2024 Rule establishes that EPA intended that the Rule's provisions be severable in all but one circumstance, which is not applicable here. "The limited circumstance in which severability is not intended is where a single type of amendment involved changes to multiple paragraphs or sections of the regulations." ACAT-ER-018. EPA does not claim that circumstance exists here, *see* EPA Br. at 35-38 (absence), so the 2024 Rule's severability analysis establishes EPA's intent that the Fast-Track Provision can be partially severed. *See Flores*, 984 F.3d at 736.

Second, the Exemptions "could function sensibly without the stricken provision," by requiring all applications for new PBTs to go through the Standard Review Process. *MD/DC/DE Broadcasters*, 236 F.3d at 22. The Fast-Track Provision establishes a two-step process for rejecting exemption applications for new PBTs, and partial vacatur would simply lop off the final step. *See* 40 C.F.R. § 723.50(d)(2)(ii). At the first step, EPA would still have to identify whether an exemption application is for a new PBT. *Id.* But EPA would not have to proceed to the second step of analyzing the new PBT's "releases and…exposures." *Id*. Instead, EPA would simply reject the application for the new PBT as ineligible, and allow the company to reapply through the Standard Review Process, a process already established in EPA's existing regulations. *See Id.* § 723.50(h)(1).

34

That outcome would be workable in the same way that the process EPA has created for new PFAS in the 2024 Rule is workable. There, EPA made PFAS categorically ineligible for the Exemptions, such that once EPA identifies an exemption application as for a new PFAS, EPA rejects the application and the chemical must go through the Standard Review Process. *See* EPA Br. at 23; 40 C.F.R. § 723.50(d)(2)(i), (h)(1).

Excluding new PBTs would be equally workable because the Standard Review Process, not exemptions, is what Congress established as the presumptive norm for reviewing new chemicals.

2.      Partial vacatur is required because "[t]he agency's errors here are significant and vacatur will not cause an environmental harm." *Neighbors*, 2023 WL 3267846 at *3. Vacatur is the presumptive remedy, and this Court "order[s] remand without vacatur only in 'limited circumstances.'" *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citation omitted); *see Neighbors*, 2023 WL 3267846 at *3 (similar). For EPA to overcome that presumption the Court weighs the seriousness of the Agency's errors against the potential for disruption from vacatur. *See* EPA Br. at 36-37; *Pollinator Stewardship Council*, 806 F.3d at 532. Here, both factors favor partial vacatur.

First, EPA's errors are so serious that EPA could not "adopt the same rule on remand." *Pollinator Stewardship Council*, 806 F.3d at 532; *contra* EPA Br. at 37.

35

Even by EPA's own rationale, only zero-release-zero-exposure PBTs could meet the will-not-present standard in advance, but the Fast-Track Provision does not establish a zero-exposure requirement. *See supra* at 14-15. Even accepting EPA's hypothesis that such zero-exposure PBTs exist, EPA would have to write a new rule that limited eligibility to these zero-exposure PBTs. Thus, EPA's errors are not "merely an error in explanation." *Contra* EPA Br. at 37.

Second, no environmental harm will result from requiring all new PBTs to go through the Standard Review Process and thus no disruption. *See Neighbors*, 2023 WL 3267846 at *3; *contra* EPA Br. at 37. EPA's claim (at 37) that partial vacatur "would fundamentally alter EPA's decades-long process for reviewing exemption applications" is at odds with EPA's contention (at 34) that "EPA rarely (if ever) granted these exemptions for PBT chemicals prior to this regulation." Accordingly, the Court should not credit EPA's claims of disruption.

3.    Partial vacatur is needed to stop the use of the Exemptions as an end-run around the Standard Review Process to secure approval of new PBTs. Industry's comments confirm they use the Exemptions across all sectors of the economy. *Supra* Section V.A. And Petitioners identified dozens of new PBT applications in recent years and established that EPA approves new PBTs under the Exemptions. Doa Decl. ¶¶ 37-42.

36

Allowing continued approval of new PBTs without the safeguards of the Standard Review Process harms Petitioners' members. *See* Petrs. Br. at 55-57. Requiring new PBTs to undergo Standard Review, where they will get more rigorous review, tailored restrictions, and additional testing, is a modest, sensible, and equitable remedy to which Petitioners are entitled under TSCA.

Respectfully submitted this 22nd day of April, 2026.

<u>/s/ *Tosh Sagar*</u>

Tosh Sagar
Earthjustice
1250 I Street NW
4th Floor
Washington, DC 20005
(202) 793-2075
tsagar@earthjustice.org

Michael Youhana
Earthjustice
48 Wall St., 15th Floor
New York, NY 10005
(212) 284-8033
myouhana@earthjustice.org

*Counsel for Alaska Community Action on Toxics*

37

/s/ *Samantha Liskow*
Samantha Liskow
Environmental Defense Fund
257 Park Ave S
New York, NY 10010
(212) 616-1247
sliskow@edf.org

*Counsel for Environmental Defense Fund*

38

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated           .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                    **Date**
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*